1  Hal P. Farley  (State Bar No. 163503)
   The Law Offices of Hal Farley
2  800 South Broadway  Suite 203
   Santa Maria, CA 93454
3  Phone (805) 346-8989
   Fax (805) 346-8955
4  hand@live.com

5  Attorney for Plaintiff
   Patricia Stewart, D.O.

```
FILED
CLERK, U.S. DISTRICT COURT

SEP 16 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY
```

6

7              UNITED STATES DISTRICT COURT

8       CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES

9

10  PATRICIA STEWART, D.O.,            Case No. EDCV13-1670-ODW
                                                 (DTB)
11       Plaintiff,

12       v.                           **COMPLAINT FOR:**

13  AMERICAN ASSOCIATION OF           1. **DECLARATORY RELIEF**
    PHYSICIAN SPECIALISTS, INC.;      2. **INJUNCTIVE RELIEF AND**
14  WILLIAM CARBONE; ANTHONY             **DAMAGES PURSUANT TO**
    DURANTE; DOUGLAS                     **TITLE VII OF THE CIVIL**
15  MARCINIACK; ROBERT CERRATO;          **RIGHTS ACT OF 1964, 42**
    ANTHONY RUSSO; STEPHEN               **U.S.C. § 2000 et seq.**
16  MONTES; JOSEPH GALLAGHER;         3. **VIOLATIONS OF UNRUH**
    BRIAN FEAVER; KEN WALLACE;           **CIVIL RIGHTS ACT,**
17  WILLIAM ANDERSON; THOMAS             **CALIFORNIA CIVIL CODE**
    BALSHI; SUSAN SLOMINSKI;             **§§ 51, 52**
18  SVETLANA RUBAKOVIC; LORI          4. **VIOLATIONS OF**
    HONEYCUTT; ROBERT ILOWITE;           **CALIFORNIA**
19  BART MAGGIO and DOES 1-10            **GOVERNMENT CODE**
                                         **12940(h)**
20       Defendants.                  5. **UNFAIR BUSINESS**
                                         **PRACTICES IN VIOLATION**
21                                       **OF CAL. BUS. & PROF.**
                                         **CODE § 17200 et. seq.**
22                                    6. **BREACH OF FIDUCIARY**
                                         **DUTY**
23                                    7. **DEFAMATION**
                                      8. **INTENTIONAL**
24                                       **INTERFERENCE WITH**
                                         **PROSPECTIVE ECONOMIC**
25                                       **ADVANTAGE**
                                      9. **DECLARATORY RELIEF**
26

27

28

                          1
                      COMPLAINT

1

2       Plaintiff Patricia Stewart, D.O. ("Dr. Stewart" or "Plaintiff") brings this action

3   seeking injunctive relief and monetary damages against defendants American

4   Association of Physician Specialists, Inc. ("AAPS"), et. al., and DOES 1-100, for

5   violations of Plaintiff's rights under Title VII of the Civil Rights Act of 1964,

6   California Civil Code §§ 51, 52, and California Government Code § 12940(h).

7                          **JURISDICTION AND VENUE**

8       1.      This action arises under 42 U.S.C. §2000e-2, et seq. Jurisdiction of this

9   matter is in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

10  Jurisdiction of the supplemental claims in this matter is pursuant to 28 U.S.C. §

11  1367(a) because the State law claims are so related to the Federal claim that they

12  form part of the same case or controversy.

13      2.      This Court is the proper venue for this action pursuant to 28 U.S.C. §

14  1391. Defendant Svetlana Rubakovic resides in Riverside County, California, and a

15  substantial part of the events or omissions giving rise to the claim occurred in Santa

16  Barbara County, California and damaged the Plaintiff's medical practice and

17  employability in Santa Barbara County, California.

18                               **THE PARTIES**

19      3.      Plaintiff Patricia Stewart, D.O. ("Plaintiff" or "Dr. Stewart") is, and at

20  all relevant times mentioned herein was, an individual residing in the State of

21  California, County of Santa Barbara. Dr. Stewart is an active physician licensed by

22  the Osteopathic Medical Board of California, specializing in Dermatology.

23      4.      Plaintiff is informed and believes, and thereon alleges, that defendant

24  American Association of Physician Specialists ("AAPS") is a Florida nonprofit

25  corporation, incorporated under the State of Florida and with its principal place of

26  business in the State of Florida. Plaintiff is informed and believes that AAPS has

27  approximately 2,500 physician members across the United States, including the state

28  of California, and conducts organizational meetings in the state of California.

5.     AAPS, through its affiliated certifying body, the American Board of Physician Specialties ("ABPS"), certifies member physicians in a number of medical specialties. The ABPS is one of only three national medical certifying bodies in the United States, controlling the certification of thousands of physicians across the United States. AAPS certification is recognized by physicians, hospitals, physician employers, State Medical Boards, professional societies and insurance companies across the United States. AAPS certification allows certified physicians to obtain medical practice privileges, medical provider contracts and to legally be employed as certified specialists within the scope of specialty practice in which they have rigorously trained. AAPS certification confers the honors, credibility, rights and privileges of a qualified medical specialist and, consequently, lucrative career opportunities for physicians. Physician recruiters and other employers, seeking board certified physicians, regularly coordinate with certifying bodies such as ABPS in order to recruit highly sought-after physician specialists. The ABPS facilitates this connection through the operation of its Career Center, which is dedicated to placing its certified physicians with recruiters and other employers. The ABPS creates a platform for physician recruiters to post job openings and allows ABPS members to connect with recruiters regarding these openings.

6.     ABPS possesses significant power over a physician member's ability to form employment relationships with third parties and to legally practice medicine within their medical specialty's scope of practice. The AAPS administrative leadership governs over the eligibility, training, testing, certification, regulation and upkeep of a physician member's AAPS specialty certification credentials and the provision of AAPS related professional references. As such, the AAPS has immense control over the AAPS physician member's  employability, employment references and earnings potential.

7.     Within AAPS, there are several subspecialty academies for physicians specializing in different areas of medicine, including Anesthesiology, Disaster

Medicine, Emergency Physicians, Family Practice, Internal Medicine, Orthopedic
Surgery, Radiology, Surgery and Dermatology. The academy for dermatologists,
such as Dr. Stewart, is the American Academy of Specialists in Dermatology
("AASD"). Similarly, within the ABPS, there are boards for certifying physicians
specializing in different areas of medicine. The board which certifies dermatologists,
like Dr. Stewart, is the Board of Certification in Dermatology ("BCD").

8.      Defendant William Carbone ("Carbone") is the CEO of AAPS, and at all
relevant times mentioned herein was, an individual residing either in the State of
Florida, County of Pinellas or in the State of Georgia, County of Fulton.

9.      Defendant Anthony Durante ("Durante") is, and at all times mentioned
herein was a resident of Florida, Hillsborough County. Durante is the Chief Financial
Officer ("CFO") of AAPS.

10.     Defendant Douglas Marciniak ("Marciniak") is, and at all relevant times
mentioned herein was a resident of Benton County, Arkansas. Marciniak is the
current President of AAPS, and sits on its Board of Directors and Executive
Committee.

11.     Defendant Robert Cerrato, D.O., J.D. ("Cerrato") is, and at all relevant
times mentioned herein was, an individual residing in the State of New Jersey,
County of Burlington. Cerrato is the immediate Past-President of AAPS, and sits on
the Board of Directors for AAPS, as well as its Executive Committee and its legal
task force.

12.     Defendant Anthony Russo ("Russo") is, and at all relevant times
mentioned herein was an individual residing in the State of New York, County of
Rockland. Russo was the President of AAPS prior to Cerrato.

13.     Defendant Stephen Montes ("Montes") is, and at all relevant times
mentioned herein was an individual residing in the State of Michigan, County of
Muskegon. Montes is a member of AAPS' Board of Directors, the chair of the
continuing medical education committee, a member of the disciplinary committee

1  and the legal task force, and the treasurer for AAPS' Political Action Committee
2  ("PAC").

3      14.   Defendant Joseph Gallagher ("Gallagher") is, and at all relevant times
4  mentioned herein was an individual residing in the State of Pennsylvania.  Gallagher
5  is a member of AAPS' Board of Directors and its Legal Task Force.

6      15.   Defendant Brian Feaver ("Feaver") is, and at all relevant times
7  mentioned herein was an individual residing in Brazoria County, Texas.  Feaver was
8  a member of AAPS' Board of Directors.

9      16.   Defendant Ken Wallace ("Wallace") is, and at all relevant times
10 mentioned herein was an individual residing in the State of Florida, County of Lake.
11 Wallace is a member of AAPS Board of Directors, and at relevant times mentioned
12 herein a member of AAPS' disciplinary committee.

13     17.   Defendant William Anderson ("Anderson") is, and at all relevant times
14 mentioned herein was a dermatologist residing in Bullhead City, Arizona.  Anderson
15 is a member of AAPS and is the immediate past President of AASD.

16     18.   Defendant Thomas Balshi ("Balshi") is, and at all relevant times
17 mentioned herein was a dermatologist residing in Palm Beach County, Florida.
18 Balshi is a member of AAPS, and at at times relevant herein Balshi was a Governor
19 of AASD.

20     19.   Defendant Susan Slominski ("Slominski") is, and at all relevant times
21 mentioned herein was a dermatologist residing in the State of Nevada, County of
22 Yuma.  Slominski is a member of AAPS, and at relevant times mentioned herein was
23 the Vice President of the AASD.

24     20.   Defendant Svetlana Rubakovic ("Rubakovic") is, and at all relevant
25 times mentioned herein was, a dermatologist residing in the State of California,
26 County of Riverside.  Rubakovic is a member of AAPS, is the current President of
27 AASD, and at relevant times mentioned herein was the Secretary of AASD.

28

21.    Defendant Lori Honeycutt ("Honeycutt") is, and at all relevant times mentioned herein was, an dermatologist residing in Travis County, Texas.  Honeycutt is a member of AAPS, and at relevant times mentioned herein was a governor of AASD.

22.    Defendant Robert Ilowite ("Ilowite") is, and at relevant times mentioned herein was a dermatologist residing in Somerset County, New Jersey.  Ilowite is a member of AAPS, and at relevant times mentioned herein was a governor of AASD.

23.    Defendant Bart Maggio ("Maggio") is, and at relevant times mentioned herein was a resident of Bergen County, New Jersey.  Maggio is a member of AAPS, and at relevant times herein was a member of AAPS' Legal Task Force and its Disciplinary Committee.

24.    The true names and capacities of the defendants sued herein as DOES are unknown to Plaintiff at this time, and Plaintiff therefore sues such defendants by such fictitious names.  Plaintiff is informed and believes that the DOES are those individuals, corporations and/or businesses or other entities that are also in some fashion legally responsible for the actions, events and circumstances complained of herein, and may be financially responsible to Plaintiff, as alleged herein.  The Complaint will be amended to allege the DOES' true names and capacities when they have been ascertained.

25.    Defendants Rubakovic, Anderson, Slominski, Honeycutt, Wallace and Balshi were officers of AASD and will collectively be referred to as the "AASD Defendants."

26.    Defendants Montes, Wallace and Maggio will collectively be referred to as the "Disciplinary Committee."

27.    Gallagher, Cerrato, Montes and Maggio will collectively be referred to as the "Legal Task Force."

28.    AAPS, Carbone, Durante, Marciniack, Cerrato, Russo, Montes, Gallagher, Feaver and the AASD Defendants will collectively be referred to herein as

1   "Defendants."

2   ## GENERAL ALLEGATIONS

3   *Dr. Stewart's Right to Sue*

4   29.    On June 17, 2013, the Equal Employment Opportunity Commission

5   ("EEOC") sent Dr. Stewart a letter certifying her right to sue AAPS for violations of

6   Title VII of the Civil Rights Act of 1964. A true and accurate copy of Dr. Stewart's

7   right to sue letter has been attached as **EXHIBIT A**.

8   *AAPS' Historical Pattern of Discrimination and Retaliation*

9   30.    In order to become board certified dermatologist through AAPS/ABPS,

10   it is first necessary to complete the educational prerequisites and an AAPS-approved

11   training program. Once these prerequisites are completed, a candidate must pass the

12   dermatology certification exam, which is prepared by the BCD on behalf of the

13   AAPS/ABPS and is offered once per year. Once an AAPS member passes the

14   dermatology certification exam, s/he attains eligibility to become a "diplomate"

15   member of AAPS and AASD.

16   31.    In 1998 and 1999, although she had completed the required education

17   and training, AAPS prevented Dr. Stewart from sitting for the dermatology board

18   certification exam administered by BCD (the "Exam"). AAPS accomplished this by

19   applying a disparate standard to Dr. Stewart, refusing to recognize Dr. Stewart's

20   participation in AAPS' training program, because she had filed a charge of

21   discrimination against her AAPS trainers for sexual harassment and hostile workplace

22   environment.

23   32.    In fact, AAPS' CEO Carbone and the members of the BCD had personal

24   knowledge that AAPS' dermatology trainers were, as a matter of custom, using the

25   authority granted by AAPS as leverage to attempt to pressure their female residents to

26   submit to their sexual advances. Carbone, the AAPS trainers, and the members of the

27   BCD were complicit in a scheme to enable the trainers to abuse their authority.

28   AAPS and Carbone participated in this scheme by preventing Dr. Stewart from sitting

1  for the dermatology certification exam, and by refusing to credit the case studies and

2  training that Dr. Stewart had received through their program.

3      33.    After being prevented from sitting for the July 25-26, 1998 exam, Dr.

4  Stewart filed a charge of discrimination against AAPS with the EEOC, stating that

5  there was no non-discriminatory reason for AAPS' refusal to recognize Dr. Stewart's

6  training or case studies. Other similarly situated candidates, such as Drs. William

7  Anderson, Jeffrey Weiss and others who had completed the substantially similar

8  education and training were allowed to sit for the dermatology certification exam.

9  The reason for imposing these requirements on Dr. Stewart was to retaliate against

10  her for filing a charge of discrimination against her AAPS-trainers and for seeking a

11  remedy for the hostile working environment which she experienced under the

12  supervision of her AAPS trainers.

13      34.    After limiting Dr. Stewart's options of career choices in her chosen

14  field for two years, AAPS agreed to allow Dr. Stewart to sit for the dermatology

15  certification exam in January, 2000. However, when she sat for this exam the first

16  time, Dr. Stewart learned that the questions on the exam were not representative of

17  the material that was taught in dermatology training . She learned from Defendant

18  Anderson, who was also sitting for that exam, that his AAPS trainer had told him to

19  study the continuing medical education questions contained in blue journals that were

20  published prior to 1984. The blue journals articles chosen covered very obscure

21  research topics which were not relevant to the ordinary practice of dermatology.

22      35.    After the exam, Dr. Stewart went to the library and studied the blue

23  journals, discovering that every single question on the dermatology certification exam

24  had been plagiarized from questions contained at the end of continuing medical

25  education articles within those journals published prior to 1984.

26      36.    Dr. Stewart contacted AAPS CEO Carbone, who asked Dr. Stewart to

27  keep this information confidential, and promised to take steps to meaningfully reform

28  the dermatology certification exam to make it fair.

37.     In 2001, when Dr. Stewart re-took the dermatology certification exam, it consisted entirely of the exact same questions which had been plagiarized from blue journals prior to 1984. Dr. Stewart notified AAPS' Certification Manager, Marjorie Paulk, who confirmed that the items on the exam had been plagiarized, and wrote to thank Dr. Stewart for her "efforts to expose unfairness among us." A true and accurate copy of Marjorie Paulk's letter has been attached as **EXHIBIT B**.

38.     Because the members of BCD had plagiarized the questions on the dermatology certification exam, and had used their control over access to study materials to assist AAPS trainers to discriminate against applicants on the basis of their gender, their race, or the religious beliefs that they expressed, and to retaliate against women who opposed this discrimination, AAPS' Board of Directors took disciplinary action in 2001, suspending the BCD. True and accurate copies of the letter notifying AASD and BCD of the disciplinary action have been attached as **EXHIBIT C**.

39.     As a consequence of the disciplinary action, AASD was no longer able to maintain itself as a standalone academy, and had to be absorbed into the academy of internal medicine. Dermatologists within AAPS who had benefitted from receiving advance knowledge of the items on the dermatology certification exam made defamatory statements about Dr. Stewart, ostracized her and yelled at her during organizational meetings. During this time period, Defendant Ilowite presided over a meeting in which he and other members of AASD had pre-selected the officers of the academy prior to the meeting outside in the hall. When another AAPS diplomate attempted to nominate Dr. Stewart for an academy office, Ilowite prevented Dr. Stewart from being considered for that office by misrepresenting that the bylaws prevented her from running for office until she had been a diplomate for five years. Ilowite fabricated this five year requirement in order to prevent Dr. Stewart from occupying an academy office. This action was taken in order to discriminate against Dr. Stewart due to her gender, and to retaliate against Dr.

1  Stewart for opposing the policies which had allowed AAPS trainees to be sexually

2  harassed and coerced by their trainers. **EXHIBIT D** is a true and accurate copy of a

3  letter documenting the foregoing allegations.

4       40.   In the first quarter of 2002, there were four residents who had qualified

5  to take the dermatology certification examination, but AAPS was unable to allow

6  them to sit for the exam since the BCD had not written a fair exam. AAPS'

7  President, Jerry Majers created a task force whose goal was to provide dermatology

8  candidates with an opportunity to attain board certification in Dermatology, and

9  asked Dr. Stewart to assist AAPS to create a new dermatology certification

10  examination. **EXHIBIT E** is a true and accurate copy of Jerry Majers' letter to Dr.

11  Stewart soliciting her assistance with this endeavor. During 2002, Dr. Stewart

12  organized a team of dermatologists who wrote and administered a new dermatology

13  certification exam in January 2003. As a result of her accomplishments and service

14  of the organization, AAPS recognized Dr. Stewart as its "Physician of the Year" in

15  2003.

16       41.   One of the applicants for the January 2003 exam was a physician named

17  L----- M--. Carbone did not like L---- M--, because she is a woman, and because she

18  is Asian. As a result of his prejudice, Carbone decided to retroactively flunk her,

19  although she had passed the exam. Carbone hired a new director of certification,

20  Stanley Kalisch, and instructed him to come up with a justification to flunk L----

21  M--. Thereafter, Carbone convened a meeting of the board on April 23, 2003, and

22  proceeded to supply the board with misinformation in order to elicit their approval of

23  his decision to retroactively flunk L---- M--. See **EXHIBIT F**, containing original

24  and modified copies of minutes which Carbone falsified to inaccurately depict the

25  events that occurred during the April 23, 2003 meeting. Note that Carbone, in

26  addition to retroactively modifying the test results to flunk Dr. M--, also retroactively

27  modified the minutes of the meeting to falsely state that "the Board directed [Dr.

28  Stewart] not to communicate with Dr. M-- on the subject of the examination results

1  and the Board's action."

2      42.  On or about April 28, 2003, Kalisch notified Dr. M--, via a letter which

3  has been attached as **EXHIBIT G**, that she had not passed the exam. Kalisch's letter

4  contained a representations to Dr. M-- that her "identity had not been divulged to the

5  board," which cannot be reconciled with the minutes of the April 23, 2003 meeting,

6  as modified by Carbone(See **EXHIBIT F**), which contained references to resolutions

7  that (which the board never made) to the effect that "Dr. Kalish is to write a letter to

8  Dr. M--, advising her of the Board's action" and "in response to Dr. Stewart's

9  question regarding what explanation she should give to the candidate regarding the

10  Board's action, the Board directed her not to communicate with Dr. M-- on the

11  subject of the examination results and the Board's action." Kalisch's letter to Dr. M--

12  contained an apology for the fact that she had been "inappropriately contacted by a

13  Board member and incorrectly advised that you passed." (See **EXHIBIT G**).

14      43.  According to Dr. Thomas Castillo ("Castillo"), a past president of

15  AAPS, a former Director of Certification for AAPS, Cassandra Newby ("Newby"),

16  has provided information that sheds light on Carbone's practice of modifying AAPS'

17  business records. Paragraph 77 of Castillo's amended complaint, **EXHIBIT H**,

18  relates that AAPS was placed on probation by the American Committee on

19  Continuing Medical Education ("ACCME") because "either Carbone alone, or

20  Carbone with the assistance of Esther Berg, destroyed the documents" necessary to

21  meet the accreditation standards. Paragraph 77 also states that "Newby also informed

22  Castillo of an episode where Carbone had gone into the secure storage room where

23  the examinations were kept and had literally trashed the room in a rampage." The

24  event which Newby related to Dr. Castillo may have been the event referenced in

25  paragraph 29 of her complaint, **EXHIBIT I**, which refers to an incident in March

26  2008 when "Carbone began yelling and wildly gesturing in such a way that he

27  appeared to have lost personal control."

28      44.  Stewart and Dr. Bill Radentz both wrote letters to Defendant Carbone,

which have been attached as **EXHIBIT J**, protesting the disparate treatment of M--, the falsification of meeting minutes, and the manipulation of the results of the board examination which they had created for AAPS.

45.    Defendant Carbone retaliated against Dr. Stewart for opposing his attempt at the disparate treatment of Dr. M-- by presenting trumped up disciplinary charges against Dr. Stewart to AAPS' Board of Directors containing the allegation that she had inappropriately contacted Dr. M-- and advised that her that she passed. In reality, Carbone had not only authorized Dr. Stewart to notify the successful candidates that they had passed the exam, he had also personally invited them to participate in writing items for the upcoming exams. When Dr. Stewart revealed to the Board of Directors that Carbone had done this, pointing out that the successful applicants could not have been invited to write items for the exam unless they had successfully passed the exam, the Board dismissed the disciplinary charges which Carbone had attempted to initiate against Dr. Stewart.

Recent Events

46.    Recently, a series of events have transpired which have given rise to Dr. Stewart's charge of discrimination. These events include the following:

AAPS Officers and Directors Distributed Pornographic, Racist, Sexist and anti-Semitic Emails At Work

47.    AAPS' CEO, Carbone, sent a variety of inappropriate materials to co-workers using his AAPS email account. These inappropriate materials included, without limitation, the following:

a) An email with the subject "Cheers XXXX," containing a 1 minute and 57 second video depicting group sex, which was sent by Carbone to a co-worker on April 3, 2009 at 9:34 a.m.

b) An email with the subject "Twister damage in Florida----not for the faint of heart!" containing photographs of naked girls playing twister (Carbone has admitted that it did not concern him that these girls appeared to be under the age of 18), which was sent by Carbone to a co-worker on February 18, 2009 at 9:11 a.m.

c) An email with the subject "Some New and Old Motivational Posters" containing a photograph of a young girl with the camera focused on her cleavage accompanied by the caption "Jailbait: Because the best things in life are illegal," and also a photograph of a girl in a miniskirt walking through the locker hall in a high school accompanied by the caption "every male teacher that day contemplated the consequences" (implying that high school students are sexually desirable, and that the sexual interest by their male teachers is so widespread as to be socially accepted), which was sent from Feaver to Carbone on November 9, 2009 at 9:57 a.m., and forwarded by Carbone to a co-worker on the same day at 1:50 p.m.

e) An email with the subject "Under arm thermometer" containing a video of a woman exposing her breasts in a supermarket in the proximity of children, which was sent by Carbone to a co-worker on December 16, 2009 at 12:28 p.m.

f) An email with the subject "I'll bet this guy never misses a day at work....." containing a series of photographs of a completely nude woman walking around in public areas (sidewalks, parks—again in the proximity of children), which was sent to Carbone on February 20, 2009 at 10:38 a.m. by Feaver to Carbone, and forwarded by Carbone to a co-worker on the same day at 10:48 a.m.

g) An email with the subject "Lesson on Towel Heads" containing a racist and sexist set of photographs indicating that Arabs who wear towels on their heads are "bad," whereas naked women who wear towels on their heads are "good," which was sent from a Feaver to Carbone on June 9, 2009 at 3:24 p.m. and forwarded by Carbone to a co-worker on the same day at 3:34 p.m.

h) An email with the subject "Here's your Christmas treeXX" containing a photograph of a naked woman posing on a hospital bed as an object of sexual interest, which was sent from Feaver to Carbone on December 3, 2009 at 2:57 p.m. and forwarded by Carbone to a co-worker on the same day at 3:17 p.m.

i) An email with the subject "the Irishman in NY" containing a joke in which the punchline was a crack made by an Irish man about how a black man had just fallen to his death after jumping from a burning building, which was sent from Gallagher to Carbone on November 12, 2009 at 2:53 p.m. and forwarded by Carbone

to a co-worker on the same day at 2:57 p.m.

j) An email with the subject "Cowboys and ?????" containing another joke in which the punchline was a crack by a cowboy about genocide of Muslims, which was sent from Gallagher to Carbone on September 4, 2009 at 3:52 p.m. and forwarded by Carbone to a co-worker on the same day at 3:58 p.m.

48.     Copies of the emails described in paragraphs above, with the pornographic portions redacted, have been attached as **EXHIBIT K**. Carbone has admitted to circulating each of the foregoing from his AAPS work email.

The Federal Elections Commission Investigated and Convicted AAPS, Its PAC and its Treasurer, Stephen Montes, of Mishandling Non-Profit Funds

49.     Between July 9, 2010 and May 12, 2011, AAPS was investigated for violations of the Federal Election Campaign Act of 1971 by the FEC in MUR 6326. On February 1, 2011, the FEC decided by a vote of 6-0 to find reason to believe that AAPS, AAPS's PAC, Montes and Carbone violated 2 U.S.C. § 441b(a), and to find reason to believe that AAPS' PAC and Montes violated 2 U.S.C. § 434(b). On May 17, 2011, AAPS, its PAC, and Montes entered into a conciliation agreement with the FEC, in which AAPS agreed that it had violated 2 U.S.C. § 441b(a) by making a prohibited corporate contribution; Montes and AAPS' PAC agreed that they had violated 2 U.S.C. § 441b(a) by accepting a prohibited corporate contribution, and AAPS' PAC and Montes also agreed that they had violated 2 U.S.C. § 434(b) by failing to disclose $21,300 in receipts and disbursements. On May 12, 2011 the FEC decided by a vote of 6-0 to accept the conciliation agreement and close the file. See **EXHIBIT L**.

AAPS' Board of Directors Avoided a Forensic Audit By Misrepresenting to the Members that there had Never Been Any Allegations of Illegal Financial Activities

50.     Notwithstanding that AAPS, its PAC and AAPS' treasurer Montes had been convicted of making and receiving illegal corporate contributions and failing to disclose $21,300 in receipts and disbursements, on June 24, 2011, AAPS' Board of Directors sent out a mass email to the entire membership of AAPS in response to the

1  fact that a past president of AAPS, Dr. Tom Castillo had called for a forensic audit.

2  The Board of Directors stated as follows: "A Forensic Audit for the most part is only

3  undertaken in situations where there is alleged violation of some law. There have

4  never been any allegations of illegal financial activities by AAPS personnel or AAPS

5  as a whole." The Board of Directors claimed that because there had never been any

6  allegations of illegal financial activities that Dr. Castillo's request for a forensic audit

7  was "irrelevant." See **EXHIBIT M**.

8  <u>AAPS Was Put on Probation By the Council that Certifies AAPS to Provide
Continuing Medical Education Credits to Physicians</u>

9  51.    On or about December 17, 2009, AAPS was placed on probation status

10  by the ACCME—which is one step away from non-accreditation status, which would

11  result in a revocation of AAPS' ability to issue CME credits to physicians. Among

12  the effects of AAPS' probationary status was that AAPS was no longer eligible to

13  jointly sponsor CME activities with non-accredited providers. Carbone and Montes

14  concealed the fact that AAPS had been placed on probation by the ACCME from

15  members of the CME committee, and the Executive Committee sent out mass emails

16  on September 24, 2010 and June 24, 2011 to the entire membership of AAPS

17  containing material misrepresentations concerning the ACCME probation problem.

18  <u>Cassandra Newby Sued AAPS and its CEO Carbone for Discrimination and
Creating a Hostile Workplace Environment</u>

19

20  52.    On April 7, 2011, AAPS' Director of Certification Cassandra Newby

21  ("Newby") filed a Complaint in Case No. 11-04381 in the Thirteenth Judicial Circuit

22  of Hillsborough County, Florida alleging civil rights violations in the form of age, sex

23  and disability discrimination in violation of the Florida Civil Rights Act of 1992,

24  Chapter 760, Florida Statutes (2007) and for the torts of negligent retention,

25  intentional infliction of emotional distress, assault, battery and defamation against

26  AAPS and Carbone. Newby's Complaint contained inflammatory allegations in

27  paragraph 22 that Carbone exposed Newby to "pornographic and racially biased

28  pictorial emails placed on AAPS' shared drive," including "pictures of women with

1  large bare breasts and women with their genitals exposed," an allegation which

2  Carbone admitted on p. 183:10-15 of his deposition taken in Case No. 11-004947 .

3  Newby's Complaint also alleged in paragraph 23 that Carbone's ageist and sexist

4  behavior toward Newby was severe and pervasive, and that Carbone's conduct

5  "created an abusive working environment" that made it "nearly impossible" for

6  Newby to work. See **EXHIBIT I**.

7      53.     On May 3, 2011, the case was settled for an undisclosed amount after the

8  Executive Committee authorized AAPS' attorneys to pay up to $35,000 to settle the

9  lawsuit. See **EXHIBIT H**, at paragraph 81.

10     *Drs. Castillo, Geller and Klein Called for an Investigation of AAPS' Executive*
    Leaders Responsible for the Lawsuits

11     54.     The concerns regarding the Carbone's civil rights violations and hostile

12 workplace, the ACCME's placement of AAPS on probationary status, the financial

13 improprieties resulting in AAPS' conviction of violations of the Federal Election

14 Campaign Act of 1971, the ongoing pattern of emails containing misrepresentations

15 to the entire membership from AAPS' Board of Directors and Executive Committee,

16 and the distribution of pornographic, sexist, racist and anti-Semitic emails from

17 Carbone to co-workers prompted several physicians to desire to investigate these

18 matters. See **EXHIBIT H**, at paragraphs 41, 48, 51, 60, 82-87.

19     AAPS Solicited a Hacker to Violate the Computer Fraud and Abuse Act of
20     1968 By Gaining Unauthorized Access to *a Whistleblower's Personal Email*
    Accounts, Downloading and Destroying Material Evidence of Wrongdoing

21     55.     On or about August 26-27, September 9-10 and September 15-17 of

22 2010, an individual operating cooperating with Defendant Durante, (AAPS' CFO)

23 hacked into the personal email account of AAPS' former director of governmental

24 affairs, who had become the whistleblower responsible for making the FEC

25 complaint that resulted in AAPS' conviction of violating 2 U.S.C. § 441b(a) in MUR

26 6326. The hacker, in violation of 18 U.S.C. § 1030 (the "Computer Fraud and Abuse

27 Act"), obtained access to the whistleblower's confidential emails, deleted several

28 emails containing evidence that Counter-Plaintiffs had participated in unethical

1    and/or criminal activities, and forwarded copies of the whistleblower's confidential

2    communications to Counter-Plaintiff Durante. See **EXHIBIT H**, at paragraphs 88-

3    92.

4    <u>AAPS Used the Illegally Obtained Information As Evidence to Suspend Drs.
     *Castillo, Geller and Klein's Memberships Without Due Pro*cess And All</u>

5    <u>Members Were Ordered Not to Have Any Contact with Them</u>

6        56.     Durante took the information—which had been illegally obtained in

7    violation of the Computer Fraud and Abuse Act—and showed it to the Executive

8    Committee. The executive committee, relying upon hacked emails obtained from the

9    whistleblower's private communications with third parties, acted in violation of

10   AAPS Bylaw 3.05 and Fla. Stat. § 617.0607 to suspend Drs. Castillo, Geller and

11   Klein's membership in AAPS without according them notice or an opportunity to

12   present evidence in their defense, via a sham process that was unfair, unreasonable

13   process and not carried out in good faith (See **EXHIBIT H**, at paragraphs 93-119).

14   Shortly after suspending these physician leaders of AAPS, the Executive Committee

15   banned these physicians from attending any AAPS functions or speaking with anyone

16   in the organization by sending out mass emails notifying members of the organization

17   that they were not to have any contact with the suspended physicians.

18   <u>AAPS Sought to Make Fundamental Changes to Its Corporate Structure to
     Justify the Suspensions of Drs. Geller, Klein and Castillo, and to Enable Them</u>

19   <u>to Continue Suspending Physicians Who Opposed Their Political Agenda</u>

20       57.     After the Florida Court made the foregoing determinations on November

21   2, 2011, the Executive Committee and AAPS' Board of Directors pressured the

22   House of Delegates to pass amendments to sections 3.05 and 3.06 of AAPS' Bylaws

23   which would have permitted the ultra vires disciplinary actions previously taken by

24   the Executive Committee, by (among other things) modifying Bylaw 3.05 to take

25   away the exclusive right to make disciplinary decisions away from the Board of

26   Directors and vesting authority in the Executive Committee, and also by removing

27   the requirements in Bylaw 3.05 of 30-days written notice and an opportunity to

28   present evidence in one's defense. Elections to ratify these proposed Bylaw changes

1    were initially scheduled on June 25, 2011, during the meeting of the House of

2    Delegates in Tyson's Corner, Virginia.  See **EXHIBIT N**.

3         58.    At this meeting, Dr. Stewart handed out copies of a document which had

4    been prepared by her husband, Dr. William Okerblom, which was titled Preliminary

5    Legal Opinion Regarding the Likely Effects of the Suspension of Drs. Castillo, Geller

6    and Klein Upon the Board-Certifying and Non-Profit Status of the AAPS, which has

7    been attached as **EXHIBIT O**.  This document prompted considerable debate, which

8    resulted in the proposed amendments to AAPS' Bylaw 3.05 being withdrawn.

9         59.    Shortly thereafter, a conference call of the House of Delegates was

10   scheduled for December 19, 2011.  The purpose of this conference call was to vote

11   upon the proposed amendment to Bylaw 3.05.  On December 18, 2011, Dr. Okerblom

12   sent a letter, which has been attached as **EXHIBIT P**, to each member of the House

13   of Delegates notifying them that the proposed amendments would enable members of

14   the executive committee to breach their fiduciary duties to the membership.  This

15   letter prompted another discussion which resulted in the withdrawal of the proposed

16   amendment to AAPS Bylaw 3.05.

17        60.    On January 10, 2012, AASD officers met via a conference call to discuss

18   academy business.  During this conference call, Dr. Stewart, who at the time was a

19   Governor of AASD, was nominated by her constituents to run for three elected

20   offices:  1) As representative of the academy to AAPS' Board of Directors, 2) As

21   one of the delegates to the House of Delegates, and 3) As Governor of her academy.

22   Dr. Stewart moved to immediately reinstate Drs. Geller, Klein and Castillo.  Dr.

23   Leslie Radentz ("Dr. Radentz") seconded Dr. Stewart's motion, and during the

24   debate, Defendants Wallace, Ilowite, and Anderson began yelling at their opponents,

25   and the motion was defeated.

26        61.    Shortly thereafter, AAPS filed a meritless defamation lawsuit against

27   Drs. Stewart and Okerblom in the Thirteenth Judicial Circuit for Hillsborough

28   County, Florida in Case No. 11-004947, alleging that Dr. Stewart was part of a

1   conspiracy to destroy AAPS, and that the publications written by Dr. Okerblom were

2   defamatory. The purpose of this lawsuit was to punish Dr. Stewart for exercising her

3   constitutional right to free speech and to retaliate against her for opposing

4   discrimination within AAPS. After the trial court acknowledged that there was no

5   basis under Florida's long arm statute to exercise personal jurisdiction over Dr.

6   Stewart, and that she had no minimal contacts with Florida, AAPS appealed to

7   Florida's Second Disctrict Court of Appeals in Case No. 2d13-958.

8       62.   A series of adverse employment actions followed. On or about March

9   26, 2012, Defendant Marciniak sent a letter to Dr. Stewart on behalf of AAPS' Board

10  of Directors, which has been attached as **EXHIBIT Q**, notifying her that she had

11  been removed from her elected position and was precluded from serving as an elected

12  officer of her academy. The pretext given for this adverse action was that Dr. Stewart

13  had failed to sign and submit a nondisclosure form by February 10, 2012 deadline.

14  Dr. Stewart's failure to meet AAPS' deadline resulted from the fact that she did not

15  receive the letter notifying her of the deadline's existence until well after the deadline

16  had passed because AAPS underpaid the required postage by $1.35, and the post

17  office withheld delivery of the letter. Although Dr. Stewart wrote a letter to the

18  board, which has been attached as **EXHIBIT R**, in which she explained the

19  circumstances and attached documentation from the post office verifying that it was

20  AAPS' fault that she did not receive timely notice of the deadline, eliminating the

21  board's ostensible pretext for the adverse action the Board took against her, the

22  adverse action remained in effect.

23      63.   The next adverse action occurred two days later, on March 28, 2012,

24  when Defendants Montes, Cerrato, Maggio and Gallagher sent out an email, which

25  has been attached as **EXHIBIT S**, to the entire AAPS membership falsely accusing

26  Dr. Stewart of playing an "active role" in a "campaign to destroy AAPS."

27      64.   The next adverse action occurred on May 30, 2012, when Carbone and

28  Cerrato induced the officers of Dr. Stewart's academy—Defendants Slominski,

1  Rubakovic, Balshi, Honeycutt, Ilowite and Wallace to send out a mass email to all

2  members of Dr. Stewart's academy falsely stating that Dr. Stewart had decided to

3  "challenge the bylaws of the AAPS, to challenge the actions of the Board of Directors

4  of the AAPS, and to challenge the actions of the President of this academy." A copy

5  of this defamatory communication (hereafter referred to as the "Defamatory Letter")

6  has been attached as **EXHIBIT T**.

7      65.   Later that week, Defendant Slominski sent an email, which has been

8  attached as **EXHIBIT U**, in which she admitted that although she privately approved

9  of Dr. Stewart's actions that she publicly criticized, that the AASD officers had been

10  blackmailed into defaming Dr. Stewart by the "higher eschelons" of AAPS who had

11  required the AASD board to send out mass communications defaming Dr. Stewart as

12  a condition of allowing the dermatology academy to move forward with its

13  fellowship "training program." Slominski stated that the reason she had issued the

14  communication was because without the training program, "our Academy will die."

15      66.   On May 30, 2012, Cerrato and members of the Disciplinary Committee

16  used the Defamatory Letter as a pretext to terminate Dr. Stewart's membership in

17  AAPS for "conduct injurious to, and not in the best interests of AAPS." According to

18  the letter which has been attached as **EXHIBIT V**, The Board of Directors voted

19  unanimously to terminate Dr. Stewart's membership without ever notifying her of the

20  meeting or providing her with an opportunity to present evidence in her defense.

21      67.   The only hearing at which the Board of Directors offered to permit Dr.

22  Stewart to present evidence in her defense was a special meeting in Tampa, Florida

23  scheduled for June 9, 2012 (See **EXHIBIT W**)—after the Board had already voted to

24  terminate Dr. Stewart's membership in AAPS. Dr. Stewart, not knowing that she had

25  already been terminated, asked  for, and was refused, to attend the meeting

26  telephonically to present evidence in her defense, as she is permitted to do by AAPS

27  Bylaw 3.05. Dr. Stewart later discovered that the purpose of this meeting was to

28  require her to come to Florida and waive personal jurisdiction by allowing herself to

1   be personally served with a frivolous Counter-Complaint in which AAPS had

2   accused her of defamation, abuse of process, conspiracy and injurious falsehood.

3       68.    AAPS and the individual members of its Board of Directors

4   demonstrated a complete absence of good faith during the disciplinary process.

5   AAPS ignored Dr. Stewart's May 24, 2012 request for copies of the documentary

6   evidence and witness statements to support the accusations. On June 21, 2012,

7   Defendant Marciniack told Dr. Stewart's lawyer to "shut up" in reply to counsel's e-

8   mail to the Board of Directors notifying them that there were not 30 days between

9   May 8 and May 30, and that Bylaw 3.05 required AAPS to provide me with 30 days

10   notice, indicating that due process violations had occurred.

11       69.    On June 25, 2012, Cerrato prevented Dr. Stewart from attending the

12   annual scientific meeting which she had already paid for, and the entire Board of

13   Directors, although present at the meeting, refused to allow Dr. Stewart to present

14   evidence in her defense to show that she had not engaged in "conduct injurious to,

15   and not in the best interests of AAPS."

16       70.    Slominski was outside the hall prior to the House of Delegates meeting.

17   Drs. Stewart and Radentz asked Slominski why she signed the Defamatory Letter?

18   "You don't agree with our agenda? What Agenda don't you agree with?" Slominski

19   said "I don't know." Drs. Stewart again asked "why did you sign that letter?"

20   Slominski said because the AASD officers were told by Cerrato that if they didn't,

21   that the academy couldn't have its dermatology fellowship. The dermatology

22   fellowship is a training program which would have enabled physicians similarly

23   situated to Slominski to pay residents minimal wages to work at their offices and see

24   their patients, in exchange for a certificate that says they've fulfilled their

25   requirements for their fellowship. Dr. Stewart told Slominski that they were going to

26   use the Defamatory Letter against her, and Slominski said "I didn't know that, I'm so

27   sorry."

28       71.    During the open meeting of the House of Delegates attended by virtually

1    every AAPS member at the annual meeting, Ratner, Cerrato and Carbone made a

2    presentation to the entire membership during which they falsely informed the

3    membership that Dr. Stewart had authored and published a blog on the internet

4    containing a variety of statements which were falsely imputed to Dr. Stewart in order

5    to harm her good reputation within the organization and subject her to humiliation,

6    shame and hatred. A copy of the slides that were presented to the entire membership

7    is attached as **EXHIBIT X**.

8         72.    After meeting of the House of Delegates, Dr. Atwood Rice, a former

9    AAPS board member, who had been terminated from the board one month earlier

10    because he had questioned the conduct of the executive leadership, and had requested

11    that copies of the financial records of the organization be made available for

12    inspection by the members of his academy, came out and approached Dr. Stewart and

13    said "I didn't know you had a blog site Patty." Dr. Stewart replied "I don't." Former

14    AAPS President, Dr. Castillo, who had been suspended from AAPS for calling for an

15    investigation of alleged executive leadership misconduct, and had been reinstated by

16    the Florida courts,   came out and said "Patty, you did all those letters and a blog site?

17    They said that you posted a letter saying money is the root of all evil." Lots of people

18    came out, very angry with Dr. Stewart, some of them asked her "how could you do

19    something like that?" A staff member said that she "could not afford to be seen with

20    Dr. Stewart  because it could jeopardize her job." Other physicians , who had been

21    friendly with Dr. Stewart before, walked by Dr. Stewart after coming out of the

22    meeting where the slides had been shown and gave Dr. Stewart  looks of utter

23    disgust. Several doctors, who had been in various leadership positions within the

24    organization over a period of many years, asked Dr. Stewart questions, and said that

25    "Things like this have been going on for a long time. These guys have a long history

26    of hurting people, causing people to quit and leave the organization." A few wanted

27    to know what was behind the termination.

28         73.    Dr. Stewart encountered Defendant Montes and asked, "why are they

1    doing this to me? Why did they terminate me when I didn't do anything?" Montes
2    replied "because you can't control your husband." Dr. Stewart asked Montes how
3    she was supposed to control her husband when there were doctors all over the country
4    calling him and asking for his help.  Montes again told Dr. Stewart that "you need to
5    control your husband" then he looked at Dr. Stewart again and said "you need to
6    control your husband" then he shook his head and said "you need to control your
7    husband" again.   Then he asked Dr. Stewart "why don't you appeal it?" Dr. Stewart
8    told him that she didn't believe it would be a fair hearing.  Montes told Dr. Stewart
9    that she needed to appeal it.  Dr. Okerblom arrived and told Montes "that those aren't
10   her blogs, you know that those weren't her emails, why did you accuse her of sending
11   those emails?" Montes hastily walked away.

12        74.    AAPS and the individual members of its Board of Directors
13   subsequently ignored Dr. Stewart's June 30, 2012 letter asking why she had been
14   terminated containing inquiries regarding the effect of termination on her board
15   certification.

16        75.    In reply to Dr. Stewart's July 2, 2012 email requesting the minutes of the
17   meeting at which the Board of Directors had voted to terminate her membership in
18   AAPS, Defendant Montes informed Dr. Stewart that she would have to contact
19   AAPS' attorney for this information and that Dr. Stewart "knew the protocols."

20        76.    Dr. Stewart replied on July 3, 2012 asking what protocols, and who she
21   was supposed to contact to appeal her termination? Dr. Stewart never received a
22   reply.

23        77.    The Board also ignored Dr. Stewart's July 13, 2012 request for
24   indemnity pursuant to AAPS Bylaw 15.02.

### FIRST CLAIM FOR RELIEF

### (Declaratory Relief)

### Count One

### (To Set Aside and Render Void Disciplinary Actions Made in Violation of AAPS

1          **Bylaw 3.05 – against all defendants)**

2          78.     Pursuant to 28 U.S.C. § 2201(a), Plaintiff seeks a declaration from this

3    Court concerning her status in relation to AAPS and the effect of AAPS' violation of

4    her procedural rights under AAPS Bylaw § 3.05. A true and accurate copy of AAPS'

5    Bylaws has been attached to this Complaint as **EXHIBIT Y**.

6          79.     AAPS Bylaw 3.05(a) – Discipline – provides as follows: "The Board of

7    Directors may expel, call for the resignation of, or otherwise discipline any member if

8    two-thirds (2/3) of the members of the Board of Directors find that the conduct of the

9    member has been injurious to the best interest of the Association or inconsistent with

10   its purposes. Before any such action is taken, however, thirty (30) days prior written

11   notice by registered mail shall be given to the member to be disciplined, advising that

12   he may appear in person, with or without counsel, and may submit such evidence as

13   he or she deems proper to show that he or she is qualified to continue as a member of

14   the Association."

15         80.     An actual controversy has arisen between the parties regarding whether

16   AAPS followed the provision of AAPS Bylaw § 3.05 which required AAPS to

17   provide Plaintiff with 30 days written notice before terminating her membership in

18   the Association.

19         81.     AAPS' position, as best as Plaintiff understands it, is as follows:

20                 a.  Cerrato sent written notice to Plaintiff on May 8, 2012.

21                 b.  The Board of Directors voted to terminate Plaintiff's membership in

22                     the Association on June 13, 2012, so

23                 c.  Therefore, the Board of Directors fulfilled the requirement of AAPS

24                     Bylaw § 3.05 that Plaintiff was to be provided with 30-day written

25                     notice prior to any termination proceedings was satisfied.

26         82.     Plaintiff believes that the AAPS' position is disingenuous for several

27   reasons, which are as follows:

28                 a.  Plaintiff agrees that on or about May 8, 2012, Cerrato sent her a

                                    24

1   letter, which has been attached as **EXHIBIT W**, advising that the

2   disciplinary committee would be meeting on June 9, 2012 at the

3   Intercontinental Hotel in Tampa, Florida. The letter indicated that if

4   she appeared in person, Plaintiff would be given up to 15 minutes to

5   present evidence to the disciplinary committee of her qualification to

6   remain in good standing with AAPS.

7   b. Plaintiff asserts that instead of waiting until after June 9, 2012 to

8   make a decision, the Board of Directors voted to terminate her

9   membership on May 30, 2012, as indicated in the June 18, 2012 letter

10   (the "Termination Letter") which has been attached to this Complaint

11   as **EXHIBIT V**. Thus, the Board of Directors acted outside the

12   scope of the actual authority granted them under AAPS Bylaw § 3.05

13   when they voted to terminate Plaintiff's membership in the

14   organization.

15   83.   Accordingly, Plaintiff seeks a judgment from this Court, finding and

16   declaring as follows:

17   a. AAPS' Board of Directors acted outside the scope of their actual

18   authority when they voted to terminate Plaintiff's membership in the

19   association, and based thereon said action was void, of no effect, and

20   that no legitimate disciplinary action ever occurred.

21   b. Plaintiff has remained a member of AAPS in good standing, before

22   and after the events of May and June, 2012, and no valid adverse

23   disciplinary action against Plaintiff has ever occurred.

24   c. AAPS must accordingly provide evidence to Plaintiff, which she can

25   deliver to third parties, showing that she has continually been a

26   member in good standing with the organization, and that any record

27   indicating that Plaintiff's membership in AAPS has been terminated

28   was the result of procedural errors which were the fault of AAPS.

1

2                                    **Count Two**

3   **(Set Aside Termination of Plaintiff's Membership Based Upon Cal. Corp. Code**

4              **§ 5341 or Fla. Stat. § 617.0607 – against all defendants)**

5       84.    Pursuant to 28 U.S.C. § 2201(a), Plaintiff seeks a declaration from this

6   Court concerning her status in relation to AAPS and the effect of AAPS' violation of

7   either Cal. Corp. Code § 5341 or Fla. Stat. § 617.0607.

8       85.    Both Cal. Corp. Code § 5341(b) and Fla. Stat. § 617.0607 provide that

9   Plaintiff may not be expelled from AAPS except pursuant to a procedure that is fair

10  and reasonable and carried out in good faith.

11      86.    The procedure by which Plaintiff was purportedly expelled from AAPS

12  was not fair, for all of the reasons listed above, and also for the following reasons:

13              a.  Following the directions of Defendant Cerrato and Anderson,

14                  Defendants Slominski, Rubakovic and Wallace, Ilowite, Honeycutt

15                  and Balshi, manufactured and falsified the evidence that was used by

16                  the Board of Directors as a pretext for terminating Plaintiff's

17                  membership in AAPS.

18              b.  This evidence came in the form of the Defamatory Letter, which has

19                  been attached to this Complaint as **EXHIBIT T**, signed on May 30,

20                  2012 by the officers of AASD—Defendants Wallace, Slominski,

21                  Rubakovic, Balshi, Honeycutt and Ilowite.

22              c.  On information and belief, this Defamatory Letter was authored by

23                  Defendant Cerrato, who, together with Defendant Carbone, had

24                  determined in advance to terminate Plaintiff's membership in the

25                  organization as an act of retaliation against her for opposing the

26                  discriminatory practices carried out by the organization by Defendant

27                  Carbone and others.

28              d.  Defendant Slominski, in an email dated June 7, 2012, which has been

                                        26

attached to this Complaint as **EXHIBIT U**, admitted that the reason that she signed the Defamatory Letter was because she did not want to "antagonize the higher eschelon of the AAPS." Slominski implied that the higher eschelons had threatened to disapprove the budget for the academy's training program if the officers did not cooperate with the adverse actions taken against Plaintiff, stating "without a training program, our Academy will die."

e. At the annual scientific meeting on June 25, 2012, Slominski was outside the hall prior to the House of Delegates meeting. Dr. Stewart asked Slominski, in the presence of Dr. Leslie Radentz, why she signed the Defamatory Letter, stating "you don't agree with our agenda? What Agenda don't you agree with?" Slominski replied "I don't know." Drs. Stewart asked "why did you sign that letter?" Slominski stated that she signed the letter because the AASD officers were told by Cerrato that if they didn't, that the academy couldn't have its dermatology fellowship.   The dermatology fellowship is a training program which would have enabled physicians similarly situated to Slominski to pay residents minimal wages to work at their offices and see their patients, in exchange for a certificate that says they've fulfilled their requirements for their fellowship. Dr. Stewart told Slominski that they were going to use the Defamatory Letter against her, and Slominski said "I didn't know that, I'm so sorry."

f. At the same scientific meeting, Dr. Leslie Radentz confronted Ilowite about his endorsement of the Defamatory Letter. Dr. Ilowite admitted that the accusations against Dr. Stewart in the letter were not true.

g. Two of the three members of the disciplinary committee appointed by Cerrato were Defendants Wallace and Stephen Montes.

h. Plaintiff's husband had stated in his email attached as **EXHIBIT P**,

revealed to the House of Delegates that Stephen Montes, as discussed in **EXHIBIT L,** had caused AAPS to become convicted of violating 2 U.S.C. § 441b(a).

   i.  Wallace had been one of the signatories to the Defamatory Letter. Wallace had been appointed to replace Dr. Stewart as Governor of AASD when she was removed from her position.  He has now taken the seat on the Board of Directors of AAPS, occupying the position that members of her academy nominated her to run for at the January 10, 2012 meeting.

   j.  Carbone, Cerrato and Stephen Montes had actively sought to cover-up the existence of the FEC investigation that resulted in convictions of 2 U.S.C. §§ 441b(a) and 434(b), through disseminating misrepresentations to the AAPS membership, as identified in **EXHIBIT M.**  Because Plaintiff's husband had sought to raise awareness about the misrepresentations concerning Stephen Montes and AAPS' conviction of crimes for misappropriating funds acquired through payment of membership dues, Stephen Montes was not impartial and putting him in charge of the disciplinary process was neither fair, nor reasonable.

   k.  Carbone was also motivated by an impetus to retaliate against Plaintiff due to the fact that she had made a motion on January 10, 2012 at the meeting of AASD officers to reinstate Drs. Castillo, Geller and Klein, who were attempting to investigate the fact that he had been sued by Cassandra Newby, AAPS' Director of Certification, for exposing her to pornography at the workplace, engaging in sex discrimination, age discrimination, and a pattern of intimidation that had created a hostile workplace environment.

   l.  Cerrato was motivated by solidarity with Carbone and Stephen

Montes, as well as his anger towards Plaintiff's husband for
informing members of the House of Delegates of the fact that he was
charging the organization substantial fees for providing legal services
to AAPS, in violation of the Bylaws of the ABPS.

m. On information and belief, on May 30, 2012 Cerrato secured
endorsement to the Defamatory Letter presented to the AAPS' Board
of Directors meeting that same day, which letter stated that Dr.
Stewart was acting against the interests of her academy, by inducing
the officers of her academy to libel Plaintiff by conditioning the
preservation of their academy's fellowship training program upon
their cooperation. Using this letter to support them, Defendants
Wallace, Montes and Maggio recommended that AAPS' Board of
Directors terminate Plaintiff's membership in the organization .

n. Based upon the evidence manufactured by Cerrato, his co-
conspirators, and the recommendations of the members of the
disciplinary committee who had pre-judged Plaintiff's case, the
Board of Directors voted to terminate Plaintiff's membership, without
providing her with the 30 day notice required by AAPS Bylaw § 3.05
as discussed above.

o. Furthermore, the offer by Cerrato in his May 8, 2012 letter to allow
Plaintiff 15 minutes to address the disciplinary committee was
conditioned upon Plaintiff's willingness to show up in person, in
Florida, at a time when Plaintiff was seeking to quash the summons
in Case No. 11-004947 in the Circuit Court of the Thirteenth Judicial
Circuit in and for Hillsborough County, Florida based upon AAPS'
lack of personal jurisdiction to sue her in that forum. As such, a
condition precedent to AAPS' willingness to allow her to defend
herself in the disciplinary proceedings was that Plaintiff would be

1                  required to waive her argument that she was not subject to personal

2                  jurisdiction in Florida.

3           p.  Additionally, on information and belief, the Termination Letter

4               misrepresented that the Board's action had been unanimous.

5               However, if the action was unanimous, this was only accomplished

6               by excluding impartial board members, such as Dr. Atwood Rice,

7               whose board position was terminated just minutes prior to the

8               discussion and vote terminating Dr. Stewart's AAPS membership.

9    87.    Plaintiff asks the Court to enter a judgment finding and declaring that the

10  procedure followed by AAPS for terminating her membership was neither carried out

11  in good faith, nor fair and reasonable. Accordingly, the Court should determine that

12  AAPS' action purporting to terminate her membership in the organization was

13  prohibited by Cal. Corp. Code § 5341 or Fla. Stat. § 617.0607, and invalid, void, of

14  no effect, and must be set aside. The declaratory judgment should include the

15  following findings and declarations:

16           a.  No legitimate disciplinary action ever occurred with respect to

17              termination of Plaintiff's membership in AAPS.

18           b.  Plaintiff has remained a member of AAPS in good standing, before

19              and after the events of May and June, 2012, and no valid adverse

20              disciplinary action against Plaintiff has ever occurred.

21           c.  AAPS must accordingly provide evidence to Plaintiff, which she can

22              deliver to third parties, showing that she has continually been a

23              member in good standing with the organization, and that any record

24              indicating that Plaintiff's membership in AAPS has been terminated

25              was the result of an unfair and unreasonable process carried out in

26              bad faith in violation of the laws of both the State where AAPS is

27              domiciled, and the State where Plaintiff resides.

28                  **SECOND CLAIM FOR RELIEF**

**Sex Discrimination, Religious Discrimination and Retaliation in violation of 42**

U.S.C. § 2000et seq. (Title VII)- against AAPS

88.   The allegations of the prior paragraphs of this Complaint are hereby repeated as if fully set forth herein.

89.   "It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin." (42 U.S.C. § 2000e-2(b).)

90.   Dr. Stewart is informed and believes, and therein alleges, that AAPS is an employment agency under 42 U.S.C. § 2000e(c). Through its American Board of Physician Specialists ("ABPS") Division, AAPS regularly undertakes, with or without compensation, to procure for its members opportunities to work for an employer. ABPS allows medical recruiters across the country to submit job openings to ABPS in order recruit certified specialist physicians. The job openings are posted in ABPS's "Career Center," and distributed digitally through ABPS's "Career Bulletin," a recent copy of which has been attached as **EXHIBIT Z**, showing that several jobs are available for dermatologists similarly situated to Dr. Stewart through the career center.

91.   AAPS is also an employment agency within the definition at 42 U.S.C. § 2000e(c) because AAPS procures physicians who have recently finished medical or osteopathic school to participate in residency programs in which they work for supervising physicians in order to meet the requirements to sit for examinations which are a prerequisite to ABPS board certification.

92.   AAPS/ABPS and its agents are labor organizations within the meaning of 42 U.S.C. § 2000e(d) since AAPS/ABPS is an organization engaged in an industry affecting commerce, and is an association, group, plan or "any organization" that exists for the purpose, in whole or in part, of dealing with prospective employers concerning grievances, labor disputes, wages, rates of pay, hours, or terms or conditions of employment. In particular, AAPS/ABPS maintains an online database

which makes material representations to millions of healthcare networks that depend on the information provided by AAPS/ABPS' as a condition to determining eligibility for hospital rights, insurance company reimbursement eligibility, and in general AAPS negotiates with healthcare businesses to negotiate compensation rates on behalf of its members. AAPS negotiates wages, rates of pay, and hours for residents involved in its training program. AAPS training supervisors in its residency programs controls the conditions of its residents' employment and supervise/control its resident employees, and even after residency is completed, AAPS continues to exercise control over its diplomate members, to a greater degree than the other national, more well-recognized Board Certifying organizations which provide a greater degree of autonomy to their members. This is especially true in light of the corruption within the AAPS and the organization's patterns and practices of discriminating against protected classes in violation of Title VII, and the culture of fear that Carbone has created in which diplomats like Slominski who have been members for decades are still operating under the supervision and control and having their day-to-day decisions dictated by AAPS/ABPS "higher eschelons," as she describes it (see **EXHIBIT U**). AAPS is also a conference, a general committee of physicians, with joint and/or system boards for each physician specialty academy. AAPS/ABPS is a joint council with many subordinate groups, such as AASD/BCD, which are governed by AAPS/ABPS.

93. AAPS/ABPS is also in a position to "interfere" with the present and future employment prospects of its membership. The Ninth Circuit has recognized in Ass'n of Mexican-Am. Educators v. State of California, 231 F.3d 572, 580 (9th Cir. 2000) that a "direct employment relationship is not a prerequisite to Title VII liability," indicating that even if AAPS/ABPS is not immediately the employer of a physician similarly situated to Dr. Stewart, it can still "be held liable under Title VII for its discriminatory treatment of the plaintiff, notwithstanding the fact that the plaintiff was employed by a third party, if the defendant had interfered with the plaintiff's employment by that third party."

94. Dr. Stewart, a female, is a member of a protected class under 42 U.S.C.

1 § 2000et seq.

2    95.   Dr. Stewart is, and at all relevant times was, a qualified and competent
3 AAPS member who had previously been recognized as Physician of the Year and had
4 served with distinction, receiving the honorary Degree of Fellow, with no prior acts
5 of professional misconduct or discipline prior to her termination in Summer, 2012.

6    96.   Dr. Stewart alleges that AAPS's actions in discriminating against her
7 based on her gender, religious belief, and retaliating against her for opposing
8 unlawful and improper practices, and ultimately terminating Dr. Stewart, were
9 unrelated to Dr. Stewart's professional conduct, qualifications or performance as a
10 member of AAPS. Instead, AAPS's conduct was motivated by a historical practice
11 of disparate treatment of female members, and women in general.

12    97.   Dr. Stewart is informed and believes, and thereon alleges, that AAPS's
13 actions occurred under circumstances suggesting a discriminatory motive, treating
14 female members differently from male members. These acts were motivated by Dr.
15 Stewart's gender and her opposition to discriminatory practices against females,
16 including the intentional flunking of female physicians on certification and
17 recertification examinations, the exclusion of female physicians during meetings and
18 disciplinary proceedings, as well as the removal of female physicians from leadership
19 positions in AAPS, and treatment of women as objects to be sexually exploited.

20    98.   AAPS also retaliated against Dr. Stewart for standing up to AAPS's
21 discriminatory treatment of female members. Dr. Stewart opposed the sexual
22 harassment of residents by AAPS trainers. Dr. Stewart's actions ended the
23 discriminatory practice of administering the dermatology certification examination
24 containing obscure questions plagiarized from blue journals prior to 1984 and only
25 giving the answers to members of non-protected classes. Dr. Stewart opposed
26 Carbone's efforts to retroactively flunk L---- M-- due to her gender and race. Dr.
27 Stewart opposed the efforts of the higher eschelons of AAPS to retaliate against Drs.
28 Castillo, Geller and Klein for asking questions regarding Newby's allegations that

1  Carbone created a hostile workplace environment, discriminated against her based
2  upon sex and age, and exposed her to pornography at the workplace. Dr. Stewart
3  opposed the efforts by Defendants to make fundamental changes to AAPS' corporate
4  structure which would have enabled them to perpetuate discriminatory customs. Dr.
5  Stewart opposed this by asking Dr. Okerblom to prepare the Preliminary Legal
6  Opinion, and by handing out copies of the Preliminary Legal Opinion at the 2011
7  meeting of the House of Delegates, provoking the discussion that led to withdrawal of
8  proposed amendments to AAPS Bylaw 3.05.

9      99.   As a result of opposing discrimination as discussed above, Dr. Stewart
10  suffered all of the adverse employment actions discussed above. Dr. Stewart was
11  named as a defendant in a meritless defamation lawsuit designed to inhibit her and
12  others from participating in discussions concerning the discriminatory practices
13  within the organization. Dr. Stewart was prohibited from occupying leadership roles
14  in the organization which she was duly elected to, and was replaced by Wallace. Her
15  membership in AAPS was terminated. She was excluded from academy meetings.
16  Her friends and colleagues were instructed not to communicate with her, or else they
17  would suffer similar retaliation. Numerous defamatory statements regarding Dr.
18  Stewart were published on a continued, ongoing basis to thousands of member
19  physicians across the nation, which were aimed to destroy her credibility and expose
20  her to ridicule, shame, humiliation, contempt, scorn, hatred, and ostracism within the
21  community. The actions of the Defendants set forth above violated Dr. Stewart's
22  rights under the Title VII of the Civil Rights Act of 1964.

23      100.  As a proximate result of the actions of Defendants as alleged above, Dr.
24  Stewart has been damaged by loss of professional stature, the impaired ability to
25  contract and affiliate with healthcare providers, the impaired ability to publish peer-
26  reviewed articles, the stigmatization of peer review sanctions which handicaps her
27  likelihood of being invited or selected to speak at conferences, resulting in public
28  humiliation.

1    101.  In particular, the disciplinary proceedings have that resulted in

2    termination of Dr. Stewart's membership in AAPS have caused her to be ineligible to

3    be recognized as a board certified dermatologist within ABPS pursuant to AAPS

4    Bylaw 3.06, titled "Effect of Termination of Membership," which in relevant part

5    indicates that a member of AAPS "whose membership has been terminated...shall be

6    stricken from the rolls of membership in the Association and in **any and all**

7    **organizations affiliated with the Association**..." ABPS, which provides Dr.

8    Stewart with professional recognition of her training and education as a dermatologist

9    through board certification is an organization affiliated with AAPS. Due to the

10   adverse disciplinary action taken against Dr. Stewart, she cannot be recognized as an

11   ABPS Diplomate in a manner consistent with AAPS' Bylaws. The consequences for

12   having this disciplinary action on one's record and no board certification significantly

13   impair Plaintiff's ability to continue in her chosen career path as a dermatologist.

14   Without board certification, Plaintiff experiences an impaired ability to contract and

15   affiliate with healthcare providers directly, and is essentially relegated to the position

16   of being less employable than a resident who has never been a board certified

17   dermatologist. Although highly skilled and well-trained, Plaintiff can not make an

18   industrious use of her qualifications or receive compensation from most insurance

19   plans in the United States without having a board certified dermatologist available to

20   supervise her and process her claims. Literally millions of patients across the United

21   States and the world will be unable to cause their insurance companies to provide

22   remuneration to Dr. Stewart for any dermatology services she provides to said

23   patients, as a result of the fact that Dr. Stewart's board certified status as a

24   dermatologist has been called into question. Furthermore, even if Dr. Stewart seeks

25   to obtain board certification through another organization, not only will she have to

26   redo her residency, essentially regressing in her career to the position that she was in

27   when fresh out of medical school, she will also have to overcome the presumption

28   that she should be presumptively disqualified from participating in said organization

1  due to her prior history of being disciplined by another board certifying

2  organization—which may not be possible. Defendants' conduct was expressly aimed

3  at triggering these serious adverse employment consequences for Plaintiff, and was

4  done with knowledge that loss of her ability to bill insurance companies could

5  foreseeably cost her more than $200,000/year for the rest of her career. Defendants

6  took this action purposefully and maliciously, not only because of institutional

7  patterns of discriminating against females, but also in retaliation against Dr. Stewart

8  for opposing discrimination within the organization. Defendants' goal was to

9  interfere with Dr. Stewart's future so seriously and flagrantly that any other member

10 of the organization would think twice, thrice, and hundreds of times before daring to

11 raise any opposition to the oppressive culture of fear which Defendants have sought

12 to engender within the AAPS.

13      102.  Defendants' conduct towards Dr. Stewart was purposely directed against

14 Dr. Stewart in the State of California and intended to cause harm to Dr. Stewart in the

15 State of California. The facts supporting this are, without limitation, that AAPS knew

16 that Dr. Stewart practiced medicine in the State of California, AAPS held its annual

17 meetings for all its members on more than one recent occasion in the State of

18 California, and that AAPS monetarily benefited from providing services to numerous

19 physicians licensed and practicing in the State of California. Several of the acts

20 which Defendants engaged in occurred during the 2012 annual scientific meeting in

21 Marina Del Rey, California, including the occasion during which Defendants made a

22 powerpoint presentation in which they defamed Dr. Stewart before the entire

23 membership and instructed her peers not to communicate with her.

### THIRD CLAIM FOR RELIEF
California Civil Code §§ 51, 52 - against AAPS

25      103.  Plaintiff incorporates by reference the paragraphs contained in her First

26 Claim for Relief.

27      104.  AAPS has violated Dr. Stewart's right to be free from gender

28 discrimination as guaranteed by California Civil Code § 51. Specifically, AAPS

1  procured a location for an organized entity-wide annual meeting in Marina Del Rey,
2  California, during which they denied Dr. Stewart entry and equal access to the
3  meeting on the basis that she is a female. In doing so, AAPS did not treat her in an
4  equal manner to male participants in a similar situation, who were allowed full access
5  to the accommodations of the organized meeting.

6        105. AAPS violated Dr. Stewart's right to be free from gender discrimination
7  as guaranteed by California Civil Code § 51, based on acts occurring in the state of
8  California. Dr. Stewart was treated differently from male members of AAPS who
9  were also contesting disciplinary charges brought against them by AAPS. Male
10 members were allowed entry to the meeting and were allowed to raise objections and
11 concerns in contesting their disciplinary charges. They were also allowed to run for
12 offices of leadership and vote. Dr. Stewart was denied this opportunity on the basis of
13 her sex. Male members were afforded greater due process under AAPS's Bylaws,
14 whereas Dr. Stewart was treated differently from male members and denied her due
15 process rights.

16       106. Based upon AAPS's history of disparate treatment of female members,
17 including denying them certification, leadership positions, and access to
18 organizational meetings, Dr. Stewart's gender was a motivating yet arbitrary factor in
19 AAPS's discriminatory and retaliatory acts. As such, AAPS denied Dr. Stewart of
20 her full and equal rights guaranteed by California Civil Code § 51.

21       107. As a direct and proximate result of the conduct of Defendant, Dr.
22 Stewart has suffered and/or will continue to suffer damage to her professional
23 reputation, financial damage to her medical practice due to a decrease in revenue
24 sources through loss of contracts, loss of employment opportunities and ostracism
25 within her professional community.

26       108. AAPS's violations of Dr. Stewart's rights as guaranteed by California
27 Civil Code § 51 entitles her to receive compensatory damages, attorney's fees, and
28 injunctive relief, all of which are provided for in California Civil Code § 52 and are

1  prayed for below.

2      109.  In doing the acts alleged herein, AAPS knew or should have known that

3  its actions were likely to injure Dr. Stewart. Dr. Stewart is informed and believes,

4  and thereon alleges, that AAPS intended to cause injury to Dr. Stewart and acted with

5  a willful and conscious disregard of her rights as secured by California Civil Code §

6  51, thereby entitling Dr. Stewart to recover treble damages, or a minimum of $4,000,

7  per offense, pursuant to California Civil Code§ 52.

8      110.  Unless AAPS is restrained by a preliminary and permanent injunction,

9  Dr. Stewart will continue to suffer irreparable harm. Dr. Stewart has no adequate

10  remedy at law because monetary damages will not afford full adequate relief for the

11  humiliation and risk of harm that a continuation of AAPS's conduct will cause.

12                          **FOURTH CLAIM FOR RELIEF**
                California Government Code § 12940(h) - against AAPS

13      111.  "It is an unlawful employment practice, unless based upon a bona fide

14  occupational qualification, or, except where based upon applicable security

15  regulations established by the United States or the State of California: (h) For any

16  employer, labor organization, employment agency, or person to discharge, expel, or

17  otherwise discriminate against any person because the person has opposed any

18  practices forbidden under this part or because the person has filed a complaint,

19  testified, or assisted in any proceeding under this part." (Cal. Gov't Code §

20  12940(h).)

21      112.  Dr. Stewart alleges that from 1998 until her termination in Summer,

22  2012, she made numerous complaints and inquiries to AAPS's administrative staff

23  and physician leadership regarding discriminatory and retaliatory practices by AAPS

24  administrative leadership. Specifically, Dr. Stewart objected to the distribution of

25  pornography and racist emails circulated by Carbone, as well as the intentional failing

26  of female physicians, improper exclusion of female physicians from membership,

27  improper exclusion of female physicians from sitting for certification examinations,

28  exclusion of females from meetings, and improper administrative removal of female

1    physicians from leadership positions and replacement with male selections that were
2    not even eligible under the bylaws to serve within those positions.

3        113.   Dr. Stewart is informed and believes, and thereon alleges, that as a direct
4    result of being a female and opposing discrimination within AAPS based upon
5    gender, race or religious beliefs, AAPS discriminated against Dr. Stewart by
6    terminating her membership with AAPS.

7        114.   As a result of AAPS's actions, Dr. Stewart has suffered harm, and will
8    continue to suffer harm, in the form of loss of past and future income, damage to her
9    professional reputation, damage to her medical practice, loss of employment
10   opportunities and ostracism.

11                              **FIFTH CLAIM FOR RELIEF**

12   **(Unfair Business Practices in Violation of Cal. Bus. Prof. Code § 17200 et seq. by**
13                                   **all defendants)**

14       115.   Plaintiff brings this cause of action on behalf of herself, and in her
15   capacity as a private attorney general against Defendant AAPS for its unfair,
16   fraudulent and/or deceptive business acts and/or practices pursuant to California
17   Business and Professions Code Sections 17200 et seq. ("UCL"), which prohibits all
18   unfair and/or fraudulent business acts and/or practices.

19       116.   Plaintiff asserts these claims as she is a representative of an aggrieved
20   group and as private attorney general on behalf of all similarly situated members and
21   employees of AAPS and other persons affiliated with AAPS who AAPS should be
22   required to make restitution to due to its ongoing patterns and practices of
23   discrimination and other unfair, fraudulent or unlawful conduct. Plaintiff hereby
24   seeks to enforce a general proscription of unfair business practices and the
25   requirement to refrain from unlawful discriminatory or retaliatory conduct.

26       117.   The business practices and acts described hereinabove which have
27   resulted in violations of 42 U.S.C. § 2000 et seq., California Government Code §
28   12940(h), California Civil Code §§ 51, 52, the Computer Fraud and Abuse Act, the

1    Federal Election Campaign Act of 1971, common law proscriptions against

2    defamation, libel and breach of fiduciary duty, violation of Cal. Corp. Code § 5341

3    and Fla. Stat. § 617.0607 each constitute "unlawful" acts which fall within the

4    meaning of unfair competition in violation of California's UCL law.

5        118. The process followed by AAPS in terminating the association

6    memberships of Dr. Patricia Stewart, Dr. Radentz, Dr. Tom Castillo, Dr. Richard

7    Cressey, Dr. Robert Gellar and Dr. Gary Klein in a manner inconsistent with Cal.

8    Corp. Code § 5341 or Fla. Stat. § 617.0607 is unlawful and constitutes violations of

9    California's UCL. It is also an unfair business practice in several respects. In the

10    case of the expulsion of Plaintiff, the expulsion was also fraudulent to the extent that

11    paper trails were falsified to create an impression that the vote to terminate Plaintiff's

12    membership occurred on June 13, 2012 so as to falsify compliance with AAPS Bylaw

13    § 3.05's requirement of providing Plaintiff with 30 day written notice, when in fact

14    the vote occurred on May 30, 2012.

15        119. The business practice by Defendants AAPS, Cerrato and Carbone of

16    inducing Plaintiff's colleagues to libel her by threatening to destroy their dermatology

17    academy by defunding their fellowship training program if they do not cooperate with

18    a scheme to libel their peers is unfair and fraudulent activity that violates California's

19    UCL.

20        120. The business practice/act of manipulating the examination process and

21    the test results of AAPS' board certifying examination in dermatology so as to

22    discriminate against female applicants such as Drs. Patricia Stewart, L---- M-- and

23    Leslie Radentz is unfair, fraudulent and also unlawful in violation of 42 U.S.C. §

24    2000 et seq., California Government Code § 12940(h) and California Civil Code §§

25    51, 52, thus constituting violations of California's UCL. This includes, without

26    limitation, AAPS' historical practices of imposing disparate eligibility requirements

27    upon female applicants who are attempting to sit for the exam, providing copies of

28    test answers in advance to male applicants or female applicants who receive quid pro

1  quo assistance for gratifying to the unsolicited advances of their residency trainers

2  and accept the terms and conditions of their hostile workplace environments, and Bill

3  Carbone's practice of retroactively discriminatorily flunking female minority

4  applicants such as L---- M--, or imposing disparate recertification requirements upon

5  individuals such as Plaintiff or L---- M-- in order to prevent them from sitting for or

6  passing the certification exam and interfere with their employment prospects or

7  ability to practice their trade or profession.

8          121.   Plaintiff and those similarly situated are entitled to equitable relief,

9  including restitution or restoration of the status quo ante which these individuals

10  experienced prior to Defendants' unfair, fraudulent, and deceptive acts and/or

11  practices, including restoration of their board certifications and positions in good

12  standing within AAPS/ABPS. Plaintiff is also entitled to attorneys fees and costs,

13  declaratory relief, and a permanent injunction enjoining AAPS, Carbone, Cerrato and

14  the other Defendants from engaging in further unfair, fraudulent and deceitful

15  activity.

16                          **SIXTH CLAIM FOR RELIEF**

17                  **(Breach of Fiduciary Duty by all defendants)**

18          122.   At all times relevant to this proceeding, each of the Defendants were

19  either officers of board members of AAPS, which is a non-profit organization in

20  which Plaintiff was formerly a member. Each of the Defendants owed a fiduciary

21  duty to AAPS and to its members, including Plaintiff.

22          123.   These Defendants have failed to carry out their fiduciary duties in good

23  faith, and have prioritized their personal interests over the best interests of the

24  organization.

25          124.   The AASD Defendants have affixed their names to the Defamatory

26  Letter distributed to all members of the AASD, dated May 30, 2012 which invokes

27  their position as officers of the organization. This Defamatory Letter contained false

28  representations concerning Plaintiff, implying that she does not agree with AAPS'

1 Bylaws, and stating without any factual basis that Plaintiff has "decided to challenge
2 the bylaws of the AAPS, to challenge the actions of the board of directors of AAPS,
3 and to challenge the actions of the President of this academy."

4 125. The AASD Defendants made these false representations to the entire
5 membership of the academy not because they are truthful (indeed, they did not even
6 know what the factual basis was for the assertions contained in the letter), because
7 these defendants wanted to advance their personal interest in obtaining the
8 opportunity to profit from a training program which would allow them to pay
9 minimal wages to physicians who would provide services to patients in their offices.

10 126. The AASD Defendants believed that making these misrepresentations
11 would advance their personal interests because Defendants Cerrato, President of
12 AAPS, and Anderson, President of AASD, informed them that AAPS would defund
13 their academy's training program if they did not cooperate and sign the libelous letter.

14 127. Defendant Carbone actively encouraged and assisted Defendant Cerrato
15 in inducing the AASD Defendants to make these misrepresentations to the
16 membership by empowering Cerrato, lending the credibility of his office and its
17 support to Cerrato, and also by systematically intimidating anybody who sought to
18 question either his or Cerrato's authority.

19 128. A typical example of how Carbone goes about doing this was revealed
20 by a Columbia professor and former AAPS member Eric Wilkens, who on or about
21 April 28, 2011 distributed a sworn, notarized open letter to AAPS members, which
22 has been attached as Exhibit III to the Preliminary Legal Opinion (**EXHIBIT O**).
23 This letter explained how after Dr. Wilkens had, in his capacity as a member of
24 AAPS' House of Delegates, opposed a change in the fundamental corporate structure
25 of AAPS, an amendment to Bylaw 6.08—which would have removed accountability
26 and significantly expanded the powers of Cerrato and other members of the executive
27 committee to dispose of the organization's funds—Carbone had called him up and
28 threatened to "sue your ass off so bad you'll be living under a bridge."

1    129. Carbone and Cerrato's mutual support for each other is further

2    evidenced by the fact that they have authorized the corporation to exhaust its

3    multimillion dollar insurance policy pursuing strategic frivolous lawsuits designed to

4    inhibit public discussion of issues of concern to all members of the organization, in

5    order to send a message to all the organization's members that those members must

6    adopt a deferential attitude and posture towards these authorities, so that when they

7    are called upon, for example, to defame members of their academy, they must do so

8    or else their academy will be punished.

9    130. Further evidence of the fact that Cerrato and Carbone have squandered

10   millions of dollars prosecuting frivolous lawsuits consists in the fact that Carbone has

11   admitted that he is causing AAPS to press claims for Defamation in Florida against

12   individuals who, he admits, have made only truthful statements to the effect that

13   Carbone has distributed dozens, if not hundreds of articles of pornography around the

14   workplace to other board members and employees. Cerrato, for his part, has

15   supported Carbone's efforts to maintain a hostile workplace environment by making

16   numerous statements under oath that statements by third parties to the effect that

17   Carbone has distributed pornography at the workplace are "unfounded" although he

18   admits that he has never investigated whether Carbone has, in fact, distributed

19   pornography at the workplace or exposed co-workers such as Cassandra Newby to

20   pornography at the workplace.

21   131. Cerrato also has made material misrepresentations to the entire

22   membership concerning the remuneration he receives in exchange for services that he

23   provides to the organization.

24   132. Cerrato, Russo, and Marciniak removed Plaintiff from her elected office

25   in violation of the bylaws of the organization.

26   133. Ilowite has also prevented Plaintiff from accepting nominations to run

27   for elected offices by misrepresenting the existence of bylaws of the organization.

28   134. Russo has disseminated misrepresentations to the entire membership in

1   his capacity as former president of AAPS, including but not limited to the

2   misinformation in **EXHIBIT M** falsely denying that AAPS has been convicted or

3   investigated for criminal financial activity in order to avoid a forensic audit.

4       135.   Each of the Defendants have conspired with each other, forming a tacit

5   agreement to deprive Plaintiff of the benefits and protections of AAPS' Bylaws and

6   California/Florida law, in particular Bylaw 3.05 and Cal. Corp. Code § 5341 or Fla.

7   Stat. § 617.0607, by denying Plaintiff 30-days notice and an opportunity to present

8   evidence in her defense, and by agreeing to carry out the disciplinary process in a

9   manner that was neither fair, reasonable nor carried out in good faith.

10      136.   When called upon to uphold their fiduciary duties to uphold Plaintiff's

11  due process rights, Marciniack told Plaintiff's attorney to "shut up."

12      137.   Feaver blatantly ignored Plaintiff's due process rights and told her to

13  "get over it" after her attorney requested 30-days notice and an opportunity to present

14  evidence in her defense.

15      138.   Montes used his role on the board of directors and on the disciplinary

16  committee to pursue a private agenda of retaliation against Dr. Stewart not only for

17  her actions, but also for her husband's actions which exposed his criminal behaviors.

18      139.   Cerrato and Carbone lent material encouragement and assistance to each

19  of the other co-conspirators because of their personal desires to retaliate against Dr.

20  Stewart for actions taken by her and her husband uncovering their wrongdoings, in

21  Cerrato's case charging exorbitant legal fees for his services in violation of  Article

22  VII, section 7.01 (a)(iii)(1) of ABPS' Bylaws, and in Carbone's case, distributing

23  pornography at the workplace and creating a hostile workplace environment.

24      140.   When Dr. Stewart requested to be indemnified for her legal expenses as

25  a result of being targeted by Defendants with a meritless defamation action, which

26  had been planned by the Legal Task force which included Cerrato, Gallagher and

27  Montes, Gallagher scoffed at Plaintiff and offered to represent her himself, although

28  he was not licensed in the state where the litigation was occurring and although he

1  had huge conflicts of interest and was not competent to represent her.

2      141.  Wallace used his position on the disciplinary committee of AAPS'

3  Board of Directors to oust Dr. Stewart from her elected offices so that he himself

4  could occupy them.  In each case, the officers and directors of AAPS breached their

5  duty of loyalty and their duty of care by unreasonably placing their own private

6  interests above those of their fiduciary.

7      142.  Durante used organizational funds to solicit a hacker to violate the

8  computer fraud and abuse act to obtain and destroy evidence which he used to

9  ostracize Drs. Geller, Klein and Castillo, in order to forestall a forensic audit which

10  would have probably uncovered information which would have caused him to lose

11  his job.  When Dr. Stewart motioned on January 10, 2012 for these physicians'

12  reinstatement, Durante provided material assistance and encouragement to each of his

13  co-conspirators to retaliate against Dr. Stewart by engaging in all of the foregoing

14  breaches of fiduciary duty.

15      143.  The aforementioned acts have damaged Plaintiff, preventing her from

16  meaningfully participating in the self-government process intended by the bylaws of

17  the organization, depriving her of the respect and esteem of her peers, interfering with

18  her career and livelihood and ability to engage in gainful employment and process

19  claims with insurance companies for services that she would otherwise have been

20  able to perform for her patients in the future, but for the numerous egregious breaches

21  of fiduciary duty heretofore articulated, which were perpetrated by the Defendants.

22      144.  These officers have agreed, tacitly or explicitly, to assist each other to

23  breach their fiduciary duties to the Plaintiff.  They have knowingly rendered

24  substantial and material assistance or encouragement each other, acted as each other's

25  agents and act under color of the authority of AAPS, and so AAPS and each of them

26  are responsible for each other's breaches of fiduciary duty to the Plaintiff, under

27  theories of vicarious liability, conspiracy, aiding and abetting, other principles of

28  agency or joint/several liability.

**SEVENTH CLAIM FOR RELIEF**

**(Defamation by all defendants)**

145. As discussed above, another aspect of the operation of the civil conspiracy to retaliate against Plaintiff for opposing discrimination and other unlawful conduct within the organization has been to attempt to systematically destroy Plaintiff's reputation within the dermatology community. This has been accomplished, inter alia, by releasing mass emails via the Informz system which allows Defendants and their designees to send out emails to every one of AAPS' 2,500+ members. AAPS and its officers have routinely use this tool to slam Plaintiff, since as early as March 28, 2012, at which time the members were falsely informed that Plaintiff has "played an active role" in a "campaign to destroy AAPS."

146. Plaintiff is aware that on May 30, 2012 the Defamatory Letter (**EXHIBIT T**) was authored and shown to the Board of Directors of AAPS and the disciplinary committee, at which time her membership in AAPS was terminated, so that she was disconnected from the Informz system, so that she has been unable to receive copies of the defamatory publications that are being broadcast on an ongoing basis to thousands of physicians across the nation which maliciously subject Plaintiff to scorn, hatred, hostility, embarrassment and ostracism, as evidenced by the attitudes that are displayed towards Plaintiff by her colleagues who were formerly friendly and welcoming towards her. During the 2012 annual scientific meeting, 99% of the members of Plaintiff's academy would not speak to her, because of the false representations that were made to them behind closed doors, in connection with the presentation, **EXHIBIT X**, which falsely attributed several of Dr. Leslie Radentz' statements to Plaintiff. Upon information and belief, the false representations are being published and re-published on an ongoing basis, and new misrepresentations are being generated on a periodic basis by the parties to the conspiracy that includes, without limitation, all of the named defendants in this lawsuit as well as the DOES.

147. The numerous statements contained in **EXHIBIT S** to this Complaint

1    constitute defamation per se.

2        148.  For this claim, in addition to requesting damages according to proof,

3    Plaintiff will seek leave to amend her complaint after completing discovery and

4    ascertaining the particular falsehoods that have been published concerning her

5    through the Informz system to the membership of AAPS, and through other channels.

6                            **EIGHTH CLAIM FOR RELIEF**

7          **(Intentional Interference with Prospective Economic Advantage by all**

8                                  **defendants)**

9        149.  Plaintiff, by virtue of her membership in AAPS and possessing her board

10   certification with ABPS, was entitled to participate in various networks which

11   granted her access to serve as a provider to millions of patients across the nation.  As

12   a result of the disciplinary actions taken by Defendants, Plaintiff will assuredly be

13   excluded from several of these networks, and will no longer be able to process claims

14   for services rendered to patients.  Plaintiff will therefore lose income for the

15   remainder of her career.

16       150.  Plaintiff had a reasonable expectation that she would continue to be able

17   to bill patients for the services she provided.

18       151.  But for Defendants' unlawful discriminatory and retaliatory conduct,

19   described above, Plaintiff would have continued to reap the benefits of participating

20   in the networks which gave her access to these millions of patients.

21       152.  Defendants intentionally interfered with Plaintiff's access to these

22   networks, and they did so maliciously, in order to oppress Plaintiff.  The actions they

23   took were fraudulent and involved falsifying documents and making

24   misrepresentations to individuals vested with the authority to interfere with Plaintiff's

25   existing relationship with these networks.

26       153.  As a result of the interference caused by Defendants, Plaintiff will lose

27   approximately $200,000 per year for the rest of her career, which would have been

28   approximately 25 more years, so Plaintiff therefore demands damages according to

1    proof, but in no event less than $5,000,000.

2    **NINTH CLAIM FOR RELIEF**
     (Declaratory Relief)

3    **(For Indemnification Under AAPS Bylaw 15.02 – against AAPS)**

4    154.  Pursuant to 28 U.S.C. § 2201(a), Plaintiff seeks a declaration of her

5    rights under AAPS Bylaw § 15.02, which provides that the AAPS "shall indemnify

6    any person made a party to any action or proceeding, whether civil or criminal, by

7    reason of service as a Board member or officer of the Association, or service in any

8    capacity at the request of the Association while a Board member or officer, to the

9    maximum extent authorized by and in a manner not inconsistent with the laws of the

10   State of Florida." A copy of AAPS' Bylaws has been attached as **EXHIBIT Y**.

11   155.  An actual controversy has arisen between AAPS and the Plaintiff

12   regarding whether AAPS is required by its bylaws or other applicable laws to

13   indemnify Plaintiff for attorney fees, costs, or the amount of any judgment taken

14   against her in this case and related cases.

15   156.  Plaintiff's position is that AAPS has, in violation of its bylaws and other

16   applicable laws, wrongfully withheld indemnification of her attorney fees and costs.

17   Plaintiff's position is that AAPS began experiencing a duty to indemnify her attorney

18   fees and costs in advance of a final determination in this action and the related

19   proceedings. This duty arose as soon as Plaintiff offered to make a good faith

20   affirmation and execute an undertaking to repay any costs advanced for litigation

21   expenses if she is ultimately found not to be entitled to indemnification by AAPS.

22   157.  AAPS' position is that Plaintiff is not entitled to any indemnification at

23   all.

24   158.  Plaintiff requests a declaratory judgment holding that she has a right to

25   immediate indemnification which retroactively covers the costs that she has

26   reasonably incurred in defending the related cases, but should also cover the

27   foreseeable expenses she will reasonably incur in prosecuting this action and

28   defending herself in the related cases.

1      159.   On June 12, 2010, at a meeting of the AAPS/ABPS subspecialty
2   academy, AASD, Plaintiff was recognized by the Academy as a Governor of the
3   AASD. A true and accurate copy of the draft minutes of this meeting have been
4   attached as **EXHIBIT AA**.

5      160.   Plaintiff has been made a party to several legal actions and proceedings
6   by reason of having taken actions in good faith, while acting in her capacity as a
7   Governor AASD subsequent to June 2010, and in her capacity as a member of
8   AAPS' Board of Directors between 2002 and 2003, and her service at the request of
9   Jerry Majers in assisting with the creation of a new exam for the BCD and in various
10  other capacities, which Plaintiff reasonably believed to be necessary to promote the
11  best interests of the members of AAPS/ABPS. As a result of taking these actions,
12  Plaintiff suffered the injuries alleged in this Complaint and was made a party not only
13  to this action, but also Case No. 11-004947 in the Circuit Court of the Thirteenth
14  Judicial Circuit in and for Hillsborough County, Florida, and as Case No. 2D13-958
15  in the Florida Second District Court of Appeal.

16     161.   Plaintiff seeks a declaration concerning her status as a governor of
17  AASD with relation to AAPS, and asks the Court to construe the term "Officer" as
18  used in AAPS Bylaw § 15.02 to include Governors of subspecialty academies and
19  certification boards, including the BCD.

20     162.   Plaintiff contends among the reasons that she has been made a party to
21  this action, and the other actions, is because of her opposition to Carbone's efforts to
22  retroactively flunk L---- M-- while Plaintiff was a member of AAPS' Board of
23  Directors.

24     163.   Plaintiff contends that on June 10, 2012, she was nominated to serve as a
25  member of AAPS' Board of Directors, and was wrongfully prevented from
26  occupying that office for no valid, non-discriminatory reasons which were
27  inconsistent with AAPS' Bylaws.

28     164.   Since AAPS Bylaw § 15.02 provides that AAPS "shall" indemnify

Board members to the "maximum extent authorized by the laws of the State of Florida," Plaintiff asks the Court to construe Florida Statutes § 607.0850 in the context of AAPS Bylaw § 15.02. The statute provides in subsection (2) that AAPS "shall have power" to indemnify Dr. Stewart, who is a party to several proceedings by AAPS, because AAPS is seeking to "procure judgments in its favor" due to Dr. Stewart's actions undertaken in service to the organization as an agent and Board member of AAPS' sub-speciality board of certification in dermatology.

165.  In assessing the portion of AAPS Bylaw 15.02 which requires the Court to interpret the "maximum extent" of indemnification allowed by Florida Law, Plaintiff asks the Court to consider the following factors:

a.  Subsection (2) of Fla. Stat. § 607.0850 allows for indemnification "against expenses and amounts paid in settlement not exceeding * * * the estimated expense of litigating the proceeding to conclusion, actually and reasonably incurred in connection with the defense or settlement of such proceeding, including any appeal thereof."

b.  Subsection (6) of Fla. Stat. § 607.0850 authorizes AAPS to make this indemnification "in advance of the final disposition of such proceeding upon receipt of an undertaking" by Dr. Stewart "to repay such amount" if she is ultimately found not to be entitled to indemnification by" AAPS.

c.  Subsection (7) of Fla. Stat. § 607.0850 authorizes AAPS to indemnify Dr. Stewart under any of its Bylaws, including Bylaw 15.02.

d.  Subsection (9)(b) of Fla. Stat. § 607.0850 authorizes this Court to order advancement of Dr. Stewart's expenses, including the expenses incurred in obtaining court-ordered indemnification or advancement of expenses in accordance with AAPS' Bylaw 15.02.

e.  Well-established Florida case law allows Officers and Board members to seek indemnification in suits such as the instant one,

where they are Plaintiffs suing the Corporation (Myakka Valley
Ranches Imp. Ass'n, Inc. v. Bieschke, 610 So.2d 3 (Fla. 2d DCA
1992); Wendt v. La Costa Beach Resort Condo Ass'n., Inc., 64
So.3d. 1228 (Fla. 2011)).

166. Wherefore, Plaintiff seeks a judgment declaring the following:

    a. that she has a right to indemnification in the maximum amount
authorized under Florida Law

    b. Plaintiff was made a party to this action and the related proceedings
(Case No. 11-004947 in the Circuit Court of the Thirteenth Judicial
Circuit in and for Hillsborough County, Florida and Case No. 2D13-
958 in the Florida Second District Court of Appeal) either by reason
of her service as an Officer or Board member of AAPS, or due to her
service at the request of AAPS while an Officer or Board member.

    c. Plaintiff is entitled under AAPS Bylaw 15.02 to the maximum
amount of indemnification authorized under Florida Law, which
includes, without limitation, the following:

(1) Indemnification of costs and fees which have actually and
reasonably been already incurred in preparing the instant case and in defending
Case No. 11-004947 in the Circuit Court of the Thirteenth Judicial Circuit in
and for Hillsborough County, Florida and Case No. 2D13-2997 in the Florida
Second District Court of Appeal;

(2) The estimated expense of litigating the instant proceeding, and
Case No. 11-004947 in the Circuit Court of the Thirteenth Judicial Circuit in
and for Hillsborough County, Florida and Case No. 2D13-2997 in the Florida
Second District Court of Appeal to conclusion, including any appeals thereof,
and

(3) Any other indemnity that Plaintiff is fairly and reasonably
entitled to as the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

167.   For preliminary and permanent injunction against Defendant from discriminating against Plaintiff based on her gender; unreasonably retaliating against Plaintiff; unreasonably terminating Plaintiff's membership at AAPS; and further interfering in any manner with Plaintiff's exercise of rights secured by 42 U.S.C. § 2000e-2, California Civil Code § 51, and California Government Code § 12940(h);

168.   For general and compensatory damages against Defendant in an amount to be proven at trial,;

169.   For punitive damages against Defendant in an amount to be proved at trial but which, combined with general and compensatory damages, Plaintiff alleges exceed $75,000.00;

170.   For the costs of this action, attorney's fees, and such other relief as the Court deems fair and appropriate under the circumstances.

171.   For the Declaratory Judgments containing the findings and declarations of rights set forth in Counts one, two and three of Plaintiff's Tenth Claim above, including but not limited to findings and declarations that Plaintiff is immediately entitled to indemnification of

(1) all attorney fees and costs already incurred in preparing the instant case and in defending Case No. 11-004947 in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida and Case No. 2D13-2997 in the Florida Second District Court of Appeal;

(2) The estimated expense of litigating the instant proceeding, and Case No. 11-004947 in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida and Case No. 2D13-958 in the Florida Second District Court of Appeal to conclusion, including any appeals thereof, and

(3) Any other indemnity that Plaintiff is fairly and reasonably entitled to as the Court deems proper.

1    172.   For any other relief the Court deems appropriate.

2

3    DATED: September 13, 2013

4                              Respectfully submitted,

5                              LAW OFFICES OF HAL FARLEY

6                              By:

7                                   Hal Farley
                                    Attorney for Plaintiff
8                                   PATRICIA STEWART, D.O.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2     Plaintiff demands a trial by jury of all issues so triable.

3

4   DATED: September 14, 2013

5                         Respectfully submitted,

6                         LAW OFFICES OF Hal P. Farley

7                         By:

8                               Hal P. Farley
                                Attorney for Plaintiff
9                               PATRICIA STEWART, D.O.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF INTERESTED PARTIES

September 14, 2013

The undersigned, counsel of record for Plaintiff Patricia Stewart certifies that the following listed party (or parties) may have a pecuniary interest in the outcome of this case. These representations are made to enable the Court to evaluate possible disqualification or recusal.

PATRICIA STEWART
AMERICAN ASSOCIATION OF PHYSICIAN SPECIALISTS, INC
WILLIAM CARBONE
ANTHONY DURANTE
DOUGLAS MARCINIACK
ROBERT CERRATO
ANTHONY RUSSO
STEPHEN MONTES
JOSEPH GALLAGHER
BRIAN FEAVER
KEN WALLACE
WILLIAM ANDERSON
THOMAS BALSHI
SUSAN SLOMINSKY
SVETLANA RUBAKOVIC
LORI HONEYCUTT
ROBERT ILOWITE
BART MAGGIO
LESLIE RADENTZ

**Hal P. Farley**
Attorney of Record for Plaintiff, Patricia Stewart

# NOTICE OF RELATED CASES

## *Radentz v. AAPS*

This case shares transactions and /or occurrences  and/or issues of law or fact with the case EDCV13-1486, which was filed in this same court some time within the past week.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Otis D. Wright II _____ and the assigned Magistrate Judge is _____ David T. Bristow _____ .

The case number on all documents filed with the Court should read as follows:

## EDCV13-1670-ODW (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ September 16, 2013 _____
Date

By  MDAVIS _____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☑ Western Division<br>312 N. Spring Street, G-8<br>Los Angeles, CA 90012 | ☐ Southern Division<br>411 West Fourth St., Ste 1053<br>Santa Ana, CA 92701 | ☐ Eastern Division<br>3470 Twelfth Street, Room 134<br>Riverside, CA 92501 |
|---|---|---|

**Failure to file at the proper location will result in your documents being returned to you.**

---

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| PATRICIA STEWART, D.O. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | Civil Action No. EDCV13-1670-ODW (DTBx) |
| v. | ) | |
| American Association of Physician periatof, INC. | ) | |
| See ATTACHMENT A (List of Defendants) | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  DEFENDANTS:  See ATTACHMENT A (List of Defendants)

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Hal P. Farley, Esq.
800 South Broadway Suite 203
Santa Maria, CA 93454
(805) 346-8989
Fax 805 346-8955

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: SEP 1 6 2013

_Signature of Clerk or Deputy Clerk_

## **ATTACHMENT A – List of Defendants**

~~AMERICAN ASSOCIATION OF PHYSICIAN SPECIALISTS, INC.~~;
WILLIAM CARBONE;
ANTHONY DURANTE;
DOUGLAS MARCINIACK;
ROBERT CERRATO;
ANTHONY RUSSO;
STEPHEN MONTES;
JOSEPH GALLAGHER;
BRIAN FEAVER;
KEN WALLACE;
WILLIAM ANDERSEN;
THOMAS BALSHI;
SUSAN SLOMINSKY;
SVETLANA RUBAKOVIC;
LORI HONEYCUTT;
ROBERT ILOWITE;
BART MAGGIO, and
DOES 1-10

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| PATRICIA STEWART, D.O. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | Civil Action No. $EDCV13-1670-ODW(DTBx)$ |
| American Association of Physician Specialists, Inc. | ) | |
| See ATTACHMENT A (List of Defendants) | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_ DEFENDANTS:  See ATTACHMENT A (List of Defendants)

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Hal P. Farley, Esq.
800 South Broadway Suite 203
Santa Maria, CA 93454
(805) 346-8989
Fax 805 346-8955

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  SEP  1 6 2013

MARILYN DAVIS

_Signature of Clerk or Deputy Clerk_

## ATTACHMENT A – List of Defendants

~~AMERICAN ASSOCIATION OF PHYSICIAN SPECIALISTS, INC.;~~
WILLIAM CARBONE;
ANTHONY DURANTE;
DOUGLAS MARCINIACK;
ROBERT CERRATO;
ANTHONY RUSSO;
STEPHEN MONTES;
JOSEPH GALLAGHER;
BRIAN FEAVER;
KEN WALLACE;
WILLIAM ANDERSEN;
THOMAS BALSHI;
SUSAN SLOMINSKY;
SVETLANA RUBAKOVIC;
LORI HONEYCUTT;
ROBERT ILOWITE;
BART MAGGIO, and
DOES 1-10

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Patricia Stewart, D.O.

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

American Association of Physician Specialists, Inc. et al.

**(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)**

LAW OFFICE OF HAL FARLEY
800 SOUTH BROADWAY, SUITE 203
SANTA MARIA, CA 93454   (805) 346-8989

**(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $ 5,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000 et seq. – American Association of Physician Specialists, Inc. has engaged in discriminatory, retaliatory adverse employment actions which have interfered with Dr. Patricia Stewart's ability to continue practicing in her occupation of choice as a dermatologist.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☒ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number: EDCV13-1670

CV-71 (09/13)   CIVIL COVER SHEET   Page 1 of 3

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A. PLAINTIFF | A. DEFENDANT | |
| ☐ Yes ☒ No | Then check the box below for the county in which the majority of DEFENDANTS reside. | Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☒ | ☒ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☒ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☒ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | ENTER INITIAL DIVISION: |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Eastern |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ NO  ☒ YES

If yes, list case number(s):  EDCV13-1486 — SJO (DPc)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**  DATE: 09-15-2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |