William A. Okerblom, MD, JD
1145 East Clark Suite H
Santa Maria, CA 93455
Phone (805) 478-6570
Fax (866)    317-4919
Drlaw07@aol.com

Attorney for Plaintiff
Patricia Stewart, D.O.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES

| | |
|---|---|
| PATRICIA STEWART, D.O., | Case No.  EDCV13-1670-ODW(DTB$_x$) |
| Plaintiff, | **Hon. Otis Wright** |
| v. | **FIRST AMENDED COMPLAINT FOR:** |
| AMERICAN ASSOCIATION OF PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ANTHONY DURANTE; DOUGLAS MARCINIACK; ROBERT CERRATO; ANTHONY RUSSO; STEPHEN MONTES; JOSEPH GALLAGHER; BRIAN FEAVER; KEN WALLACE; WILLIAM ANDERSON; THOMAS BALSHI; SUSAN SLOMINSKI; SVETLANA RUBAKOVIC; LORI HONEYCUTT; ROBERT ILOWITE; BART MAGGIO and DOES 1-100 | |
| Defendants. | 1. **BREACH OF CONTRACT** |
| | 2. **INJUNCTIVE RELIEF AND DAMAGES PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000 et seq.** |
| | 3. **VIOLATIONS OF UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE §§ 51, 52** |
| | 4. **VIOLATIONS OF CALIFORNIA GOVERNMENT CODE 12940(h)** |
| | 5. **INTENTIONAL MISREPRESENTATION AND FALSE PROMISE** |
| | 6. **DEFAMATION** |
| | 7. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| | 8. **UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *et. seq.*** |

Plaintiff Patricia Stewart, D.O. ("Patricia Stewart" or "Plaintiff") brings this action seeking injunctive relief and monetary damages against defendants American Association of Physician Specialists, Inc. ("AAPS"), et. al., and DOES 1-100, for violations of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, California Civil Code §§ 51, 52, and California Government Code § 12940(h); and for Intentional Misrepresentation (Fraud); Breach of Contract; Defamation; Interference With Prospective Economic Advantage; for violations of California's Business & Professions Code § 17200 (Unfair Competition) and § 17500 (False Advertising), and for Defamation.

## JURISDICTION AND VENUE

26.     This action arises under 42 U.S.C. §2000e-2, et seq.  Jurisdiction of this matter is in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331. Jurisdiction of the supplemental claims in this matter is pursuant to 28 U.S.C. § 1367(a) because the State law claims are so related to the Federal claim that they form part of the same case or controversy.

27.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391.  Defendant Svetlana Rubakovic resides in Riverside County, California; a substantial part of the events or omissions giving rise to the claim occurred in Los Angeles County and Santa Barbara County, California; the damage to the Plaintiff's medical practice and employability is in Santa Barbara County, California; and AAPS has continuously and systematically conducted business in this venue for many years and they even held their annual meeting in Marina Del Rey, California in 2012, at which each of the Defendants came and intentionally harmed the Plaintiff.

## THE PARTIES

28.     Plaintiff Patricia Stewart, D.O. ("Plaintiff" or "Patricia Stewart") is, and at all relevant times mentioned herein was, an individual residing in the State of California, County of Santa Barbara.  Patricia Stewart is an active physician licensed

by the Osteopathic Medical Board of California, formerly specializing in Dermatology.

29.    Defendant American Association of Physician Specialists ("AAPS") is a Florida nonprofit corporation, incorporated under the State of Florida and with its principal place of business in the State of Florida.  AAPS has approximately 2,500 physician members across the United States, including the state of California, and conducts organizational meetings in the state of California.

30.    Defendant William Carbone ("Carbone") is the CEO of AAPS, and at all relevant times mentioned herein was, an individual residing either in the State of Florida, County of Pinellas or in the State of Georgia, County of Fulton.

31.    Defendant Robert Cerrato, D.O., J.D. ("Cerrato") is, and at all relevant times mentioned herein was, an individual residing in the State of New Jersey, County of Burlington.  Cerrato is the Past-President of AAPS, and sits on the Board of Directors for AAPS, as well as its Executive Committee and its legal task force.

32.    Defendant Stephen Montes ("Montes") is, and at all relevant times mentioned herein was an individual residing in the State of Michigan, County of Muskegon.  Montes is a member of AAPS' Board of Directors, the chair of the continuing medical education committee, a member of the disciplinary committee and the legal task force, and the treasurer for AAPS' Political Action Committee ("PAC").

33.    Defendant Susan Slominski ("Slominski") is, and at all relevant times mentioned herein was a Dermatologist residing in the State of Nevada, County of Yuma.  Slominski is a member of AAPS, and at relevant times mentioned herein was the Vice President of the AASD.

34.    Defendant Svetlana Rubakovic ("Rubakovic") is, and at all relevant times mentioned herein was, a Dermatologist residing in the State of California, County of Riverside.  Rubakovic is a member of AAPS, is the current President of AASD, and at relevant times mentioned herein was the Secretary of AASD.

1      35.     Defendant Lori Honeycutt ("Honeycutt") is, and at all relevant times

2  mentioned herein was, a Dermatologist residing in Travis County, Texas.  Honeycutt

3  is a member of AAPS, and at relevant times mentioned herein was a governor of

4  AASD.

5      36.     Defendant Bart Maggio ("Maggio") is, and at relevant times mentioned

6  herein was a resident of Bergen County, New Jersey.  Maggio is a member of AAPS,

7  and at relevant times herein was a member of AAPS' Legal Task Force and its

8  Disciplinary Committee.

9      37.     The true names and capacities of the defendants sued herein as DOES

10  are unknown to Plaintiff at this time, and Plaintiff therefore sues such defendants by

11  such fictitious names.  Plaintiff is informed and believes that the DOES are those

12  individuals, corporations and/or businesses or other entities that are also in some

13  fashion legally responsible for the actions, events and circumstances complained of

14  herein, and may be financially responsible to Plaintiff, as alleged herein.  The

15  Complaint will be amended to allege the DOES' true names and capacities when they

16  have been ascertained.

17                        **GENERAL ALLEGATIONS**

18      38.     AAPS, formerly known as AAOS, is a private, non-profit

19  corporation that was formed in 1952 as a nation-wide organization in order to certify

20  to the public that its Diplomates are board-certified specialists who possess the

21  qualifications-- including training, experience, skill, and good character—required to

22  be recognized as qualified medical and surgical specialists in their respective fields of

23  specialization. AAPS is not a social club.  It was formed and existed solely and

24  entirely because it provided a means for its member physicians to acquire board

25  certification that the public would recognize and accept, so that its Diplomates  can

26  hold themselves out to be specialists in their respective fields of specialization.

27      39.     This certification is necessary because board certification is required in

28  most states, including California, for a physician to hold oneself out to be a specialist.

Most employers, insurance companies, and hospitals, require board certification as a minimal prerequisite before they will consider employing, credentialing, compensating, or granting privileges to a physician as a specialist.  The reason for this is that board certification is the only reliable means that said organizations can assure that the specialists who serve their patients have been trained in their field of specialization, and have demonstrated that they possess, at a minimum, the degree of skill, knowledge, and ethics that society requires from a specialist physician.

15.     AAPS certifies its physician specialists through its certifying body, the American Board of Physician Specialties ("ABPS"), which certifies that those member physicians, who they determine have been able to document their completion of the required training, to have passed a certification examination in their area of specialization, and to have demonstrated to meet their ethical standards are qualified to be recognized as board certified specialists in a variety of medical and surgical specialties.  Although ABPS has its own Bylaws and is made of numerous distinct Boards of Certification—one for each specialty—ABPS does not exist as a separate legal entity from AAPS.  According to its Bylaws, it is a division of AAPS.

16.    ABPS is one of only three national multi-specialty medical and surgical board certifying bodies in the United States, and controls the certification of approximately 2500 physicians across the United States.  Historically ABPS certification has been recognized by many physicians, hospitals, physician employers, State Medical Boards, professional societies and insurance companies across the United States. ABPS certification has allowed certified physicians to obtain medical practice privileges at hospitals, care facilities, and multi-specialty clinics.  ABPS board certification has been recognized to satisfy the requirements of board certification that are necessary for specialists to contract with many HMOs, large medical groups, and insurance providers as a specialist physician.

17.     Because board certification is generally required to establish a generally acceptable level of competence in any area of medical or surgical specialization,

1  physician recruiters and other employers, who are seeking to recruit specialist

2  physicians, regularly coordinate with certifying bodies, such as ABPS, in order to

3  locate potential candidates for employment, contracting, or for recruitment by

4  communities which lack the specialists required for their medical and surgical needs.

5      18. The ABPS not only controls physician certification, it also facilitates the

6  connection of its certified specialists with communities and potential employers

7  through the operation of its Career Center, which is dedicated to placing its certified

8  physicians with recruiters and other employers throughout the nation, with whom

9  AAPS partners.  The Career Center of ABPS enables physician recruiters to post job

10  openings.  It also sends out a regular bulletin to AAPS members that contains job

11  listings, which are potentially available to ABPS certified specialists.  ABPS controls

12  its physician members' abilities to form contractual and employment relationships

13  with third parties within their medical or surgical specialty through granting and

14  denying board certification, and it controls its members' access to employment

15  opportunities through limiting the distribution of its career opportunities bulletin.

16      19.     The AAPS administrative leadership governs over the eligibility,

17  training, testing, certification, regulation and upkeep of a physician member's AAPS

18  specialty certification credentials and the provision of AAPS related professional

19  references. As such, the AAPS has immense control over the AAPS physician

20  member's employability, employment references and earnings potential.

21      20.     Within AAPS, there are several subspecialty academies for physicians

22  specializing in different areas of medicine, including Anesthesiology, Disaster

23  Medicine, Emergency Physicians, Family Practice, Internal Medicine, Orthopedic

24  Surgery, Radiology, Surgery and Dermatology.  The academy for Dermatologists  is

25  the American Academy of Specialists in Dermatology ("AASD").  Similarly, within

26  the ABPS, there are boards for certifying physicians specializing in different areas of

27  medicine.  The board which certifies Dermatologists, and previously certified Patricia

28  Stewart, is the Board of Certification in Dermatology ("BCD").

6

FIRST AMENDED COMPLAINT

### *Patricia Stewart's Right to Sue Under EEOC*

21.        On June 17, 2013, the Equal Employment Opportunity Commission ("EEOC") sent Patricia Stewart a letter certifying her right to sue AAPS for violations of Title VII of the Civil Rights Act of 1964.  A true and accurate copy of Patricia Stewart's right to sue letter has been attached as **EXHIBIT A (p**. 71).

### *Patricia Stewart Was Aggressively Recruited, Through the Affirmative Misrepresentatives of AAPS' Agents, to Leave her ABMS Accredited Residency Training Program, and Turn Down Several Opportunities Available to Her Train in ABMS and AOA Approved Dermatology Residencies, to Instead Train in an AAPS Affiliated Residency Program*

22.     Immediately prior to applying to medical school, Patricia Stewart was a professional model, a regular member of the team of half time performers for the San Diego Chargers, and won a number of beauty pageants.  In addition, she received outstanding performance evaluations in all of her Dermatology course work and clinical rotations.  Consequently, while Patricia Stewart was a medical student in 1993 and 1994, and again after she had been accepted into an ABMS accredited residency program at the University of California in San Diego, and was doing her internship there in 1995, she was continually receiving offers to undertake her specialty training at ABMS and AOA programs throughout the country.  AAPS' leaders-- including its Executive Director  and  the physicians in charge of the AAPS-endorsed residency program into which she ultimately enrolled-- actively and aggressively recruited her to join their training program.  Patricia Stewart was told by the then CEO of AAPS, and by AAPS' agents that she should choose a training program affiliated with AAPS because AAPS was one of the three equally recognized and accepted national certifying bodies, any one of which could offer her board certification.  AAPS's agents also told her that AAPS was the best board certifying organization in the country, because AAPS offered better training and had higher professional and ethical standards than the other two nationally recognized certification boards.

7

23.     These statements were false, and AAPS' leaders knew that they were false, but Patricia Stewart did not know that they were false.  Through their intentional misrepresentations, they induced her to give up all other options and to pursue her residency training in the field of Dermatology through a training program that would lead to her being eligible to becoming board certified exclusively through AAPS, rather than through a program accredited by the American Osteopathic Association ("AOA") or the American Board of Medical Specialties ("ABMS").

24.     Patricia Stewart relied upon the representations of AAPS, made through its authorized representatives and supported by its published materials (**EXHIBIT B, pp. 72-74** )  that AAPS was as a premier and distinguished board certifying organization that was widely recognized for its certification because of its strong commitment to maintaining the ethical  and professional qualifications of its leadership and its Diplomates.  Because she believed that the claims AAPS' agents were making to her were true, she withdrew from her ABMS accredited residency training program and declined numerous opportunities available for her to undergo her Dermatology residency training in AOA and ABMS approved training programs. She did so only because she trusted the claims of the representatives of AAPS that pursuing her residency training in an AAPS affiliated training program would prepare her to receive nationally and internationally recognized board certification and would help to make her the best Dermatologist she was capable of becoming.

25. Had AAPS' leadership told her the truth, which is that AAPS board certification is not universally recognized, and that its claims of operating according to high ethical standards are completely false, Patricia  Stewart  would have either stayed in her ABMS accredited residency program or chosen one of the AOA or ABMS approved training programs in Dermatology that that had expressed a willingness to accept her instead of enrolling in an AAPS affiliated training program.

*AAPS' Historical Pattern of Sexual Harassment, Discrimination and Retaliation Against Patricia Stewart and Another Female Physician*

26.     In order to become a board certified Dermatologist through AAPS/ABPS, it is first necessary to complete the educational prerequisites at an AAPS-approved training program.  Once these prerequisites are completed, a candidate must pass the Dermatology certification exam, which is administered by the BCD, an affiliate  of  AAPS/ABPS,  and which is offered once per year.  Once an AAPS member passes the Dermatology certification exam, s/he attains eligibility to become a "Diplomate" member of AAPS and AASD.

Sexual Harassment And Retaliation By Her AAPS Affiliated Residency Director

27.     Patricia Stewart started her training in an AAPS affiliated Dermatology residency training program in July of 1995.  It was not until she had completed the first year and a half of her training program that Patricia Stewart began to encounter difficulties with her AAPS trainer.  During the second half of the second year of her AAPS approved residency training, Patricia Stewart was subjected to progressively worsening sexual harassment from the head of her training program.  An example of his sexual harassment included his uninvited tampering with her computer to speak the words, "I want to have sex with you."  The uninvited sexual advances and other inappropriate conduct on the part of the physician in control of her professional training program were extremely intimidating, and frightening experiences for a resident physician who had just invested two years of her life performing hard work for minimal compensation because she wanted to become a board-certified Dermatologist. She was afraid that she would not be allowed to complete her training unless she accommodated his demands, which she felt were completely uninvited, entirely inappropriate and totally unacceptable.

28.     At the time Patricia Stewart had no idea that the problems that she was encountering with her trainer were indicative of a systemic problem with AAPS.  She

thought that she was merely encountering a personal problem with her trainer. However, when AAPS and the Academy of Dermatology were informed of the existence of the problem while it was still occurring, and she asked them to please intervene and help her, both groups claimed that there was nothing that they could do about the escalating problem of sexual harassment. Consequently, upon completing the second year of her residency training in her original AAPS approved training program, Patricia Stewart quietly left the program and switched to another training program so that she could complete her final year of training free from sexual harassment.

29.   When she told her original residency director that she was transferring to another program, he tried to stop her from leaving.  He vowed that if she left he would personally see to it that she would never be able to become a board certified Dermatologist.   He followed through on his threat.  Though he had already signed off her training logs documenting the cases she had handled in her first two years as a resident, he refused to sign verification that she had completed all of the requirements of her two years of training in his program.

### Gender Discrimination By AAPS—Refusal to Allow Her to Sit For Board Certification Examination

30.   AAPS did not advise Patricia Stewart that any problems would result from her decision to change training programs and they approved her new training program.  However, after she had completed her three years of residency training and wanted to sit for the certification examination, Patricia Stewart learned that AAPS adopted a position that was supportive of their approved residency trainer, who they knew had been sexually harassing her, and who they knew had threatened to retaliate against her if she left his training program.  Though Patricia Stewart had been communicating with AAPS since 1993 and they had recruited her; though AAPS and its leaders knew that Patricia Stewart had been attending a residency program that was affiliated with AAPS from the time that she began her training program; though

she had been attending AAPS meetings since 1995; though she had formally joined AAPS in 1996; though they knew that she had been experiencing sexual harassment during the second year of her training program that required her to change programs; and though she had provided AAPS with detailed documentation showing that she had completed all of the training requirements necessary for  her take the certification examination by June 30, 1998 (**EXHIBIT C, p. 75),**  AAPS refused to allow her to sit for the July, 1998 board certification examination.  At the same time they allowed male applicants, and female applicants who had not opposed discrimination by residency trainers, who had completed substantially the same training as she had completed, to take the certification examination.

### EEOC Finds Probable Cause and AAPS Alters Its Position and Allows Her to Take Board Certification Examination

31.     After being prevented from sitting for the July 25-26, 1998 exam, Patricia Stewart filed charges with the EEOC against her residency trainers for sexual harassment and retaliation, and against AAPS for gender discrimination with the EEOC, stating that there was no non-discriminatory reason for AAPS' refusal to recognize Patricia Stewart's training or case studies.

32.     It took more than a year for the EEOC to investigate her claim. However, once the EEOC found that there was probable cause to support her complaint against her residency director, AAPS quickly changed its position.  In settlement of her EEOC claim and potential lawsuit against AAPS, after having prevented her from taking the board certification examination for almost two years, AAPS changed its position and agreed to accept the exact same evidence of the completion of her residency training that Patricia Stewart had previously submitted prior to her original application, which they had previously claimed was inadequate to prove that she had completed her residency training requirements.  (**EXHIBIT D, p. 76).**

33.     At the time, Patricia Stewart did not know, or have any reason to know,

11

that the AAPS and its Executive leadership secretly advocated and supported the kind of sexually inappropriate conduct that had been perpetrated against her by her residency director.  In fact, she did not learn this information until June of  2011.

### AAPS' Unfair and Discriminatory Practices Associated With Administration of the Board Certification Examination

34.     When she sat for the AAPS Dermatology certification examination  for the first time on the year 2000, Patricia Stewart learned that the questions on the exam were not representative of the material that was taught in her Dermatology training .  She learned from a male candidate taking the same exam that his AAPS trainer had told him and other candidates for board certification to prepare for the certification examination by studying the continuing medical education questions contained in specific "Blue Journal" editions.  Patricia Stewart had not been similarly informed that the certification examination would be derived from those sources.

35.     After the exam, Patricia Stewart went to the library and studied the blue journals, discovering that virtually every single question on the Dermatology certification exam had been plagiarized from questions contained at the end of the specific continuing medical education articles within those journals that the male certification candidates had been instructed to study.  The Blue Journal questions chosen for the certification examination covered obscure research topics which were not relevant to the ordinary practice of Dermatology, and which were not included in the core materials that would ordinarily be expected to be known by a physician who had completed a Dermatology residency training program.  In fact, the answers to the questions on the examination would not ordinarily been known by anyone, unless he or she had been directed to prepare for the Dermatology certification examination by studying the specific questions found in the designated journals.

36.     Stewart contacted AAPS CEO Carbone, and explained that the examination questions had been plagiarized, and that unfair and discriminatory practices were taking place within the Dermatology Academy.  Mr. Carbone asked

1  Patricia Stewart to keep this information confidential, and promised to take steps to

2  meaningfully reform the Dermatology certification exam in order to make it fair.

3      37.    Despite Mr. Carbone's promises, one year later in 2001, when Patricia

4  Stewart re-took the Dermatology certification exam, it consisted entirely of the exact

5  same questions which had been plagiarized from blue journals that had been present

6  on the previous year's certification examination.  Although she easily passed the

7  examination, since she had made copies of all of the questions from the Blue Journals

8  that were on the previous examination, and had copies of their published answers, as

9  well.  Nevertheless, she was still concerned about the unfairness of the practice of

10  testing candidates using plagiarized exam questions concerning issues that were not

11  part of the core Dermatology materials included in residency training, and of

12  selectively informing candidates for certification of how to prepare for the

13  examination.  Patricia Stewart notified AAPS' Certification Manager, Marjorie Paulk,

14  and provided her with copies of the plagiarized questions, including the sources they

15  had been taken from, so that Ms. Paulk could confirm that the items on the exam had

16  been plagiarized.  After that, Ms. Paulk recognized that what Patricia Stewart has

17  been saying was true, and she wrote to thank Patricia Stewart for her "efforts to

18  expose unfairness among us."  A true and accurate copy of Marjorie Paulk's letter has

19  been attached as (**EXHIBIT E, p. 77** ).

20      38.    Because the members of BCD could not deny that they had plagiarized

21  the questions on the Dermatology certification exam, and had used their control over

22  access to study materials to assist AAPS agents to discriminate against applicants on

23  the basis of their gender, their race, or the religious beliefs that they expressed, and to

24  retaliate against women who opposed this discrimination, AAPS' Board of Directors

25  took disciplinary action in 2001, suspending the BCD.  True and accurate copies of

26  the letter notifying AASD and BCD of the disciplinary action have been attached as

27  (**EXHIBIT F, pp. 78-82** ).

28      39.    As a consequence of the disciplinary action, AASD was no longer able

to maintain itself as a standalone academy, and had to be absorbed into the Academy of Internal Medicine.  Dermatologists within AAPS who had benefitted from receiving advance knowledge of the items on the Dermatology certification exam made defamatory statements about Patricia Stewart, ostracized her and yelled at her during organizational meetings.  During this time period, Defendant Ilowite presided over a meeting in which he and other members of AASD had pre-selected the officers of the academy prior to the meeting outside in the hall.  When another AAPS Diplomate attempted to nominate Patricia Stewart for an academy office, Ilowite prevented Patricia Stewart from being considered for that office by misrepresenting that the Bylaws prevented her from running for office until she had been a Diplomate for five years.  Ilowite fabricated this five year requirement in order to prevent Patricia Stewart from occupying an academy office.  This action was taken in order to discriminate against Patricia Stewart due to her gender, and to retaliate against Patricia Stewart for opposing the policies which had allowed AAPS trainees to be sexually harassed and coerced by their trainers.  (**EXHIBIT G, pp. 83-84**) is a true and accurate copy of a letter documenting the foregoing allegations.

Patricia Stewart Helped Create a Sound Certification Examination and Received AAPS' "Physician of the Year Award."

40.     In the first quarter of 2002, there were four residents who had qualified to take the Dermatology certification examination, but AAPS was unable to allow them to sit for the exam since the BCD had not written a fair exam.  AAPS' President, Jerry Majers created a task force whose goal was to provide Dermatology candidates with an opportunity to attain board certification in Dermatology, and asked Patricia Stewart to assist AAPS to create a new Dermatology certification examination.  (**EXHIBIT H, p. 85** ) is a true and accurate copy of Jerry Majers' letter to Patricia Stewart soliciting her assistance with this endeavor.  During 2002, Patricia Stewart organized a team of Dermatologists who wrote and administered a new Dermatology certification exam in January 2003.  As a result of her accomplishments

1   and service of the organization, AAPS recognized Patricia Stewart as its "Physician

2   of the Year" in 2003.

3

4           AAPS Continued Its Discriminatory Practices

5           41.    Patricia Stewart and the team of Dermatologists she had assembled to

6   create and administer the examination worked under the supervision of Dr. Larry

7   Early, a Psychometrician who AAPS had consulted to help to oversee the

8   administration, scoring, and notification of the results of the examination

9   (**EXHIBIT I, pp. 86-88).** The team administered and scored the examination, and on

10  February 22, 2003, Dr. Early met with the team, notified them of the testing results

11  and of which questions on the exam were problematic.  After the seven problem

12  questions were removed from consideration, Dr. Early informed the team that all of

13  the candidates tested had passed the examination.  After Dr. Early informed the team

14  that all of the candidates had passed the examination, the results were released and all

15  of the candidates were notified that they had passed the certification examination.

16          42.    One of the applicants for the January 2003 exam was a female physician.

17  Carbone did not want AAPS to extend board certification to her, because she is a

18  woman, and because she is Asian.  Carbone decided to retroactively deny her board

19  certification--, even though it had already been determined by the BOCD and the

20  consulted Psychometrician that she had passed the certification exam,   and  even

21  though both she and all of the other candidates had already been notified that they

22  had passed the exam.

23          43.    Carbone hired a new director of certification, Dr. Stanley Kalisch, in late

24  February of 2003, and instructed him to come up with a justification to change the

25  scoring and interpretation of the results of her examination to from passing to failing.

26  Dr. Kalisch did as he was requested to do and in March of 2003, Dr. Kalisch sent out

27  a letter to the affected physician overruling the determination that had been made by

28  the Dermatologists and the Psychometrician who had administered and scored the

examination.  The letter informed her that she had not passed the examination.

44.     This letter caused considerable controversy within the Academy of Dermatology-- particularly among the Dermatologists who had participated in the drafting and scoring of the examination, who all believed that the candidate in question had achieved a passing score on the examination.  Thereafter, on April 23, 2003 Carbone convened a special conference call meeting of the Board of Certification in Internal Medicine, which oversaw the Board of Certification in Dermatology.   Despite the fact that Patricia Stewart was the elected representative of the Dermatology Academy to the Board of Certification in Internal Medicine, she was not correctly informed in advance of the meeting by AAPS of how to attend the telephonic meeting, which had been scheduled by Mr. Carbone. (She was provided the wrong phone number for the conference call, a common practice when Mr. Carbone wants to exclude someone from a meeting.)  Consequently, she did not arrive into the meeting until it was too late for her to address the results of the certification testing.  By the time she had joined the conference call, both Mr. Carbone and Dr. Kalisch had supplied the Board with false information concerning the outcome of the certification examination.  In particular, they both falsely claimed that the candidate in question had scored almost whole standard of error (standard deviation) lower than the other candidates, and that she had correctly answered significantly fewer than 68% of the examination questions, which she had not.  As a result of the misrepresentations, the Board of Certification voted to uphold Mr. Carbone and Mr. Kalish's decision to overrule the decision of BOCD and Dr. Early and retroactively fail the candidate.

45.     On or about April 28, 2003, Kalisch notified the candidate, via a letter which has been attached as (**EXHIBIT J, p. 89** ), that the Board of Certification in Internal Medicine had confirmed that she had not passed the exam.  Kalisch's letter contained an apology for the fact that she had been "inappropriately contacted by a Board member and incorrectly advised that you passed."

46.     The affected physician decided to appeal the decision of the Board of Certification overruling the original determination of the Dermatology subspecialty board.  In support of the affected physician's appeal, both Patricia Stewart and Dr. William Radentz , an ABMS certified Dermatologist who was a member of the team that had created, administered, and scored the examination wrote letters explaining the errors in, and impropriety of, what had taken place.  Dr. Radentz's letter to Mr. Carbone explained, among other things, that all of the candidates who took the examination—including the affected physician-- had correctly answered at least 74% of the examination questions that were ultimately determined to have been valid. This controverted the false claim made by Dr. Kalisch to the Board of Certification that the failed examinee had correctly answered well below 68% of the questions. Patricia Stewart's letter, copies of which she sent to all members of the Board of Certification in Internal Medicine, explained the careful process that had been undertaken in administering and scoring the examination—and reminded the Board that all of the scoring had been done under the supervision of the consulting Psychometrician, Dr. Larry Early, who had been hired by AAPS to consult and oversee the administration and scoring of the examination.  She strongly objected to a non-Dermatologist, and non-physician-- who had not been present during  either the examination or the actual scoring-- unilaterally and retroactively over-ruling the decision that had been reached by the Dermatology experts and the expert consultant. These letters have been attached as (**EXHIBIT K, pp. 90-93).**

47.     The appeal brought by the physician who had been retroactively failed was denied.  But Mr. Carbone was not satisfied.  He wanted Patricia Stewart to be disciplined for daring to oppose his efforts to prevent the affected physician from receiving a passing score on the examination.  To accomplish this, he fabricated a case against Patricia Stewart.  First, Mr. Carbone secretly calendared a disciplinary hearing before the Board of Directors at their annual meeting scheduled for June 28, 2003 in Las Vegas, NV.  Then, on June 4, 2003 -- just a couple of weeks prior to the

1   annual meeting -- Mr. Carbone created the evidence he needed to create the false

2   impression that Patricia Stewart, who at the time was the representative of the

3   Dermatology Academy to the ABPS Board of Certification in Internal Medicine,  had

4   defied the instructions of the Board of Certification—both by communicating the

5   results of the meeting to the affected physician, and by originally improperly

6   notifying the aforementioned physician that she had passed the certification

7   examination.  Mr. Carbone retroactively altered the minutes of the Board of

8   Certification meeting of April 23, 2003 to falsely state that "the Board directed

9   [Patricia Stewart] not to communicate with the Dr. M-- on the subject of the

10  examination results and the Board's action."  **(EXHIBIT L, pp. 94-97 at 97).**

11      48.     The statement that Mr. Carbone added to the minutes of the meeting six

12  weeks after it had occurred was not true.  As can be seen from the last two lines of

13  paragraph 3 of the letter sent by Dr. Kalisch to the affected physician on April 28,

14  2003, **(EXHIBIT J, p. 89)** the affected physician's name had not even been

15  mentioned at the meeting on April 23, 2003.  As could be seen from the last line of

16  the original minutes **(EXHIBIT L, p. 95)**, the original minutes had been drafted and

17  signed by Dr. Kalisch, and he had done so the day after the late evening meeting had

18  taken place.  Consistent with his written communication to the affected physician, her

19  name was not mentioned in the minutes.  As is his custom, Mr. Carbone simply

20  altered the minutes of the meeting to achieve his personal goal, which was to create

21  the false impression that Patricia Stewart had violated the specific instructions of the

22  Board of Certification, and that, therefore, she should be subjected to disciplinary

23  action.

24      49.     When Mr. Carbone altered the minutes of the April 23, 2003 meeting on

25  June 4, 2003--six weeks after the meeting had occurred --to include the name of the

26  affected physician, and to insert the false claim that Patricia Stewart had been

27  specifically instructed not to inform the affected physician of the results of the

28  meeting, Mr. Carbone apparently forgot that the Committee has insisted that the

1    affected physician's identity be kept confidential from them.  This mistake showed

2    that his additions did not reliably reflect what had actually occurred at the meeting.

3        50.    Patricia Stewart was required to appear before the Board of Directors at

4    the annual meeting of AAPS which took place in Las Vegas, Nevada on June 28,

5    2003 to face disciplinary charges under Bylaws § 3.05 for allegedly engaging in

6    conduct deleterious to the organization by allegedly refusing to abide by the directive

7    of the Internal Medicine Board of Certification.  She denied that she had

8    communicated with the affected physician about the results of the meeting prior to

9    the physician without authorization.  She was able to present evidence showing the

10   blatant discrepancy between the modified minutes and the earlier accounts of what

11   had taken place at the meeting.  She was also able to show other evidence revealing

12   that the examination committee had been authorized to release the results of the

13   Dermatology Certification examination.  Consequently the Board of Directors found

14   that there was no merit to the charges that had been brought against her by Mr.

15   Carbone and dismissed them.

16

17       ***Recent Events***

18       51.    Having achieved her board certification; having assured that there was a

19   fair and reasonable testing procedure in place for other prospective candidates for

20   board certification in Dermatology; and having no wish to be involved in any

21   additional controversies that could potentially subject her to discipline again, Patricia

22   Stewart withdrew from participation in all political issues involving AAPS from 2003

23   until late 2010.  In late October of 2010 she had been asked to serve as Governor of

24   the Academy of Dermatologists.  Although she had been elected to the position, she

25   expressed her reluctance to once again become involved in any of the controversies

26   involving AAPS because of her previous unpleasant experience of having been

27   subjected to disciplinary proceedings for carrying out her duties in good faith.  In

28   response to her concerns, she was personally reassured by Mr. Carbone that AAPS'

1   discriminatory practices had been reformed, and that she could safely participate in

2   leadership within the organization in a diligent and ethical fashion without fear of

3   being retaliated against. (**EXHIBIT M, pp. 98-102**) Relying upon Mr. Carbone's

4   representations, Patricia Stewart served in her role as Governor of AASD with

5   diligence.

6       52.     However, unknown to Patricia Stewart at the time, but well known to

7   Mr. Carbone, who was in the middle of the controversy, a series of events had been

8   transpiring at AAPS that would once again place Patricia Stewart right back into the

9   middle of Mr. Carbone's disciplinary machine, where he could finish the task that he

10  had intended to accomplish years ago, which was to get rid of Patricia Stewart.

11      53.     The controversy had begun earlier in the year in 2007, when the Florida

12  based former Chairman of the Board of Certification of the Academy of Emergency

13  Physicians, by far the largest academy of AAPS, comprising approximately 2/3 of its

14  AAPS' members, Dr. Richard Spindler, was arrested and charged with repeatedly

15  sexually molesting his 14 year old patient and possession of child pornography, and

16  attempting to induce his patient to help him to create child pornography.  Dr. Spindler

17  hung himself and died in his jail cell just hours after his arrest.  Although the scandal

18  was widely reported in the newspapers and other media in Florida, including Tampa,

19  where AAPS in headquartered,  AAPS covered up the  scandal by misrepresenting to

20  its members nationwide that Dr.  Spindler had died of a "heart attack." (**EXHIBIT N,**

21  **pp. 103-105**)**.**

22      54.     The next phase of the controversy began in early to mid 2010, when two

23  high level employees of AAPS, Cassandra Newby, the Director of Board

24  Certification, and Tim Bell, the Director of Governmental Affairs, were terminated

25  and subsequently published complaints that were forwarded to the Board of

26  Directors, but not to the members.  These letters and other documents revealed the

27  fact that Mr. Carbone had been engaging in scandalous, racist, sexist, and otherwise

28  unprofessional and discriminatory practices at AAPS headquarters.

**Former Director of Governmental Affairs, Tim Bell, Informed Members of the Board of Directors That Mr. Carbone Had Circulated Scandalous Pornographic Materials at AAPS Headquarters**

55.     Documents circulated to Board members in early 2010 by former Director of Governmental Affairs Timothy Bell had revealed that AAPS' CEO, Carbone, had sent and received inappropriate emails using his AAPS email account, from and to persons affiliated with AAPS-- including numerous high ranking officers and past presidents of AAPS, as well as employees of AAPS-- that contained a variety of offensive materials disparaging women, children, people of color, patients, religious groups, and others.  The emails revealed by Mr. Bell to have been sent to him by Mr. Carbone using AAPS workplace computers during work hours contained photos and videos of nude women, some of whom appeared to be under the age of 18 years, as well as photos of nude women exposing themselves in public  in the presence of small children; a video of group sex; a nude woman urinating in public, and extensive other scandalous and controversial materials.  Regardless of one's personal views, it is currently universally accepted that such materials are not appropriate for recreational distribution by employees during work hours in the headquarters of an organization that certifies that its Diplomate physicians are extremely ethical, and can be trusted to be above reproach in dealing with patients who must undress to be examined.

56.     Mr. Carbone has admitted in deposition testimony that he did send and receive these emails using AAPS computers while he was working there.  Anthony Robert Cerrato, undergoing a deposition as the representative of AAPS admitted that, despite learning about Mr. Carbone's alleged inappropriate conduct from Mr. Bell, AAPS did not perform any investigation whatsoever of Mr. Carbone's alleged misconduct.  AAPS did not even ask Mr. Carbone if the allegations were true.

**Former Director of Board Certification Cassandra Newby Sued AAPS and its CEO Carbone for Discrimination and Creating a Hostile Workplace**

Environment

57.     Although she had initiated her complaints beginning in early 2010, on April 7, 2011, AAPS' Director of Certification Cassandra Newby ("Newby") filed a formal legal Complaint in Case No. 11-04381 in the Thirteenth Judicial Circuit of Hillsborough County, Florida alleging that she had experienced civil rights violations in the form of age, sex and disability discrimination in violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes (2007) and for the torts of negligent retention, intentional infliction of emotional distress, assault, battery and defamation against AAPS and Carbone.  Newby's Complaint contained inflammatory allegations in paragraph 22 that Carbone exposed Newby to "pornographic and racially biased pictorial emails placed on AAPS' shared drive," including "pictures of women with large bare breasts and women with their genitals exposed," an allegation which Carbone admitted on p. 183:10-15 of his deposition taken in Case No. 11-004947 .  Newby's Complaint also alleged in paragraph 23 that Carbone's ageist and sexist behavior toward Newby was severe and pervasive, and that Carbone's conduct "created an abusive working environment" that made it "nearly impossible" for Newby to work.  (**EXHIBIT O, pp. 106-135**).

58.     On May 3, 2011, the Newby legal case was settled for an undisclosed amount after the Executive Committee authorized AAPS' attorneys to settle the lawsuit.  The settlement occurred even prior to the deadline for AAPS and Mr. Carbone to answer the Complaint.

### AAPS Was Put on Probation By the Council that Certifies AAPS to Provide Continuing Medical Education Credits to Physicians

59.     On or about December 17, 2009, AAPS had been placed on probation status by the ACCME—which is one step away from non-accreditation status, which would result in a revocation of AAPS' ability to issue CME credits to physicians. Among the effects of AAPS' probationary status was that AAPS was no longer eligible to jointly sponsor CME activities with non-accredited providers.  Carbone

and Montes knew about probation in 2009, but concealed the fact that AAPS had been placed on probation by the ACCME from members of the CME committee. This information was revealed to the Board Members by Tim Bell.

### The Immediate Past President of AAPS, Dr.Tom Castillo; Another Board Member Robert Geller and Another Physician Leader, Dr. Gary Klein Called for an Investigation of AAPS' Executive Leaders Responsible for the Lawsuits

60.     Because of concerns that Carbone's alleged civil rights violations and creation of a hostile workplace, the ACCME's placement of AAPS on probationary status, and the distribution of pornographic, sexist, racist and anti-Semitic emails from Carbone to co-workers at AAPS headquarters could have an adverse effect upon the reputation of AAPS as an ethical organization, and upon the public recognition of its board certification, and because the allegations of misconduct by Mr. Carbone appeared to be supported by substantial evidence, several leading physicians in AAPS expressed a desire to see that an investigation be performed into these matters.

### AAPS Suspended Drs. Castillo, Geller and Klein's Memberships Without Due Process And All Members Were Ordered Not to Have Any Contact with Them

61.     Rather than looking at any of the evidence of misconduct on the part of Mr. Carbone; and rather than considering whether Mr. Carbone's conduct was ethical, consistent with AAPS espoused ethical standards, or posed any risk to the reputation of AAPS, or to the public recognition of its board certification, the executive leadership adopted the position that protecting Mr. Carbone from being questioned, or held accountable for his conduct was the only priority worth considering.  Anyone who openly questioned the appropriateness of Mr. Carbone's conduct, or who wanted an investigation of his conduct to be performed, was considered to be part of a conspiracy to destroy the organization.  Consequently, the Executive leadership—all of whom were hand-picked for the Executive Committee by Mr. Carbone—told the physicians requesting an investigation that it would take

many months to schedule a meeting to discuss initiating an investigation of Mr. Carbone's conduct. In the meantime, working closely with Mr. Carbone behind the scenes, they aggressively looked for a way to shut down the physicians who were requesting an investigation. Ultimately, they decided to suspend the membership of the three physicians who were calling for an investigation of Mr. Carbone's conduct-- without providing them a hearing, as is required under the AAPS Bylaws—and to threaten, terminate, and due anyone who dared to question the propriety of their decisions.

62.     Rather than inform the entire Board of Directors about their plan to suspend the immediate past president and another Board member without providing them a hearing, the executive leadership willfully concealed their plans from most of the Board. Instead, they held a secret meeting on September 30, 2010, at which only nine members of the Board were present—five of whom were members of the Executive Committee, who had been hand selected for their positions by Mr. Carbone, plus Dr. Montes—a close ally of Mr. Carbone's who was appointed to the Board by someone chosen by Mr. Carbone.   These six individuals had enough votes to control the outcome of the Board vote, as long as the President of AAPS who called the meeting limited the total number of Board members at the meeting to nine, which they did by concealing the occurrence of the meeting from all of the other Board members. Thus, the Executive Committee put together a sham Board meeting at which they acted in violation of AAPS Bylaw 3.05 and Fla. Stat. § 617.0607 to suspend Drs. Castillo, Geller and Klein's membership in AAPS without according them notice or an opportunity to present evidence in their defense, via a process that was unfair, unreasonable process and not carried out in good faith (See **EXHIBIT P**, **at paragraphs 93-119, pp. 163-168**).

63.     That same day, the President of AAPS Anthony Russo sent a letter to Mr. Carbone informing him that "we will stand behind (or in front) of you, whatever it takes." In declining to investigate the clearly inappropriate conduct of Mr.

Carbone; in suspending the three physicians who were requesting an investigation to be performed of Mr. Carbone's alleged misconduct; and in pledging their loyalty to their CEO, Mr. Carbone, without consideration of the effect of his conduct upon the organization—especially when Mr. Carbone's conduct which is clearly inconsistent with the AAPS Code of ethics, AAPS' control group has revealed that they do not consider it to be important to abide by their Code of Ethics. They have further revealed that their repeated representations to prospective members of the organization, and to the public at large, that AAPS is a highly ethical organization are false.

64.    Shortly after suspending these physician leaders of AAPS, on October 7, 2010 the Executive Committee banned these physicians from attending any AAPS functions or speaking with anyone in the organization by sending out mass emails to the leaders of all academies and staff of AAPS notifying them that the members of the organization that they were not to have any contact with the suspended physicians.

65.    Thus, at the time that Mr. Carbone informed Patricia Stewart that she could safely serve AAPS as governor of AASD in a diligent and ethical manner without fear of retaliation, he knew that he was in the middle of a huge ethical scandal; that the persons who had expressed a desire for an investigation to be performed of his scandalous conduct had been suspended from the organization; and that the executive leadership of AAPS, who were able to control its Board of Directors of AAPS had pledged and proven that they would use their authority to support him and his interests, without regard to any Ethical Code that AAPS and its members were supposed to abide by ; and that the executive leadership would do whatever it took to prove their loyalty to Mr. Carbone.

66.    Since the scandal concerning Mr. Carbone was being actively discussed among the leaders of AAPS, Mr. Carbone knew that Patricia Stewart would soon learn about the scandal. He also knew from past dealings with her, that Patricia

Stewart would take a stand against any unethical or unfair conduct that she knew about within the organization.  Consequently, Mr. Carbone knew that by encouraging Patricia Stewart to become involved in the leadership of AAPS, at the time that he did in October of 2010, that he was setting the stage to achieve his longstanding goal of seeing her membership in the organization terminated.

> AAPS Unsuccessfully Sought to Make Fundamental Changes to Its Corporate Structure to Expand the Power of the Executive Committee To Act On Behalf of The Entire Board

67.    The first time the Executive Committee tried to get the House of Delegates to ratify proposed amendments to the Bylaws that would expand their powers to include allowing them to make decisions traditionally reserved for the Board of Directors was on or about December 15 of 2010.  At that time, their request was defeated after Member of the House of  Delegates, Dr. Eric Wilkens, spoke out and opposed the ratification of the proposed changes. The next day, Mr. Carbone allegedly called Dr. Wilkens and stated,"we will end you" if he continued to oppose the proposed changes. As a direct result of Mr. Carbone's threats to harm him for voting against the proposed amendments, Dr. Wilkens resigned from AAPS the very next day. **(EXHIBIT Q, pp. 186-188).**  Thus, at a bare minimum Mr. Carbone exploited his absolute control over the executive leadership of AAPS to eliminate opposition to his agenda of further consolidating his grip on all sources of power within the organization.

> AAPS Sought to Make Fundamental Changes to Its Corporate Structure to Justify the Suspensions of Drs. Geller, Klein and Castillo, and to Enable Them to Continue Suspending Physicians Who Opposed Their Political Agenda

68.    After Dr. Wilkens resigned, the Executive Committee and AAPS' Board of Directors once again pressured the House of Delegates to pass amendments to sections 3.05 and 3.06 of AAPS' Bylaws which would have permitted the *ultra vires* disciplinary actions previously taken by the Executive Committee, by (among other things) modifying Bylaw 3.05 to take away the exclusive right to make disciplinary

decisions away from the Board of Directors and vesting authority in the Executive Committee, and also by removing the requirements in Bylaw 3.05 of 30-days written notice and an opportunity to present evidence in one's defense. Elections to ratify these proposed Bylaw changes were initially scheduled on June 25, 2011, during the meeting of the House of Delegates in Tyson's Corner, Virginia.  (**EXHIBIT R, pp. 189-192 at p. 190**).

> Prior the Annual Meeting in Tyson's Corner, Virginia Numerous Individuals— Including Patricia Stewart's Constituents in the AASD-- Contacted Her With Concerns About the Suspension of the Three Physician Leaders and Requests That She Represent Their Interests at the Annual Meeting

69.     Prior to the Annual Meeting that took place in Tyson's Corner, VA, because she was serving as Governor, and because she was known for her strong ethical positions on issue of common concern to members of AAPS, Patricia Stewart received numerous phone calls from members of AAPS who were concerned about the alleged conduct of Mr. Carbone , the suspension of the three physicians who were requesting an investigation into his conduct, and the Bylaws changes that were being proposed.  Members were extremely concerned about Bylaws changes that would enable any three members of the Executive Committee to suspend the membership of any member without a hearing—even for disagreeing with their political agenda— because the passage of such an amendment would effectively end free speech within the organization.  One member reported that she had received a letter from AAPS' attorney threatening legal action against her for merely attempting to discuss the issue of the suspension of the three leaders on a public member forum.

70.     In response to the myriad of concerns that were being voiced by physicians of conscience throughout the organization, including within her academy, Patricia Stewart  requested an attorney to do an investigation into the allegations of impropriety that had been brought to her attention.  The attorney performed an investigation and found that there was reason to be concerned about the suspension of the three physicians requesting an investigation of the conduct of Mr. Carbone and

the manner in which the Executive leadership was addressing the problems facing the organization,  because Mr. Carbone's alleged conduct and the manner in which the leadership was addressing the problems could affect the reputation of the organization, the recognition of its board certification, and its non-profit status.

71.    Acting as an elected official under a duty to protect the interests of the organization and the rights of her constituents, as well as a member of the organization who had pledged to uphold and support ethical conduct within the organization, and as a Diplomate who wanted AAPS carry out its mandate and enjoy a good reputation so that her board certification would continue to be recognized, Patricia Stewart adopted a position on the suspension of the three physicians and on the proposed Bylaws amendments that were scheduled  to be voted upon by the House of Delegates at the annual meeting.  Prior to the voting on the election of officers and the ratification of the proposed Bylaws amendment at the annual meeting of AAPS in Tyson's Corner, VA on June 25, 2011,  Patricia Stewart handed out copies of a document which had been prepared by the attorney.  This document was entitled *Preliminary Legal Opinion Regarding the Likely Effects of the Suspension of Drs. Castillo, Geller and Klein Upon the Board-Certifying and Non-Profit Status of the AAPS,* which has been attached as **EXHIBIT S, pp. 193-223**.  This document prompted considerable debate at the annual meeting, which resulted in the proposed amendments to AAPS' Bylaw 3.05 being withdrawn.

72.    During the annual meeting, Mr. Carbone approached Patricia Stewart in a hostile and threatening manner in the hallway.  He demanded to speak with her in private, which she refused to do. Mr. Carbone voiced that he was extremely angry about the opinion that she had circulated.  His tone of voice and hostile attitude revealed that he intended to do something about what he apparently perceived to be a personal attack directed against him.  Concerned once again about her risk of being retaliated against for adopting an ethical and competent position on issues within the organization that differed from Mr. Carbone's agenda, Patricia Stewart withdrew

from further public discussion of issues related to the suspension of the three physicians and the changes in the Bylaws with the following exception:  On January 10, 2012, AASD officers met via a conference call to discuss academy business. During this conference call, Patricia Stewart, who at the time was a Governor of AASD moved for her Academy to request the Board of Directors to immediately reinstate Drs. Geller, Klein and Castillo. Another member seconded the motion but it was defeated.

73.     During the same meeting Patricia Stewart was nominated by her constituents to run for three elected offices:  1)  As representative of the academy to AAPS' Board of Directors, 2) As one of the delegates to the House of Delegates, and 3) As Governor of her academy.

AAPS Retaliates Against Patricia Stewart For Voicing Opposition Immediately Prior to the Annual Elections to the Workplace Discrimination, Retaliatory Suspensions of  Leaders, and Attempts By the Executive Leaders to Suppress Free Speech Within The Organization

74.     Shortly after Patricia Stewart was nominated to run for the governing bodies of AAPS, a series of adverse actions followed.  On or about March 26, 2012, Defendant Marciniak sent a letter to Patricia Stewart on behalf of AAPS' Board of Directors, which has been attached as **EXHIBIT T**, **p. 224** notifying her that she had been removed from her elected position and was precluded from serving in any elected office within AAPS.  The pretext given for this adverse action was that Patricia Stewart had failed to sign and submit a nondisclosure form by February 10, 2012 deadline.  However, Patricia Stewart's failure to meet AAPS' deadline resulted from the fact that she did not receive the letter notifying her of the deadline's existence until well after the deadline had passed.  This occurred because AAPS had underpaid the required postage by $1.35, and the post office withheld delivery of the letter.  Although AAPS knew that the return receipt-requested registered letter had been delivered after the deadline had expired; and although Patricia Stewart wrote a

letter to the Board, which has been attached as **EXHIBIT U**, **pp. 225-228**, in which she explained the circumstances and attached documentation from the post office verifying that it was AAPS' fault that she did not receive timely notice of the deadline—thereby eliminating the Board's ostensible pretext for the adverse action against her—AAPS refused to reinstate her, or to restore her right to run for office and the adverse action remained in effect.

75. The next adverse action occurred two days later, on March 28, 2012, when Defendants Montes, Cerrato, Maggio and Gallagher sent out an email from Florida, which has been attached as **EXHIBIT V**, **pp. 229-230**, to the entire AAPS membership nationwide falsely accusing Patricia Stewart of playing an "active role" in a "campaign to destroy AAPS." AAPS and the physicians who drafted and sent the letter knew that the allegations they had made against Patricia Stewart were not true, and intentionally disseminated the false statements in order to destroy Patricia Stewart's reputation as part of their scheme to mislead the members of AAPS into believing they were serving the members' interests and the best interests of the organization, when they were really just trying to eliminate and destroy anyone who stood in the way of their common scheme to mislead, extort and exploit the members for their own private interests.

76. At about the same time AAPS filed a meritless defamation lawsuit against Dr. Stewart in the Thirteenth Judicial Circuit for Hillsborough County, Florida in Case No. 11-004947, alleging that Patricia Stewart was part of a conspiracy to destroy AAPS. The purpose of this lawsuit was to punish Patricia Stewart for exercising her constitutional right to free speech, to retaliate against her for opposing discrimination within AAPS at the annual meeting in June of 2011, and to send a message to anyone else who might contemplate trying to stop them or stand up for requiring AAPS' leadership to behave in an ethical or professional manner. After the trial court acknowledged that there was no basis under Florida's long arm statute to exercise personal jurisdiction over Patricia Stewart, and that she had no

minimal contacts with Florida, AAPS appealed to Florida's Second District Court of Appeals in Case No. 2D 13-958.

77.     On May 8, 2012, Cerrato sent a letter to Patricia Stewart stating that she was going to be subjected to discipline by the Board of Directors for conduct injurious to the best interests of AAPS and or incompatible with its purposes.  The evidence she was directed to consider to know what she was being accused of doing was a copy of the claims that AAPS had made against her in their lawsuit. In the letter, she was told that she would be permitted to appear before a Disciplinary Committee, rather than before the Board of Directors.  This represented an unprecedented modification of how discipline had previously been conducted within the AAPS.  (**EXHIBIT W, p.231**)

78.     On May 24, 2012, Patricia Stewart sent each of the members of the Board of Directors a copy of a letter explaining that as far as she knew, she had done nothing worthy of being disciplined, and requested to be provided evidence of what she had allegedly done so that she could prepare her defense.  She also explained why it would not be fair for her to appear before a Disciplinary Committee consisting of individuals who had conflicts of interest that could affect her ability to receive a fair hearing. (**EXHIBIT** X, **pp. 232-237**)  She requested to be permitted to appear before the entire Board of Directors that was scheduled to meet in Marina Del Rey, California on June 25, 2012.  She received no response to this letter.

79.     The next adverse action occurred on May 30, 2012, when Carbone and Cerrato induced the officers of Patricia Stewart's academy—Defendants Slominski, Rubakovic, Balshi, Honeycutt, Ilowite and Wallace to send out a mass email to all members of Patricia Stewart's academy falsely stating that Patricia Stewart had decided to "challenge the bylaws of the AAPS, to challenge the actions of the Board of Directors of the AAPS, and to challenge the actions of the President of this academy."  A copy of this defamatory communication (hereafter referred to as the "Defamatory Letter") has been attached as **EXHIBIT Y, p. 238**.  The contents of this

email were false, because Patricia Stewart had not challenged the Bylaws of AAPS. She had merely opposed ratification of proposed Bylaws changes that would restrict the rights of AAPS members.  Furthermore, all of her actions regarding the issues had been conducted in a reasonable and respectful manner.

80.    Later that week, Defendant Slominski sent an email, which has been attached as **EXHIBIT Z, pp. 239-240**,  in which she admitted that although she privately approved of Patricia Stewart's actions that she publicly criticized, that the AASD officers had been blackmailed into defaming Patricia Stewart by the "higher eschelons" of AAPS who had required the AASD board to send out mass communications defaming Patricia Stewart as a condition of allowing the Dermatology  academy to move forward with its fellowship "training program." Slominski stated that the reason she had issued the communication was because without the training program, "our Academy will die."

The Board of Directors of AAPS Terminates Patricia Stewart's Membership in AAPS on May 30, 2012, Without Providing Her Either 30 Days Notice or The Right to Present Evidence In Her Defense, As Required Under Bylaws § 3.06

81.    On the same day that the Defamatory Letter was signed by the AASD Board and sent to all of the members of the Academy of Dermatology Specialists, May 30, 2012, at a Conference Call meeting of the Board of Directors that Patricia Stewart was not invited to attend, Cerrato and members of the Disciplinary Committee used the Defamatory Letter as a pretext to persuade the Board to vote to terminate Patricia Stewart's membership in AAPS for "conduct injurious to, and not in the best interests of AAPS."  According to the letter that Patricia Stewart received on or about June 21, 2012, which has been attached as **EXHIBIT AA, pp. 241-242,** on May 30, 2012, the Board of Directors voted unanimously to terminate Patricia Stewart's membership in AAPS.  However, they did so without ever notifying her of the meeting or providing her with an opportunity to present evidence in her defense.

82.    Since the Board of Directors did not respond to her request for the

hearing on her termination to be held before the entire Board at the annual meeting of AAPS in Marina Del Rey, the only hearing at which the Board of Directors offered to permit Patricia Stewart to present evidence in her defense was a special meeting in Tampa, Florida scheduled for June 9, 2012 (See **EXHIBIT W, p. 231**)—10 days after the Board had already voted to terminate Patricia Stewart's membership in AAPS.

83.     Patricia Stewart, not knowing that she had already been terminated, asked for, and was refused, to attend the meeting telephonically to present evidence in her defense, as she is permitted to do by AAPS Bylaw 3.05.  Patricia Stewart later discovered that she had already been terminated and that the real purpose of this meeting was to induce her to come to Florida and thereby waive her legal challenge to Florida's right to exercise personal jurisdiction over her.  Had she come to Florida, she would have been allowing herself to be personally served with the frivolous Counter-Complaint in which AAPS had accused her of defamation, abuse of process, conspiracy and injurious falsehood. The effect of this would have been to negate the trial court's ruling that she was not subject to jurisdiction in Florida.

> The Judge in the Related Florida Cases Had Ruled  on June 7, 2012 That AAPS' Plan to Employ A Disciplinary Committee Instead of Permitting The Accused Members to Appear Before the Board Violated Bylaws § 3.06

84.     AAPS and the individual members of its Board of Directors demonstrated a complete absence of either fairness or good faith during the entire disciplinary process.  On June 7, 2012 Hon. Judge  Robert Foster, who was ruling in the case in Florida which AAPS had brought against Patricia Stewart and numerous other physicians--,  intervened and stopped AAPS from employing a Disciplinary Committee to conduct the hearing on June 9, 2012 that AAPS Executive leadership was trying to conduct in order to terminate the membership of Drs. Castillo, Geller, Klein, and Cressey-- who had previously had their suspensions lifted by the same court, and who were not contesting Florida's jurisdiction over them. Judge Foster

ruled that the language of Bylaw § 3.05 must be interpreted to mean that the accused physicians had the right to appear before the Board of Directors and present evidence in their defense, not a three person Disciplinary Committee. **[EXHIBIT BB, pp. 252-276 --**Transcript of Hearing on 6/7/12 pp. 83-85, found on pages **272-273 ]**

85. Judge Foster issued an order enjoining AAPS from carrying out the entire disciplinary process in the manner that they had intended to do. Despite knowing that the Florida court had determined that AAPS was not following its own Bylaws in employing a Disciplinary Committee instead of allowing the accused physicians to appear before the entire Board to present evidence in their defense, AAPS refused to change their course of action against Patricia Stewart to conform to the court's determination.

86. Judge Foster's interpretation of the Bylaws is consistent with the manner in which the Bylaws had previously been interpreted over the previous 14 years that Patricia Stewart had been a member of AAPS. Thus, even if AAPS had permitted Patricia Stewart to appear before a Disciplinary Committee before terminating her membership, according to Judge Foster's ruling, they would have still materially breached their contractual duty under the Bylaws to provide her an opportunity to appear before the Board of Directors to present evidence in her defense prior to being terminated from the organization.

### AAPS' Termination of Patricia Stewart's Membership Was Unlawful, and Neither Fair, Nor Carried Out In Good Faith

87. However, AAPS did not even provide Patricia Stewart either 30 days notice or the opportunity to appear before even a Disciplinary Committee before terminating her membership in the organization. According to the letter AAPS sent to Patricia Stewart on June 18, 2012, which was received by her on or about June 21, 2012, her membership in AAPS had been terminated upon a vote of the Board of Directors at a special meeting that took place on May 30th, 2012. Thus, the decision to terminate her membership was made 21 days after the earliest date she could have

received the letter mailed out on May 8, 2012, providing her notice of the disciplinary action against her.  This length of time was considerably less than 30 days notice that the Board was required to provide her under the Bylaws before terminating her membership.  Thus, AAPS failed to carry out their disciplinary termination of Patricia Stewart's membership in the organization action in accordance with the terms of the contractual agreement between AAPS and Patricia Stewart, both by failing to provide her with 30 days notice,  and by failing to permit her to appear before the Board of Directors to present evidence in her defense.

88.    Contrary to the inappropriately reached decision of the Board of Directors that Patricia Stewart deserved to have her membership in AAPS terminated because she had committed acts deleterious to, or not in the best interests of AAPS, Patricia Stewart had always conducted herself appropriately and ethically and had done nothing to justify any disciplinary action against her whatsoever. AAPS has never produced any evidence to support any other position, despite having been requested, in writing, to do so.   Consequently, AAPS' failure to provide her either the notice required under the Bylaws, or the right to appear before the Board and present evidence in her defense constituted a material breach of the written contract between Patricia Stewart and AAPS and it resulted in her being wrongfully terminated from her membership in AAPS via a process that was neither fair, nor conducted in good faith.

Cerrato, Carbone, Montes, and the Board of Directors Defame Patricia Stewart at the Annual Meeting of the Board of Directors Through Conducting A Sham Hearing, At Which They Presented False, Fabricated  Evidence and At Which They Falsely Alleged That She Was Being Permitted to Present A Defense, When, In Reality, They Had Placed Guards Who Prevented Her From Entering the Room.

89.    On June 25, 2012, Cerrato prevented Patricia Stewart from attending the annual scientific meeting  of AAPS that was being held in Marina Del Rey, CA, which she had already paid for.  The entire Board of Directors, although present at

the meeting, refused to allow Patricia Stewart to present evidence in her defense to show that she had not engaged in "conduct injurious to, and not in the best interests of AAPS" because they had already terminated her membership before the meeting.

90.    Slominski was outside the hall prior to the House of Delegates meeting. Drs. Stewart and Radentz asked Slominski why she signed the Defamatory Letter. Dr. Slominski was asked, "You [said you] don't agree with our agenda?  What agenda don't you agree with?"  Slominski said "I don't know."  Drs. Stewart again asked "why did you sign that letter?"  Slominski said because the AASD officers were told by Cerrato that if they didn't sign the letter, that the Academy couldn't have its Dermatology fellowship training program.

91.    The Dermatology fellowship is a training program which would have enabled physicians similarly situated to Slominski to pay residents minimal wages to work at their offices and see their patients, in exchange for a certificate that says they've fulfilled their requirements for their fellowship.  Patricia Stewart told Slominski that the AAPS executive leadership had used the Defamatory Letter to establish its case against her, and Slominski said "I didn't know that, I'm so sorry."

92.    During the open meeting of the Board of Directors attended by virtually every AAPS member at the annual meeting, Cerrato and Carbone made a presentation to the entire membership, which they stated was the disciplinary hearing provided for under the AAPS Bylaws, during which they falsely informed the membership that Patricia Stewart had authored and published a blog on the internet that was open to the public that contained a variety of statements that appeared to be very disrespectful and openly critical of AAPS leadership.  These letters were falsely imputed to Patricia Stewart in order to harm her good reputation within the organization and subject her to humiliation, shame and hatred.  A copy of the slides that were presented to the entire membership is attached as **EXHIBIT CC, pp. 243-251**.  These documents were presented to convince the membership present that Patricia Stewart had been harming the organization, that she had refused to accept

correction, and that because her conduct represented a threat to the public recognition of their board certification, the Board had no reasonable choice but to terminate her membership if they wanted to stop the ongoing harm she was allegedly causing to the organization.

93.    The members present were led to believe that Patricia Stewart was being provided an opportunity to present evidence in her defense as is specified under the Bylaws, and has had always been done previously when a physician was being disciplined.  The members were not informed that Patricia Stewart had already been terminated at a secret meeting that had taken place on May 30, 2012.  Dr. Cerrato pretended to invite Patricia Stewart to come forward and present information, if there was anything she wanted to say in her own defense.  However, as he well knew, she was unable to do so because he had posted guards at the door who were instructed to prevent her from entering the meeting.  Thus, the entire process was a sham, knowingly willfully and maliciously premeditated to defame her by presenting false information in the form of a hearing to the members in order to deceive the members of AAPS into believing that she had been provided her rights to defend herself specified in the Bylaws, but she appeared to have nothing to say in her defense.

94.    The sham hearing achieved its intended purpose of further destroying Patricia Stewart's reputation within the organization, which had already been tarnished by the Executive leaderships' disciplinary actions against her—including her removal from office.  Even members who had historically been supportive of her, were deceived by the false presentation.  After the House of Delegates meeting, Dr. Atwood Rice, a former AAPS board member, who had been removed from the board one month earlier because he had disagreed with some of the conduct of the executive leadership, and because he had requested that copies of the financial records of the organization be made available for inspection by the members of his Academy, came out and approached Patricia Stewart and said "I didn't know you had a blog site Patty."  Patricia Stewart replied "I don't" to which he replied, "Then why didn't you

defend yourself?"  Former AAPS President, Dr. Castillo, who had been suspended from AAPS for calling for an investigation of alleged executive leadership misconduct, and had been reinstated by the Florida courts, came out and said, "Patty, you did all those letters and a blog site?"

95.     Many other members came out of the meeting expressing anger toward Patricia Stewart.  Some of them asked her, "how could you do something like that?"  A staff member said that she "could not afford to be seen with Patricia Stewart because it could jeopardize her job."  Physicians  who had previously been friendly with Patricia Stewart before, walked by Patricia Stewart after coming out of the meeting where the slides had been shown and gave Patricia Stewart  looks of utter disgust.

Cerrato, Carbone, and the Board of Directors Intentionally Misrepresented to Patricia Stewart That She Would Be Provided the Right to Appeal the Board's Decision When They Actually Had No Intention To Provide The Appeal

96.     In late July, 2012, Dr. Cerrato sent her a letter stating that she would be provided an appeal hearing, in accordance with the Bylaw § 3.06, in accordance with her request for her appellate rights. His letter also stated that AAPS would inform her of the time and place of the hearing and they never did so.**(EXHIBIT DD, p. 277)**

Contrary to the False Representation AAPS Made In Their Letter Terminating Patricia Stewart's Membership in AAPS, That Her Board Certification Would Not Be Affected By the Termination of Her Membership, Patricia Stewart's Board Certification Ended When Her Membership Was Terminated

97.     The letter informing her that her membership in AAPS had been terminated falsely stated that her Board Certification by the ABPS would not be affected by the termination.  **(EXHIBIT AA, p. 241)**  Acting in reliance upon this intentional misrepresentation by the Board of Directors of AAPS, Patricia Stewart has paid her annual renewal certification renewal fees of $895/per year in 2012 and 2013. In addition, Patricia Stewart paid an additional $895 "Legal Assessment" fee, which

1   AAPS stated was necessary for her to pay if she wanted to maintain her

2   certification—even though the money she was forced to pay was being used to pay

3   attorneys to maliciously sue her.

4          98.    Patricia Stewart has recently learned that, contrary to the intentional

5   misrepresentation that AAPS made to her in June of 2012, and the ongoing continued

6   intentional misrepresentations that AAPS continues to make to her, AAPS has never

7   had the authority under the Bylaws and other charter documents of the organization

8   to maintain her board certification after they terminated her membership in 2012.

9   AAPS knew that their Bylaws specifically precluded them from continuing her board

10  certification when they terminated her membership in AAPS on May 30, 2012.  Their

11  knowledge of this fact is evident from the fact that they deleted the second half of

12  page 5 of the 15th Revision of the Bylaws, dated June 25, 2011, which were in effect

13  at the time of her termination, which they attached when they sent her the letter

14  notifying her of her termination.  The second half of page 5 contained Bylaws §3.06,

15  entitled *Effect of Termination of Membership*. This section clearly stated that a

16  terminated physician's name is to be stricken from the rolls of AAPS and all affiliated

17  organizations and that they may no longer hold themselves as possessing any of its

18  honors, including certification.  **(Exhibit EE, pp. 285- 320 at p. 293)**  The fact that

19  they deleted the section  of the Bylaws showing that they did not have the authority to

20  do what they claimed they were doing, reveals that they knew what they were doing

21  when they did it, and did not want Patricia Stewart to know that they did not have the

22  authority to continue her board certification, as they claimed they could do and were

23  doing.

24         99.    Florida law states that incorporated organizations must follow their

25  bylaws. Thus, AAPS had no authority to continue her board certification at the time

26  that they terminated her membership.  They were once again making a

27  misrepresentation when they made the false claim that the termination of her

28  membership would not affect her board certification. Although AAPS later modified

1  the Bylaws on 6/25/12, approximately one month after terminating Patricia Stewart's

2  membership, by removing the language stating that terminated members may not

3  hold themselves out as being board certified, that modification was not applicable to

4  her, since her retaliatory termination occurred under the previous Bylaws.

5  Furthermore, the deletion of one line from the Bylaws did not change anything

6  material.  They did not remove the language of Bylaws §3.06 stating that the

7  terminated members name shall be stricken from the rolls of membership in AAPS

8  and all organizations affiliates with AAPS.  Clearly ABPS, which states under its

9  Bylaws that it is a division of AAPS is affiliated with AAPS.  As such, Patricia

10 Stewart's name has been stricken from the rolls of ABPS, as well. Furthermore,

11 Article Two Section 2.02 of the Bylaws of the American Academy of Specialists in

12 Dermatology, AASD, states that the Diplomate members of the AASD shall consist

13 of those physicians who have been certified by the Board of Certification in

14 Dermatology, "BCD" an affiliate of the American Association of Physician

15 Specialists, Inc. ["AAPS"].  **(EXHIBIT FF, pp. 278-284 at p. 278)** Clearly, since the

16 BCD is an affiliate of AAPS, and since pursuant to the current language of Bylaws

17 §3.06 Patricia Stewart's name has been stricken from the rolls of all of its affiliated

18 organizations, including BCD, she cannot still be certified by BCD.  Furthermore,

19 according to the Bylaws of the AASD, being board certified by the BCD is the

20 equivalent of being a Diplomate member of AASD.  Being a Diplomate member of

21 AASD requires being a member of AAPS.  Therefore, having her membership of

22 AAPS terminated, and her name stricken from the rolls of AAPS and of all of its

23 affiliated organizations means that she no longer meets the requirement to be board

24 certified by the BCD.

25      100.   AAPS has no authority to support its claim that their termination of her

26 membership in AAPS has no effect upon her board certification.  Consequently,

27 AAPS' claim to Patricia Stewart that their termination of her membership in AAPS

28 did not in any way affect her board certification through ABPS was nothing more

than the next in a series of fraudulent  misrepresentations made by them to her with the intent to mislead both her and the Court  concerning the full extent of the harm that she has suffered as a result of their bad faith breach of contract and the wrongful termination of her membership in AAPS.  AAPS is merely attempting, through fraud, to mislead her into failing to recognize that they had taken away her board certification, and hence, her status as a Dermatology specialist.  Consistent with their past deceptive practices, they will continue in this vein until the statutes of limitations for all possible legal actions to set aside her improperly conducted termination have passed, and then enforce the Bylaws against her.

101.   As a direct consequence of AAPS' willful and intentional misrepresentations to the effect that Patricia Stewart's board certification was not affected by their wrongful disciplinary actions against her, until recently Dr. Stewart has continued to hold herself out to be a board certified Dermatologist.  Now that she realizes that she has not been board certified for the past two and one half years, she also realizes that for the past two years she has inappropriately billed insurance carriers and medical groups as a board certified specialist. In reality, she is not a Dermatologist, but is rather a general practitioner whose practice emphasizes the treatment and care of Dermatologic conditions.

102.   It is also clear that Patricia Stewart cannot simply be reinstated back into AAPS to correct the harm that has been caused to her.  The individuals who had contributed to the wrongful termination of Patricia Stewart have been rewarded for their loyalty to Mr. Carbone and are deeply entrenched into the leadership of AAPS. AAPS and Mr. Carbone, Cerrato, Montes and others have already demonstrated that they will simply fabricate evidence—including altering the minutes of meetings—to create evidence to use against her.  Furthermore, AAPS' leaders, as well as their attorneys have already told both her and her attorney that if the Court reinstates her, they will simply reinstitute new disciplinary proceedings, terminate her again, and this time at least follow the form of the rules.

103.   Furthermore, the entire membership has been told that she has been trying to destroy the organization and to ruin their livelihoods.  She cannot rejoin an organization whose members view her as a threat to their careers.  Patricia Stewart will not be able to continue as a board certified Dermatologist through AAPS.  At age 55, she is too old to go back to an ABMS or AOA certified residency program.  Consequently, there is no going back and redoing her training.  Patricia Stewart's career as a board certified Dermatologist is over.

104.   Though Patricia Stewart has generally earned between $300,000 to $400,000 per year as a board certified Dermatologist, which is an amount that has been consistent with what most credible organizations who evaluate physician income by specialty attribute to be the average income of a Dermatologist in California, now that it has been revealed that she is not a board certified physician, she can now reasonably be expected to earn on the order of $150,000 per year-- roughly half of the income that she has traditionally earned.  Because Patricia Stewart's training was conducted through an AAPS approved residency, and is not recognized by either the ABMS or the AOA, she is not eligible to be certified by anyone else.  Consequently she is now discretely withdrawing from all provider contracts that require that she be a board certified or board eligible Dermatologist, including, but not limited to her HMO contracts, as will be described further below.

105.   A large scale survey of 24,216 physicians conducted by Medscape in 2012 revealed that Dermatologists earned, on the average, $283,000/year. The same large scale survey revealed that board certified physicians earned, on the average $236,000/year, while income of physicians without board certification averaged $125,000/year.  **(EXHIBIT GG, pp. 321-325 at p. 321 and 322)**.   Based upon the fact that she has to withdraw from all of her provider contracts that require board certification or board eligibility, it is reasonable to expect that her experience will be similar to what has been demonstrated in the large scale studies.  Thus, it is reasonable and not speculative to believe that, as a result of losing her board

certification, Patricia Stewart will incur a reduction of income of at least $158,000 per year.

106.   Being age 55, and in good health, Patricia Stewart intends to practice for at least another 15 years.  Therefore, it is entirely reasonable to expect that her future lost profits resulting from AAPS' intentional misrepresentations and breach of contract will be at least 15 years x $158,000/year or $2,370,000.

### FIRST CAUSE OF ACTION- INTENTIONAL BREACH OF CONTRACT

107.   Plaintiff incorporates by reference all of the factual assertions made in paragraphs 1-106, above, as if fully stated herein.

108.   Pursuant to established Florida case law, the 15th Revision of the AAPS Bylaws, enacted June 25, 2011, which were in effect until they were revised on June 25th, 2012, constituted an enforceable contract between AAPS and the Plaintiff.

109.   Pursuant to AAPS Bylaw § 3.05 before Defendant AAPS could terminate Patricia Stewart's membership in AAPS they were required to provide her 30 days prior written notice, and provide her an opportunity to appear before the Board of Directors to present evidence that she should be permitted to remain a member of the association.

110.   As is stated in paragraphs above, AAPS did not carry out either of the required terms of the enforceable contract between themselves and Patricia Stewart. They have materially breached the agreement.  The termination of Patricia Stewart's membership was not only done in a manner that violated the Bylaws, it also was done in a manner that was neither fair, nor conducted in good faith.

111.   As a direct, and foreseeable consequence of the wrongful and the unlawful termination of Patricia Stewart's membership in AAPS, she has also been wrongfully deprived of her status as a board certified Dermatologist, and is now merely a general practitioner whose practice emphasizes Dermatology.  According to large scale studies, the deprivation of her board certification will foreseeably result in

a loss of $2,370,000 in future earnings over the expected 15 years that she will continue to work.

112.   However, it is clear that AAPS has been completely taken over by a group of individuals who have consistently demonstrated that they are committed to terminating Patricia Stewart's membership in the organization, as well as to continue to harm her reputation, if provided the opportunity to do so. Therefore it is not in the best interests of the Plaintiff to seek reinstatement of her membership in AAPS since she will be subjected to ongoing efforts to harm her in retaliation for her past opposition of Mr. Carbone's agenda.

113.   Consequently, Plaintiff seeks a judgment from this Court, finding and declaring as follows:

a.   AAPS' Board of Directors failed to carry out their contractual obligations owed to Patricia Stewart and all members of AAPS, as specified in the AAPS Bylaws 15th Revision § 3.05, and acted outside the scope of their actual authority when they voted to terminate Plaintiff's membership in the association, and they have terminated her membership via a procedure that was neither fair, nor conducted in good faith.

b.   Plaintiff has been harmed and will continue to be harmed as a result of having been wrongfully terminated from her membership in AAPS. The harm that she has suffered includes, but is not limited to the loss of her board certification in Dermatology, which occurred on May 30, 2012.

c.   It would be futile for Plaintiff to seek reinstatement of her membership in AAPS or the restoration of her board-certification, as AAPS' entrenched leadership has demonstrated that they are committed to terminating her membership and the destruction of her professional reputation.

d.   Plaintiff is entitled to recover damages, including the return of certification any payments that she has made to AAPS since her board certification was revoked as well as any special assessments she has been

1   required to pay.  In addition, Plaintiff is entitled to recover all reasonably

2   foreseeable lost future profits that she is likely to incur as a result of the loss of

3   her board Certification, the best measure of which will be the difference between

4   her historical earnings as a board certified Dermatologist over the period prior to

5   the loss of her board certification, and the average salary of a general practitioner

6   in the state of California times the number of years that she could have

7   reasonably expected to have continued to practice Dermatology (15 years) if her

8   membership in AAPS and her board certification had not been taken from her in a

9   manner that violated the terms of the contract between AAPS and Plaintiff.

10

11

### SECOND CAUSE OF ACTION
**Sex Discrimination, and Retaliation in Violation of 42 U.S.C. § 2000et seq. (Title VII)- against AAPS**

14      114.   The allegations of paragraphs 1-113 of this Complaint are hereby

15   repeated as if fully set forth herein.

16      115.   "It shall be an unlawful employment practice for an employment agency

17   to fail or refuse to refer for employment, or otherwise to discriminate against, any

18   individual because of his race, color, religion, sex, or national origin, or to classify or

19   refer for employment any individual on the basis of his race, color, religion, sex, or

20   national origin."  (42 U.S.C. § 2000e-2(b).)

21      116.   AAPS is an employment agency under 42 U.S.C. § 2000e(c). Through

22   its American Board of Physician Specialists ("ABPS") Division, AAPS regularly

23   undertakes, with or without compensation, to procure for its members opportunities

24   to work for an employer.  ABPS allows medical recruiters across the country to

25   submit job openings to ABPS in order recruit certified specialist physicians.  The job

26   openings are posted in ABPS's "Career Center," and distributed digitally through

27   ABPS's "Career Bulletin," a recent copy of which has been attached as **EXHIBIT**

28   **HH**, pp. **326 – 333**, showing that several jobs are available for Dermatologists

1    similarly situated to Patricia Stewart through the career center.

2        117.   AAPS is also an employment agency within the definition at 42 U.S.C. §

3    2000e(c) because AAPS procures physicians who have recently finished medical or

4    osteopathic school to participate in residency programs in which they work for

5    supervising physicians in order to meet the requirements to sit for examinations

6    which are a prerequisite to ABPS board certification.

7        118.   AAPS/ABPS and its agents are labor organizations within the meaning

8    of 42 U.S.C. § 2000e(d) since AAPS/ABPS is an organization engaged in an industry

9    affecting commerce, and is an association, group, plan or "any organization" that

10   exists for the purpose, in whole or in part, of dealing with prospective employers

11   concerning grievances, labor disputes, wages, rates of pay, hours, or terms or

12   conditions of employment.   In particular, AAPS/ABPS maintains an online database

13   which makes material representations to millions of healthcare networks that depend

14   on the information provided by AAPS/ABPS' as a condition to determining

15   eligibility for hospital rights, insurance company reimbursement eligibility, and in

16   general AAPS negotiates with healthcare businesses to negotiate compensation rates

17   on behalf of its members.  AAPS negotiates wages, rates of pay, and hours for

18   residents involved in its training program.  AAPS training supervisors in its residency

19   programs controls the conditions of its residents' employment and supervise/control

20   its resident employees, and even after residency is completed, AAPS continues to

21   exercise control over its Diplomate members, to a greater degree than the other

22   national, more well-recognized Board Certifying organizations which provide a

23   greater degree of autonomy to their members.  This is especially true in light of the

24   corruption within the AAPS and the organization's patterns and practices of

25   discriminating against protected classes in violation of Title VII, and the culture of

26   fear that Carbone has created in which diplomats like Slominski who have been

27   members for decades are still operating under the supervision and control and having

28   their day-to-day decisions dictated by AAPS/ABPS "higher eschelons," as she

describes it (see **EXHIBIT W, p. 231**).  AAPS is also a conference, a general

committee of physicians, with joint and/or system boards for each physician specialty academy.  AAPS/ABPS is a joint council with many subordinate groups, such as AASD/BCD, which are governed by AAPS/ABPS.

119.   AAPS/ABPS is also in a position to "interfere" with the present and future employment prospects of its membership.  The Ninth Circuit has recognized in Ass'n of Mexican-Am. Educators v. State of California, 231 F.3d 572, 580 (9th Cir. 2000) that a "direct employment relationship is not a prerequisite to Title VII liability," indicating that even if AAPS/ABPS is not immediately the employer of a physician similarly situated to Patricia Stewart, it can still "be held liable under Title VII for its discriminatory treatment of the plaintiff, notwithstanding the fact that the plaintiff was employed by a third party, if the defendant had interfered with the plaintiff's employment by that third party."

120.   Patricia Stewart, a female, is a member of a protected class under 42 U.S.C. § 2000et seq.

121.   Patricia Stewart is, and at all relevant times was, a qualified and competent AAPS member who had previously been recognized as Physician of the Year and had served with distinction, receiving the honorary Degree of Fellow, with no prior acts of professional misconduct or discipline prior to her termination in Summer, 2012.

122.   Patricia Stewart alleges that AAPS's actions in discriminating against her based on her gender, and retaliating against her for opposing unlawful and improper practices, and ultimately terminating Patricia Stewart, were unrelated to Patricia Stewart's professional conduct, qualifications or performance as a member of AAPS.  Instead, AAPS's conduct was motivated by a historical practice of disparate treatment of female members, and women in general.

123.   AAPS's actions occurred under circumstances suggesting a discriminatory motive, treating female members differently from male members. These acts were motivated by Patricia Stewart's gender and her opposition to discriminatory practices against females, including the intentional flunking of female

physicians on certification and recertification examinations, the exclusion of female physicians during meetings and disciplinary proceedings, as well as the removal of female physicians from leadership positions in AAPS, and treatment of women as objects to be sexually exploited.

124. AAPS also retaliated against Patricia Stewart for standing up to AAPS's discriminatory treatment of female members. Patricia Stewart opposed the sexual harassment of residents by AAPS trainers. Patricia Stewart's actions ended the discriminatory practice of administering the Dermatology certification examination containing obscure questions plagiarized from blue journals and only giving the answers to members who tolerated their discriminatory practices. Patricia Stewart opposed Carbone's efforts to retroactively flunk a prospective female candidate due to her gender and race. Patricia Stewart opposed the efforts of the higher eschelons of AAPS to retaliate against Drs. Castillo, Geller and Klein for asking questions regarding Newby's allegations that Carbone created a hostile workplace environment, discriminated against her based upon sex and age, and exposed her to pornography at the workplace. Patricia Stewart opposed the efforts by Defendants to make fundamental changes to AAPS' corporate structure which would have enabled them to perpetuate discriminatory customs. Patricia Stewart opposed this by asking an attorney to prepare the *Preliminary Legal Opinion*, and by handing out copies of the *Preliminary Legal Opinion* at the 2011 meeting of the House of Delegates, provoking the discussion that led to withdrawal of proposed amendments to AAPS Bylaw 3.05.

125. As a result of opposing discrimination as discussed above, Patricia Stewart suffered all of the adverse employment actions discussed above. Patricia Stewart was named as a defendant in a meritless defamation lawsuit designed to inhibit her and others from participating in discussions concerning the discriminatory practices within the organization. Patricia Stewart was prohibited from occupying leadership roles in the organization which she was duly elected to, and was replaced by Wallace. Her membership in AAPS was terminated and her board certification

1    was revoked. She was excluded from academy meetings.  Her friends and colleagues

2    were instructed not to communicate with her, or else they would suffer similar

3    retaliation.  Numerous defamatory statements regarding Patricia Stewart were

4    published on a continued, ongoing basis to thousands of member physicians across

5    the nation, which were aimed to destroy her credibility and expose her to ridicule,

6    shame, humiliation, contempt, scorn, hatred, and ostracism within the community.

7    The actions of the Defendants set forth above violated Patricia Stewart's rights under

8    the Title VII of the Civil Rights Act of 1964.

9       126.   As a proximate result of the actions of Defendants as alleged above,

10   Patricia Stewart has been damaged by loss of professional stature, the impaired

11   ability to contract and affiliate with healthcare providers, the impaired ability to

12   publish peer-reviewed articles, the stigmatization of peer review sanctions which

13   handicaps her likelihood of being invited or selected to speak at conferences,

14   resulting in public humiliation.

15      127.   In particular, the disciplinary proceedings that have resulted in

16   termination of Patricia Stewart's membership in AAPS have caused her to be

17   ineligible to be recognized as a board certified Dermatologist within ABPS pursuant

18   to AAPS Bylaw 3.06, titled "Effect of Termination of Membership," which in

19   relevant part indicates that a member of AAPS "whose membership has been

20   terminated…shall be stricken from the rolls of membership in the Association and in

21   **any and all organizations affiliated with the Association**…"  ABPS, which

22   formerly provided Patricia Stewart with professional recognition of her training and

23   education as a Dermatologist through board certification is an organization affiliated

24   with AAPS.  Due to the adverse disciplinary action taken against Patricia Stewart, she

25   cannot be recognized as an ABPS Diplomate in a manner consistent with AAPS'

26   Bylaws.  The consequences for having this disciplinary action on one's record, and

27   no board certification, significantly impair Plaintiff's ability to continue in her chosen

28   career path as a Dermatologist.  Without board certification, Plaintiff experiences an

impaired ability to contract and affiliate with healthcare providers directly, and is
essentially relegated to the position of being less employable than a resident who has
never been a board certified Dermatologist.  Although highly skilled and well-trained,
Plaintiff cannot make an industrious use of her qualifications or receive compensation
from most medical groups and insurance plans in the United States without having a
board certified Dermatologist available to supervise her and process her claims.
Literally millions of patients across the United States and the world will be unable to
cause their insurance companies to provide remuneration to Patricia Stewart for any
Dermatology services she provides to said patients, as a result of the fact that Patricia
Stewart's board certified status as a Dermatologist has been revoked.  Furthermore,
even if Patricia Stewart seeks to obtain board certification through another
organization, not only will she have to redo her residency, essentially regressing in
her career to the position that she was in when fresh out of medical school, she will
also have to overcome the presumption that she should be presumptively disqualified
from participating in said organization due to her prior history of being disciplined by
another board certifying organization—which may not be possible.

128.  Defendants' conduct was expressly aimed at triggering these serious
adverse employment consequences for Plaintiff, and was done with knowledge that
loss of her ability to bill insurance companies will foreseeably and unquestionably
cost her more than $158,000/year for the rest of her career.  Defendants took this
action purposefully and maliciously, not only because of institutional patterns of
discriminating against females, but also in retaliation against Patricia Stewart for
opposing discrimination within the organization.  Defendants' goal was to interfere
with Patricia Stewart's future so seriously and flagrantly that any other member of the
organization would think twice, thrice, and hundreds of times before daring to raise
any opposition to the oppressive culture of fear which Defendants have sought to
engender within the AAPS.

129.  Defendants' conduct towards Patricia Stewart was purposely directed

against Patricia Stewart in the State of California and intended to cause harm to Patricia Stewart in the State of California.  The facts supporting this are, without limitation, that AAPS knew that Patricia Stewart practiced medicine in the State of California, AAPS held its annual meetings for all its members on more than one recent occasion in the State of California, and that AAPS monetarily benefited from providing services to numerous physicians licensed and practicing in the State of California.  Several of the acts which Defendants engaged in occurred during the 2012 annual scientific meeting in Marina Del Rey, California, including the occasion during which Defendants made a powerpoint presentation in which they defamed Patricia Stewart before the entire membership and instructed her peers not to communicate with her.

## **THIRD CAUSE OF ACTION**

### **California Civil Code §§ 51, 52 - against AAPS**

130.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-129, as if fully stated herein.

131.   AAPS has violated Patricia Stewart's right to be free from gender discrimination as guaranteed by California Civil Code § 51.  Specifically, AAPS procured a location for an organized entity-wide annual meeting in Marina Del Rey, California, during which they denied Patricia Stewart entry and equal access to the meeting on the basis that she is a female.  In doing so, AAPS did not treat her in an equal manner to male participants in a similar situation, who were allowed full access to the accommodations of the organized meeting.

132.   AAPS violated Patricia Stewart's right to be free from gender discrimination as guaranteed by California Civil Code § 51, based on acts occurring in the state of California.  Patricia Stewart was treated differently from male members of AAPS who were also contesting disciplinary charges brought against them by AAPS.  Male members were allowed entry to the meeting and were allowed to raise

objections and concerns in contesting their disciplinary charges.  They were also allowed to run for offices of leadership and vote. Patricia Stewart was denied this opportunity on the basis of her sex.  Male members were afforded greater due process under AAPS's Bylaws, whereas Patricia Stewart was treated differently from male members and denied her due process rights.

133.   Based upon AAPS's history of disparate treatment of female members, including denying them certification, leadership positions, and access to organizational meetings, Patricia Stewart's gender was a motivating yet arbitrary factor in AAPS's discriminatory and retaliatory acts.  As such, AAPS denied Patricia Stewart of her full and equal rights guaranteed by California Civil Code § 51.

134.   As a direct and proximate result of the conduct of Defendant, Patricia Stewart has suffered and/or  will continue to suffer damage to her professional reputation, financial damage to her medical practice due to a decrease in revenue sources through loss of contracts, loss of employment opportunities and ostracism within her professional community.

135.   AAPS's violations of Patricia Stewart's rights as guaranteed by California Civil Code § 51 entitles her to receive compensatory damages, attorney's fees, and injunctive relief, all of which are provided for in California Civil Code § 52 and are prayed for below.

136.   In doing the acts alleged herein, AAPS knew or should have known that its actions were likely to injure Patricia Stewart. AAPS intended to cause injury to Patricia Stewart and acted with a willful and conscious disregard of her rights as secured by California Civil Code § 51, thereby entitling Patricia Stewart to recover treble damages, or a minimum of $4,000, per offense, pursuant to California Civil Code§ 52.

### **FOURTH CAUSE OF ACTION**

### **California Government Code § 12940(h) - against AAPS**

137.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-136 as if fully stated herein.

138.   "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:  (h) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Cal. Gov't Code § 12940(h).)

139.   Patricia Stewart alleges that from 1998 until her termination in Summer, 2012, she made numerous complaints and inquiries to AAPS's administrative staff and physician leadership regarding discriminatory and retaliatory practices by AAPS administrative leadership.  Specifically, Patricia Stewart objected to the distribution of pornography and racist emails circulated by Carbone, as well as the intentional failing of female physicians, improper exclusion of female physicians from membership, improper exclusion of female physicians from sitting for certification examinations, exclusion of females from meetings, and improper administrative removal of female physicians from leadership positions and replacement with male selections that were not even eligible under the bylaws to serve within those positions.

140.   Patricia Stewart alleges that as a direct result of being a female and opposing discrimination within AAPS based upon gender, race or religious beliefs, AAPS discriminated against Patricia Stewart by terminating her membership with AAPS.

141.   As a result of AAPS's actions, Patricia Stewart has suffered harm, and will continue to suffer harm, in the form of loss of past and future income, damage to her professional reputation, damage to her medical practice, loss of employment

opportunities and ostracism.

## FIFTH CAUSE OF ACTION
### (Intentional Misrepresentation and False Promise by AAPS and William Carbone)

Count 1 --Misrepresentation that AAPS Board Certification Is Comparable to ABMS or AOA Board Certification

142.   Plaintiff incorporates by reference all of the factual allegations made in paragraphs 1-141, as if fully stated herein.

143.   At the time that Patricia Stewart was first approached and recruited by AAPS and its agents, she was enrolled in, and in good standing in, an ABMS accredited residency program. In addition, Patricia Stewart had been offered admission to several ABMS approved Dermatology residency training programs prior to the time she chose to enroll in an AAPS affiliated Dermatology residency training program.

144.   AAPS and its agents represented to her that AAPS was a nationally recognized board of certification, that it offered superior training when compared to ABMS and AOA approved programs, which were the other two nationally recognized boards of certification for physicians, and that AAPS operated according to higher ethical standards than the ABMS or the AOA.

145.   These three representations were materially false.  First, Patricia Stewart was exposed to sexual harassment at her AAPS affiliated residency training program and AAPS did absolutely nothing to oppose or stop it.  Unlike ABMS and AOA board certification, which are universally recognized and accepted in all 50 states and worldwide, acceptance of AAPS board certification is limited.  Only a handful of states formally recognize AAPS related board certification and several states specifically forbid AAPS Diplomates from advertising that they are board certified specialists.

146.   Patricia Stewart relied to her detriment upon AAPS' agents' representations that its certification was universally recognized when she gave up her

54

FIRST AMENDED COMPLAINT

1   position in an ABMS accredited residency training program, and her numerous

2   options to train in AOA and ABMS approved Dermatology Residency Training

3   Programs chose to train in their AAPS affiliated Dermatology residency training

4   program over her other options.

5      147.   The detriment that she has experienced as a result of relying upon

6   AAPS' false representations that their board certification is universally recognized on

7   a par with other major boards includes:  First, her board certification was not

8   recognized by Cottage Hospital, and she was unable to obtain hospital privileges in

9   the community where she practices.  Second, she was not permitted under the laws of

10  the state of California to advertise that she is a board certified Dermatologist, since

11  California only permits physicians certified by the ABMS and AOA to advertise that

12  they are board certified.  Third, she had been ostracized from local Dermatology

13  associations because they do not recognize her AAPS board certification.  Fourth, she

14  was denied access to being a member of the specialist panels by certain medical

15  insurance companies—including Multiplan,  a major insurance network that covers

16  more than 50 million patients nationwide.

17     148.   Had AAPS and its agents not intentionally made the false representation

18  that AAPS board certification was universally accepted on par with board

19  certification from the ABMS and AOA, which they did in order to induce her to give

20  up her other options and join their program.  Patricia Stewart would not have left her

21  ABMS accredited residency program or chosen an AAPS affiliated Dermatology

22  residency over the ABMS and/or AOA approved residency programs that she could

23  have attended.  She would not have been subjected to the harms that she has suffered

24  as a result of relying upon the materially false representations that were made to her

25  by AAPS and its agents.

26

27  <u>Count 2-  Intentional Misrepresentation That AAPS Is An Ethical Organization</u>
    <u>That Holds Its Staff And Members to Abide By Its Exposed Code of Ethics</u>

28     149.   Plaintiff incorporates by reference all of the factual allegations made in

paragraphs 1-148, as if fully stated herein.

150.   In order to induce Patricia Stewart to give up her position in an ABMS accredited residency program, and her various other options to be trained in an AOA and ABMS approved  residency program, AAPS, through its agents represented to her that AAPS held itself to higher standards of ethics than AOA or ABMS.  This representation is and was materially false and was calculated to mislead her into choosing to be trained in an AAPS affiliated residency program over her other options.

151.   In reality, AAPS does not hold either itself, or its members to abide by its exposed Code of Ethics or any ethics at all, for that matter. This is evident from the fact that her AAPS affiliated residency trainers were permitted to sexually harass her without experiencing any consequences, that Dr. Spindler was criminally prosecuted for unethical conduct and it was covered up;  and Mr. Carbone was permitted to circulate materials at AAPS headquarters including a video of group sex; a woman urinating in public with a dog; naked photos of  girls that at least appeared to be under the age of 18; a photo of  a nude female patient in a hospital bed being characterized as an object of sexual interest; materials disparaging all kinds of people, including injured persons and hospitalized patients ; and materials advocating sexual exploitation of children—all without any consequences whatsoever.  AAPS leaders and representatives did not even ask Mr. Carbone if he did what he was accused of doing.  Later, when he admitted doing such things under oath, there were still absolutely no consequences for him—not even a public reprimand .

152.   Instead, AAPS suspended and/or  terminated every member who spoke up and attempted to insure that the organization abides by its espoused Code of Ethics.  This occurred despite the fact that the Code is boldly published on its web site; and despite the fact that AAPS has repeatedly claimed in a variety of verbal and published communications that the organization is founded upon, abides by, and requires it members to abide by its published Code of Ethics.

153.   Patricia Stewart has incurred great and irreparable harm as a result of relying upon AAPS' and its agents' representations that the organization is committed to operating in accordance with the "highest ethical standards."  She has been terminated from AAPS and has lost her board certification and her status of being a Dermatologist.  She cannot become board certified by another organization without starting her residency training all over in an ABMS approved program.  She gave up her position in her ABMS accredited residency program and withdrew from numerous AOA and ABMS Dermatology residency training programs who had expressed a willingness to accept her because she believe and relied upon AAPS' representations that they were the most ethical of the board certifying organization. She sought to uphold AAPS' espoused ethical standards and was severely retaliated against by Mr. Carbone and AAPS's executive leadership for the simple act of encouraging members of AAPS to require the leadership to abide by the organization's published Code of Ethics.

154.   By attempting to uphold the organizations Code of Ethics, she made herself a target of the covert scheme of AAPS's executive leaders to create the false impression that they are an ethical organization by suspending, terminating, and defaming anyone who calls attention to their serious ethical deficiencies, and/or tries to advocate the taking of steps to correct their serious ethical failings.

155.   Had Patricia Stewart known that AAPS' agents were intentionally misrepresenting to her that the organization operated in accordance with "the highest ethical standards, in order to recruit her to join their organization, when they knew that AAPS actually does not even attempt to abide by those standards, she would not have given up her position in an ABMS accredited residency program, or her other options and sought AAPS affiliated training and board certification. Furthermore, she would also not have jeopardized and greatly harmed her career by trying to promote the practice of those published ethical standards within the organization.

1    Count 3—False Promise (Against William Carbone)

2    156.   Plaintiff incorporates by reference all of the factual allegations made in

3    paragraphs 1-155, as if fully stated herein.

4    157.   On October 19, 2010 Mr. Carbone sent Patricia Stewart an email in

5    which he promised her that if she diligently carried out her duties as an officer of the

6    Academy of Dermatology, that she would not be exposing herself to retaliation or

7    abuse by the leadership of AAPS.

8    158.   Patricia Stewart, who at the time was wary of participation in AAPS

9    leadership because of her previous adverse experience of having disciplinary charges

10   levied upon her for serving the organization so competently and in such good faith

11   that she had received the "2003 Physician of the Year" award. Despite serving so

12   well that she had received the award, that same year she had been compelled to

13   appear before the Board of Directors and face disciplinary charges, despite the fact

14   that she had done nothing to deserve to be disciplined.

15   159.   At the time, Mr. Carbone knew from his recent experience in the

16   preceding several weeks,   that he was in complete control of the Board of Directors

17   and that he could persuade the Board to discipline anyone that he wanted them to

18   discipline.  He also knew that a scandal was taking place within the organization

19   regarding his own unethical conduct, which had resulted in the Board suspending

20   without a hearing the three physicians who had dared to call for an investigation of

21   his controversial and obviously unethical conduct.

22   160.   Believing that he had an opportunity to purge the organization of

23   individuals such as Patricia Stewart, who had previously displayed disapproval of his

24   unethical conduct, Mr. Carbone wanted Patricia Stewart, who had withdrawn from

25   serving in leadership roles for the preceding seven years,  to get back into leadership

26   so that he could exploit his newly gained power and finally get even for her

27   opposition to his policies of advocating sexual exploitation of female residents and of

28   discriminating against certification candidates based upon gender and race.

Consequently, he falsely represented to Patricia Stewart that she could feel free to
participate in a leadership role within AAPS by promising that he had changed his
historical practice of retaliating against persons who opposed him,  and that what had
happened to Patricia Stewart previously would never happen again.

161.   Patricia Stewart believed his false promises and relied upon them. As a
result of her reliance upon Mr. Carbone's false promises, Patricia Stewart served
diligently and faithfully in her capacity as Governor of the Academy of Dermatology
of AAPS.   When violations of the ethical standards that AAPS and its agents claimed
that the organization operated under, Patricia Stewart stood up for the rights of
leaders within the organization who were seeking to uphold AAPS' ethical standards,
As a direct consequence of standing up for the principles that AAPS claimed it was
committed to, Patricia Stewart's membership in AAPS was terminated; her board
certification was stripped from her by the Board of Directors of AAPS;  she was
defamed and publically humiliated;  and she was subjected to a frivolous retaliatory
lawsuit.

162.   Had Mr. Carbone not made the false promise to Patricia Stewart  that she
would not be retaliated against for serving diligently as an officer of AAPS, she
would not have continued in the role of Governor of AAPS, and would not have
taken a stand against the unethical behavior that  she had learned was occurring
within the organization. Consequently, she would not have been subjected to
discipline for opposing ethical violations within the organization.  She would not
have lost her board certification, and would not have had to defend herself against a
frivolous lawsuit.

Count 4—Intentional False Promise That AAPS Would Provide Patricia
Stewart An Appeal Hearing Before A Panel of Past Presidents and (against
Robert Cerrato and AAPS)

163.   Plaintiff incorporates by reference all of the factual allegations made in
paragraphs 1-162, as if fully stated herein.

164.    On July 27, 2012  Robert Cerrato sent the Plaintiff a letter informing her that her request for an appeal of the decision of the Board of Directors had been granted.   She was told that a date for the hearing would be set once they were able to arrange to convene the past presidents together to conduct the hearing. Patricia Stewart was required to exhaust her administrative remedies before she could file a lawsuit against AAPS.

165.    Patricia Stewart relied upon Mr. Cerrato's promise of an appeal hearing and did not file an immediate lawsuit for wrongful termination.

166.    Since, as a practical matter it is a difficult task to assemble physicians from around the country, and since all disciplinary hearings have always been conducted at the annual meetings of AAPS over the past 14 years that she has been affiliated with AAPS, Patricia Stewart waited until the next annual meeting had occurred, and she was not permitted to appear before the assembly of past presidents as promised, before she concluded that she had been deceived and filed her lawsuit.

167.    AAPS should be estopped from asserting the statute of limitations for the filing of a claim for wrongful termination because any delay in filing beyond the 1 year deadline was a direct result of the fraudulent representations of its president.

### Count 5--Misrepresentation That  Her Board Certification Was Not Affected By the Termination of Her Membership.

168.    Plaintiff incorporates by reference all of the factual allegations made in paragraphs 1-167, as if fully stated herein.

169.    AAPS has willfully and intentionally misrepresented to the Plaintiff that their decision to terminate her membership in AAPS would have no effect upon her status as a board certified Dermatologist.

170.    In reality, AAPS and its leaders knew that their decision to terminate her membership in AAPS would also end her board certification through their affiliated organizations ABPS and BCD, and concealed their knowledge and this fact by redacting the section of the Bylaws that addressed the issue in their communications

60

with her.  They have continued their pattern of false representations concerning the effect of their unwarranted, hostile, and discriminatory actions committed against her in violation of the terms of their written agreements with her.

171.   The Plaintiff relied upon the intentional misrepresentations of the Defendants and, as a result of her justifiable reliance, she has been further harmed by their willfully false and misleading conduct.

172.   Plaintiff seeks any additional damages and injunctive relief available to help to offset the additional harm that she has incurred as a result of her justifiable reliance upon the Defendant's willful misrepresentations that her board certification would not be affected by the termination of her membership in AAPS.

## SIXTH CAUSE OF ACTION

### (Defamation by All Defendants)

173.   Plaintiff incorporates by reference all of the factual allegations made in paragraphs 1-172, as if fully stated herein.

174.   As discussed above, another aspect of the operation of the civil conspiracy to retaliate against Plaintiff for opposing discrimination and other unlawful conduct within the organization has been to attempt to systematically destroy Plaintiff's reputation within the Dermatology community and within the entire organization.  This has been accomplished, inter alia, by releasing mass emails which originate in Florida, but are circulated nationwide via the Informz system which allows Defendants William Carbone, Anthony Robert Cerrato, Stephen Montes, and their designees to send out emails to every one of AAPS' 2,500+ members.  AAPS and its officers have routinely use this tool to defame Plaintiff, since as early as March 28, 2012, at which time the members were falsely informed that Plaintiff has "played an active role" in a "campaign to destroy AAPS." These statements were known by their publishers to be false, and are published for the malicious purpose of harming the Plaintiff's reputation, in order to discredit her and

1    the effect of her opposition to their unethical practices that are harming individuals

2    and the entire organization.  They originated in Florida and were sent nationwide.

3        175.   On May 30, 2012 the Defamatory Letter was authored in Florida and

4    shown to the Board of Directors of AAPS and the Disciplinary Committee, via wire

5    and fax, at which time her membership in AAPS was terminated, so that she was

6    disconnected from the Informz system.  Consequently, Plaintiff has been unable to

7    receive copies of the defamatory publications that are being broadcast from Florida

8    nationwide on an ongoing basis to thousands of physicians across the nation.

9        176.   These emails are maliciously premeditated to subject Plaintiff to scorn,

10   hatred, hostility, embarrassment and ostracism, and have achieved their intended

11   result, as is evidenced by the attitudes that are displayed towards Plaintiff by her

12   colleagues, who were formerly friendly and welcoming towards her.

13       177.   After the meeting of the Board of Directors of AAPS that took place in

14   Marina Del Rey, California on June 25, 2012, which has been described above, 99%

15   of the members of Plaintiff's academy would not speak to her, because of the false

16   representations that were made to them behind closed doors, in connection with the

17   presentation.   Upon information and belief, the false representations are being

18   published and re-published on an ongoing basis, and new misrepresentations are

19   being generated on a periodic basis by the parties to the conspiracy that includes,

20   without limitation, all of the named defendants in this lawsuit as well as the DOES.

21       178.   The numerous statements contained in **EXHIBIT V** to this Complaint

22   constitute defamation *per se*.  For this claim, in addition to requesting damages

23   according to proof, Plaintiff will seek leave to amend her complaint after completing

24   discovery and ascertaining the particular falsehoods that have been published

25   concerning her through the Informz system to the membership of AAPS, and through

26   other channels.

27                              **SEVENTH CAUSE OF ACTION**

28

---

62

**FIRST AMENDED COMPLAINT**

**(Intentional Interference with Prospective Economic Advantage by all Defendants)**

179.   Plaintiff incorporates by reference all of the factual allegations made in paragraphs 1-178, as if fully stated herein.

180.   Plaintiff, by virtue of her membership in AAPS and possessing her board certification with ABPS, was entitled to participate in various networks which granted her access to serve as a provider to millions of patients across the nation— including the local HMO contracting medical group Physician's Choice, Inc., which was formerly named Midcoast Care, Inc.  As a result of the disciplinary actions taken by Defendants, Plaintiff is no longer a member in good standing in AAPS, or eligible to be board certified by any of its affiliated organizations—including ABPS.  As a consequence of no longer being board certified. Patricia Stewart is no longer eligible to serve as a contracted capitated Dermatologist with medical groups that require its specialist physicians to be board certified—including Physician's Choice and Santa Barbara Select IPA, both large local IPAs, with whom Patricia Stewart has previously enjoyed exclusive contracts , having been for many years the sole provider of Dermatology services for over 15,000 HMO Santa Barbara County patients residing in both Northern and South Santa Barbara County through her offices located in Santa Barbara and Santa Maria.

181.   As a direct result of no longer being a board certified Dermatologist, and no longer  eligible to serve as the capitated panel Dermatologist, Patricia Stewart has had to forgo acceptance of an offer to provide capitated Dermatology services to Physician's Choice for both Santa Barbara and San Luis Obispo Counties, which would have paid her a contract based monthly fee of $15,000/month.  As a consequence of this, Patricia Stewart lost a capitated revenue source that would have provided her the annual amount of $180,000 in 2013, and she will continue to lose a similar amount each year for the next 15 years that she would have been able to serve as the capitated Dermatologist for Physician's Choice.

182.   AAPS knew that Patricia Stewart was serving as a capitated specialist

63

for Physician's Choice because Physician's Choice, acting under its former name of Midcoast Care, Inc., which it operated under before it merged with San Luis Obispo Select IPA and took over operation of its northern neighbor, made an inquiry concerning Patricia Stewart's board certification status through AAPS and AAPS faxed verification of her board certification in Dermatology to Midcoast Care, Inc. on 7/10/08.

183.   Plaintiff had a reasonable expectation that she would continue to obtain and maintain the Physician's Choice contract if she had been able to maintain her board certification because the longstanding President of Physician's Choice is her brother in law.  However, even her family relations could not help her to maintain that contract because the HMO insurance plans require the local HMO to contract with board certified specialists to provide specialty services to their patients.

184.   In addition to the loss of her Physician's Choice contract, because she is no longer board certified and eligible to serve on their specialty panel, Patricia Stewart has been forced to submit her resignation to Santa Barbara Select IPA.  She has previously served as the sole contracted provider of Dermatology services to this company for the more than the past 15 years having received capitated payments monthly in amounts ranging from $7,000 to $14,000, or approximately $126,000 per year.   Defendants have either known about, or had reason to know about the fact that she would have to give up her Santa Barbara Select IPA HMO contract if she lost her board certification because her attorneys have been telling AAPS' attorneys about the harm that she is experiencing from their adverse actions since they initiated their retaliatory actions against her.  However, AAPS has refused to acknowledge that they have been harming her business, because they insist that she is still board certified by them—even though their Bylaws clearly reveal that they do not have the authority to extend board certification to her after they terminated her membership in AAPS as their Bylaws clearly state that they are required to strike her name from the rolls of AAPS and all of its affiliated organizations, including the BCD.

185.   But for Defendants' unlawful discriminatory and retaliatory conduct, described above, Plaintiff would have continued to be able to provide capitated Dermatology services to both the Santa Barbara Select IPA and Physicians Choice IPA and to reap the benefits of being the exclusive capitated Dermatology provider for a significant majority of the HMO patients residing in both Santa Barbara and San Luis Obispo Counties.

186.   Defendants intentionally interfered with Plaintiff's access to these networks, and they did so maliciously, in order to oppress Plaintiff.  The actions they took were fraudulent and involved falsifying documents and making misrepresentations to individuals vested with the authority to terminate her membership in AAPS and thereby revoke her board certification and interfere with Plaintiff's existing relationship with these and other medical groups.

187.   As a result of the interference caused by Defendants, Plaintiff will lose at least $158,000 per year for the rest of her career, which is likely to be  approximately 15 more years, so Plaintiff therefore demands damages according to proof, but in no event less than $2,370,000.

## EIGHTH CAUSE OF ACTION
### (Unfair Business Practices in Violation of Cal. Bus. Prof. Code § 17200 *et seq.* by all defendants)

188.   Plaintiff incorporates by reference all of the factual allegations made in paragraphs 1-187, as if fully stated herein.

189.    Plaintiff brings this cause of action on behalf of herself against Defendant AAPS for its unfair, fraudulent and/or deceptive business acts and/or practices pursuant to California Business and Professions Code Sections 17200 et seq. ("UCL"), which prohibits all unfair and/or fraudulent business acts and/or practices.

190.   Plaintiff asserts these claims as she is a representative of an aggrieved group and on behalf of all similarly situated prospective members and members of

AAPS and other who AAPS should no longer be permitted to harm through its ongoing patterns and practices of discrimination and other unfair, fraudulent or unlawful conduct.

191.   The business practices and acts described hereinabove which have resulted in violations of 42 U.S.C. § 2000 et seq., California Government Code § 12940(h), California Civil Code §§ 51, 52, Breach of Contract, common law proscriptions against defamation, libel and intentional misrepresentation, violation of Cal. Corp. Code § 5341 and Fla. Stat. § 617.0607 each constitute "unlawful" acts which fall within the meaning of unfair competition in violation of California's UCL law.

192.   The process followed by AAPS in terminating the association memberships of Dr. Patricia Stewart, in a manner inconsistent with Cal. Corp. Code § 5341 or Fla. Stat. § 617.0607 is unlawful and constitutes violations of California's UCL.  It is also an unfair business practice in several respects.  The Plaintiff's expulsion was also fraudulent to the extent that paper trails were falsified to create the false impression that the Plaintiff was conducting herself in a manner that was potentially disruptive and disrespectful of AAPS leadership and that presented a possible risk of harm to the livelihoods of AAPS members, when she had not.

193.   The business practice by Defendants AAPS, Cerrato and Carbone of inducing Plaintiff's colleagues to libel her by threatening to destroy their Dermatology academy by defunding their fellowship training program if they do not cooperate with a scheme to libel their peers is unfair and fraudulent activity that violates California's UCL.

194.   The business practice/act of manipulating the examination process and the test results of AAPS' board certifying examination in Dermatology so as to discriminate against female applicants such as Drs. Patricia Stewart, the unnamed affected applicant who took the 2003 certification examination, is unfair, fraudulent and also unlawful in violation of 42 U.S.C. § 2000 et seq., California Government

1   Code § 12940(h) and California Civil Code §§ 51, 52, thus constituting violations of

2   California's UCL.  This includes, without limitation, AAPS' historical practices of

3   imposing disparate eligibility requirements upon those female applicants who are

4   attempting to sit for the exam, providing copies of test answers in advance to male

5   applicants and/or female applicants who receive quid pro quo assistance accepting

6   the terms and conditions of their hostile workplace environments, and Bill Carbone's

7   practice of retroactively discriminatorily flunking female minority applicants such as

8   the unnamed candidate in 2003, or imposing disparate certification requirements

9   upon individuals such as Plaintiff  and the unnamed candidate in 2003 in order to

10  prevent them from sitting for or passing the certification exam and interfere with their

11  employment prospects or ability to practice their trade or profession.

12      195.   In particular, AAPS' practices of recruiting potential candidates for its

13  membership and certifications through the making of materially false representations

14  that their certification is widely recognized, and/or comparable to AOA or ABMS

15  certification and that they are an ethical organization that abides by its espoused code

16  of ethics has not only harmed the Plaintiff, and other physicians who were deceived

17  by their false statements, but threatens to continue to result in material harm to other

18  prospective medical students, residents, and candidates for board certification

19  nationwide.

20      196.   In order to help to prevent such individuals from experiencing the kinds

21  of harm that she has suffered as a result of the Defendant's misrepresentations,

22  Plaintiff seeks an injunction forbidding AAPS, ABPS, and its board of certification

23  from advertising or representing that they are an ethical organization, or that their

24  members or administrative staff are required to, or can be expected or relied upon to,

25  operate under any ethical code or standards of professional behavior for a period of

26  up to 5 years.

27      197.   Plaintiff also seeks an injunction requiring  AAPS and its Board of

28  Directors to notify, via the Informaz system, all members of AAPS, and to provide a

FIRST AMENDED COMPLAINT

1    copy to Patricia Stewart, as well, that the Court has determined that Patricia Stewart

2    has <u>not</u> engaged in conduct deleterious to AAPS, or incompatible with its purposes,

3    and that she did not author, publish, or repeat any of the statements that were

4    attributed to her at the annual meeting of the Board of Directors in Marina del Rey,

5    California, and that the reason that she did not defend herself against those false and

6    defamatory accusations was because the Board of Directors had placed guards at the

7    door of the meeting who had been instructed to prevent her from entering the room

8    where the meeting was taking place.

FIRST AMENDED COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

198.   For preliminary and permanent injunctions against Defendant for the relief requested in the Eighth Cause of Action;

199.   For general and compensatory damages against Defendant in an amount to be proven at trial;

200.   For punitive damages against Defendant in an amount to be proved at trial.

201.   For the costs of this action, attorney's fees, and such other relief as the Court deems fair and appropriate under the circumstances.

202.   For any other relief the Court deems appropriate.

DATED: July 21, 2014

Respectfully submitted,

LAW OFFICES OF WILLIAM OKERBLOM

By: _____

William Okerblom
Attorney for Plaintiff
PATRICIA STEWART, D.O.

FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

DATED: July 21, 2014

Respectfully submitted,

LAW OFFICES OF WILLIAM OKERBLOM

By: _____

William Okerblom
Attorney for Plaintiff
PATRICIA STEWART, D.O.

70

FIRST AMENDED COMPLAINT