1            UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3              HONORABLE OTIS D. WRIGHT, II

4          UNITED STATES DISTRICT JUDGE PRESIDING

5   PATRICIA STEWART, D.O.,              )
                                         )
6                    Plaintiff,          )
                                         ) ED CV 13-1670-ODW(DTBx)
7            vs.                         )
                                         )
8   AMERICAN ASSOCIATION OF PHYSICIAN    )         VOLUME 1
    SPECIALISTS, INC., WILLIAM           )
9   CARBONE; ROBERT CERRATO; SVETLANA    )       PAGES 1 – 62
    RUBAKOVIC and DOES 1-100,            )
10                                       )
                     Defendants.         )
11  _____     )

12

13

14              REPORTER'S TRANSCRIPT OF
                    TRIAL – DAY 1
15           TUESDAY, JANUARY 26, 2016
                     9:33 A.M.
16            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22
    _____

          DEBI READ, CSR 3949 CRR RMR RDR
23       FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET 432A
24        LOS ANGELES, CALIFORNIA 90012
             READIT3949@GMAIL.COM

25

1                          A P P E A R A N C E S

2

ON BEHALF OF THE PLAINTIFF:

3

        CONWELL BUSINESS LAW, P.A.
4       BY:  GEORGE DONOVAN CONWELL, JR.
             Attorney at Law
5       12610 Race Track Road, Suite 200
        Tampa, Florida 33626
6       813-282-8000
        dconwell@conwellbusinesslaw.com

7

        HILAIRE MCGRIFF, PC
8       BY:  MIKA HILAIRE
             Attorney at Law
9       601 S. Figueroa Street, Suite 4050
        Los Angeles, California 90017
10      213-330-4260
        mika@hmpclaw.com

11

        WILLIAM A. OKERBLOM LAW OFFICES
12      By:  WILLIAM ALLEN OKERBLOM
             Attorney at Law
13      1145 E. Clark Avenue, Suite H
        Santa Maria, California 93454
14      805-478-6570
        drlaw07@aol.com

15

ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
16 PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:

17      ANDERSON, MCPHARLIN & CONNERS LLP
        BY:  ERIC A. SCHNEIDER
18      BY:  LEILA M. ROSSETTI
             Attorney at Law
19      707 Wilshire Boulevard, Suite 4000
        Los Angeles, California 90017-3623
20      213-688-0080
        eas@amclaw.com
21      lmr@amclaw.com

22

23

24

25

                    UNITED STATES DISTRICT COURT

1          A P P E A R A N C E S  (continued)

2

   ON BEHALF OF DEFENDANT AMERICAN ASSOCIATION OF PHYSICIAN
3  SPECIALISTS, INC.:

4          GUSRAE KAPLAN NUSBAUM PLLC
           BY:  MARLEN KRUZHKOV
5               Attorney at Law
           120 Wall Street
6          New York, New York 10005
           212-269-1400
7          mkruzhkov@gusraekaplan.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2    EXAMINATION                                    PAGE    VOL.

3
     Voir Dire Examination By Mr. Conwell            45      1
4    Voir Dire Examination By Mr. Schneider          52      1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JANUARY 26, 2016

 2                          9:33 a.m.

 3                          -o0o-

 4              (Call to Order of the Court.)

 5              (Open court with the prospective jurors.)

 6              THE COURTROOM DEPUTY:  All rise and please raise

 7    your right hand.

 8         Do you and each of you solemnly swear that you will

 9    truthfully answer all questions that shall be asked of you

10    touching upon your qualification as a juror in the case now

11    before this court, so help you God?

12              (All prospective jurors answered affirmatively.)

13              THE COURTROOM DEPUTY CONNIE:  Please be seated.

14              THE COURTROOM DEPUTY MS. ENGLISH:  You may be

15    seated.

16              THE COURT:  Way too much formality.

17         Good morning, ladies and gentlemen.  I'm Judge Otis

18    Wright.  Saw my name on the door.

19         Everybody knows what that is, right?  (Demonstrating.)

20    Everybody in Los Angeles County seen those.  This one has my

21    name on it.  Everybody knows what that is too, right?  'Cause

22    y'all got one.  This is mine.  They wouldn't let me serve.  I

23    tried.

24         Here's this.  Particular point of my name being on the

25    door out there is this:  Some of you are going to say, Well, I
```

1    can't serve on jury duty, because, well, my job.  And if I'm

2    not there, then life as we know it ceases to exist.  Trust me,

3    when I go to jury duty, there's nothing going on in here.

4    Nothing.  Okay?  But my behind shows up.  I never get selected.

5    They call; I show up.

6         Can you imagine how hypocritical it would be of me not to

7    show up for jury duty?  Aside from the fact that I believe that

8    this is the way it ought to be done, that I don't think we

9    should have professional jurors, you know, paid by whom?  The

10   government?  City?  No.

11        And I know if I need to have a dispute resolved, I want my

12   peers.  I want people who have walked where I've walked to

13   decide the issue.  And the only way that happens, the only way

14   this fabulous system actually works is if we're willing to show

15   up.  Okay?

16        All right.  Now, here's the deal.  In fact, let me tell

17   you what this is about, 'cause you all don't really know what

18   the case is about and you're sitting here wondering is it a

19   criminal case?  Is it a bank robbery thing?  Is this terrorism?

20   Is Homeland Security going to come in?  Nah, it's not going to

21   be that interesting, I'm afraid.

22        This is a statement that the parties have prepared to just

23   give you an idea, for example, that this isn't a patent

24   infringement case, all right?  This case is about plaintiff,

25   Patricia Stewart, who is a board-certified dermatologist,

1    bringing suits against defendants American Association of

2    Physician Specialists, Inc., William Carbone, Robert Cerrato,

3    Stephen Montes for breach of contract, fraud, and gender

4    discrimination.  And of course the defendants deny any

5    wrongdoing.

6         Now, we're going to introduce the players only for one

7    purpose:  If anybody happens to be engaged to any of the

8    participants in this case, I'd like to know about it.  Or, if

9    there is any other reason that you may have some bias against

10   one party or another, I'd kind of like to know about it.

11        You all have met Ms. English.  She runs the courtroom, and

12   those of you who will be lucky enough to serve on this case

13   will get real close with Ms. English.

14        And behind me to my left, your right, is Ms. Debi Read.

15   She is the official shorthand reporter for this courtroom.  She

16   records everything that is said in this courtroom.

17        And now I'm going to have the attorneys identify

18   themselves and those seated at counsel table, as well as read

19   their witness lists.  If any of you feel that you know someone

20   on the witness list, I want you to keep that in mind 'cause I

21   want to ask you, and we will also get further identifying

22   information regarding that witness to see whether or not any of

23   you know someone who's going to be a witness in the case.

24        All right.  So we'll begin with the identification of the

25   attorneys, beginning with the plaintiffs.

 1          MS. HILAIRE:  Mika Hilaire appearing on behalf of

 2  the plaintiff, Patricia Stewart.

 3          MR. CONWELL:  Good morning.  My name is Don Conwell

 4  and I'd like to introduce Dr. Patricia Stewart to you.  And

 5  also we're assisted with computer technology by Arie Schinnar.

 6      Your Honor, do you want me to read our witness list at

 7  this time?

 8          THE COURT:  Yes, yes.

 9          MR. CONWELL:  I'll come up here so you can hear me.

10  These are witnesses who may be called in this trial:

11      Patricia Stewart, who you just saw, Leslie Radentz, Atwood

12  Rice, Thomas Castillo, William Okerblom, William Carbone,

13  Robert Cerrato, Eric Wilkens, Cassandra Newby, David Lemonick,

14  Betsy Schenck, Anthony Russo, Kenneth Wallace, Dr. Leonard

15  Young, Christine Otto, and Heather Xitco.  That's it.  Thank

16  you.

17          MR. SCHNEIDER:  Good morning, ladies and gentlemen.

18  I'm Eric Schneider.  With me and counsel in this case are

19  Marlen Kruzhkov, right here, and Leila Rossetti.

20      The witnesses we will be presenting, some of the names

21  you've already heard; both sides are relying on them as

22  witnesses:  Anthony Durante is the Chief of Operations of the

23  American Association of Physician Specialists.  It goes by

24  AAPS; William Carbone is in the lovely yellow tie there.  He is

25  the Chief Executive Officer of AAPS.  Dr. Robert Cerrato is

1    sitting next to him.

2         In addition, we will be calling Dr. Anthony Russo,

3    Dr. Kenneth Wallace, Dr. William Okerblom, Dr. Joseph

4    Gallagher, Lynn Haas, H-a-a-s, Dr. John Okerblom, Dennis

5    Coleman, Jubin Merati, Dr. Betsy Schenck.  That's all we got.

6              THE COURT:  Thank you, Mr. Schneider.

7         All right.  Any recognition?  First of all, does anyone

8    out here in the panel recognize anyone seated at counsel table?

9    No?

10        What about from the witness list?  Any names sound

11   familiar?

12        Yes, sir.  What is your name?

13             THE PROSPECTIVE JUROR NO. 13:  I'm David Karns.

14   David Karns.

15             THE COURTROOM DEPUTY:  Number 13.  Number 13.

16             THE PROSPECTIVE JUROR NO. 13:  Strictly a name

17   recognition.  I don't know.

18             THE COURT:  Who do you think you recognize,

19   Mr. Karns?

20             THE PROSPECTIVE JUROR NO. 13:  Well, I recognize the

21   name Thomas Castillo and I recognize --

22             THE COURT:  Okay.  Hang on.  Hang on.  Let's just

23   deal with Mr. Thomas Castillo.  Whose witness is that?

24             MR. CONWELL:  Plaintiff's, your Honor.

25             THE COURT:  Plaintiff?  All right.  Any identifying

1    information regarding Mr. Castillo?  Occupation?  Geographic

2    location in the country?

3             MR. CONWELL:  He's a physician who resides in

4    Wisconsin.

5             THE PROSPECTIVE JUROR NO. 13:  No.

6             THE COURT:  Who else?

7             THE PROSPECTIVE JUROR NO. 13:  Well, Dr. Anthony

8    Russo, but I only know an Anthony Russo, so he's not a doctor.

9             THE COURT:  He's not a doctor, okay.  Thank you.

10            THE PROSPECTIVE JUROR NO. 13:  There was one other

11   on this side -- and I can't remember which one that he had

12   mentioned -- sounded familiar too, was a familiar name.  No --

13   perhaps they could repeat them and I'll tell you.

14            THE COURT:  Okay.

15            THE COURTROOM DEPUTY:  Turn your mic on.  Green

16   light.  When it's green, it's on.

17            MR. SCHNEIDER:  Yeah.

18            THE COURT:  They got graduate degrees.

19            MR. SCHNEIDER:  William Carbone, fellow over there;

20   Robert Cerrato is sitting next to him; Anthony Durante is

21   seated here; Kenneth Wallace, he's a doctor; Dennis Coleman.

22            THE PROSPECTIVE JUROR NO. 13:  Dennis Coleman.

23            THE COURT:  What is Dennis Coleman's profession and

24   where does he live in the country?

25            MR. SCHNEIDER:  He lives in the city of Oxnard and

1    he is retired in the hospital industry.

2          THE PROSPECTIVE JUROR NO. 13:  No, that's not him.

3          THE COURT:  Okay.

4          THE PROSPECTIVE JUROR NO. 13:  Those were the three

5    that --

6          THE COURT:  Thank you, sir.  Appreciate it,

7    Mr. Karns.

8     Anybody else?  (No response.)

9     Anything that you've heard so far about the subject matter

10   of this litigation -- and you haven't heard much at all -- but

11   you know it's a doctor against a medical association and the

12   doctor's a dermatologist.  Does that strike a chord with

13   anybody?  Does anyone go, "Oh, my God, I'm conjuring up

14   horrible memories of the past"?  Anything at all like that?

15   Had a bad breakup with a dermatologist when you were in

16   college?  Anything like that?  (No response.)

17    Got a skin condition you can't get rid of because -- I

18   didn't think so, but some of the cases are -- particularly some

19   of the criminal cases, we have to worry about jurors having

20   been victims of that same crime.  And we have to be sensitive

21   to that, and we absolutely don't want to put anyone through a

22   difficult experience or reawaken some unpleasant memories.

23    But this is pretty dry, okay?  I wish it were more

24   exciting, but...

25    We've already talked to those among you who have, we'll

just say, issues that preclude you from serving as jurors.  The
only thing I care about is this -- the only thing the parties
care about:  fairness, an open mind, a willingness to listen to
the evidence, decide where the truth lies, listen to my
instructions on the law and apply the facts to the law as I
give it to you, and render what is -- in your mind is a fair
and just decision.  That's what you're being called upon to
do -- no more, no less.  I'm not asking you to sit in judgment
of your fellow man and all that sort of thing.  I'll do that.
Just asking you to find the facts.

Anybody have a real problem with that?  I'm waiting for
the aluminum hat.  No aluminum hats?  Okay.

I understand that you all are going to want to do other
things, that this is a disruption in your lives, but I can make
you a promise.  I can make you a promise.  With the eight of
you who are going to be fortunate enough to sit on this jury, I
promise you an enjoyable experience.  100 percent of the time
I've delivered on that promise.  Ms. English sees to it.

Here's the way it's going to work, and maybe this too will
impact some of you.  We're going to begin at 8 o'clock in the
morning and we're going to end around 2 in the afternoon.
There'll be no stopping for lunch.  You'll be going home while
the sun is still shining.  Okay?

The length of this puppy:  It's going to take us a couple
of weeks.  And I'm going to do everything in my power, as are

1    the attorneys, to expedite this thing and move it along.  And

2    we always bring in trials a shorter period of time than we

3    estimate because the lawyers always end up getting information

4    to you much more expeditiously than they thought would be

5    possible.

6         Now, if we can do that, if we can get this to you in a

7    couple of weeks -- we're not going to do anything today other

8    than select you today, and I've got another trial I've got to

9    do, a court trial I've got to do -- as soon as we get you

10   selected, we come back in the morning, come back at 8 o'clock

11   in the morning, we're going to go in two weeks, maybe less,

12   maybe a lot less.  Is that going to be a problem?

13        (No response.)

14        God, I love you guys.  This is so easy, I can't stand it.

15   All right.  I'm trying to look for problems and you guys aren't

16   giving me any problems.  All right.  Tell you what.  We're

17   almost there.

18        I forgot to tell you about the process.  Listen.  Going to

19   ask you questions.  Questions are not meant to embarrass you,

20   trust me.  But here's the deal.  I need you to be candid with

21   me.  What we don't want is this -- and this happens all the

22   time -- it happens all too often -- trial is over with and now

23   we're reading in the paper where some juror is talking to the

24   media and revealing for the first time that, "I was actually

25   once married to one of the parties in the case."  Nobody knew

this.  The things that we would like to know, we want to know

now.  We want -- we don't want to go through an entire trial

and then have one of you talking to some reporter and revealing

things that we really need to know now.  Okay?

I need you to be honest.  I need you to not only answer

the question, perhaps give us more information than we ask for.

Okay?  It's better that you talk too much than not enough.  We

don't want you to withhold anything.

We also don't want to embarrass anyone.  If you think the

question would cause you some embarrassment, just let me know

and then we'll go talk about it at the bench.  All right?  Just

me and 26 of these lawyers, okay?

All right.  The only thing I care about -- I don't believe

this -- all I care about, aside from how you may feel about

things and have felt about things in the past, I don't really

care.  Even though I'm going to ask you questions about it, I

don't really care what you do for a living.  I don't care what

your spouses do for a living.  I don't care what your kids do

for a living.  I'm not going to draw conclusions based upon

that.  I've been there.  Because of my past employment, people

think they know me.  No.  So, I don't make those

generalizations about other citizens -- because you did this or

do that for a living that you must feel a certain way.  No.  I

know that's not true.

But what I do care about is this:  For now, right here and

now, for the purposes of this proceeding, are you willing to

put all that stuff aside, just listen; listen to what people

talk about on that witness stand, make a determination for

yourself whether or not you think they're telling the truth or

not?  You are the triers of fact.  You will determine what

happened.  And I'll tell you the law, so you'll know what to do

with that.

Putting everything else aside, can you be fair and

impartial to these litigants in this case?  Can you do that?

Who can't?  Who feels that they in all honesty cannot do

that?  And that's all right.  I've heard people say, "I can't

do that.  I'm an idiot.  I can't be fair."  Well, you wouldn't

be an idiot.  You'd be honest.  There's some people, they

simply -- they can't do this.  And we need to know now.  They

need to know now.  Anybody at all?  This is your E ticket out

of here.  (No response.)

No?  You're giving me that look.

THE PROSPECTIVE JUROR NO. 5:  Yeah.

THE COURT:  What's your name, ma'am?

THE PROSPECTIVE JUROR NO. 5:  Wolf.

THE COURT:  Ms. Wolf?

THE PROSPECTIVE JUROR NO. 5:  First question, I want

to know what that is?  You said everybody knows what that is --

THE COURT:  Everybody knows what this is, Ms. Wolf.

THE PROSPECTIVE JUROR NO. 5:  I don't know what that

1    is.

2              THE COURT:  That's 'cause you threw yours away.

3              THE PROSPECTIVE JUROR NO. 5:  No.  That's 'cause I

4    don't live in Los Angeles County.

5              THE COURT:  There you go.

6              THE PROSPECTIVE JUROR NO. 5:  That's why.

7              THE COURT:  Yeah, this is the juror -- I forgot.  I

8    used to know the numbers.  They send out a million of these

9    things every month?  L.A. County trying to get jurors.

10             THE PROSPECTIVE JUROR NO. 5:  I live in Ventura

11   County.  My summons looks different.

12             THE COURTROOM DEPUTY:  Number 5.

13             THE COURT:  You're right there on the first page,

14   Ms. Wolf.  Okay.  Retired teacher.  Yes, ma'am.

15       By the way, thank you.  Listen, this has got nothing to do

16   with nothing.  In my view there's two decent professions, and

17   one of them is teaching.

18             THE PROSPECTIVE JUROR NO. 5:  Thank you.

19             THE COURT:  Talk to me.

20             THE PROSPECTIVE JUROR NO. 5:  I hate to throw out

21   the age card, but I'm in my late 70s and I cannot get up at

22   4 o'clock in the morning for two weeks straight to get here on

23   time.

24             THE COURT:  What if I told you I can get you a hotel

25   room down the street?

```
 1                  THE PROSPECTIVE JUROR NO. 5:  Possibly make it by 8,
 2    but I cannot come from Ventura every day.
 3                  THE COURT:  I wouldn't expect that.
 4                  THE PROSPECTIVE JUROR NO. 5:  And I won't get home
 5    tonight till 8 o'clock because of the way the trains run, and I
 6    don't want to drive in traffic early morning and late
 7    afternoon, so I have to take the train, and the train won't get
 8    me home before 8 tonight.
 9                  THE COURT:  Okay.
10                  THE PROSPECTIVE JUROR NO. 5:  So I just --
11                  THE COURT:  I hear you.  And I'm glad you're
12    bringing this up.  And me getting you a hotel room is not going
13    to help?
14                  THE PROSPECTIVE JUROR NO. 5:  Yeah, I could probably
15    do it with a hotel room where I could stay here.
16                  THE COURT:  Yeah, you can stay here.
17                  THE PROSPECTIVE JUROR NO. 5:  All right.
18                  THE COURT:  That be okay?
19                  THE PROSPECTIVE JUROR NO. 5:  Yeah.  I can -- I can
20    manage to get up at 6.  But 4 is just too early for these old
21    bones.
22                  THE COURT:  No, I hear you.  That's fine.
23                  THE PROSPECTIVE JUROR NO. 5:  Yeah.
24                  THE COURT:  I appreciate you letting me know.
25          Is there similar problems with anyone else?
```

1       (No response.)

2       Cool.  All right.  Thanks, Ms. Wolf.

3           Absolutely get her a hotel room.

4           THE COURTROOM DEPUTY CONNIE:  We're going to call

5  names, and the first seat will be in the front right here and

6  then the next going that way.  There is a step, so be careful

7  when your name is called.

8       Miriam Hernandez, H-e-r-n-a-n-d-e-z.

9       Jacob Running, R-u-n-n-i-n-g.

10      Renee Johns, J-o-h-n-s.

11      Louetta Wolf, W-o-l-f.

12      Jazmin Ramos, R-a-m-o-s.

13      Jose Contreras, C-o-n-t-r-e-r-a-s.

14      Janine Dunn, D-u-n-n.

15      Linda Cattaneo, C-a-t-t-a-n-e-o.

16          THE COURTROOM DEPUTY MS. ENGLISH:  No, no.  Come

17  this way.

18          THE COURTROOM DEPUTY CONNIE:  Cynthia Vargas,

19  V-a-r-g-a-s.

20      Christopher Nation, N-a-t-i-o-n.

21      David Karns, K-a-r-n-s.

22      Kirby Kotler, K-o-t-l-e-r.

23      Zulema Juarez, J-u-a-r-e-z.

24      Nicholas Destefano, D-e-s-t-e-f-a-n-o.

25      Yvonne Fiebush, F-i-e-b-u-s-h.

1           Mario Garcia, G-a-r-c-i-a.

2               THE COURT:  All right.  Ms. Hernandez, you see the

3       monitor to your left, that huge screen?  Could you answer the

4       questions on the screen, please.

5               THE PROSPECTIVE JUROR NO. 1:  My name's Miriam

6       Hernandez.  My address?

7               THE COURT:  Just -- just the city.

8               THE PROSPECTIVE JUROR NO. 1:  I live in Pacoima in

9       San Fernando Valley.  And I work with a special boy.  I'm

10      single.  And no, I don't have grandchildren.  I have not ever

11      served on a jury before.  Uh --

12              THE COURT:  Well, no, I think that's it.

13              THE PROSPECTIVE JUROR NO. 1:  Okay.

14              THE COURT:  Okay.  Under question three, occupation,

15      you said something about you work with a special boy?

16              THE PROSPECTIVE JUROR NO. 1:  Yeah, special needs, I

17      work in Santa Monica and I have to be work three days a week.

18              THE COURT:  Two days a week?

19              THE PROSPECTIVE JUROR NO. 1:  Three.

20              THE COURT:  Three?  Is this in a school setting or

21      do you go to someone's home?

22              THE PROSPECTIVE JUROR NO. 1:  Uhm, no, in the home,

23      the parent home.

24              THE COURT:  You go to the parents' home?

25              THE PROSPECTIVE JUROR NO. 1:  Yeah.

1          THE COURT:  Okay.  And what is it that you do with

2     this child?

3          THE PROSPECTIVE JUROR NO. 1:  Uhm, I have to give

4     his medicine and, uhm, cook his dinner.  I give a shower.  When

5     he's tired to screaming or yelling, I have to take care to stop

6     doing that.

7          THE COURT:  What days of the week do you perform

8     these functions?

9          THE PROSPECTIVE JUROR NO. 1:  Uhm, Tuesday, Thursday

10    and Sunday.

11         THE COURT:  Who's doing it now?

12         THE PROSPECTIVE JUROR NO. 1:  He have another

13    house -- he have another person who take care.

14         THE COURT:  Okay.  Thank you.

15       All right.  If you'll pass the mic then to your right,

16    please.

17         THE PROSPECTIVE JUROR NO. 2:  Jacob Running.  I'm

18    from Covina.  And I have two occupations.  I work for the City

19    of San Gabriel Public Works part-time, and I manage a retail

20    shop.  I am married.  I do not have any children and I have not

21    served on a jury before.

22         THE COURT:  Thank you, sir.

23         THE PROSPECTIVE JUROR NO. 3:  My name is Renee

24    Johns.  I live in Simi Valley.  I work at a credit union.  I am

25    married.  I have two grown children:  One is still in school

1  and one works as a server at Disneyland.

2          THE COURT:  What's your husband's occupation?

3          THE PROSPECTIVE JUROR NO. 3:  He's a sales rep for

4  Granger.

5          THE COURT:  I said husband.  I'm sorry.  Okay.

6  Thank you.  Pass the mic now to Ms. Wolf.

7          THE PROSPECTIVE JUROR NO. 4:  I'm Louetta Wolf.  I

8  live in Ventura.  I'm a retired teacher.  I'm not married.  I

9  have two grown children.  One is a supervisor in the Water

10 Department at Simi Valley.  The other one is a salesperson.

11 And no, I haven't served on a jury before.

12         THE COURT:  All right.  Thank you, Ms. Jones[*sic*].

13         THE PROSPECTIVE JUROR NO. 5:  My name is Jazmin

14 Ramos.  I live in the Los Angeles area.  I am a medical biller

15 for UC Care Medical Group.  I'm not married, no children, and I

16 have never served before on a jury.

17         THE COURT:  All right.  Thank you.

18         THE PROSPECTIVE JUROR NO. 6:  My name is Jose

19 Contreras.  I'm from Santa Clarita.  My occupation, I work for

20 Sherman William Paint Store and I go to college, Cal State

21 L. A., majoring in business administration.  I'm single, no

22 kids.  I haven't been a juror before.

23         THE COURT:  Thank you.  Ms. Dunn?

24         THE PROSPECTIVE JUROR NO. 7:  My name's Janine Dunn.

25 I live in Woodland Hills, California.  I am a dental hygienist

```
 1    by profession, but I now teach in the community college and the

 2    university system.

 3              THE COURT:  What are you teaching?

 4              THE PROSPECTIVE JUROR NO. 7:  Uhm, School of

 5    Dentistry, dental.  Uhm, I also work for a dental company as an

 6    independent professional educator, and I also still work in

 7    private practice.  I am in a committed relationship.  I have

 8    one grown son who is in college.  And I have never served on a

 9    jury.

10              THE COURT:  Are you now a member of or have you ever

11    been a member of a dental association?

12              THE PROSPECTIVE JUROR NO. 7:  I am.

13              THE COURT:  You are?

14              THE PROSPECTIVE JUROR NO. 7:  Several.

15              THE COURT:  Several?

16              THE PROSPECTIVE JUROR NO. 7:  Yep.

17              THE COURT:  Have you ever held a position of either

18    a director or officer?

19              THE PROSPECTIVE JUROR NO. 7:  No.

20              THE COURT:  Have you ever been asked to leave that

21    association or any professional association?

22              THE PROSPECTIVE JUROR NO. 7:  No.

23              THE COURT:  Okay.  Have you ever been disciplined by

24    the association?

25              THE PROSPECTIVE JUROR NO. 7:  No.
```

```
 1              THE COURT:  Okay.  Thank you.

 2              THE PROSPECTIVE JUROR NO. 7:  Uh-huh.

 3              THE PROSPECTIVE JUROR NO. 14:  My name is Nicholas

 4   Destefano.  I'm a freelance illustrator and copy editor.  I am

 5   married.  My wife is a office manager for a real estate

 6   company.  We have no children.  And I have never served on a

 7   jury.

 8              THE COURT:  Thank you, sir.

 9              THE PROSPECTIVE JUROR NO. 13:  My name is Zulema

10   Juarez.  I live in Simi Valley.  Uhm, I'm a marketing

11   representative for an insurance company.  I am married and have

12   two kids, one in college, one is working in an insurance

13   agency.  And my husband is -- works in real estate.  I have

14   never served in a jury before.

15              THE COURT:  All right.  Thank you.

16              THE PROSPECTIVE JUROR NO. 12:  My name is Kirby

17   Kotler.  I live in Malibu.  I am a real estate agent in Malibu

18   and also I build custom homes in Malibu.  I am married and my

19   wife is a nurse practitioner, liver transplant.  I have two

20   children, not grown.  They're teenagers and a handful.  And

21   I've never served on a jury before.

22              THE COURT:  All right.  Thank you.

23              THE PROSPECTIVE JUROR NO. 11:  My name is David

24   Karns.  I live in the Santa Clarita area.  I own a real estate

25   company for 30 years.  My wife, Susan Karns, is also in the
```

1   business.  I have two grown children that are also in the

2   business.  And I've never served on a jury before.

3          THE COURT:  Thank you, sir.

4          THE PROSPECTIVE JUROR NO. 10:  My name is

5   Christopher James Nation.  I live in San Dimas, California.  My

6   occupation is an accountant.  I work at Macias, Gini &

7   O'Connell as an external auditor.  I'm in a committed

8   relationship and she works at SoCal Gas Company as an

9   accountant as well.  I do not have any children, and I've never

10   served on a jury before.

11          THE PROSPECTIVE JUROR NO. 9:  My name is Cynthia

12   Vargas.  I reside in West Covina.  I've been a contract admin

13   analyst for two years.  My husband is a maintenance mechanic

14   and my children are not grown.  And I've never served on a jury

15   before.

16          THE COURT:  Thank you.

17          THE PROSPECTIVE JUROR NO. 8:  My name is Linda

18   Cattaneo.  I'm from San Luis Obispo, California.  I am a

19   retired house painter and my -- I am married and my husband is

20   a retired supervisor from the garbage company.  I have three

21   children, all grown.  The oldest works in a law office as a

22   secretary.  The middle works at an ITT company in San Diego,

23   and the youngest is in college.  And I've never served on a

24   jury duty before.

25          THE COURT:  All right.  Thank you, ma'am.

1          THE PROSPECTIVE JUROR NO. 15:  My name is Yvonne

2     Fiebush.  I live in Covina.  I'm a financial analyst and I was

3     a legal secretary for 27 years before that.  I'm married.  My

4     husband is a district attorney for San Bernardino and a special

5     Assistant U.S. Attorney for Riverside.  I have two kids -- we

6     have two kids.  One is in college and the other one's in high

7     school.  I have served on a jury.  It was a civil and we did

8     reach a verdict.

9          THE COURT:  I'm just going to ask you one thing.  I

10    want -- well, if I ask you that everything that you learn about

11    the law as it applies to this case, I'm going to ask that you

12    receive it from me, not from your husband, no matter how

13    incredible his credentials may be, can you promise that you

14    will rely on this Court to instruct you on all areas of the law

15    that are relevant to your duties as a juror in this case?

16         THE PROSPECTIVE JUROR NO. 15:  Yes.

17         THE COURT:  Okay.  Thank you.

18      Well, wait.  One more thing.  You were a legal secretary?

19         THE PROSPECTIVE JUROR NO. 15:  Yes.

20         THE COURT:  What was the law firm's specialty?

21         THE PROSPECTIVE JUROR NO. 15:  Everything.  It's

22    Sidley Austin.

23         THE COURT:  Oh, Sidley?

24         THE PROSPECTIVE JUROR NO. 15:  Yeah.

25         THE COURT:  Okay.  Yeah.  Okay.  Thank you.

1          THE PROSPECTIVE JUROR NO. 16:  My name is Mario

2    Garcia.  I live in Los Angeles.  I am a administrator assistant

3    for the last three years.  Before that I was in the airline

4    industry.

5          THE COURT:  Wait, wait, wait.  Did you say you were

6    a illustrator's assistant?

7          THE PROSPECTIVE JUROR NO. 16:  Administrator.

8          THE COURT:  Administrative assistant.  Okay.  With

9    whom?

10         THE PROSPECTIVE JUROR NO. 16:  With church.

11         THE COURT:  A church?

12         THE PROSPECTIVE JUROR NO. 16:  Yes.

13         THE COURT:  Okay.  Thank you.

14         THE PROSPECTIVE JUROR NO. 16:  Actually, my previous

15   occupation -- I jumped from my previous one -- I used to work

16   here in the courthouse in the jury department.

17         THE COURT:  Ms. English said she thought she

18   recognized you.  And you recognized Ms. English?

19         THE PROSPECTIVE JUROR NO. 16:  I think so, yes.

20         THE COURT:  Well, I wanted you -- I wanted all you

21   to tell me, you know, you recognize any of us?  You used to

22   date Ms. English, right?

23         THE PROSPECTIVE JUROR NO. 16:  No.  I -- she seemed

24   familiar, but I wasn't sure.  That's why I didn't.

25         THE COURT:  All right.  Well, Ms. English isn't a

1   party.  She hasn't taken up sides here, so, all right.  Well,

2   welcome back.

3            THE PROSPECTIVE JUROR NO. 16:  Thank you.  I have

4   one child, a grown son who works in education.  I have served

5   in several juries before, both civil and criminal.

6            THE COURT:  Okay.  Excellent.  Thank you.

7            THE PROSPECTIVE JUROR NO. 16:  And we did reach

8   verdicts.

9            THE COURT:  Thank you.

10      All right.  I need to see at least one lawyer from each

11   side very quickly.

12      Ladies and gentlemen, we may have the first sidebar.

13   There may be others during jury selection.  I'm going to try to

14   keep sidebars to an absolute minimum during the trial because I

15   don't want to waste your time.  Those of you who are going to

16   be selected here, you're here for that reason and the reason

17   isn't to watch us chatting over here.  I promise you that the

18   only time it's going to happen is when it's absolutely

19   necessary, like now.

20            (Sidebar conference:)

21            THE COURT:  Okay.  I'm only throwing this out and

22   it's not a suggestion.

23            MR. SCHNEIDER:  You said you wanted one more?

24            THE COURT:  I don't care.  At least one lawyer.

25      Okay.  I don't know how to put this.  I was a little

```
 1   troubled by Ms. Hernandez, just in her ability to communicate.

 2   Remember I told you I view that as extremely important?  That's

 3   all.  If any of you share that view, no.  If both sides share

 4   that view, then she's gone.  But otherwise, if either of you

 5   disagree with my assessment, that's fine.  I just throw it out.

 6              MR. SCHNEIDER:  I concur with the Court.

 7              MR. CONWELL:  We don't concur.

 8              THE COURT:  Wait, wait, wait.  We got white noise

 9   over here.

10              MR. CONWELL:  Okay.  We don't concur.

11              THE COURT:  Excellent.

12              MR. CONWELL:  She seemed to be able to communicate.

13              THE COURT:  All right.  Good.  Anybody else that you

14   would just like to challenge for cause?

15              MR. SCHNEIDER:  No.

16              THE COURT:  No?

17              MR. CONWELL:  I would like you to ask perhaps all

18   the questions of the woman who lives in San Luis Obispo --

19              THE COURTROOM DEPUTY:  She can't hear your.

20              MR. CONWELL:  The woman who lives in San Luis

21   Obispo, given the distance and, you know, starting at 8 A.M.,

22   she'd have to leave her house at 3 or 4.

23              THE COURT:  You can ask her that and we will take

24   care of that.

25              MR. CONWELL:  Okay.
```

```
 1              THE COURT:  Anyone -- the rule is I think it's
 2   88 miles, right?  But for Ms. Wolf, I don't care.  I'm going to
 3   order a hotel for her and for anybody else, primarily because
 4   we're starting so early.  Okay?  So if anybody's having
 5   difficulty there, great, we'll take care of that.
 6              MR. CONWELL:  Okay.
 7              THE COURT:  Okay?  But if you want to get into it,
 8   you can get into it.  I'm going to give you guys five minutes.
 9   There's really no need to talk to the people sitting on the
10   bench, okay?  We can't get that far.  Check my math:  three
11   here on this side --
12              MR. SCHNEIDER:  That's my math.
13              THE COURT:  -- three on that side, we have a jury,
14   right?
15              MS. HILAIRE:  Uh-huh.
16              THE COURT:  Whenever you get there.  All right.  Ten
17   minutes.  Ten minutes each side.  Go.
18              (Open court in the presence of the jury.)
19              THE COURT:  That was very important.
20              THE PROSPECTIVE JUROR NO. 16:  Sure.
21              THE COURT:  Anybody ever work in HR, human
22   resources?  Of course you did.
23              THE PROSPECTIVE JUROR NO. 16:  Yes, I did.
24              THE COURT:  How long?  Where?  Here?
25              THE PROSPECTIVE JUROR NO. 16:  Here, in the
```

1   Probation Office.

2          THE COURT:  Have to fire people?  Or oversee their

3   firing?

4          THE PROSPECTIVE JUROR NO. 16:  I never did myself,

5   no.

6          THE COURT:  Give any advice to any department heads

7   with respect to the discharge of any personnel?

8          THE PROSPECTIVE JUROR NO. 16:  No.

9          THE COURT:  Okay.  Cool.

10       Anybody else have to fire anyone?  Hmm.  Mr. Karns.

11         THE COURTROOM DEPUTY:  Speak into the mic.

12         THE COURT:  Mr. Karns is sitting in the back right

13  in the middle.

14         THE COURTROOM DEPUTY:  Yeah.  We'll just pass it

15  around.

16         THE COURT:  The circumstances, sir.

17         THE PROSPECTIVE JUROR NO. 11:  Well, I worked at

18  Arrowhead Water Company and I was a manager and I had people

19  working under me, route salespeople, so I had to fire them, you

20  know, as time -- I mean, as things happened, so over the years,

21  in the course of over the years.

22         THE COURT:  All right.  You ever fire anybody just

23  because they were female?

24         THE PROSPECTIVE JUROR NO. 11:  No.

25         THE COURT:  Because they were a minority?

```
 1                    THE PROSPECTIVE JUROR NO. 11:  No.

 2                    THE COURT:  Because of their religious beliefs?

 3                    THE PROSPECTIVE JUROR NO. 11:  No.

 4                    THE COURT:  Okay.  Just curious.  Was that the

 5      policy where you were working?  Were there standards?

 6                    THE PROSPECTIVE JUROR NO. 11:  Yes, absolutely.

 7                    THE COURT:  Anybody else have to fire anyone?

 8           Mr. Kotler.

 9                    THE PROSPECTIVE JUROR NO. 12:  Kirby Kotler.

10                    THE COURT:  What about circumstances, sir?

11                    THE PROSPECTIVE JUROR NO. 12:  On construction

12      sites, and the only reason I fired anybody is they're not

13      adhering to safety procedures, affecting other people and

14      themselves.

15                    THE COURT:  All right.  One other thing about work

16      spaces, work sites, places of employment and things that people

17      do.  How do you feel about use of, say, company e-mail to send

18      off-colored jokes?  I say off-color and that includes triple X

19      down to just whatever -- impolite, discourteous.

20                    THE PROSPECTIVE JUROR NO. 12:  You asking me?

21                    THE COURT:  I'm asking everybody.

22           Let me start with you, Ms. Hernandez.  I want you to all

23      think about it.  I'm talking about sending, for example, jokes

24      as to other employees through e-mail that may be, well, let's

25      go the range from just simply off-color, impolite, to
```

1    pornographic.

2        Yes, ma'am?

3        (Discussion with clerk off the record.)

4        THE COURT:  Ms. English says that I ignored someone

5    on the last question with respect to discharging of employees.

6        Yes, sir, Mr. Running?

7        THE PROSPECTIVE JUROR NO. 2:  I've worked at a

8    retail store and just over disciplinary issues.

9        THE COURT:  Okay.

10        THE PROSPECTIVE JUROR NO. 2:  Just tardiness and not

11    keeping up with their daily routine.

12        THE COURT:  In doing so, did you pay any special

13    attention to -- well, first of all, did the retail stores have

14    some sort of a protocol that you had to follow or even a

15    checklist in terms of proper grounds for discharge?

16        THE PROSPECTIVE JUROR NO. 2:  Just three write-ups.

17        THE COURT:  Okay.  Three write-ups?

18        THE PROSPECTIVE JUROR NO. 2:  Yes.

19        THE COURT:  So you had to document that employee's

20    performance.  Did it also require that that employee be warned

21    of whatever that employee was engaging in that --

22        THE PROSPECTIVE JUROR NO. 2:  Yes, two prior and

23    then on the third.

24        THE COURT:  Okay.  Was there a program where you put

25    an employee on, say, improvement needed before we got to the

1   ultimate of discharge?

2           THE PROSPECTIVE JUROR NO. 2:  On the second he was,

3   yes, given a 30-day warning.

4           THE COURT:  Okay.  All right.  And that was company

5   policy?

6           THE PROSPECTIVE JUROR NO. 2:  Yeah.

7           THE COURT:  Okay.  Thank you.  Anybody else?

8       Yes, Ms. Johns.

9           THE PROSPECTIVE JUROR NO. 3:  I work at a credit

10  union so we -- at branch level, so operational issues that we

11  have, the tellers or platform staff, I've had to let people go

12  for that.

13          THE COURT:  Same question as to Mr. Running.  Was it

14  the practice to simply summarily let people go or was there

15  some sort of a protocol that you follow?

16          THE PROSPECTIVE JUROR NO. 3:  No, there's certain

17  guidelines that we follow.  If they have a certain amount of

18  outages or the dollar amount of an outage, or -- it's

19  progressive.

20          THE COURT:  Okay.  Is it fair to say that the

21  employee would be alerted to the circumstances or whatever

22  activities that employee was engaging in which was leading to

23  that employee's imminent termination, or would you just pull

24  the rug out from under them and go --

25          THE PROSPECTIVE JUROR NO. 3:  Oh, no.  We would

1   research everything and decide whether it was something that

2   needed to be terminated right away or put on counseling and a

3   training program.

4         THE COURT:  Okay.  Thank you.

5     Anybody else?  (No response.)

6     Before I get back to my other question about e-mails,

7   etc., those of you who have worked at an organization, did your

8   organization have a policy for dealing with sexual harassment

9   complaints?  Hands.  Everybody's nodding.

10     For those of you who have dealt with -- who have actually

11   worked with a company?  All right.  Those of you who have

12   worked for a company or organization, did any of you work at a

13   place that did not have a protocol for handling sexual

14   harassment complaints?  I see no hands.

15         THE COURTROOM DEPUTY:  Oh, there's one.

16         THE COURT:  Oh, Ms. Juarez?

17         THE PROSPECTIVE JUROR NO. 13:  Yes.

18         THE COURT:  You worked at an organization which did

19   not have a policy on how to deal with sexual harassment

20   complaints?

21         THE PROSPECTIVE JUROR NO. 13:  Correct.

22         THE COURT:  Outstanding.  How long ago was this?

23         THE PROSPECTIVE JUROR NO. 13:  I was there for five

24   years.

25         THE COURT:  No, dear.  How long ago was it that you

1    worked at this place?  Was it before the dinosaurs --

2            THE PROSPECTIVE JUROR NO. 13:  More than a year --

3    more than 20 years.

4            THE COURT:  More than 20 years.

5            THE PROSPECTIVE JUROR NO. 13:  Actually, it was

6    my -- you could say one of my first employers that I had.

7    Everybody complained about him being, uhm -- I don't know --

8    too good for -- with the employees.  I didn't have any problem

9    with him.  So I -- I tend to think that it's employers --

10   employees' responsibility to make themselves respect.  So far

11   I've -- that's what I've done.  And with that person, I never

12   had a problem.

13           THE COURT:  Okay.

14           THE PROSPECTIVE JUROR NO. 13:  So --

15           THE COURT:  And you feel it's because of the way you

16   carried yourself?

17           THE PROSPECTIVE JUROR NO. 13:  I -- well, I think

18   that in everything, my motto of living has always been respect

19   before everything.

20           THE COURT:  Do you believe it's possible for a woman

21   who carries herself as a decent, respectable woman -- do you

22   believe that, nonetheless, she can be the victim of sexual

23   harassment?

24           THE PROSPECTIVE JUROR NO. 13:  Yes.

25           THE COURT:  Or unwanted sexual advances?

1               THE PROSPECTIVE JUROR NO. 13:  Yes, yes.

2               THE COURT:  So it's not always the woman's fault,

3     right?

4               THE PROSPECTIVE JUROR NO. 13:  No, no.

5               THE COURT:  Thank you.

6               THE PROSPECTIVE JUROR NO. 13:  You're welcome.

7               THE COURT:  But again, this was over 20 years ago,

8     right?

9               THE PROSPECTIVE JUROR NO. 13:  Uhm, yes, yes.

10              THE COURT:  I don't want to ask how much over, but

11    we didn't become civilized till -- I don't know -- day before

12    yesterday.  I just want to make sure it's way in the past.

13              THE PROSPECTIVE JUROR NO. 13:  Yes, it is.

14              THE COURT:  Okay.  All right.  Thank you, ma'am.

15              THE PROSPECTIVE JUROR NO. 13:  All forgotten.

16              THE COURT:  Anybody else have a situation where they

17    worked someplace that did not have a formal process or program

18    or mechanism for dealing with sexual harassment complaints?

19    Did not have?  (No response.)

20        Okay.  Excellent.  Thank you.

21        Now let's go back to my next scintillating question which

22    dealt with either sending or receiving -- let's deal with

23    receiving.  How do you feel about receiving jokes, pictures

24    that we will call off-color, maybe even indecent, all the way

25    up to pornographic on -- through e-mails?

1       Ms. Hernandez, do you have any feeling about that one way

2   or another?

3             THE PROSPECTIVE JUROR NO. 1:  Uhm, I never receive

4   anything like that.  Can I --

5             THE COURT:  So you don't have any view on it one way

6   or another?

7             THE PROSPECTIVE JUROR NO. 1:  No.

8             THE COURT:  Okay.  Mr. Running?

9             THE PROSPECTIVE JUROR NO. 2:  When you first asked

10  the question, you said through a business e-mail, right?  Or

11  just in general?

12            THE COURT:  Let's talk about business because what

13  folks do in the basement of their mom's house, who cares?

14            THE PROSPECTIVE JUROR NO. 2:  Yes.  Through business

15  I think it is very inappropriate.

16            THE COURT:  Okay.  What if -- okay.  If you were on

17  the receiving end of such a communication, what, if anything,

18  would you do about it?

19            THE PROSPECTIVE JUROR NO. 2:  Uhm, if it was through

20  work, I would report it to a supervisor in our human resources

21  department.

22            THE COURT:  Okay.  All right.  Thank you.

23      Ms. Wolf?  I'm sorry -- Ms. Johns?

24            THE PROSPECTIVE JUROR NO. 3:  I think it's

25  inappropriate also.

1          THE COURT:  Okay.  What would you do about it?

2          THE PROSPECTIVE JUROR NO. 3:  I would report it.

3          THE COURT:  Okay.  Ms. Wolf, same question.

4          THE PROSPECTIVE JUROR NO. 4:  Yes, I think it's

5     totally inappropriate.  And I guess being of a younger

6     generation than this group, I would try to handle it myself

7     first by just sending it back and saying it was totally

8     inappropriate and delete my name from your list.

9          THE COURT:  Okay.  Excellent.

10         THE PROSPECTIVE JUROR NO. 4:  That would be my

11    first.

12         THE COURT:  Okay.  Ms. Ramos.

13         THE PROSPECTIVE JUROR NO. 5:  I think it's the same

14    answer, be inappropriate.  I get e-mails constantly 'cause I

15    work -- actually do work with providers and coordinators, so if

16    that were to ever -- were the case, I would actually report it

17    to my supervisor as well.

18         THE COURT:  Okay.

19         THE PROSPECTIVE JUROR NO. 5:  Uh-huh.

20         THE PROSPECTIVE JUROR NO. 6:  I think that it is

21    wrong and that can be classified as sexual harassment.  I just

22    seen a presentation about sexual harassment like a week ago.

23         THE COURT:  Okay.

24         THE PROSPECTIVE JUROR NO. 7:  Yes, I think it's

25    extremely unprofessional conduct and I probably would report it

1   to someone at my work, HR probably.

2          THE COURT:  Thank you, Ms. Dunn.

3          THE PROSPECTIVE JUROR NO. 14:  I agree that it's

4   inappropriate.  If I were to receive something like that, at

5   least the first time I would probably ignore it at first.

6          THE COURT:  Second time?

7          THE PROSPECTIVE JUROR NO. 15:  Second time I would

8   tell somebody.

9          THE COURT:  Okay.  Thank you.

10      Ms. Juarez.

11          THE PROSPECTIVE JUROR NO. 13:  Well, I'm going to

12   agree with the lady that talks about experience.

13          THE COURT:  Ms. Hernandez?

14          THE PROSPECTIVE JUROR NO. 13:  And I deal with it

15   the first time, but I will report it definitely.

16          THE COURT:  All right.  Thank you.

17          THE PROSPECTIVE JUROR NO. 12:  Yeah, I think it's a

18   lack of respect.  And if it happened to me, I would try and

19   work it out with the person if I thought that was a possibility

20   of doing it, and if not, I would absolutely go to somebody in

21   authority and pass it on.

22          THE COURT:  Thank you.

23      Mr. Karns?

24          THE PROSPECTIVE JUROR NO. 11:  Inappropriate and

25   delete it.

```
 1                    THE COURT:  Take it any further?

 2                    THE PROSPECTIVE JUROR NO. 11:  Uhm, I haven't

 3      worked -- I work for myself, so I haven't --

 4                    THE COURT:  You're the boss.

 5                    THE PROSPECTIVE JUROR NO. 11:  Yeah.  I really

 6      haven't had that in the last 30 years.  But, you know, if I was

 7      working for someone, I would delete it first time.  Second time

 8      then I would bring it to their attention.

 9                    THE COURT:  Their attention?

10                    THE PROSPECTIVE JUROR NO. 11:  Their meaning my

11      supervisor.

12                    THE COURT:  Oh, okay.  Not the sender's attention?

13                    THE PROSPECTIVE JUROR NO. 11:  No.

14                    THE COURT:  Okay.  Mr. Nation.

15                    THE PROSPECTIVE JUROR NO. 10:  I think it's

16      extremely inappropriate, and also the organization has the

17      right and authority to actually monitor that e-mail.  So in my

18      opinion, they'd already know about it, if they had that

19      monitoring system.

20                    THE COURT:  Yes, Ms. Vargas.

21                    THE PROSPECTIVE JUROR NO. 9:  I think it's

22      unprofessional and if it happened to me, I would remind the

23      person about the rules and policies that were in place.  And if

24      it would happen again, I would report it to my supervisor.

25                    THE COURT:  Okay.
```

```
 1              THE PROSPECTIVE JUROR NO. 8:  I think it's
 2    inappropriate also, and if it happened to me, I would probably
 3    talk to them first.  But I would also talk to somebody in
 4    charge and I would let them know before I talked to the person
 5    in charge that I was going to.
 6              THE COURT:  All right.  Good.
 7              THE PROSPECTIVE JUROR NO. 15:  Totally inappropriate
 8    and again, I would also talk to them first, let them know that
 9    it's against policies and then talk to the supervisor.
10              THE COURT:  All right.
11              THE PROSPECTIVE JUROR NO. 16:  I think it's
12    inappropriate too, and would probably talk to the person first,
13    letting him or her know that that is not an appropriate thing
14    in the workplace, and then probably tell her that if that would
15    happen again, I would report it to a supervisor.
16              THE COURT:  Okay.  Thank you.
17         I don't remember if I asked this, whether or not any of
18    you -- now, Ms. Juarez has addressed this, where she had been
19    the victim of unwanted advances.  Anybody else in the workplace
20    victim of unwanted advances?
21         Yes, sir.
22              THE PROSPECTIVE JUROR NO. 12:  Yeah.
23              THE COURT:  Yeah, right.
24              THE PROSPECTIVE JUROR NO. 12:  It was a long time
25    ago.  It's embarrassing.  Yeah, it was a long time ago in
```

1    Hawaii.  I was a room service waiter and a manager.  It didn't

2    happen once; it happened several times.  People on vacation

3    and -- I don't know -- can't speak to it, but it happened.

4            THE COURT:  And what did you do?  You just chalk it

5    up and a cross you bear for being so hot?

6            THE PROSPECTIVE JUROR NO. 12:  Uhm, it's awkward.

7    It's not comfortable and I wouldn't want that for somebody

8    else.

9            THE COURT:  Right.

10            THE PROSPECTIVE JUROR NO. 12:  Since I was the

11    manager, there really wasn't someone to report it to.  And

12    oftentimes the hotel would put a spotter in there, pay for them

13    to be there and actually do this kind of stuff to see if we

14    would respond, male and female.  So, you know, it's just -- I

15    was there to do a job and then I wanted to get out and go

16    surfing, so I kind of left it at that.

17            THE COURT:  Thank you, sir.

18        Anybody else?  Yes, ma'am?  All the way -- oh, Ms. Dunn,

19    yes, of course.

20            THE PROSPECTIVE JUROR NO. 7:  Unfortunately, yes.  I

21    worked for a dentist about 2002 to 2007 who was of the mindset

22    where he would just come up and rub against you and it was

23    awkward, so I just cut him off.  But he was known to have

24    probably had affairs with two other hygienists that were in our

25    office.  And occasionally he would send, you know, it was just

```
1   like a late night e-mail that would come out, and I was like I
2   hope that was an accident because, you know.  But I was a
3   single parent at that time so I couldn't really do anything
4   about it, so I kept my head down and moved forward and, you
5   know, till I could finally get out of that practice.
6              THE COURT:  Was your response to him tempered by the
7   fact that he had control over your paycheck?
8              THE PROSPECTIVE JUROR NO. 7:  My response to him
9   was, yes, because I had to work there and it was my only source
10  of income at that time, so I kind of, you know, didn't respond
11  to anything that he ever, you know, came on to me.  I would
12  just not -- you know, just kind of nonresponse was my motto and
13  like just, you know, get away from me, you're being weird.
14             THE COURT:  Okay.  And why did you elect that
15  particular response?
16             THE PROSPECTIVE JUROR NO. 7:  'Cause I'm kind of
17  nonconfrontational and so I thought if I laid under the
18  limelight and let him move on to the next hygienist in the
19  other room, I wouldn't have to -- you know, he would finally
20  get the hint that I wasn't of that mindset, that I wasn't, you
21  know -- like what I had heard, there was two other hygienists
22  who had had relationships with him before I worked there.
23             THE COURT:  Were you at all worried about
24  retaliation if your rejection was too firm or impolite?
25             THE PROSPECTIVE JUROR NO. 7:  Hmm, not really.
```

```
 1                  THE COURT:  Okay.

 2                  THE PROSPECTIVE JUROR NO. 7:  Not really, no.

 3                  THE COURT:  Good.  Thank you.

 4                  THE PROSPECTIVE JUROR NO. 7:  Yeah.

 5                  THE COURT:  There was somebody else back there.

 6     Yes?

 7                  THE PROSPECTIVE JUROR NO. 8:  I worked in the

 8     construction field, so of course I -- I encountered a lot of

 9     construction workers, and I was probably one of the first women

10     painters in my area, so I would encounter that a lot.  When I

11     was younger, I would kind of, like she said, duck my head and

12     run away.  But as I got older and more suave with the

13     construction workers, I just learned how to handle them.  I

14     would usually confront them, say, "This is not okay.  You need

15     to stop it," and nine times out of ten they would.

16                  THE COURT:  Would you be holding a hammer while you

17     were delivering this message?

18                  THE PROSPECTIVE JUROR NO. 8:  Or a caulking gun.

19                  THE COURT:  Okay.  Cool.  Nail gun.  That'll do it.

20                  THE PROSPECTIVE JUROR NO. 8:  I wasn't allowed to

21     have those.

22                  THE COURT:  Okay.  Okay.  All right.

23         Ladies and gentlemen, thank you.  At this time I'm going

24     to have -- or permit the lawyers to ask a few questions of you,

25     follow-up questions.  We'll begin with the plaintiff.
```

1          MR. CONWELL:  Thank you, your Honor.

2          THE COURT:  Ten minutes.

3                    VOIR DIRE EXAMINATION

4     BY MR. CONWELL:

5          Q    This case involves medical professions.  Has anybody

6     here been involved in working with something called

7     credentialing in the medical profession where doctors are

8     credentialed?  Does anybody have knowledge or experience with

9     that?

10         Yes?

11         THE PROSPECTIVE JUROR NO. 5:  I don't necessarily

12    work in that department, but I do know people that work in

13    credentialing because they work for USC Medical Care Group.

14         Q    Do you have any knowledge or particular expertise

15    involving the process of credentialing?

16         THE PROSPECTIVE JUROR NO. 5:  Not really.  But I do

17    talk to providers every day for work 'cause I do the medical

18    billing for orthopedics, so I'm constantly in direct with

19    providers and with where they went to school.  I could look

20    that up all in my computer base and the program that we have.

21         MR. CONWELL:  Okay.  Ms. Dunn, in your work in the

22    dental field, have you had any experience with the process of

23    credentialing -- I don't know --

24         THE PROSPECTIVE JUROR NO. 7:  Right.  There's

25    disciplinary action if someone has had something brought

 1    against their license, yeah.

 2         Q      And what sort of knowledge, experience do you have

 3    about the disciplinary actions that can be brought in the

 4    credentialing process?

 5                THE PROSPECTIVE JUROR NO. 7:  Uhm, that if -- in

 6    inappropriate conduct with a patient, I had a dentist who was

 7    putting patients under anesthesia and doing things to them at

 8    one point with nitrous oxide sedation, so he was disciplined

 9    and he lost his licensure.  He wasn't allowed to be around

10    patients.  That's basically what I know.

11         Q      All right.  Do you have any preconceived ideas about

12    whether or not if someone has been given a black mark on their

13    record in credentialing, whether or not you would assume that

14    to be rightfully given to them or not rightfully given to them?

15                THE PROSPECTIVE JUROR NO. 7:  In -- I know in

16    dentistry it would have been rightfully given to them because

17    it takes a lot for them to finally do that.

18         Q      Okay.

19                THE PROSPECTIVE JUROR NO. 7:  At least in my field.

20         Q      All right.  Does anyone here -- has anyone here been

21    a defendant in a lawsuit?  Has anyone been a plaintiff in a

22    lawsuit?  (No response.)

23                Was anyone in this case the plaintiff?

24                THE PROSPECTIVE JUROR NO. 12:  Actually, I was.

25         Q      Yes, sir.  What kind of dispute was that?

```
 1                THE PROSPECTIVE JUROR NO. 12:  It was my mom passed

 2      away and her boyfriend tried to sue us for a million dollars

 3      and take the house.

 4           Q    Okay.  So you were?

 5                THE PROSPECTIVE JUROR NO. 12:  That was the extent

 6      of it.

 7           Q    And yes, sir.

 8                THE PROSPECTIVE JUROR NO. 10:  How about class

 9      action?

10           Q    No.  Not class action.  So you were a member of a

11      large class?

12                THE PROSPECTIVE JUROR NO. 10:  Yeah.

13           Q    Anyway, you were one of the parties in the case?

14                THE PROSPECTIVE JUROR NO. 10:  What was that?

15           Q    One where -- turn it on, work better.

16                Anyway, you were actually the only party in the

17      case?

18                THE PROSPECTIVE JUROR NO. 10:  No.

19           Q    Does anyone have -- there's going to be a

20      presentation of evidence regarding damages in the case.  Does

21      anyone have any opposition to awarding damages that are proven

22      to you by a plaintiff in a case?  Just, you know, I feel a

23      little bit uncomfortable with that?  You know, I think juries

24      give out big damage awards that are too big?  Anybody have any

25      thoughts like that at all?  (No response.)
```

1          Anybody at all?  (No response.)

2          Okay.  Ms. Wolf, are you saying yes?

3          THE PROSPECTIVE JUROR NO. 4:  Yeah.  I think that

4    many times they are excessive, the damages are excessive many

5    times.  Not all the time, but many times I think they are and I

6    think they are sue happy people in this country, especially in

7    California, I think.

8        Q    Okay.  Do you -- do you or anyone else here have any

9    thoughts about whether or not most plaintiffs really are just

10   coming in and trying to get money out of somebody and most

11   plaintiffs' cases are not well founded; it's just kind of an

12   idea that you have?  (No response.)

13         Anybody?

14         Yes?

15         THE PROSPECTIVE JUROR NO. 13:  Well, maybe it won't

16   be in this case, but I work in the insurance industry, and,

17   yes, I think it's sometimes people just take advantage of the

18   means of getting money.

19       Q    Do you think that would affect your ability to

20   decide this case, the fact that you work in the insurance

21   industry and you see instances where that's happened?

22         THE PROSPECTIVE JUROR NO. 13:  For what I've heard,

23   it doesn't have anything to do, so I don't think so.

24       Q    Okay.  This case -- well, does anyone have an issue

25   at all in awarding punitive damages in a case?  You know

```
 1    what -- everybody know what punitive damages are?  Have you

 2    heard of that?

 3            Does anyone here -- you're just philosophically

 4    opposed and think that punitive damages should not be awarded

 5    in litigation?  (No response.)

 6            I'm sorry.  Was somebody --

 7            THE PROSPECTIVE JUROR NO. 13:  Yeah.  I was going to

 8    say well it depends on the case, I think.  I don't know.

 9       Q    Right.  Well, I -- certainly I understand what

10    you're saying.  But I'm talking about where you just walk in

11    here before you've heard anything, you would honestly say,

12    "Yeah, I do have a problem with awarding punitive damages.  I

13    think the plaintiff is going to have to really meet a very high

14    burden to get me to award punitive damages or for me to award

15    punitive damages"?  Does anybody feel that way?

16            (No response.)

17            Okay.  Has anyone been involved in an experience

18    where -- I know some of you said you had to fire or terminate

19    someone.  Have any of you been involved in an experience where

20    you know of someone that was fired unfairly or where something

21    wrong happened in the firing and they were fired unfairly or

22    disciplined in their employment unfairly?  Has anybody had that

23    experience before?  (No response.)

24            Okay.  As the Court has explained, one of the claims

25    here is for gender discrimination.  Does anyone here think --
```

1   or walk in here with an idea that gender discrimination claims

2   are usually not well founded?  (No response.)

3           Okay.  Does anyone have a negative view about

4   doctors?  You had a bad experience?

5           There's going to be a lot of doctors testifying in

6   this case and my client, Dr. Stewart, is a physician.  Anybody

7   have any negative views about doctors or you've had a bad

8   experience with a doctor that you think would affect your

9   ability to decide this case?  (No response.)

10          And you know, I know I've been looking there, but

11  not over here?

12          THE PROSPECTIVE JUROR NO. 15:  No, that's fine.

13          THE PROSPECTIVE JUROR NO. 16:  We're listening.

14      Q   So you're listening, okay.

15          Would anyone here be reluctant to award money

16  damages to a plaintiff because she is a doctor?  I mean, does

17  anyone have an idea that doctors are well compensated and so

18  for that reason you'd be reluctant to award damages if they're

19  proven to you?  (No response.)

20          MR. CONWELL:  How am I doing on time, your Honor?

21          THE COURT:  Three minutes.

22      Q   (BY MR. CONWELL:) Has anybody here served on a board

23  of directors?  You've been a board member on a board of

24  directors?  (No response.)

25          Has anyone here -- and I understand, Mr. Karns,

```
 1   you've been self-employed -- anybody working in a company where

 2   you've been an officer in the company?  (No response.)

 3            Does anyone -- you know, the judge asked you about

 4   receiving off-color e-mails and so forth.  Does anyone think

 5   it's appropriate for a leader in an organization to forward

 6   photographs and videos of nude women to other people in the

 7   organization using the work computer?  Does anyone think that

 8   that's okay?  (No response.)

 9            Does anyone think that it's okay for the leader -- a

10   leader in an organization to forward ethnic and

11   racially-charged e-mails to others in the organization using

12   work computers?  (No response.)

13            Okay.  Does -- if -- yes, sir?

14            THE PROSPECTIVE JUROR NO. 12:  I'm sorry.  You

15   talking about business?  Board of directors if it was a

16   nonprofit organization, does that count?

17       Q    Yes.

18            THE PROSPECTIVE JUROR NO. 12:  Okay.  I'm sorry.

19   Then I did.

20       Q    Okay.  And what was the nonprofit?

21            THE COURTROOM DEPUTY:  Pass the mic.

22            THE PROSPECTIVE JUROR NO. 12:  The nonprofit was a

23   club called the Malibu Boardriders.  It was 200 surfers that

24   provided a day at the beach for kids with cancer, 300 of them

25   annually, and we had five of us and it was very -- you had to
```

1   do the minutes and everything to follow the rules, but it was

2   pretty -- pretty chill.

3        Q    This is probably my last question.  If either as a

4   board member or just someone who is a part of an

5   organization -- could be a teacher in a school or an employee

6   in a company -- if you learn of inappropriate conduct by people

7   in leadership, how many people here would say you need to speak

8   up as opposed to keeping your mouth -- you know, staying quiet?

9   How many people think you should speak up about that?

10        Okay.  Does anyone here think that you should just

11   keep quiet about it and play it safe, so to speak?

12        (No response.)

13        MR. CONWELL:  Okay.  Thank you, your Honor.

14        THE COURT:  All right.  Thank you, sir.

15    Mr. Schneider.

16                    VOIR DIRE EXAMINATION

17   (BY MR. SCHNEIDER:)

18        Q    Good morning, folks.  You were asked if you had a

19   problem in awarding damages to people.  I'd like to ask you if

20   you found that the evidence demonstrated that there was no

21   basis for awarding damages, would you have a problem finding

22   that way?  Anybody?  (No response.)

23        One of the parties to this case is not a -- an

24   actual human being, but is one in the eyes of the law and it's

25   a corporation.  Does anybody think that corporations should be

1    treated better than regular people?  (No response.)

2          Does anybody think that corporations should be

3    treated worse than regular people?  (No response.)

4          Does anybody think that corporations should be

5    treated the same as regular people?

6          THE PROSPECTIVE JUROR NO. 11:  Yes.

7    Q    That seems to cover all the bases on that.

8          Have you or anyone close to you ever been expelled

9    from an association of any kind?  (No response.)

10          Either fair or unfair?  (No response.)

11          You've heard some references to off-color materials

12    and nudity.  Does anyone have a problem with people outside the

13    work environment sharing that sort of thing by use of the

14    internet?

15          THE PROSPECTIVE JUROR NO. 11:  Have a problem with

16    it?  Yeah.

17    Q    Okay, Mr. Karns, what is your problem about that?

18          THE PROSPECTIVE JUROR NO. 11:  It's just like --

19    just like I said before, you know, you just -- I get e-mails

20    all the time from, you know, God knows who, but I just delete

21    it or try to get it into junk mail.  So, I don't -- I don't

22    appreciate it, so --

23    Q    It's something that you don't enjoy, but how do you

24    feel about other people who do seem to enjoy that sort of thing

25    sending those sorts of materials to like-minded people?

```
 1              THE PROSPECTIVE JUROR NO. 11:  To someone who wants
 2    it?
 3         Q    Yes.
 4              THE PROSPECTIVE JUROR NO. 11:  I guess they can do
 5    whatever they want to do.  You know, I'm -- I just don't want
 6    to be involved.
 7         Q    Okay.  Two other people had raised their hands about
 8    that.
 9              THE PROSPECTIVE JUROR NO. 12:  Yeah, I feel the same
10    way.  If it's happening to me, I feel the uncomfortable.  If
11    it's happening to someone else and I was a third party to it, I
12    couldn't stop it, it's their business.
13         Q    That's their decision to make?
14              THE PROSPECTIVE JUROR NO. 12:  Yeah.
15         Q    And Mr. Nation, what is your position on that issue?
16              THE PROSPECTIVE JUROR NO. 10:  My position is that,
17    you know, if you're sending me that material and we have some
18    type of relationship where we can accept, uhm, certain
19    correspondences like that whether, you know, jokingly or
20    something of that manner, I'm okay with that as long as I've
21    accepted that, uhm, from you in the past, essentially.  So if
22    we have that type of relationship then, yeah, okay, go ahead
23    and send me that stuff; we might think it's funny or not funny,
24    so on and so forth.
25          But if it's somebody outside of that, meaning I don't have
```

1   a relationship with that person and I guess I don't really know

2   them or it's in a professional manner, I would disagree with

3   that; I wouldn't want it to happen.

4        Q    But if you knew that you had a friend who enjoys

5   whatever the material is and you thought it was amusing or

6   entertaining, and you believed that that person would as well,

7   then it would be okay for you to send it to him?

8             THE PROSPECTIVE JUROR NO. 10:  I mean, that's on a,

9   you know, case-by-case basis.  Like I said before, if -- if

10  that person and I have joked around about that outside of a

11  correspondence as far as like e-mail, then, you know, there's

12  the potential for me to say, "Oh, you know what?  He'll

13  probably think this is funny," or, "She might think this is

14  funny."

15       But other than that, you know, I wouldn't send something

16  like that and I wouldn't accept something like that.

17            MR. SCHNEIDER:  Thank you, folks.

18            THE PROSPECTIVE JUROR NO. 6:  Excuse me.  I rose my

19  hand.

20            MR. SCHNEIDER:  Oh, sorry.

21            THE PROSPECTIVE JUROR NO. 6:  I have a problem with

22  pornography because I think it's wrong.  I see many people

23  became addict to pornography and that bring bad consequence to

24  them.  You know, like friends that starts sending like one

25  e-mail with pornography and then they send like ten e-mails per

1    day, I'm like, really?  So I have seen people became addict to

2    pornography.

3         Q    (BY MR. SCHNEIDER:)  Okay.  Anyone else have

4    anything that they would like to offer?  (No response.)

5              Okay.  Thank you, folks.

6              THE PROSPECTIVE JUROR NO. 15:  Hi.  I pretty much

7    feel the same way.  I really don't appreciate that at all, so

8    I -- I would just rather not even deal with it.  I don't want

9    to deal with that.  I don't think it's professional and I don't

10   like it at all.

11        Q    So you don't want to receive it?

12             THE PROSPECTIVE JUROR NO. 15:  I don't want to

13   receive it.

14        Q    What I'm asking is do you have a problem with one

15   person who enjoys it sending it to another person who also

16   enjoys it?

17             THE PROSPECTIVE JUROR NO. 15:  Oh, as long as I'm

18   out of it, you know, it's whatever they decide they want to do,

19   you know.

20             MR. SCHNEIDER:  Okay.  Thank you.

21        Well, I've tried to sit down three times now.  Is there

22   anybody else who wants to offer an opinion on the subject?

23        (No response.)

24        Okay.  Thank you very much.

25             THE COURT:  And you have time to spare.  So we're

1   going to use your time for you to -- both sides to sit and

2   carefully consider against whom you would like to exercise your

3   peremptory challenges, if anyone.  All right?  Then we will

4   have a jury and that will be that.  You have one minute.

5              (Brief pause in the proceedings.)

6              THE COURT:  All right, counsel, let's go.  Does

7   the -- does the plaintiff pass for cause?

8              MR. CONWELL:  Yes, your Honor.

9              THE COURT:  Does the defense pass for cause?

10             MR. SCHNEIDER:  Yes, your Honor.

11             THE COURT:  First peremptory is with the plaintiff.

12   You're kidding.

13             MR. CONWELL:  Number 4.

14             THE COURT:  All right.  Ms. Wolf, you may return to

15   the jury room on the third floor.  Our issues have been

16   resolved.  Thank you, ma'am.

17       All right.  The defense first peremptory.

18             MR. SCHNEIDER:  Your Honor, the defense would like

19   to thank and excuse Juror No. 6, Mr. Contreras.

20             THE COURT:  All right.  Thank you.

21       Mr. Contreras, you may return to the third floor jury

22   room.  And thank you, sir, for your willingness to serve.

23       Plaintiff's second peremptory.

24             MR. CONWELL:  We'll pass on this round.

25             THE COURT:  All right.  Plaintiff passes.

1          Defense second peremptory.

2               MR. SCHNEIDER:  Your Honor, the defense would like

3     to thank and excuse Juror No. 7, Ms. Dunn.

4               THE COURT:  All right.  Ms. Dunn, you may return to

5     the third floor jury assembly room.

6          Plaintiffs, your second peremptory.

7               MR. CONWELL:  We'll pass on this round.

8               MR. SCHNEIDER:  Your Honor, the defense would like

9     to thank and excuse Juror No. 8, Ms. Cattaneo.

10              THE COURT:  All right.  Thank you, ma'am.  You may

11    return to the third floor.

12         All right.  Plaintiff's second peremptory challenge.

13              MR. CONWELL:  Number 10.

14              THE COURT:  All right.  Mr. Nation, thank you, sir.

15    You are excused.  You may return to the third floor.

16              THE PROSPECTIVE JUROR NO. 10:  Have a good day.

17              THE COURT:  Plaintiff's third peremptory.

18              MR. CONWELL:  Number 13.

19              THE PROSPECTIVE JUROR NO. 13:  Do we have numbers?

20              THE COURT:  Actually, you do, ma'am.  Ms. Juarez,

21    that was directed at you, ma'am.  As entertaining as you are --

22              THE PROSPECTIVE JUROR NO. 13:  Well, good luck.

23              THE COURT:  Thank you, ma'am.

24         All right.  We -- where is -- I'm missing something.  I

25    don't remember -- I'm missing -- okay.  We now have a jury.

1       You all, thank you.  You may return upstairs.  Thank you

2   for your willingness --

3             THE PROSPECTIVE JUROR NO. 16:  Thank you, Judge.

4             THE COURT: -- at least.

5             THE COURTROOM DEPUTY:  Please rise.  And please

6   raise your right hand.

7       Ladies and gentlemen of the jury, do you and each of you

8   solemnly swear that you will well and truly try the cause now

9   before this court and render a true verdict according to the

10  evidence and instructions of the court, so help you God?

11            (All jurors answered in the affirmative.)

12            THE COURTROOM DEPUTY:  Thank you.  Please be seated.

13            THE COURT:  All right.  Ladies and gentlemen, couple

14  of things.  I'm going to give you a formal instruction, but I'm

15  also going to just give you some advice.  You all are wearing

16  white badges.  My preference is is that you only speak to other

17  people wearing white badges, but I know that isn't always

18  practical.

19      What I don't want you to do under any circumstances at all

20  is to communicate with anyone you see at these tables.  If you

21  say good morning to them when you encounter them in the

22  corridor, they won't respond.  It's still a capital offense for

23  an attorney to communicate with a juror in the midst of a trial

24  that that juror is sitting on.  So it's not they're not being

25  impolite and don't hold it against them.  Okay?

1        But my preference is is that you don't talk to anyone who

2   is not wearing a white badge.  All right.

3        Now I'll say a few other words about your conduct as

4   jurors.  First, you are not to discuss this case with anyone,

5   including members of your family, people involved in the trial,

6   or anyone else.  This includes discussing the case in internet

7   chat rooms or through internet blogs, internet bulletin boards

8   or e-mails, nor are you allowed to permit others to discuss the

9   case with you.  If anyone approaches you and tries to talk to

10  you about the case, please let me know about it immediately.

11       Secondly, do not read or listen to any news reports,

12  articles, radio, television, or online reports about the case

13  or about anyone who has anything to do with it.

14       Third, do not do any research, such as consulting

15  dictionaries, searching the internet, or using other reference

16  materials.  And do not make any investigation about the case on

17  your own.

18       Fourth, do not make up your mind about what the verdict

19  should be until after you have gone to the jury room to decide

20  the case and you and your fellow jurors have discussed the

21  evidence.  Until then, keep an open mind.

22       Finally, until this case is given to you for your

23  deliberation and verdict, you are not to discuss the case, even

24  with your fellow jurors.

25       Now, you're going to be discharged -- not discharged --

1    we're going to adjourn for the day.  But before you leave the

2    building, Ms. English is going to have to show you how to get

3    back into the building, okay?

4         But until then, we'll see you at 8 o'clock in the morning.

5              THE COURTROOM DEPUTY:  All rise.

6              (Open court out of the presence of the jury.)

7              THE COURT:  Okay.  Anything we need to talk about

8    before tomorrow?  We come back tomorrow, we're going to do

9    opening statements.  If you wish and have agreed upon

10   preliminary instructions, I will give them.  And then we will

11   begin with the presentation of evidence starting with the

12   plaintiff.

13        Now, one caution.  If you run out of witnesses before

14   11 o'clock, you have rested.  Is that clear?

15        The other thing is this:  Everybody's got plenty of help

16   or something sitting at counsel table.  I don't want to have a

17   witness step down and have to wait ten minutes for the next

18   butt to get in that chair.  I want the next witness standing

19   outside in the anteroom or narthex or whatever that is out

20   there, standing there, because by the time we get to

21   re-re-redirect, come on, let's -- I want -- I want one butt

22   leaving that chair and another one shortly after filling it.  I

23   want this thing to move.  Let's not waste time.  Any questions

24   about that?  We're good?

25        Anything we need to talk about before tomorrow?

1          (No response.)

2          I do want the plaintiffs to let defense counsel know what

3     witnesses you plan to call tomorrow.

4              MR. SCHNEIDER:  They've already been kind enough to

5     do that, your Honor.

6              THE COURT:  This is outstanding the way you guys

7     have gotten along so well.  It is truly.  I mean that.

8          I will be here very early, so if there's anything we need

9     to talk about in the morning before the jury gets in, we'll

10    talk about it because I don't want to waste time.  I don't want

11    to waste their time, okay?

12         Okay.  See you in the morning.

13             MS. HILAIRE:  Your Honor, what's the earliest time

14    we can come in to test the technology?

15             THE COURT:  You can -- I'd say you can do it today.

16    6:30.

17             MS. HILAIRE:  Thank you.

18             THE COURT:  He's going -- 4:30?  Having trouble

19    sleeping?

20             MS. HILAIRE:  I'll take 5.

21             THE COURT:  Take 5?  Okay.  You'll be here early,

22    though.  Okay.  Go away.  Got another.

23             (Proceedings adjourned at 11:09 A.M., until

24             Wednesday, January 27, 2016, at 8:00 A.M.)

25

1               CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5    I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6    FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7    OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8    TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14        DATED THIS 26TH DAY OF JANUARY, 2016.

15

16

17        /S/ DEBRA READ
          _____
18        DEBRA READ, CSR NO. 3949 CRR RMR RDR
          FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT