1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3                    HONORABLE OTIS D. WRIGHT, II

4             UNITED STATES DISTRICT JUDGE PRESIDING

5    PATRICIA STEWART, D.O.,            )
                                        )
6                    Plaintiff,         )
                                        ) ED CV 13-1670-ODW(DTBx)
7           vs.                         )
                                        )
8    AMERICAN ASSOCIATION OF PHYSICIAN  )            VOLUME 2
     SPECIALISTS, INC., WILLIAM         )
9    CARBONE; ROBERT CERRATO; SVETLANA  )         PAGES 1 – 173
     RUBAKOVIC and DOES 1-100,          )
10                                      )
                     Defendants.        )
11   _____)

12

13

14                    REPORTER'S TRANSCRIPT OF
                          TRIAL – DAY 2
15             WEDNESDAY, JANUARY 27, 2016
                          8:06 A.M.
16                   LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

          DEBI READ, CSR 3949 CRR RMR RDR
23        FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET 432A
24        LOS ANGELES, CALIFORNIA 90012
          READIT3949@GMAIL.COM
25

```
 1                      A P P E A R A N C E S

 2

    ON BEHALF OF THE PLAINTIFF:
 3
        CONWELL BUSINESS LAW, P.A.
 4      BY:  GEORGE DONOVAN CONWELL, JR.
             Attorney at Law
 5      12610 Race Track Road, Suite 200
        Tampa, Florida 33626
 6      813-282-8000
        dconwell@conwellbusinesslaw.com
 7
        HILAIRE MCGRIFF, PC
 8      BY:  MIKA HILAIRE
             Attorney at Law
 9      601 S. Figueroa Street, Suite 4050
        Los Angeles, California 90017
10      213-330-4260
        mika@hmpclaw.com
11
        WILLIAM A. OKERBLOM LAW OFFICES
12      BY:  WILLIAM ALLEN OKERBLOM
             Attorney at Law
13      1145 E. Clark Avenue, Suite H
        Santa Maria, California 93454
14      805-478-6570
        drlaw07@aol.com
15

16  ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
    PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:
17
        ANDERSON, MCPHARLIN & CONNERS LLP
18      BY:  ERIC A. SCHNEIDER
        BY:  LEILA M. ROSSETTI
19           Attorney at Law
        707 Wilshire Boulevard, Suite 4000
20      Los Angeles, California 90017-3623
        213-688-0080
21      eas@amclaw.com
        lmr@amclaw.com
22

23

24

25
```

UNITED STATES DISTRICT COURT

1          A P P E A R A N C E S (continued)

2

ON BEHALF OF DEFENDANT AMERICAN ASSOCIATION OF PHYSICIAN
3   SPECIALISTS, INC.:

4       GUSRAE KAPLAN NUSBAUM PLLC
        BY:  MARLEN KRUZHKOV
5            Attorney at Law
        120 Wall Street
6       New York, New York 10005
        212-269-1400
7       mkruzhkov@gusraekaplan.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| PROCEEDINGS | PAGE | VOL. |
|---|---|---|
| OPENING STATEMENT BY MR. CONWELL | 9 | 2 |
| OPENING STATEMENT BY MR. SCHNEIDER | 45 | 2 |

CHRONOLOGICAL INDEX OF WITNESSES

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **THOMAS A CASTILLO, M.D.** | | |
| Direct Examination By Mr. Conwell | 62 | 2 |
| Cross-Examination By Mr. Schneider | 137 | 2 |
| **ATWOOD RICE, M.D.** | | |
| Direct Examination By Ms. Hilaire | 144 | 2 |

E X H I B I T S

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|---|---|---|---|---|
| 206 | AAPS Code of Ethics | 150 | 150 | 2 |
| 224 | McCann Response to Castillo's Request for Investigation August 3, 2010 | 86 | 86 | 2 |
| 1020 | FEC Conciliation Agreement dated March 22, 2011 | 110 | 112 | 2 |
| 1060 | Copy of Legal Complaint filed by Cassandra Newby in Florida | 107 | 110 | 2 |
| 1333 | AAPS's First Amended Answer, Affirmative Defenses and Counterclaims filed in the Florida case | 123 | 124 | 2 |
| 1498 | Certified Letter dated May 8, 2012, from Robert Cerrato to Dr. Stewart regarding Disciplinary Committee Meeting of June 9, 2012 | 124 | 124 | 2 |
| 1525 | Copy of PowerPoint presentation slides from annual meeting of AAPS in Marina Del Rey, California on June 25, 2012 | 130 | | 2 |
| 1591.2 | RFA:  Exhibits attached to RFA to Carbone | 98 | 101 | 2 |
| 1718 | AAPS Employee Handbook dated October 29, 2009 | 78 | 78 | 2 |
| 1719 | ACCME Letter from Esther Berg dated December 4, 2009 | 112 | | 2 |
| 1748.1 | Open letter and e-mail chain between Atwood Rice, Russo, and Montes, et al, re Antitrust AAPS, April 28, 2011 | 157 | | 2 |

```
 1                  E X H I B I T S  (continued)

 2                                    FOR              FOR
 3                               IDENTIFICATION      EVIDENCE
       NO.    DESCRIPTION             PG.          PG.   VOL.
 4     ─────────────────────────────────────────────────────

 5     1758   Order granting Castillo's    121              2
              motion for partial summary
 6            judgment, Judge Nielsen,
              January 17, 2012, Florida
 7            Circuit Court, Certified
              Copy
 8     1801   AAPS 2010 Tax Return(Parts   116        120    2
              Redacted)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 27, 2016

2                             8:06 a.m.

3                              -oOo-

4              (Call to Order of the Court.)

5              (Open court in the presence of the jury.)

6              THE COURT:  All right.  The record will reflect all

7    counsel and the parties are present, as is the jury.

8         All right.  Ladies and gentlemen -- what?  I'm sorry.  Go

9    on.

10             THE COURTROOM DEPUTY:  Calling Item 1,

11   ED CV 13-1670, Patricia Stewart versus American Association of

12   Physician Specialists, et al.

13             Counsel, may I have your appearances, please.

14             MR. SCHNEIDER:  Eric Schneider, Leila Rossetti, and

15   Marlen Kruzhkov for the defendants.

16             THE COURT:  Good morning, counsel.

17             MS. HILAIRE:  Good morning, your Honor.

18        Mika Hilaire and Don Conwell, who's using the restroom at

19   the moment, on behalf of the plaintiff.

20             THE COURT:  All right.  Ladies and gentlemen, we'll

21   proceed in the following way:  First, each side may make an

22   opening statement.  Now, an opening statement is not evidence.

23   It is simply an outline to help you understand what that party

24   expects the evidence will show.  Now, a party is not required

25   to make an opening statement.
```

1          The plaintiff will then present evidence and counsel for

2    the defendant may cross-examine.

3          Then the defendant may present evidence and counsel for

4    the plaintiff may cross-examine.

5          After all of the evidence has been presented, I will then

6    instruct you on the law that applies to the case and the

7    attorneys will make their closing arguments.

8          After that, you will go to the jury room to deliberate on

9    your verdict.

10          We will now begin with the opening statement, beginning

11    with the party who bears the burden of proof, the plaintiff.

12               MR. SCHNEIDER:  Your Honor, before we begin, may we

13    request that nonparty witnesses be excluded from the courtroom?

14               THE COURT:  Even during the opening statements?

15               MR. SCHNEIDER:  Yes.

16               THE COURT:  Okay.  Anyone expected to be a witness

17    in this case is excluded from the courtroom until after you

18    have testified.

19               MR. CONWELL:  May I proceed, your Honor?

20               THE COURT:  Yes, please.  Thank you.

21               MR. CONWELL:  Your Honor, during my opening, I

22    wanted to use the flip chart to just write a couple things

23    down.  Is that permissible for the Court?

24               THE COURT:  Whatever you wish.

25               MR. CONWELL:  Thank you, your Honor.

1          THE COURT:  Wait a minute.  Whatever it is that you

2    plan today, have you shown that --

3          MR. CONWELL:  Just going to --

4          THE COURT:  Okay.  Go ahead.

5          MR. CONWELL:  Thank you, your Honor.

6                **OPENING STATEMENT BY MR. CONWELL**

7          MR. CONWELL:  Good morning.  My name is Don Conwell,

8    and with Mika Hilaire, we represent the plaintiff, Dr. Patricia

9    Stewart, in her lawsuit against the American Association of

10   Physician Specialists.  During the trial, we'll be referring to

11   them as AAPS.

12   This case is about what AAPS did to Dr. Stewart that

13   essentially ruined her medical career.  And during the course

14   of the trial, we're going to be presenting evidence to you to

15   show you what they did and how they did it.

16   But first, I'd like to talk about how Dr. Stewart and AAPS came

17   to be involved with one another.  Dr. Stewart is a

18   dermatologist in Santa Barbara, California, and she's been

19   practicing for over 20 years.  For most of her career she's

20   been a member of the AAPS.  She, upon completion of her medical

21   school, did an internship or a residency that was an AAPS

22   residency.  And not long after completing her residency, she

23   took examinations and went through peer review and she obtained

24   what's called board certification from the AAPS.

25   Now, the AAPS is a national board-certifying organization.

1    What they do, they're permitted by certain states, though not

2    all states, to administer exams to doctors, and then the

3    doctors who pass the exams and go through peer review are given

4    board certification in an area of specialty.  There are various

5    kinds of specialty.  There's surgery, there's dermatology,

6    internal medicine, this sort of thing.  And you may have seen

7    your doctor's office, they'll have certificates on their wall

8    that talk about what kind of certification they have.

9    The certification as a board-certified specialist is extremely

10   important to a doctor.  Membership in a professional

11   association and board certification are really essential to

12   surviving as a doctor in today's medical business environment.

13   Doctors cannot obtain or retain, for the most part, a contract

14   with an insurance company, they can't attain a preferred

15   provider contract, they can't join medical groups, they can't

16   obtain hospital privileges without board certification.  So

17   that's one piece.

18   The other piece, they have to be in good standing with the

19   board-certifying organization.  So that's going to be important

20   as we move along in the trial and you see what happened with

21   Dr. Stewart.

22   To obtain those contracts, the doctor has to go through

23   something called credentialing, and credentialing is a process

24   whereby a doctor fills out an application that describes the

25   doctor's qualification, including board certification, and

1  including whether or not they are a member in good standing.

2  There's actually a question on most of these questionnaires

3  that asks, "Have you ever been disciplined by your professional

4  association?"  That is an extremely important issue in the

5  business of medicine.  If you've been disciplined and you have

6  to check the box, you're probably not going to pass

7  certification.

8  The more severe the discipline, the less likely it is that

9  you're going to get credentialed.  And if you're not

10  credentialed, then you're not going to get the contracts,

11  you're not going to retain the contracts that you need, really,

12  to survive.  And now I'm sure there are exceptions, but for

13  most doctors in today's business environment, these are

14  essential.

15  Why is this so important to a doctor that they not have a black

16  mark on their record, that they have -- that they're able to

17  answer that they're in good standing with their professional

18  association?  Well, in today's legal environment, insurance

19  companies, other businesses in the medical field that are faced

20  with litigation -- because their medical malpractice is a major

21  issue in the medical industry -- if they're faced with

22  litigation, they've got to make sure that the people they're

23  contracting with, their preferred providers, have a totally

24  clean record.  So this is very, very important to a doctor that

25  they not have any blemish on their record.  Companies, frankly,

1    just are not willing to take risk.

2    And so why am I telling you all this?  Well, on June 13, 2011,

3    the unthinkable happened to Dr. Stewart.  She was expelled from

4    the AAPS, that organization that certified her that she'd been

5    a member of for over 20 years, for conduct that was, quote,

6    "injurious to the organization and its purposes."

7    Expulsion from the organization is the most severe sanction

8    that was possible.  And by doing this, AAPS put a scarlet

9    letter on Dr. Stewart that she bears the rest of her life

10   because the expulsion specifies that it's permanent.  And

11   because she went through a residency with AAPS, she doesn't

12   have another certifying organization to go to.  So this is a

13   lifelong expulsion for Dr. Stewart and something that she has

14   to check on the box, Yes, I've been disciplined and it's been

15   expulsion.

16   When you hear that, you've got to be asking yourself why.  What

17   did she do to deserve this?  She must have done something

18   wrong.  And the answer is and the evidence is going to show she

19   didn't do anything wrong.  What she did is something right.

20   What she did was she spoke up about misconduct and corruption

21   in the leadership of AAPS.  She had a duty, she felt, to do

22   that not only as the member who'd pledged herself under AAPS

23   rules to abide by the highest ethical standards, but also as a

24   governor in the Academy of Dermatology, someone who'd been

25   elected by her peers to represent them in leadership.  And she

1    had a duty to speak up about misconduct.

2    You're going to hear how certain leaders in the AAPS were

3    engaged in unethical and sometimes unlawful conduct that they

4    tried to cover up, including, as you might have guessed,

5    disseminating or receiving and redistributing pornography in

6    the workplace on workplace computers.  And these are medical --

7    medical doctors doing this.

8    And this was brought to light in 2010 by Dr. Tom Castillo.

9    Dr. Castillo is a former president of the AAPS, and former AAPS

10   staff employees contacted him and told him about things that

11   were going on at the AAPS, and he called for an investigation.

12   Now, 2011, 2012 -- if I may, just going to write three names on

13   the Board.  These issues of misconduct involve three people:

14   Mr. Carbone, Dr. Cerrato, and Dr. Stephen Montes.

15   So those are three very important names because they're --

16   throughout this case you're going to hear about these doctors

17   and what they did that led to Dr. Castillo calling for an

18   investigation.

19   Dr. Cerrato is a doctor and a lawyer.  He was on the Board of

20   Directors for many years and held offices in leadership.  He

21   was the AAPS president for two terms.

22   Dr. Montes was a doctor, served as the treasurer of what's

23   called the AAPS Foundation, a chair of the continuing medical

24   education committee, and was a permanent member of the Board of

25   Directors.  He's also a former president of the AAPS.

1   And the third person is Bill Carbone.  Bill Carbone is the CEO

2   of AAPS.  He works full time for the AAPS managing the staff at

3   the time relevant here of about 15 people at a salary of over

4   $260,000 per year plus a lot of perks.

5   Over the years, the evidence is going to show, he developed a

6   good ol' boy network among doctors in that organization and

7   placed them in positions of leadership, people who became very

8   loyal to him.  But Carbone, Dr. Cerrato, and Dr. Montes are --

9   really have been the power group at AAPS.

10  I'm going to talk more about what the misconduct was in just a

11  minute, but first I'd like to tell you what our three claims

12  are.  There's a claim for breach of contract.  That's the first

13  claim that's going to be decided in the case.  And the law is

14  that a bylaw of an organization is considered to be a contract

15  between the member and the organization.  So if you violate the

16  bylaws, then you violated a contract with the member of the

17  organization.

18  So Dr. Stewart has got a claim for breach of the contract of

19  the bylaws with AAPS, and the reason is because AAPS did not

20  follow its own bylaws in the way they terminated her.  There

21  was no due process, and the law is that she can only be

22  terminated by procedures that are fair, that are reasonable,

23  and not carried out in good faith.

24  I'm going to write that down because I want everybody to keep

25  that in mind.

1          MR. SCHNEIDER:  Your Honor, could the board be

2    turned so the defense can see it?

3          THE COURT:  This isn't going to work.  Counsel?

4          MR. CONWELL:  Yes, your Honor.

5          THE COURT:  You've got other equipment in here that

6    will enable you to write whatever you want so that the jury can

7    see it and so can everybody else in the courtroom.  This isn't

8    going to work when defense counsel can't see a thing that

9    you're writing.  All right?

10          MR. CONWELL:  Yes, your Honor.

11          THE COURT:  So you can remove your easel, you can

12    just grab some paper, put it on the document cam.  Write on it

13    to your heart's content and everybody in the room will be able

14    to see it.

15          MR. CONWELL:  Okay.

16          THE COURT:  One other thing.  Remember who's going

17    to provide the instruction on the law.

18          MR. CONWELL:  Yes.

19       So we're going to show that Dr. Stewart was terminated

20    because she was a woman who spoke up about misconduct and

21    corruption in the AAPS, and that the AAPS disciplinary

22    proceedings were a sham that was set up from the start to expel

23    her from the AAPS rather than to investigate whether or not

24    she'd engaged in any misconduct or done anything to harm AAPS.

25       The second claim is for gender discrimination.  And the

evidence is going to show that the leadership of AAPS is really a good ol' boy network, that the two women in the organization who spoke up about corruption and misconduct, they alone were expelled from the organization even though other men were also involved in speaking up.  The AAPS expelled the two women.  No men were expelled or even disciplined.  You're going to hear about other instances of discrimination.

Third, she sued for fraud.  And the fraud claim is based upon a misrepresentation to Dr. Stewart that the AAPS was a highly ethical organization.  In fact, it tries to distinguish itself from the other certifying organizations as the only one that requires its members to pledge to the highest ethical standards, when in fact it was the lack of ethics that led to her expulsion.

And then there's a claim that's part of the fraud claim called a false promise.  You can hear evidence about the AAPS president promising her a right to an appeal after they expelled her from the organization, but they never gave her the appeal.  To this day she's not been given that appeal of some three-and-a-half years later, and it's a promise that they never intended to keep when they made it.

So let's go back to 2010, what Dr. Castillo learned.  Dr. Castillo, as I said, is a former president of the AAPS, and in 2010 he was on the Board of Directors of AAPS, and in the Executive -- on the Executive Committee.  And Dr. Castillo with

1   two other doctors, a Dr. Geller and a Dr. Klein, all of whom

2   were involved in leadership at the AAPS, received information

3   about misconduct by Drs. Cerrato, Montes, and Carbone.  So

4   Dr. Castillo went to the president-elect, David McCann, and he

5   reported this misconduct to Mr. McCann and said, "As a member

6   of the Board of Directors, I feel like we have a fiduciary duty

7   to our members and to the Association to conduct an

8   investigation."

9       So what were the issues of misconduct that were alleged by

10  Dr. Castillo?  So the first one was that there was -- are you

11  able to show that?  So the first one was that there was a

12  distribution of pornography by Bill Carbone.  And he had

13  received a report from Timothy Bell, a former employee of the

14  AAPS.  He was the Director of Governmental Affairs for the

15  AAPS.

16      If you can just let me -- so apparently we're having a

17  technical issue.

18          THE COURTROOM DEPUTY:  I was going to say can he

19  connect and it'll come up there.  Push that button.

20          THE COURT:  Push the button on the console that says

21  "Plaintiffs."

22          MR. SCHINNAR:  Maybe we can use a different --

23  there's something not going through.

24          THE COURTROOM DEPUTY:  Push plaintiff button.

25          MR. CONWELL:  It's illuminated.  The plaintiff

1    button is illuminated.

2              THE COURT:  Okay.

3              (Brief pause in the proceedings.)

4              MR. CONWELL:  We're just going to continue.  Okay.

5         The first instance of misconduct was that Bill Carbone was

6    receiving pornography from members of the Board of Directors

7    and other doctors.  He was receiving it on the work computer

8    and he was exposing staff to the pornographic images, and these

9    are, staff has reported, triple X-rated group orgies, full

10   frontal nudity focussed on, you know, female vaginas, crude

11   jokes, and humor as part of all this, and he was then

12   distributing it to staff.

13        The second issue was that he was doing the same thing with

14   e-mails that were racially slanderous, that made fun of blacks,

15   Hispanics, Asians, American Indians, just all these different

16   races, and he was receiving those and he was also disseminating

17   those to others in the AAPS.

18        These were very, very serious issues for the organization

19   because AAPS has got to get approved by states to do this board

20   certifying that I talked to you about earlier, and so their

21   reputation has got to be impeccable.  And Dr. Castillo is a

22   long-term member and former president who was extremely

23   concerned about these charges and wanted an investigation.

24        Next, there was questions regarding the federal election

25   commission and whether or not there were violations of campaign

1    contributions.  And so the Federal Election Commission has

2    rules and so forth regarding reporting income and regarding who

3    can make contributions.  So there are questions raised about

4    that.

5         There were questions raised about the continuing medical

6    education and whether or not the organization was complying

7    with the ACCME's rules for continuing medical education.  And

8    then there was even an allegation that the company whose

9    business it was to provide continuing medical education had

10   been put on probation and that this had not been disclosed.

11        And then there was a charge regarding the -- excuse me --

12   the unlawful compensation of AAPS leaders.  Dr. Bob Cerrato,

13   who's also a lawyer, was providing volunteer services, but it

14   was reported that he was getting paid for those services and

15   also that he was involved in the unlicensed practice of law.

16   And as a person in leadership, if in fact he was involved in

17   the unlicensed practice of law providing legal services to AAPS

18   in Florida which is where it's headquartered and he was not a

19   Florida attorney, that would be quite a problem for the AAPS.

20        So Dr. Castillo went to Dr. McCann with this and said, "We

21   need to do an investigation."  What happened was Dr. McCann

22   then went to Mr. Carbone with this information.  And

23   Mr. Carbone, Mr. Cerrato, and Mr. Montes began a cover-up.  And

24   what they did is they decided to go on the offense and the

25   first thing they did is they removed Dr. Castillo and

1   Dr. Geller from the Board of Directors.  And then they

2   suspended them for up to six months and they sent them a notice

3   saying, "You're suspended from the organization for up to six

4   months.  You can't participate in any activities.  You can't

5   hold yourself out as a holder of any our privileges, including

6   certification, while we conduct an investigation."

7           So the one who called for an investigation of

8   misconduct now has been suspended.  Castillo, Geller, and

9   Klein, all who were raising these questions, were all suspended

10  by the leadership.

11      And so they work behind the scenes now to really demonize

12  Drs. Castillo, Geller, and Klein.  They say they're doing an

13  investigation, but, in fact, no investigation ever occurs.  In

14  fact, AAPS denies all of these allegations, says they're all

15  false, and they file a lawsuit against Timothy Bell, the former

16  government affairs official who was reporting some of this to

17  Dr. Castillo.

18      And in that lawsuit, Dr. -- Mr. Bell had now moved out of

19  state and didn't even defend, and they obtained a judgment

20  against him because he didn't defend, and then they used that

21  as part of an e-mail propaganda campaign and said, "We've --

22  we've had a trial," or, "We've had an adjudication that

23  Mr. Bell is guilty and now we're going after his

24  co-conspirators, Drs. Castillo, Geller, and Klein."

25          So Drs. Castillo, Geller, and Klein then hired a lawyer,

1   hired me to file a lawsuit against the AAPS to clear their name

2   and to have these suspensions removed.  So we filed a lawsuit

3   in Florida against the AAPS seeking restoration of their

4   membership in the AAPS and have them restored to the Board.

5       Meanwhile, Mr. Carbone prepares a memorandum to the

6   bylaws -- and you're going to hear a lot about this amendment

7   to the bylaws -- whereby he attempts to create these super

8   powers in just a handful of people, this control group at the

9   AAPS, so that they can just get rid of anyone who would expose

10   misconduct in leadership.  And he -- he puts this on the agenda

11   for the next meeting of the AAPS in June of 2011.

12       Meanwhile, a gentleman who you're going to hear from,

13   Dr. Atwood Rice, is put -- comes in and he is now contacting

14   Dr. Castillo regarding what had happened to Dr. Castillo, and

15   he was very concerned about this.  Dr. Castillo explained about

16   the misconduct that he'd heard about that he'd called for an

17   investigation and instead he was suspended.

18      Dr. Rice then is told not by Dr. Castillo, but by another

19   person in the AAPS, "Who can I contact about what's happened to

20   Castillo, Geller, and Klein?  And who can I talk to about this

21   new amendment that the -- this control group is trying to get

22   passed at the AAPS that gives them these unfettered powers to

23   get rid of anyone who speaks up regarding corruption within the

24   organization?"  And he's referred to Dr. Patricia Stewart.  So

25   this is the first time she's involved in any of this.

1          And Dr. Rice contacts Dr. Stewart in March or April of

2     2011 and says, "I've heard these things about Drs. Castillo,

3     Geller, and Klein.  I heard about this new amendment.  Have you

4     heard about it?"  And he's the one who tells her and she hears

5     this now from Dr. Rice.

6          And he said, "You're a governor in the Dermatology

7     Academy.  Can you speak out at the next meeting against this

8     amendment?  And also can you speak out about what's happened to

9     Castillo, Geller, and Klein?  We can't allow this in our

10    organization."  So she says that she'll do so.

11         Dr. Rice also speaks to her husband, who's also a doctor

12    and he's a lawyer.  His name is Dr. William Okerblom.  And he

13    asks Dr. William Okerblom if he would help Dr. Rice and some

14    other concerned doctors to get ready for this next meeting.

15    And so Dr. Okerblom agrees to do that.

16         In June of 2011 they have their annual meeting.  Every

17    June AAPS has an annual meeting at a hotel in a different city

18    and the members come together and they take care of AAPS

19    business and they have continuing medical education.  So in

20    2011 they did this at the Tysons Corner, Virginia.  And at that

21    meeting there was a big hot topic there and that was this new

22    amendment.  Dr. Okerblom has prepared something called a

23    preliminary legal opinion, and in that preliminary legal

24    opinion he talked about most of these issues about

25    mismanagement by -- or misconduct by the management of AAPS.

1    And he talked about the pornography, and he, in fact, verified

2    that this was all -- that these things were in fact true.  He

3    also talked about the -- this amendment that was being proposed

4    to give the super power to this committee.

5         Dr. Stewart passed out a few copies of his preliminary

6    legal opinion.  She talked to members of the House of

7    Delegates, primarily women that she knew, and she advocated

8    against passing the amendment.  And then she also said that the

9    organization should settle the lawsuit with Castillo, Geller,

10   and Klein and remove the suspension and restore them because

11   what they had been charging was in fact the fact and that they

12   could not tolerate that sort of conduct in the leadership of

13   the AAPS.  That's all that she does at that meeting.

14        Now, the two other things that are really important about

15   that meeting you're going to hear about, one is that

16   Dr. Stewart is accosted by Dr. -- by two people.  Dr. Herbert

17   Pardell, he's a member of the Board of Directors, and as we

18   later learned one of the people that was involved in this

19   pornography exchange with the CEO William Okerblom.  And

20   Dr. Pardell came up with this preliminary legal opinion,

21   beating her basically on her chest area and saying, "Why are

22   you doing this?  This is all false.  This is all false.  None

23   of it's true."  Of course, he knew at the time that he was

24   going to be, if this investigation went forward -- people would

25   discover his involvement in distributing these e-mails within

1    the organization.

2         Another thing that happened was Mr. Carbone came up and

3    verbally accosted her in front of all of her professional

4    colleagues and told her, you know, "What are you doing?"  You

5    know, "I'm" -- basically saying he's going to get her for

6    this -- for this preliminary legal opinion going out to the

7    other members.

8         That was very traumatizing for Dr. Stewart and she had

9    decided at that point, It's not worth it; I'm just going to

10   back off, and that's what she did.

11        Now, Dr. Rice and there's other doctors, Dr. Lemonick and

12   other physicians you'll hear about, still were opposed to this

13   amendment and still wanted something done to restore Castillo,

14   Geller, and Klein.  So they wrote a letter with

15   Dr. Okerblom to the AAPS in December of 2018[*sic*], and in the

16   letter they urged again that the amendment not be passed and

17   explained also that the allegations of the -- that Dr. Castillo

18   had made had been proven to be true.  And that amendment then

19   failed again.  So each of these times someone's speaking up.

20   It's in the political process at AAPS.

21             Meanwhile, the court in Florida had ruled in favor

22   of Castillo, Geller, and Klein, said they were unlawfully

23   suspended and restored their membership.  However, that lawsuit

24   didn't end because they had other claims at this point against

25   the AAPS and AAPS had countersued against them.

1          So the next time that's important here on our timeline is

2     January of 2012.  January in 2012 there's a Dermatology Academy

3     meeting and this takes place by telephone.  You'll find that

4     most of the business of AAPS is conducted by telephone because

5     the doctors are all over the country, and when they meet, they

6     just have conference calls.

7          Dr. Stewart had received a call from another female doctor

8     saying that she had been discriminated against by Mr. Carbone,

9     and she'll explain to you what this doctor said to her, but it

10    caused great concern to Dr. Stewart because she'd seen this

11    discrimination in the organization before against women.  And

12    she was very concerned about what was happening to her

13    organization that she'd been a part of for so long.

14         And so during that telephone conference, she made a couple

15    of motions.  One of the motions was a motion to apologize to

16    Castillo, Geller, and Klein.  That's all she did.  She said,

17    "We need to make a public statement here and apologize to

18    them."

19         And secondly, she said, "We need to call for Dr. Cerrato

20    to step down as president" -- and so he at that point was the

21    president of the AAPS -- because of his part in what he did

22    with Drs. Castillo, Geller, and Klein and because of the

23    concerns that he was getting paid for his volunteer work at the

24    AAPS.

25         So what happens after that?  Immediately this power

group -- oh, thank you -- immediately this power group, again they go on the offense, just like they did with Castillo, Geller, and Klein.  Now they do with Dr. Stewart, and by May of 2012 they had removed her as the governor of the Dermatology Academy.  They orchestrated some things to give them an excuse to do this and they said, "You're now removed as the governor."

Then in March of 2012 or early April of 2012, they sued her and her husband in Florida saying that they were trying to injure the AAPS.  They filed a lawsuit against her.

Then on May 8th of 2012, they send a document to her.  Bob Cerrato sends this document to her and he says, "You are being disciplined by the AAPS.  This is the ultimate hammer.  You're being disciplined by AAPS.  You are ordered that there's going to be a disciplinary hearing in Tampa on June 9th of 2012, for you to come in and defend yourself for engaging in conduct injurious to the best interests of the AAPS."  And he attaches to that letter a -- the complaint that had been filed against her in Florida.  Now, this complaint makes allegations that she had conspired with Drs. Castillo, Geller, and Klein to disseminate false information about the AAPS.

And the same letter told her, "You have 15 minutes for a hearing in Tampa" -- 2,000 miles from your home -- "to come in and defend yourself."  It also said that, "You may submit evidence in writing to defend yourself."

So let me tell you what's been established at this point

regarding the allegations that I've shown you here of

misconduct by AAPS.  First, the -- it had been established

that, in fact, the pornography had been distributed and

disseminated at the AAPS headquarters by the president, by the

CEO, Mr. Carbone, and this included a video, what's called the

*Cheers* video.  And the *Cheers* video, it's basically a group

orgy that takes place in a bar with -- they show the *Cheers*

sign from the TV show and they play this music during the orgy.

Other, you know, videos of this nature that were sent to

Mr. Carbone by doctors on the Board of Directors, and this is

particularly a concern for a couple of reasons.  No. 1, these

are doctors.  These are people who for a living ask women to

undress and men to undress.  And these doctors are circulating

this kind of material among themselves.

No. 2, this is all taking place in the workplace.  This is

on the workplace computers with Mr. Carbone.  And then he

exposes employees to this, including Cassandra Newby.

Cassandra Newby at one point had been head of certifications

for the AAPS, and she was exposed to these videos.  In fact, he

sent them to her on her computer.

The videos and the photographs are particularly degrading.

One of them shows a woman urinating on a fire hydrant with her

leg hiked up without any clothes and her undergarments as if

she's a dog.  They also show a nude woman in a hospital bed, as

if this is okay to show this sort of thing with patients.

1    And --

2              MR. SCHNEIDER:  Your Honor, we object.  We have

3    raised objections.  These exhibits have not been admitted into

4    evidence.  The Court has not considered our objections at this

5    point.

6              THE COURT:  All right.  My first question is -- and

7    I thought I went over this -- did you clear with opposing

8    counsel the exhibits that you intended to use during your

9    opening statement?

10             MR. CONWELL:  We sent these images to them.

11             THE COURT:  All right.

12             MR. SCHNEIDER:  Your Honor, they were not cleared

13   that they were going to be shown now.

14             THE COURT:  What I told you all was that unless

15   you've got an objection with respect to the authenticity of any

16   of the exhibits -- and do you?

17             MR. SCHNEIDER:  The authenticity, no.

18             THE COURT:  Okay.  Relevance?

19             MR. SCHNEIDER:  Uhm, no.  It's not irrelevant.  The

20   objection that we made and submitted to the Court is that it's

21   overly prejudicial under the totality of the circumstances of

22   this case.

23             THE COURT:  Got you.  All right.  Overruled.

24             MR. CONWELL:  So -- so they're particularly

25   degrading to women, not to say that pornography in general is

not.  It all is.  But then they showed a woman on a hospital
bed -- not seeing it on the screen -- and -- and it says -- and
this is from one of the doctors in AAPS.  They sent it to Bill
Carbone at Christmas time and it says, "Ho, ho, ho," and, you
know, there's an intended play on words, but she's sitting on
the hospital bed with her legs spread open and the camera
focussed, you know, right in the middle.

     And then there's -- there's a particular emphasis on
teenage pornography.  There's a -- there's a photograph of a
young girl, obviously a teen, and it says, "Jailbait because
the best things in life are illegal."  These are doctors and
this is their board-certifying organization.

     Another one shows a teenage girl by school lockers and it
says, quote, "Every male teacher considered the consequences,"
clearly suggesting them getting involved in illegal sex acts
with underaged females.

     Another shows what appears to be three nude teenage girls
playing the game of Twister, you know, where you spin a dial
and you put your hands and feet on different places in the --
and your bodies are in all sorts of weird positions.  And of
course it always focuses on their vagina and their breasts, and
very young looking girls.

     The AAPS handbook says that if you even have pornography
on your computer, that's grounds for immediate termination, as
you would expect.  It also says that if this occurs, or you

hear about it occurring, you are to report it immediately to the CEO of the organization.  But in this instance, it was the CEO of the organization who was the one receiving it and exposing Cassandra Newby to it, exposing Timothy Bell to it. You're going to hear them say, "Well, Mr. Bell wanted to see it," as if that makes it okay.  But this is what they were doing.

So now Mr. Carbone also -- Mr. Carbone, by the way, now has admitted to all this.  He didn't at first, but now he has. He's admitted to receiving and distributing the racially biased and degrading e-mails.

One shows a bunch of African-American doctors and nurses around a table and there is a white man on the table wearing a Ku Klux Klan outfit and it says, "I don't know about you, but I got a feeling it's not going to go too well for this guy."

Another one shows President Obama shining -- down on the ground shining Sarah Palin's shoes.

You know, jokes about Hispanics, just one after another.

Then on the sexual harassment claim that had been alleged to Dr. Castillo, that also -- there was evidence now to support that.  Cassandra Newby had filed a complaint against the AAPS suing them for sexual harassment, a claim that they immediately came in and settled with her.  And the complaint alleged that it was Bill Carbone who was sexually harassing her and discriminated against her, calling her horrendous names -- an

 1    old cow, a cunt -- things like that.  This is the kind of

 2    person, this is the kind of atmosphere that they created at

 3    AAPS.

 4         The FEC issue, there was an conciliation agreement whereby

 5    AAPS agreed with the Federal Election Commission in the spring

 6    of 2011 they in fact had violated the laws.  And Stephen Montes

 7    had violated the law, a claim that they originally had denied.

 8         The ACCME probation, we uncovered the letter where ACCME

 9    put the AAPS on probation for providing medical continuing

10    education.

11         We obtained records, financial records, showing that in

12    2010 AAPS had paid Bob Cerrato, the president, who's supposed

13    to be volunteering the services, $40,000 for his providing

14    legal advice to the AAPS.

15         So, you know, all these things are established.  But as I

16    said, they make these claims now and they turn all this into an

17    offense against the people who are uncovering this and are

18    seeking accountability and transparency and leadership.  They

19    sue Dr. Stewart, they remove her as governor, and then they

20    bring this charge against her for discipline and she's got, as

21    I said, to appear at this hearing on June the 9th, 2013.

22         So she writes to them and she says on May 24th -- there's

23    three -- as I said, the charging document, the May 8th letter

24    says that we can submit written evidence.  And so she does and

25    she sends them three e-mails, lengthy documents, going through

 1     the complaint and denying the allegations.

 2          It says, "You conspired with Tim Bell to bring down the

 3     organization and to destroy it."

 4          She says, "I don't even know Tim Bell."

 5          Said, "You've conspired with Cassandra Newby to cause her

 6     to bring a sexual harassment claim against us."

 7          She says, "I've spoken to the woman once in my life.  I

 8     think I saw her at an annual meeting."

 9          "You conspired with Dr. Castillo."  She hadn't spoken to

10     Dr. Castillo for five years before she got the call from Atwood

11     Rice, she learned from them about this.  All she did was speak

12     up as a governor, "My goodness, what are we doing?  Shouldn't

13     we hold these people accountable?  Shouldn't we have an

14     investigation?  Isn't it wrong to -- when there's a evidence

15     like this brought forward, isn't it wrong for us to bring the

16     people that are calling for the investigation and attack them

17     and suspend them with no hearing?"  That's all she did.

18          And so she defends herself in the letters.  She also says,

19     "You know, I'm not going to that hearing because I don't have

20     any contact with the state of Florida and I'm not going to

21     subject myself to jurisdiction in Florida."  She opposed

22     jurisdiction in Florida because she lives and works in

23     California.  And she said, "If I show up in Florida for your

24     hearing, you're going to serve me with the papers and I'm going

25     to be -- I'm going to lose my -- my objection to jurisdiction.

1   So I can't do that."

2       In fact, her husband even called and spoke to one of their

3   lawyers and said, "Okay.  Would you agree that if she came, you

4   would not serve her with a complaint and not make her lose her

5   jurisdiction argument?"

6       They said, "We're not going to make any promises to you."

7   So they're trying to trap her into coming to Florida for -- you

8   know, by setting up this disciplinary hearing in Florida.

9       Also, the three members of the disciplinary committee, one

10  of them was Stephen Montes.  He was the chair of that

11  committee.  He's the one that was involved in the FEC

12  violations.  He was the one that was the chair of the CME

13  committee that got him on probation.  He was the one at the

14  center of that controversy, and Cerrato are best -- very close

15  friends.  Cerrato puts Montes and makes him the chair of the

16  committee that's going to judge her.

17      And he also puts another good friend of his, Bart Maggio,

18  on the committee and a fellow, Ken Wallace, who had replaced

19  her.  Cerrato and him -- I'm sorry.  Ken Wallace had replaced

20  her on the Academy of Dermatology as a governor.  So he had

21  everything to gain by her not coming back to that position, a

22  position he wanted.

23      So she complained in one of the e-mails about the

24  conflicts of interest, said, "This is not fair."  You know,

25  "This is all set up to" -- you know, "for me to fail."

1          They ignored her letter.

2          She said, "Can I participate by telephone?"  Dr. Montes

3   lives in Michigan, Dr. Maggio lives in New Jersey, Dr. Wallace

4   lives in North Florida.  They all had to fly to Tampa.  She

5   said, "Why don't we just do this by phone?"

6          "No, can't do it by phone."

7          She said, "Well, the annual meeting is in two weeks in

8   Marina Del Rey, California."  It just happened to be coming up

9   in California.  "It's just two weeks from now.  Can we have my

10  disciplinary hearing in California?"

11         "No, you've got to come to Florida."

12         Why?  Serve her with process.

13         So she objects.  She sends these letters and then they

14  have their meeting on the 9th without her.  And then there's

15  a -- are you able to pull up documents there?  -- there's an

16  e-mail on June 10, 2012, from Mr. Montes.  And this e-mail

17  recommends that she be permanently expelled.

18         So this is Mr. Montes -- one of the people involved in the

19  alleged misconduct -- and in here he says a couple of things.

20  He says -- he says, "You know what?  No written evidence was

21  submitted to our committee.  First -- first of all, she didn't

22  show up."

23         Can you enlarge the first paragraph?  It's kind of hard

24  for people to read it.

25         It says that, "We didn't get anything in writing," when

1   she'd sent them three e-mails denying the allegations.  Ken

2   Wallace in his deposition testified, "I wasn't aware of any

3   written defense.  Nobody told me about it."

4        Then, Mr. Montes says in the next paragraph, he says,

5   "Because she didn't appear and prove her innocence, we find her

6   guilty."  He completely flips it around of instead of innocent

7   until proven guilty, he said, "She didn't prove her innocence,

8   therefore, we find her guilty."

9        Can you enlarge this?  It's kind of hard to read.  Okay.

10       So you'll be able to see all this later during the trial.

11  I know it's hard to see that right now.

12       So -- and he says -- and the final thing he says is, "So

13  we recommend that Dr. Patricia Stewart and Dr. Leslie

14  Radentz" -- the other female who had spoken up, just these two

15  women -- "that they be permanently expelled from the AAPS

16  without any further -- with loss of all rights and privileges."

17  He wanted to make sure every escape hatch was closed.

18       And that's what Dr. Montes says to the committee, to the

19  Board.  And on June 13th, the Board votes.  And you know how

20  the Board met?  By conference call.  She's not allowed to

21  participate in a conference call to orally present her defense,

22  but the Board meets on June 13th, just four days later, by

23  conference call and they vote to expel her.

24       But you're going to see the document later where they do

25  this and I want you to look at the members of the Board who

vote to expel her:  Bob Cerrato is there.  He's one of the
people that was the subject of the request for an investigation
for receiving these payments; Herb Pardell, the one that was
sending pornography to Mr. Carbone; Joseph Gallagher, also
sending pornography to Mr. Carbone; Brian Feaver, also sending
pornography to Mr. Carbone.  All of these people who don't --
who want this covered up are now the ones voting to expel her
knowing what it means to have that black mark on your record.
And that's what they did on June 13, 2012, a day she'll never
forget.

Now, I told you that the first claim is for breach of
contract and the question is whether or not this was fair,
reasonable, and done in good faith.

Their second claim is for gender discrimination.  And that
claim is did the women -- I'm sorry -- did the AAPS
discriminate based on gender?  And you're going to see the
evidence that although each of the men -- and there were a
number of men involved in objecting and in calling for an
investigation -- all of these men, none of them were
disciplined, only the two women were.  And the two women were
not just disciplined.  It wasn't like, you know, "Here's a
warning.  Get it right," you know, "Stop what you're doing.
You got 90 days to fix it."  It was expulsion permanent,
forever to the two women.

Now, there was a -- one other part of this that I need to

explain.  On June 7, 2012, in Tampa, Florida, there was a
hearing on a motion for temporary injunction.  Dr. Castillo,
Geller, and Klein and another doctor, Dr. Cressey who had also
been added to AAPS's lawsuit against Dr. Stewart and her
husband, filed a motion for temporary injunction.  And I
represented them there.  Dr. Stewart was not represented there
because she was opposing jurisdiction, and had she appeared,
and Dr. Radentz who's also a California medical doctor
appeared, then they would have waived their jurisdiction
argument.  So they did not participate in that.  And we brought
a motion for temporary injunction saying that this disciplinary
hearing on the 9th of June violated the bylaws and it wasn't
fair and it should not got forward, and our motion -- that
motion was granted.

So she wrote a letter to the AAPS on June 7th, the very
same day, and she said, "The court in Florida just ruled
everything you're doing to me is unlawful, and so I hereby
request that you not proceed against me."  And she then -- now
the order didn't apply to her because she didn't want to waive
jurisdiction.  She didn't participate.  But she said, "But you
know you're crazy to go forward with me just having received a
court ruling that you're violating the law with this hearing."

MR. KRUZHKOV:  Objection.

MR. CONWELL:  Well, they went --

MR. KRUZHKOV:  Your Honor --

 1           THE COURT:  Sustained.  Let's get to what the

 2    evidence will show.  We're getting into closing argument here.

 3           MR. CONWELL:  Well, this is what her letter said.

 4    Her letter said, "Don't proceed against me," and so, as you've

 5    heard, they did.  They proceeded on the 9th without her.  They

 6    recommended permanent expulsion for what?  For speaking up

 7    against an amendment?  As an elected officer of this

 8    organization, she spoke up.  She spoke up in defense of three

 9    physicians who called for accountability and transparency and

10    simply asked for an investigation and nothing more.  And for

11    that she was expelled.

12        So you're going to hear about other instances of the

13    discrimination, including the way Cassandra Newby was treated

14    and including the environment among the leadership.  This is a

15    good ol' boy network where it's okay to distribute pornography,

16    triple X videos, very, very explicit pornography, and you're

17    going to see, and an organization of medical doctors that's

18    okay there among the good ol' boys.  It's okay to use degrading

19    terms when addressing women like Cassandra Newby as Mr. Carbone

20    did and there's no consequence.  To this day there's been no

21    consequence to Mr. Carbone even though all this has been

22    exposed.  In fact, there's a Board minutes where he's thanked

23    by a doctor for his work in trying to police Dr. Castillo,

24    Geller, and Klein.

25        It's okay for the CEO, Bill Carbone, to dress her down at

1    the annual meeting in 2011 for having the temerity to speak up

2    about what was going on.  It's okay for Herb Pardell to strike

3    her on her breast with a stack of papers saying all these

4    claims are false about Bill Carbone disseminating pornography.

5    That's okay there.  So you're going to hear about the gender

6    discrimination.

7        Then you're going to hear also about mean conduct, in

8    addition to what I've already told you.  On June 21st, her

9    husband, Bill Okerblom, sent an e-mail to AAPS.  You know,

10   she'd been expelled, they received that notice on the 20th of

11   June, and he said, "We'd like to appear before the Board of

12   Directors at the Marina Del Rey meeting," which is just around

13   the corner four days later.  "We'd like to do that."

14       And then she shows up at this meeting.  Leslie Radentz

15   does too because they're both local.  And they go to the hotel

16   at Marina Del Rey to attend the meeting and she's fully

17   expecting to be able to participate as she always has at these

18   annual meetings.  She gets in there, she's able to get into the

19   hotel, but the doors to where they're meeting are locked and

20   there are guards who have been explicitly instructed by Bob

21   Cerrato, "Do not let Dr. Radentz in this room," in this banquet

22   room.

23       Meanwhile, Dr. Cerrato is in the banquet room with a

24   PowerPoint presentation that AAPS has put together which

25   supposedly exposes the unlawful injurious conduct of

1    Dr. Stewart and others.  And there's a slide up there that's

2    got her name on it, and he says, "She's got a blog,"

3    something -- she is -- she is technophobic.  She still uses a

4    little tiny flip phone.  She doesn't even have a smart phone.

5        He says, "She's running a blog and look at the things

6    she's saying on the blog," knowing full well it's not her blog.

7    Dr. Radentz had a blog; Dr. Stewart doesn't.  And he makes

8    claims about her in front of this body of her peers, former

9    friends.  And then he says, "I invite Dr. Stewart and

10   Dr. Radentz to come up and respond," both of whom are out in

11   the hallway trying to get in and the guards won't let them in.

12   So there's an appearance now to their peers that there is no

13   defense to the claims he's making about them.

14       Well, she then appeals -- she does two things.  She files

15   a lawsuit against them, and -- but not this lawsuit.  She files

16   a lawsuit against them and she appeals.  She sends a letter on

17   July 2nd of 2012, an e-mail asking, "Would you please send me

18   minutes of the meeting of the Board of Directors on June 13th.

19   I would like to see the minutes whereby I was expelled from

20   your organization, and I'd like to see a transcript of the

21   disciplinary committee hearing on June 9th.  I want to know

22   exactly what happened and I want to use this in my appeal."

23       She gets an e-mail back on July 3rd from Stephen Montes,

24   very mean-spirited.  And look at how he speaks so

25   condescendingly to her, you know, commanding her what to do.

UNITED STATES DISTRICT COURT

1    He says, "You've been told to only speak to our attorneys,"

2    which wasn't true, "and now you're bringing in all this

3    legalese."  Well, what legalese?  She asked for them to send

4    her the transcript of the disciplinary hearing and the minutes

5    of the meeting whereby she was expelled.  He calls that

6    legalese.

7         And then he says, "You know the protocol.  Follow them."

8    And this is the kind of men they are, no respect for women at

9    all.

10         And she writes back and she said, "I'm sorry" -- this is

11    right up the page -- "I'm sorry.  I didn't know.  Who are your

12    attorneys?  Who do you want me to talk to?  I'll be glad --

13    whatever the protocol is, I'll be glad to do it."

14         On June -- or July 27th she gets an e-mail from Bob

15    Cerrato.  He says, "The AAPS has granted your request for an

16    appeal.  And we're going to convene."  And by the way, the

17    bylaws say in Section 3.05 you have a right to an appeal, and

18    the appellate panel consists of former presidents of the AAPS.

19    Well, she's greatly comforted by this because she believes that

20    these former presidents are not going to be beholding to

21    Cerrato and Carbone and to Montes.

22         And so she drops her lawsuit because she's got an appeal,

23    and she's confident that when they hear the evidence, the same

24    thing I've told you, that she's going to be reinstated.  But

25    that day never comes.  Her husband contacts the lawyers.  They

said, "We'll let you know."  Here we are three-and-a-half years

later.  We've never been given a date for an appeal 'cause they

never intended to give her an appeal.  And so that's the false

promise part of this case.  So she filed a lawsuit, this

lawsuit, in I think September of 2013, and here we are.

So now the -- Carbone, Cerrato, Montes, the good ol' boys,

they got what they wanted.  They got her out forever.  They

denied her an appeal.  They tried to hurt her; they succeeded.

Now Dr. Stewart has to check the box when she credentials,

"Yes, I've been disciplined by my professional certifying

organization," and then you have to explain, "I've been

permanently expelled for the rest of my career."

The damage to her from that scarlet letter will follow her

throughout the rest of her career.  And expert witnesses are

going to come in here -- experts who analyzed these things are

going to come in and talk about her past losses and her future

losses, because this can't be fixed.  And her income already

has been cut in half.  You're going to hear evidence about what

she's done to try to reduce her losses, to try -- there's a

national database whereby this sort of information on

discipline is recorded, what she's done to try to allow

contracts she has with providers to lapse rather than go

through the credentialing process and thereby reveal that she's

been permanently expelled from her organization.  You're going

to hear about efforts she's made to cut her losses, which they

are going to describe to you as efforts she's making to create loss.  Again, flipping it around and going on the offense is their defense.  And you're going to hear how she has lost -- or her past and future losses are in the millions of dollars for her loss of income as a dermatologist from the inability now to get the referrals and the preferred provider contracts and to join the medical groups.  And you're going to hear about lost business opportunity that she experienced in San Luis Obispo on an opportunity there.

And you're going to hear about stress and emotional harm that she's experienced from the way that she was manhandled by the AAPS.  You're going to hear about the shame she suffered from being shunned by her professional colleagues, from being isolated and banned.  Their rules say you are banned from having any contact with any of your professional colleagues. So you've enjoyed these relationships for 20 years, people that they not only get together socially, but primarily to exchange information about the developments in their medical fields. Professional associations for doctors are extremely important for that purpose.  She has no other place to go for that. You're going to -- you're going to hear about the losses in this case.

I want to finish by saying on behalf of Dr. Stewart, to each you, thank you.  This is her problem.  This is her fight. What happened happened to her, not to you.  But you're here and

1    you're serving on this jury.  This case is expected to go more

2    than a week and you all have jobs.  You've got other things to

3    do in your life and we are very aware of that.  And so we want

4    to say thank you very much for your service.  I really thank

5    you for your attention, and thank you for listening to the

6    evidence as it comes in on both sides of this case.

7              THE COURT:  All right.  Thank you, Mr. Conwell.

8         All right.  Ladies and gentlemen, we're going to take our

9    break early because I don't want to interrupt defense counsel's

10   opening statement just to give the reporter a break.  So we're

11   going to break now.

12        Remember the admonition that I gave you yesterday about

13   not discussing this matter until such time as it's submitted to

14   you for your decision.  All right.

15             THE COURTROOM DEPUTY:  All rise.

16             THE COURT:  Let's come back at 25 after the hour.

17             (A recess was taken.)

18             (Open court in the presence of the jury.)

19             THE COURT:  All right.  Ladies and gentlemen --

20   well, the record will reflect the jury is here; all counsel and

21   parties are here.

22        I will now have the opening statements from the defendant.

23             MR. SCHNEIDER:  Thank you, your Honor.

24             THE COURT:  Mr. Schneider.

25

1      **OPENING STATEMENT BY MR. SCHNEIDER**

2           MR. SCHNEIDER:  Good morning, ladies and gentlemen.

3      You've just heard a long and impassioned speech by

4      Mr. Conwell.  As the Court informed you at the outset, nothing

5      that Mr. Conwell said is evidence.  Evidence only comes when

6      witnesses are at the witness stand and exhibits are admitted

7      into evidence.  And to be fair, likewise, what I'm about to

8      tell you is not evidence either.

9           You are ultimately going to be empowered to decide this

10     case, but you should only do so after you have heard the actual

11     evidence, and that means that you need to keep an open mind.

12     The plaintiff is going to go first.  They're going to be

13     presenting their evidence.  You should not make assumptions

14     until you hear everything.

15          You've heard about an organization called AAPS.  It's the

16     American Association of Physician Specialists.  The

17     organization itself is largely a social and networking club

18     with a very important component, and that very important

19     component is board certification.  And AAPS has a special arm

20     that takes care of that, and that's called the American Board

21     of Physician Specialties.  That's part of AAPS that is ABPS.

22          You've heard how the plaintiff lost her membership in

23     AAPS.  AAPS itself does not certify physicians.  ABPS certifies

24     physicians.  Dr. Stewart has at all times since she became

25     certified remained certified.  She is certified as we speak

1    right now.

2         AAPS has about 3,000 members who are physicians all across

3    the United States.  It operates with a small staff of 15

4    people.  Mr. Carbone is, indeed, the chief executive officer.

5    Mr. Durante, who is seated at counsel table with us, is the

6    chief operating -- or executive -- chief operating officer.

7         You heard how Dr. Stewart and Dr. Castillo -- and I'm told

8    that is the proper pronunciation of his name -- and others

9    brought complaints that they were unhappy about certain aspects

10   of how AAPS operated.  There is absolutely nothing wrong with

11   that.  And in order for any organization to survive, it has to

12   listen to the members and consider what the members have to say

13   and accept meaningful criticism of how they're operating.  And

14   indeed, AAPS has done that.

15        Some of the complaints that they have raised are quite

16   legitimate.  Some of them are not.  None of them was sufficient

17   to bring down the organization.  That is a mischaracterization.

18        You saw a good deal of information concerning pornography.

19   You saw an exhibit with a woman by a fire hydrant.  You were

20   told about a *Cheers* episode.  You were told about photographs

21   of young ladies playing Twister when they didn't have their

22   clothes on.  All of that is true.  We are not denying that.

23   That did occur.  But what Mr. Conwell chose not to tell you is

24   that after it came to light, it was addressed with Mr. Carbone,

25   "You can't do this."  Yes, it is grounds for termination.  It

1    doesn't mean the person has to be terminated; you can counsel

2    employees, and that is what they did.  They counselled him.

3    They told him to stop doing that.  He did stop doing that.

4         And one thing that they haven't mentioned to you is none

5    of this material was sent to Dr. Stewart.  I can also add none

6    of it was sent to Cassandra Newby, the terminated employee.

7    The only person at AAPS, employee to whom it was sent, was Tim

8    Bell, and Mr. Bell specifically requested it.  Now, please

9    understand, I am not telling you that AAPS condones any

10   employee sending pornography by way of its office computers.

11   That is not appropriate.  But we're not talking about a victim

12   with regards to Mr. Bell.  And who is Mr. Bell?  He is the

13   former government affairs worker.  He was terminated because he

14   was a terrible employee.  He didn't show up to work on time; he

15   made lots and lots of mistakes.

16        You heard that Mr. Bell was sued by AAPS.  That is true.

17   What you didn't hear is that Mr. Bell sued AAPS.  He sued them

18   first.  And ultimately AAPS obtained a judgment against

19   Mr. Bell.  Now, it is true that Mr. Bell elected not to defend

20   himself.  It is not true that that automatically means that a

21   judgment is going to be granted.  The plaintiff, or in this

22   case the cross-complainant against Mr. Bell, AAPS, still had to

23   prove its case and it did.  It got a judgment against him for

24   $180,000.

25        I'd also like you to think for a moment while Mr. Conwell

is telling you that Dr. Castillo was talking to Mr. Bell, he is

talking to Mr. Bell at a time that AAPS is in litigation with

Mr. Bell.  Mr. Bell was an opponent of AAPS.  Mr. Bell had a

stated goal of trying to take the entire organization down.

That is the person that Dr. Castillo thought it was a good idea

to exchange ideas with.  Dr. Castillo did, Dr. Klein did, and

Dr. Geller did.

        You heard that Drs. Klein, Geller, and Castillo were

suspended.  Indeed, they were.  What had happened was AAPS was

monitoring Mr. Bell's e-mail because not everyone knew that he

did not work there any more, and e-mails, business e-mails,

would come to him.  And AAPS had to address those e-mails.

There's nothing sneaky about that.  Companies do have the right

to monitor their own employees' e-mails and that's what they

were doing.  And much to their surprise, they find an e-mail

from Mr. Bell to somebody indicating that he is working with

Dr. Klein, Dr. Castillo, and Dr. Geller that alarmed them.

That very much alarmed them.  He should -- those doctors should

not have been communicating with a fellow who is in litigation

against AAPS.  This was an unprecedented situation for AAPS.

        Now, let me go back a step and talk about AAPS and who the

members and the Board of Directors are.  They are volunteers.

They are members who are physicians.  They -- they don't get

paid for their efforts in serving as directors.  They really

did not know how to address this situation.  They got some

1    legal advice, and after getting the legal advice, they elected

2    to suspended these doctors to protect the organization from

3    people who were working with someone who had a stated goal of

4    trying to destroy the organization.  That's who these doctors

5    were working with.  That's why they got suspended.

6         They very much have an agenda.  Dr. Castillo is going to

7    be coming in to testify as a witness.  He is far from an

8    unbiased witness.  As Mr. Conwell told you, he is in litigation

9    right now against AAPS.  He is suing AAPS; AAPS is suing him.

10   So as you consider his testimony, you need to think about the

11   fact that he is hardly unbiased.

12        You are also not going to meet Cassandra Newby, but you

13   will see her testimony by way of video deposition.  In point of

14   fact, she was never harassed as an employee.  She lied in her

15   deposition about being called names by Mr. Carbone.  She did

16   file a lawsuit.  The lawsuit was settled.  The lawsuit was

17   settled because an insurance company made them settle.  That

18   was not their idea.  That happens all the time.

19        And you should also know just why Cassandra Newby was

20   terminated.  She didn't get fired for complaining about sexual

21   harassment.  She got fired because as she is walking down a

22   hallway in the offices and another employee is walking down the

23   hallway in the opposite direction, she decided it was a good

24   idea to throw a hip check and slam this woman against the file

25   cabinet.  That's why she got fired.  You are going to see the

1    video of that occurring, and that's the reason for her

2    termination.

3        You've also heard that -- and let me tell you, I am not

4    going to go through an entire chronology of everything that

5    Mr. Conwell talked about.  It's not that I'm trying to hide

6    anything from you.  You're going to hear all of the evidence.

7    I'm trying to focus on those points that -- those facts that I

8    think are most important for you to understand relative to your

9    analysis of this case.

10       Dr. Stewart claims that she was terminated because she

11    brought up legitimate complaints, and she claimed that she was

12    discriminated against because she's female, because the men who

13    complain about those things did not have their memberships

14    removed.  And Mr. Conwell told you about a hearing in June of

15    2012 where the hearings that were going to go forward as to

16    Drs. Klein, Geller, Castillo and Cressey did not go forward

17    because the court issued something called a temporary

18    restraining order.  The operative word there is temporary.  The

19    judge didn't say that they could not ultimately meet with these

20    individuals.  The judge put it on hold.  And two months later,

21    there was another hearing and the court kept that injunction

22    going.  It's still going right now.  They can't proceed with

23    this -- these disciplinary meetings as to those four doctors.

24    So it's not because they are men and Dr. Stewart is a woman and

25    Dr. Radentz is a woman that Dr. Radentz and Dr. Stewart had

```
 1   their membership removed and the four male doctors did not.
 2   The fact is AAPS could not proceed with regard to the four male
 3   doctors.
 4        You also heard about the involvement of Dr. Okerblom.  I
 5   don't know if his name was mentioned, but he is not only
 6   Dr. Stewart's lawyer, he is also her husband.  And he wrote
 7   some letters on her behalf.  And you heard -- well, one of
 8   them, called preliminary legal opinion, and I -- my voice drops
 9   an octave every time I use it because he makes it sound so
10   somber -- and in this preliminary legal opinion that
11   Dr. Stewart distributed at AAPS's annual meeting in 2011, he
12   identified himself as Dr. Stewart's lawyer.
13                MR. KRUZHKOV:  I think we're still connected to
14   Mr. Schinnar's computer rather than the display.  That's what
15   we're seeing up here.
16                THE COURT:  Flip it over to --
17                THE COURTROOM DEPUTY:  -- to "Defendant."  Push the
18   button.
19                MR. SCHNEIDER:  It's on "Defendant."
20                THE COURTROOM DEPUTY:  Are you trying to show that
21   document?
22                MR. SCHNEIDER:  I'm just trying to show this
23   document.
24                THE COURTROOM DEPUTY:  Doc cam.  Doc cam underneath
25   the cabinet.
```

```
 1              MR. SCHNEIDER:  Oh, thank you.

 2              THE COURTROOM DEPUTY:  Yes.  There you go.

 3              MR. SCHNEIDER:  Ah.  Thank you.

 4         Okay.  This is the preliminary legal opinion and it indeed

 5    comes from -- it is from Dr. Okerblom.  It's from the Law

 6    Offices of Dr. William A. Okerblom.  And take a look at what it

 7    says under that, "Attorney for AA Physician Member Patricia

 8    Stewart."  This is the same document.  He three times

 9    references Dr. Stewart as "my client," not "my friend," not

10    "some member."  He is writing this letter as an attorney and

11    he's writing as an attorney who is representing Dr. Patricia

12    Stewart.

13         So that's one of the letters that he sent, and this letter

14    is inaccurate in a multitude of ways.  Some of it is half

15    truth.  Some of it is simply not truth whatsoever.  So it's

16    certainly legitimate for Dr. Stewart to raise complaints about

17    issues going on with her organization -- no one is contesting

18    that -- but not by way of inaccurate correspondence from a

19    lawyer.

20         And after that, Dr. Stewart -- I'm sorry -- Dr. Okerblom

21    acting again as her lawyer and her husband, continued to write,

22    and he seemed to be emboldened because his correspondence got

23    more and more vile.

24         In December of 2011, he wrote a letter to the Board of

25    Directors and something called the House of Delegates.  The way
```

1    this operation works with AAPS, they have a Board of Directors

2    just like any other corporation, even though they're a

3    not-for-profit corporation.  They also have another body that

4    is empowered with electing officers and approving amendments to

5    bylaws.  So if a bylaw's going to be amended, first the Board

6    of Directors has to approve it, then the House of Delegates

7    does.

8         So the Board of Directors approves an amendment to expand

9    the powers of something called the Executive Committee.  The

10   Executive Committee consists of the six officers of the

11   organization which includes the vice president, the

12   president-elect -- one goes from vice president, the next year

13   is president-elect, and then the year after that is

14   president -- and it also includes the immediate past president.

15   So the four of them plus the secretary/treasurer and the

16   members' officer are the Executive Committee.  They are all

17   members of the Board of Directors.  And the purpose of this

18   amendment was not to take power away from the Board of

19   Directors as a whole; the purpose of it was to allow a body to

20   deal with things on an emergency urgent basis that would later

21   have to be approved by the entire Board of Directors.

22        Remember, these people are volunteers.  They are all

23   across the country and it just is not that easy for them to

24   mobilize.  In fact, during a number of their telephone

25   conference meetings, some of those doctors are on call.  They

1    are emergency physicians, for example, who are at hospitals and

2    are not in the emergency room at that moment treating patients.

3    So these are people with full-time jobs who are assisting this

4    organization by acting as directors.

5        So, Dr. Okerblom sends this letter to the entire Board of

6    Directors and the entire House of Delegates.  And he begins

7    this correspondence by saying -- and as you can see, this is

8    boldfaced, all capital letters -- "To all officers, Board

9    members, and members of the House of Delegates collectively and

10   individually."  I suppose that's to make it look like he's very

11   serious.  And it begins with, "You are hereby notified that

12   several concerned physician members and leaders of your

13   organizations -- your organization have authorized me to

14   informally -- to formally demand" blah, blah, blah.  So he

15   wants everyone's attention by way of this correspondence.  And

16   he is addressing this amendment.

17       Now, there is absolutely nothing wrong with any member of

18   this organization opposing the amendment.  We live in a country

19   that has free speech, the right to vote on things, the right to

20   make oneself heard.  No problem with that whatsoever.

21       But that's not exactly what Dr. Okerblom on behalf of

22   Dr. Stewart does in this letter.  Instead, he says, "Prior to

23   voting for such bylaw amendments" -- and then he goes to all --

24   to bold -- "you are hereby" -- "you are hereby advised to seek

25   legal advice" -- go out and get a lawyer -- "with regard to

1   your potential liability for aiding and abetting the executive

2   officers and executive staff members of the AAPS in breaches of

3   fiduciary duties that they owe to the members of AAPS."

4       And then he says, "Any persons who knowingly assist the

5   executive leadership to violate their fiduciary duties may be

6   named as co-defendants in a number of legal actions that are

7   currently being drafted and that are expected to be filed

8   within 90 days of the time that the proposed amendments are

9   ratified."

10      And then he says, again in giant boldfaced type, "You are

11  now on notice that lawsuits will be filed if the amendments are

12  adopted."

13      Ladies and gentlemen, he is threatening to sue the

14  volunteer members of this Board of Directors if they vote for

15  an amendment because he doesn't like that amendment.  So, yes,

16  it is true this amendment did not pass.  In fact, it never even

17  came to a vote at that House of Delegates meeting.  But

18  Dr. Okerblom acting on behalf of Dr. Stewart had put the House

19  of Delegates in a position where they had to worry about

20  getting sued regarding their volunteer job for which they don't

21  get paid if they didn't vote the way Dr. Okerblom and

22  Dr. Stewart wanted them to vote.

23      I also want to tell you about something else that appears

24  in this letter.  Now, I told you a moment ago that one of the

25  functions of the House of Delegates is to elect the officers of

1    the organization, and they do so at the annual meeting this --

2    every year which is in June of each year.  So in June of 2011,

3    the president-elect was then a fellow named Dr. Dave McCann and

4    he was coming up to become president.  Dr. McCann told

5    Mr. Carbone during that conference that he was dealing with

6    abdominal pain and just did not feel well, and that his doctor

7    said, "I need to talk to you."  And even though there was a

8    vote coming up for him to become president, Mr. Carbone told

9    Dr. McCann, "Dave, your health is paramount.  You need to go

10   home."  So he did.  Nothing wrong with that.

11       The president of the organization at the time was

12   Dr. Anthony Russo.  Dr. Anthony Russo was told by either

13   Dr. McCann or Mr. Carbone what the situation was with

14   Dr. McCann, and he informed the members of the Board of

15   Directors and then the members of the House of Delegates that

16   Dr. McCann had to leave because he had a family emergency, and

17   he did have a family emergency.

18       Here is what Dr. Okerblom wrote, quotes, "It will be

19   alleged" -- and this is in the lawsuit that he is threatening

20   to file against AAPS and anybody who votes for the amendment

21   that he doesn't like -- "It will be alleged that the executive

22   leadership knowingly and intentionally committed election

23   fraud" -- fraud, that's a crime -- "by concealing from the

24   voting members of the House of Delegates their knowledge of the

25   fact that the nominated candidate for president, David McCann,

had been known by them prior to the election to have metastatic
tumors in his pancreas and liver.  Instead of disclosing that
Dr. McCann was not present at the meeting because he discovered
he was terminally ill, they stated simply that Dr. McCann was
unable to attend the meeting because he had a family emergency
thereby depriving the delegates of critical information that
they needed to knowingly and intelligently exercise their right
to elect the president of the AAPS."  Now, like most
organizations, there is a succession plan, and the person who's
elected as president-elect would become president if the
president became unable to serve.  And remember again, this is
a volunteer organization.  We are not talking about the Chief
Executive Officer of the United States.

So, firstly, he accuses these people of fraud and he is
saying they already knew what his condition was.  The fact is
the leadership did not know.  Dr. Cerrato did not know,
Mr. Carbone did not know, Dr. Russo who spoke to both groups,
the House of Delegates and the Board of Directors, he did not
know, and ladies and gentlemen, Dr. McCann did not know that
either.  He hadn't been diagnosed yet.  Well, he might have
been diagnosed, but he didn't know what the diagnosis was.

So Dr. Okerblom thinks this is a good way of addressing
the House of Delegates and the Board of Directors so that they
can make good decisions by accusing people of fraud and
threatening to sue volunteers.

1    And apparently this became a habit for Dr. Okerblom to be

2    writing on behalf of himself and Dr. Stewart because just a few

3    days later he sends yet another e-mail, an e-mail blast.  And

4    here he is talking about Dr. Cerrato.  Now, you heard

5    Mr. Conwell go on chapter and verse about Dr. Cerrato.

6    Dr. Cerrato, in fact, did get paid by the organization, but not

7    for serving as a director and not for serving as a volunteer.

8    He was spending half of his time -- he's a physician, after

9    all -- working for AAPS and he charged them for some of his

10   time.  You've heard charges that he engaged in the unauthorized

11   practice of law, that he is licensed in New Jersey but was

12   practicing law in Florida.  Now, Mr. Bell, that you heard about

13   before, had filed a complaint with the New Jersey Bar that

14   Dr. Cerrato was practicing without a license in Florida.  The

15   New Jersey Bar ultimately investigated and dismissed that

16   charge.  He was not practicing law in Florida without a

17   license.  And then it didn't end there.  Dr. Geller brings the

18   same claim and the New Jersey State Bar comes to the same

19   conclusion:  He was not practicing law without a license.

20       But Dr. Okerblom goes after Dr. Cerrato, who for the most

21   part is donating his time, just hammer and tong.  Here is what

22   he says in this e-mail blast -- it's not just a letter to

23   Dr. Cerrato -- "Dr. Cerrato does not seem to know how to stay

24   out of trouble.  He seems to think that rules don't apply to

25   him.  He is very bold to try to bend the rules, even when

1    dealing with powerful authorities like the New Jersey Bar when

2    he told them he was not providing legal services in Florida

3    when he actually was."

4         Well, it's interesting that Dr. Okerblom knows that

5    Dr. Cerrato is practicing in Florida when Dr. Cerrato doesn't

6    know that and the New Jersey Bar concludes that that just was

7    not true.

8         And he doesn't stop there, "Most doctors are prudent and

9    careful and responsible.  Dr. Cerrato seems to be a significant

10   exception.  He has practiced with reckless indifference to

11   societal norms."  This is what he's sending out to all kinds of

12   people in this organization.  Now is he doing this simply to

13   register a complaint?  No, he is going way past that.

14        "Certainly his conduct does not comport with the kind of

15   character that typically belongs to the president of a

16   board-certifying body.  Unfortunately for the AAPS, the current

17   Board has also violated its bylaws and followed Dr. Cerrato's

18   very bad legal advice and example into disaster."

19        Well, Dr. Cerrato actually wasn't rendering them legal

20   advice.  And this disaster?  Well, here we are five years later

21   and this organization is still operating.  They didn't exactly

22   face disaster.

23        "They are now flirting with the total destruction of the

24   organization."  Well, not so much.

25        And then he says, "Dr. Cerrato may have to go.  He has

proved that he is not qualified to run this organization anywhere but into the ground.  Besides, there's a pretty good chance that he is going to need to focus his energy in getting his own life in order."

So Dr. Okerblom knows that Dr. Cerrato's life is out of order and this is what he's sending to lots and lots of people in the organization, "Perhaps a little bit of time off to do a little bit of soul searching and introspection might help him to figure out the difference between good and bad," again, way, way overboard.

So when you hear that Dr. Stewart was terminated merely for expressing contrary viewpoints, that's not exactly true. Those are the sort of things that are injurious to the organization.

And let me tell you why they are injurious to the organization.  ABPS which is, again, the certifying body, is one of three national boards of this nature.  They were in competition with the others.  One of them, ABMS, has stated its goal in its own newsletter to drive ABPS and AAPS out of business.  So that's -- that's what they are trying to deal with, and here's this doctor making all kinds of disparaging remarks about the organization.

And Dr. Stewart and Dr. Okerblom say, "Oh, no, I wasn't" -- you know, Dr. Okerblom was not representing her when he sent these letters.  Well, the first thing that he sends

1    very clearly said he was representing her, "Attorney for

2    Dr. Patricia Stewart."  Then he sends these other letters, and

3    he doesn't say, "I'm representing Dr. Smith or Dr. Jones," or,

4    "I'm writing in my own behalf."  He simply says, "I'm writing

5    on behalf of several concerned physicians," without identifying

6    who they were.

7        Well, this organization knows that he is Dr. Stewart's

8    lawyer.  He is saying he's representing anonymous doctors.  All

9    of the signs pointed to he is representing Dr. Stewart.

10       You also heard about this hearing that took place and you

11   were shown an e-mail from Dr. Montes.  By the way, you're not

12   going to see Dr. Montes because, unfortunately, he passed away

13   a few months ago.  And there was a -- the disciplinary

14   committee that you heard about, unfortunately, Dr. Maggio just

15   passed away as well.  The third member of that committee you're

16   going to see video testimony from, that's Dr. Wallace.  And you

17   heard that -- from Mr. Conwell that Dr. Cerrato handpicked his

18   best friends.  He did not have a social relationship with any

19   of those three doctors.  He is going to tell you that he

20   selected them not because of any bias, but because Dr. Montes

21   and Dr. Maggio had been around a long time.  Dr. Cerrato has

22   been with this organization since 1992 or 1993 and those other

23   two doctors were involved before him.  So he wanted to have

24   people who had experience.  And he's going to tell you that he

25   selected Dr. Wallace because -- on his theory of odd man out --

1    that you have two people who have a similar background -- he

2    wanted to have somebody who was not a director participate in

3    the process, somebody who did not have the experience the other

4    two doctors did.

5        He also -- Mr. Conwell also told you that Dr. Wallace was

6    biased because he ended up in the governor's seat that

7    Dr. Stewart had been removed from.  But regardless of how this

8    vote turned out, Dr. Wallace was going to remain in that seat.

9    The seat was vacant when he took it.  So whether they expelled

10   Dr. Stewart or didn't expel Dr. Stewart, Dr. Wallace would

11   still be a governor of the Dermatological Academy.

12       So let's talk about what Dr. Stewart has done since her

13   membership ended.  Now, I told you before that she is

14   certified.  She really is certified.  Now, this termination of

15   membership occurred in June of 2012.  In order to remain

16   certified with this organization, each doctor has to pay what's

17   called a maintenance fee, and they pay that every year.  So

18   Dr. Stewart had paid her maintenance fee for 2012 toward the

19   end of 2011.  So 2013 is approaching and Dr. Stewart paid her

20   maintenance fee for 2013.  So she knew that she was still

21   certified.  And when AAPS notified her of the loss of

22   membership, it specifically stated, "You will remain

23   certified."  So she paid for 2013, then she paid for 2014.  And

24   then for reasons that are difficult to understand, she did not

25   pay her maintenance fee for 2015, and to my knowledge she has

1  not paid it for 2016 either.  And the directions that the

2  people who man the phones at AAPS have in case anybody calls to

3  ask about her are to say that she's in inactive status.  She

4  can change that inactive status whenever she likes by making

5  the back payments.

6       Now, you also heard Mr. Conwell go on and on about this

7  black mark that results from losing her membership.  There's no

8  black mark.  Yes, that's a question that is asked by health

9  plans, insurance companies, "Have you been disciplined by a

10  professional society?"  And the form says, "If the answer is

11  yes, please provide an explanation."  What those health plans

12  and insurance companies are interested in is three things, and

13  you're going to be hearing this from credentialing experts.

14  They are interested in, "Do you have a current license?"  They

15  are interested in, "Are you currently board certified?"  And

16  they are interested in, "Have you engaged in poor patient

17  care?"

18       Now, I have no reason to believe that Dr. Stewart is

19  anything other than an outstanding dermatologist and fine

20  physician.  There is no evidence anywhere that she did not

21  treat her patients properly or she had engaged in malpractice.

22  And we presume that she remains --

23            THE COURT:  I've been patient with the rebuttal long

24  enough.  Let's hear what the evidence will show.

25            MR. SCHNEIDER:  Thank you, your Honor.

1          The evidence will show that she remains licensed to

2     this -- that -- lost my train of thought here -- she is

3     certified to this day.

4          You are not going to hear any witnesses from any insurance

5     company or health plan come in to say that they had terminated

6     their relationship with her.  She terminated all of those

7     relationships.  The expert witnesses are going to tell you that

8     these companies with whom she can do business really have no

9     interest in whether she's been kicked out of an organization

10    like AAPS.

11         Ladies and gentlemen, all of these facts ultimately will

12    be borne out at trial.  I appreciate that you have given both

13    Mr. Conwell and me your undivided attention, and I hope you

14    continue to do so throughout the litigation.

15         Again, we ask that you wait for all of the evidence to

16    come in and then make your decision.  Thank you for your

17    attention.

18              THE COURT:  Thank you, Mr. Schneider.

19         All right.  Your first witness.

20              MR. CONWELL:  First witness is Dr. Tom Castillo.

21         Your Honor, I've got some exhibits I want to use with him.

22    May I pull them out now and put them up on the witness stand or

23    furnish them to the Court's clerk?  I think that'll make his

24    testimony go more quickly.  Thank you.

25              THE COURT:  This is your liaison with the rest of

```
 1    the world in this courtroom.

 2        THOMAS A CASTILLO, M.D., PLAINTIFF'S WITNESS, WAS SWORN

 3            THE COURTROOM DEPUTY:  Please be seated.

 4            THE WITNESS:  Thank you.

 5            THE COURTROOM DEPUTY:  Please state your name and

 6    spell your last name for the record.

 7            THE WITNESS:  Thomas A. Castillo, C-a-s-t-i-l-l-o.

 8            THE COURTROOM DEPUTY:  Thank you.

 9            MR. CONWELL:  Thank you, your Honor.

10       May I proceed, your Honor?

11            THE COURT:  Please.

12            MR. CONWELL:  Thank you.

13                         DIRECT EXAMINATION

14    BY MR. CONWELL:

15        Q    Good morning.  Can you state your full name, please?

16        A    Thomas Alvin Castillo.

17        Q    And what is your occupation?

18        A    I'm a physician.

19        Q    And how long have you been a physician?

20        A    Since 1977, about 39 years.

21        Q    And what is your specialty?

22        A    Ophthalmology.

23        Q    Where do you practice?

24        A    I practice in Beaver Dam, Wisconsin.

25        Q    Are you a member of the AAPS?
```

1        A       Yes, I am.

2        Q       What is your educational background?

3        A       Uhm, I went to high school at DePaul University

4    Academy in Chicago, Loyola University of Chicago, and I had a

5    BS degree in biology.  I went to medical school at Chicago

6    College of Osteopathic Medicine and graduated in 1977 with my

7    D.O. degree.  I also was a teaching fellow in anatomy during

8    that period of time.  I did my internship and my residency in

9    ophthalmology at Chicago Osteopathic Hospital in Olympia Fields

10   Medical Center in Chicago and finished in 1981, and then

11   received an MBA degree from St. Ambrose University in

12   Davenport, Iowa, in 1994.

13       Q       When did you join the the AAPS?

14       A       It was in 1993, I believe, or '94.

15       Q       What positions have you held in the AAPS?

16       A       I was president of the AAPS.  I was on the Executive

17   Committee.  I was on the -- I served on the Board of Directors.

18   I served on the Medical Missions and Outreach Committee.  I

19   served as president of the American Association of Surgical

20   Specialists.  I served as the chair of the Board of

21   Certification in Surgery.  I served as a co-chair on the

22   Certification Standards Committee which later became the

23   American Board of Physician Specialties, and other committees.

24       Q       Okay.  What is the AAPS?

25       A       AAPS is the board-certifying organization.  It is

1    the third board-certifying -- multispecialty board-certifying

2    organization in the United States.  It certifies both opth- --

3    D.O.s, rather, and M.D.s and their specialties, and it was

4    formed in 1949 and incorporated in 1951.

5         Q    Does it provide continuing medical education?

6         A    Yes, it does.

7         Q    And what part of the AAPS does that?

8         A    The AAPS provides continuing medical education

9    through its academies and it's done at the annual meetings in

10   their scientific sessions.

11        Q    Can you just explain for the jury what an academy

12   is?

13        A    A surgical academy -- all of the academies

14   basically are groups of specialists in their field:  surgery,

15   internal medicine, dermatology, emergency medicine.  They

16   gather together to discuss scientific advancements, to provide

17   lectures -- lecturers for the scientific meeting, propose

18   policies in regards to their academies and the AAPS through

19   their presidents and the counsel of presidents.

20             It's -- a lot of business is done at the academies.

21   It's -- a lot of collegial networking is done as well.  You're

22   able to know, you know, who your colleagues are within the

23   organization and across the country for referral purposes.

24   That's --

25        Q    Is AAPS just a social organization?

```
 1         A      No, it's not.

 2         Q      What is it?

 3         A      It is a board-certifying organization through its

 4   subsidiary, the American Board of Physician Specialties.

 5         Q      Is that a separate legal entity or is it just a

 6   division of AAPS?

 7         A      It is a division of the AAPS.

 8         Q      Okay.  So they're one and the same --

 9         A      Yes.

10         Q      -- in the same legal entity?

11         A      Yes.

12         Q      Okay.  And you've used the term board certifying.

13   Can you explain what that means?

14         A      After you finish your residency training program, a

15   physician will then go ahead and take a rigorous written

16   examination and an oral examination and -- in surgical

17   specialties, and they also take a clinical examination.  There

18   the examiner will come to the hospital or the facility and

19   watch them do surgery to make sure that they're competent in

20   their area of expertise.

21              Having completed that process, then they are felt to

22   be what we call board certified, so that they passed all of

23   these tests and they can claim to be board certified on any of

24   the applications that they make.

25         Q      And is AAPS recognized in all states as a
```

```
 1   board-certifying organization?

 2        A     No, it is not.

 3        Q     And have you been a part of efforts in your

 4   leadership role at AAPS in obtaining recognition in other

 5   states?

 6        A     Yes, I have.

 7        Q     Can you describe what you've done and why this is

 8   important?

 9        A     I've attended several meetings of the Federation of

10   State Medical Boards to advocate for the inclusion of AAPS in

11   the FSMB which is an organization that has all of the medical

12   boards around the country.  You are -- when you apply for a

13   license in a state, you have to go to your medical examining

14   Board and then they will go ahead and determine, you know, if

15   you have the qualifications to be licensed.  And you can be

16   licensed in any state, but it -- we were looking for the

17   recognition to show that we are just as equally as stringent in

18   our examinations and that our members are held to the highest

19   standards as well as the other organizations.

20        Q     Okay.  Does AAPS hold itself out as -- or does it

21   distinguish itself from the other two leading board-certifying

22   organizations in the area of ethics?

23        A     Yes, it does.

24        Q     Can you explain?

25        A     We, uhm -- AAPS was the only organization or is the
```

1    only organization that requires a nonremedial ethics course as

2    part of their recertification process.  Surgeons will --

3    physicians will get recertified every eight to ten years, and

4    as part of that process, the -- they would have to take a

5    course on ethics in order to refamiliarize themselves with

6    ethical behavior.

7         Q     Are AAPS members required to pledge to high ethical

8    standards?

9         A     Yes, they are, on their application.

10        Q     And is the reputation of AAPS important in seeking

11   and obtaining recognition from these state medical boards as a

12   Board -- recognized board-certifying organization?

13        A     Absolutely.

14        Q     Can you explain?

15        A     Uhm, the -- in trying to -- can you state the

16   question again?

17        Q     Yeah.  You said that the reputation of AAPS was

18   important in obtaining and retaining recognition from state

19   medical boards as a board-certifying organization.  Can you

20   explain why that reputation is important in that process?

21        A     It's important in the process because in any medical

22   field the patients have a -- the doctors have a duty of

23   responsibility -- responsibility to maintain trust from their

24   physician.  They -- the patients need to know that they can

25   trust the doctor and that they have maintained all of the

1    standards that we have claimed in our Hippocratic oath and in

2    the -- within our organization as well.

3            It's highly important to all the patients that we --

4    that we have this high standard, personal and professional.

5        Q    Have you found in your work in attempting to get

6    recognition from state medical boards that whether or not AAPS

7    has a good reputation as a board-certifying organization helps

8    it or hurts it in obtaining that recognition?

9        A    Yes, it is important that they know this.

10       Q    Okay.  Do you know Dr. Patricia Stewart?

11       A    Yes, I do.

12       Q    And how do you know her?

13       A    I met her back in the early 2000s when I was the

14   co-chair of the certification standards committee and she was

15   the chair of her board of certification in dermatology.

16       Q    What does that mean, the chair of the board of

17   certification?

18       A    The two organizations, the AAPS and ABPS, the

19   American Board of Physician Specialties are -- and which was

20   previously the Board -- the certification standards committee,

21   was the -- there are two -- there's an academy, which has all

22   of the members, and then there is the board certification which

23   includes members who have been board certified, so they're what

24   we call diplomates.  And they're able to go ahead and

25   administer the examination and the tests that are necessary and

1   determine the requirements necessary to become board certified.

2       Q     Was she the person in charge of doing that when she

3   was the chair of board certification for anyone seeking

4   certification in dermatology?

5       A     Yes.

6       Q     And did you and Dr. Stewart end up being involved in

7   a controversy at AAPS involving alleged misconduct and

8   corruption of some of the AAPS leaders?

9       A     Yes.

10          MR. SCHNEIDER:  Objection.  Irrelevant.

11          THE COURT:  Overruled.

12      Q     (BY MR. CONWELL:)  And did that include alleged

13  misconduct of Bill Carbone, Dr. Bob Cerrato, and Dr. Stephen

14  Montes?

15      A     Yes, it did.

16      Q     And do you know Mr. Carbone, Dr. Cerrato, and

17  Dr. Montes?

18      A     Yes, I do.

19      Q     Have you heard of something called -- in the

20  2010-2012 time frame something called the control group at

21  AAPS?

22      A     Yes, I have.

23      Q     What is that or who was that control group?

24      A     That control group was Dr. Robert Cerrato and

25  Dr. Stephen Montes and Mr. Bill Carbone.

```
 1          Q      And how long have you known Mr. Carbone?

 2          A      Uhm, since I was a member of AAPS, since 1993 or '4.

 3          Q      How long have you known Dr. Bob Cerrato?

 4          A      I believe I met him somewhere in the -- around 2000

 5   or so.

 6          Q      And how long have you known Dr. Montes?

 7          A      I've known Dr. Montes since 1975.  He was a medical

 8   student at Chicago College of Osteopathic Medicine when I was

 9   teaching anatomy as an anatomy fellow.

10          Q      Have you observed the relationship between the three

11   of them?

12          A      Yes, I have.

13          Q      Can you describe it?

14          A      Uhm, they are very close friends and business

15   acquaintances.  They -- Dr. Cerrato and --

16                 MR. KRUZHKOV:  Objection, your Honor.  Lack of

17   foundation as to their business together.  He's never

18   established that he knows anything about that.

19                 THE COURT:  Just the grounds.

20           And sit down.

21                 MR. KRUZHKOV:  Apologies, your Honor.  Thank you.

22          Q      (BY MR. CONWELL:)  Do you see them at AAPS meetings?

23          A      Yes, I do.

24          Q      Have you worked with them in your various leadership

25   roles at the AAPS?
```

1          A     Yes, I have.

2          Q     Throughout the time that you've been at AAPS and

3    known those three?

4          A     Yes, I have.

5          Q     And do you see them at dinners and banquets and so

6    forth that the AAPS has its meetings?

7          A     Yes, I have seen them.

8          Q     Have you seen them with their spouses, those that

9    have spouses?

10         A     Yes.

11         Q     And what have you seen in terms of their

12   relationship?

13         A     Uhm, when we were in Atlanta, Georgia, Dr. Steve

14   Montes and his wife --

15         Q     Can I stop you for a second?  You said, "When we

16   were in Atlanta, Georgia."  Are you referring to the AAPS?

17         A     The AAPS offices were located in Atlanta, Georgia,

18   prior to 2007.

19         Q     That's one thing I forgot to ask you.  Where is AAPS

20   headquartered now?

21         A     They are in Tampa, Florida.

22         Q     And prior to 2007 where were they headquartered?

23         A     They were headquartered in Atlanta, Georgia.

24         Q     Okay.  So you were saying, "When we were in Atlanta,

25   Georgia."

```
 1        A      Yeah.  When we were in Atlanta, Georgia, I would see

 2   them the -- Dr. Montes and his wife and Mr. Carbone and his

 3   wife would frequently socialize at -- out of the meeting they

 4   would go out for dinner, they would go to various functions.

 5   And then when they were at the annual meeting banquet, they

 6   would always be sitting together at the same table.

 7        Q      Have you seen Dr. Cerrato doing anything in the AAPS

 8   to try to -- to help out Bill Carbone financially?

 9        A      Yes.  While I was on the Executive Committee,

10   Dr. Cerrato had pushed for a pay raise for Mr. Carbone and had

11   told us that, you know, if we didn't increase his money, that

12   he would -- we would lose him.

13        Q      Did you give him the pay raise?  Mr. Carbone get the

14   pay raise as a result of Mr. Cerrato's efforts?

15        A      Yes, he did.

16        Q      Excuse me.  Dr. Cerrato?

17        A      Yes.

18        Q      And can you -- let's go back to my questions earlier

19   regarding this controversy that you and Dr. Stewart were

20   involved with involving alleged misconduct and corruption of

21   some of the leaders.

22               Can you briefly describe the events that led up to

23   that, that controversy?

24        A      There were a number of things that I was told about

25   and discovered and learned.  The -- we received a letter --
```

UNITED STATES DISTRICT COURT

```
 1              MR. SCHNEIDER:  Objection, your Honor.  This is
 2    hearsay.
 3              THE COURT:  Not yet.  Overruled.
 4              THE WITNESS:  We received a letter -- the Board of
 5    Directors all received a letter from an attorney representing
 6    Timothy Bell which had included pornography that Mr. Carbone
 7    had been sending to other physicians, other members of the
 8    Board of Directors, people outside of the organization, and
 9    also had been sending them to staff members at AAPS.
10         Q    (BY MR. CONWELL:)  Okay.  Were there a number of
11    areas of alleged misconduct that were brought to your attention
12    in 2010?
13         A    Yes.
14         Q    Okay.  And can I show you a list that I used earlier
15    and ask you to take a look, if you can see that on your screen.
16              Now, you just mentioned the pornography.  You said
17    you received that from an attorney representing Mr. Bell?
18         A    That is correct.
19         Q    And was that sent just to you?
20         A    No, it was not.
21         Q    Who was it sent to?
22         A    It was sent to all the the members of the Board of
23    Directors.
24         Q    Okay.  And did you have any personal knowledge one
25    way or another whether or not Mr. Carbone was involved in
```

1    pornography at the workplace?

2        A    Not until that time.

3        Q    Okay.  But -- now, the next one, racial and ethnic

4    e-mails, what was communicated to you regarding that?

5        A    In addition to the --

6            MR. KRUZHKOV:  Objection.  Hearsay.

7            THE COURT:  Calls for hearsay.  Sustained.

8        Q    (BY MR. CONWELL:)  Okay.  Did somebody report to you

9    that that was occurred and did that lead you to request an

10   investigation?

11           MR. KRUZHKOV:  Objection.

12           THE COURT:  Overruled.

13           THE WITNESS:  It was reported in the documents

14   received from Mr. Bell's attorney.

15       Q    (BY MR. CONWELL:)  Okay.  On the next one, was it

16   reported to you and did you, therefore, request an

17   investigation, that there was sexual harassment and gender

18   discrimination taking place at the CEO level at AAPS?

19           MR. KRUZHKOV:  Objection, your Honor.  Hearsay.

20           THE COURT:  It is not.  Calls for a yes or no only.

21           THE WITNESS:  Yes.

22           THE COURT:  Overruled.

23       Q    (BY MR. CONWELL:)  Okay.  Was it purported to you

24   and did you, therefore, request an investigation, that there

25   was alleged violations of federal election laws?

```
 1        A     Yes.

 2        Q     And was it reported to you and did you, therefore,

 3   request an investigation, that the continuing medical education

 4   rights -- or excuse me -- the right of AAPS to conduct

 5   continuing medical education had been put on probation by the

 6   ACCME?

 7        A     Yes.

 8        Q     And did you, therefore, request an investigation?

 9        A     Yes.

10        Q     Was it reported to you that there was unlawful

11   compensation of Bob Cerrato?

12        A     Yes.

13        Q     And did you request an investigation?

14        A     Yes.

15        Q     And was it reported to you that there was alleged

16   unlicensed practice of law by Bob Cerrato?

17        A     Yes.

18        Q     And did you request an investigation?

19        A     Yes.

20        Q     Were these issues of importance to you as a director

21   of the AAPS?

22        A     Absolutely, sir.

23        Q     Why were they important to you?

24        A     It destroyed the credibility of the organization,

25   the credibility of the members of the organization and our
```

attempts to seek recognition across the country for all of our members.

Q    Well, what did you -- what concern did you have about what would happen to the AAPS's efforts to be recognized by these medical boards if these allegations were true?

A    It would be scandalous.  We would -- we would have difficulty at success at all in trying to show that we were physicians who held high ethical standards that were high standards in regards to their finances, high standards in regards to their education.  Basically, it put us in such a bad position that it threatened to really be recognized anywhere in hospitals or states or insurance companies, any of the medical organizations or groups.

Q    Okay.  And did you -- let me ask you specifically regarding the pornography.  Now, did you come to learn later that, in fact, Mr. Carbone was involved in receiving and then forwarding e-mails containing pornographic images, including triple X video showing an orgy and other such things?

MR. SCHNEIDER:  Objection.  Asked and answered and lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.  I found -- we did -- were able to verify that this was true.  Mr. Carbone in his deposition admitted to it.

Q    (BY MR. CONWELL:)  Now, what I -- were you at his

1    deposition where he admitted to it?

2        A    Yes, I was.

3        Q    And I want to focus specifically on pornography.

4            What concern did you have about the allegation that

5    this sort of thing was taking place in an association that was

6    supposed to be a professional association of doctors?

7        A    As physicians, we ask our patients -- fortunately

8    not for ophthalmology -- but we ask our patients to get

9    undressed.  As family physicians, as anesthesiologists, many

10   times we're viewing a naked body -- obstetrics, gynecology,

11   there's a number of areas here that require that.

12           When you have people who see women as sexual objects

13   or sexual fantasies, it makes you concerned that these people

14   may not be --

15           MR. KRUZHKOV:  Objection.  Speculation.

16           THE WITNESS:  I'm concerned.

17           THE COURT:  Overruled.

18           MR. CONWELL:  He's describing his concern.

19       Q    (BY MR. CONWELL:)  So --

20       A    It makes -- let me put -- it makes me concerned that

21   patients will then not be able to trust their physicians and,

22   you know, we are one of the top three trusted people in this

23   country according to surveys, and it's important for us to be

24   able to engender the confidence to be able to treat and

25   reassure our patients that they will be getting the best care,

1   and that when they send their wives or their daughters or their

2   sisters to a physician, that they're not being viewed as a

3   sexual object.

4        Q    And how did that affect you or motivate you when you

5   heard these allegations that this was -- this pornography was

6   being disseminated and exchanged among members of the Board

7   with your CEO?

8        A    I was disgusted.  I was disappointed.  I was -- knew

9   that we had to do something in order to be able to investigate

10  these allegations.

11       Q    Would you -- were you concerned at all that if these

12  allegations were true, that that would affect the AAPS's

13  ability to obtain or retain its recognition by medical boards

14  as a board-certifying organization?

15            MR. KRUZHKOV:  Your Honor, objection.  Leading

16  questions.  This is direct.

17            THE COURT:  Sustained.

18       Q    (BY MR. CONWELL:)  Can you tell us one way or

19  another that was an issue that was of concern to you?

20       A    That was an issue that was of concern to me.

21            MR. CONWELL:  I'd like you to take a look at

22  Exhibit 1718 which is the employee handbook.

23            (Exhibit 1718 previously marked for identification.)

24            MR. CONWELL:  Your Honor, I don't think there's any

25  dispute about this document.  We offer it.

```
 1              MR. SCHNEIDER:  No objection.

 2              (Exhibit 1718 received into evidence.)

 3       Q     (BY MR. CONWELL:)  Now, is this a document that you

 4   were familiar with as a member of the Board of Directors?

 5       A     Yes, sir.

 6       Q     Does the document show that -- state anything about

 7   whether or not this document is, in fact, from the Board of

 8   Directors?

 9       A     Yes.  On the page 6 there is a welcome and it says

10   it's from the Board of Directors and the Chief Executive

11   Officer.

12       Q     Okay.  Now, can you go to page 23?

13       A     Yes, sir.

14       Q     Do you recall that the employee handbook says

15   anything about viewing or possessing pornography in the

16   workplace?

17       A     Yes, sir.

18       Q     And what do you recall?

19              MR. SCHNEIDER:  Objection.  The document should be

20   the -- it's hearsay.

21              THE COURT:  He asked him what does he recall.

22              MR. SCHNEIDER:  What he recalls we object as

23   irrelevant.

24              THE COURT:  Overruled.

25       Q     (BY MR. CONWELL:)  Okay.  So can you look on page 23
```

```
 1    where it says, "The following actions, among other things,
 2    could constitute ground for immediate dismissal."
 3        A     Yeah.  I have that in front of me, yes, sir.
 4        Q     See that?  And then if you go down the line, it
 5    says, "Displaying, disseminating, or discussing pornographic or
 6    sexually explicit materials or information."  You see that?
 7        A     Yes, I do, sir.
 8        Q     Why is that in the handbook?
 9        A     Because it's totally against the mission statement
10    and the code of ethics of the AAPS and its employees -- its
11    physicians and employees.
12        Q     Okay.  And so when it was brought to your attention
13    that there was an allegation that Mr. Carbone was engaging in
14    this very conduct, did you take any steps to report that to
15    anyone and do something about it?
16        A     Yes.  I notified the president-elect, Dr. David
17    McCann, who was on the Executive Committee.
18        Q     And approximately when was that?
19        A     That was in July of 2010.
20        Q     All right.  And why did you report it to Dr. McCann?
21        A     'Cause Dr. McCann was going to be the next president
22    of the AAPS and I felt that it would be good for him to go
23    ahead and bring this forward since I knew him and I believed
24    him to be a man of high moral standards.
25        Q     And did you bring anything else to his attention
```

1  from the allegations that we went through a moment ago?

2      A     I brought to him the allegations regarding the

3  possible sexual harassment and discrimination against a female

4  employee, as well as the -- the FEC controversy and the --

5            MR. KRUZHKOV:  Objection, your Honor.  Lack of

6  foundation.

7            THE COURT:  Overruled.

8            THE WITNESS:  And the -- also the license to

9  practice law and pretty much everything.  I told him these were

10  all terrible, but the sexual -- the pornography was probably

11  the worst possible thing and that was sent to all of the Board

12  members, so he should have had a copy already.

13      Q     (BY MR. CONWELL:)  And why were you asking that the

14  Board conduct an investigation?

15      A     Because the protocol basically would say that if

16  this type of thing was found amongst our executive -- in other

17  words, the staff, then we would have to take it up through --

18            MR. KRUZHKOV:  Objection.  Lack of foundation.

19  There's been no discussion of any protocol or anything of that

20  nature.

21            THE COURT:  Overruled.

22            THE WITNESS:  In the organizational chart and our --

23  it is necessary for us to go through and have a chain of

24  command.  I took this up through the chain of command.

25      Q     (BY MR. CONWELL:)  Okay.  Now, I want to ask you

```
 1   specifically about the Federal Election Commission alleged

 2   violations.  Did you have any personal knowledge in that in

 3   addition to anything else that was communicated to you in 2010

 4   by Mr. Bell?

 5        A    In 2008, Brian Shufford was the Director of

 6   Government Affairs, while I was the chair of the Government

 7   Affairs Committee --

 8        Q    And this is -- let me just stop you for a second.

 9   Mr. Shufford was the Government Affairs Director for AAPS?

10        A    That is correct.

11        Q    And you were the chair of the Government Affairs

12   Committee for AAPS?

13        A    That is correct.

14        Q    And now is Mr. Shufford paid staff or is he

15   volunteer like you?

16        A    He's paid staff.

17        Q    Okay.  So now go ahead.  What happened?

18        A    He had left AAPS because of the mishandling of funds

19   by Stephen Montes --

20             MR. SCHNEIDER:  Objection.  Lacks foundation.

21             MR. KRUZHKOV:  Objection --

22             THE COURT:  Sustained.

23        Q    (BY MR. CONWELL:)  Well, did you work with

24   Mr. Shufford in your position as the chair of the Government

25   Affairs Committee?
```

```
 1        A       Yes, I did.

 2        Q       And is one of the things that you all did in working

 3   together have meetings and carry on business regarding the

 4   handling of funds for making political contributions?

 5        A       Yes, we did -- I did.

 6        Q       Okay.  And so go on.  What happened?

 7        A       Well, basically in the transfer of funds in 2008,

 8   apparently there were --

 9                MR. SCHNEIDER:  Objection.  Lacks foundation.

10                THE COURT:  Overruled.

11                THE WITNESS:  -- there was -- there was a

12   mishandling of funds.  This was reported and Mr. Shufford left

13   because he didn't want to be around when the FEC found out what

14   was going on.

15                MR. SCHNEIDER:  Objection.  Lacks foundation.

16                THE COURT:  Sustained.

17        Q       (BY MR. CONWELL:)  Did you have discussions with

18   Mr. Shufford about whether or not he felt safe staying at AAPS

19   under those conditions?

20                MR. KRUZHKOV:  Objection.  Leading and speculation.

21                THE COURT:  Overruled.

22                THE WITNESS:  Yes, I did.

23        Q       (BY MR. CONWELL:)  Okay.  And from that, did you

24   learn that he felt very uncomfortable staying?

25        A       Yes.
```

```
 1              MR. KRUZHKOV:  Objection.  Hearsay.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.

 4      Q    (BY MR. CONWELL:)  Okay.  And then in -- what -- can

 5  you just describe to the jury what the issue was regarding the

 6  mishandling of funds?

 7              MR. KRUZHKOV:  Objection, your Honor.  Mr. --

 8  Dr. Cerrato is not an attorney and he cannot opine on the

 9  legalities of various laws and the violations thereof.

10              THE COURT:  Overruled.  Make that the last speaking

11  objection.

12              THE WITNESS:  Would you repeat the question again

13  for me, please?

14      Q    (BY MR. CONWELL:)  Yes.  You said you were the chair

15  of the Government Affairs Committee?

16      A    That's correct.

17      Q    And did the Government Affairs Committee have

18  oversight or any responsibility involving the issues involving

19  the Federal Election Campaign laws?

20      A    Yes.  We -- we would -- the political action

21  committee would determine who funds would be distributed to in

22  various political campaigns, and the moneys that would be

23  collected and donated to the PAC were supposed to be separate

24  from moneys given to the American Association of Physician

25  Specialists.  They have to be completely separate
```

1    contributions, otherwise they violate --

2              MR. KRUZHKOV:  Objection.  Legal opinion.

3              THE COURT:  Overruled.

4              THE WITNESS:  -- unless they will violate federal

5    election laws, just like any one of us would be required to

6    report donations that we give to candidates.

7         Q    (BY MR. CONWELL:)  And did AAPS have a PAC fund?

8         A    Yes, they did.

9         Q    And what is that?

10        A    Political action committee fund.  People would

11   contribute to that fund in order to support various candidates

12   that were sympathetic to the causes of AAPS.

13        Q    Okay.  And what was the role of Stephen Montes

14   regarding those funds?

15        A    He was the chair of the PAC committee and he oversaw

16   the receipt and disbursement of funds.

17        Q    Okay.  So when you heard from Mr. Bell in 2011 that

18   there was a potential problem for AAPS related to the handling

19   of funds with the Federal Election Commission, was that

20   something that you already had some background with?

21        A    Yes.  As I said, I had learned that from

22   Mr. Shufford.

23             MR. CONWELL:  Now, I'd like you to take a look at

24   Exhibit 224.

25         I don't believe there's any objection to this, your Honor.

1    We're offering Exhibit 224.

2              MR. SCHNEIDER:  If you could focus it.  I can't see

3    it.

4              (Exhibit 224 previously marked for identification.)

5              MR. SCHNEIDER:  Thank you.

6              MR. CONWELL:  Is that admitted, your Honor?

7              THE COURT:  Any objection?

8              MR. SCHNEIDER:  No.

9              THE COURT:  Okay.  Be admitted.

10             (Exhibit 224 received into evidence.)

11       Q    (BY MR. CONWELL:)  So Dr. Cerrato, take a look at

12   the e-mail from David McCann to you dated August 3rd of 2010.

13             Can you -- first of all, just tell us what the

14   context is of this e-mail.  What's going on at this time?

15       A    After receiving the letter from Mr. Bell's attorney,

16   the demand letter, we -- I had spoken with Dr. McCann and asked

17   that he would look into initiating investigation into these

18   allegations, and he said that he would be making contact with

19   the other members of the Board and Executive Committee.

20       Q    Okay.  And then can you just read this e-mail to us?

21       A    (Reading:)

22             "Tom, I called for a Board of Directors

23             meeting within 30 days, but the

24             investigation into the e-mails, etc., will

25             take longer than that.  Tony R." -- that's

```
 1                  Tony Russo -- "is leaning toward mid

 2                  October for a Board of Directors meeting.

 3                  D."

 4        Q    And what e-mails were you discussing with David

 5   McCann at that time?

 6        A    I believe we were discussing e-mails regarding

 7   pornography and racist e-mails.

 8        Q    Okay.  So did you think that an investigation was

 9   going to take place?

10        A    Yes, I did.

11        Q    And then what -- did an investigation into those

12   allegations take place?

13        A    No.

14        Q    What happened?

15        A    I found myself, Dr. Klein, and Dr. Geller

16   suspended --

17        Q    Okay.

18        A    -- from membership of AAPS.

19        Q    And when did that happen?

20        A    October 8th, 2010.

21        Q    Did -- who's Dr. Geller and who's Dr. Klein?

22        A    Dr. Geller is an emergency room physician, emergency

23   medicine physician, and he was a member of the Board of

24   Directors, as I was.  And Dr. Klein was a leader in the

25   Disaster Medicine Board -- the American Board of Disaster
```

```
 1   Medicine.

 2         Q     And how were they involved in this?

 3         A     Dr. Klein had been in contact with Mr. Bell.

 4   Mr. Bell had reported to Dr. Klein the --

 5               MR. SCHNEIDER:  Objection.  Hearsay.

 6               THE COURT:  Overruled.

 7               THE WITNESS:  Dr. Klein had reported to Dr. McCann

 8   about these misconduct and the pornographic e-mails, and

 9   Dr. Geller also -- Dr. Klein spoke with Dr. Geller, and

10   Dr. Geller spoke with Tim Bell, and then Dr. Geller also spoke

11   to me as a past president and a fellow Board member.

12         Q     (BY MR. CONWELL:)  Okay.  Now, do you know or have

13   you seen that AAPS sued Timothy Bell?

14         A     Yes.

15         Q     And was that subsequent to all of this?  Was that

16   subsequent to the time that these communications with Mr. Bell

17   occurred?

18         A     Yes.

19         Q     Okay.  So after you brought the allegations to the

20   attention of David McCann, sometime after that is when there

21   was a lawsuit filed against Mr. Bell by AAPS?

22         A     I believe that is correct.

23         Q     And the discussions you had with Mr. Bell, that was

24   also before the lawsuit was filed by AAPS against Mr. Bell?

25         A     That is correct.
```

1          Q      And the same for what you described regarding Drs.

2     Geller and Klein, the Florida lawsuit?

3          A      That is correct.

4          Q      Okay.  And so tell me more about what -- what

5     exactly was communicated to you about you and Dr. Geller and

6     Dr. Klein being suspended, your having your membership

7     suspended by the AAPS.

8          A      On October 8th I received two letters, one from AAPS

9     attorneys telling us that we had been named or at least were

10    co-conspirators in this lawsuit against Tim Bell, and we also

11    received a letter from Dr. Russo telling us that we had been

12    suspended from our memberships in accordance with the bylaws

13    3.05 and 3.06.

14         Q      And for how long?

15         A      For a minimum of six months, but it could be

16    extended longer.

17         Q      And did they say anything about an investigation?

18         A      Yes.  They said there would be an investigation and

19    that we were to have no contact with anyone from AAPS and not

20    to be at any of the meetings or be on the property of AAPS, and

21    that we would be appointed a liaison within two weeks of the

22    letter and --

23         Q      Was this an investigation of the misconduct that you

24    had brought to the attention of David McCann or was this an

25    investigation into you?

1      A      This was an investigation into me, into Dr. Klein,

2  and to Dr. Geller.

3      Q      And so what happened after -- after that, after you

4  got that notice that now you were being investigated and you

5  were being suspended?

6      A      In accordance with the bylaws, we contacted an

7  attorney to represent us and -- and asked to give depositions

8  and speak on our behalf before the Board in accordance with the

9  bylaws.

10     Q      Did you volunteer to give a deposition?

11     A      Yes, sir.

12     Q      And did your attorney volunteer both you and Mr. --

13  Dr. Geller and Dr. Klein to give depositions?

14     A      Yes.

15            MR. SCHNEIDER:  Objection.  Lacks foundation.

16  Hearsay.

17            THE COURT:  Overruled.

18     Q      (BY MR. CONWELL:)  And did AAPS then come take your

19  deposition?

20     A      No, sir.

21     Q      Did they do anything to investigate you that you

22  know of?

23     A      No, sir.

24     Q      So after your efforts to get AAPS to come get a

25  deposition of you -- well, what did you want to say?  What were

1   you -- what was the reason for you wanting them to depose you?

2   　　　A　　　We wanted to be able to explain that the only thing

3   that we had done was ask for a investigation into the

4   allegations of this misconduct and that we were not attempting

5   to harm the AAPS in any way, shape, or form, and that we felt

6   that the best way to go about things is through the regular

7   chain of command and protocols and take it through to the Board

8   of Directors and ask for their investigation.

9   　　　Q　　　Did you have any reason to want to harm the AAPS?

10   　　　A　　　I've been a member for -- well, since, like I said,

11   1993, '94.  I've been in all of these positions to serve AAPS.

12   AAPS is how I am board certified.  So with my board

13   certification dependent upon AAPS, if I was not a member in

14   good standing, I would not be able to hold myself out as being

15   board certified according to our bylaws.

16   　　　Q　　　So when they said that you were engaging in conduct

17   injurious to the best interests of the AAPS, did they ever tell

18   you what -- what exactly is it about requesting an

19   investigation into misconduct they considered to be injurious

20   to the best interests of AAPS?

21   　　　A　　　No, they did not.

22   　　　Q　　　So did you do anything then to try to get your

23   membership restored?

24   　　　A　　　Uhm, after they had --

25   　　　Q　　　Excuse me.  Let's just take it one at a time.

1          Did you do anything to try to get your membership

2    restored?

3          A     Yes, I did.

4          Q     What did you do?

5          A     We hired you to represent us in Florida and you sent

6    a demand letter on March 18th, 2011, asking that we be restored

7    to all of our membership rights and also to our directorship

8    positions for Dr. Geller and myself.

9          Q     Okay.  And did AAPS comply with the demand?

10         A     No, they did not.

11         Q     So what did you do next?

12         A     Since we could not seem to get relief in our own

13   organization, we filed a lawsuit.

14         Q     Okay.  And at this stage, having been put in this

15   category of suspended as opposed to expelled, you were

16   suspended; is that right?

17         A     That is correct.

18         Q     So was it of concern to you that now you were

19   suspended in the AAPS?

20         A     Yes, it was a concern to me.

21         Q     Were -- as a suspended member, were you a member in

22   good standing?

23         A     No, I was not.

24         Q     And why was that a concern to you?

25         A     Because I would have to report this to the insurance

```
 1    companies.  I'd have to report it to my -- to the hospital
 2    staff.  I'd have to report this to medical board.  I'd have to
 3    report it to just about everybody that I dealt with that I was
 4    not a member in good standing and that I had been suspended.
 5         Q    Why is that a problem?
 6         A    Basically it means that I might not be able to get
 7    staff privileges at the hospital, or have them removed.  I
 8    might be -- would lose insurance contracts.  I wouldn't be able
 9    to take care of patients.  They -- just the simple fact that
10    you have to check off on a form a yes, you know, that I had
11    been suspended, you know, then you have to try and explain
12    that, you know, this is not because of my medical incompetency
13    or some other reason.  And it places a black mark on my record
14    that is indelible.  It's going to stay there forever.  So I had
15    to do something and as did Dr. Geller and Dr. Klein in order to
16    restore our reputations.
17         Q    And do you recall that AAPS filed a lawsuit against
18    you?
19         A    Yes.
20         Q    Who else did they sue at this time back in this
21    early 2011 time frame?
22         A    In 2011 AAPS then filed a counterclaim against --
23    let me see.  Was that 2011?  No, they just filed the lawsuit --
24    in 2011 the lawsuit was filed, uhm, against Drs. Geller, Klein,
25    and myself.  And then later on they amended the lawsuit to
```

1    include others.

2         Q    Okay.  So do you recall -- well, we talked about the

3    fact that they had sued Timothy Bell?

4         A    That's correct.

5         Q    Now, did you read the complaint?

6         A    Yes, I did.

7         Q    Did you become aware that AAPS had -- was making an

8    allegation that you, Dr. Geller, and Dr. Klein were conspiring

9    with Timothy Bell to disseminate pornography?

10        A    Yes.

11        Q    And had you ever done that?

12        A    No, we did not.

13        Q    And were you made aware of efforts that were being

14   made by the people that you had called to be investigated to

15   discredit you in the organization?

16        A    I was not aware of that at the -- at the time.

17        Q    Did you learn later that that was happening?

18        A    Yes, I did.

19        Q    Did you learn later that they were alleging that you

20   were the one disseminating pornography with Mr. Bell?

21        A    Yes, I did learn that later.

22        Q    And had you ever done anything of the sort?

23        A    No, I have not, never.

24        Q    At some point were you contacted by Dr. Atwood Rice?

25        A    Yes, I was.

```
1          Q      Who is Dr. Atwood Rice?

2          A      Atwood Rice is an emergency medicine physician and

3    an attorney, as well as an M. D., and a member of AAPS.

4          Q      And approximately when did he contact you?

5          A      I believe that was in February of 200- -- 2012.

6          Q      You were -- you were disciplined in October of 2010?

7          A      Let me think here now.  We were disciplined in

8    October 2010, and then in -- let's see -- in 20- -- no.  That

9    was in 2011.  In 2011, yeah, February of 2011 is about when we

10   were doing that.

11         Q      Let me ask you.  You recall -- well, AAPS, does it

12   have annual meetings?

13         A      Yes, it does.

14         Q      And where was the annual meeting in 2010?

15         A      In Orlando, Florida.

16         Q      And where was it in 2011?

17         A      Tysons Corner in Virginia.

18         Q      Virginia near Washington, D.C.?

19         A      That's correct.

20         Q      And did Dr. Rice contact you before that 2011

21   meeting?

22         A      Yes.  So it would have been February 20th.

23         Q      Okay.  And what happened when he contacted you?

24         A      He asked me what -- why Dr. Geller and --

25                MR. KRUZHKOV:  Objection.  Hearsay.
```

```
 1                    THE COURT:  He said, "What happened?  What happened
 2     during the meeting?"
 3                    THE WITNESS:  Yes.  He asked me why I had --
 4                    MR. KRUZHKOV:  Objection.  Hearsay.
 5                    THE COURT:  Overruled.
 6                    THE WITNESS:  He asked me why I had been suspended
 7     and I explained to him the circumstances and what had gone on.
 8     And --
 9          Q     (BY MR. CONWELL:)  Now, what was his affiliation
10     with the Academy for Emergency Medicine?
11          A     I believe he was an officer in the Academy of
12     Emergency Medicine at the time.
13          Q     And how large of an academy is the Academy of
14     Emergency Medicine at AAPS?
15          A     Emergency medicine is the largest academy.  They're
16     the largest number of members in AAPS.
17          Q     Okay.  And so --
18          A     Maybe about 2,000 members, I believe.  I can't
19     recall exactly the number of members, but it's a substantial
20     portion of AAPS.
21          Q     At some point were you contacted by Dr. Stewart?
22          A     Yes, I was.
23          Q     And when was that?
24          A     I believe that was in March of 2011.
25          Q     And what happened?
```

1      A      She asked me, you know, why was I suspended.

2              MR. KRUZHKOV:  Objection.  Hearsay.

3              THE COURT:  Overruled.

4              THE WITNESS:  And also asked me why I was suing the

5      organization.

6      Q      (BY MR. CONWELL:)  Okay.  And what did you tell her?

7      A      I told her that I had no other choice.  Uhm, we had

8      taken it through -- tried to get this resolved through the

9      normal channels, and that in order to restore our membership

10     and to restore our reputations and for the protection of the

11     organization and the patients, you know, it was -- it had

12     become necessary to go ahead and take it outside of the

13     organization to the courts.

14     Q      (BY MR. CONWELL:)  When's the last time you had

15     spoken to her?

16     A      Maybe about five or six years before that.

17     Q      Did you do anything in the Florida lawsuit to

18     determine whether or not the allegations regarding the

19     pornography were true?

20     A      Yes, we did.

21     Q      And did you -- you took the deposition of

22     Mr. Carbone?

23     A      Yes.  We took the deposition of Mr. Carbone and we

24     also asked for the computer files and the computer records in

25     order to -- to investigate that -- that it was coming from his

1   computer.

2        Q     And did they provide them to you?

3        A     No, they did not.

4        Q     And do you recall that the pornographic e-mails were

5   shown to him during his deposition?

6        A     Yes, I recall that.

7        Q     Okay.  And have you seen those pornographic e-mails

8   as being exhibits here in this case?

9        A     Yes, I have seen them.

10            MR. CONWELL:  Can you take a look at Exhibit 1591.2.

11            (Exhibit 1591.2 marked for identification.)

12       Q     (BY MR. CONWELL:)  And are those those e-mails?

13       A     Yes.

14            MR. CONWELL:  Okay.  And we offer 1591.2.

15            THE COURT:  Any objection?

16            MR. SCHNEIDER:  I -- can I see 1591.2?  I mean, is

17  that on the screen?  I don't see anything.

18            THE COURT:  The fire hydrant?

19            MR. CONWELL:  No.  It's -- it's all the e-mails in

20  one exhibit.

21            MS. HILAIRE:  Don't you have the exhibit book?

22       The exhibit book is right in front of him.

23            MR. CONWELL:  Yeah.  All the exhibits have been

24  exchanged, your Honor.  May I furnish him --

25            THE COURT:  Does defense counsel have a copy of your

```
 1   exhibit book?
 2               MS. HILAIRE:  Absolutely.
 3               MR. CONWELL:  Yes, they do.
 4               THE COURT:  Open the book.
 5        We're going to take our break, ladies and gentlemen,
 6   15 minutes.  Let's come back at roughly ten after the hour.
 7   Remember the admonition.
 8               THE COURTROOM DEPUTY:  All rise.
 9               (Open court out of the presence of the jury.)
10               THE COURT:  So if you want it on the record, then,
11   okay, do it quickly.
12               MR. SCHNEIDER:  I will do it quickly.
13               THE COURT:  Okay.
14               MR. SCHNEIDER:  Your Honor, we don't know what
15   volume of these kinds of materials the plaintiff plans to
16   present, but it seems excessive.  The witness has made it clear
17   what was being talked about.  Do we need the jury to see, you
18   know, 150 examples?
19               THE COURT:  You all brought a Beacon's moving van
20   full of documents in here for some reason.  What was that
21   reason?  Is it to move all this crap into evidence?
22               MR. SCHNEIDER:  Your Honor --
23               THE COURT:  I don't know what your plan was.  And
24   besides that, I told you all to go through these exhibits in
25   advance.
```

UNITED STATES DISTRICT COURT

1          MR. SCHNEIDER:  And --

2          THE COURT:  Why are we now with every single exhibit

3    having a dispute?

4          MR. SCHNEIDER:  Well, your Honor, we objected to

5    that exhibit.  And when you asked about the volume of

6    materials, this is, obviously, not our materials.

7          THE COURT:  Oh, but some of these objections are

8    just completely specious, all right?  Prejudicial, that's kind

9    of the way it is.

10          MR. SCHNEIDER:  Right.

11          THE COURT:  They're not going to be presenting

12    anything in their lawsuit that's laudatory to your clients or

13    your position.  Is that a surprise that it's going to be

14    prejudicial?  But is it probative?  Oh, yes, it's quite

15    probative.

16          MR. SCHNEIDER:  Thank you, your Honor.

17          THE COURT:  Okay.  Please -- you know, you're going

18    to have plenty of time this afternoon when we break -- get the

19    exhibit thing worked out.  Maybe it's even necessary and

20    advisable that you share with defendants what exhibits you plan

21    on using the next day so that they can get all this stuff

22    together, 'cause this is an absolute mess.

23              (A recess was taken.)

24          THE COURT:  All right.  Jury's present.  All counsel

25    and the parties are present.

1          MS. ROSSETTI:  Your Honor, all counsel's not

2    present.  I think they just stepped out for a minute.  May I

3    run out and get them?

4          THE COURTROOM DEPUTY:  They were just here.

5          THE COURT:  Now all counsel are present.

6      Dr. Castillo has returned to the witness stand.  When we

7    left off, there was some dispute over the exhibit.  Where do we

8    stand now?

9          MR. SCHNEIDER:  We do not have an objection, your

10   Honor.

11         THE COURT:  It'll be received.

12         (Exhibit 1591.2 received into evidence.)

13         THE COURT:  All right.  Continue.

14    Q    (BY MR. CONWELL:)  So I'd like to direct your

15   attention to the first page which is on the screen, the

16   computer screen, if you can just look at the computer screen.

17         Do you see there the e-mail from William Carbone

18   dated February 12, 2009, 4:50 P.M., "Sometimes I just do not

19   understand my wife"?

20    A    I see that.

21    Q    And now is this one of the pornographic e-mails that

22   Mr. Carbone had sent during work hours at AAPS?

23    A    Yes, sir.

24    Q    Okay.  And if you look at the second page of the

25   exhibit, you'll see it says, "Sometimes I just do not

1   understand my wife.  My neighbor was out training her dog" --

2   can you look at the folder there in front of you, Dr. Castillo,

3   the -- look at the second page, just the second -- page 2.  It

4   says, "And guess what?  I got yelled at for staring."

5         See that on page 2 of the document?

6         THE COURTROOM DEPUTY:  The numbers are at the

7   bottom.  Right there.

8      Q   (BY MR. CONWELL:)  Tell you what.  Let's just stick

9   with the computer screen.  That'll be easier.

10      A   Just a few of these, unfortunately.

11      Q   Let's look at the computer screen.  Okay.  And

12   then -- and then if you scroll down the page, then it's got a

13   photograph here of a woman urinating on a fire hydrant.  So you

14   understand that we, for purposes of this trial and for decency,

15   have blocked out with a little black box certain things on the

16   e-mail so that it's not exactly the same as it was when

17   Mr. Carbone was sending it out?

18      A   Yes, I understand that.

19      Q   The women's vaginas and so forth.

20      A   Yes, sir.

21      Q   Okay.  Now, why is that e-mail of concern to you as

22   a member of the Board of Directors -- as a former member of the

23   Board?

24      A   It's degrading to women.  I've got -- I've got four

25   daughters and two foreign exchange daughters and, I mean, I

```
 1   would not want them treated this way.  I would not like anyone
 2   looking at them this way and I would not like anyone thinking
 3   of them in this manner.
 4        Q    How would you feel about your CEO looking at it in
 5   this manner and sending this to other people in the
 6   organization?
 7        A    It's absolutely wrong.  It's just -- it's wrong.
 8        Q    Do you -- now, do you recall there was a photo -- if
 9   we can move on to the next one -- of a woman in a hospital bed?
10        A    Yes, I recall this one.
11        Q    And was it a particular concern to you that there
12   was a photograph sent, a pornographic image sent of a naked
13   woman with her legs spread sitting in a hospital bed?
14        A    Yes, sir.
15        Q    Why?
16        A    Well, I'm not real sure exactly who took the
17   picture.  Was it a physician that was taking this picture?
18   Was -- I believe it was a physician that was -- had sent it to
19   Mr. Carbone.
20        Q    Was it a member of the Board of Directors?
21        A    It was a member of the Board of Directors.  And
22   it -- you know, it's -- it breaks all trust amongst the
23   physician and the patient.  I would hate to think that my
24   doctor was someone that was involved in this type of activity.
25        Q    Let's move on to the next one.  Do you recall that
```

1  there were e-mails sent regarding or suggesting inappropriate

2  sexual relationships with teens?

3      A      Yes, sir.

4      Q      Underage minors?

5      A      Yes.

6      Q      And you see this, it says, "Jailbait"?

7      A      Yes, sir.

8      Q      And then down below that there's another -- you can

9  scroll down -- and see the one "Twins"?

10     A      Yes, sir.

11     Q      "Four tits are better than two"?

12     A      Yes, sir.

13     Q      And then that's from a Web site weloveteengirls.com.

14 How did you feel about your CEO getting e-mails from

15 weloveteengirls.com like this?

16     A      Uhm, well, A, I didn't like seeing that he was

17 getting any pornographic e-mails, and especially when it dealt

18 with underage --

19          MR. KRUZHKOV:  Objection.  Lack of foundation.

20          THE COURT:  His feelings?  His feelings are a lack

21 of foundation?

22          MR. KRUZHKOV:  Your Honor, he said that these are

23 underage girls and there's nothing to suggest that they're

24 underage.  Teens can be 18, 19, and that's legal age.

25          THE COURT:  How about the name of the site?  Would

1    that might suggest it?  Overruled.

2        Go on.

3            THE WITNESS:  I -- again, as the counsellor pointed

4    out, these are -- we don't know the age of these girls, but,

5    obviously, they're in their teens.

6        Q    (BY MR. CONWELL:)  How did you feel about the other

7    one next to that?  There's a girl near locker -- school lockers

8    that says, "Every male teacher said they contemplated the

9    consequences."  How did you feel about your CEO getting e-mails

10   and sending out e-mails like that?

11       A    Again, it's -- it's -- obviously, it's an underage

12   girl.

13       Q    And did that cause you concern about what would

14   happen to the organization if this sort of information was

15   not -- excuse me -- was discovered and made available to people

16   who compete with the AAPS for rights to be board-certifying

17   organizations before medical boards?

18       A    I was concerned about this.

19       Q    Can we go to the next slide in.  Again, we've

20   blocked this out, but this slide is the one called Twister.

21   You recall this also was sent by another member of the Board of

22   Directors to Mr. Carbone?

23       A    Yes, sir.

24       Q    And he forwarded that on to Timothy Bell?

25       A    Yes, sir.

1        Q       And again, these girls certainly look very young.

2   Was that a concern to you?

3        A       Yes, sir.

4        Q       Let's go on down, next one.  Do you recall there

5   were also racist e-mails sent to you?

6        A       Yes, I remember this.

7        Q       Is this one of them that -- excuse me -- sent to

8   Mr. Carbone?

9        A       Yes.

10       Q       Is this one of them?

11       A       Yes, it is.

12       Q       And was it a current concern to you that e-mails

13  like this were being exchanged among Board members with your

14  CEO?

15       A       Yes, it was a concern.

16       Q       How did you think that would affect your ability to

17  get board -- to get recognized in the different states if it

18  was discovered that this sort of thing was happening at AAPS?

19       A       It would hurt our -- it would hurt any of the

20  abilities for us to do this because this type of racism is --

21  really is wrong.  We treat all patients of all different ages

22  and races and creeds and religions, and to find that these type

23  of e-mails were going out just --

24       Q       Did you think the Board needed to do something about

25  this?

1          A       Most definitely.

2          Q       Is that why you spoke up?

3          A       Yes, sir.  I had to do the right thing.

4          Q       Did you ever think that you would end up being

5     suspended and investigated for bringing this to their

6     attention?

7          A       It never crossed my mind.

8               MR. CONWELL:  Let's look at Exhibit 1060.

9               (Exhibit 1060 previously marked for identification.)

10         Q       (BY MR. CONWELL:)  Did you end up obtaining a copy

11    of the Cassandra Newby complaint against AAPS?

12         A       Yes.  I've seen it.

13         Q       Okay.  And is that the -- is that 1060?  Is that the

14    complaint?

15         A       Yes, it is.

16         Q       And did you read the allegations in the complaint of

17    sexual harassment by Mr. Carbone and, therefore, by AAPS?

18         A       Yes, I have.

19         Q       Okay.  And -- excuse me -- can you turn to page 3 of

20    that document, Dr. Castillo?

21         A       Yes, sir.

22         Q       And paragraph 17, it says, "Castillo" -- or,

23    "Carbone repeatedly referred to plaintiff as an old bitch and

24    an old cow"?

25         A       Yes, I see that.

1      Q      In paragraph 18 he openly referred to plaintiff as,

2   "A bitch and a cunt"?

3      A      Yes, I see that, sir.

4      Q      And that he told an applicant that he wanted "young

5   blood running around the -- running the certification

6   department"?

7      A      I see that, sir.

8      Q      And the next paragraph that "physicians respond more

9   to a man in this position as opposed to a woman"?

10            MR. KRUZHKOV:  Your Honor, objection.  Document

11   speaks for itself.

12            THE COURT:  That's all he's doing is reading.

13      Q      (BY MR. CONWELL:)  So you saw that as well?

14      A      Yes, I saw that, sir.

15      Q      Now -- and were you aware that AAPS immediately

16   settled this lawsuit?

17      A      Yes.

18      Q      Did -- look at paragraph 22.

19      A      I see that, sir.

20      Q      Can you enlarge 22?

21            It says (Reading:)

22            "In addition, on more than one occasion

23            Carbone exposed plaintiff to pornographic,

24            even racially-biased pictorial e-mails and

25            items placed on AAPS's share drive.  These

```
 1                 pictures included women with large bare

 2                 breasts, women with their genitals and

 3                 back sides exposed."

 4                 You see that?

 5         A    Yes, I do.

 6         Q    Now, what was -- did you have any concern about

 7   sexual harassment and gender discrimination at AAPS?

 8         A    Yes, sir.

 9         Q    And why would -- why is that a concern to you as a

10   member and as a former Board member?

11         A    As a member, I was concerned about it because

12   there's -- there's numerous reasons.  Number one -- all

13   right -- it's wrong.  Discrimination against women is wrong.

14   Discrimination against age is wrong.  And this type of

15   activity, if it was learned by our membership, they would

16   realize that the organization was also at risk for lawsuits.

17   The hostile work environment was created.

18            I own my own practice in Beaver Dam, Wisconsin, and

19   we have to abide by all of the same rules that any other

20   business would for human resource, and this is totally outside

21   of the normal protocol to be able to show this type of stuff or

22   do these things.

23         Q    And why did you report -- or why did you feel you

24   needed to report this to the Board and have the Board

25   investigate?
```

1      A     Because basically the Board is the ultimate

2   authority over the organization.  The Board employs the CEO,

3   the Director of Finance and Operations, or legal counsel.  So

4   basically the Board is the one that would have to take action.

5      Q     Okay.  And did you believe that you had a duty as a

6   member of the Board to investigate this?

7      A     Most definitely.

8            MR. CONWELL:  Your Honor, we offer Exhibit 1060.  I

9   don't know if I had offered that or not.

10           THE COURT:  Any objection?

11           MR. SCHNEIDER:  No objection, your Honor.

12           THE COURT:  Received.

13           (Exhibit 1060 received into evidence.)

14           MR. CONWELL:  So let's look at Exhibit 1020.

15           (Exhibit 1020 previously marked for identification.)

16      Q     (BY MR. CONWELL:)  Now, we'd talked earlier about

17   the Federal Election Commission and the federal election law

18   issue that you had reported to Dr. McCann in 2010.  Do you

19   recall that?

20      A     Yes, sir.

21      Q     And at that point it was an allegation.  Did you

22   later see that the AAPS had entered into a conciliation

23   agreement with the election -- the Federal Election Commission?

24      A     Yes, sir.

25      Q     And is this that agreement?

1       A       Yes, it is.

2       Q       That agreement was -- or this stamp on that says

3  March 24, 2011.

4       A       Yes, sir.

5       Q       So this is sometime after you brought the

6  allegations to the attention of the Board?

7       A       Yes, sir.

8       Q       Sometime after they suspended you and started --

9  told you they were going to investigate you instead of Montes?

10      A       That is correct.

11      Q       And then can you turn to the third page of this

12 document?

13      A       Yes, sir.

14      Q       And look at Roman Numeral V.

15      A       Yes, sir.

16      Q       And says, "Roman Numeral V, No. 1, Respondents," and

17 it says, "American Association of Physician Specialists, Inc.,

18 violated 2 U.S.C. 441b(a) by making a prohibited corporate

19 contribution."

20              You see that?

21      A       Yes, I do.

22      Q       And below that, paragraph B, "American Association

23 of Physician Specialists PAC and Stephen Montes in his official

24 capacity as treasurer violated 2 U.S.C. 441b(a) by receiving a

25 prohibited corporate contribution."

1          You see that?

2     A     Yes, sir.

3     Q     And then it goes on and talks about other violations

4  that they'd found.  Did this -- is this verifying the

5  allegation that you brought to the attention of David McCann

6  and requested an investigation of in 2010?

7     A     Yes, sir.

8          MR. CONWELL:  Take a look at Exhibit 1719.

9          (Exhibit 1719 previously marked for identification.)

10          MR. CONWELL:  1719.

11      And, your Honor, we're offering Exhibit 1020 which was the

12  Federal Election Commission conciliation agreement.

13          THE COURT:  Any objection?

14          MR. SCHNEIDER:  No objection, your Honor.

15          THE COURT:  Received.

16          (Exhibit 1020 received into evidence.)

17          MR. CONWELL:  And also, your Honor, we had offered

18  before 1718 and 1591.  I didn't note if they were admitted or

19  not.  1591 was the one with the pornographic e-mails and the

20  racist e-mails.  I think you'd overruled their objection, but I

21  don't know if they've been received in evidence.

22          THE COURT:  Anything -- so far everything that's

23  been offered has been received.

24          MR. CONWELL:  Okay.  Thank you.

25     Q     (BY MR. CONWELL:)  All right.  So -- so do you

1    recognize Exhibit 1719?

2        A     Yes, I do.

3        Q     And this document is from the American Counsel for

4    Continuing Medical Education, known as the ACCME?

5        A     Yes, sir.

6        Q     Am I right?

7        A     That's correct.

8        Q     Now, what does the ACCME do?

9        A     ACCME sets the standards and monitors all of the

10   organizations that are accredited to give continuing medical

11   education.  So they -- some of the things that they do, they

12   make sure that the educational programs that are put on provide

13   information that will enhance the physician's knowledge, that

14   will improve the quality of care towards the patients, and also

15   that they are unbiased, that there is no funds or that the

16   lecturers are not being paid by a medical device company or a

17   drug company.

18       Q     Okay.  And after you brought the allegations to the

19   attention of David McCann calling for an investigation on this,

20   did you subsequently obtain a copy of this letter?

21       A     Yes, I did.

22       Q     And let's look at the first paragraph.  First it

23   says, "Dear Ms. Berg."  Who is Esther Berg?

24       A     Esther Berg was the director of the CME meetings and

25   what was called recruitment and retention, and also she was the

1    liaison between AAPS and the ACCME.

2         Q    And was she staff?

3         A    She was staff.

4         Q    Did she report to Bill Carbone?

5         A    Yes, she did.

6         Q    Who was the chair of the CME committee?

7         A    There were two co-chairs, Dr. Steve Montes and

8    Dr. Ken Flowe.

9         Q    Okay.  And in the first paragraph it says, "At its

10   December 2009 meeting, the Accreditation Council For

11   Continuing" -- could you enlarge that, please, just that first

12   paragraph?

13              We'll start again (Reading:)

14              "At its December 2009 meeting the

15              Accreditation Counsel for Continuing

16              Medical Education took action on the

17              accreditation review of your organization.

18              The ACCME's decision was probation," and

19              that's bolded.

20              Now, were you on the CME committee?

21        A    Yes, I was.

22        Q    Was this ever disclosed to you?

23        A    No, it was not.

24        Q    And was this one of the things that you had

25   called -- well, was the issue about whether or not you were

1    complying with CME requirements one of the things that you had

2    asked David McCann to have the Board investigate?

3        A    Yes, sir.

4        Q    So did this verify that the allegations that had

5    been made to you were true?

6        A    Yes, it did.

7        Q    And what is your recollection of why they were put

8    on probation?

9        A    They were put on probation for --

10            MR. SCHNEIDER:  Objection.  It lacks foundation.

11            THE COURT:  "What's your recollection."  Overruled.

12            THE WITNESS:  My recollection was that they were put

13    on probation for failing to be compliant with the number of

14    rules and regulations in order to be found to be accredited in

15    good standing, and those were also pointed out in this letter.

16        Q    (BY MR. CONWELL:)  Okay.  So if you can turn to

17    page 6 of the letter.  Do you recall there being findings of

18    the ACCME regarding potential conflicts of interest?

19        A    Yes.

20        Q    And if you look on page 7 under Noncompliance, it

21    says, "The provider" -- under C7, says, "The provider does not

22    develop activities, educational inventions" -- excuse me --

23    "interventions independent of commercial interest."

24        A    Yes.

25        Q    And then -- are you with me?

1      A      Yes, I do see that.

2      Q      And then down the page in the same block it says

3   (Reading:)

4              "The provider did not disclose to learners

5              the relevant financial relationships of

6              all persons who control content,

7              including, for example, faculty, item

8              writers, reviewers, etc."

9              So what do you understand that to be

10             saying regarding whether -- or what the

11             AAPS was failing to do to be in

12             compliance?

13     A      They were failing to reveal any commercial interests

14   and moneys that might be transferred.

15     Q      And who was in charge of those moneys for that

16   committee?

17     A      The co-chairs, Dr. Stephen Montes and Dr. Ken Flowe.

18   Primarily Dr. Montes.

19     Q      Okay.  And did Montes -- Dr. Montes remain on that

20   committee?

21     A      Yes, he did.

22             MR. CONWELL:  Was he -- well, let's move on to the

23   next exhibit, 1801.

24             (Exhibit 1801 previously marked for identification.)

25             MR. SCHNEIDER:  Your Honor, we object to questions

```
 1    concerning this document at this time in the litigation.
 2              MR. CONWELL:  What's the basis?
 3          Your Honor, this is a public tax return.  Anybody --
 4              THE COURT:  This is for the violations of the
 5    federal election laws?
 6              MR. CONWELL:  No.  This one, your Honor, is payments
 7    to Bob Cerrato by the AAPS.
 8              THE COURT:  A volunteer?
 9              MR. CONWELL:  Yes.
10              THE COURT:  Okay.  Overruled.
11        Q    (BY MR. CONWELL:)  Okay.  Do you recall obtaining
12    this Return of Organization Exempt from Income Tax -- basically
13    an income tax return for a nonprofit for AAPS for the year
14    2010?
15        A    Yes, sir, I've seen this.
16        Q    And that was after you had reported to Mr. McCann --
17    or Dr. McCann the allegation that there were payments being
18    made to a volunteer by the AAPS --
19        A    Yes, sir.
20        Q    -- for their volunteer work?
21        A    Yes.
22        Q    And do you recall using this document in the
23    depositions taken in the Florida case?
24        A    Yes, I do.
25        Q    And the AAPS agreeing that this was their return and
```

```
 1    an accurate statement, contains accurate information?

 2         A    Yes, sir.

 3         Q    Turn to the last page of this document, very last

 4    page.

 5         A    Yes, sir.

 6         Q    See this section, Business Transactions Involving

 7    Interested Persons?

 8         A    Yes, sir.

 9         Q    Why don't you look at your screen.  I've got it up

10    on the screen.

11         A    I've got it.  I see that, sir.

12         Q    And in this case the name of the interested person

13    is Robert Cerrato?

14         A    That is correct.

15         Q    And his relationship is described as an officer?

16         A    That is correct.

17         Q    And what's the amount of the transaction?

18         A    $40,000-plus.

19         Q    Okay.  And description of transaction was AAPS

20    Foundation Officer?

21              THE COURT:  Look at your screen.

22              THE WITNESS:  That is not showing up on the screen.

23              THE COURT:  Look at your screen.  You can see what

24    we're seeing.

25              THE WITNESS:  Yeah.  There we go.  $40,110, and he
```

1    was -- the description of transaction was an AAPS Foundation

2    Officer.

3         Q     What does that mean?

4         A     That means that money from the nonprofit AAPS

5    foundation was being transferred and paid to him by the

6    American Association of Physician Specialists.

7         Q     Okay.  And so what was the -- what was the

8    foundation?  What is that?

9         A     Foundation was a separately incorporated

10   organization to receive money for the -- in its documents was

11   to -- for continuing medical education.  So we were supposed to

12   use that money to be able to provide education to the

13   physicians in our CME meetings and so on.

14        Q     And so were you concerned when you saw that the

15   money was being used instead to pay Dr. Cerrato?

16        A     I was concerned that it was being used to pay

17   Dr. Cerrato for work on the foundation from the AAPS money and

18   not from the foundation as well.  In other words, there were

19   two violations here.  He was being paid for his volunteer

20   service and then he was -- there was also a transfer of funds

21   between these two separate organizations.

22             MR. CONWELL:  Okay.  Now, we offer 1801.

23             MR. SCHNEIDER:  Yeah, your Honor, we object beyond

24   that one page.

25             THE COURT:  And why is that?  What is the one page

1    you're referring to?

2            MR. SCHNEIDER:  The one page that --

3            THE COURT:  The last page or the first one?

4            MR. SCHNEIDER:  That page, the one that's on the

5    screen now.  I --

6            THE COURT:  Is that the one you object to?

7            MR. SCHNEIDER:  No.  That's the one I don't object

8    to.

9            THE COURT:  All right.  What about the first page

10   that simply identifies the filer?

11           MR. SCHNEIDER:  Oh, it identifies a good deal more

12   than that if we're looking at the same document.

13           THE COURT:  Does it?  All right.

14           MR. CONWELL:  Your Honor, I am fine with just

15   identifying -- or if they'll stipulate to the filer and/or

16   redacting any other financial information on the first page and

17   offering the exhibit that way.

18           THE COURT:  Okay.  I just simply want it to be

19   placed in some sort of context.  But would you be satisfied if

20   everything but the name of the filer is redacted off of the

21   first page?

22           MR. SCHNEIDER:  And we're just talking about the

23   first page --

24           THE COURT:  Just the first page.

25           MR. SCHNEIDER:  -- and that one being submitted?

1          THE COURT:  Yes.

2          MR. SCHNEIDER:  No, I have no objection.

3          THE COURT:  All right.  That's the way it'll be

4    received then.

5          (Exhibit 1801 received into evidence.)

6          MR. CONWELL:  All right.

7    Q    (BY MR. CONWELL:)  Now, Dr. Castillo, were the

8    suspensions against you and Dr. Geller and Dr. Klein ever

9    lifted?

10   A    Yes, they were.

11   Q    What happened?

12   A    In -- on November 2nd, 2011, there was a hearing

13   before Judge Nielsen in Tampa, Florida, in which he -- the

14   court ordered AAPS to lift our suspensions.  And then in

15   January 17th of 2012 -- I believe it's 17th -- there was a

16   written order from Judge Nielsen.

17         MR. CONWELL:  And can you look at Exhibit 1758?

18         (Exhibit 1758 previously marked for identification.)

19         THE WITNESS:  Yes, sir.

20   Q    (BY MR. CONWELL:)  Okay.  And what is that?

21   A    This is an order granting in part and denying in

22   part the plaintiff's motion for partial summary judgment on

23   Count 3.  This is the one that lifted our suspension because of

24   violation of the laws of Florida and the AAPS bylaws.

25         MR. SCHNEIDER:  Your Honor, we object to this

```
 1    testimony.  It is not final judgment --

 2                THE COURT:  Sustained.

 3                MR. SCHNEIDER:  Thank you.

 4        Q    (BY MR. CONWELL:)  Okay.  And the court ordered the

 5    reinstatement --

 6                MR. SCHNEIDER:  Objection.

 7                THE COURT:  Can he finish?

 8                MR. SCHNEIDER:  The objection --

 9                THE COURT:  Can he finish his question?

10                MR. SCHNEIDER:  Certainly.

11        Q    (BY MR. CONWELL:) -- the court ordered AAPS to

12    reinstate you to full membership rights?

13                MR. SCHNEIDER:  Objection.

14                THE COURT:  Overruled.

15                THE WITNESS:  Yes.

16        Q    (BY MR. CONWELL:)  And the same for Dr. Geller and

17    Dr. Klein?

18        A    Yes, sir.

19                MR. CONWELL:  Okay.  We offer Exhibit 1758.

20                MR. SCHNEIDER:  We object to this document that the

21    judgment is nonfinal.  The case is still pending.

22                THE COURT:  Four years later?

23                MR. SCHNEIDER:  Yes.  I think the witness would

24    confirm that.

25                THE WITNESS:  No, actually I would be more than
```

1    happy to say that it was taken to appeal and upheld.

2              MR. SCHNEIDER:  Your Honor, this litigation is still

3    pending.

4              THE WITNESS:  But this --

5              THE COURT:  We're only talking about this case.

6              MR. SCHNEIDER:  We are talking about that case.

7              MR. KRUZHKOV:  It is still pending.  I'm the

8    attorney on that case.  I can very clearly tell you it is still

9    pending.

10             THE COURT:  This is very strange.  We will hold off.

11             MR. CONWELL:  I'll explain it, your Honor, if I may?

12   This is a --

13             MR. SCHNEIDER:  I'd rather it not be explained in

14   front of the jury.

15             THE COURT:  That's all right.  That's all right.

16   We'll deal with this later.

17             MR. CONWELL:  Okay.  So take a look at Exhibit 1333.

18             (Exhibit 1333 previously marked for identification.)

19        Q    (BY MR. CONWELL:)  What is that?

20        A    This is the first amended answer and affirmative

21   defenses and counterclaims against Drs. -- excuse me --

22   doctor -- myself, Dr. Klein, and Dr. Geller.

23        Q    Okay.  And were defendants being added at that time

24   through that amended counterclaim?

25        A    Yes.  Counter-defendants Dr. Patricia Stewart and

```
 1   her husband, Dr. Okerblom, Dr. Leslie Radentz, Dr. Richard

 2   Cressey, and someone named Michael Destefano, and John Does 1

 3   through 10, and Jane Does 1 through 10.

 4        Q    Okay.  And what is the date of the document?

 5        A    I believe this was somewhere in -- I don't see the

 6   date on the front here.

 7        Q    Do you recall that this was filed in March or April

 8   of 2012?

 9             MR. SCHNEIDER:  Objection.  Leading question.

10             THE COURT:  Sustained.

11        Q    (BY MR. CONWELL:)  When do you recall --

12             THE COURT:  There's no date on the last page?

13             THE WITNESS:  I'm looking for the last page.  I'm

14   sorry, your Honor.

15             MR. SCHNEIDER:  Your Honor, there actually is no

16   date.

17             MR. CONWELL:  I can -- I can take care of that

18   later, your Honor.

19             THE COURT:  But that -- okay.

20             MR. CONWELL:  So take a look now at Exhibit 1498.

21             (Exhibit 1498 previously marked for identification.)

22             THE WITNESS:  Okay.

23             MR. CONWELL:  Hang on to the one you've got.  Hang

24   on to 1333.  I want to look now at Exhibit 1498.

25        Now, your Honor, this is a May 8, 2012, charging document
```

```
 1    by which Patty Stewart, Dr. Patricia Stewart, was charged by

 2    the AAPS.  And there's no objection been lodged as to this.  In

 3    fact, I think it's one of their exhibits.  So we're offering

 4    Exhibit 1498.

 5              MR. SCHNEIDER:  That's fine.  We didn't object to

 6    1333.

 7              MR. CONWELL:  Well, then I offer both of them, your

 8    Honor.

 9              THE COURT:  All right.  They are both received, 1333

10    and 1498.

11              (Exhibits 1333 and 1498 received into evidence.)

12        Q     (BY MR. CONWELL:)  So Dr. Castillo, do you see that

13    this charging document has the amended counterclaim attached to

14    it?

15        A     Yes, sir.

16        Q     So that 1333 is part of 1498, the counterclaim.  The

17    claims that were brought against Dr. Patricia Stewart were

18    attached to that charging document.  Do you see that?

19        A     Yes, sir.

20        Q     So now in this counterclaim, in this claim against

21    Dr. Stewart, there are a number of admission -- oral

22    allegations that she conspired with you to harm the AAPS.  Did

23    you and Patricia Stewart ever conspire to harm the AAPS?

24        A     No, sir.

25        Q     You said that she had called you on the telephone
```

1    sometime in the spring of 2011 and asked you why you were suing

2    the AAPS; is that right?

3         A    That is correct.

4         Q    And you told her about the suspensions and you said,

5    "I had no choice," and so forth?

6         A    Yes, sir.

7         Q    Now, from that time up to the time that she was sued

8    and then sent this charging document, had you been in

9    communication with Dr. Stewart?

10        A    Not that I can recall.

11        Q    Had you been conspiring to do anything with her?

12        A    No, sir.

13        Q    Did anybody ever take your deposition up through

14   March or April -- or let's say up to May 8th of 2012, in the

15   lawsuit that was existing between you and the AAPS and ask you

16   whether or not you were conspiring with Dr. Stewart to do

17   anything?

18        A    No, sir.

19        Q    Did you ask them to take your deposition, again?

20        A    Yes, sir.

21        Q    Did they depose Dr. Castillo -- I'm sorry --

22   Dr. Geller or Dr. Klein?

23        A    No, sir.

24        Q    Did AAPS send you a charging document?

25        A    Yes, they did.

```
 1        Q      Did they threaten you with a disciplinary hearing in
 2   approximately May of 2012?
 3        A      Yes, they did.
 4        Q      Did it look pretty much like this one?
 5        A      Yes, sir.
 6        Q      And did you and Dr. Geller, Dr. Klein, and
 7   Dr. Cressey move for a temporary injunction?
 8        A      Yes, we did.
 9        Q      Were you present at a hearing in Florida on June 7th
10   of 2012, where that motion -- your motion for a temporary
11   injunction was granted?
12        A      Yes, sir.
13        Q      Do you recall whether Dr. Stewart participated in
14   that?
15        A      Uhm, no.
16        Q      She did not; is that correct?
17        A      She did not, that's correct.
18        Q      And why were you requesting the temporary
19   injunction?
20        A      Because we had already been granted our rights as
21   members and the temporary -- the process that AAPS was
22   following was violating our bylaws and our --
23               MR. KRUZHKOV:  Objection.  Legal opinion.  Legal
24   conclusions.
25               MR. CONWELL:  Stating why he filed a motion for
```

UNITED STATES DISTRICT COURT

1    temporary injunction.

2             MR. KRUZHKOV:  There's an order issued that says

3    what it says and --

4             THE COURT:  I thought we talked about this.

5             MR. KRUZHKOV:  I was just responding to Mr. --

6             THE COURT:  You don't respond to anyone but me.

7             MR. KRUZHKOV:  Absolutely, your Honor.

8             THE COURT:  Overruled.

9          Your motivation is what he's asking about, all right?

10            MR. CONWELL:  Right.  Why you --

11            THE COURT:  Your mindset.

12            THE WITNESS:  Would you repeat the question for me,

13   please?

14       Q    (BY MR. CONWELL:)  Why were you moving for a

15   temporary injunction?

16       A    I was moving for a temporary injunction because they

17   intended to expel us from the organization without due process.

18       Q    Okay.  You got the similar letter to this May 8th

19   letter.  Take a look at the May 8th letter.  You see in there,

20   I believe it's on the third paragraph, it says that you have --

21   you are permitted 15 minutes to defend yourself against

22   approximately 160-page charging document?

23       A    I see that, sir.

24       Q    Did you feel like that was fair?

25       A    No, sir.

1      Q     Did they tell you who was going to be adjudicating

2   your guilt or innocence?

3      A     They did -- they did not in this document, no.

4      Q     But --

5      A     It was a meeting of the disciplinary committee, but

6   we had no idea who was on that committee.

7      Q     And were you concerned about whether or not the

8   people on that disciplinary committee would be fair and

9   impartial?

10     A     Yes, sir.

11     Q     Did you later -- well, I'll save that for a

12   different witness.

13           So was the order that was entered that day, was it

14   temporary?  You recall that it was a order granting your motion

15   for a temporary injunction?

16     A     Yes, sir.

17     Q     Okay.  Let me move on from this.

18           Did you attend the AAPS annual meeting in June of

19   2012?

20     A     Yes, sir.

21     Q     And where was it that year?

22     A     The 2012 meeting was at Marina Del Rey in

23   California.

24     Q     And do you recall attending a meeting at the AAPS

25   annual meeting at which Dr. Bob Cerrato was addressing the

1   attendees?

2        A     Yes, I do.

3              MR. SCHNEIDER:  Your Honor, can you turn the exhibit

4   off while this other examination is pending?

5              THE COURT:  Why is that?

6              MR. SCHNEIDER:  Different focus right now.  It's a

7   moot point at this moment.

8              THE COURT:  It's up to them.

9        Q     (BY MR. CONWELL:)  Okay.  Do you recall attending

10  that meeting?

11       A     Yes, I do, sir.

12       Q     And what happened at that meeting?

13             MR. SCHNEIDER:  Objection.  Overbroad.

14             THE COURT:  Sustained.

15       Q     (BY MR. CONWELL:)  Did Bob -- Dr. Cerrato make

16  statements during that presentation contending that Patty

17  Stewart was attempting to destroy the AAPS?

18             MR. SCHNEIDER:  Objection.  Leading.

19             THE COURT:  Can't have it both ways.  Overruled.

20             THE WITNESS:  Yes.

21       Q     (BY MR. CONWELL:)  And do you recall him showing a

22  PowerPoint presentation?

23       A     Yes, sir.

24             MR. CONWELL:  Can we look at Exhibit 1525.

25             (Exhibit 1525 previously marked for identification.)

1     Q     (BY MR. CONWELL:)  And I'd like you -- is this the

2  PowerPoint presentation?

3     A     Yes, it is, sir.

4     Q     Was Dr. Stewart in the room when this was taking

5  place?

6     A     No, sir.

7     Q     Do you know if she was in the building?

8     A     She was in the building, but she was not allowed to

9  be in the room.

10     Q     And turn to the page it's got identification number

11  on it 22712.

12     A     Yes, sir.

13     Q     All right.  Dr. Castillo, do you remember this being

14  presented by Dr. Cerrato at the meeting of the AAPS?

15     A     Yes, I do.

16     Q     And it says here, "Dr. Patricia Stewart blog,

17  March 29, 2012, history of bullies within the leadership of

18  AAPS by Dr. Leslie L. Radentz."

19          Now, did you ever know Dr. Patricia Stewart to have

20  a blog?

21     A     No, she does not have a blog.

22     Q     Does Dr. Radentz have a blog?

23     A     Yes, she did.

24     Q     Dr. Cerrato claimed to the delegates that

25  Dr. Stewart had a blog that was posting information that was

1    against the AAPS?

2         A    Yes, he stated that.

3         Q    And then it goes on here and it talks about the

4    history of bullies within the AAPS leadership.

5              Did you ever see anything indicating that

6    Dr. Stewart had anything at all to do with what was presented

7    to these members of the AAPS by Dr. Cerrato at this meeting

8    claiming that she put it on a blog?

9         A    I don't recall anything that would have indicated

10   that she did that.

11        Q    Okay.  And then there's another page I want to show

12   you just prior to that, "Dr. Patricia Stewart blog, June 17,

13   2012, letter to Dr. Montes."  And then it's got what purports

14   to be a reproduction of a letter written to Dr. Montes by

15   Dr. Stewart.  Do you see that?

16        A    Yes, I do.

17        Q    And then it says -- its written, "Money is the root

18   of all evil.  Private profiteering within a nonprofit

19   corporation is one evil root."

20             Do you see that?

21        A    Yes, I see that.

22        Q    And did Dr. Cerrato allege or make the accusation at

23   this meeting in front of Dr. Stewart's colleagues that she was

24   the author of this?

25        A    Yes, he did.

1       Q     Okay.  And was she able to get inside that meeting

2  and defend herself?

3       A     No, she was not.

4       Q     Did he also make a presentation -- include in that

5  PowerPoint presentation e-mails that he claimed to be from

6  Timothy Bell?

7       A     Yes, he did.

8       Q     Were these e-mails that you had seen before as part

9  of your discovery and investigation in the Florida lawsuit?

10      A     Yes, sir.

11      Q     When and how did you get them?

12      A     Through our -- through our lawsuit, through the

13 discovery request of AAPS documents.

14      Q     When you saw them, did you question whether or

15 not -- did you question their authenticity?

16      A     Yes, I did.

17      Q     Why?

18      A     Because there's so many things that was cut and

19 paste.  There was no identifying information as to who it came

20 from, where it came from, and there were things that were said

21 there that were attributed to me which I had never said.

22      Q     Okay.  And did you do anything in the Florida

23 lawsuit to try to get the original computer files from AAPS to

24 have them forensically examined to determine whether or not

25 these were authentic or whether or not they'd been fabricated

1    by the AAPS?

2         A      Yes.  We --

3              MR. SCHNEIDER:  Objection.  Lacks foundation

4    regarding this witness.

5              THE COURT:  You're asking -- the question is whether

6    or not he did anything.

7              MR. SCHNEIDER:  I don't think that was the question.

8              THE COURT:  (Reading:)  "Did you do anything to

9    inspect the Florida lawsuit to try to get the original computer

10   files from AAPS to have them forensically examined to determine

11   whether or not they were authentic?"

12             MR. SCHNEIDER:  What I was referring to is he's not

13   the counsel in that case, and if he's talking about him

14   personally, it's not clear.

15             THE COURT:  It's quite clear, "Did you do anything?"

16   Overruled.

17             THE WITNESS:  Yes, we did.  We asked AAPS to provide

18   us with the computers, with the computer files so that they

19   could be forensically analyzed to determine the authenticity.

20             THE COURT:  Hang on a sec.  The question wasn't

21   whether or not someone else on your behalf or a team.  The

22   question was did you do anything.

23             THE WITNESS:  Thank you, your Honor.

24             THE COURT:  Okay.

25             THE WITNESS:  Yes.  I instructed my attorney to get

```
 1   the information necessary to authenticate these documents.

 2        Q    (BY MR. CONWELL:)  And were the -- were the original

 3   computer files ever furnished to you or your counsel?

 4        A    No, they were not.

 5             MR. SCHNEIDER:  Objection.  Lacks foundation.

 6             THE COURT:  All right.  Sustained.

 7        Q    (BY MR. CONWELL:)  Were you a part --

 8             MR. SCHNEIDER:  And move to strike the answer.

 9             THE COURT:  Not yet.

10        Q    (BY MR. CONWELL:)  Were you a part of the efforts to

11   obtain those records?

12        A    Yes, I was.

13        Q    And as a participant in that lawsuit, as a party,

14   both a plaintiff and a counter-defendant, were you reviewing

15   records that came in from the court regarding requests that

16   were being made on your behalf for these computer records and

17   the objections lodged by these attorneys to those requests?

18        A    Yes.

19        Q    You were a part of that?

20        A    I was part of that.

21        Q    You actually saw their objections to producing these

22   computer records?

23        A    Yes, sir.

24        Q    And did -- and did they produce the computer

25   records?
```

1        A      No, they did not.

2        Q      So were you ever able to determine whether or not

3    these were fabricated by the AAPS?

4        A      We were never able to authenticate these or tell

5    whether they were fabricated or just -- we have no idea who

6    they came from, where they came from, how they were received.

7        Q      Okay.  On page 2696 of this document, there's a --

8    do you recall that there was as part of this PowerPoint

9    presentation, a presentation by Bob Cerrato to the members of

10   the AAPS regarding these e-mails?

11       A      Yes, I recall that.

12       Q      And one of these, it purports to be an e-mail from

13   Timothy Bell with no date on it, but it says, "I spoke with the

14   immediate past president of the AAPS today, Tom Castillo.  He's

15   on board in a big way in getting rid of Carbone."

16              Did you ever have a discussion with Mr. Bell in

17   which you said, "I'm on board in a big way in getting rid of

18   Bill Carbone"?

19       A      No, I did not.

20       Q      Then it says (Reading:)

21              "After they, Klein, Geller, and Castillo,

22              have the forces marshalled, enough docs

23              signed up to overthrow Carbone, they're

24              going to demand an emergency Board meeting

25              in Tampa.  Castillo is a Board member.  He

1          will tell the Board that if Carbone is not

2          ousted, that he will resign his position

3          on the Board and report back to the Board

4          of certification that he represents,

5          surgery, why he resigned."

6          Did that ever happen?

7     A    No, sir.

8     Q    Has AAPS since June of 2012 attempted to expel you?

9     A    No, sir.

10    Q    Or otherwise discipline you?

11    A    No, sir.

12    Q    And are you currently a member in good standing with

13 AAPS?

14    A    Yes, sir.

15         MR. CONWELL:  No further questions.

16         THE COURT:  Cross.

17         MR. SCHNEIDER:  Thank you, your Honor.

18                    CROSS-EXAMINATION

19 BY MR. SCHNEIDER:

20    Q    First, Dr., I'd like to clarify.  Do you go by

21 Castillo or Castillo?

22    A    I've been living up in Wisconsin, so they've been

23 calling me Castillo.  But my -- the correct pronunciation of my

24 name is Castillo.

25    Q    Is that your preference?

1      A      Yes, sir.

2      Q      Dr. Castillo, you have indicated that in October of

3   2010, AAPS suspended your membership privileges, correct?

4      A      That is correct.

5      Q      Did you regard that as fair?

6      A      No, sir.

7      Q      And at the same time they -- AAPS suspended the

8   privileges of Dr. Geller, correct?

9      A      That is correct.

10      Q      Dr. Geller is a man, isn't he?

11      A      Yes, he is.

12      Q      And in October of 2010, AAPS also suspended the

13   membership privileges of Dr. Klein, correct?

14      A      That is correct.

15      Q      And Dr. Klein is also a man?

16      A      That is correct.

17      Q      And you regarded the lawsuit filed against you by

18   AAPS as unfair as well, didn't you?

19      A      That is correct.

20      Q      You had indicated that you and your legal team had

21   attempted to obtain the computer records of AAPS regarding the

22   e-mail we just looked at supposedly from Mr. Bell?

23      A      Yes, sir.

24      Q      And you indicated those records, computer records,

25   were not produced, correct?

1    A     The files necessary to authenticate these records

2    were never produced.

3    Q     Okay.  And no court order was ever issued to require

4    their being produced, was there?

5    A     I do not recall.  There was a number of issues that

6    were not addressed in our lawsuit.  As your counsel pointed

7    out, this is kind of ongoing.  The only thing that has been

8    determined is that we were unjustly suspended.

9          But I don't believe that I have seen an order from

10   the court allowing us to continue with that discovery.  We have

11   tried to track that down, but there's been objections, the same

12   way as you're objecting to seeing these.  There were objections

13   to us getting that information.

14   Q     And you understand certainly from this trial today

15   that parties are entitled to make legal objections?

16   A     Yes, sir.

17   Q     And it's, as you've seen today, up to the court to

18   either sustain or grant the objection or alternatively to

19   overrule or deny the objection?

20   A     Correct.

21   Q     So to your knowledge, the court in Florida has never

22   ordered that those records be produced, correct?

23   A     Correct.

24   Q     Thank you.

25         You made reference to the FEC.  That's the Federal

1    Election Commission?

2         A     That is correct.

3         Q     And you identified the conciliation agreement?

4         A     Yes, sir.

5         Q     And the conciliation agreement represents an

6    agreement between the Federal Election Commission and AAPS?

7         A     That is correct.

8         Q     And that relates to the charges surrounding the

9    transfer of funds?

10        A     That is correct.

11        Q     And do you recall whether there was a financial

12   sanction issued against AAPS?

13        A     Yes, sir.

14        Q     You recall the amount?

15        A     It was about $5,700, I believe.

16        Q     Thank you.

17              You've also testified concerning the ACCME

18   probation?

19        A     Yes, sir.

20        Q     And that was probation, not a suspension, correct?

21        A     That is correct.

22        Q     And to your knowledge, AAPS has never been

23   prohibited from putting on continuing medical education

24   courses, has it?

25        A     That's correct.

1    Q    And that's because it was a probation and not

2    suspension?

3    A    That is correct.

4    Q    You testified concerning allegations in Cassandra

5    Newby's lawsuit.  You recall that?

6    A    Yes, sir.

7    Q    And you understand that allegations are just that,

8    allegations?

9    A    That is correct.

10   Q    They are not findings by any court, are they?

11   A    No, sir.

12   Q    So the mere fact that Ms. Newby made those

13   allegations does not mean that those allegations are true, does

14   it?

15   A    They are allegations until proven.

16   Q    So you would agree with me that until they are

17   proven, they are simply allegations?

18   A    That is correct.

19   Q    And you thought that the process that was being

20   employed relative to the investigations in May and June of 2012

21   as to you were not being done fairly, correct?

22   A    Correct.  May I explain?

23   Q    Uhm, I'm sure your counsel may ask you, but not

24   right now.

25   A    Okay.

1       Q       You thought it was unfair in part because you were

2   given 15 minutes rather than an extended period of time to

3   present your position?

4       A       That is part of it, correct.

5       Q       And you felt it unfair that Dr. Montes was a member

6   of the disciplinary committee?

7       A       When I learned later on, yes.

8       Q       Okay.  As of now you think that, don't you?

9       A       Oh, most definitely.

10       Q       Okay.  Did you also think it was unfair for

11   Dr. Maggio to serve on that committee?

12       A       I didn't know what his involvement was at the time,

13   so I did not feel it was unfair.

14       Q       Has that changed?

15       A       He's dead.

16       Q       Yes, I understand that.

17       A       Okay.

18       Q       But has that changed?

19       A       That he would be -- I hate to speak against somebody

20   who's passed away, but --

21       Q       Well, you didn't have any trouble with Dr. Montes,

22   did you?

23       A       Ah, that's a good point.  Yes, I would have trouble

24   with it.

25       Q       With Dr. Maggio?

1       A       Yes, Dr. Maggio and Dr. Montes.

2       Q       And did you feel it was unfair for Dr. Montes to

3    serve on that -- I'm sorry -- Dr. Wallace to serve on that

4    panel?

5       A       I didn't know Dr. Wallace well enough to make a

6    judgment.

7       Q       Since that time have you formed an opinion on that?

8       A       Since that time I have not really had much dealings

9    with Dr. Wallace.  Matter of fact, I haven't had any dealings

10   with members of AAPS since my suspension.  I do not participate

11   in leadership.

12      Q       Okay.  So to your knowledge, the following people

13   were sent those May 8, 2012, notices with the first amended

14   counterclaim attached:  Yourself?

15      A       Yes.

16      Q       Dr. Cressey?

17      A       Yes, sir.

18      Q       Dr. Klein?

19      A       Yes, sir.

20      Q       Dr. Geller?

21      A       Yes, sir.

22      Q       Dr. Radentz?

23      A       Yes, sir.

24      Q       And Dr. Stewart?

25      A       Yes, sir.

1      Q      And of them, Dr. Stewart we can see is a woman,

2   correct?

3      A      That is correct.

4      Q      Thank you.  And you know Dr. Radentz to be a woman?

5      A      Yes, sir.

6      Q      The other four people who were the subject of that

7   correspondence and inviting them to participate in a

8   disciplinary meeting were all men, weren't they?

9      A      One-third of them were women and two-thirds were

10   men.

11      Q      Four men, two women?

12      A      That's correct.

13          MR. SCHNEIDER:  Thank you.  I have no further

14   questions.

15          THE COURT:  Redirect?

16          MR. CONWELL:  I have no redirect.

17          THE COURT:  You may step down, Dr.  Thank you.

18          THE WITNESS:  Thank you, your Honor.

19          THE COURT:  May this witness be excused from this

20   trial?

21          MR. CONWELL:  Yes, your Honor.

22          THE COURT:  All right.  Thank you, sir.  Head back

23   to the snow.

24      Your next witness.

25          MR. CONWELL:  Our next witness is Dr. Atwood Rice.

```
 1    I think co-counsel has gone to get him.
 2              ATWOOD RICE, M.D., PLAINTIFF'S WITNESS, WAS SWORN
 3              THE COURTROOM DEPUTY:  Please be seated.
 4         Please state your name and spell your last name for the
 5    record.
 6              THE WITNESS:  My name is Atwood Rice.
 7              THE COURTROOM DEPUTY:  Spell it.
 8              THE WITNESS:  A-t-w-o-o-d, R-i-c-e.
 9              THE COURTROOM DEPUTY:  All right.  Thank you.
10                        DIRECT EXAMINATION
11    BY MS. HILAIRE:
12         Q    Good afternoon, Dr. Rice.  Can you see me?
13         A    Yes.
14         Q    Okay.  How are you doing today?
15         A    Fine, thank you.
16         Q    Okay.  Can you tell the jury your occupation,
17    please?
18         A    I am a physician, emergency physician primarily.
19    I'm also an attorney and an Anglican priest.
20         Q    Okay.  And how long have you been a physician?
21         A    Since 1977.
22         Q    Do you specialize in any particular area?
23         A    Emergency medicine.
24         Q    Could you -- I know you have many degrees.  Could
25    you briefly tell the jury about your educational background?
```

1         A      Uhm, my education is -- started with Culver Military

2   Academy and I graduated in '67.  I went to Tulane University.

3   I majored in history and chemistry.  I graduated with dual

4   degrees, bachelor of arts and bachelor of science in 1971.

5              I went to seminary after that and I tried to proceed

6   to become ordained in the Episcopal Church, and at that time

7   the Episcopal Church was going through some turmoil that people

8   with more orthodox Christian beliefs were not well-accepted.

9   So a number of people suggested after I was already doing

10  hospital chaplain work, I should apply to med school, which I

11  did, and I was accepted at Tulane Med School.

12             And I went to Tulane Medical School and -- on a dual

13  degree program, a Master's of Public Health and M. D.,

14  graduated from Tulane in '77 with both degrees.

15             I did a partial internship which was called a

16  rotating internship where you did multiple different

17  specialties.  And then I resigned that to do a fellowship and

18  submission work in tropical medicine, and went to Indian

19  Indonesia for that, came back and did a year of general

20  surgery, decided I wanted to do microsurgery of the ear and did

21  three years of ear, nose, and throat training for that, and

22  developed a tremor which precluded me from doing microsurgery,

23  and so I switched then to emergency medicine, and I've been in

24  emergency medicine pretty much the whole time since 1984.

25        Q      Thank you.  And where do you currently practice

1    medicine?

2        A    I'm currently doing locum tenens work for different

3    companies that place people in emergency rooms.  I'm getting

4    sort of towards the end of my career and I heard that the

5    Veterans Administration needed physicians and the Indian also

6    had shortages, so I requested placement at those kinds of

7    facilities.  So I've been working on an Indian reservation in

8    Arizona recently and a VA in Tennessee.

9        Q    Okay.  And are you currently a member of AAPS?

10       A    Yes, I am.

11       Q    And when did you become a member?

12       A    I believe I became a member in 2004.

13       Q    Is there any particular academy within AAPS that you

14   belong to?

15       A    I belong to the Academy of Emergency Medicine.

16       Q    Okay.  And can you give me kind of an estimate as to

17   how large the membership is with respect to your academy?

18       A    Well, the Emergency Medicine Academy is the largest

19   academy of AAPS.  They have approximately 65 to 75 percent of

20   the membership of the organization.

21       Q    Okay.  And can you explain to the jury why you

22   specifically chose to join AAPS as your board-certifying

23   organization?

24       A    Well, a friend of mine who had been involved with me

25   in another emergency medicine organization, Association of

1    Emergency Physicians, invited me to come to the conference that

2    AAPS was having in New York City which had an emergency

3    medicine track, but it also had a course in medical ethics.

4    And I'd never been to an organization that sponsored a course

5    in medical ethics at one of their regular meetings, and so I

6    was really impressed with that and I signed up for that class.

7    And I felt like that was -- you know, an organization that was

8    promoting medical ethics must be a good -- really good

9    organization to be a part of.  So I joined that organization.

10        Q    And can you briefly describe the formal positions

11   that you've held at AAPS since you joined in 2004?

12        A    Well, the formal positions I've held is governor of

13   the Academy of Emergency Medicine, then membership chair of the

14   Academy of Emergency Medicine, and finally I was elected to the

15   Board of Directors in the whole organization.

16        Q    Okay.  And can you tell the jury what years you were

17   on the Board of Director -- I'm sorry -- that you served as a

18   member on the Board of Director?

19        A    I served on the AAPS Board of Directors from August

20   of 2011 till the end of May in 2012.

21        Q    Okay.  And have you ever testified on behalf of

22   AAPS?

23        A    Uhm, I testified on behalf of AAPS in a court case

24   going on in New York concerning board recognition and the

25   equivalence of AAPS boards to the American Osteopathic Boards

1   and the American Association of Physician Specialists Boards.

2   I also testified before the Louisiana State Medical Board for

3   the same issue of recognition and equivalency, and I also

4   testified before the Texas State Medical Board for those

5   things.

6        Q    Okay.  And when you were representing AAPS, what was

7   the purpose that you were chose to provide this testimony?

8        A    I'm sorry.  Repeat the question.

9        Q    Sure.  What was the purpose that you were selected

10  as an individual to represent the interests of AAPS while you

11  provided this testimony?

12       A    Uhm, I think I was selected because of my background

13  as being a physician/attorney and being familiar with the

14  issues.  I had served on the Governmental Affairs Committee

15  before being asked to appear before the Louisiana State Board,

16  which was the first place I testified.  And then I was asked to

17  do the other two things, I guess probably because they thought

18  I did a good job before the Louisiana State Medical Board.

19       Q    Okay.  And are you familiar with AAPS's code of

20  ethics?

21       A    Yes, I am.

22       Q    And you testified earlier that one of the reasons

23  you specifically chose AAPS was because of its high regard to

24  ethics.  Can you explain further what you meant by that?

25       A    Well, I think medicine is a profession that is

1    esteemed because the people who are in it are supposed to be

2    very ethical, placing patient interest first.  And all of

3    ethics is based on trust -- relationships of trust, and I felt

4    like that was the most important aspect of AAPS.  If a doctor

5    and a patient don't have trust, then -- then the doctor can do

6    everything right and it still won't have the same effect on the

7    patient.  And so I think that's very important.

8              I think trust is important and also in relationships

9    with your peers.  If you want to be able to refer to another

10   physician in an area that you don't have expertise, you have to

11   have trust with those physicians.

12             I think likewise trust amongst members of an

13   organization when you're working for the same goals and trust

14   for society at large.  So the code of ethics of AAPS says that

15   we're supposed to maintain the highest standards of personal

16   conduct and the highest standards of medical ethics.

17             MS. HILAIRE:  Thank you, and -- Dr. Rice.

18        On that point, your Honor, I'd like to mark for

19   identification Exhibit No. 206.

20             (Exhibit 206 previously marked for identification.)

21             THE COURT:  You said to mark a new exhibit or is

22   there an exhibit that has been previously marked as 206?

23             MS. HILAIRE:  No, your Honor.  I'm sorry.  I just

24   want to introduce Exhibit 206.

25             THE COURT:  Okay.  All right.

```
 1              MS. HILAIRE:  If there are no objections, I'd also
 2   like to admit Exhibit 206.
 3              MR. SCHNEIDER:  We have no objection.
 4              THE COURT:  All right.  It will be received.
 5              (Exhibit 206 received into evidence.)
 6         Q    (BY MS. HILAIRE:)  Dr. Rice, do you know what this
 7   exhibit is?
 8         A    This is the AAPS Code of Ethics.
 9         Q    And to your knowledge, where are these code of
10   ethics published?
11         A    Uhm, I believe they're published on the
12   Association's Web site.
13         Q    Okay.  And could you please for the jury read the
14   first three bullet points?
15         A    (Reading:)
16              "As a member of the American Association
17              of Physician Specialists, Inc., I pledge
18              myself to maintain the highest standards
19              of personal conduct" --
20              THE COURT:  Dr. -- Dr. -- and this goes for
21   everyone -- it's like when we read, we seem to speed up.  We
22   still have the court reporter.  All right.  Slow down.
23              THE WITNESS:  Okay.  I'm sorry.
24          (Reading:)
25              -- "maintain the highest standard of
```

1              personal conduct; promote and encourage

2              the highest level of medical ethics in

3              medicine; maintain loyalty to the goals

4              and objectives of the American Association

5              of Physician Specialists, Inc."

6        Q    (BY MS. HILAIRE:)  Did you read all three bullet

7   points?

8        A    Yes.

9        Q    Thank you.

10            Okay.  Let's shift gears a bit.  At some point in

11  time did you learn that there had been suspensions of three

12  physicians, Dr. Castillo, Geller, and Klein?

13       A    Yes, I did.  I learned that I believe in January of

14  2011.

15       Q    Okay.  And once you became aware of that

16  information, did you take any steps to look into the

17  suspensions further?

18       A    Well, I attended, along with a lot of other members

19  of my academy, a winter meeting in Tampa which involved both

20  dealing with academy issues and writing exam questions for the

21  certification examination for emergency physicians.  And at

22  that time I was informed that Robert Geller, who was our

23  academy member of the Board of Directors, had been suspended.

24  And we had one of our academy members who was -- at that time

25  was on the Executive Committee, a Dr. Betsy Schenck, and she

```
 1   told us that there were some charges against these physicians
 2   and that they were under investigation, and that's why that Rob
 3   Geller wasn't there.  And I started asking some more questions.
 4   She said she couldn't talk about it while the investigation was
 5   going on.
 6          And I began to ask her, I said, "I don't want to
 7   know the specifics of the investigation or the charges.  I just
 8   want to know what the process was that was followed for
 9   suspending these people."
10          And she couldn't really explain except that the
11   Executive Committee made an emergency decision about it.
12          And I said, "So who's in charge of the
13   investigation?"
14          She didn't know.
15          How long was the investigation going to take?
16          She didn't know.
17          And so that was very alarming to me.
18     Q    And based on those responses, what did you do next
19   to get answers as to why these individuals were suspended?
20     A    Well, when she didn't have any answers, I tried to
21   get in touch with Dr. Geller and Dr. Castillo because I knew
22   both of them and I reached Dr. Castillo.  And he --
23          MR. KRUZHKOV:  Objection.  Hearsay, your Honor.
24          THE WITNESS:  So I -- anyway I spoke with Dr. --
25          THE COURT:  Hang on.  Hang on.  Hang on.  "Tried to
```

1    get in touch with the doctors.  I reached" -- not even a

2    statement.  Overruled.

3         Q    (BY MS. HILAIRE:)  You can continue, Dr.

4         A    Anyway, I spoke with Dr. Castillo, and he told me

5    that --

6              MR. KRUZHKOV:  Your Honor, same objection.  Hearsay.

7              THE COURT:  You are getting there.  Sustained.

8              THE WITNESS:  He told me that --

9              THE COURT:  Hang on.

10             THE WITNESS:  -- he had been --

11             THE COURT:  Hang on.  Hang on.  Hang on.  Don't

12   repeat the conversation.

13             THE WITNESS:  Don't repeat the conversation?

14             THE COURT:  No.

15             THE WITNESS:  Okay.

16             THE COURT:  You remember from law school?  That's

17   hearsay.

18             THE WITNESS:  Okay.

19             THE COURT:  Okay.

20        Q    (BY MS. HILAIRE:)  Okay.  Based on your conversation

21   with Mr. Castillo, did you become concerned about the

22   suspensions?

23        A    I did.

24        Q    Okay.  And did you take any steps to report your

25   concerns to AAPS?

1          A     I -- I began discussions with other members about

2     it, and I also talked with Betsy Schenck about it because I

3     said under our current bylaws, if you suspended somebody, they

4     lose their board certification.  And if they lose their board

5     certification, they're going to have to answer questions that

6     relate to discipline in the organization.

7                Every doctor is going to get -- every year when they

8     renew their hospital privileges or their malpractice insurance

9     or their medical license, there's going to be a question on the

10    forms that you're sent:  Have you ever been under any kind of

11    suspension, discipline, or, you know, it may be worded

12    differently, but the gist of those questions on those

13    applications is, "Have you come under some form of disciplinary

14    process?"

15               And I said that that's -- that's very damaging to

16    the career of a physician.  And I said that if you've

17    temporarily suspended these people, then there needs to be a

18    really speedy resolution on the matter, otherwise these

19    physicians are going to have their careers damaged.

20         Q     Okay.  And also around the same time that you

21    learned about the suspensions of Dr. Castillo, Geller, and

22    Klein, had you also been made aware of other concerns about

23    misconduct on the part of AAPS leadership?

24         A     Well, at that meeting I also found out that there

25    had been an effort to pass an amendment to the bylaws in

1    December that would have increased the power of the Executive

2    Committee delegating powers of the organization that had

3    previously belonged only to the Board of Directors to just a

4    handful of people that was on the Executive Committee.

5              And when I read a copy of the amendment -- I was

6    shown a copy of the amendment that was -- was voted down in

7    December -- I found it a little bit strange because I went and

8    read Florida law about nonprofit corporations and I found out

9    that most of the powers that were --

10             MR. SCHNEIDER:  Objection, your Honor.  He's not

11   designated as an expert.

12             THE WITNESS:  -- requested --

13             THE COURT:  Overruled.

14             THE WITNESS:  -- requested by that amendment were

15   already vested in the Executive Committee anyway, and that in

16   the 21st century there's no need to be able to act so quickly

17   without the board's decisions because it's easy to get people

18   together now and communicate on conference calls and so on.  So

19   it didn't make a lot of sense why it was being promulgated by

20   the leadership.

21        Q    (BY MS. HILAIRE:)  Okay.  And then at some point in

22   time did you contact Ms. -- Dr. Stewart to discuss some of

23   these concerns?

24        A    Well, I did.  I found out in addition to --

25             MR. SCHNEIDER:  Objection.  It's not responsive.

          THE COURT:  Sustained.  The question calls for a yes
or no answer.

          THE WITNESS:  Yes.

     Q    (BY MS. HILAIRE:)  Okay.  And what was the purpose
of contacting Dr. Stewart?

     A    Well, I contacted Dr. Stewart because I had become
aware of a number of things in addition to the Castillo,
Geller, Klein matter and the Bylaws Amendment, another suit
against the organization by a former employee, and a
resignation of a member because of a conversation he said he
had with Mr. Carbone.  And it again came to my attention that
they were again trying to pass the same amendment to expand the
powers of the Executive Committee to act without the full
Board.

          And so I contacted -- I had been in communications
with a number of people in my academy.  I said this is, I
think, a dangerous precedent for the organization, that we need
to have more open discussions about these things and we need to
get other academies involved.

          And so another member in my academy suggested that I
contact Dr. Stewart, that she was well known in the Dermatology
Academy.  So that's the reason I contacted her.

     Q    Okay.  And to your knowledge, who -- which member of
AAPS leadership was attempting to get the amendments cleared?

     A    Which -- which person in the leadership of AAPS was

1    trying --

2         Q     Correct.  Who was proposing these amendments?

3         A     Well, I don't know the specifics of who actually

4    proposed the amendment.  When an amendment goes to the House of

5    Delegates --

6              MR. SCHNEIDER:  Objection.  Nonresponsive.

7              THE COURT:  All right.  The question's been

8    answered.  Thank you.

9          Next question.

10             MS. HILAIRE:  Thank you, your Honor.  I'd like to

11   show the witness Exhibit 1748.1.

12             (Exhibit 1748.1 previously marked for identification.)

13             MR. KRUZHKOV:  I'm sorry.  You said 1748.1?

14             MS. HILAIRE:  1748 on the labelling, but it's

15   actually Bates stamp 1748.1.

16             MR. KRUZHKOV:  Would it be possible for you to put

17   it on the screen so we can make sure we have the right

18   document?

19             MS. HILAIRE:  You want it published before the jury

20   now?  Okay.

21             THE COURT:  Yes.  Go ahead.

22             MR. KRUZHKOV:  Just want to see the first page.

23   Okay.  We understand which one it is.  Thank you.

24             MS. HILAIRE:  It's 1748 in your exhibit book.

25        Q     (BY MS. HILAIRE:)  Okay.  Mr. -- I apologize.

```
 1   Dr. Rice, do you know what this document is?

 2        A      This is a e-mail I sent to Tony Russo who is the

 3   president of AAPS, and it was in response to some other things

 4   that I have been working on.  I had been testifying before the

 5   state medical boards, as I said earlier, for -- because the

 6   organization was being squeezed politically on state levels by

 7   the American Board of Medical Specialties who didn't want

 8   further competition recognized in the marketplace for

 9   certification by people who had certified with our

10   organization, even though the exams were equivalent.  And so

11   that organization, being much larger, had a lot of money to

12   spend to work against us politically.  And so I was suggesting

13   to the leadership that a better approach may be for our money

14   to go for an antitrust suit because they kept trying to keep us

15   from being recognized when we had clearly equivalent

16   examinations.

17            And when I heard about the amendment trying to be

18   passed again for the Executive Committee, I began calling

19   people on the list of the House of Delegates explaining to them

20   why I did not think the amendment should be passed.

21            And Dr. Russo thought that I was stabbing him in the

22   back and hugging him at the same time, and that I'm trying to

23   promote the organization on the outside but opposing his agenda

24   on the inside, and so this letter is an explanation of all the

25   things that I've learned since January and why I'm doing what
```

1    I'm doing, that I'm not opposing him, but I'm standing for the

2    principle that we're a democratic organization and we need to

3    follow due process and good procedure.

4           So, uhm -- so this letter is explaining my position

5    and why I'm taking it and --

6      Q    Dr. Rice, in this letter, do you oppose the issue

7    with the amendments?

8      A    Yes.  I'm taking a strong stand against the

9    expansion of power for the Executive Committee.

10     Q    And do you also attach to this e-mail the Newby

11   complaint?

12     A    I did.  I attached the Newby complaint and the

13   Castillo, Geller, Klein complaint because I felt there may be

14   people in the organization who did not know that the

15   organization was under legal assault by the suspended members

16   because by now what was only a suspension in January has now

17   become a matter in litigation because I was told that AAPS

18   never contacted the suspended doctors as they said they would.

19     Q    Okay.  And did you consider this open letter to be

20   an open opposition to those three categories of concerns that

21   you had?

22     A    Yes.

23     Q    And who did you address this open letter to?

24     A    Well, I addressed it primarily to Tony Russo, the

25   president.  And when he had responded to me, he sent -- sent

```
 1   out a -- sent out his response to my request that I present for
 2   consideration the antitrust thing.  I wrote a 12-page letter,
 3   an open letter to them suggesting for the organization that we
 4   should pursue an antitrust suit for national recognition rather
 5   than working on a state-by-state basis.
 6              And because I had made phone calls opposing the
 7   Executive Committee amendment, he said he was not going to fast
 8   track this or present it to the Board any more.  And in his
 9   response to me, he included a lot of other people on the list.
10   And so I included those people on the list and a number of
11   other perhaps leaders I may have added -- I don't remember for
12   sure at this point in time -- but I added maybe a few names to
13   the list, but just sent it back to all the people that he had
14   sent it to, my letter along with the two attached complaints so
15   they would recognize that the organization --
16        Q    Dr. Rice --
17        A    -- now had several lawsuits.
18        Q    -- I hate to interrupt.  I've just been notified we
19   have two minutes.
20              If you look for me at the middle of the page, it
21   says, "Both the letter and the phone calls."  Do you see that
22   there in the document?
23        A    Yes.
24        Q    What are you referring to there about phone calls?
25        A    Those are the phone calls I've been making to the
```

1    House of Delegates telling them please don't vote for the

2    expansion of powers of the Executive Committee, that my reading

3    of Florida law says, you know, it really wasn't necessary.

4         Q    Okay.  So you're vocally expressing your opposition

5    in writing and verbally, correct?

6         A    That's correct.

7              MS. HILAIRE:  Your Honor, is this a good time to

8    take a break?

9              THE COURT:  Excellent time.

10             MS. HILAIRE:  Thanks.

11             THE COURT:  All right.  Excellent.

12        All right.  Ladies and gentlemen, we're going to take --

13   this will probably be our last break -- 15 minutes.  Remember

14   the admonition, please.

15             THE COURTROOM DEPUTY:  All rise.

16             (A recess was taken.)

17             (Open court out of the presence of the jury.)

18             THE COURT:  Okay.  Back on the record.  Everyone is

19   here other than the jury.

20        David Karns, I guess you've been told -- you've been

21   advised that David Karns is having some discomfort in the heart

22   region.  He was instructed to go up to the nurse.  That was

23   about 15 minutes ago.  Ms. English just went up there to check,

24   see what the status is.  She's not there.  She has done the

25   unforgivable:  She has gone to lunch, and she will not be back

1    until 1:30.

2         David does not -- I'm sorry.  David Karns does not feel

3    comfortable enough to even drive until he sees the nurse, and I

4    don't want anybody jeopardizing their health.  I, too, would

5    like him to see the nurse.

6         Should we sit here and -- what's your pleasure?  We can

7    let the jury go and start in the morning, or we can wait.  I'm

8    going to be here anyway, so...

9              MS. HILAIRE:  Your Honor, considering that he will

10   not be able to see the nurse until 1:30 and be checked out and

11   we won't find anything close till 2, we probably should go to

12   the next day.

13             MR. SCHNEIDER:  I cannot disagree.

14             THE COURT:  First time today, right?

15             MR. KRUZHKOV:  Your Honor, at least second.

16             THE COURT:  I think that's the right thing to do

17   because we will not know and I'm certain that she's going to

18   want to observe him for a while.  And so we won't have an

19   answer until this time to end the day anyway.

20        So, all right, we will adjourn for today.  Ms. English

21   will let --

22             MR. SCHNEIDER:  I had the understanding from the

23   plaintiff counsel that this was the only day that Dr. Rice

24   could be here.  So if it's all right with Dr. Rice to come back

25   tomorrow, then I certainly agree with that.

 1          MS. HILAIRE:  Well, yes, Dr. Rice did want to be

 2   able to leave today, but he understands that if he had to stay,

 3   that he'd be willing to stay another day.

 4          THE COURT:  I want to leave it up to you.

 5          THE WITNESS:  Well, if -- if --

 6          THE COURT:  Wait a minute.  He's a doctor.

 7          MS. HILAIRE:  We have a lot of doctors.

 8          THE COURT:  We've got lots of doctors.  Why are we

 9   waiting on a nurse?

10          THE WITNESS:  I'm happy to see the patient.

11          THE COURT:  I was only kidding.  I was only -- the

12   question is -- and apparently I guess there was an

13   understanding that you would only be available for today.

14          THE WITNESS:  That is correct.  I'm supposed to be

15   at a conference tomorrow.  But if -- if --

16          THE COURT:  Where's the conference?

17          THE WITNESS:  In South Carolina.

18          THE COURT:  You're leaving America.  Well, okay.

19       Has he been deposed?

20          MR. SCHNEIDER:  No.

21          MS. HILAIRE:  No.  And that's my concern.  I'm just

22   not sure if we'd finish.  Unless we'd want to go longer than

23   2:00 today, I'm not sure if we'd complete him in any event if

24   we're still taking a break.  That's my problem.

25          MR. KRUZHKOV:  What happens if the juror needs to go

1   to the hospital or whatever?

2           THE COURT:  Then we will go with seven, you know?

3   I didn't like eight.  I didn't like eight at all.  That's not

4   enough cushion for a two-week trial.

5           MS. HILAIRE:  Your Honor, that's why we'd like to

6   see he's okay at least until tomorrow before we have to go to

7   the decision to seven.

8       Can I talk to Dr. Rice?  Thank you.

9           (Brief pause in the proceedings.)

10          THE COURT:  Yes, ma'am.

11          MS. HILAIRE:  So Dr. Rice is fine with resuming his

12  testimony tomorrow.

13          THE COURT:  Good man.  Here's the deal.  All these

14  doctors, and apparently you as well, are saying we probably

15  need to get him some medical attention now instead of waiting

16  for a nurse, right?

17          THE WITNESS:  I think so.

18          THE COURT:  All right.  What I'm going to do --

19  let's everybody take at least ten.  I'm going to run up there.

20          (A recess was taken.)

21          THE COURT:  Is there anything we need to talk about

22  other than I do want to get to the point?

23          MR. SCHNEIDER:  I'm sorry.

24          THE COURT:  You're pretty good.  You cross with a

25  purpose.

1          MR. SCHNEIDER:  Thank you.

2          THE COURT:  Then you sit your butt down.  That's

3   very good.  That's what I want you to do tomorrow.  But I am

4   serious about this.  I don't want us to waste his time.  He's

5   really doing us a favor.

6          MR. SCHNEIDER:  Much appreciated, Dr.

7          THE COURT:  Okay.

8          THE WITNESS:  You're welcome.

9          THE COURT:  It is appreciated.  It really is.  Okay.

10   All right.

11          MR. KRUZHKOV:  Both sides have agreed to try and

12   give each other a heads-up in advance of what exhibits so we

13   can prepare everything in advance.  We hear you, your Honor.

14   We want it to go faster, too.

15          THE COURT:  I didn't make myself clear in the

16   pretrials.  If you do this, then I don't have to have all this

17   mark it for -- none of that crap.  I was trying to relieve you

18   all of this.  Just show it.

19       Now, if there's some good faith, honest-to-God objections

20   with respect to what you tell them you're going to show

21   tomorrow, I will deal with that as soon as we get in.  You can

22   get in the building at 7.  I'll be here at 7.  Okay?

23          MR. KRUZHKOV:  Yes.

24          THE COURT:  We can work out those kinds of things.

25          MR. KRUZHKOV:  Excellent, your Honor.  Thank you.

```
 1                 THE COURT:  Like I'm --

 2                 MR. CONWELL:  Your Honor, I've got an issue.  I

 3     wanted to raise a question regarding the deposition.

 4                 THE COURT:  Yes.

 5                 MR. CONWELL:  So we've got our -- these video

 6     depositions ready to play to the jury based on the

 7     designations.

 8                 THE COURT:  Okay.

 9                 MR. CONWELL:  But they asserted some objections.

10     Now, most of them are to relevancy.

11                 THE COURT:  The one I've seen are relevancy

12     objections.

13                 MR. CONWELL:  Right.  So the thing is we're not

14     equipped to on-the-fly make changes to it.  These are all --

15     you know, a set -- you know, it's all created in a -- like a

16     little movie and you just play it through, so --

17                 THE COURT:  I know.  Here's the poor man's way of

18     dealing with it, okay?

19                 MR. CONWELL:  Okay.

20                 THE COURT:  And we got the U.S. Attorney's Office

21     and they can just make all kinds of magic happen in a

22     heartbeat.  But here's the deal.  If there is a valid

23     objection -- and many of those are to the questions -- but if

24     there's a valid objection, then what we can do is just simply

25     kill the sound --
```

UNITED STATES DISTRICT COURT

1          MR. CONWELL:  Okay.

2          THE COURT:  -- play it through, kill the sound.  Can

3    we do that?  And that doesn't take a whole lot of --

4          MR. KRUZHKOV:  Is that possible technologically?

5          MR. CONWELL:  Yeah.

6          MS. ROSSETTI:  Then when are we determining whether

7    the question's valid or not?

8          MR. SCHNEIDER:  The Court's going to have the

9    transcript.

10          THE COURT:  I'm going to tell you.  You tell me what

11    it is you're going to play, I can look at those.  What I did

12    was I just went in order.

13          MR. CONWELL:  All right.  So, your Honor, we told

14    them yesterday the ones we were going to play, first ones that

15    are up, and I can give that list to the Court.

16          THE COURT:  Okay.  Well, I've got what you filed and

17    I just finished going through Okerblom, John Okerblom.  I

18    couldn't find Betty Schenck.

19          MR. SCHNEIDER:  Are you talking about original

20    transcripts?

21          THE COURT:  Oh, no, no.  Yeah --

22          MR. SCHNEIDER:  We lodged a number today.

23          THE COURT:  -- I did see some, but, all right.  Just

24    tell me -- tell me.

25          MS. ROSSETTI:  Your Honor, Dr. Betsy Schenck, I

```
 1    believe it is, is right here.  This is Betsy --
 2              THE COURT:  This is Betsy.
 3              MS. ROSSETTI:  Yeah.  Is it Schenck or Schenck?
 4              MR. KRUZHKOV:  Schenck.
 5              THE COURT:  S-c-h-e-n-c-k.
 6              THE WITNESS:  She pronounces it Schenck.
 7              MR. KRUZHKOV:  She pronounces it Schenck.
 8              THE WITNESS:  But most people say it --
 9              THE COURT:  She's got a choice and she picked
10    Schenck.
11              MR. KRUZHKOV:  That is the case, your Honor.
12              THE COURT:  Keep my mouth shut?  All right.
13              MS. ROSSETTI:  It's right here, yeah.
14              THE COURT:  All right.  But what I'm really
15    interested in is you guys.
16              MR. CONWELL:  So the ones we're going to call are in
17    this order of play:  Cassandra Newby, Anthony Russo,
18    Dr. Lemonick, and Dr. Schenck.
19              THE COURT:  Betsy.
20              MR. CONWELL:  Yes, Betsy Schenck, and then
21    Dr. Wilkens.
22              THE COURT:  Now, that is all tomorrow, right?
23              MR. CONWELL:  That's all for tomorrow, yes.
24              THE COURT:  I got things to do tonight.  All right.
25    Okay.
```

1          MR. CONWELL:  We're also -- we're also going to play

2     tomorrow, if we have time, portions of Carbone and Cerrato.

3          THE COURT:  Okay.  All right.  I'll get on it.

4          MR. CONWELL:  All right.  Thank you.

5          MR. KRUZHKOV:  Thank you, your Honor.

6          (Proceedings adjourned at 1:29 P.M., until

7          Thursday, January 28, 2016, at 8:00  A.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5   I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

 6   FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

 7   OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 8   TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

 9   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14           DATED THIS 27TH DAY OF JANUARY, 2016.

15

16

17           /S/ DEBRA READ
             _____
18           DEBRA READ, CSR NO. 3949 CRR RMR RDR
             FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```