1          UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3          HONORABLE OTIS D. WRIGHT, II

4    UNITED STATES DISTRICT JUDGE PRESIDING

5  PATRICIA STEWART, D.O.,              )
                                        )
6                Plaintiff,             )
                                        )  ED CV 13-1670-ODW(DTBx)
7        vs.                            )
                                        )
8  AMERICAN ASSOCIATION OF PHYSICIAN    )          VOLUME 3
   SPECIALISTS, INC., WILLIAM           )
9  CARBONE; ROBERT CERRATO; SVETLANA    )       PAGES 1 — 106
   RUBAKOVIC and DOES 1-100,            )
10                                      )
                 Defendants.            )
11 _____)

12

13

14          REPORTER'S TRANSCRIPT OF
               TRIAL — DAY 3
15        THURSDAY, JANUARY 28, 2016
                 7:43 A.M.
16        LOS ANGELES, CALIFORNIA

17

18

19

20

21

22    _____

23          DEBI READ, CSR 3949 CRR RMR RDR
          FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET 432A
24        LOS ANGELES, CALIFORNIA 90012
              READIT3949@GMAIL.COM

25

UNITED STATES DISTRICT COURT

1                          A P P E A R A N C E S

2

     ON BEHALF OF THE PLAINTIFF:

3

         CONWELL BUSINESS LAW, P.A.
4        BY:  GEORGE DONOVAN CONWELL, JR.
              Attorney at Law
5        12610 Race Track Road, Suite 200
         Tampa, Florida 33626
6        813-282-8000
         dconwell@conwellbusinesslaw.com

7

         HILAIRE MCGRIFF, PC
8        BY:  MIKA HILAIRE
              Attorney at Law
9        601 S. Figueroa Street, Suite 4050
         Los Angeles, California 90017
10       213-330-4260
         mika@hmpclaw.com

11

         WILLIAM A. OKERBLOM LAW OFFICES
12       BY:  WILLIAM ALLEN OKERBLOM
              Attorney at Law
13       1145 E. Clark Avenue, Suite H
         Santa Maria, California 93454
14       805-478-6570
         drlaw07@aol.com

15

16   ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
     PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:
17

         ANDERSON, MCPHARLIN & CONNERS LLP
18       BY:  ERIC A. SCHNEIDER
         BY:  LEILA M. ROSSETTI
19            Attorney at Law
         707 Wilshire Boulevard, Suite 4000
20       Los Angeles, California 90017-3623
         213-688-0080
21       eas@amclaw.com
         lmr@amclaw.com

22

23

24

25

                        UNITED STATES DISTRICT COURT

```
1              A P P E A R A N C E S (continued)

2

   ON BEHALF OF DEFENDANT AMERICAN ASSOCIATION OF PHYSICIAN
3  SPECIALISTS, INC.:

4        GUSRAE KAPLAN NUSBAUM PLLC
         BY:  MARLEN KRUZHKOV
5             Attorney at Law
         120 Wall Street
6        New York, New York 10005
         212-269-1400
7        mkruzhkov@gusraekaplan.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2                CHRONOLOGICAL INDEX OF WITNESSES

3

4    PLAINTIFF'S WITNESSES                      PAGE    VOL.

5

6    **ATWOOD RICE, M.D.**
     Direct Examination Resumed By Ms. Hilaire    22      3
     Cross-Examination By Mr. Schneider           62      3
7    Redirect Examination By Ms. Hilaire          72      3
     Recross-Examination By Mr. Schneider         84      3
8
     **CASSANDRA NEWBY  (Videotaped Deposition)**
9    Examination                                  87      3

10   **ANTHONY RUSSO M.D.  (Videotaped Deposition)**
     Examination                                  94      3
11   Examination                                 100      3

12   **DAVID LEMONICK, M.D.  (Videotaped Deposition)**
     Examination                                 101      3
13   Examination                                 102      3

14   **BETSY SCHENCK, M.D.  (Videotaped Deposition)**
     Examination                                 103      3
15   Examination                                 103      3

16   **ERIC WILKENS,M.D.  (Videotaped Deposition)**
     Examination                                 105      3
17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

<u>E X H I B I T S</u>

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|---|---|---|---|---|
| 1030 | 12/18/11 E-mail from Dr. William Okerblom to the AAPS House of Delegates, its Board of Directors, and others | 46 | 86 | 3 |
| 1031 | Preliminary Legal Opinion by Dr. William Okerblom dated 06/23/11 | 38 | 86 | 3 |
| 1317 | 15th Revision to AAPS's bylaws adopted 06/25/11 | 24 | 86 | 3 |
| 1334 | Minutes from 05/30/12 AAPS Board of Directors Meeting | 54 | 86 | 3 |
| 1341 | 16th Revision to AAPS's bylaws adopted 06/25/12 | 83 | 86 | 3 |
| 1446 | Minutes and Agenda of the House of Delegates, June 25, 2011 | 30 | 86 | 3 |
| 1507 | Open Letter dated 12/14/11, from Atwood Rice to AAPS House of Delegates and other documents | 44 | 86 | 3 |
| 1762 | Dr. Atwood Rice e-mail to Dr. Okerblom, 12/19/11 | 49 | 86 | 3 |

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, JANUARY 28, 2016

 2                            7:43 a.m.

 3                            -o0o-

 4              (Call to Order of the Court.)

 5              (Open court out of the presence of the jury.)

 6              THE COURT:  Here's what we're going to do.  We're

 7    going to question her about her telephone call to Ms. English

 8    this morning where she indicates that she's -- her English

 9    isn't so good and she's having trouble understanding what's

10    going on.

11         We haven't been able to reach Mr. Karns.  I hold no hope

12    whatsoever that we will hear from him today, and I guess I'm

13    okay with that.  I just want him to be all right.

14         But we need to talk about -- talk to Ms. Hernandez, and if

15    we lose her as well, we are down to six.  Okay?

16         All right.  Bring her out here.

17         (The Juror No. 1 entered the courtroom.)

18              THE COURT:  I just need a microphone, dear.  Would

19    you stand over there at the lectern?  Only because there's a

20    microphone there.

21         Go ahead and call the case, dear.

22              THE COURTROOM DEPUTY:  Okay.  Calling Item 1,

23    ED CV 13-1670, Patricia Stewart D.O. versus American

24    Association of Physician Specialists.

25              Counsel, may I have your appearances, please.
```

 1            MS. HILAIRE:  Mika Hilaire on behalf of the

 2    plaintiff, Patricia Stewart.

 3            MR. CONWELL:  Don Conwell.

 4            MR. SCHNEIDER:  Eric Schneider, Marlen Kruzhkov,

 5    Leila Rossetti for the defense.

 6            THE COURT:  All right.  Good morning, counsel.  And

 7    we've also been joined by Juror No. 1, Ms. Miriam Hernandez,

 8    correct?

 9            THE JUROR NO. 1:  Yes.

10            THE COURT:  Ms. Hernandez, you called and left a

11    message on Ms. English's phone this morning.  Basically what

12    was the substance of that message?

13            THE JUROR NO. 1:  Yes, I did last night.  I want to

14    tell her and I understand English, but I can't speak English

15    very well.  That the reason.

16            THE COURT:  Okay.  And what was -- specifically what

17    was your point in alerting her that you could not speak English

18    very well?

19            THE JUROR NO. 1:  Why can't I speak English?

20            THE COURT:  Why did you call and -- to inform her of

21    that?

22            THE JUROR NO. 1:  Oh, yeah, because I not feeling

23    really comfortable with my other person sit with me because

24    they writing down in the notebook and I can't write anything.

25            THE COURT:  You cannot write English?

1              THE JUROR NO. 1:  No.

2              THE COURT:  Can you write in Spanish?

3              THE JUROR NO. 1:  Uhm, yeah.

4              THE COURT:  Is there something that keeps you from

5    writing -- keeping your notes in Spanish?

6              THE JUROR NO. 1:  Yes, it better -- it will be

7    better for me because I can't speak English very well, but I

8    can't write English, almost nothing.

9              THE COURT:  All right.  But you can write in

10   Spanish?

11             THE JUROR NO. 1:  Oh, yes, I do.

12             THE COURT:  So you can take your notes in Spanish.

13             THE JUROR NO. 1:  Oh, all right.

14             THE COURT:  Okay?  No one is going to read your

15   notes but you.

16             THE JUROR NO. 1:  Okay.

17             THE COURT:  They're your notes, all right?

18             THE JUROR NO. 1:  Sure.  Understand.

19             THE COURT:  Okay.  Day before yesterday in the

20   morning when we were going through jury selection and we were

21   asking you a lot of questions, were you able to understand our

22   questions?

23             THE JUROR NO. 1:  Yes, I did.

24             THE COURT:  Okay.  And yesterday when we had

25   witnesses testifying, could you understand what they were

1  saying?

2         THE JUROR NO. 1:  With the Dr. Castillo better for

3  me, but with the second one, I didn't very well.

4         THE COURT:  Okay.  All right.  Do you feel confident

5  in your ability to be able to serve as a juror in this case?

6         THE JUROR NO. 1:  Uhm, not really because I think

7  that it's really, uhm -- I think it's -- I don't know -- but a

8  big case, I think.  I think -- I thought it will be easy,

9  nothing very complicate, but that what I think.  It's

10  complicated for me.

11         THE COURT:  Well, we don't do easy over here.

12     So, all right.  Mr. Conwell, I think this was a lady that

13  you wanted.  Do you have any questions that you'd like to put

14  to her?

15         MR. CONWELL:  Ms. Hernandez, are you able to read

16  the things that are put up there?  Do you read English?

17         THE JUROR NO. 1:  Yeah, I did.  I do.

18         MR. CONWELL:  So you can read the things that --

19         THE JUROR NO. 1:  Yeah.  But my problem is I

20  can't -- I can't speak English very well.

21         MR. CONWELL:  Okay.  And then --

22         THE JUROR NO. 1:  But I can read and understand a

23  lot.  Not a hundred percent, but a lot.

24         MR. CONWELL:  Okay.  Is there anything that has been

25  shown to you, any documents that have been shown to you that

1  you've been unable to read the parts that you wanted to read so

2  far?

3          THE JUROR NO. 1:  Uhm, no.  I -- I can read a lot.

4  Some words I can't, but --

5          MR. CONWELL:  Okay.  And so -- and then in terms of

6  your ability to -- how long have you been here in --

7          THE JUROR NO. 1:  United States?

8          MR. CONWELL:  Yes.

9          THE JUROR NO. 1:  Fourteen years.  But I never been

10 able to go to school to learn English.

11         MR. CONWELL:  So when Dr. Castillo was speaking, you

12 were able to understand what he was saying?

13         THE JUROR NO. 1:  Yeah, uh-huh.

14         MR. CONWELL:  When the next witness was speaking --

15 what was it? -- you had difficulty hearing him?  Was he not

16 speaking loudly enough?

17         THE JUROR NO. 1:  I don't know exactly what the

18 reason was, but I -- probably because he talks for a long time

19 or -- I don't know exactly.  I can't explain you --

20         MR. CONWELL:  It's the length -- excuse me.

21         THE JUROR NO. 1:  I think he speak English, he speak

22 very clear, but very -- the problem is me, not --

23         MR. CONWELL:  His answers were really long?

24         THE JUROR NO. 1:  Probably.

25         MR. CONWELL:  And so if the answers were shorter,

1    that would help?

2              THE JUROR NO. 1:  Yeah.

3              MR. CONWELL:  Okay.  If the answers were shorter the

4    way Dr. Castillo's were, you think you'd be able to understand?

5              THE JUROR NO. 1:  Yeah.  Probably that's the reason.

6              MR. CONWELL:  Okay.  Thank you.

7              MR. SCHNEIDER:  I don't have any questions --

8              THE COURT:  Mr. Schneider?

9              MR. SCHNEIDER:  -- your Honor.

10             THE COURT:  Thank you, Ms. Hernandez.  You may go

11   back into the jury room.

12             THE JUROR NO. 1:  Okay.

13        (The Juror No. 1 left the courtroom.)

14             THE COURT:  The Court was concerned enough about

15   Ms. Hernandez's language skills enough to offer to the parties

16   the opportunity to exclude her for cause.  Once again, I

17   indicated it's more to being a juror than simply being able to

18   understand.  One must have an adequate facility with the

19   English language in order to communicate with their fellow

20   jurors and articulate their position and be able to persuade,

21   if necessary.

22        I still remain uncomfortable with Ms. Hernandez, but I am

23   not going to unilaterally exclude a juror for cause over the

24   objection, in this case, of the plaintiff.

25        Mr. Conwell, is it still your position that you would like

1    to keep her on the jury?

2             MR. CONWELL:  Your Honor, may I have a brief

3    conference with co-counsel and my client?

4             THE COURT:  Sure.

5             (Brief pause in the proceedings.)

6             THE COURT:  And Mr. Schneider?

7             MR. SCHNEIDER:  Yes, your Honor.

8             THE COURT:  I want you and your team to give some

9    thought to whether or not you would object at this stage of the

10   proceedings to this juror being excused now for cause.

11            MR. SCHNEIDER:  We don't think --

12            THE COURT:  I'm not asking.  I'm -- just think about

13   it and you all discuss it.

14            MR. SCHNEIDER:  Oh, thank you.

15            MR. CONWELL:  Your Honor?

16            THE COURT:  Uh-huh.

17            MR. CONWELL:  So our concern is if we're not going

18   to see Mr. Karns again, we're down to seven.  If we lose her,

19   we're down to six, and then who knows.  And we don't want to be

20   in a position of going through this and not having enough

21   jurors.  That's our concern at this point with letting her go.

22            THE COURT:  It's --

23            MR. CONWELL:  I do believe that she understands.

24   She just said it was with the last witness and apparently, you

25   know, when his answers go on at some point, it's hard for her

1    to follow.  And also the subject matter, what he's been talking

2    about so far, has been more, you know, Board resolutions and

3    meetings and things like that, and that's not what the majority

4    of the trial's going to be about.

5         So I -- we feel like she's going to be able to understand.

6    She can read English, she indicated.  She can understand

7    English.  We just -- now with the explanation regarding the

8    problem she had with part of the testimony of the last witness,

9    I think both sides can make an adjustment to our presentation

10   of our case, try to keep the answers shorter.

11        But I -- we don't want to risk running out of jurors is

12   our main concern.

13             THE COURT:  Anything, Mr. Schneider?

14             MR. SCHNEIDER:  Your Honor, we do not object to her

15   continuing to serve as a juror.

16             THE COURT:  Okay.  All right.  I've just had my law

17   clerk do some research on whether or not we could, in fact, if

18   necessary, due to jury -- juror depletion during the course of

19   the trial, if we could drop down below six, and though it's not

20   advisable, apparently the parties can stipulate to a fewer

21   number of jurors.

22        All right.  Then we will keep going on.  We will actually

23   be on time.

24        Yes, dear?

25        All right.  Everyone knows, but just for the record

1    because we didn't put it on the record, but yesterday

2    approximately 1 o'clock or so was our last afternoon break,

3    Mr. David Karns, Juror No. 6, was stricken ill and was advised

4    by the CRD, Ms. English, to go to the 10th floor nurse's

5    office.  A few minutes later she went to the 10th floor to

6    check on Mr. Karns and discovered that the nurse's office was

7    closed because it was the noon hour and that the nurse would

8    not be expected to return until approximately 1:30.

9         I suppose due to the nature of this case and the

10   occupations of all the parties and the witnesses, we were

11   strongly urged that the prudent course of action would be to

12   get Mr. Karns to the hospital.  So paramedics were called.

13   They responded, and Mr. Karns was evacuated to the L.A.

14   County+USC Medical Center, and we have been -- since last

15   evening been attempting to get in touch with Mr. Karns.

16        Our inability to do so at least leaves the Court to

17   strongly suspect that either he has been kept in the hospital

18   overnight for either tests or observations, or has been

19   released home, but still does not feel strong enough either to

20   respond to his telephone or to return to court.  He is not here

21   yet and it is 8 o'clock and this is when the trial is due to

22   start.  Mr. Karns previously has been the first juror to

23   arrive, arriving in court shortly after 7 when the building

24   opens.  So I believe that we have lost Mr. Karns.

25        Is there anything that any of the attorneys -- either of

1    the attorneys would like to add for the record?

2                MR. CONWELL:  You say lost.  You mean as a juror?

3                THE COURT:  As a juror -- oh, no, no, no, no, no.

4                MR. CONWELL:  All right.

5                THE COURT:  Don't even say that.

6         Okay.  Let's bring them out.

7                MS. HILAIRE:  Your Honor?

8                THE COURT:  Yes.

9                MS. HILAIRE:  Before you do that, did you have an

10   opportunity to --

11               THE COURT:  Do you want --

12               MS. HILAIRE:  Yes, that's fine.

13        Your Honor, I believe when we concluded yesterday, we were

14   going to be talking about the deposition designations --

15               THE COURT:  Yes.

16               MS. HILAIRE:  -- because we were going to be playing

17   the video.  Was there anything that you reviewed that has

18   caused any concern so that we can make sure we can play our

19   video from beginning to end without disruption?

20               THE COURT:  My concerns have nothing to do with

21   anything other than the nature of the objections that have been

22   raised has caused the Court a great deal of work in going

23   through -- through some of the transcripts.

24        We finished about three of the transcripts and what we

25   have decided, unless someone can come up with a better way of

```
 1    doing this -- and we may have mentioned it yesterday -- that

 2    we're going to have to lower the volume on those sections where

 3    an objection has been sustained and your technician is going to

 4    just simply turn the volume down and watch the lips of the

 5    speaker engage when that answer's been completed, and then we

 6    will turn the volume back up.

 7         If we can come up with a better way of doing it in the

 8    time -- within the time limitations we have, I will certainly

 9    entertain that.  But --

10              MS. HILAIRE:  Okay.

11              THE COURT:  Okay?

12              MS. HILAIRE:  Your Honor, and one more thing.

13              THE COURT:  Yes.

14              MS. HILAIRE:  While -- during my examination -- and

15    I know yesterday there were two counsel objecting.  I just

16    wanted to respectfully request that we only have one attorney

17    objecting per examination.

18              THE COURT:  Normally I -- I was troubled by that

19    initially, but they're representing different parties.  So each

20    party has got a right to have -- to voice an objection, as

21    disconcerting as it is.

22              MS. HILAIRE:  Okay.  Thank you, your Honor.

23              THE COURT:  Okay.

24              MS. ROSSETTI:  Your Honor, if I could quickly ask

25    for clarification on the depo testimony issue?  So when will we
```

1  sort out which objections have been sustained and how we're

2  going to deal with that?

3          THE COURT:  Oh, yes.  Tell you what I'll do.  I'm --

4  what I'm going by -- I'm glad you brought this up.  What I'm

5  going by are the written objections that have been filed with

6  the Court.  Because I've basically got -- in some cases I have

7  three different objections.  An objection was interposed during

8  the course of the deposition, that's one, and then in reading

9  the transcripts, a completely different objection has been

10 written in the margins, and then in some cases yet a third

11 deposition -- or objection has been interposed to the Court in

12 writing.

13     Now, I'll put it to all of you:  Which should I go by?

14 The one that was raised during the course of the deposition

15 when you're shooting from the hip?  Or someone's notes in the

16 margins -- I know not whose -- or the document that's been

17 filed with the Court?

18         MR. SCHNEIDER:  Your Honor, I think the Court should

19 follow the written -- those that were interposed in the

20 margins.

21         THE COURT:  Then what use was this filing which

22 states different objections?  And how do I know for certain who

23 wrote these notes in the margins?

24         MR. SCHNEIDER:  They -- the parties designated

25 colors.  The plaintiff's --

```
 1              THE COURT:  I'm not talking about the colors.  I'm
 2   talking about the objections that have been -- come forward.
 3   This is just an example.  Next to the bracketed material
 4   there's the word "Irrelevant."  Did a paralegal write that?
 5   Did a witness write that?  Who wrote that?
 6              MR. SCHNEIDER:  I did.
 7              THE COURT:  You did?
 8              MR. SCHNEIDER:  Yes.
 9              THE COURT:  In many cases there's no correlation
10   between what's in the margin and what's been filed with the
11   Court.  That's why I say sometimes I'm dealing with three
12   different objections.  One is asserted during the course of the
13   deposition; I've got some handwritten notes in the margins; and
14   then I've got what I thought would be a considered and more
15   reflective better-considered objection that has been filed with
16   the Court.  I have been going with the latter --
17              MS. ROSSETTI:  Your Honor --
18              THE COURT:  -- because I don't know anything about
19   the authorship of these notes.
20              MS. ROSSETTI:  -- my understanding was that the
21   document you're holding incorporates all of the other
22   objections.  If they don't every once in a while, that might
23   just be a staff error or something.
24              THE COURT:  And what do I do with that?
25              MS. ROSSETTI:  I --
```

1          THE COURT:  This is -- okay.  Maybe I'm not making

2    myself clear.  In some cases I have three different grounds.

3    One was stated at the depo; there's a different one written in

4    the margins; and then what I assumed would be a more carefully

5    considered, more thoughtful objection is what is in this

6    written submission that's been filed with the Court.  Was I

7    wrong?

8          MR. SCHNEIDER:  Yes.

9          THE COURT:  So this was less well-considered than

10   whatever these notes are written in some of the margins?

11          MR. SCHNEIDER:  No.  The --

12          MS. HILAIRE:  Your Honor -- and I have -- I have

13   some concern about allowing objections that should have been

14   made at the -- during the course of the deposition because, as

15   you know, form of the question, those type of objections are

16   waived if you don't state them at the time of the deposition.

17      So the plaintiff -- we strenuously object to allowing the

18   defendant to now insert objections that should have been done

19   at the deposition.

20          THE COURT:  So you advocate that I go with what was

21   stated on the record during the course of the deposition?  That

22   makes it very easy.

23          MR. SCHNEIDER:  Well, your Honor, we would not be --

24          MS. HILAIRE:  Just to relevancy, of course.

25          MR. SCHNEIDER:  -- asserting hearsay objections

1    during the deposition because --

2              THE COURT:  You shouldn't be asserting irrelevance

3    objections either during the course of discovery.  That's what

4    I've got.

5              MR. SCHNEIDER:  No, that was not during the course

6    of discovery.  Those were --

7              THE COURT:  A deposition isn't during the course of

8    discovery?

9              MR. SCHNEIDER:  No.  Your Honor, I hope I didn't

10   make irrelevance objections.  It's possible that I did.  The

11   ones that are handwritten were done for the purpose of the

12   trial.

13             THE COURT:  Oh, okay.  There should have been some

14   consistency.

15        All right.  We'll do it again.  I don't know, counsel, to

16   answer your question.  So I suppose what I will have to do now

17   is just go through all of the transcripts and make a little

18   note next to the handwritten note.  How's that?

19             MS. ROSSETTI:  I mean, your Honor, I would think in

20   terms of how the objections are sustained, it's just as

21   important for plaintiff's counsel 'cause they're going to be

22   the ones narrowing down the depo testimony in terms of the

23   video.

24             MS. HILAIRE:  The bigger issue today is that we have

25   multiple depositions that we expect to be played via video as

```
 1   soon as we conclude Dr. Rice's testimony, and so we need to be

 2   able to know the parameters of that testimony ahead of time.

 3             THE COURT:  All right.  Then the only way I can do

 4   that is --

 5             MS. HILAIRE:  Or at least while it's being played I

 6   can lower the volume.

 7             THE COURT:  We will go -- all right.  I will give

 8   you then what I've completed and you can do with that what you

 9   will, in terms of what you want to or at least have your

10   technician edit out.

11             MS. HILAIRE:  And your Honor, is it acceptable by

12   the definition of edit out at this late stage that we lower the

13   volume?

14             THE COURT:  Yes.

15             MS. HILAIRE:  Thank you.

16             THE COURT:  Everybody understands that and I haven't

17   heard any objections to us employing that procedure.  So if

18   there are, now's a good time to speak up.  Here you go.

19        Okay.  Now you can bring them out.

20             MR. SCHNEIDER:  Your Honor, is there a set for us?

21             THE COURT:  Pardon me?

22             MR. SCHNEIDER:  Is there a set for us?

23             THE COURT:  Nope.  I didn't make notes on two copies

24   last night.  And -- and if I'm to make my rulings on the

25   transcript itself, what do you suggest?  Never mind.
```

```
1          Ms. Hilaire.
2               MS. HILAIRE:  Yes, your Honor.
3               THE COURT:  Have you had an opportunity to speak
4    with your witness with respect to the format of his answers --
5               MS. HILAIRE:  Yes.
6               THE COURT:  -- just for the purpose of
7    Ms. Hernandez?
8               MS. HILAIRE:  Oh, not since we've spoken to her.
9    May I have just a few minutes?
10              THE COURT:  Please.
11              MS. HILAIRE:  Okay.
12              (Open court in the presence of the jury.)
13              THE COURT:  All right.  The jury has joined us with
14   the exception of Juror No. 6, Mr. Karns, who, as you all know,
15   was stricken ill yesterday afternoon and was transported to the
16   hospital.  And we've had no contact with him since.
17          All right.  The parties are present.  All counsel are
18   present.  Dr. Atwood has once again taken his place on the
19   witness stand.
20          Ms. Hilaire, you may continue.
21              MS. HILAIRE:  Thank you, your Honor.
22          ATWOOD RICE, M.D., PREVIOUSLY SWORN, RESUMED THE STAND
23                     DIRECT EXAMINATION RESUMED
24   BY MS. HILAIRE:
25          Q    At the conclusion --
```

```
 1              THE COURT:  I apologize.  I'm sorry.  I said
 2    Dr. Atwood.  I'm sorry.
 3              THE WITNESS:  That's okay.
 4         Q    (BY MS. HILAIRE:)  Dr. Rice, at the --
 5              THE COURT:  Dr. Rice, you were placed under oath
 6    yesterday and this is just the resumption of that testimony.
 7    You remain under oath, sir.
 8              THE WITNESS:  Yes, sir.  I understand.
 9         Q    (BY MS. HILAIRE:)  Okay.  Dr. Rice, at the end of
10    your testimony, you indicated that you learned someone had
11    resigned from being a member within AAPS due to a conversation
12    that they had with Mr. Carbone.  Do you recall that testimony?
13         A    Yes.
14         Q    Okay.  And I think you just used the pronoun he, and
15    I just want to make it clear for the jury who you were
16    referring to?
17         A    That was Everett Wilkens.
18         Q    Thank you.  Dr. Rice, does AAPS have bylaws?
19         A    Yes, they do.
20         Q    And as a former Board member, what is the purpose of
21    AAPS having bylaws?
22         A    The bylaws are a part of the legal documents of the
23    organization that are governing the behavior of the
24    organization, specifying methods whereby the organization can
25    achieve its mission purpose vision through the instrumentality
```

1    of various committees, functions that are outlined and

2    organized.  It specifies as to how the Board of Directors,

3    which is the legally responsible entity of the organization, is

4    constituted.  For example, the president is allowed to appoint

5    certain members to the Board and -- like Dr. Cerrato would

6    appoint the head of the continuing education committee; it was

7    Dr. Montes.  Or the academies would be allowed to elect members

8    to the Board, different things like that.  So Board members is

9    one of the functions of the bylaws.

10           MS. HILAIRE:  Okay.  And I'd like you to look at

11   Exhibit 1317.

12           (Exhibit 1317 previously marked for identification.)

13           THE COURTROOM DEPUTY:  Sorry.

14           MS. HILAIRE:  No problem.

15       Q    (BY MS. HILAIRE:)  Dr. Rice, while we're waiting,

16   you can close that exhibit in front of you and you can hand it

17   to Ms. English.

18       A    Oh, I'm sorry.

19           MS. HILAIRE:  1317.  Your Honor, I don't believe

20   there are any objections to this document.  May I publish this

21   document?

22           MR. SCHNEIDER:  Yes.

23       Q    (BY MS. HILAIRE:)  And Dr. Rice, can you identify

24   this document, please?

25       A    This document is the Bylaws of the American

1    Association of Physician Specialists and it is the 15th

2    revision which was adopted on -- at the annual meeting in

3    June 25th, 2011.

4         Q    Okay.  And to your knowledge, is the 15th revision

5    that was adopted June 25th, 2011, the effective bylaws that

6    would have been in place through June of 2012 when Ms. Stewart

7    was expelled from AAPS?

8         A    To the best of my knowledge, yes.

9         Q    And if you look at the table of contents for me,

10   under Section 3.05, you see the word "Discipline"?

11        A    Yes.

12        Q    Okay.  And how discipline is supposed to be carried

13   out is governed by the bylaws, right?

14        A    Yes -- yes, that's correct.

15        Q    Okay.  And why don't you turn for me to page 4,

16   please.

17        A    Okay.

18        Q    And in particular, I'm looking for the Section 3.05.

19   I believe in your document it's page 8.

20        A    That's -- okay.  I see it.

21        Q    Do you see it on your screen as well?

22        A    Yes.

23        Q    Okay.  And according to the bylaws -- let me make

24   this bigger for the jury.  So when enacting discipline to an

25   AAPS member, the rules that would govern how that discipline is

1   supposed to be implemented would be delineated here in the

2   bylaws in this section, right?

3        A    That is correct.

4        Q    Okay.  And if you can also turn for me the next page

5   under 3.05 subsection (b)?

6        A    Yes.

7        Q    What does this subsection indicate?

8        A    It indicates that if discipline is carried out

9   against a member, that they have the right to appeal the

10  decision and the Association then would refer the matter of

11  appeal to an appeal Board composed of three -- between three

12  and seven past presidents of the Association who were members

13  in good standing.

14       Q    Okay.  And let's go back to Section (a) for

15  discipline.

16       A    All right.  Uh-huh.

17       Q    And what is required in order for an AAPS member to

18  be disciplined pursuant to the bylaws?

19       A    The Board of Directors -- if two-thirds of the

20  members of the Board would vote for a finding that the member

21  had been doing something against the best interests or

22  injurious to the best interests of the Association -- by a

23  two-thirds vote could discipline that member.

24       Q    Okay.  Thank you.  And if we can turn to the second

25  to the last page of this document, please?

1      A      Okay.

2      Q      Do you see this Section 15.09 Rules of Order?

3      A      Yes.

4      Q      Can you explain what this section designates or

5   defines?

6      A      Well, the Section 1509 Rules of Order refers to how

7   business is to be conducted by any of the deliberative bodies

8   within the organization.  Whether that is a committee or the

9   Board of Directors or any group function where more than one

10  individual would be involved in decision making, then Robert's

11  Rules of Order would be the method by which the meetings and

12  procedures should be conducted.

13     Q      And those would be conducted by what's referred to

14  as the Robert's Rules of Order?

15     A      Correct.

16     Q      Before we move on, Dr. Rice, I want to turn your

17  attention back to Section 3.05 for discipline.  Can you go back

18  to that page?  And I believe it was page 8.

19     A      Yes.  Okay.

20     Q      If you can turn to page 9?

21     A      Okay.

22     Q      That is where the paragraph is completed?

23     A      Uh-huh.

24     Q      Do you see that at the top of the page?

25     A      Yes.

1      Q    Okay.  And do you see that after the word "however"

2  there indicates that there's also some notice requirements with

3  respect to discipline?  Do you see that?

4      A    Yes.

5      Q    Can you read that to the jury, please.

6      A    (Reading:)

7           "30 days' prior written notice by

8           registered mail shall be given to the

9           member to be disciplined advising that he

10           may appear in person, with or without

11           counsel, and may submit such evidence as

12           he or she deems proper to show that he or

13           she is qualified to continue as a member

14           of the Association."

15      Q    Okay.  So there's a notice requirement and there's

16  the ability to submit evidence; is that right?

17      A    Yes.

18      Q    Was there a June 2011 House of Delegates meeting?

19      A    Yes, there was.

20      Q    Did you attend that meeting?

21      A    Yes, I did.

22      Q    And at that time were there -- was there a proposal

23  to make further amendments to the bylaws?

24      A    Yes.  There was a proposal to further change the

25  bylaws specifically applying to these sections, 3.05 and 3.06.

```
1         Q      Okay.  Thank you.

2                And yesterday you testified that there were other

3  and different amendments that were proposed -- that were

4  proposed that you opposed, correct?

5         A      Yes.  The amendments I was speaking of yesterday was

6  to Sections 6.08, uhm, because it expanded the power of the

7  Executive Committee to deal with certain problems independent

8  of the full Board, and the original proposed 6.08 amendment had

9  been voted down after Mr. Wilkens asked questions that the

10  proposing members didn't have answers for that led to

11  Mr. Wilkens having to resign after having received a phone call

12  from Mr. Carbone and --

13                MR. SCHNEIDER:  We object.  This is nonresponsive.

14  It also calls for speculation.

15                THE WITNESS:  -- Mr. --

16                THE COURT:  Hang on a sec.  All right.  Everything

17  after the word "Yes" is to be disregarded.  That's stricken.

18                MS. HILAIRE:  Okay.

19         Q      (BY MR. CONWELL:)  Dr. Rice, so just so we're clear,

20  yesterday you were speaking about the amendments to

21  Section 6.08, and as of June 2011, the new amendments referred

22  to Section 3.05 Discipline, correct?

23         A      That is correct.

24         Q      Okay.  And why were you so concerned about the

25  newly-proposed amendment changes that were -- that you felt
```

1    compelled to take action?

2        A       The newly-proposed disciplinary amendment,

3    Section 3.05, changed the ability to discipline a person from

4    the entire Board of Directors as a decision-making body to

5    which evidence would be presented to a quorum of the Executive

6    Committee.

7            The Executive Committee is comprised of six people,

8    one of whom is the president, and it is allowed to conduct

9    business with a quorum of three people.  So when three people

10   meet, if two of them are for discipline on the Executive

11   Committee, then that means two people have the power to control

12   a physician's career by disciplining them and giving them a

13   suspension or something else that has to be reported on

14   insurance forms, licensing, whatever.  And the newly-proposed

15   amendment said the Executive Committee under exigent

16   circumstances can exercise its power for even just disagreeing

17   with the political agenda of the leadership.

18            MS. HILAIRE:  Okay.  Dr. Rice, why don't we give

19   some context to your testimony.  Let me introduce Exhibit 1446.

20       I'd like to publish this document as long as there is no

21   objections by the defendants.  It's a June 25th, 2011, House of

22   Delegates minutes.

23            THE COURT:  Go ahead.

24            (Exhibit 1446 previously marked for identification.)

25       Q    (BY MS. HILAIRE:)  Do you have document 1446 in

1    front of you?

2        A    Yes.

3        Q    Okay.  If you look at the first page, the top

4    header.

5        A    Yes.

6        Q    What does that indicate?

7        A    This is the Minutes of the Meeting of the House of

8    Delegates of June 25th, 2011.

9        Q    Okay.  And if you look at the second highlighted

10   portion on this page, do you see that your name is there?

11       A    Yes, it is.

12       Q    Okay.  And next to your name it says "alternate."

13   Can you explain what that means?

14       A    Every academy elects the member of that academy to

15   be a delegate to the House of Delegates, and they also elect

16   alternates to the House of Delegates because on certain

17   occasions delegates are not able to perform their function in

18   order for the business of the academies and the organization to

19   move forward.  They don't want to be in a situation where they

20   don't have a quorum of delegates, so they elect alternates as

21   well as delegates.

22       Q    Okay.  So you were present at the June 25th, 2011,

23   meeting, correct?

24       A    That is correct.

25       Q    Okay.  Can you turn to page 7, please.

1      A      Okay.

2      Q      Okay.  Dr. Rice, can you read the first few lines of

3  3.05 Discipline which represents the proposed amendments?

4      A      (Reading:)

5              "The proposed new amendment:  The

6              Executive Committee, in the case of

7              exigent circumstances, may immediately

8              suspend the Association membership of any

9              member who has or may have committed acts

10             which are -- may have committed acts which

11             are considered to be inconsistent with or

12             interferes with the mission, proper

13             functioning, operation, or political

14             agenda of AAPS.  A majority of the

15             Executive Committee members must vote for

16             the suspension after a quorum is reached.

17             A telephonic conference call of the

18             Executive Committee meeting is sufficient

19             for ratification of the suspension.  The

20             member suspension must be approved within

21             90 days by a majority vote of the Board of

22             Directors after a quorum is reached."

23     Q      Okay.  And how many people were on the Executive

24  Committee as of June 2011?

25     A      At that time there were six people on it, to the

1    best of my --

2        Q    So in order to reach a quorum, how many people would

3    that take?

4        A    Three.

5        Q    And how many would it take to reach a majority?

6        A    Two.

7        Q    So Dr. Rice, explain the significance of the

8    proposed amendment compared to the version we just saw that was

9    in place with the 15th revision.

10       A    This member[*sic*] was clearly a power grab by the

11   Executive Committee.  This member -- this allowed them to be

12   accuser, judge, jury, and executioner for any member of the

13   organization, just two people.

14       Q    Okay.  And if you can for me, can you look to the

15   next paragraph there and read that to the jury as well?

16       A    (Reading:)

17            "The Executive Committee will be charged

18            with the handling of the investigation of

19            the member's activities leading to the

20            suspension"

21       Q    And what's troubling about that proposed amendment?

22       A    Well, what's troubling is that the persons who are

23   in the position of bringing an accusation are also responsible

24   for finding whatever it is that they can use to justify their

25   decisions.

1      Q      Okay.  And if you can for me, read the first few

2    sentences of the third paragraph.

3      A      (Reading:)

4            "The suspension may last for a period of

5            24 months to allow sufficient time for

6            further investigation.  The Executive

7            Committee can recommend that an official

8            hearing on the matter should commence as

9            in the process described in Section 3.05

10            or recommend that the suspension be

11            rescinded.  During the period of the

12            member's suspension, the member will no

13            longer meet the requirement of a member in

14            good standing as described in

15            Section 3.02.  Therefore, the member is

16            banned from contact, in any form, with

17            AAPS members, staff -- or staff unless

18            AAPS contacts the suspended member."

19      Q      Okay.  Thank you.

20            And can you please elaborate further what you found

21    troubling with respect to this paragraph in terms of due

22    process rights?

23      A      Well, if a person is banned from contacting or

24    speaking with any members or staff, then they don't have any

25    ability to defend themselves.  They don't have any ability to

1    gather evidence that might be beneficial in their defense.

2    They're basically shut off with no recourse.  That's neither

3    fair nor reasonable nor -- and is subject to the abuse of not

4    being done in good faith.

5        Q    Thank you.  And also according to these proposed

6    amendments, what happens to the AAPS's standing within the

7    organization?

8             MR. SCHNEIDER:  Objection.  Vague.

9             THE COURT:  Sustained.

10            THE WITNESS:  I'm sorry.  I didn't understand the

11   question.

12            MS. HILAIRE:  I'll -- I'll rephrase the question.

13       Q    (BY MS. HILAIRE:)  The provisions that you just read

14   also indicated that an AAPS member would not be in good

15   standing?

16       A    That's correct.  If a person is disciplined and not

17   in good standing, that's something, again, that would need to

18   be reported to any outside agency.  That would be a block that

19   would damage the --

20            MR. SCHNEIDER:  Objection.  Nonresponsive.

21            THE WITNESS:  -- employability of a physician who

22   has to answer questions concerning discipline on hospital

23   privilege applications or insurance or licenses.

24            THE COURT:  I think -- I think maybe you

25   misunderstood the question.  You're talking about consequences

1   to the member.  I think the question was consequences to the

2   organization.

3              THE WITNESS:  Oh, I'm sorry.

4      Q    (BY MS. HILAIRE:)  No, the question was whether or

5   not if your -- during this suspension stage, would the AAPS

6   member be in good standing within the AAPS organization?

7              THE COURT:  Okay.

8              THE WITNESS:  No.  This indicates that they would

9   not be held in good standing while they were suspended.

10     Q    Okay.  And the suspension was supposed to last for

11  two years, right?

12     A    It could last up to two years, yes, which would

13  bring people through several cycles of the --

14             MR. SCHNEIDER:  Objection.  The rest of the answer

15  is nonresponsive.

16             THE COURT:  Sustained.

17     Q    (BY MS. HILAIRE:)  Dr. Rice, you see there is a

18  large water print on this document that reads "Confidential"?

19     A    Yes.

20     Q    Do you know why that is placed on this document?

21     A    Well --

22             MR. SCHNEIDER:  Objection.  Lack of foundation.

23             THE COURT:  Sustained.

24     Q    (BY MS. HILAIRE:)  Dr. Rice, given that you were

25  present at these meetings, what information did you receive as

1    to the confidentiality of these proposed amendments?

2        A     There is a confidentiality agreement that people

3    sign when they serve as an officer within AAPS, and it's

4    supposed to control sharing of information on the outside.

5    However, the confidentiality agreement that AAPS handed out and

6    has been handing out --

7                MR. SCHNEIDER:  Objection.  Nonresponsive.

8                THE WITNESS:  May I finish my answer, your Honor?

9                THE COURT:  Hang on a sec.

10               THE WITNESS:  -- that confidentiality agreement says

11   that they can determine the things are confidential even after

12   the fact.

13               THE COURT:  Dr. --

14               MR. SCHNEIDER:  Your Honor, may we ask that the

15   witness be admonished to stop talking when there's an objection

16   pending and the Court is considering the objection?

17               THE COURT:  Mr. Schneider, you've got a difficult

18   job.  I'm going to let you do yours.  I'm going to do mine.

19               MR. SCHNEIDER:  Fair enough.

20               THE COURT:  All right.  The entire -- the

21   objection's sustained.  The answer is nonresponsive.

22               MS. HILAIRE:  That's fine, your Honor.  I'm going to

23   shift gears.

24        I'm going to introduce what was previously identified and

25   marked as Exhibit 1031.

```
 1              (Exhibit 1031 previously marked for identification.)

 2      Q      (BY MS. HILAIRE:)  Dr. Rice, do you know what this

 3 document is?

 4      A      Yes.  It is a document written by Dr. Okerblom.

 5      Q      Okay.  And you see at the bottom of this document it

 6 indicates that Dr. Okerblom indicates that he's representing

 7 Ms. -- Dr. Stewart?  Do you see that?

 8      A      Yes, I do.

 9      Q      Okay.  Did you have conversations with Mr. Okerblom

10 about this document?

11      A      Did I have conversations with Dr. Okerblom about the

12 document?  Yes.

13      Q      Yes.  And did you provide content to Dr. Okerblom

14 for this document?

15      A      Uhm, I probably did provide some content.

16      Q      Did you provide Dr. Okerblom with the Newby

17 complaint?

18      A      I don't remember specifically what I provided him at

19 this point in time.

20      Q      Okay.  Did -- did -- when you had conversations with

21 him, did you have an understanding that he was going to be

22 preparing a document?

23      A      I did have an understanding that he was going to

24 research and possibly prepare a document, yes.

25      Q      Okay.  And you took this document and distributed
```

1  this document at the June 25th, 2011, annual meeting, correct?

2      A     I did distribute some copies of this document to

3  various leaders and I think at least one Board member.

4      Q     Okay.  And approximately how many of these documents

5  did you distribute?

6      A     Between half a dozen and a dozen, probably.

7      Q     And where were you at the time when you distributed

8  this document?

9      A     At the annual meeting in Tysons Corner, Virginia.

10     Q     Okay.  And when you were there, was Dr. Stewart

11  present as well?

12     A     Yes.

13     Q     Did you witness Dr. Stewart handing this document

14  out?

15     A     I think I might have seen her hand one out to

16  somebody, but --

17     Q     Okay.  And before you handed this document out, did

18  you agree with the contents contained therein?

19     A     I'm sorry.  Did I agree with the content?

20     Q     Right.  Did you agree with what was stated, the

21  substance of what was in this document?

22     A     Most of it, yes.

23     Q     Okay.  And when you witnessed Ms. Stewart distribute

24  this document, did you see an altercation between herself and

25  Mr. Carbone?

1        A       Well, I saw Mr. Carbone being very angry in a

2    hallway, very red-faced and --

3                MR. SCHNEIDER:  Objection.  Nonresponsive.

4                THE COURT:  Sustained.

5        Q       (BY MR. CONWELL:)  What did you observe based upon

6    your observance of Mr. Carbone interacting with Dr. Stewart?

7        A       It appeared to me that Mr. Carbone was angry and he

8    was saying he wanted to talk to her privately.

9        Q       And what do you base your belief that he was angry?

10       A       He was very animated and his face was very red.

11       Q       Okay.  Did his voice rise?

12       A       His voice was above normal level, yes.

13       Q       Okay.  Did you also witness someone physically

14   assault Dr. Stewart at this June 25th, 2011, meeting?

15       A       I eyewitnessed Dr. Pardell slapping Dr. Stewart on

16   the chest with a copy of the preliminary legal opinion.

17       Q       And did -- based on your observations of that event,

18   did Dr. Stewart seem visibly upset?

19       A       She did.

20       Q       And how would you describe your belief that she

21   looked visibly upset?

22       A       Well, her facial expression indicated displeasure or

23   possibly even fear.

24       Q       Okay.  Did anybody approach you in any kind of angry

25   fashion about the fact that you were passing out this

```
 1   preliminary legal opinion?

 2        A    Nobody appeared angry with me about it.

 3        Q    Okay.  Did anybody hit you with any documents at all

 4   during this meeting?

 5        A    No.

 6        Q    Okay.  I'd like to shift gears now.

 7             So after the June 25th, 2011, meeting, I understand

 8   that you then started to have more conversations with

 9   Dr. Okerblom; is that correct?

10        A    I did have some more conversation with him, yes.

11        Q    Okay.  And what was the purpose of continuing your

12   conversations with Dr. Okerblom at this time?

13        A    Well, after reading Dr. Okerblom's preliminary legal

14   opinion, and at one point I think in the back of it he had said

15   that, you know, he was willing to do pro bono work for members

16   of the organization concerning the issues raised in the

17   document, and I felt he was -- he was a qualified person as an

18   M.D./J.D., physician/attorney, and being not a member of the

19   organization, a sort of outside party, a more objective, more

20   neutral party.

21        Q    And to your knowledge, were other doctors also

22   conferring with Dr. Okerblom about all of the ethical and

23   issues of misconduct that had been arising between late 2010

24   until now, the summer of 2011?

25        A    Quite a few doctors were in contact with
```

```
 1    Dr. Okerblom after the June 2011 meeting with voicing -- all
 2    voicing common concerns over the issues raised in the
 3    preliminary legal opinion and other issues that came to light
 4    after that.
 5         Q     Okay.  And previously you indicated that it was
 6    Dr. Pardell who had hit Dr. Stewart on her breast with the
 7    preliminary legal opinion.  Do you know Dr. Pardell's first
 8    name?
 9         A     His first name is Herbert.
10         Q     And do you know whether or not Dr. Herb Pardell was
11    on the Board of Directors?
12         A     Dr. Herbert Pardell has been a long-time member of
13    the organization.  He's a past president of the --
14              MR. SCHNEIDER:  Objection.  Nonresponsive.
15              THE COURT:  Overruled.
16              THE WITNESS:  Past president.  He had served on the
17    Board many times.  He was a delegate to the House of Delegates
18    and, in fact, the outcry against the disciplinary amendment --
19              MR. SCHNEIDER:  Objection.  Nonresponsive.
20              THE COURT:  All right.  You've answered the
21    question, Dr.
22              MS. HILAIRE:  Thank you, Dr. Rice.
23         Q     (BY MS. HILAIRE:)  Now, also after you began having
24    these conversations with Dr. Okerblom and with the preliminary
25    opinion, did you learn that there was going to be an
```

 1     implementation of the legal task force?

 2          A     I'm sorry?

 3          Q     Did you learn that there was going to be a task

 4     force committee formed?

 5                MR. SCHNEIDER:  Objection.  Leading.

 6                THE WITNESS:  I --

 7                THE COURT:  Overruled.

 8                THE WITNESS:  After the June meeting, I was elected

 9     to the Board of Directors, and at the November Board of

10     Directors meeting --

11                MR. SCHNEIDER:  Objection.  Nonresponsive.

12                THE COURT:  Overruled.

13                THE WITNESS:  At the November Board of Directors

14     meeting, Dr. Cerrato, the president, announced the formation of

15     a legal task force, if I remember correctly.

16          Q     (BY MS. HILAIRE:)  Other than just the announcement,

17     what information were you provided about the legal task force?

18          A     I don't think there was any specific information

19     given other than the announcement of its formation.

20          Q     Did you learn who was actually going to be appointed

21     to the legal task force?

22          A     I did not.

23          Q     Did you learn the purpose of the legal task force?

24          A     I did not.

25          Q     Then in December of 2011, did you prepare an open

1   letter?

2       A      I did prepare an open letter.  The amendment 3.05

3   that --

4              MR. SCHNEIDER:  Objection.  Nonresponsive.

5              MS. HILAIRE:  Dr. Rice, let me show you

6   Exhibit 1507, please.

7              (Exhibit 1507 previously marked for identification.)

8       Q      (BY MS. HILAIRE:)  Okay.  Have you had an

9   opportunity to look at this document?

10      A      Yes, I have.

11      Q      Okay.  And what is this document?

12      A      This document is a, uhm, response to a

13  miscommunication from the Board of Directors through official

14  channels stating that a disciplinary amendment to Section 3.05,

15  almost identical, not quite, just some minor changes, to the

16  one that had been presented at the June meeting that had been

17  withdrawn from the floor by a motion of Dr. Pardell to be taken

18  back into committee to be reconsidered.  And they called for

19  people to write in any objections, suggestions for the

20  disciplinary amendment.  And many people wrote in a lot of

21  things.  I did not.  I can't tell you all of them, but I know

22  of several people who sent things, including myself.

23             But anyway, the amendment that was presented back to

24  the Board in November had the same problems as the original

25  amendment --

1       Q      Dr. Rice, just so we can be clear, were those the

2  same issues that we just discussed previously with due process?

3       A      Right, exactly, the same issues with due process.

4  It allowed the Executive Committee to be the accuser, the fact

5  finder, judge, jury, executioner, the whole thing.  All of

6  those things which were objectionable in the first proposed

7  power-grab amendment in June were still present in the

8  newly-proposed amendment.

9              I vigorously had opposed it.  At that time I became

10  aware with a conversation with Dr. Castillo -- Castillo --

11             MR. SCHNEIDER:  Objection.  Nonresponsive.

12      Q      (BY MS. HILAIRE:)  I think you answered my question.

13             Who did you send this letter to?

14      A      This is an open letter to the House of Delegates.

15      Q      And did you also send it to any Board members?

16      A      I believe I sent it to the Board as well.

17      Q      And you also indicate there that you sent it to

18  alternate delegates?

19      A      Right -- that I was an alternate delegate, right.

20      Q      And so you were again voicing pretty publicly your

21  opposition to these amendments, correct?

22      A      Yes.  And -- and in it I expressed why I thought

23  this was a very, very dangerous course of action for the

24  organization, that it would have very serious implications.  It

25  would subject the organization to ridicule, much less

```
 1    discipline --

 2              THE COURT:  Dr. --

 3              THE WITNESS:  -- of the member.

 4              THE COURT:  -- I'm going to ask you to limit your

 5    responses directly to the question as phrased, for a couple of

 6    reasons.

 7              THE WITNESS:  Okay.

 8              THE COURT:  I think your counsel has probably

 9    explained that we would appreciate that your answers be

10    short --

11              THE WITNESS:  Okay.

12              THE COURT:  -- okay -- for the sake of one of the

13    jurors.

14              THE WITNESS:  All right.  Thank you.

15              MS. HILAIRE:  Okay.  I'd like to show Dr. Rice

16    Exhibit 1030, please.

17              (Exhibit 1030 previously marked for identification.)

18              MS. HILAIRE:  Can't get the full document, but I

19    think that's the most pertinent portion of the first page.

20         Q    (BY MS. HILAIRE:)  Dr. Rice, can you see this

21    document?

22         A    I do.

23         Q    And do you know what this document is?

24         A    I believe this is a letter from Dr. Okerblom to the

25    House of Delegates.
```

```
 1        Q    Okay.  And if you see on the -- within the first
 2   paragraph, Dr. Okerblom indicates that he's writing this
 3   document "on behalf of many concerned members."
 4             Do you see that portion?  Let me point it out for
 5   you.
 6        A    Right.
 7        Q    Do you see the section that I've underlined?
 8        A    I do.
 9        Q    Can you read that section, please.
10        A    (Reading:)
11             "You are hereby notified that several
12             concerned physician members and leaders of
13             your organization have authorized me to
14             formally demand on their behalf that you
15             and the AAPS cease and desist from
16             undertaking any actions that could result
17             in the suspension of rights of the
18             physician members who have or will in the
19             future" --
20        Q    Dr. Rice, can you slow down a little bit, please?
21        A    I'm sorry.
22        Q    Thank you.
23        A    (Reading:)
24             -- "cease and desist from undertaking any
25             actions that could result in the
```

UNITED STATES DISTRICT COURT

1              suspension of rights of a physician

2              member, who have or will in the future

3              have voiced concerns regarding the

4              conduct of the executive leadership

5              of the AAPS."

6         Q    Okay.  And that portion that says that Dr. Okerblom

7    was writing that on behalf of several concerned members, did

8    you authorize Dr. Okerblom to write this on your behalf?

9         A    I did.

10        Q    Okay.  And you were aware of other members that were

11   also joining in with Dr. Okerblom, correct?

12        A    Yes, I was.

13        Q    Okay.  Now, during this time in December of 2011,

14   are you having any conversations with Dr. Rice?

15        A    With Dr. --

16        Q    I'm sorry.  With Dr. Stewart.  I apologize.

17        A    No, I had had no conversations about any of the

18   ongoing activities in the organization with Dr. Stewart --

19        Q    Do you have any understanding as to whether or not

20   Dr. Stewart participated in any fashion with respect to this

21   document, Exhibit 1030?

22        A    No.  I knew as a result of the response that she had

23   received from --

24             MR. SCHNEIDER:  Objection.  This is nonresponsive.

25             THE COURT:  Sustained.

1                    THE WITNESS:  She said she didn't want to be

2      involved --

3                    MR. SCHNEIDER:  Objection.

4                    THE WITNESS:  -- with anything after --

5                    MR. SCHNEIDER:  Objection.  That's hearsay.

6           Q    (BY MS. HILAIRE:)  To your knowledge --

7                    THE COURT:  Overruled.

8           Q    (BY MS. HILAIRE:)  To your knowledge, was

9      Ms. Stewart involved in the preparation of this document?

10          A    No.  As I -- no.  Dr. Stewart was not involved at

11     all in this document.

12                   MS. HILAIRE:  Okay.  I'd like to turn your direction

13     to Exhibit 1762.

14                   (Exhibit 1762 previously marked for identification.)

15                   THE WITNESS:  Thank you.

16          Q    (BY MS. HILAIRE:)  And Dr. Rice, what is this

17     e-mail?

18          A    This e-mail's one I sent to Dr. Okerblom after

19     receiving the e-mail below indicating that the House of

20     Delegates meeting from December 19th was going to be cancelled

21     that had proposed the bylaws amendment that had -- had no due

22     process for members.

23          Q    And why did you forward this e-mail to Dr. Okerblom?

24          A    Because since I had asked him to write the letter

25     demanding that the leadership cease and desist from trying to

1    deprive members of rights, between my letter, my open letter,

2    and his demand letter of ceasing and desisting, that meeting of

3    the House of Delegates was cancelled and the bylaws still had

4    not been changed.

5         Q    And did you address this e-mail to Dr. Stewart?

6         A    No.

7         Q    Did you talk to Dr. Stewart about what you

8    considered a success with the cancelling of this meeting?

9         A    No.

10        Q    You testified earlier about other concerned members.

11   Can you specify any names as you sit here today as to who those

12   concerned members were other than yourself?

13             MR. SCHNEIDER:  Objection.  Lacks foundation.

14             THE COURT:  Sustained.

15        Q    (BY MS. HILAIRE:)  Dr. Rice, you previously

16   testified that you authorized -- that you were aware of

17   conversations between yourself and other members with

18   Dr. Okerblom.  Do you recall that?

19        A    Yes.

20        Q    Okay.  And the other members that were talking to

21   Dr. Okerblom were also individuals who you considered to be

22   concerned?

23        A    Correct.

24        Q    Okay.  Do you know the names of those individuals?

25             MR. SCHNEIDER:  Objection.  Vague.

1          THE COURT:  Overruled.

2          THE WITNESS:  Some of those individuals were members

3   of my academy, including Dr. Lemonick, Dr. Hanna, Dr. Cressey,

4   Dr. Rochelle, Dr. Pappas, Dr. Mukau.  Members of other

5   academies included Dr. Friedlander -- I can't think of any

6   other names right offhand, but there were quite a few.

7          MS. HILAIRE:  Okay.  Thank you.  And if we can show

8   the witness Exhibit 1525, please.

9      Q    (BY MS. HILAIRE:)  And Dr. Rice, if you could turn

10  to page 38, please.  Do you see this document?

11     A    Yes.

12     Q    Okay.  And what is this letter?

13     A    Uhm, this is a letter that I wrote to Mr. Carbone as

14  a member of the organization and as a member of the Board of

15  Directors requesting certain information that is allowed for

16  members under Florida law.  And being on the Board of

17  Directors, I was entitled to all of these things and additional

18  things because there's an implied duty to be informed to direct

19  an organization.  So directors should have complete open access

20  to all records or -- of an organization in order to be informed

21  to direct it properly.

22     Q    And Dr. Rice, had you previously requested these

23  types of documents?

24     A    I had requested a few things, one of which was to

25  look at the insurance policy that insured me as a director.  I

1    was never given that, and these things that I requested I was

2    also not given.

3         Q    Okay.  And have you received these documents to

4    date?

5         A    I have never received any of these things requested

6    to date.

7         Q    And do you recall when you requested these

8    documents, the date of this letter?

9         A    Uhm, the formal request was on the date of the 21st

10   of May.  That was when I mailed the letter out.

11        Q    In May of what year?

12        A    That would be 2012.

13        Q    And you indicated that there were many members who

14   approached you in regard to getting these documents.  Was one

15   of those members Dr. Stewart?

16        A    No.

17        Q    Do you know who were the members who approached you

18   about obtaining these financial documents?

19        A    I do.

20        Q    And who are they?

21        A    Dr. Ellen Rochelle and Dr. Lewis Friedlander.

22        Q    Do you recall any others?

23        A    I think Dr. Lemonick wanted it and there were a

24   number of other people.  Financial information was requested at

25   the 2011 June meeting.  They actually passed a sheet around for

1    signatures that people were promised a copy of the audit, and

2    nobody that requested the audit ever received it.

3         Q    Okay.

4              MR. SCHNEIDER:  Objection.  Move to strike.  That

5    lacks foundation.

6              THE COURT:  Sustained.

7              MS. HILAIRE:  And we'll move on to another question,

8    your Honor.

9         Q    (BY MS. HILAIRE:)  Why were you requesting these

10   documents?  Why were you requesting financials of AAPS?

11        A    Because we were concerned that lots of moneys were

12   being spent on lawsuits and being diverted from the mission and

13   purpose of the organization, and we wanted to see what the

14   financial health of the organization was.

15             We were concerned that we might be facing more legal

16   assessments -- I mean, a legal assessment to sustain the

17   litigation against the three suspended members who had not

18   received due process.

19        Q    Thank you.

20             Now -- and then later on -- that was, you said,

21   May 21st, 2012; is that correct?

22        A    Yes.

23        Q    Okay.  And then that same month there was a meeting

24   that you attended in May -- on May 30, 2012; is that right?

25        A    Right.  That's May 30 meeting of the Board of

 1   Directors.

 2        Q     Okay.  And did you appear in person or by phone?

 3        A     No, this was a telephonic meeting.

 4              MS. HILAIRE:  I'd like you to look at Exhibit 1334.

 5   That's okay.  1334, please.

 6              (Exhibit 1334 previously marked for identification.)

 7              THE WITNESS:  Thank you.

 8        Q     (BY MS. HILAIRE:)  And Dr. Rice, do you see your

 9   name indicated as someone that's present at this particular

10   meeting?

11        A     I do.

12        Q     And you recall being at the meeting?

13        A     I do.

14        Q     Can you turn to page 2, please.

15        A     Okay.

16        Q     Can you read Section D first?

17        A     (Reading:)

18              "Section D:  Document request by

19              Dr. Atwood Rice.  The Board considered and

20              discussed a letter request from Dr. Atwood

21              Rice, M.D./J.D, for certain records of

22              AAPS.  It was resolved that AAPS will

23              respond to this request" --

24              THE COURT:  Dr., Dr., she will come up here and get

25   you.

```
 1              THE WITNESS:  Okay.

 2              THE COURT:  Swear.

 3              THE WITNESS:  Okay.  Sorry.

 4          (Reading:)

 5              "The Board considered and discussed a

 6              letter request from Dr. Atwood Rice

 7              M.D./J.D. for certain records of the AAPS.

 8              It was resolved that the AAPS will respond

 9              to this request in accordance with the

10              applicable law."

11      Q    (BY MS. HILAIRE:)  And that portion is the -- that's

12   the letter that we just reviewed for May -- that you'd

13   written -- that you wrote -- sorry -- on May 21st, 2012?

14      A    This refers to that letter which we just were shown

15   a few minutes ago requesting records quoting Florida law.

16      Q    And then can you read the next section for me,

17   Section E?

18      A    (Reading:)

19              Section E, Removal of Dr. Atwood Rice:

20              The Board considered and discussed whether

21              Dr. Rice's past and present conduct was

22              not in the best interests of AAPS and

23              otherwise violated his fiduciary

24              obligations as a member of the Board.

25              Motion was made" -- that was made by
```

1                    Dr. Montes -- or by Dr. Gallagher, I'm

2                    sorry -- "and seconded by Dr. Montes, to

3                    remove Dr. Atwood from the Board of

4                    Directors for conduct not in the best

5                    interests of AAPS, pursuant to sections

6                    6.09 and 7.09 of AAPS bylaws.

7                    Following an executive session of the

8                    Board to further consider and discuss the

9                    pending motion, the Board unanimously

10                   voted to remove Dr. Rice as a member of

11                   the Board effective immediately."

12        Q     And were you, in fact, removed as a Board member?

13        A     Right.  The procedure that was followed once that

14   motion was made, I was asked to get off of the telephone call.

15   I was told I would be called back in about 20 minutes or

16   30 minutes after they had had a discussion.  I was called back

17   in 20 or 30 minutes and asked if there was anything I wanted to

18   say in my defense, and I said, "What am I charged with?"

19             They didn't answer the question.  They said, "Do you

20   have anything to say in your defense?"

21             And I said, "I've never done anything except open in

22   front of the Board as far as my duties of providing, you know,

23   representation.  And what I've said I've said publicly.  So" --

24        Q     So from that point on you were removed from the

25   Board, right?

1           A       From that point on I was removed from the Board.

2    Dr. Cerrato called me back and said I would have information

3    about how to appeal.  I got a overnight letter from Mr. Ratner,

4    Mr. Kruzhkov's associate, the next day saying there would be no

5    appeal, even though the bylaws specifies that you can have an

6    appeal.

7           Q       Thank you.

8                   Now, moving forward to the next month, I understand

9    you've now been removed, but you -- as a Board member.  But

10   there is still going to be an annual meeting in June of 2012;

11   is that right?

12          A       Yes, that's correct.

13          Q       And where was that meeting going to be held?

14          A       That meeting was held in Marina Del Rey, California.

15          Q       And what was that meeting?

16          A       It was the annual meeting, annual scientific

17   meeting.

18          Q       And could you attend the meeting?

19          A       Yes, I was able to attend the meeting.

20          Q       Since you were removed from the Board, would you

21   still be able to make any -- cast any types of votes at the

22   June 2012 meeting?

23          A       No.  I was not --

24                  MR. SCHNEIDER:  Objection.

25                  THE WITNESS:  -- allowed to vote.

```
1                  THE COURT:  Hang on, Dr.  Hang on.

2          What's your objection?

3                  MR. SCHNEIDER:  That it's vague as to votes as to

4    what.

5                  THE COURT:  All right.  Sustained.

6          Q     (BY MS. HILAIRE:)  Dr. Rice, were you able to make

7    any type of votes with respect to discipline at the June 2012

8    meeting?

9          A     No.  After being removed, I was not allowed to vote

10   in the Academy of Emergency Medicine --

11                 MR. SCHNEIDER:  Objection.  Objection.

12                 MS. HILAIRE:  You've answered the question.  We'll

13   move on.

14         Q     (BY MS. HILAIRE:)  When you entered the meeting, did

15   you observe any security guards?

16         A     Did I observe what?

17         Q     Any security guards?

18         A     There was a security guard outside of the Board of

19   Directors meeting, yes.

20         Q     And during this meeting, was there a portion of the

21   meeting where there was a PowerPoint presentation?

22         A     Yes, there was a PowerPoint presentation.

23         Q     And who was presenting?  Who was presenting the

24   PowerPoint?

25         A     Dr. Cerrato.
```

```
 1        Q     Okay.  And who was standing next to Dr. Cerrato?

 2        A     Mr. Ratner.

 3        Q     And who else was present on the stage with

 4   Mr. Ratner and Dr. Cerrato?

 5        A     Mr. Carbone was there from time to time.

 6        Q     I'd like to show you again Exhibit 1525.  It's

 7   already been marked and admitted.  And Dr. Rice, can you turn

 8   to page 27?

 9        A     27?

10        Q     And to the left at the bottom it says 1525-27.

11        A     I see.

12        Q     Have you -- did you ever learn that Dr. Stewart

13   maintained a blog?

14        A     To the best of my knowledge, Dr. Stewart never had a

15   blog.

16        Q     Did you ever learn that Dr. Stewart maintained a Web

17   site?

18        A     I don't believe Dr. Stewart maintained any Web

19   sites.

20        Q     Okay.  And can you turn to the next page for me?

21        A     Okay.

22        Q     Do you recognize who wrote this which is being

23   attributed to Dr. Stewart?

24        A     I believe this refers to Dr. Radentz who made a trip

25   to Russia.
```

UNITED STATES DISTRICT COURT

```
 1        Q     Okay.  And previously you indicated that standing

 2   next to Dr. Cerrato whom was the person presenting the slides

 3   was a Mr. Ratner.  Can you specify or provide more information

 4   as to who Mr. Ratner is?

 5        A     Mr. Ratner was associate attorney with

 6   Mr. Kruzhkov's firm.

 7        Q     Okay.  And when you were at the meeting, did you

 8   also hear Mr. Cerrato call for either Dr. Radentz or

 9   Dr. Stewart to come forward?

10        A     I believe at the end of this PowerPoint presentation

11   he said that if they wanted to come forward and defend

12   themselves, that they would be welcome to come forward and

13   defend themselves.

14        Q     Did you have an understanding that Dr. Stewart

15   couldn't get into the building?

16        A     Did I understand that Dr. Stewart what?

17        Q     Could not get into the building?

18        A     No, I think Dr. Stewart could not get into the room.

19        Q     Okay.  Thank you.

20              Have you ever heard Mr. Carbone make any derogatory

21   comments about women?

22        A     Well, I've occasionally heard him use the B word,

23   you know, in relation to some women.

24        Q     And when you refer to the B word, you're referring

25   to the word bitch?
```

1          A      Yes.

2          Q      And how many occasions have you heard Mr. Carbone

3    refer to females as bitch?

4          A      Just a handful.  Not many.

5          Q      What was the context or where were you when you

6    heard Dr. -- Mr. Carbone refer to women as bitches?

7          A      I don't -- it would have been at AAPS at

8    headquarters as one meeting I attended for one reason or

9    another, but it wasn't like he was doing it all the time.

10             MS. HILAIRE:  Okay.  Thank you.  I have no further

11   questions.

12             THE COURT:  Cross.  Oh, actually, Mr. Schneider, you

13   can have a few minutes to set up.  We're going to take our

14   first morning break now, 15 minutes.

15         Ladies and gentlemen, let's come back at 9:30.  Remember

16   the admonition, please.

17             THE COURTROOM DEPUTY:  All rise.

18             (Open court out of the presence of the jury.)

19             THE COURT:  Anything?  Okay.  15.

20             (A recess was taken.)

21             (Open court in the presence of the jury.)

22             THE COURT:  All right.  We've been joined by the

23   jury.  Everyone's present.  And Dr. Rice has resumed his place

24   on the witness stand.

25         Mr. Schneider, you can begin your cross.

```
 1              MR. SCHNEIDER:  Thank you, your Honor.
 2                         CROSS-EXAMINATION
 3   BY MR. SCHNEIDER:
 4         Q     Dr. Rice, would you please take a look at
 5   Exhibit 1446.
 6         A     Yes.
 7         Q     These are Board minutes, are they not?
 8         A     Uhm, these are minutes of the House of Delegates.
 9         Q     I'm sorry.  House of Delegates.  And that's a
10   meeting that you attended, correct?
11         A     That's correct.
12         Q     And that was on June 25, 2011?
13         A     Yes, sir.
14         Q     And that was in Tysons Corner, Virginia?
15         A     Yes, sir.
16         Q     Would you take a look, please, at the fourth page of
17   that document.
18         A     The fourth page?
19         Q     Yes, sir.
20         A     Okay.
21         Q     Yes, Dr.  Actually, do you see four -- Roman numeral
22   IVb, AAPS BOD Approved Bylaws Amendment?
23         A     Yes.
24         Q     Had you been at the -- well, would you take a look
25   at that amendment, please.  It provides that 3.06 be amended,
```

```
 1    and it says, (Reading:)
 2              "Effective termination of membership
 3              whereby Dr. Pardell motioned to recommit
 4              Article III, 3.06, Effective Termination
 5              of Membership back to the AAPS Board of
 6              Directors to remove the wording:  'As well
 7              as any certificate of degree of fellow
 8              issued to him or her by the Association or
 9              by any organization affiliated with the
10              Association.'"
11              And then it says, "Also remove the wording
12              'or as the holder of any of its honors.'"
13        A     That's correct.
14        Q     And you understood that the procedure for amending
15    the bylaws entailed the Board of Directors first passing a
16    motion to amend the bylaws?
17        A     That's correct.
18        Q     And then it would have to be ratified by the House
19    of Delegates in order to be of effect?
20        A     That's correct.
21        Q     Do you recall this particular amendment?
22        A     Uhm, yes.
23        Q     And wasn't the effect of that amendment to allow
24    members who have been expelled to maintain their certification?
25        A     Uhm, it doesn't say word certification.  It just
```

```
 1   says "certification of degree of fellow or any of its honors,"

 2   and I don't -- I assume that's meant, you know, like awards and

 3   stuff.

 4        Q    So you did not understand that the Board of

 5   Directors had approved an amendment to allow doctors to keep

 6   their certification if they had been expelled from membership?

 7        A    Not at that time.

 8        Q    Would you take a look now at Exhibit 1507, please.

 9             Actually, if you could look at Exhibit 1030 first.

10        A    You said 1030?

11        Q    Yes, sir.

12        A    Thank you.

13        Q    Dr. Rice, do you recall this item is an e-mail from

14   Dr. Okerblom to a number of different people?

15        A    Yes, I do.

16        Q    And that included the House of Delegates?

17        A    Yes, it did.

18        Q    And the Board of Directors?

19        A    Yes.

20        Q    And it begins, "To all officers, Board members" --

21   make this a little bit bigger -- "To all officers, Board

22   members, and members of the House of Delegates, collectively

23   and individually."

24             That's who it was sent to, correct?

25        A    That is.
```

1    Q    And as Ms. Hilaire had asked you, it begins, "You

2    are hereby notified that several concerned physician members

3    and leaders of your organization have authorized me to formally

4    demand on their behalf," etc.

5         You see that?

6    A    Yes.

7    Q    Wouldn't you agree that nowhere within this letter

8    are the physician members and leaders identified by name?

9    A    Nowhere in the letters, but in the headings to the

10   people to whom it was sent.

11   Q    No.  I'm referring to the people on behalf of whom

12   the letter was sent.  The letter doesn't identify them by name,

13   does it?

14   A    Uhm, I don't remember any specific individuals being

15   named in it.

16   Q    Okay.  If you could go to the next page, please.

17        Okay.  It says (Reading:)

18        "Litigation is currently being prepared

19        that alleges that the executive leadership

20        have breached the fiduciary duties that

21        they owe to the AAPS and its members and

22        will seek to enjoin them from further

23        harming the organization.  The litigation

24        will seek to recover monetary damages

25        against them for the harm that they have

```
 1              caused the organization."

 2              You see that?

 3    A         Yes.

 4    Q         And then further down the page, it says (Reading:)

 5              "Prior to voting for such bylaw

 6              amendments, you are hereby advised to seek

 7              legal advice with regard to your potential

 8              liability for aiding and abetting the

 9              executive officers and executive staff

10              members of the AAPS in breaches of

11              fiduciary duty that they owe to the

12              members of the AAPS."

13              And you see that?

14    A         I do.

15    Q         Okay.  And lastly it says (Reading:)

16              "Any persons who knowingly assist the

17              executive leadership to violate their

18              fiduciary duties may be named as

19              co-defendants in a number of legal actions

20              that are currently being drafted and that

21              are expected to be filed within 90 days of

22              the time that the proposed amendments are

23              ratified."

24              You see that as well, don't you?

25    A         I do.
```

```
1        Q    And this is the letter from Dr. Okerblom?

2        A    Yes.

3        Q    I would now like you to look at your -- at

4    Exhibit 1446.

5             THE COURTROOM DEPUTY:  You have that one?

6             THE WITNESS:  No.

7             THE COURTROOM DEPUTY:  Okay.  All right.

8             THE WITNESS:  Okay.

9        Q    (BY MR. SCHNEIDER:)  And this is your letter to

10   Dr. Russo, correct?

11       A    No, 1446 is minutes of the House of Delegates.

12       Q    Oh, I'm sorry.  Would you look at 1748?  My mistake.

13   We didn't -- is that -- sorry.

14            THE COURTROOM DEPUTY:  I don't have 1748.  Oh, you

15   did.  Okay.  Give me a second.

16        There you are.

17            THE WITNESS:  All right.  Thank you.

18       Q    (BY MR. SCHNEIDER:)  This says "From A. L. Rice."

19   That is you, is it not?

20       A    It is.

21       Q    And you sent it to a number of people?

22       A    That is correct.

23       Q    And you were addressing a proposed amendment to

24   expand the authority of the Executive Committee?

25       A    No.  I was addressing many things in this particular
```

1    letter.

2        Q    Well, nowhere in this letter did you threaten to sue

3    anyone, did you?

4        A    Uhm, no.

5        Q    Thank you.

6             Would you take a look now at Exhibit 1507, please.

7    And this is your letter concerning the proposal to expand the

8    authority of the Executive Committee?

9        A    That is correct.

10       Q    And this is just a few days before Dr. Okerblom's

11   letter on the same subject, is it not?

12       A    I believe it is.

13       Q    Dr. Rice, you felt very strongly that this

14   particular amendment was not in the best interests of AAPS,

15   didn't you?

16       A    I did.

17       Q    You felt impassioned about it, did you not?

18       A    I did.

19       Q    But even though you felt impassioned, nowhere in

20   this letter did you threaten to sue anyone, did you?

21       A    I did not.

22       Q    Okay.  I'd like you to turn back to -- what

23   happened? -- Exhibit 1030, please.  Do you have that in front

24   of you now?

25       A    Yes, I do.

```
 1        Q     Do you recall a letter from Dr. Okerblom where he
 2   accused the Board of Directors of committing fraud by not
 3   disclosing Dr. McCann's condition at the House of Delegates
 4   meeting?
 5        A     Not specifically.
 6        Q     Well, you yourself never accused in writing the
 7   Board of Directors of committing fraud with regard to telling
 8   the House of Delegates that Dr. McCann had to leave that
 9   meeting because of a family emergency, did you?
10        A     I don't recall ever doing that, no.
11        Q     Thank you.  Yeah, I would like you to look now,
12   please, at Exhibit 1317.
13        A     Thank you.
14        Q     And if you would look at page 22, please.  And Dr.,
15   this is the 15th revision of the bylaws of AAPS?
16        A     That's correct.
17        Q     Okay.  Do you see Section 6.09?
18        A     I do.
19        Q     And you recall testifying about this section just a
20   few minutes ago?
21        A     I do.
22        Q     And this relates to removal of directors?
23        A     Correct.
24        Q     And you testified that you were removed as a
25   director during the course of the May 30, 2012, Board of
```

```
 1    Directors meeting, correct?
 2         A    That is correct.
 3         Q    And you testified that you were not given the
 4    opportunity to appeal?
 5         A    That's correct.
 6         Q    And you testified that this section provided that
 7    you had the right to appeal, correct?
 8         A    Uhm, one of the sections did.  Uhm --
 9         Q    Well, Dr., isn't it true that nowhere in the bylaws
10    is there a right of a removed director to appeal his or her
11    removal from the Board of Directors?
12         A    Uhm, Section 7.09 to the bylaws says that any
13    officer so removed may appeal such removal to the president's
14    advisory committee.
15         Q    Dr. Rice, you were not an officer, were you?
16         A    A member of the Board of Directors is considered an
17    officer.
18         Q    Really?  By whom?
19         A    I think by everybody that elects them.
20         Q    Oh.
21         A    You have to be an officer of your academy to serve
22    on the Board.
23         Q    Okay.  Dr., let's take a look at Section 7 of the
24    bylaws.  And Section 7.01 identifies who the officers of the
25    Association are, doesn't it?
```

```
 1      A      It does.

 2      Q      Thank you.

 3      A      And in the -- in the Board --

 4      Q      You've answered the question, sir.

 5      A      In the Board minutes --

 6      Q      You've answered the question, sir.

 7             THE COURT:  Hang on.

 8      Q      (BY MR. SCHNEIDER:)  This section provides that one

 9  of the officers is the president, correct?

10      A      It does.

11      Q      And another is immediate past president?

12      A      Yes.

13      Q      President-elect?

14      A      Yes.

15      Q      Secretary/treasurer?

16      A      Yes.

17      Q      And member officer?

18      A      Right.

19      Q      You don't see anywhere in this paragraph that anyone

20  else other than those people I just identified is an officer,

21  do you?

22      A      Not in this.  Paragraph --

23      Q      Thank you.  Paragraph, yes?

24      A      Pardon?

25      Q      Please go ahead.
```

```
1        A      In -- in the Board minutes it referred me to 7.09.
2   It said I was removed according to 6.09 and 7.09.
3        Q      Okay.  But 7.09 didn't apply to you because you
4   weren't an officer, correct?
5        A      No -- well, I believed I was an officer and I think
6   that they did as well; that's why it was in the minutes.
7               MR. SCHNEIDER:  Thank you.  I have no further
8   questions.
9               THE COURT:  Redirect?
10              MS. HILAIRE:  Thank you, your Honor.
11        Thank you for your patience, jurors.
12                        REDIRECT EXAMINATION
13  BY MS. HILAIRE:
14       Q      Dr. Rice, are you a member in good standing?
15       A      I'm sorry?
16       Q      Are you an AAPS member in good standing?
17       A      Yes, ma'am.
18       Q      Have you been formally disciplined?
19       A      I have not been.
20       Q      Are you currently in any litigation with AAPS?
21       A      I am not.
22       Q      Okay.  I'd like you to turn to Exhibit 1030.
23       A      Thank you.
24       Q      Okay.  And Mr. Schneider asked you a serious of
25  questions about whether or not there were any specific names on
```

```
 1    this document.  Do you recall that testimony?
 2         A    I do.
 3         Q    And irrespective of whether there are any names on
 4    this document, you had conversations with Dr. Okerblom about
 5    this very document, correct?
 6         A    I did.
 7         Q    And you were very concerned about the issues that
 8    are raised in this document, right?
 9         A    Uhm, yes, for the most part.
10         Q    And you -- you wanted Dr. Okerblom to write about
11    these issues because they were issues that were of great
12    concern to you?
13         A    That's -- that's correct.
14         Q    Okay.  And so when you gave Dr. Okerblom the
15    authority to write this on your behalf, you did so irrespective
16    of the fact that your name is written on it, correct?
17         A    I'm sorry?
18              MR. SCHNEIDER:  Objection --
19              THE WITNESS:  So without respect to my name being on
20    it, you mean?
21              MS. HILAIRE:  Correct.
22              THE WITNESS:  Yes.
23         Q    (BY MS. HILAIRE:)  So let me rephrase the question,
24    Dr. Rice.
25              Your name is not on this document; that's been
```

1  established, right?

2      A    Well, my name is at the top of the document, but

3  otherwise, no.

4      Q    I meant, you -- your name is not indicated

5  specifically that Dr. Okerblom is writing the document on your

6  behalf?

7      A    That's correct.

8      Q    But that does not negate the fact that you told him

9  and gave him authority to prepare this on your behalf, right?

10     A    Right.  I -- I suggested to him that he --

11          MR. SCHNEIDER:  Objection.  Nonresponsive.

12          THE COURT:  "Right" will suffice.  Anything after

13  that is stricken.

14          THE WITNESS:  All right.  Yes.

15     Q    (BY MS. HILAIRE:)  Dr. Rice, what did you understand

16  that Dr. Okerblom -- I think you were cut off -- was going to

17  be doing to prepare this document?

18     A    My understanding was that he was going to represent

19  a demand that the Board -- or House of Delegates cease and

20  desist on trying to pass an amendment that would be contrary to

21  Florida law and contrary to the due process due our members.

22     Q    And did you have conversations with Dr. Okerblom

23  about litigation, about potential litigation?

24     A    I had conversation with Dr. Okerblom concerning the

25  possibility of filing for a derivative suit along with a number

1    of other members.

2         Q    Right.  And who were those other members that you

3    just mentioned?

4         A    Uhm, Dr. Lemonick was one.  I think Dr. Hanna was

5    one.

6         Q    Had you ever become aware of any information that

7    Dr. Stewart was involved or had any interest with respect to

8    bringing any claims tied to a derivative suit against AAPS?

9         A    Dr. Stewart expressed that she didn't want to be

10   involved any more at the June meeting in any -- any ongoing

11   controversies in AAPS.

12        Q    Okay.  I'd like to direct your attention to

13   Exhibit 1748.  Okay.  Do you see this document, Dr. Rice?

14        A    I do.

15        Q    Okay.  Now, Attorney Schneider wanted to ask you a

16   couple -- or did ask you questions about what was not contained

17   in this document, and I want to go through and talk about what

18   is contained in this document.

19             And if you look, there's a star?

20             MR. SCHNEIDER:  Your Honor, this is beyond the

21   scope.

22             THE COURT:  I don't know yet.  Why don't you wait

23   for the question to be completed.

24             MS. HILAIRE:  Well, as a foundation, your Honor,

25   Dr. --

```
 1              THE COURT:  No, no.  Just go ahead.

 2              MS. HILAIRE:  Thank you.

 3         Q    (BY MS. HILAIRE:)  Dr. Rice, can you look where the

 4    star is there?

 5         A    I see it.

 6         Q    Now, in this paragraph, you are indicating the

 7    responsibility that the Board of Directors has to AAPS to

 8    ensure that it's acting responsibly, correct?

 9         A    Yes.

10         Q    Okay.  And then even if you move further down the

11    document, you refer to behavior as tyranny.  Do you recall

12    that?

13         A    Refer to the behavior as what?

14         Q    Tyranny?

15         A    Tyranny?

16         Q    Tyranny, sorry.  Did I say tyranny?

17              THE COURT:  West L. A.

18         Q    (BY MS. HILAIRE:)  If you look on page 3?

19         A    Yes.

20              MR. SCHNEIDER:  Your Honor, we object.  This is

21    beyond the scope.

22              THE COURT:  I'm waiting on a question.  Hang on a

23    sec.

24         Q    (BY MS. HILAIRE:)  Dr. Rice, do you see the -- at

25    the bottom of the paragraph?
```

```
1        A      Yes.

2        Q      Okay.  Could you read where my hand is here?

3        A      (Reading:)

4               "When a tyranny exists, it must be" --

5               I have to find it on here.

6               MR. SCHNEIDER:  Your Honor, we object.  This is

7   beyond the scope.

8               MS. HILAIRE:  Your Honor, Mr. Schneider indicated

9   that Dr. Rice did not indicate that he wanted to sue AAPS, and

10  what I'd like to establish is that although Dr. Rice did not

11  indicate that, there are still a lot of strong opposition that

12  he did in this document, and I think that should be brought to

13  the jurors' attention.

14              THE WITNESS:  (Reading:)

15              "When tyranny exists, it must be

16              surrounded by a web of lies, a culture of

17              secrecy and repression, and a network of

18              informants retained by the -- retained

19              by" --

20              THE COURT:  "Self-interest"?

21              THE WITNESS:  (Reading:)

22              -- "self-interests, by the -- to

23              manipulate self-interest, including bribes

24              and threats of coercion.  Every effort is

25              made by the tyranny to control the flow of
```

```
 1                   information so that people can be

 2                   manipulated, the truth presented

 3                   selectively, and the right spin put on

 4                   things so that above all power, hopefully

 5                   absolute power in the case of most

 6                   tyrants, is retained by those in control.

 7                   Because justice is sometimes delayed, some

 8                   believe it will never happen.  Therefore,

 9                   tyrannies continue and sometimes

10                   revolutions happen.  It comforts me to

11                   believe that God keeps accounts."

12        Q    Okay.  And when you used the word tyranny, who were

13   you referring to?

14        A    The executive leadership of AAPS that had suspended

15   Drs. Castillo, Geller, and Klein.

16        Q    And if you could turn to page 4 of this for me,

17   Dr. Rice?

18        A    Okay.

19        Q    And you see there I've underlined "Coincidental,

20   maybe, if not criminal."  Do you see that?

21        A    Yes.

22        Q    And you were -- what were you referring to there?

23        A    Uhm, Dr. Radentz had posted things on the members'

24   LinkedIn Web site which were removed by the leadership and she

25   was sent a letter threatening that.  In addition to that,
```

```
 1   shortly after that had occurred, she experienced some major
 2   hacking on her computer, uhm, and it severely damaged her
 3   computer.  And she linked it with her activity of blogging and
 4   maybe it was coincidental and maybe it was not.  If it was not,
 5   then it was a criminal act to mess with her computer.
 6        Q    And you were indicating that there was a potential
 7   of criminality that was existing also within AAPS leadership,
 8   right?
 9        A    Yeah, if they had anything do with that.  I'm not
10   saying they did it.
11        Q    Okay.  And also along these lines of threats, you
12   testified yesterday that you had a conversation with Betsy
13   Schenck.  Do you recall that?
14        A    Yes.
15        Q    And in that conversation you specifically stated
16   there could be lawsuits and threatened the fact there could be
17   potential lawsuits based on the behavior of AAPS leadership,
18   right?
19        A    Right.  My understanding of the disciplinary --
20             MR. SCHNEIDER:  Objection.  Beyond -- it's
21   nonresponsive.
22             THE COURT:  Hang on.
23             THE WITNESS:  -- indicated that --
24             THE COURT:  Hang on a sec.
25             THE WITNESS:  Oh, I'm sorry, your Honor.
```

```
 1              THE COURT:  Okay.  Everything after "Right" is
 2    stricken.
 3              MS. HILAIRE:  Your Honor, what was the ruling?
 4              THE COURT:  Everything after the word "Right" in his
 5    answer is stricken.
 6         Q    (BY MS. HILAIRE:)  Okay.  And can you explain why
 7    you made that belief?
 8         A    I believe that the disciplinary provisions that
 9    existed during the time of the suspensions of Drs. Castillo,
10    Geller, and Klein did not provide for the Executive Committee
11    to act in the fashion that it did in suspending them.  And I
12    was concerned because the provisions that existed under the
13    bylaws at that time indicated that a doctor that was suspended
14    would lose his or her certification and would have to answer
15    all the questions on the insurance licensing forms, hospital
16    applications that they had lost their certification or had been
17    disciplined.  And the end results of that would be devastating
18    to those doctors' careers.
19              And I believe that the process -- after reviewing
20    Florida law as an attorney, I believe that the process did not
21    meet the law's standards of fair and reasonable, and were
22    subject to being done not in good faith.
23              And so I was concerned that Drs. Castillo, Geller,
24    and Klein who had been suspended originally for I think six
25    months while an investigation was pending would find themselves
```

```
 1   in a position of having to answer those questions in a way that

 2   would have been detrimental to their careers.

 3           And I -- I -- at the time I found out about the

 4   suspensions and was talking to Dr. Schenck who was on the

 5   Executive Committee, she did not have any answers about how the

 6   investigation was going, who was in charge of the

 7   investigation, how long it was expected to take, and I actually

 8   warned her.  I said, "Do you understand that what you have done

 9   is going to be damaging to these physicians and that if you

10   don't resolve it very quickly, you are likely to wind up

11   getting the organization into lawsuits?"

12      Q    Thank you --

13           THE COURT:  Dr. --

14      Q    Thank you, Dr. Rice.  Let's shift gears.

15           Dr. Rice, you were also asked a series of questions

16   with respect to the bylaws being amended in Section 3.06 which

17   is the effective termination.  Do you recall that testimony?

18      A    Yes.

19      Q    Okay.  Can you please look at 1446 so we can remind

20   the jury with respect to the exact portion of the minutes that

21   Mr. Schneider was questioning you on?

22      A    Okay.

23      Q    And that's on page 4, Dr. Rice.

24      A    Okay.

25      Q    Okay.  And do you see this section --
```

1      A      Yes.

2      Q      -- for 3.06, the amendment?

3      A      Uhm, yes.

4      Q      And I believe you formed -- or testified that you

5   did not have the understanding that the -- this amendment went

6   into effect in June of 2011; is that right?

7      A      I did not have the understanding that it, uhm, would

8   allow the board certification to remain intact.

9      Q      Right.  And so I'd like you now to look back at

10  Exhibit 1317 and that is page 9, Dr. Rice.

11     A      Okay.

12     Q      And do you see there next to 3.06 is the title

13  Effective Termination of Membership?

14     A      I went too far.  Okay.

15     Q      It's page 9?

16     A      Yes, I have it.

17     Q      Okay.  And before -- do you see that?

18     A      Yes.

19     Q      Okay.  And do you -- do you have an understanding

20  that this was the verbiage that was in place for the 15th

21  revision with respect to effective termination, meaning that if

22  you -- if your membership was terminated, then you no longer

23  were certified?

24     A      That is correct.

25     Q      Okay.

```
 1          A     It specifically states that, that if your membership

 2    is terminated, you don't -- you're no longer certified.

 3          Q     Okay.  And let's look at the first page of this

 4    bylaws, the 15th revision -- sorry -- the second page.

 5                And do you see where it says "15th revision adopted

 6    June 25th, 2011"?

 7          A     I do.

 8                MS. HILAIRE:  Okay.  And I now want to turn your

 9    attention to Exhibit 1341.

10                (Exhibit 1341 previously marked for identification.)

11                THE COURTROOM DEPUTY:  -31 or -41?  What did you

12    say?

13                MS. HILAIRE:  1341.

14                THE COURTROOM DEPUTY:  Oh, -41, okay.

15          Q     (BY MS. HILAIRE:)  Okay.  And can you read in that

16    Section 3.06.

17          A     (Reading:)

18                "Effective termination of membership:  A

19                member of the Association who is no longer

20                a member in good standing or whose

21                membership has been terminated shall

22                forthwith return to the Association his or

23                her membership certificate; shall no

24                longer qualify to hold any office or

25                position whatsoever in the Association or
```

```
1                in any organization affiliated with the

2                Association; shall be stricken from the

3                rolls of membership in the Association and

4                any -- and in any and all organizations

5                affiliated with the Association; and shall

6                no longer hold himself or herself out as a

7                member of the Association."

8        Q     And so now pursuant to the 16th revision, now there

9    is no longer any verbiage related to certification, correct?

10       A     There's no direct verbiage.  But the American Board

11   of Physician Specialty --

12             MR. SCHNEIDER:  Objection.  Move to strike.

13       Q     (BY MS. HILAIRE:)  And if you can for me, Dr. Rice,

14   can you look at the top -- go again to the second page of that

15   document?

16       A     The top of the second page?

17       Q     Correct.

18       A     Okay.

19       Q     And when were these revisions adopted?

20       A     June 25th, 2012.

21             MS. HILAIRE:  Thank you.  I have no further

22   questions.

23             THE COURT:  Any recross?

24             MR. SCHNEIDER:  Yes, your Honor.

25                          RECROSS-EXAMINATION
```

```
 1   BY MR. SCHNEIDER:

 2        Q    Dr. Rice, you were just asked some questions about

 3   your letter where you researched coercion and tyranny.

 4        A    Yes.

 5        Q    And you indicated that based on your conversations

 6   with Dr. Schenck, you were concerned that there may be

 7   lawsuits?

 8        A    That is correct.

 9        Q    But, Dr., at no time did you ever put in writing any

10   indication that if a member of the House of Delegates were to

11   vote in favor of the amendment to expand the authority of the

12   Executive Committee, that that person could be sued based on

13   how he or she voted; isn't that correct?

14        A    I didn't personally put anything in writing about

15   that, no.

16        Q    You never threatened to sue people because of how

17   they were going to vote in the House of Delegates, did you?

18        A    I didn't make any direct threats to do that, no.

19        Q    Your threat related -- well, your comment regarding

20   the Klein, Geller, Castillo situation related to the fact that

21   the organization may face litigation in connection with those

22   suspensions?

23        A    That's correct.  The May -- May letter of 2011

24   referred to that.

25        Q    So -- and it didn't refer to how any individuals was
```

```
 1   going to vote, correct?

 2        A     No.

 3        Q     What I'm saying is correct, isn't it?

 4        A     Yes, that's correct, yes.

 5              MR. SCHNEIDER:  Thank you.  No further questions.

 6              MS. HILAIRE:  No further questions, your Honor.

 7              THE COURT:  All right.  You may step down, sir.  You

 8   go catch your plane.

 9              THE WITNESS:  Thank you, your Honor.

10              MS. HILAIRE:  Your Honor?  Your Honor, I just want

11   to make sure all of the exhibits that were identified to the

12   witness will be offered into evidence.

13              MR. SCHNEIDER:  We have no objection, your Honor.

14              THE COURT:  They'll all be received.

15              (Exhibits received into evidence.)

16              THE COURT:  Your next witness.

17              MR. CONWELL:  We're now going to present the

18   deposition testimony of Cassandra Newby.

19              THE COURTROOM DEPUTY:  Spell her name for the

20   record.

21              MR. CONWELL:  C-a-s-s-a-n-d-r-a, and second -- or

22   last name is N-e-w-b-y.

23              THE COURTROOM DEPUTY:  Thank you.

24              THE COURT:  All right.  Ladies and gentlemen, as you

25   heard counsel say, we're now going to hear the next witness
```

 1   testify via videotaped deposition.

 2       Now, a deposition is, in fact, tantamount to a court

 3   proceeding though it does not occur in court.  It most

 4   generally occurs in one of the offices of the attorneys

 5   involved in the litigation.  Attending a deposition normally

 6   are attorneys from either side of the litigation and a

 7   certified court reporter, like Ms. Read sitting in front of

 8   you.  And any parties to the litigation may also attend.

 9       The witness is placed under oath, questions are put to

10   them in much the same way as they would be put to them here in

11   the courtroom, and answers are provided.

12       In the event that witness is unable to appear at trial in

13   person, then that deposition may be used as though and in place

14   of live testimony.

15   **CASSANDRA NEWBY, PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED**

16                 **THROUGH VIDEOTAPED DEPOSITION**

17                         EXAMINATION

18            (Video played, not reported.)

19            MR. CONWELL:  That's the conclusion of that

20   deposition, your Honor.

21            THE COURT:  All right.

22            MR. CONWELL:  Our next deposition is Tony Russo by

23   deposition.

24            MR. SCHNEIDER:  Your Honor, before that testimony

25   comes on, may we address something with the Court?

```
 1                 THE COURT:  Yes.  Yes.

 2                 MR. SCHNEIDER:  I don't want to do so in the

 3     presence --

 4                 THE COURT:  I'm sorry.  I was only half listening.

 5     Something relative to?

 6                 MR. SCHNEIDER:  To the video testimony generally.

 7                 THE COURT:  Do we need to excuse the jury?

 8                 MR. SCHNEIDER:  Is it --

 9                 THE COURT:  Sidebar?  I don't know.  What's your

10     pleasure?  Yes, 11 o'clock we were planning to break, but given

11     the fact that that last witness testified via video, our

12     reporter wasn't working, really.

13         So, sidebar?

14                 MR. SCHNEIDER:  Yes.

15                 THE COURT:  I don't know when we'll take another

16     break unless someone says, "Hey, I need a break," okay?

17                 (Sidebar conference:)

18                 MR. SCHNEIDER:  I just want to know whether the

19     Court had considered any of our objections relative to that

20     testimony.

21                 THE COURT:  Yes.  I think I finished that one,

22     Russo.

23                 MR. SCHNEIDER:  Oh, no, I'm talking about the last

24     one.

25                 THE COURT:  I'm sorry.  You have to be more
```

```
 1   specific.

 2                 MR. SCHNEIDER:  The testimony that just happened.

 3                 THE COURT:  Specifically what objection and to what

 4   question?

 5                 MR. SCHNEIDER:  We had -- we object, actually, to

 6   every single question.

 7                 THE COURT:  Because they're all prejudicial?

 8                 MR. SCHNEIDER:  No, because they're all irrelevant

 9   because that's not what -- whether there was harassment or

10   whatnot is not relevant to this case.

11                 THE COURT:  If that was your objection, it would

12   have been overruled.

13                 MR. SCHNEIDER:  Okay.  That was our objection.

14                 THE COURT:  Okay.

15                 MR. SCHNEIDER:  Thank you.

16                 THE COURT:  Uh-huh.

17                 MS. HILAIRE:  We need to be heard.

18                 MR. CONWELL:  While we're here, your Honor, on this

19   next witness, I told you that there was some portion of it that

20   the media was not good and we were going to have to read some

21   of the Q and A.  And so, Ms. Hilaire is going to read the

22   questions and I'm going to read the answers.  I'll be

23   Mr. Russo, and then we'll go into the deposition.

24       There are questions asked of the witness regarding the

25   Exhibit 1591.2 which is in evidence, and so we've got copies of
```

```
 1   1591.2 which we'd like to furnish to the jury because he's

 2   being asked questions about that exhibit and he's answering

 3   those questions.  We have no way of showing or publishing the

 4   document to them on the screen while --

 5            THE COURT:  Mr. Schneider, what's your feeling?

 6            MR. SCHNEIDER:  I think he's right.

 7            THE COURT:  He may be right, but do you object to

 8   that procedure?

 9            MR. SCHNEIDER:  No.  I don't see what else he can

10   do.

11            THE COURT:  Okay.  All right.  So it's just the

12   second page of an exhibit?

13            MR. CONWELL:  No.  It's called 1591.2.  It's already

14   in evidence.

15            THE COURT:  But the .2 is the page number?  Second

16   page?

17            MR. CONWELL:  No --

18            MS. HILAIRE:  That's just an administrative thing

19   because there were multiple exhibits that were wrongly named so

20   we --

21            THE COURT:  Oh, oh, oh.

22            MS. HILAIRE:  It's just --

23            THE COURT:  Okay.  Make sure Ms. English gets it and

24   she'll make seven copies.

25            MS. HILAIRE:  We already have the copies.
```

```
1              THE COURT:  You already did it?

2              MS. HILAIRE:  We've already passed them out.

3              THE COURT:  Great.

4              MS. ROSSETTI:  One more thing while we're here.

5    With regard to Mr. Russo's deposition testimony, any objections

6    being considered?  I don't know if you ever --

7              THE COURT:  I'm going to smack you.  Don't put that

8    down.

9         All right.  While we've got live witnesses here, the trial

10   is going on, I am sitting up here trying to review those things

11   now.

12             MS. ROSSETTI:  Okay.

13             THE COURT:  And I would like to strangle each and

14   every one of you.  You want to ask me that question again?

15             MS. ROSSETTI:  I do not.

16             THE COURT:  Go away.

17             MS. ROSSETTI:  Yes, your Honor.

18             THE COURT:  You know what?  I'm going to get rid of

19   you.  You write down everything.

20             (Open court in the presence of the jury.)

21             MS. HILAIRE:  Your Honor, we would like to make a

22   request that for the video can we have the court reporter

23   transcribe?

24             THE COURT:  No.  Hell no.

25             MS. HILAIRE:  Okay.
```

```
 1                THE COURT:  Wait a minute.  Wait, wait.  Okay.  What
 2      am I missing here?
 3                MS. HILAIRE:  Just a request.
 4                THE COURT:  Okay.
 5                MS. HILAIRE:  He said no.
 6                THE COURT:  Wait, wait.  Is there something unusual
 7      about these?  'Cause that's never done.  Never done.  You have
 8      a transcript.  You have the record.  But is there something
 9      special about these?  Or Florida, that's what it is?  It's
10      Florida, right?
11                MR. CONWELL:  No.  You know --
12                THE COURT:  This is the United States.  We don't do
13      that.  You know, we've got this.
14                MR. CONWELL:  For every wound there's a war story,
15      so I could tell you some war stories.
16           (Discussion off the record.)
17                MR. CONWELL:  Oh, so your Honor?
18                THE COURT:  Yes.
19                MR. CONWELL:  I'd like to request you explain why
20      I'm going up here.
21                THE COURT:  I'm sorry.  You --
22                MR. CONWELL:  I'm going to read the answers and
23      she's going to read the questions.
24                THE COURT:  Oh, are we doing that now?
25                MS. HILAIRE:  Yes, your Honor.
```

1          THE COURT:  Ladies and gentlemen, once again,

2     another witness is going to be testifying in absentia through a

3     previously-given deposition.  Like the last witness,

4     Ms. Cassandra Newby, this witness, Mr. Russo, would also be

5     testifying via video, but apparently there is some glitch with

6     respect to -- or defect in the media which is going to prevent

7     us from actually playing a portion of the deposition.

8          So with respect to the testimony that's affected by the

9     defective media, the attorneys are going to read the questions

10    and answers to you, all right?  And there'll be no

11    dramatization; it'll be as sterile and neutral and unemotional

12    as they could possibly make it.  All right.

13          Now, if -- sir -- all right.

14              MR. CONWELL:  This is --

15              THE COURT:  Mr. Conwell's going to be Mr. Russo, the

16    witness.  And, yes, I think it's probably a good idea, sir, if

17    you do read from the witness stand and replicate to the extent

18    possible what it would be like if he were actually here.  All

19    right.  Thank you.

20              Okay, counsel.

21              MS. HILAIRE:  Sure.

22              THE COURT:  Wait, wait, wait.

23              MR. CONWELL:  He needs a page and line.

24              THE COURT:  And the name of the witness.

25              MS. HILAIRE:  Okay.  This is Dr. Anthony Russo.  I

1    will be reading from page 18, lines 1 through 9.

2                **ANTHONY RUSSO M.D., PLAINTIFF'S WITNESS, WAS SWORN**

3                    **AND TESTIFIED THROUGH VIDEOTAPED DEPOSITION**

4                                EXAMINATION

5         (Deposition portion read, not reported.)

6              MS. HILAIRE:  Page 29, lines 24, 25, through

7    page 30, lines 1 through 5.

8         (Deposition portion read, not reported.)

9              MS. HILAIRE:  Page 49, lines 16 through 25 carries

10   on to page 50, lines 1 through 6.

11        (Deposition portion read, not reported.)

12             MS. HILAIRE:  Page 51, lines 19 through 23, and then

13   it continues to page 52, lines 1 through 3.

14        (Deposition portion read, not reported.)

15             MS. HILAIRE:  Page 57, lines 19 through 25.

16        (Deposition portion read, not reported.)

17             MS. HILAIRE:  And this carries on to page 58, lines

18   1 through 2.

19        (Deposition portion read, not reported.)

20             MS. HILAIRE:  Page 58, lines 19 through 22, and then

21   it continues to line 25.  On page 59, lines 1 through 4.

22        (Deposition portion read, not reported.)

23             MR. SCHNEIDER:  There's only a question that's been

24   identified there without an answer.

25             THE COURT:  Are you saying that the reading is

```
 1    inaccurate?
 2            MR. SCHNEIDER:  I'm saying that what she identified
 3    she was going to read, there's no answer that I have marked.
 4            MS. HILAIRE:  It's page 58, line 25 to page 59,
 5    line 1.
 6            MR. SCHNEIDER:  Oh, I'm sorry.  Yeah.  You're
 7    reading from you said through line 4.
 8            THE COURT:  Shh.  Go ahead.
 9            MS. HILAIRE:  Okay.  Now page 59, lines 2 through 7.
10        (Deposition portion read, not reported.)
11            MS. HILAIRE:  Page 61, lines 11 through 20.
12        (Deposition portion read, not reported.)
13            MS. HILAIRE:  Page 62, lines 13 to 25 which carries
14    on to page 63, lines 1 through 6.
15        (Deposition portion read, not reported.)
16            MS. HILAIRE:  Okay.  At this particular point, we'd
17    like to refer to exhibit --
18            MR. CONWELL:  No, I don't think we have them all
19    published.  So do you have -- I think this is 59 --
20            MS. HILAIRE:  1591.2.  The jurors have a copy as
21    well.
22            MR. CONWELL:  I believe it's been published to the
23    jury.
24            MS. HILAIRE:  Yes.
25            THE COURT:  Are you going to try to publish that
```

1   again?

2              MR. CONWELL:  They've got it in their hands.

3              MS. HILAIRE:  Your Honor, I'm just trying to make

4   sure I can find the page so that the jury can follow along.

5       Question -- this is from pages 67, lines 15 through 25 to

6   68, lines 1 through 23.

7       (Deposition portion read, not reported.)

8              MS. HILAIRE:  Page 69, lines 16 through 25 which

9   continues page 70, lines 1 through 6.

10      (Deposition portion read, not reported.)

11             MS. HILAIRE:  Page 71, lines 1 to 23, continues to

12  page 72, lines 1 to 18.

13      (Deposition portion read, not reported.)

14             MR. CONWELL:  I'm sorry.  What page are you on?

15             MS. HILAIRE:  Page 71, line 2, from what I read.

16  Your response is page 6.

17             MR. CONWELL:  Okay.  Did we miss something on

18  page 70 or --

19             MS. HILAIRE:  Yes.

20             MR. CONWELL:  Okay.

21      (Deposition portion read, not reported.)

22             MS. HILAIRE:  Page 75, lines 6 through 25, continues

23  page 76, lines 1 through 8.

24      (Deposition portion read, not reported.)

25             MS. HILAIRE:  Page 77, lines 4 through 14.

```
1              (Deposition portion read, not reported.)

2              MR. CONWELL:  Excuse me for a moment.  Can we put it

3    on the ELMO?  The ELMO, just switch the button --

4              MS. HILAIRE:  No, I know.  I'm looking for 206.  I

5    asked him for it.

6              This is going to be page 78, 1 through 25 continuing

7    to page 79, 1 through 21.

8              MR. SCHNEIDER:  I'm sorry.  Could you repeat that?

9              MS. HILAIRE:  Sure.  Give me one second.

10        78, 1 through 25 through 79, 1 through 21.

11        (Deposition portion read, not reported.)

12             MS. HILAIRE:  And to be clear, the question was

13   "code of ethics."

14        (Deposition portion read, not reported.)

15             MS. HILAIRE:  Page 90, lines 6 through 25 which

16   carries on to page 91, lines 1 through 5.

17        (Deposition portion read, not reported.)

18             MS. HILAIRE:  Page 93, lines 18 through 25 through

19   page 94, lines 1 through 4.

20        (Deposition portion read, not reported.)

21             MS. HILAIRE:  Page 95, 6 through 11.

22        (Deposition portion read, not reported.)

23             MS. HILAIRE:  Page 103, lines 18 -- correction --

24   lines 21 through 25 to page 104, lines 1 through 25, to

25   page 105, lines 1 through 4.  And we're back referring to
```

1    Exhibit 1591.

2          (Deposition portion read, not reported.)

3              MS. HILAIRE:  Page 106, lines 7 through 22.

4          (Deposition portion read, not reported.)

5              MS. HILAIRE:  Page 107, lines 13 through 17.

6          (Deposition portion read, not reported.)

7              MS. HILAIRE:  Page 108, lines 19 through 25.

8          (Deposition portion read, not reported.)

9              MS. HILAIRE:  Page 113, lines 4 to 25 which carries

10   on to page 114, lines 1 through 6.

11         (Deposition portion read, not reported.)

12             MS. HILAIRE:  Page 129, lines 11 through 16.

13         (Deposition portion read, not reported.)

14             MS. HILAIRE:  Page 131, lines 1 through 25 which

15   continues to page 132, lines 1 through 7.

16         (Deposition portion read, not reported.)

17             MS. HILAIRE:  Page 133, lines 21 through 25,

18   continues to page 134, lines 1 through 5.

19         (Deposition portion read, not reported.)

20             MS. HILAIRE:  That concludes this portion of the

21   testimony.

22             MR. CONWELL:  The second part we're going to show a

23   video.

24             THE COURT:  Okay.

25         (Video played, not reported.)

```
 1              THE COURT:  You guys want to take a break?  Okay.
 2    Me, too.
 3        All right.  Let's take 15.  Remember the admonition,
 4    please.
 5              THE COURTROOM DEPUTY:  All rise.
 6              (Open court out of the presence of the jury.)
 7              THE COURTROOM DEPUTY:  You can be seated.
 8              THE COURT:  Anything?  Nothing?
 9              MR. SCHNEIDER:  Not from our end.
10              THE COURT:  Okay.
11              (A recess was taken.)
12              (Open court in the presence of the jury.)
13              THE COURT:  All right.  The jury has returned.
14    Counsel are present and looks like all but one of the
15    parties -- one of the defendants -- is present.
16        All right.  Who is the next witness, also whom I assume
17    will be testifying via videotaped deposition?
18              MR. CONWELL:  Dr. David Lemonick.
19              MR. SCHNEIDER:  Excuse me.  We have our testimony
20    from this past witness.
21              THE COURT:  The counterdesignated testimony?
22              MR. SCHNEIDER:  Yes.
23              THE COURT:  Absolutely, absolutely.  Well, I guess
24    we should have been using the break to set up for that, right?
25              MR. SCHNEIDER:  I am set up.
```

1          THE COURT:  You ready to go?

2          MR. SCHNEIDER:  Yeah.

3          THE COURT:  Outstanding.  Let's go.

4          THE COURTROOM DEPUTY:  Wait.  Can we get the name?

5          THE COURT:  The same witness.

6      Ladies and gentlemen, the way this works, when the parties

7  are aware that a witness is going to be testifying basically

8  via deposition -- this is a lousy example, horrible -- each

9  side will bracket that testimony that they wish to have

10  presented to the jury right on the transcript in a distinctive

11  color.  And then the other side, of course, may have additional

12  testimony which they would like to have presented to the jury

13  and that will be bracketed directly into the transcript in a

14  different color.

15      And then we -- pardon me -- they have sent the transcripts

16  out to have the videotape edited to comport with the designated

17  party in the transcript.

18          MR. SCHNEIDER:  Your Honor, this is the same

19  testimony so I'm going to stop this part.  It's already been --

20          THE COURT:  However you go.

21                          EXAMINATION

22              (Video played, not reported.)

23          MR. CONWELL:  Your Honor, I object to the hearsay.

24          THE COURT:  There's a problem with that -- well,

25  maybe not.  You say -- you don't want me to have them play it

UNITED STATES DISTRICT COURT

```
 1   again, do you?

 2              MR. CONWELL:  No.

 3              THE COURT:  This Volume 1 or 2 of Mr. Russo?

 4              MR. SCHNEIDER:  Volume 1.

 5              THE COURT:  Volume 1?

 6              MR. SCHNEIDER:  Yeah.

 7              THE COURT:  What page, roughly?

 8              MR. CONWELL:  Page 41.

 9              THE COURT:  41?

10              MR. SCHNEIDER:  41-23, 42-12.

11              THE COURT:  Oh.  All right.  I'm going to overrule

12   the objection.

13              MR. SCHNEIDER:  I don't know exactly where it was,

14   so I may have to play it again.

15         (Video played, not reported.)

16              MR. SCHNEIDER:  This is the last part.

17         (Video played, not reported.)

18              MR. SCHNEIDER:  That's the conclusion, your Honor.

19              THE COURT:  All right.  Thank you.  All right.

20              MR. CONWELL:  David Lemonick.

21         **DAVID LEMONICK, M.D., PLAINTIFF'S WITNESS, WAS SWORN**

22             **AND TESTIFIED THROUGH VIDEOTAPED DEPOSITION**

23                          EXAMINATION

24              (Video played, not reported.)

25              MR. CONWELL:  That concludes our designations.
```

```
 1                 THE COURT:  Does it conclude all of your
 2    depositions?
 3                 MR. CONWELL:  No.  There's just one more.
 4                 THE COURT:  Okay.  All right.  Mr. Schneider, your
 5    counterdesignations?
 6                 MR. SCHNEIDER:  Your Honor, we understood there were
 7    three more from the plaintiffs of videos.
 8                 THE COURT:  They're saying they want to withdraw
 9    two, then --
10                 MR. SCHNEIDER:  Well, are you withdrawing two?
11                 MR. CONWELL:  There's -- I thought you meant today
12    we're doing Betsy Schenck, and then after that I believe
13    there's only one more.
14                 THE COURT:  It's your case.  It's your case.
15                 MR. CONWELL:  What were the others?
16                            EXAMINATION
17                 (Video played, not reported.)
18                 MR. CONWELL:  Your Honor, you sustained the
19    objection to this testimony.  This is on page 88.  Yeah.
20                 THE COURT:  Yeah, I don't understand the relevance
21    of malpractice actions against any of these doctor witnesses.
22                 MR. CONWELL:  You also sustained the objection on
23    page 89 and 90.
24                 MR. SCHNEIDER:  Can you tell me what page that's on?
25                 MR. CONWELL:  May I show this to counsel?
```

```
 1              (Video played, not reported.)

 2              MR. SCHNEIDER:  That's all the testimony, your

 3    Honor.

 4              THE COURT:  All right.  Thank you.

 5         Next.

 6              MR. CONWELL:  Dr. Betsy Schenck.  Betsy Schenck by

 7    deposition.

 8         BETSY SCHENCK, M.D., PLAINTIFF'S WITNESS, WAS SWORN

 9             AND TESTIFIED THROUGH VIDEOTAPED DEPOSITION

10                            EXAMINATION

11                 (Video played, not reported.)

12         MR. SCHNEIDER:  Objection.  The Court sustained an

13    objection.

14              MS. HILAIRE:  We're on it.

15              MR. SCHNEIDER:  Thank you.

16         (Video played, not reported.)

17              MR. SCHNEIDER:  Objection.

18              MR. CONWELL:  So then that'll be the conclusion of

19    this videotaped deposition.

20              THE COURT:  Mr. Schneider, did you have any

21    counterdesignations?

22              MR. SCHNEIDER:  Yes.

23              THE COURT:  Okay.

24                            EXAMINATION

25                 (Video played, not reported.)
```

1          MR. CONWELL:  Your Honor, you sustained the

2     objection to this.  The objection to this was sustained.

3          MR. SCHNEIDER:  Your Honor, I don't have the benefit

4     of the rulings.

5          THE COURT:  I'm sorry?

6          MR. SCHNEIDER:  I don't have the benefit of the

7     rulings.

8          THE COURT:  What's the subject?

9          MS. HILAIRE:  I can show it where it's sustained,

10    your Honor, if you like.

11         THE COURT:  No, I take your word for it.  Show it to

12    them.

13         MS. HILAIRE:  It's about --

14         THE COURT:  Show it to them.

15         MS. HILAIRE:  Sorry.

16       (Video played, not reported.)

17         MR. SCHNEIDER:  That's the last one, your Honor.

18         THE COURT:  Let's see how far we get.

19         MR. CONWELL:  We have a 20-minute segment for

20    Dr. Eric Wilkens.

21         MS. HILAIRE:  Your Honor, do you have the objections

22    for Wilkens?

23         THE COURT:  I'm sorry?

24         MS. HILAIRE:  Do you have --

25         THE COURT:  Carbone, Russo --

1          MS. HILAIRE:  I'll double-check if they're on my

2     side.

3          THE COURT:  Oh, here it is.  Here it is.  Here it

4     is.

5          MR. SCHNEIDER:  Your Honor, may we see it as well?

6          THE COURT:  Sure.

7          **ERIC WILKENS, M.D, PLAINTIFF'S WITNESS, WAS SWORN**

8          **AND TESTIFIED THROUGH VIDEOTAPED DEPOSITION**

9                              EXAMINATION

10                     (Video played, not reported.)

11         MS. HILAIRE:  Your Honor?

12         THE COURT:  I'm looking up.

13         MS. HILAIRE:  Okay.

14     (Video played, not reported.)

15         MR. CONWELL:  That's the end of our designations.

16         THE COURT:  Mr. Schneider.  I'll let you know that

17     I'm expecting the marshals to walk through that back door and

18     when they do so, this will come to an abrupt end and we will

19     pick up in the morning.

20         MR. SCHNEIDER:  Your Honor, there's only one snippet

21     of testimony.

22         THE COURT:  Then we'll adjourn for the day.

23         MR. SCHNEIDER:  You're saying I shouldn't --

24         THE COURT:  No.  Go ahead.  Go, go.  I'm sorry.

25                              EXAMINATION

```
 1                    (Video played, not reported.)

 2              THE COURT:  That was it?

 3              MR. SCHNEIDER:  That was it.

 4              THE COURT:  All right.  Okay, ladies and gentlemen,

 5   that'll do it for today.  Remember the admonition.  We'll begin

 6   tomorrow at 8 A.M.

 7              THE COURTROOM DEPUTY:  All rise.

 8              (Open court out of the presence of the jury.)

 9              THE COURT:  Anything?

10              MR. CONWELL:  No, your Honor.

11              THE COURT:  You may want to tidy up just a little

12   bit 'cause we're going to be here a while.

13              (At 2:42 P.M. an adjournment was taken until

14              Friday, January 29, 2016, at 8:00 A.M.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5   I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

 6   FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

 7   OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 8   TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

 9   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14         DATED THIS 28TH DAY OF JANUARY, 2016._____

15

16

17         /S/ DEBRA READ
     _____
18   DEBRA READ, CSR NO. 3949 CRR RMR RDR
     FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT