1            UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE OTIS D. WRIGHT, II

4         UNITED STATES DISTRICT JUDGE PRESIDING

5   PATRICIA STEWART, D.O.,            )
                                       )
6                   Plaintiff,         )
                                       ) ED CV 13-1670-ODW(DTBx)
7          vs.                         )
                                       )
8   AMERICAN ASSOCIATION OF PHYSICIAN  )         VOLUME 4
    SPECIALISTS, INC., WILLIAM         )
9   CARBONE; ROBERT CERRATO; SVETLANA  )      PAGES 1 - 150
    RUBAKOVIC and DOES 1-100,          )
10                                     )
                    Defendants.        )
11  _____  )

12

13

14              REPORTER'S TRANSCRIPT OF
                   TRIAL - DAY 4
15            FRIDAY, JANUARY 29, 2016
                    8:09 A.M.
16            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22  _____

23        DEBI READ, CSR 3949 CRR RMR RDR
        FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET 432A
24        LOS ANGELES, CALIFORNIA 90012
             READIT3949@GMAIL.COM

25

```
 1                        A P P E A R A N C E S

 2
     ON BEHALF OF THE PLAINTIFF:
 3
         CONWELL BUSINESS LAW, P.A.
 4       BY:  GEORGE DONOVAN CONWELL, JR.
              Attorney at Law
 5       12610 Race Track Road, Suite 200
         Tampa, Florida 33626
 6       813-282-8000
         dconwell@conwellbusinesslaw.com
 7
         HILAIRE MCGRIFF, PC
 8       BY:  MIKA HILAIRE
              Attorney at Law
 9       601 S. Figueroa Street, Suite 4050
         Los Angeles, California 90017
10       213-330-4260
         mika@hmpclaw.com
11
         WILLIAM A. OKERBLOM LAW OFFICES
12       BY:  WILLIAM ALLEN OKERBLOM
              Attorney at Law
13       1145 E. Clark Avenue, Suite H
         Santa Maria, California 93454
14       805-478-6570
         drlaw07@aol.com
15

16   ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
     PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:
17
         ANDERSON, MCPHARLIN & CONNERS LLP
18       BY:  ERIC A. SCHNEIDER
         BY:  LEILA M. ROSSETTI
19            Attorney at Law
         707 Wilshire Boulevard, Suite 4000
20       Los Angeles, California 90017-3623
         213-688-0080
21       eas@amclaw.com
         lmr@amclaw.com
22

23

24

25
```

1                         I N D E X

2              CHRONOLOGICAL INDEX OF WITNESSES

3    PLAINTIFF'S WITNESS                    PAGE   VOL.

4    **WILLIAM J. CARBONE**
       Direct Examination By Mr. Conwell      10     4
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|---|---|---|---|---|
| 12 | Russo letter from BOD to all members of AAPS, dated 6/24/11 | 56 | | 4 |
| 304 | E-mail from William Carbone to Anthony Russo dated September 24, 2010, regarding draft of provision for Executive Committee Bylaw | 142 | | 4 |
| 1093.2 | Surveillance video | 52 | | 4 |
| 1314 | 14th Revision to AAPS's bylaws adopted 05/03/11 | 81 | | 4 |
| 1347 | 06/13/12 Draft Minutes of the AAPS Board of Directors Meeting | 135 | | 4 |
| 1405 | Board meeting minutes for September 30, 2010 | 68 | | 4 |
| 1413 | Board minutes for November 6, 2010 | 71 | | 4 |
| 1446 | Minutes of the House of Delegates' meeting of June 25, 2011 | 113 | | 4 |
| 1457 | AAPS Board of Directors minutes, November 5, 2011 | 76 | | 4 |
| 1498 | Certified Letter dated May 8, 2012, from Robert Cerrato to Dr. Stewart regarding Disciplinary Committee meeting of June 9, 2012 | 116 | | 4 |
| 1591.1 | RFA: Dr. Stewart's RFA to Carbone | 21 | | |
| 1767 | Return of Organization Exempt from Income Tax 2013 | 67 | | 4 |
| 1801 | Return of Organization Exempt from Income Tax 2010 | 65 | | 4 |

UNITED STATES DISTRICT COURT

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 29, 2016

 2                              8:09 A.M.

 3                               -o0o-

 4              (Call to Order of the Court.)

 5              (Open court out of the presence of the jury.)

 6              THE COURTROOM DEPUTY:  Calling Item 1,

 7    ED CV 13-1670, Patricia Stewart, D.O. versus American

 8    Association of Physician Specialists, Inc., et al.

 9          Counsel, may I have your appearances, please.

10              MS. HILAIRE:  Good morning.

11        Mika Hilaire appearing on behalf of the plaintiff,

12    Patricia Stewart.

13              THE COURT:  Ms. Stewart.

14              MR. CONWELL:  Don Conwell on behalf of plaintiff,

15    Dr. Patricia Stewart.

16              THE COURT:  Mr. Conwell.

17              MR. SCHNEIDER:  Eric Schneider and Leila Rossetti

18    for the defense.

19              THE COURT:  Counsel.

20              MS. ROSSETTI:  Good morning, your Honor.

21              THE COURT:  I understand there's something we need

22    to discuss?

23              MR. SCHNEIDER:  Yes, your Honor.

24              THE COURT:  Okay.

25              MR. CONWELL:  Yesterday morning we were told that
```

```
 1    they did not represent all the defendants; that Mr. Kruzhkov
 2    represented certain defendants --
 3                 THE COURT:  Yes.
 4                 MR. CONWELL:  -- and they represented the others.
 5    So are we allowed to proceed without counsel for the -- for one
 6    of the defendants?
 7                 MR. SCHNEIDER:  Your Honor, we represent all of the
 8    defendants.
 9                 THE COURT:  That isn't what was stated on the record
10    on the first day of trial.
11                 MR. SCHNEIDER:  I said for the defendants and I said
12    all three of them.
13                 THE COURT:  All right.  If you're making that
14    representation that you represent all of the defendants, fine.
15                 MR. SCHNEIDER:  Yes.  It's on the pleadings.  We
16    have from the outset.
17                 THE COURT:  Okay.  Let's go.
18                 MR. CONWELL:  You recall yesterday when we were
19    concerned that they were both objecting --
20                 THE COURT:  Yes.
21                 MR. CONWELL:  -- that that was the opposite view.
22                 THE COURT:  Exactly.
23                 MR. SCHNEIDER:  And at that point, Mr. Kruzhkov
24    stopped speaking on objections.
25                 THE COURT:  Are we playing fast and loose?
```

1          MR. SCHNEIDER:  I don't think so.

2          THE COURT:  You don't?

3          MR. SCHNEIDER:  No.

4          THE COURT:  Because on the first day of trial you

5  indicated he was representing the other defendants.  That's all

6  right.  Okay.  Fine.  You're making the representation now, so

7  we will proceed in his absence.  Why is he not here?

8          MR. SCHNEIDER:  He is simply not coming today.

9          THE COURT:  Okay.  All right.  Let's go.

10          MS. ROSSETTI:  Your Honor, Mr. Kruzhkov does

11  represent AAPS as do we, just like Mr. Conwell and Ms. Hilaire

12  both represent the plaintiff.

13          THE COURT:  Counsel, that isn't the point.  The

14  point was that he represented separate defendants; that's why I

15  permitted him to interpose additional objections.  You don't

16  have two or three counsel interposing objections, right?

17      The only reason I allowed it was because he made the

18  representation, or at least he led all of us to believe that he

19  was representing different defendants.  Is that clear?

20          MS. ROSSETTI:  Understood, your Honor.

21          THE COURT:  All right.  Let's go.

22          MR. SCHNEIDER:  The other matter is that Mr. Young

23  is the plaintiff's -- one of the plaintiff's expert.  He's

24  going to be testifying today.  He was in the courtroom all day

25  yesterday.

```
 1              MR. CONWELL:  And your Honor --

 2              THE COURT:  Listen, if you knew that --

 3              MR. SCHNEIDER:  No, I did not know that.  I did not

 4    know who he was.

 5              THE COURT:  Nor did I.

 6              MR. SCHNEIDER:  I understand that.  But the

 7    plaintiffs did.

 8              THE COURT:  Oh, all right.  Listen, it's too late to

 9    fix it, isn't it?  What would you propose we do?

10              MR. SCHNEIDER:  The Court ordered witnesses be

11    excluded.

12              THE COURT:  That's not my question.  What do you

13    propose we do now?  Had the gentleman been in the courtroom

14    when I made that order, that would be a different situation.

15    Then I'd find him in contempt.

16          Who is he, anyway?

17              MR. CONWELL:  Dr. Young.

18              THE COURT:  Ah, yes.

19              MR. CONWELL:  Your Honor, may I speak to this?  The

20    rule against --

21              THE COURT:  My understanding -- No. 1, my

22    understanding with respect to what this gentleman's testimony

23    is was completely unaffected by anything we heard yesterday.

24              MR. SCHNEIDER:  I can't disagree with that, your

25    Honor.
```

```
 1                    THE COURT:  Okay.  Then let's -- I don't know.

 2   What's the point of this?

 3                    MR. SCHNEIDER:  Well, I don't think witnesses should

 4   be here if they've been excluded.

 5                    THE COURT:  Because their testimony might be

 6   influenced by what other witnesses have to say.  That isn't the

 7   case with this gentleman, is it?

 8                    MR. SCHNEIDER:  I do -- I agree, your Honor.

 9                    THE COURT:  Okay.  Why we wasting time with this?

10                    MR. CONWELL:  I agree, your Honor.  And the rule

11   against --

12                    THE COURT:  Get the jury out her.

13                    MR. CONWELL:  -- is for fact witnesses, not --

14                    THE COURT:  That's the other thing.

15                    MR. CONWELL:  He is an expert.

16                    MS. HILAIRE:  Your Honor, I've never seen a

17   situation where an expert was excluded, your Honor.

18                    THE COURT:  It's not.  Experts surely are not, even

19   when their counterpart is on the stand.

20                    MS. HILAIRE:  They're allowed to listen to the

21   testimony.

22                    THE COURT:  Yes.  All right.  It's kind of like --

23   well --

24                    (Open court in the presence of the jury.)

25                    THE COURT:  All right.  We've been joined by the
```

```
 1   jury.

 2        Plaintiff's next witness, please.

 3            MR. SCHNEIDER:  Your Honor, should we impress on the

 4   record that there's a juror that's not here?

 5            THE COURT:  Oh, yes.  We apparently have now lost

 6   Juror No. 1, Miriam Hernandez.  She called in indicating that

 7   she is too ill to attend trial, so we're now down to six.

 8        All right.  Your next witness.

 9            MR. CONWELL:  Call William Carbone.

10        WILLIAM J. CARBONE, PLAINTIFF'S WITNESS, WAS SWORN

11            THE COURTROOM DEPUTY:  Please be seated.

12        Please state your name and spell your last name for the

13   record.

14            THE WITNESS:  William J. Carbone, C-a-r-b-o-n-e.

15            THE COURTROOM DEPUTY:  Thank you.

16            THE WITNESS:  You're welcome.

17            THE COURT:  All right, counsel.

18                         DIRECT EXAMINATION

19   BY MR. CONWELL:

20        Q    Good morning, Mr. Carbone.

21        A    Good morning.

22        Q    You are the chief executive officer of the defendant

23   AAPS; is that correct?

24        A    Correct.

25        Q    And how long have you been the chief executive
```

```
 1    officer of AAPS?

 2          A      March of 1997.

 3          Q      Is there anybody on staff that you report to?

 4          A      Excuse me?

 5          Q      Is there anybody on staff at AAPS that you report

 6    to?

 7          A      No.

 8          Q      You are the top, correct?

 9          A      I'm the CEO.

10          Q      The buck stops with you; is that right?

11          A      I am the CEO for management, yes.

12          Q      Okay.  And one of the things that you do is you

13    manage the preparation of the employee manual; is that right?

14          A      I help to manage, yes.

15          Q      And I'd like you to look at that, which is

16    Plaintiff's Exhibit -- or Exhibit 1718.  And if you would turn

17    to page 6.

18                 This is the welcome page of the employee manual; is

19    that correct?

20          A      Yes.

21          Q      And it has a little welcome message and then it

22    says, "This message is from the Board of Directors and the

23    Chief Executive Officer."  That's you, right?

24          A      Correct.

25          Q      And so you're familiar with the employee manual,
```

 1   right?

 2        A     Yes, I am.

 3        Q     Okay.  And it's important that you be familiar with

 4   it since you're the CEO and you're the top guy for staff,

 5   right?

 6        A     Yes.

 7        Q     Turn to page 11.  Let me know when you're there.

 8        A     I'm there.

 9        Q     Part of the manual deals with harassment; is that

10   correct?

11        A     Yes.

12        Q     And the handbook that you manage the preparation of

13   says, "AAPS is opposed to all forms of harassment"; is that

14   correct?

15        A     Where does it say that?  On that page?

16        Q     Well, if you'd look at the computer screen.

17        A     Okay.  I was looking at the page.  Okay.

18        Q     That'll help you if you want to find it on the page.

19   You're welcome to.  It's under the title Harassment Policy.

20        A     Okay.  Yes.

21        Q     It says, "AAPS is opposed to all forms of

22   harassment"?

23        A     My answer is yes.  I see it.

24        Q     Okay.  You don't disagree with that, do you?

25        A     No.

1    Q    Okay.  That's a good thing, right?

2    A    I believe it is, yes.

3    Q    Okay.  "Including sexual, racial, ethnic, age,

4    disability, or religious harassment"; is that correct?

5    A    Agreed.

6    Q    "Furthermore, verbal or physical conduct directed at

7    a person's race, color, religion, sex, national origin, age, or

8    disability may constitute harassment and is prohibited,"

9    right?

10   A    Understood, yes.

11   Q    Prohibited means you're not allowed to do it, right?

12   A    Correct.

13   Q    "Anyone engaging in such conduct is subject to

14   disciplinary action, including, uh, not limited to -- including

15   discharge"; is that right?

16   A    Yes.

17   Q    And then it says, "At any time if you believe that

18   you have been harassed or have been witnessed -- or have

19   witnessed harassing conduct, you must report the harassment to

20   the Chief Executive Officer or the President of the Board"?

21   A    Correct.

22   Q    So the harassment's supposed to be reported to you,

23   right?

24   A    Uhm, yes.

25   Q    Okay.  And -- but the manual says more about the

```
 1   topic of sexual harassment than this; is that right?

 2        A    I would have to review it, but I believe that's

 3   correct.

 4        Q    Well, you knew there was going to be a trial, right?

 5        A    Of course.

 6        Q    And you knew that your conduct was the subject of

 7   this trial, right?

 8        A    Understood.

 9             MS. ROSSETTI:  Objection, your Honor.

10   Argumentative.

11             THE COURT:  Overruled.

12             MR. CONWELL:  Cross-examination.

13        Q    (BY MR. CONWELL:)  And Mr. Carbone, you know that an

14   issue in this trial was going to be your sexual harassment and

15   your receiving and forwarding pornography in the workplace on

16   company computers, right?

17        A    I would add alleged sexual harassment.

18        Q    Okay.  But you did not review the employee handbook

19   in preparation for your testimony?

20        A    No, I did not.

21        Q    Okay.  Well, let's see if we can remind you of what

22   it says.

23             Turn to page 23, please.  Now, it says in bold, "The

24   following actions, among other things, could constitute grounds

25   for immediate dismissal."  You see that?
```

1      A     No.  I'm sorry.  Is it the top paragraph?

2      Q     If you can take a look at the computer screen, and

3  I'm probably going to be doing this throughout our time

4  together, so maybe you could start looking at the screen and

5  then refer to the document, if you'd like?

6      A     Okay.  I can't see all of it.  It's restricted.

7      Q     Okay.  Well --

8      A     So if you'd like me to look at the top --

9      Q     Now that you found it on the screen, you're welcome

10  to look at it on the page.

11      A     Got it.

12      Q     Okay.  And it says, "The following actions, among

13  other things, could constitute grounds for immediate

14  dismissal."  Do you see that?

15      A     Yes, I do.

16      Q     Now, what is No. 2?

17      A     Harassment.

18      Q     Okay.  And then what's this one?  You see where I'm

19  pointing?

20      A     Gross misconduct.

21      Q     Okay.  And now this next one is of particular

22  interest to me, "displaying, disseminating, or discussing --

23  even discussing pornographic or sexually explicit materials or

24  information."  You see that?

25      A     Yes, I do.

UNITED STATES DISTRICT COURT

```
 1        Q     And you had a hand in preparing the manual that said

 2   that this was going to be the instructions that would guide the

 3   conduct of employees of AAPS, including yourself; is that

 4   right?

 5        A     That's correct.

 6        Q     That's a good policy to have, isn't it?

 7        A     Yes, it is.

 8        Q     Because disseminating, discussing, looking at

 9   pornography and sexually explicit material on your work

10   computer is degrading to women, isn't it?

11        A     Yes.

12        Q     And you have and had in 2009, 2010, 2011 female

13   staff; is that correct?

14        A     Correct.

15        Q     How many of the staff were females?

16        A     A vast majority.  75 percent would be my estimate.

17        Q     And so you would agree with me that it's a good

18   thing to have a policy that says that you're not allowed to

19   view or even discuss pornographic or even sexually explicit

20   material at the workplace; is that right?

21        A     I agree.

22        Q     But as we have seen, you actually spent -- you

23   actually did receive and forward and discuss sexually explicit

24   and pornographic material; is that right?

25        A     I received and forwarded.  I don't recall discussing
```

1    it other than for this trial.

2        Q     Okay.  So you never -- I want to make sure I'm clear

3    on this.  You never had a discussion with Timothy Bell, your

4    director of governmental affairs, involving any of the

5    pornographic material you were forwarding to him?  You just did

6    that on your own with no discussions whatsoever?

7        A     The only discussion would have been his request to

8    forward the material to him.

9        Q     Okay.  Well, did he make a one-time request?

10       A     Couple times.

11       Q     Two times he requested you do this?

12       A     I don't remember precisely, but he made requests.

13       Q     And so he -- this seems odd to me.  The director of

14   government affairs is going to the top man in the organization

15   to request pornography?

16       A     Can't explain that to you.

17       Q     And you acquiesced?  You said, "Sure, I'll send it

18   to you"?

19       A     I did, and that was an error in judgment.

20       Q     Well, it was not just an error in judgment.  You

21   violated the standards of conduct and subjected yourself to

22   immediate dismissal by degrading women; isn't that correct?

23       A     It was an error in judgment and I'm sorry that I

24   made that decision.

25       Q     Well, and you should be.

```
 1        A      I said I am.

 2               MS. ROSSETTI:  Objection.  Argumentative.

 3        Q      (BY MR. CONWELL:)  You've been doing it for years?

 4               THE COURT:  Sustained.

 5        Q      (BY MR. CONWELL:)  You did this for years?

 6               MS. ROSSETTI:  Objection.  Argumentative.  Objection

 7   was sustained.

 8               THE COURT:  Sustained.

 9        Q      (BY MR. CONWELL:)  This was a different question.

10   You did this for years, didn't you?

11        A      No.

12        Q      In your deposition, you testified that you were

13   exchanging -- you were receiving and forwarding pictures of

14   women with their clothes off for at least two to three years.

15        A      Well, then I stand corrected.

16        Q      Would you like me to read your deposition testimony

17   to you?

18        A      Your -- your choice.

19        Q      Okay.  In your deposition, you appeared before a

20   court reporter; is that right?

21        A      I did, yes.

22        Q      The stenographer just like the stenographer here?

23        A      Yes.

24        Q      And when we started that deposition, you took an

25   oath to tell the truth?
```

```
 1        A      I did.

 2        Q      And I asked you to tell the truth, didn't I?

 3        A      Yes, you did.

 4        Q      And I asked you and you said that you had been

 5   receiving and forwarding pictures of women with their clothes

 6   off for at least two to three years; isn't that correct?

 7        A      Yes.  If that's what I said --

 8        Q      That's what you said under oath?

 9        A      If that's what I said, that's what the facts are.

10        Q      So we can rely on what you said under oath, can't

11   we?

12        A      Yes.

13        Q      Thank you.

14               Now, the pictures -- the pornographic material that

15   you were receiving and sending to Mr. Bell, you did that while

16   he was reporting to you as your subordinate; is that correct?

17        A      That's correct.

18        Q      You also agree that what -- the material that

19   Mr. Bell received from you that ultimately we obtained is just

20   a small portion of what you had been receiving and viewing on

21   your company computers over the years; isn't that correct?

22               MS. ROSSETTI:  Objection.  Lacks foundation.

23               THE COURT:  It's a question.  Overruled.

24        Q      (BY MR. CONWELL:)  Isn't that correct, Mr. Carbone?

25        A      I don't recall specifically.
```

1        Q      Do you have Exhibit 1591.1?

2               THE WITNESS:  Want that back?

3               THE COURTROOM DEPUTY:  Yes.

4               (Exhibit 1591.1 previously marked for identification.)

5        Q      (BY MR. CONWELL:)  You do?

6        A      Yes.  I do now.

7        Q      And you see in here that Dr. Stewart sent a request

8    for admissions as to each and every one of these pornographic

9    photographs and videos asking you to admit that you received

10   them and you forwarded them on to Timothy Bell, and they were

11   all admitted; is that correct?

12       A      Yes.  Yes.

13       Q      So we don't have to spend any more time on that

14   issue.  That fact is established; is that right?

15       A      Yes.

16       Q      Okay.  Now, a lot of this was from doctors; is that

17   right?

18       A      Physicians.

19       Q      Physicians, okay.  And some of those physicians were

20   on the AAPS Board of Directors; is that right?

21       A      That's correct.

22       Q      Take a look at 1591.2, which I think is part of

23   that.  It's going to be pages 103 to 104.

24       A      Where is the page?  At the bottom or at the top?

25       Q      It's bottom left-hand corner.

1        A     Okay.  I see 1591.2.  Okay.  What was the pages

2   again, please?

3        Q     103 to 104.

4        A     Okay.

5        Q     Can you pull that up, please?

6        A     Yes.

7        Q     Okay.  You see there's an e-mail at the bottom of

8   103 and it says it's from Doc Feaver, dated December 3, 2009,

9   at 2:57 P.M.  That was a Thursday, right?

10       A     Right.  Correct.

11       Q     That's working hours on a work day, right?

12       A     Yes.

13       Q     And Doc Feaver is on the Board of Directors, right?

14       A     At one point he was.  I don't recall specifically on

15   this date or this year he was.

16       Q     Well, we'll see this in a minute.

17       A     Okay.

18       Q     But Doc Feaver, actually his name is Brian Feaver,

19   right?

20       A     Correct.

21       Q     And Brian Feaver is a family practice physician,

22   isn't he?

23       A     Correct.

24       Q     In Texas?

25       A     That's correct.

```
1          Q      He treats families?

2          A      He's a family physician from Texas, correct.

3          Q      Okay.  And we're going to see that he was on the

4    Board of Directors on June 13th --

5          A      Okay.

6          Q      -- 2012.  You remember that, don't you?

7          A      I remember he was on the Board of Directors.

8          Q      And you remember that this man who was sending you

9    the image we're going to see and some other things that were

10   strictly prohibited by company policy -- we're going to see

11   that this man voted to expel Dr. Stewart, aren't we?

12              MS. ROSSETTI:  Objection.  Lacks foundation.

13              THE COURT:  Overruled.

14              THE WITNESS:  I would have to look at the minutes,

15   if he was there at that time.  I don't have a precise memory to

16   tell you today that he was there that day and voted.  But --

17              MR. CONWELL:  Okay.

18              THE WITNESS:  Okay?

19         Q      (BY MR. CONWELL:)  I'm happy to do that.  In fact,

20   maybe -- well, let's just finish off with this one e-mail.

21   Let's scroll down here.

22         A      Okay.

23         Q      Now, this is December 3rd, so he's sending you a

24   Christmas greeting; is that right?

25              Can you scroll down?
```

1          A     That says, "Here's your Xmas tree access," yes.

2          Q     And of course, you thought that was totally

3    appropriate for him to be sending that, right?

4          A     I did not.

5          Q     And you thought it was inappropriate for him to be

6    sending that to you?

7          A     It was inappropriate, yes.

8          Q     It was inappropriate for him to send it to you, but

9    it was appropriate for you to forward it on to Mr. Bell?  Is

10   that what you're saying?

11         A     I didn't say that.

12         Q     Well, you did forward it on to Mr. Bell?

13         A     I did not say it was appropriate.  I said what I did

14   was inappropriate.  It was an error in judgment.

15         Q     Let's look at pages 39 and 40, 039 and 040 in the

16   same exhibit.

17               Now, you can look at the e-mail at the very top.

18   This is June 9, 2009.  This is some six months earlier; is that

19   right?

20         A     Yes.

21         Q     And 3:24 P.M. on a Tuesday, so it's during working

22   hours again, right?

23         A     That's correct.

24         Q     And so you're receiving this on your AAPS computer?

25         A     Yes.

1       Q     Okay.  And then he has this photograph of a very

2  famous -- or infamous person, right?

3       A     Uhm, yes.

4       Q     Osama bin Laden.  And he's making a joke out of

5  this.  He says, "You have to tell the difference between a bad

6  towel head and a good towel head.  Study the pictures carefully

7  so you will not confuse the two in a moment of indecision that

8  could save your life.  This is the bad towel head."

9            And then if you turn the page to page 40 -- keep

10 scrolling -- "This is the good towel head."

11           And you received that?

12      A     Yes.

13      Q     And then you thought it was totally appropriate for

14 him to be sending this to you, right?

15      A     I didn't think it was totally appropriate at all.

16      Q     You thought it was completely inappropriate?

17      A     I thought it was inappropriate, yes.

18      Q     Okay.  And yet even though you thought it was

19 inappropriate, you went ahead and forwarded it to Mr. Bell,

20 correct?

21      A     Correct.

22      Q     And you knew when you did it that was inappropriate?

23      A     Correct.

24      Q     I'm going to find that -- well, I'll tell you what.

25 I'm going to come to that Board of Directors minutes from

 1    June 13, 2012, and we'll satisfy ourselves that he was one of

 2    the people that voted to expel Dr. Stewart.

 3              Another Board member was Lloyd Fernald; is that

 4    right?

 5        A    He was a public member.

 6        Q    He was a member of the Board?  He's on the minutes

 7    as a member of the Board?

 8        A    Of not the AAPS Board.

 9        Q    Okay.

10        A    It was a --

11        Q    The ABPS Board?

12        A    He was not a member of the AAPS Board.

13        Q    What is his leadership position in AAPS?

14        A    He was a public member.

15        Q    Okay.  And Lloyd Fernald, a public member of AAPS,

16    was also sending you pornographic material; is that right?

17        A    Yes.

18        Q    And he sent you a video, a biker video.

19              Turn to page 107.  Do you see that?

20        A    Yes, I do.

21        Q    And this was received by you on December 4th of

22    2009; is that right?

23        A    Yes.

24        Q    And the subject was Smart Biker and there's five Xs,

25    XXXXX, right?

1    A    Uhm, yes.

2    Q    And so when you see a lot of Xs like that, doesn't

3    that send -- it's kind of a warning to you that this is going

4    to be sexually explicit?

5    A    Yes.

6    Q    Okay.  Now, let's take a look at the video that he

7    sent to you.  And while he's pulling that up, a lot of the

8    women, the females in the pornography that we've been -- that

9    we've obtained that you were exchanging with Mr. Bell are

10   pretty young looking, aren't they?

11   A    I don't know how to respond to that except to say

12   I'd have to look at them.  It's difficult to tell the age.

13   Q    But you saw one of them, it says,

14   "Iloveteengirls.com."  You had to be thinking these are pretty

15   young girls, right?

16   A    That thought I hadn't thought of.

17   Q    Okay.  That would be inappropriate for you to be

18   looking at pornography involving underage girls, right?

19   A    I would agree with that.

20   Q    Let's take a look at this -- that this Lloyd Fernald

21   sent to you.

22        (Video played, not reported.)

23   Q    (BY MR. CONWELL:)  This is how you entertain

24   yourself in your big chair in your executive office at AAPS

25   headquarters?

```
 1              MS. ROSSETTI:  Objection.  Argumentative.
 2              THE COURT:  Sustained.
 3        Q    (BY MR. CONWELL:)  You received this video from
 4   Lloyd Fernald, the public member, and you forwarded it on to
 5   the director of government affairs, right?
 6        A    I believe I did.  I don't see that specific e-mail
 7   here, but --
 8        Q    Another -- another lapse in judgment, right?
 9        A    I said I made an error in judgment and it was
10   inappropriate, not --
11        Q    We're going to see you made a lot of errors in
12   judgment, didn't you?
13              MS. ROSSETTI:  Objection.  Argumentative.
14              THE COURT:  Sustained.
15        Q    (BY MR. CONWELL:)  The -- turn to page 107 to 112 in
16   that exhibit.  I think it's on the same page -- yeah --
17        A    107 or 112?
18        Q    You're right there, "Why a good bottle of wine costs
19   so much."
20        A    Okay.
21        Q    This is another pornographic e-mail sent to you by
22   Lloyd Fernald, and it shows, if you keep scrolling through, a
23   number of pictures of pornographic photographs.  And you
24   received that and you also forwarded that on to the director of
25   government affairs, your subordinate; is that right?
```

1    A    Correct.

2    Q    So now each time that you got these, you're saying

3    that Mr. Bell came to your office and said -- just he happened

4    to be in there when you happened to be opening it and happened

5    to ask for it?

6    A    No.

7    Q    Is that the way it happened?

8    A    Not every time, no.

9    Q    Well, so each time this happened, did you call him

10   and say, "Hey, I got another one.  Come look at this"?

11   A    No, I did not.

12   Q    How did you communicate to him that you had another

13   one so you would then forward it?

14   A    On couple occasions he said, "Just send them to me

15   as you receive them."

16   Q    Really?  It was that regular?

17   A    Excuse me?

18   Q    It was that regular?

19   A    I recall him making the statement, "Just send them

20   to me when you get them."

21   Q    And you agreed to that?

22   A    In cases, yes, I did.

23   Q    There's some that you didn't send to him?

24   A    I don't recall that.

25   Q    Okay.  Let's look at page 64 now.  If you look at

1    the bottom of the page, there's an e-mail from Lloyd Fernald to

2    you, this one, October of 2009; is that right?

3        A    Mine said October 7th.

4        Q    Okay.

5        A    2009.

6        Q    And what's the subject?

7        A    "Holy shit."

8        Q    Okay.  Now, there's a lot of photographs after that

9    and they all say that -- have that caption on them, don't they?

10            Let's look at the first one.  Is that correct?

11       A    What's -- what do you mean what is correct?

12       Q    That they all have that caption on them.

13            MR. CONWELL:  Go ahead and scroll through those.

14            THE WITNESS:  Yes, that is correct.

15       Q    (BY MR. CONWELL:)  Now, was this one of those that

16   he came and specifically said, "Send that to me," or is this

17   part of the standing order to Send me all this sort of stuff?

18       A    I don't recall.

19       Q    Okay.  Now, Herb Pardell was a member of the Board

20   of Directors; is that right?

21       A    At one time that's correct.

22       Q    And we're going to see that Herb Pardell was on the

23   Board in June of 2012 and voted to expel Dr. Stewart; is that

24   right?

25       A    Again, without seeing the minutes, I can't tell you

1    unequivocally that's correct, but I believe it is.

2         Q    Okay.  I understand.  I'm happy to show that to you.

3         A    Okay.

4         Q    So let's take a look at page 19.  Okay.  If you go

5    to the bottom of the page, you'll see there's an e-mail from

6    Dr. Herbert Pardell sent to you on February 20, 2009, Friday,

7    February 20, 2009, at 10:38 in the morning.  So we have nearly

8    a full year's period of time covered here already, don't we?

9         A    Yes.

10        Q    And your lapses in judgment went on the entire year?

11             MS. ROSSETTI:  Objection.  Argumentative.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yes.

14        Q    (BY MR. CONWELL:)  Okay.  And so now let's take a

15   look at what he sent to you.  Where is he -- he's a doctor,

16   right?  Physician?

17        A    He's a physician.

18        Q    Where?

19        A    In Florida.

20        Q    Okay.  What kind of medicine does he practice?

21        A    He's an internist.

22        Q    A what?

23        A    He is an internist.

24        Q    Internist.  What does that do -- what do they do?

25        A    Internal medicine.

```
1        Q     Can you give me an example of what they do?

2        A     Oh, they're similar to family practitioner, family

3   member specialist, but they're more focussed on internal

4   infectious diseases, things of that nature.

5        Q     Okay.  Now, if we look here, page 21 -- scroll up

6   from there -- what is this a picture of?

7        A     Somebody painting a body.

8        Q     But more specifically what?

9        A     More specific than what?

10       Q     More specifically what?  I'd like you to put it on

11  the record.

12       A     Someone is painting a female body.

13       Q     Her vagina?

14       A     Yes.

15       Q     And pubic area?

16       A     Right.

17       Q     And let's go two pages from there.  Now he's doing

18  the backside?

19       A     Correct.

20       Q     And this goes on and on with these sorts of photos,

21  right?

22       A     Yes, it does.

23       Q     And you received that and you sent it on to

24  Mr. Bell?

25       A     I believe I did.
```

```
 1        Q    So had he placed a standing order for all porno back
 2   as early as February of 2009?
 3             MS. ROSSETTI:  Objection.  Lacks foundation.
 4             THE COURT:  Overruled.
 5             THE WITNESS:  I can't give you the specific date
 6   when he originally asked me or made a comment.
 7        Q    Well, why did you send it to him?
 8        A    It had to include his request.  Whether it was
 9   individual or a massive one like that, I don't recall.
10        Q    Okay.  Why didn't you ever -- when he asked it, you
11   know, I mean, he clearly was violating company policy by
12   talking to you about the pornographic material at the workplace
13   and by receiving these from you on his work computer at the
14   workplace, wasn't he?
15        A    Yes.
16        Q    And you were the CEO, right?
17        A    Yes.
18        Q    So you were supposed to terminate him, right?
19        A    Uhm --
20             MS. ROSSETTI:  Objection.  Lacks foundation.
21             THE COURT:  Overruled.
22             THE WITNESS:  I wasn't -- what do you mean "supposed
23   to terminate him"?
24        Q    (BY MR. CONWELL:)  Well, he was violating the rules
25   of the company by doing this.  It was your job to fire him?
```

1        A      You could argue that, yes.

2        Q      But, obviously, you did not, correct?

3        A      I did not, no.

4        Q      Now, Herb Pardell, he also sent you racist material.

5   Look at page 56.  This is an e-mail you received from Herb

6   Pardell, Dr. Herb Pardell, on September 17, 2009, at 1:11 P.M.

7   which was a Thursday; is that right?

8        A      Yes.

9        Q      And it depicts several black African-American people

10  around someone who appears to be dressed as a Ku Klux Klan

11  member?

12       A      Yes.

13       Q      And you thought this was funny?

14       A      No.  I didn't make any comment.

15       Q      Well, now this does not appear to be pornographic,

16  does it?

17       A      I wouldn't say it is, no.

18       Q      Well, why did you send this on to Mr. Bell since

19  it's not the pornography that he had a standing order that you

20  send to him?

21       A      He had also requested any humor, jokes, things of

22  that nature.

23       Q      Okay.  And we're going to see quite a bit -- quite a

24  few more of these, several any of them, anyway -- I'm not going

25  to go through all of them -- but you received from doctors at

AAPS racist e-mails and you forwarded them on to the director of government affairs, Timothy Bell; is that right?

MS. ROSSETTI: Objection. Lacks foundation.

THE COURT: Overruled.

THE WITNESS: I have to look at each one to tell you whether I personally thought they were racist.

MR. CONWELL: Well --

THE WITNESS: If you're asking me about this one, I'll be happy to respond.

Q (BY MR. CONWELL:) Yeah. The -- you've already admitted -- we started this -- you've already admitted that all these that we're looking at in this exhibit you received and you forwarded on to Timothy Bell. So -- is that correct? We've agreed on that, right?

A Would you repeat that statement, please?

Q We started out this -- this time together with you looking at the request for admissions and admitting that what you all had done is admitted that all of these photographs and e-mails in this exhibit you received and you forwarded them on to Mr. Bell. That's done. We don't have to do that again, right?

A You're right. I agree.

Q So what you're saying is that you may or may not agree that they're racist?

A I wouldn't characterize all of them that way without

```
 1   seeing each one.
 2        Q    Okay.  So, yeah, I want to show you some others and
 3   give you that opportunity.
 4             Now, Dr. Pardell sent you pictures of naked women at
 5   least once a week, didn't he?
 6        A    I would have to go look at the record.  Whatever the
 7   record would show, I would agree to.  But offhand --
 8        Q    You mean --
 9        A    -- I can't give you specifics sitting here today.
10        Q    Well, would it help -- you want me refresh your
11   memory with what you said in your deposition?
12        A    If I said that in a deposition couple years ago, I'm
13   just not recalling it sitting here at this time.  So I
14   would --
15        Q    Right --
16        A    -- defer to my deposition as being accurate.
17        Q    Yes.  The deposition you gave in December of 2012,
18   okay.
19             And in that deposition, 2012, that was closer in
20   time to the events than we are today, right?
21        A    Yes.
22        Q    So your memory was better?
23        A    It's been a couple years.  My memory is not perfect.
24             THE COURT:  Counsel?
25             (Sidebar conference:)
```

1          THE COURT:  Okay.  I briefly covered the way we do

2    impeachment by means of a depo.  You ask the witness a

3    question, he gives you an answer.

4        See, "I direct the Court and counsel to this deposition

5    taken on blah, blah, blah, page No. 43, lines 13 through 15."

6    Give us a moment to find it and look at it.

7        If in response to the same question during his deposition

8    he gave a different answer, you can read it -- just read it and

9    move on.

10         MR. CONWELL:  Right.  I was just going to refresh

11   his memory as I'm impeaching him, showing him the testimony

12   from 2012.

13         THE COURT:  Okay.

14         MR. CONWELL:  It's closer in time to today.  He said

15   he couldn't recall, so I was going to show him.

16         MS. ROSSETTI:  It would help us to know what you're

17   looking at.  We'd appreciate that.

18         MR. CONWELL:  Page 182 of his deposition.

19         MS. ROSSETTI:  But every time.

20         THE COURT:  As a practical matter, he can show him

21   this (demonstrating).

22         MS. ROSSETTI:  Uh-huh.

23         THE COURT:  Does that refresh your recollection?

24   Maybe it does, maybe it doesn't.  Okay.  You can show him

25   anything.  You can show him a baseball, all right?  Okay.

```
 1                (Open court in the presence of the jury.)

 2                MR. CONWELL:  I'm going to switch this for just a

 3    second here.

 4        Q    (BY MR. CONWELL:)  See on the screen this is from

 5    your deposition page 182, (Reading:)

 6                "How many times has Dr. Pardell sent you

 7                pictures of women" --

 8                MR. SCHNEIDER:  Give us a page too, please.

 9                MR. CONWELL:  Page 182, line 13 on your screen.

10                MR. SCHNEIDER:  I can't seen see the line number on

11    the screen.

12                MR. CONWELL:  Oh, I'm sorry.

13        Q    (BY MR. CONWELL:)  (Reading:)

14                "How many times has Dr. Pardell sent you

15                pictures of women without their clothes

16                on?

17                "Frequently he did it.  He doesn't do it

18                any more, but he used to.

19                "How frequently?

20                "Answer:  Once a week sometimes."

21                Does that refresh your memory?

22        A    Yes.

23        Q    Now, Joseph Gallagher was on the Board also; is that

24    right?

25        A    At one time he was.
```

1       Q     Okay.  And I think we'll see that he was on the

2  Board on June 13, 2012, but we'll come back to that.

3       A     Okay.

4       Q     Take a look at pages 136 to 139.  Let's go to the

5  bottom of 136.  This is an e-mail from Joseph Gallagher which

6  you then forwarded dated November 12, 2009, subject "The

7  Irishman in New York."

8             Do you recall this one?

9       A    I didn't recall it by seeing this.  I do, but prior

10  to this I wouldn't have recalled it.

11      Q     Okay.  Well, we covered it in your deposition.

12      A     Right.

13      Q     Do you remember that?

14      A     Okay.

15      Q     Okay.  And then let's turn over to page 139.  Now,

16  this --

17      A     139?

18      Q     139, just two pages later -- two or three pages

19  later.

20      A     Okay.

21      Q     This tries to say that it's funny when a black man

22  jumps to his death, doesn't it?

23             MS. ROSSETTI:  Objection.  Argumentative.

24             THE COURT:  Sustained.

25      Q     (BY MR. CONWELL:)  Okay.  Let's just read it.  Would

```
 1    you please read the joke on page 139?
 2        A    I'm going to read it from the screen.  It's easier
 3    for me to see it.  (Reading:)
 4                 "Paddy was walking along the street during
 5                 his once-in-a-lifetime visit to New York
 6                 when he rounds the corner and there's a
 7                 rise -- high-rise building on fire.
 8                 Paddy, ever the kind-hearted and
 9                 resourceful Irishman, runs up to the
10                 building to see if he can help and notices
11                 people trapped five stories up.
12                 Paddy yells to the people, 'I'm Patrick
13                 Sean Michael Fitzpatrick, the Irish Rugby
14                 Union fullback.  If you jump, I'll catch
15                 you.'
16                 One lady in desperation jumps, and sure
17                 enough, Paddy catches her.  Then a man
18                 sees that Paddy catches the women and
19                 jumps.  Sure enough, Paddy catches him
20                 also.
21                 The black man jumps out and crashes to the
22                 sidewalk.  Paddy didn't even attempt to
23                 catch him.  Paddy looks up and yells,
24                 'Don't be throwin' out the fookin' burnt
25                 ones.'"
```

```
 1        Q     Now, that was totally inappropriate for you to send

 2   that to Mr. Bell, wasn't it?

 3        A     Absolutely.

 4        Q     And you knew when you sent that that you were

 5   sending an outrageous racist e-mail, didn't you?

 6              MS. ROSSETTI:  Objection.  Argumentative.

 7              THE WITNESS:  All right.  Let's strike "outrageous."

 8        Q     (BY MR. CONWELL:)  Okay.  A racist e-mail, didn't

 9   you?

10        A     This was totally inappropriate.

11        Q     No.  I said you knew you were sending a racist

12   e-mail, didn't you?

13        A     Oh, yes.

14        Q     You agree this is a racist e-mail?

15        A     I concur, yes.

16        Q     You also sent out racist e-mails regarding

17   Hispanics, didn't you?

18              MS. ROSSETTI:  Objection.  Lacks foundation.

19              THE COURT:  It's a question.  Overruled.

20              THE WITNESS:  I'd have to see them.  If in my

21   deposition I attested to that fact, then I would agree that

22   that would be correct.

23        Q     (BY MR. CONWELL:)  Okay.  Now, Mr. Gallagher also

24   sent you e-mails with sexual content, didn't he?

25        A     I think he did, yes.
```

1      Q      Excuse me.  I said Mr.  This is Dr. Gallagher.

2             Dr. Gallagher, what kind of doctor is he?

3      A      Orthopedic surgeon.

4      Q      Okay.  These doctors, the family practices doctor,

5      the internist, the orthopedic surgeon, do they ask women to get

6      undressed in their practice?

7      A      That's something I can't speak to with any accuracy.

8      Q      Okay.  Now, you also enjoyed and forwarded photos of

9      naked elderly women, didn't you?  Not just young teens, but

10     also elderly women?

11            MS. ROSSETTI:  Objection.  Lacks foundation.

12            THE COURT:  That should have been your last

13     objection to the last question.  Sustained.

14     Q      (BY MR. CONWELL:)  Take a look at page 115.  This is

15     one of the photos that you received from a doctor and forwarded

16     on to Mr. Bell; isn't that correct?

17     A      Correct.

18     Q      Take a look at page 123.  Referring to the photo at

19     the bottom -- no, you went too far; that one right there --

20     that's a photo of an elderly woman barechested that you

21     received and forwarded to Mr. Bell?  Yes?

22     A      I don't see the exact e-mail here, but if it's -- if

23     I did, if it's in here, I would admit to that.

24     Q      Okay.  And take a look at 128.

25     A      Okay.  Okay.

1          Q     This appears also to be a photograph of a naked

2    elderly woman; is that correct?

3          A     I would agree with that, yes.

4          Q     And you received that and forwarded it on to

5    Mr. Bell?

6          A     I think I did, yes.

7          Q     And you also received and forwarded sexually

8    explicit e-mails and photos related to children; is that right?

9                MS. ROSSETTI:  Objection.  Lacks foundation.

10               THE COURT:  It's a question.  Overruled.

11               THE WITNESS:  I don't recall that.

12         Q     (BY MR. CONWELL:)  You don't recall it one way or

13   another?

14         A     Children, I don't recall that.

15         Q     Take a look at page 89.

16         A     Okay.

17               MR. CONWELL:  And if you can enlarge the one with

18   the big whatever that is, the yellow thing.  Okay.

19         Q     (BY MR. CONWELL:)  You see that?

20         A     Yes.

21         Q     Now, can you read what that says?

22         A     Yes.

23               MR. CONWELL:  Can you enlarge that part?

24         Q     (BY MR. CONWELL:)  What's it say?

25         A     "Crawl inside, children."

1       Q     And above that what's it say?

2       A     "Piku's vagina."

3       Q     "Pikachu's vagina"?

4       A     Correct.

5       Q     Kind of like a play on words like kids would say

6  peekaboo?

7       A     Yeah.  I didn't think of that, but, yeah.

8       Q     And it shows young children crawling into an area,

9  and an area that would be a vagina; is that right?

10      A     Yes.

11      Q     Now, the word "children" is misspelled?  The H is

12  missing, right?

13      A     Correct.

14      Q     Now, in the sites that you look at and the sorts of

15  things that you look at, is that something that's done to avoid

16  detection by law enforcement, to misspell the word so that

17  their software won't find these things?

18            MS. ROSSETTI:  Objection.  Lacks foundation.

19            THE COURT:  Sustained.

20      Q     (BY MR. CONWELL:)  Well, do you have any -- you

21  understood that it was saying "children," right?

22      A     Yes.

23      Q     And you thought this was okay to forward to

24  Mr. Bell?

25      A     I didn't say that, no.

1        Q      You knew it was extremely wrong and you did it

2    anyway?

3              MS. ROSSETTI:  Objection.  Argumentative.

4              THE COURT:  Sustained.

5        Q      (BY MR. CONWELL:)  You forwarded it to Mr. Bell; is

6    that right?

7        A      I did.

8        Q      Now, you also received a video of an orgy called

9    "*Cheers*"; is that right?

10       A      Correct.

11       Q      And turn to page 36.  Now, this -- you see these

12   series of e-mails, it says "Forward:  *Cheers*, 4X, XXXXX"?

13       A      Yes.

14       Q      Was that some kind of a warning sign to you, or did

15   you view that as a signal to forward this on to people?

16       A      Neither.

17       Q      Okay.  You thought it meant sexually explicit,

18   right?

19       A      Yes.

20       Q      And let's see what you forwarded on to Mr. Bell.

21   This is 214.3.

22              While he's pulling that up, do you recall the video?

23       A      Yes, I do.

24              (Video played, not reported.)

25       Q      (Inaudible.)

1           THE REPORTER:  I can't hear you.

2           THE WITNESS:  Excuse me?

3           MR. CONWELL:  Withdraw the question.

4      (Video played, not reported.)

5      Q    (BY MR. CONWELL:)  Mr. Carbone, what were you

6  thinking when you sent that video to the director of government

7  affairs in your office?

8      A    Well, I would say I wasn't thinking appropriately.

9  I will tell you that I do not recall viewing it before sending

10  it, but at the previous deposition when I saw it, I did

11  recognize it, so -- and the e-mails show that I sent, it so I

12  admit to that.  But totally, totally completely an error in

13  judgment and I'm sorry I did that.

14      Q    Your computer desk there's -- you've been in the

15  courtroom, you've heard the testimony -- your screen faces the

16  door so the people walking by your office can see your computer

17  screen, and you, in fact, said so in your deposition.  Do you

18  recall that?

19      A    At one time the office desk -- my desk was set up

20  that that was correct, yes.

21      Q    So that people walking by would be exposed to your

22  pornography, correct?

23      A    People walking into my office behind me.

24      Q    Okay.  Now, this doctor who sent you the *Cheers*

25  video also sent you -- can you turn to page 17?

1        A      I'm there.

2        Q      He also sent you some pretty explicit photographs,

3   women with their private parts exposed; is that right?

4        A      Yes.

5        Q      And you forwarded that on, too?

6        A      Yes, I did.

7        Q      Now, we -- we did talk in your deposition about you

8   sending e-mails that made fun of Hispanics.  Do you need me to

9   refresh your memory or do you remember testifying to that?

10        A      If it was in testimony, then -- and I concurred with

11   it, there's no need to reiterate it.

12        Q      It sounds like something you would do, doesn't it?

13             MS. ROSSETTI:  Objection.  Argumentative.

14             THE COURT:  Sustained.

15        Q      (BY MR. CONWELL:)  That's why you're comfortable in

16   saying that you sent it; is that right?

17             MS. ROSSETTI:  Objection.  Argumentative.

18             THE COURT:  Misstates the testimony.

19             THE WITNESS:  Do I answer that?

20             THE COURT:  He's going to ask another question.

21             THE WITNESS:  I can't --

22             MR. CONWELL:  I'm going to ask another question.

23        Q      (BY MR. CONWELL:)  You didn't think that sending e

24   e-mails that made fun of Hispanics was appropriate either, did

25   you?

1          A      Would you repeat that, please?

2          Q      You don't think it's appropriate to forward e-mails

3    that make fun of Hispanics, do you?

4          A      I agree.

5          Q      Now, at the time of your deposition in December of

6    2012, you had a different view regarding whether or not this

7    was appropriate than you do today; isn't that true?

8          A      I truly don't recall.  I may have.

9          Q      This is page 183, lines 20 through 25.  Tell me if

10   this refreshes your memory.  We had been going through this

11   pornography and I asked you, "When Tim Bell asked you to

12   forward these e-mails to him, you did so?"

13                And you answered, "Yes."

14                And I ask, "Why did you do so?"

15                And you said, "It was an interoffice issue.  He was

16   one of our staff, so I didn't see an issue with it."

17                Does that refresh your memory?

18         A      Yes, it does.

19         Q      You don't think that it's inappropriate to forward

20   e-mails such as the pornograph- -- pornography that we've seen

21   to staff if they ask you for it; is that right?

22         A      I did not say that.

23         Q      Show you your deposition page 184, lines 9 through

24   12.

25                We were talking about the pornography and the racist

```
 1   e-mails --

 2        A     Right.

 3        Q     -- and I said, "You think it's okay" --

 4              THE COURT:  Hang on.  Hang on.  Hang on.  Hang on.

 5              MR. CONWELL:  I'm going to work towards line 12,

 6   your Honor.

 7              THE COURT:  Uh-huh.  I'm taking a look at your

 8   question here.

 9        Any objection?

10              MR. SCHNEIDER:  Can I get the previous question

11   back, please?

12              THE COURT:  Okay.

13              MR. CONWELL:  I can re-ask it, your Honor.

14              THE COURT:  No.  No, no, no, no.  Doesn't work that

15   way.

16              MR. CONWELL:  Okay.

17              THE COURT:  The previous question was:  "You don't

18   think it's appropriate to forward e-mails that make fun of

19   Hispanics, do you?"

20        And he says, "I agree."

21              MR. CONWELL:  No --

22              THE COURT:  And the next question is, "Now at the

23   time of your deposition in December of 2012, you had a

24   different view regarding whether or not this was appropriate

25   than you do today; isn't that true?"
```

```
1        And then he says, "I don't recall."

2         It's difficult to impeach, "I don't recall."

3              MR. CONWELL:  That's not the preceding question,

4    your Honor.

5              THE COURT:  Okay.

6              MR. CONWELL:  That's like four questions ago.  I

7    could re-ask it, if the Court would like me to do so.

8              THE COURT:  Sure.  Go ahead.

9        Q    (BY MR. CONWELL:)  (Reading:)

10             "You think it's okay for" --

11             MS. ROSSETTI:  Objection, your Honor.  This -- the

12   questions don't match up.  It misstates the testimony.

13             THE COURT:  He said he's going to restate the

14   question.

15             MS. ROSSETTI:  Oh, sorry.  Thank you.

16       Q    (BY MR. CONWELL:)  (Reading:)

17             "You think it's okay or appropriate for

18             you to forward such e-mails to an AAPS

19             staff member if they make the request?"

20             MS. ROSSETTI:  Objection.  Vague.

21             THE COURT:  Overruled.

22             THE WITNESS:  I don't think it's appropriate.

23       Q    (BY MR. CONWELL:)  Okay.  In your deposition on

24   page 184, lines 9 through 12, do you recall me asking this

25   question and you giving this answer --
```

Case 5:13-cv-01670-ODW-DTB   Document 483   Filed 03/17/16   Page 50 of 151   Page ID
#:13224

50

```
1              THE COURT:  No, no.

2              MR. CONWELL:  (Reading:)

3         "You think it's okay" --

4              THE COURT:  No, no.  Just read the answer.  Read the

5    question, read the answer.

6         Q    (BY MR. CONWELL:)  Yes.  (Reading:)

7              "You think it's okay or appropriate for

8              you to forward such e-mails to an AAPS

9              staff member if they make the request?"

10             And your answer was," I don't think it's

11             inappropriate."

12             Do you recall that?

13        A    Yes.  After seeing this I do.

14        Q    You have admitted to exposing Cassandra Newby to at

15   least one photograph with -- of a woman with large bare breasts

16   with her genitals and back sides exposed; is that correct?

17        A    I opened an e-mail and she was standing behind my --

18   behind me and I didn't know she was there and I didn't know

19   what was on the e-mail as I was opening it.

20        Q    And you deny what she said, that you exposed her to

21   a lot more than that; is that correct?

22        A    No, it is not correct.

23        Q    I'm saying you dispute what she says, right?

24        A    Absolutely.

25        Q    Okay.  Now, when your pornographic activities were
```

51

```
 1   exposed, you were not fired, were you?

 2               MS. ROSSETTI:  Objection.  Argumentative.

 3               THE COURT:  Overruled.

 4               THE WITNESS:  No, I was not.

 5      Q    (BY MR. CONWELL:)  Nor did you resign, did you?

 6      A    No, I did not.

 7      Q    But you testified that you fired Cassandra Newby --

 8   or, I'm sorry -- you haven't testified to this -- you told me

 9   in your deposition that you fired Cassandra Newby because she

10   pushed another woman into a file cabinet; is that right?

11      A    I terminated her for assaulting an employee.

12      Q    Do you recall testifying that she pushed another

13   woman into a file cabinet?

14      A    I may have very well made that statement, yes.

15      Q    Would you like to look at your testimony -- your

16   deposition testimony to refresh your memory?

17      A    If I had said that and it's in the testimony, then I

18   would accept that as fact.

19               MR. CONWELL:  Okay.  May I approach the witness,

20   your Honor, and show him the testimony?

21               THE COURT:  This is a waste of time.  He said he may

22   very well have made that statement, so what are we doing?

23               MR. CONWELL:  I'll move on then.

24               THE COURT:  All right.

25      Q    (BY MR. CONWELL:)  You also testified that Ms. Newby
```

```
  1    then turned around and smirked; is that correct?  Will you
  2    adopt that testimony as well?
  3         A     I believe so, yes.
  4         Q     And you also testified that you have this on
  5    surveillance video; is that right?
  6         A     Yes.
  7         Q     And then you produced that surveillance video to us,
  8    right?
  9         A     Someone did, yes.
 10         Q     Okay.  Let's take a look at Exhibit 1093 and tell me
 11    if this is that surveillance video.
 12              (Exhibit 1093.2 previously marked for identification.)
 13              MR. CONWELL:  Can you go ahead and play that?
 14              THE COURT:  Let's take a break right now.  Is 1093 a
 15    DVD?
 16              MR. CONWELL:  It's like a 30- to 45-second video
 17    clip.
 18              THE COURT:  Okay.
 19              MR. CONWELL:  We would appreciate the break 'cause
 20    we're having trouble pulling it up.
 21              THE COURT:  Okay.  Good.
 22         Ladies and gentlemen, remember the admonition.  We're
 23    going to take about ten minutes, all right?
 24              THE COURTROOM DEPUTY:  All rise.
 25              (A recess was taken.)
```

```
 1                    (Open court in the presence of the jury.)

 2             THE COURT:  All right.  Counsel and the parties are

 3    present.  The jury has returned.  Mr. Carbone has resumed his

 4    place in the witness chair.

 5         All right, counsel, you may continue.

 6             MR. CONWELL:  Thank you, your Honor.  And we're

 7    showing 1093.2, which is the surveillance video that was

 8    furnished to us.  Just --

 9         (Video played, not reported.)

10             MR. CONWELL:  I want to play that again.  It

11    happened so quickly.

12         Q    (BY MR. CONWELL:)  Who's coming towards who?

13    Mr. Carbone, the one approaching us, who is that?

14         A    Well, there's two people there.

15         Q    The one walking towards us, who is that?

16         A    That's one of the employees, Debra Comorgan, and the

17    the other is Cassandra Newby walking away from us.

18         Q    So Cassandra Newby is the smaller of the two people?

19         A    I don't know if smaller, but she's in the turquoise

20    or blue top with short hair.

21         Q    Okay.  Right.  And this is what you described as hip

22    checking the larger of the two women into the filing cabinet?

23         A    Yes.

24         Q    And then -- and that, that right there, is what led

25    you to firing Cassandra Newby?
```

1      A      Yes.

2      Q      Now, you had been sending pictures of women without

3  their clothes on from your AAPS computer for two to

4  three years, and you neither resigned nor were fired; is that

5  right?

6      A      Excuse me.  The end part of that?

7      Q      You had been sending pictures of women without their

8  clothes on to people for two to three years with your AAPS

9  computer and you were never fired, right?

10     A      That's correct.

11     Q      Although the employee handbook says it's grounds for

12  immediate termination, right?

13     A      Won't argue with that.

14     Q      Okay.  Thank you.

15            And yet Cassandra Newby runs into this woman or they

16  have this whatever encounter, that's grounds for termination?

17     A      My opinion is that she was assaulted.

18     Q      Really?

19     A      Really.

20     Q      Okay.  You heard her testify that she had just been

21  diagnosed with diabetes, didn't you?

22     A      Yes.

23     Q      That her blood sugars were 600?

24     A      I think that was correct.  They were high, yes,

25  yeah.

```
 1        Q      Normal is 100?

 2               MS. ROSSETTI:  Objection.  Calls for an expert

 3    testimony.

 4               THE COURT:  Sustained.

 5               MR. CONWELL:  You heard her testimony that normal --

 6               THE COURT:  Hang on.  Hang on.  Hang on.  Sustained.

 7        Q      (BY MR. CONWELL:)  You heard her testify that normal

 8    was 100?

 9        A      I believe so, yes.

10        Q      You can't even walk straight when your blood sugar

11    is 600, can you?

12               MS. ROSSETTI:  Objection.  Calls for expert

13    testimony.

14               THE COURT:  Sustained.

15        Q      (BY MR. CONWELL:)  Instead of -- you know what?

16    Excuse me.  Now, the story you told us today about Tim Bell

17    making a one-time request or maybe two-time request of you as

18    opposed to coming into your office and occasionally seeing

19    these e-mails, it wasn't true?  What you just told us is not

20    true, is it?

21               MS. ROSSETTI:  Objection.  Argumentative.

22               THE COURT:  And confusing.  Would you rephrase that?

23               MR. CONWELL:  Yes, your Honor.  I don't want it to

24    be confusing.

25        Q      (BY MR. CONWELL:)  The the testimony that you've
```

1  given us that the way -- the reason you were sending these to

2  Mr. Bell was 'cause he made a one-time request, or I think you

3  said maybe two times he asked, "Just anything you get like

4  this, just send it on to me," that testimony's not true, is it?

5       A     No, it is correct.

6       Q     Well, that's not what you told the Board of

7  Directors, is it?

8       A     That I don't recall.

9             MR. CONWELL:  Take a look at Exhibit 12?

10            (Exhibit 12 previously marked for identification 1801

11            MR. CONWELL:  I'm sorry I went out of order.  I

12  changed the order of the exhibits.

13       Q     (BY MR. CONWELL:)  Okay.  You recognize this don't

14  you?

15       A     It's a newsletter from AAPS, yes.

16       Q     Right.  This was sent out on June 24, 2011, right?

17       A     Yes.

18       Q     Now, that was during the annual meeting at Tysons

19  Corner, wasn't it?

20       A     Yes.

21       Q     The annual meeting at Tysons Corner?

22       A     I would say yes, correct.

23       Q     And someone had sent out a 14-point letter making

24  certain statements regarding a number of issues, and

25  particularly regarding you distributing pornography; is that

```
 1   right?

 2       A     I believe that's correct, yes.

 3       Q     And so this was in connection with this debate that

 4   was going to be happening regarding whether or not the House of

 5   Delegates would adopt a -- this amendment that we heard

 6   described in other testimony as giving these super powers to

 7   the Executive Committee?

 8       A     Yes, I do.

 9       Q     Can you speak in the microphone?

10       A     My answer is yes, I do recall it.

11       Q     Thank you.

12             And so this was the official response to the

13   statements in that 14-point letter that had been sent to those

14   delegates, isn't it?

15       A     I would have to read this and read the 14 points to

16   tell you specifically this was the response.

17       Q     It says, "Dear members," on the first page, "Thank

18   you to all those that participated in the Board of Directors

19   meeting on June 23, 2011, at the Ritz-Carlton in Tysons Corner,

20   Virginia, and thank you to all of our members for their

21   continued support, many, unfortunately, who were unable to join

22   us at this year's annual meeting."

23             You see that?

24       A     Yes, I do.

25       Q     And then it goes on, and the third paragraph and it
```

```
 1    says, "An anonymous communication was brought forth not only at

 2    the June 23, 2011, Board of Directors' meeting, but was sent

 3    out broadly to our members as well.  These concerns and issues

 4    were brought forth at the meeting and addressed broadly by

 5    myself, and the Board responded in an as transparent manner as

 6    possible.  Please understand that certain matters could not be

 7    elaborated ongoing" -- excuse me -- "elaborated upon as ongoing

 8    litigation does not allow us to do so, even though this goes

 9    against our greatest wishes."

10               Do you see that?

11        A     Yes, I do.

12        Q     And then what follows here are statements by the

13    members to Save AAPS, as we can see at the bottom of the page,

14    and then the next page, the Board of Directors' Response to All

15    Concerns and Allegations.  See that?

16        A     Yes.

17        Q     And so I'm not going to go through each of these.

18    Many of them have been gone through already.

19               What I would like to direct you to is the bottom of

20    page 003.  It's 12-003.  And specifically Item No. 6.  It says

21    that, "The CEO of our organization was accused of distributing

22    pornography via company e-mail ."

23               You see that?

24        A     Yes.

25        Q     That was the same statement that had been made to
```

```
 1    Save AAPS.

 2              And then after that is the AAPS Board of Directors'

 3    response.  Do you see that?

 4         A    Yes.

 5         Q    And let's look at your response.

 6              MS. ROSSETTI:  Objection.  Lacks foundation.

 7              THE COURT:  Sustained.

 8              MR. CONWELL:  Your Honor, this is already in

 9    evidence -- let's look at the response of the Board of

10    Directors.  This is already in evidence, your Honor.

11         Q    (BY MR. CONWELL:)  (Reading:)

12              "Bill Carbone occasionally receives

13              off-color and questionable e-mails.  Tim

14              Bell more than one occasion saw these

15              e-mails" -- here's the key part -- "by

16              walking into Bill's office on his own

17              accord.  Bell then requested that Bill

18              forward it to him.  Please, we request

19              that do you not forward any distasteful

20              e-mails to anyone at AAPS, no matter how

21              funny you think they are."

22           That's the representation that was made by the Board of

23    Directors to the members, isn't it?

24         A    It -- yes.

25         Q    Okay.  You didn't -- or the Board of Directors did
```

```
 1    not tell the members that Mr. Bell had made a one-time or

 2    two-time request for you to forward any racist or pornography

 3    e-mail -- pornographic e-mails that you get, does it?

 4         A    The Board did not, did you say?

 5         Q    Right.  It didn't do that?  The thing you told us

 6    this morning, the Board didn't do that in its communications to

 7    the members?

 8         A    Repeat the question again, please.

 9         Q    The things you told us this morning about how this

10    happened is not consistent with what the Board told the

11    members, is it?  It's not the same?

12         A    I don't see the inconsistency.

13         Q    You don't.  Okay.

14              So it doesn't say anywhere here that you were

15    getting and forwarding hardcore pornography like the Cheers

16    video that was just shown, does it?

17         A    No, it does not.

18         Q    Instead, it calls it "off-color and questionable,"

19    doesn't it?

20         A    That's what I read, correct.

21         Q    Can we at least agree that the video in the

22    photographs we've been seeing are far worse than just

23    off-color?

24         A    Agreed.

25         Q    Did you not tell the Board that you were getting
```

1    hardcore pornography and forwarding that, or did you tell them

2    and they failed to disclose it?

3          A     Neither.  I told them and whether they disclosed it

4    or not wasn't my discretion.  It wasn't my purview.  I didn't

5    write this.

6          Q     So you did tell the Board of Directors that you were

7    getting and forwarding hardcore pornography?

8          A     All types, yes.

9          Q     Okay.  When did you do that?

10         A     I don't recall.  Soon after it was made evident, but

11   I can't give you a specific date.

12         Q     When was it made evident?

13         A     Can't recall specifically.

14         Q     Was it when Tom Castillo went to Dr. McCann in

15   August 2010 and said that there's been a report that our CEO is

16   receiving and forwarding pornography in the workplace?

17         A     As I said, I don't recall specifically when.

18         Q     Okay.  You think it was after he did that?

19         A     As I said, I can't specifically recall.  It was

20   after, but I can't give you any date or timeline.

21         Q     Okay.  Was it -- did you disclose that to the Board

22   before they suspended Dr. Castillo, Geller, and Klein without a

23   hearing?

24         A     I don't recall.

25         Q     Did you feel any obligation to disclose that to the

1    Board knowing -- well, first you knew that they were suspending

2    Dr. Castillo, Geller, and Klein.  We covered that extensively

3    in your deposition, right?

4         A     I didn't know that was inevitable.

5         Q     You knew that they did it, right?

6         A     I knew they were considering that.

7         Q     And in fact, you were at the Board meeting on

8    September 30, 2010, when there were discussions regarding these

9    topics; is that correct?

10        A     You know, I don't recall being there.

11        Q     Okay.  I'll come to the Board meeting minutes in a

12   minute.

13        A     Okay.

14        Q     Minutes in a minute.

15        A     Okay.

16        Q     So in any event, did you feel any sense of

17   obligation or duty to Drs. Castillo, Keller, and Klein to

18   disclose to the Board that these three doctors were being --

19   excuse me -- disclose what you had done before these three

20   doctors were suspended?

21        A     I hadn't considered that issue.

22        Q     Okay.  But you knew that Dr. Castillo had -- was

23   calling for an investigation of "alleged conduct by our CEO

24   Bill Carbone and receiving and distributing pornography in the

25   workplace," right?

1      A      I knew he was calling for an investigation.  I

2  didn't know the specifics.

3      Q      You didn't know it had anything to do with you?

4      A      I didn't say that.  I said I just didn't know all

5  the specifics, what he was specifically calling for.  I knew it

6  had to -- to deal with me, yes.

7      Q      You knew it had to do with you allegedly

8  distributing pornography?

9      A      Something in general to that, yes.

10     Q      Okay.  So knowing that, you did not make the

11 disclosure or you did?

12     A      I did or did not make a disclosure, would you

13 complete the sentence or the question?

14     Q      Let me rephrase.  Maybe it was confusing.

15     A      Okay.

16     Q      Knowing that Dr. Castillo, Geller, and Klein were

17 calling for an investigation into a number of things including

18 whether you were distributing pornography in the workplace, you

19 did not disclose that you, in fact, were distributing

20 pornography in the workplace; is that right?

21     A      I did disclose that, yes.

22     Q      You did.  Before they were suspended?

23     A      I'm not sure of that.

24     Q      Is it your memory that they were suspended from the

25 organization for engaging in conduct injurious to the best

```
 1   interests of the AAPS after you had disclosed that the

 2   allegations were true?

 3        A    I believe that I disclosed it to the Board members

 4   before a decision was made.

 5        Q    So --

 6        A    Before the Board reached a decision.

 7        Q    So the chronology is they called for an

 8   investigation in August of 2010 into whether you were

 9   distributing pornography in the workplace.  You then disclosed

10   to the Board that you were distributing pornography in the

11   workplace, and then the Board suspended Drs. Castillo, Geller,

12   and Klein for conduct injurious to the best interests of AAPS?

13   Is that really your testimony?

14             MS. ROSSETTI:  Objection.  Argumentative.

15        Q    (BY MR. CONWELL:)  Is that your testimony?

16        A    Should I answer the question?

17             THE COURT:  Yes.

18             THE WITNESS:  I believe so, yes.  That's --

19        Q    (BY MR. CONWELL:)  What was injurious -- what was

20   causing injury to the AAPS by Dr. Castillo, Geller, and Klein

21   requesting an investigation into allegations that you knew to

22   be true?

23             MS. ROSSETTI:  Objection.  Lacks foundation.

24             THE COURT:  Overruled.

25             THE WITNESS:  There were other issues I understood
```

1    to be under consideration by the Board.

2         Q    (BY MR. CONWELL:)  Like the Federal Election

3    Commission issue?

4         A    No.

5         Q    The ACCME probation issue?

6         A    No.

7         Q    The payment of money to Bob Cerrato by the AAPS?

8         A    No.

9         Q    Were you -- did you participate in the decision to

10   suspend Drs. Castillo, Geller, and Klein?

11        A    No.

12        Q    Let me come back to this.

13             AAPS sued -- I'm sorry.  I'm sorry.  I lost my place

14   here.

15             So instead of firing you when you disclosed that you

16   were disseminating pornography in the workplace, you were given

17   a pay raise; is that right?

18        A    I would have to look at the record to verify that.

19        Q    Well, take a look -- well, how much do you make now?

20        A    Over a little over $250,000.

21        Q    Per year?

22        A    Correct.

23             MR. CONWELL:  Okay.  And now, take a look at

24   Exhibit 1801.

25             (Exhibit 1801 previously marked for identification.)

```
1          Q     You recall this, don't you, the tax return or the

2    return of organization exempt from income tax for 2010?

3          A     We submit one annually.  I'm not recalling this

4    specifically, but I've got it in front of me so --

5          Q     I think we covered this in your deposition.

6                But in any event if you --

7                MS. ROSSETTI:  Objection, your Honor.  All of these

8    numbers in this document were supposed to be redacted per

9    agreement of counsel and the ruling of the Court.

10               MR. CONWELL:  I'm just going to ask him about his

11   salary in 2010.

12               THE COURT:  Go ahead.  Go.

13         Q     (BY MR. CONWELL:)  Can you take a look at page 8?

14   Do you see your salary in 2010?

15         A     Correct.  Yes, I do.

16         Q     And what was it?

17         A     223,270, if I'm reading it correctly.

18         Q     So at the time the allegations were made, you were

19   making 223,000, and now you're making over 250,000; is that

20   right?

21               MS. ROSSETTI:  Objection.  Misstates testimony.

22               THE COURT:  Overruled.

23               THE WITNESS:  As I said, yes.

24         Q     (BY MR. CONWELL:)  Okay.  Take a look at

25   Exhibit 1767.
```

```
 1              (Exhibit 1767 previously marked for identification.)

 2              MR. CONWELL:  Don't put it up yet.

 3      Q     (BY MR. CONWELL:)  Now, is that the same type of

 4  document for the year 2013?

 5      A     Yes, it is.

 6      Q     Okay.  And turn to page 23.

 7      A     23?

 8      Q     Yes, sir.

 9      A     Okay.

10      Q     So by 2013, what had your salary been increased to?

11      A     257,990, it looks like.

12      Q     I'm sorry.  Could you speak --

13      A     257,990.

14      Q     Okay.  So you'd received a pay raise from the time

15  you had made this disclosure to the Board of your distribution

16  of pornography to 2013 of $34,000, approximately?

17      A     If this is what -- this is what -- this is what the

18  facts show, yes, I won't dispute that.  Yes.

19      Q     Okay.  Thank you for not disputing the facts.

20              Now, Tim Bell, you -- AAPS sued Tim Bell; is that

21  right?

22      A     That's correct.

23      Q     He brought some kind of a complaint with the City of

24  Tampa for employment-related charges against AAPS; is that

25  right?
```

```
 1        A       Correct.

 2        Q       He never filed a lawsuit against AAPS, did he?

 3        A       I know there was an EEOC complaint, one or two.  I'm

 4   not sure if there was an actual lawsuit.  I don't think so.

 5        Q       And then you sued him -- AAPS sued him, excuse me,

 6   on October 1, 2012; is that right?

 7        A       I know we sued him.  I can't tell you the specific

 8   date.

 9        Q       Okay.  It was after September 30th of -- it was

10   after September -- I used the wrong date, didn't I?  I said

11   2012.

12                Here.  Let's just go to an exhibit.  Let's go to

13   Exhibit 1405.

14                (Exhibit 1405 previously marked for identification.)

15        A       Okay.

16        Q       (BY MR. CONWELL:)  Those are the minutes of the

17   Board for the Board meeting on September 30th of 2010; is that

18   right?

19        A       Yes.  Yes.

20        Q       Thank you.

21                And so if you look at the bottom of the page, it

22   says, "The confidential discussion concerned the inappropriate

23   and fraudulent actions taken by a former AAPS employee,

24   Mr. Timothy Bell.  All questions by Board members were

25   answered.  Subsequently, a motion was made by Dr. McCann to
```

```
 1    immediately proceed with filing a lawsuit and injunction

 2    against Mr. Bell.  The motion was seconded by Dr. Cerrato.  The

 3    vote passed unanimously."

 4              Do you see that?

 5        A    Yes.

 6        Q    And so this was some two months after Dr. Castillo

 7    had gone to Dr. McCann, as we saw during his testimony, calling

 8    for an investigation; is that right?

 9        A    I believe you're correct, yes.

10        Q    So you would agree that the alleged -- that the

11    discussions that led up to Mr. Castillo going to Dr. McCann --

12    excuse me -- the discussions between Dr. Castillo and

13    Dr. Bell preceded the lawsuit that AAPS filed against Mr. Bell,

14    right?

15        A    Please repeat that.

16        Q    It was complicated.  I'm sorry.

17        A    Would you please repeat it?

18        Q    I will.

19        A    Okay.

20        Q    I'm not going to repeat it.  I'll rephrase it so

21    we're clear.

22        A    That's fine.

23        Q    So you sued Mr. Bell after September 30, 2010,

24    right?

25        A    According to this, correct, yes.
```

1      Q      And you heard Dr. Castillo's testimony that before

2    August of 2010, he got information from Mr. Bell that led him

3    to go to Dr. McCann and call for an investigation, right?

4      A      Correct.

5      Q      So those communications between Dr. Castillo and

6    Mr. Bell were far before you sued Mr. Bell, correct?

7      A      I believe they were prior to the Board making that

8    decision.  I don't know exactly the date that the lawsuit was

9    filed.  My answer would be I believe you're correct.

10     Q      Okay.  While we're here, the Board sent -- you heard

11   the testimony that the Board suspended Drs. Castillo, Geller,

12   and Klein in the first week of October of 2010.  Do you recall

13   that?

14     A      I believe you're correct, but I'm not certain.

15     Q      Okay.  I don't think there's any dispute in the case

16   that that's when they were suspended --

17     A      Okay.

18     Q      -- first week of October 2010.

19            Now, looking at September 30th --

20            MS. ROSSETTI:  Objection, your Honor.  Objection,

21   your Honor.  Mr. Conwell is testifying.

22            THE COURT:  Overruled.

23     Q      (BY MR. CONWELL:)  Look at the September 30 minutes

24   for 2010.  Now, do you see anything there where the Board

25   approves suspending Drs. Castillo, Geller, and Klein?

1      A      No, I do not.

2      Q      Okay.  Now, let's -- let's jump over and look at the

3  Board minutes for November 6, 2010, which is Exhibit 1413.

4              (Exhibit 1413 previously marked for identification.)

5              THE COURTROOM DEPUTY:  The exhibit again, counsel?

6              MR. CONWELL:  1413.

7              THE COURTROOM DEPUTY:  Okay.

8              THE WITNESS:  Thank you.

9      Q      (BY MR. CONWELL:)  Have you found it?

10     A      Yes.

11     Q      And there's nothing in these minutes either that

12  whereby the Board approves suspending Drs. Castillo, Geller,

13  and Klein, is there?

14     A      I'd have to read it.  Would you please repeat the

15  question for me so I'm clear?

16     Q      Yes.  First, if you go to page 1, I just want to

17  establish you were at that meeting, right?

18     A      Yes.

19     Q      First page?  Okay.

20             And the question was there's -- there's nothing in

21  these minutes that show that the Board of Directors voted to

22  suspend Drs. Castillo, Geller, and Klein at this meeting,

23  correct?

24     A      I see it.  Nothing in here, yes.

25     Q      Okay.  So it didn't happen in September and it

1    didn't happen in November, right?  Right?

2         A    Well, it didn't happen --

3              MS. ROSSETTI:  Objection.  Lacks foundation.

4              THE COURT:  Overruled.

5              THE WITNESS:  It didn't happen November 6th.

6              MR. CONWELL:  Okay.

7              THE WITNESS:  I don't know about the entire month,

8    but it didn't happen November 6th, according to these minutes.

9         Q    (BY MR. CONWELL:)  All right.  If you look on the

10   first page of this document, it says, "Approval of minutes, Dr.

11   Measures' motion to approve the September 30, 2010,

12   September 3rd, 2010, and June 10, 2010, minutes."

13             Do you see that?

14        A    Yes, I do, yes.

15        Q    Those had been all the Board meetings prior to

16   November 6, 2010; is that right?  From June 10th up to

17   November 6th, those are the three Board meetings that had

18   occurred; is that right?

19        A    Based on this, I would agree with that.

20        Q    Sir, you're not aware -- or are you aware of any

21   Board minutes, minutes of the Board of Directors of AAPS that

22   approved suspending Drs. Castillo, Geller, and Klein?

23        A    I would have to review all the minutes of that

24   period to be able to answer that accurately.

25        Q    Okay.  Well, I -- I -- I would like to see if there

```
 1    is such a set of minutes.  If you have them, I'd like to see
 2    them.  Have you done that?
 3         A    Have I gone through all the minutes?
 4         Q    Right.
 5         A    No, I have not.
 6         Q    Okay.  Do you have any memory of such minutes?
 7         A    Offhand, no.  There were so many meetings that were
 8    convening, I do not recall specifically.
 9         Q    Okay.  Now, if you look at the minutes here for
10    November 6, 2010, it identifies the Board members, doesn't it?
11         A    It -- in terms of being their names?
12         Q    Yes.  Right.
13         A    And attendance or not in attendance?
14         Q    Yes.
15         A    Yes.
16         Q    Now, if you look in the right-hand column, those who
17    were absent, he's a Board member, but he's just not there on
18    the meeting -- at that meeting is your porn buddy Herb Pardell.
19    Do you see that?
20              MS. ROSSETTI:  Objection.  Argumentative.
21              THE COURT:  Sustained.
22         Q    (BY MR. CONWELL:)  Herb Pardell was the guy that you
23    said was sending you pornographic e-mails once a week, right?
24         A    Frequently, and it could have been weekly, yes.
25         Q    Okay.  Stephen Montes was there, right?  He was on
```

1  the Board?

2       A      His name is here, yes.

3       Q      Okay.  Dr. Cerrato also?

4       A      I see his name as well, yes.

5       Q      Go to page 2 at the center of the page.  It says,

6  "Dr. Cerrato reviewed the six-month suspension of the three

7  AAPS/ABPS Board members as these members have been implicated

8  in the *AAPS vs. Bell* complaint as co-conspirators with

9  Mr. Bell, and their activities are a violation of AAPS Bylaws

10 Section 3.05, discipline."

11             See that?

12      A      Yes.

13      Q      Dr. Cerrato reported that?

14      A      According to these minutes, yes.

15      Q      And in fact, in your complaint against Mr. Bell,

16 AAPS alleged that Mr. Bell conspired with Drs. Castillo,

17 Geller, and Klein to, quote, "portray the CEO in a false light

18 by contacting public members of the organization and

19 distributing pornographic e-mails to them."

20             Do you recall that?

21      A      What was -- where are you reading from?

22      Q      I'm reading from your deposition.

23      A      Okay.  Yes.

24      Q      Okay.  So after Dr. Castillo brings to the attention

25 of the Board and Dr. McCann these allegations that you were in

1    fact distributing pornographic e-mails, AAPS turns around and

2    alleges in a publicly-filed complaint that Drs. Castillo,

3    Geller, and Klein were conspireing with Bell to distribute

4    pornographic e-mails, right?

5         A    If that's what the minutes state, I would concur

6    with what's written.

7         Q    That's what you said.

8         A    Okay.  I would concur with what I said, too.

9         Q    But you had no evidence at all that Drs. Castillo,

10   Geller, and Klein were conspireing with Timothy Bell to

11   distribute pornography, did you?

12        A    I don't believe I did.

13        Q    And there's nothing false about anyone portraying

14   you as someone distributing pornography because that's what you

15   were doing; is that right?

16        A    I was doing that, correct.

17        Q    So there's nothing false about the allegation in the

18   Bell complaint that -- that you were being portrayed as someone

19   distributing pornography, right?

20        A    I would agree with that also.

21        Q    That would be a true allegation?

22        A    Yes.

23        Q    Now, in the Board minutes on November 6, 2010 -- if

24   I'm looking at the right ones -- -- oh, I'm on the wrong ones.

25             Can you look at Exhibit 1457?

```
 1              (Exhibit 1457 previously marked for identification.)

 2      Q      (BY MR. CONWELL:)  And you have that?

 3      A      Yes, I do.

 4      Q      Now, this is a year later, right?

 5      A      Yes -- oh, yes.

 6      Q      And so you were present at this Board meeting as

 7 well, right?

 8      A      Yes.

 9      Q      Okay.  And so at this point this lawsuit with

10 Mr. Bell has not yet been resolved; is that right?

11      A      I believe it has not been, correct.

12      Q      And if you'd look at the bottom of the page under

13 Report of Officers, the very last line, it says, "Dr. Cerrato

14 noted that the default judgment against Mr. Bell will be

15 proceeding."

16        Do you see that

17      A      Yes, I do -- yes.

18      Q      And it was in fact true that there was no trial in

19 that case, right?  You obtained a judgment without a trial?

20      A      Yes.

21      Q      'Cause Mr. Bell did not defend it, correct?

22      A      He did not what?

23      Q      Defend.

24      A      There was no trial.

25      Q      Right.  He allowed a judgment to be entered against
```

```
 1   him.  He'd moved to another state at this point, hadn't he?

 2        A     I don't know where he went.

 3        Q     And then AAPS submitted affidavits primarily for

 4   attorneys' fees and administrative time for Mr. Durante that

 5   somehow totaled $180,000 and submitted that to the Court; is

 6   that right?

 7        A     We submitted expenses.

 8        Q     Right.  And then you obtained a judgment with no

 9   fight whatsoever from Mr. Bell for $180,000 against him; is

10   that right?

11        A     What was your statement again, please?

12        Q     I say then you submitted these expenses for $180,000

13   and you obtained a judgment against Mr. Bell with no fight by

14   him at all; is that right?

15        A     No fight by him did you say?

16        Q     No defense.  It was a default judgment.

17        A     We filed a judgment.  It was up to him to react and

18   respond.

19        Q     And he did not?

20        A     That's his choice.

21        Q     I'm just saying he did not; is that right?

22        A     To my understanding, you're correct, he did not.

23        Q     Okay.  Do you know if he even got the affidavit of

24   costs?  Do you know if he even received that?

25        A     I don't recall.
```

```
 1        Q     Yet, Tony Russo told the members that he was found

 2   guilty by a court, right?  That's what Tony Russo was telling

 3   the members?

 4        A     I don't remember that specific statement.

 5        Q     You didn't here that yesterday in his testimony?

 6        A     I don't -- you mean in his deposition?  I don't

 7   recall that, no.  But I was here, right.

 8        Q     But it -- certainly that's not true, is it?  He

 9   never was found guilty, was he?

10        A     He wasn't found guilty by a jury, I know that.

11        Q     Wasn't found guilty by anybody.  He got a default

12   judgment --

13              MS. ROSSETTI:  Objection.  Calls for expert legal

14   testimony.

15              THE COURT:  Overruled.

16              THE WITNESS:  I would say he was found negligent by

17   the judge that decided to accept the charges against him.

18              MR. CONWELL:  I want to talk about the preliminary

19   legal opinion, Exhibit 1870.  Oh, is it 1031?  I'm sorry, 1031.

20        Q     (BY MR. CONWELL:)  Okay.  You've seen this document

21   before, haven't you?

22        A     Yes.  Yes.

23        Q     You recall that this document was handed out to some

24   people at the June 2011 annual meeting of AAPS in Tysons

25   Corner, Virginia?
```

1      A      I understand it was distributed at that meeting,

2  yes.

3      Q      Okay.  And you were upset about that, weren't you?

4      A      I don't know if I was upset.  I was disappointed

5  after reading some of it.

6      Q      Well, you were disappointed because it points out

7  that there were allegations that you were distributing

8  pornography and engaging in other inappropriate conduct; is

9  that right?

10      A      I believe it does, yes.

11      Q      And so I'd like to just go through this.  I'm trying

12  to see -- I want to find out what it is in here that is stated

13  that you think is not true, if anything.

14            And if we can go to page 4 of the exhibit entitled

15  "Introduction.

16            Can you make that larger?

17            It says, "AAPS is in the midst of a major crisis,

18  one that appears to have been brought about by unprofessional

19  and inappropriate conduct on the part of its CEO, Mr. Bill

20  Carbone?"

21            Do you see that?

22      A      Yes.

23      Q      Now, that's true; you had been engaged in

24  unprofessional and inappropriate conduct, right?

25      A      Definitely inappropriate.

1       Q       Okay.  But you think professional?

2       A       It was unprofessional, yes.

3       Q       So that statement's true?

4       A       Yes.

5       Q       "This crisis appears to have been greatly aggravated

6    by the inappropriate response of the AAPS Executive Committee

7    to the crisis possibly because of bad legal advice they may

8    have received from their attorney, Mike Nolan.  The executive

9    committee's" --  well, let me stop there.

10              There -- that's true, right?  That they had engaged

11   in an inappropriate response by suspending Drs. Castillo,

12   Geller, and Klein; is that right?

13      A       I wouldn't categorize it as inappropriate.

14      Q       It says, "The executive committee's inappropriate

15   response to this crisis suspending three prominent physicians

16   who were requesting that an investigation be performed into the

17   alleged misconduct by Mr. Carbone, which was done without

18   providing the affected members a hearing, has greatly harmed

19   three of the most loyal and esteemed members of the

20   organization," etc.

21              Do you see that?

22      A       Yes.

23      Q       They never got the hearing, did they?  They were

24   suspended without a hearing?

25      A       Correct.

1      Q      Okay.  Now, you know that the bylaws say that you

2   got to have a hearing, don't you?

3      A      I would have to see them to refresh my recollection.

4      Q      Okay.

5      A      I believe that's correct, though, but I wouldn't say

6   absolutely.

7             MR. CONWELL:  Well, let's look at Exhibit 1317.

8             Can you also furnish the witness Exhibit 1314?

9   Thank you.

10            (Exhibit 1314 previously marked for identification.)

11     Q      (BY MR. CONWELL:)  Let's look at 1314 first.  Can

12   you turn to 3.05?

13     A      Okay.

14     Q      This says under Discipline 3.05, "The Board of

15   Directors may expel, call for the resignation of, or otherwise

16   discipline any member if two-thirds of the members of the Board

17   of Directors find that the conduct has been injurious to the

18   best interests of the Association or inconsistent with its

19   purposes."

20            Well, my page is -- page 5 is missing.  Well,

21   there's a page missing, so let's go to 1317.  3.05, 1317.

22     A      Yes, I'm there.

23     Q      Okay.  So the sentence I just read is the same,

24   right, page 4?

25     A      Correct.

1      Q    Then it says, "Before any such action is taken,

2  however, 30 days' prior written notice by registered mail shall

3  be given to the member to be disciplined advising that he may

4  appear in person with or without counsel and may submit such

5  evidence as he or she deems proper to show that he or she is

6  qualified to continue as a member of the Association."

7           So the bylaws require notice of a hearing and that

8  was not done; is that correct, for Dr. Castillo, Geller, and

9  Klein?

10     A    The bylaws do, and I don't recall that there -- I

11 don't believe there was a prior written notice.

12     Q    So the suspension was inappropriate, wasn't it?

13     A    I wouldn't term it inappropriate.

14     Q    I'm sorry?

15     A    I say I wouldn't characterize it as inappropriate.

16     Q    Even though it violates the bylaws?

17     A    Maybe deficient.

18     Q    Deficient, but appropriate?

19     A    I didn't say appropriate.

20     Q    Oh, it's neither appropriate nor --

21     A    I'm not saying appropriate.

22     Q    What does that mean?  If it's not appropriate and

23 inappropriate, what is it?

24     A    I said my term, I would characterize it as it was

25 deficient.

```
 1        Q     Okay.  Well, in fact, it was unlawful, wasn't it?

 2              MS. ROSSETTI:  Objection.  Calls for expert

 3  testimony.

 4              THE COURT:  Sustained.

 5        Q     (BY MR. CONWELL:)  You have personal knowledge of

 6  the order granting the Motion For Summary Judgment in the

 7  lawsuit filed by Castillo, Geller, and Klein, finding that

 8  they -- that what had been done was in violation of 3.05 --

 9              MS. ROSSETTI:  Objection, your Honor.

10              MR. CONWELL:  Excuse me.  I'm asking a question.

11        Q     (BY MR. CONWELL:) -- violated -- the suspension

12  violated 3.05 and violated Florida law because you were at the

13  hearing, weren't you?

14              MS. ROSSETTI:  Objection, your Honor.  It was not a

15  final judgment.

16              THE COURT:  It's not valid.  Overruled.

17              THE WITNESS:  There's a lot that I don't recall that

18  has transpired.  I was at the hearing.

19        Q     (BY MR. CONWELL:)  I was there, too.

20        A     I --

21        Q     You saw me, right?

22        A     Yes.

23        Q     I was arguing that this violated the bylaws and

24  Florida law.  You recall that, don't you?

25        A     I was at the hearing, but I don't remember
```

1    everything that transpired at the hearing.  If that is in fact

2    what occurred --

3        Q    The judge entered an order and you saw the order,

4    didn't you?

5        A    I'm sure I looked at it, yes.  I haven't --

6        Q    You're the CEO?

7        A    It's been years since I've looked at it, but, yes.

8        Q    Well, let's go take a look at it Exhibit 1758.

9        A    Okay.

10       Q    Does this refresh your memory?

11       A    Yes, it does.  Thank you.

12       Q    And your suspension of these three doctors was found

13   to be contrary to the bylaw, 3.05, and did not comply with the

14   Florida statutes; is that correct?

15       A    Yes.

16       Q    And you appealed that judgment, didn't you?  AAPS?

17   I mean, AAPS appealed?

18       A    Yes.

19       Q    In fact, I recall I believe seeing you at the oral

20   argument.  Weren't you there?

21       A    I don't specifically recall being there.  I was at a

22   lot of them.

23       Q    And this judgment was affirmed, wasn't it?

24       A    I believe it was, yes.

25       Q    Okay.  Yet you can't agree with me that the

1    suspensions were inappropriate?

2         A    Well, after seeing this, I would say that they were.

3         Q    So you now agree with the statement and the

4    preliminary legal opinion that the action of the Executive

5    Committee in suspending these three Board members was

6    inappropriate?

7         A    Based on this ruling, yes.

8         Q    Okay.  Back to the preliminary legal opinion, back

9    at the introduction again -- I'll just wait till he pulls it

10   up.  Let me know when you find it.

11        A    I'm almost there.  Okay.  I'm there.

12        Q    Exhibit --

13        A    Second paragraph?

14        Q    Same one.

15        A    1317.

16        Q    1031.  Exhibit 1031.

17             THE COURTROOM DEPUTY:  You still have that up there,

18   1031.

19             THE WITNESS:  Yes, I've got it.  I have it.

20             THE COURTROOM DEPUTY:  Okay.

21        Q    (BY MR. CONWELL:)  Okay.  So Dr. Okerblom wrote,

22   "It's difficult to understand why the Executive Committee would

23   have acted as they have.  Their response creates the impression

24   that one or more of the members of the Executive Committee may

25   have also engaged in acts of misconduct that they are trying to

```
 1   hide."
 2            You see that?  Is Dr. Cerrato on the Executive
 3   Committee?
 4       A    Yes, I see that.
 5       Q    Is Dr. Cerrato on the Executive Committee?
 6       A    Yes.
 7       Q    There was some Board members with something to hide,
 8   too; is that right?
 9            MS. ROSSETTI:  Objection.  Argument.
10            THE COURT:  Overruled.
11            THE WITNESS:  I don't know what any --
12       Q    (BY MR. CONWELL:)  Herb Pardell was a Board member;
13   he's sending you pretty explicit pornography?
14       A    Well, I understand that.  But you said he's trying
15   to hide that.  I don't know that -- that he is.
16       Q    I said that he has something to hide.  You don't
17   think that's something to hide?
18       A    Oh.  I'm not going to make a judgment based for him.
19       Q    Okay.  How about Mr. Montes?  He's the one that
20   was -- in 2011 -- actually just prior -- around the same time
21   this preliminary legal opinion was written, found by the
22   Federal Election Commission to have violated federal election
23   law.  Do you think he had something to hide?
24       A    My own personal opinion based on what occurred and
25   the decision with the FEC, no.
```

```
 1        Q    Okay.  Let's go to the next page, a Summary of

 2   Events and Historical Background.  This says, "Last year two

 3   former high-level employees of the organization, Tim Bell and

 4   Cassandra Newby, filed complaints against the AAPS with various

 5   government regulatory agencies after being terminated."

 6             That's true, isn't it?

 7        A    Yes, it's true.  Yes.

 8        Q    And then it says, "In these complaints they made

 9   numerous specific allegations of serious misconduct by

10   Mr. Carbone."

11             That's true, isn't it?

12        A    Inappropriate conduct, yes.

13        Q    Excuse me?

14        A    Yes.  I said it was inappropriate what I did.

15        Q    Okay.

16        A    In terms of the e-mails.

17        Q    Okay.  And then in the next paragraph, it says,

18   "The" -- I'm not going to read all this, but it says, "Although

19   two members of the Board of the AAPS, the representative of the

20   Emergency Medicine Academy" -- that's Dr. Geller, right?

21   Dr. Geller was the representative from the Emergency Medicine

22   Academy?

23        A    Either the Academy or the Board.  I don't know

24   specifically, but he was emergency medicine.

25        Q    All right. -- "and the representative of the
```

```
1   Surgical Academy" -- that was Dr. Castillo; is that correct?

2        A     Yes.

3        Q     -- "had looked into the allegations and concluded

4   that there was some truth to them.  And though they had urged

5   the Executive Committee to initiate an investigation of the

6   allegations, it did not."

7              That's all true, isn't it?

8        A     Uhm, I believe, yes, it is.

9        Q     Instead, the Executive Committee suspended both of

10  the Board members as well as another physician leader of the

11  AAPS who had urged the two Board members to request the

12  investigation claiming the suspended members had, quote,

13  "conspired with Tim Bell to destroy the organization," close

14  quote.

15             That's all true, isn't it?

16       A     Tim Bell did --

17       Q     Excuse me?

18       A     Tim Bell did state that he was going to destroy the

19  organization.

20       Q     That entire sentence that I just read to you is

21  true, isn't it?

22       A     Yes, it is correct.

23       Q     Okay.  And the next paragraph it says that these,

24  uhm -- "In suspending these leaders, which was done without

25  providing the suspended members notice that they were under
```

```
1    accusation and that they could possibly be subjected to
2    discipline without articulating in the accusation the specific
3    facts supporting the conclusion that their conduct might
4    warrant their suspension, and without an open hearing at which
5    the accused could confront their accusers" -- that's all true,
6    isn't it?
7         A    I would say yes.
8         Q    Then it says -- "the Executive Committee not only
9    usurped powers that belong exclusively to the Board of
10   Directors at the AAPS, it acted in a manner that's entirely
11   inconsistent with the procedures specified in the bylaws of the
12   AAPS."
13             That's true, isn't it?
14        A    Uhm, I would point out that it was my understanding
15   it was the Board of Directors, not just the Executive
16   Committee.
17        Q    Well, again, if you can show me Board minutes where
18   the Board does this, I'd like to see them.
19        A    Okay.
20        Q    But the notice from the -- that you all sent said
21   that these doctors were suspended for six months, a minimum of
22   six months, while you conducted an investigation, right?
23        A    I believe that's correct, yes.
24        Q    And that's what it says in the next paragraph, "The
25   three physician leaders were suspended for a minimum of six
```

1   months."

2          That's true, isn't it?

3      A    I believe that's correct also, yes.

4      Q    "And after the six months of investigation, the

5   accused physicians still had not been provided any factual

6   evidence to support the allegations that they had committed any

7   wrongdoing."

8          That's true, isn't it?

9      A    I think that's also correct.

10     Q    Uhm, the next says, "Having the professional status,

11  medical licensure, or hospital affiliations, malpractice

12  insurance potentially effected by being suspended from their

13  board-certifying organization and having been afforded no

14  opportunity to defend themselves within the AAPS, these

15  physician leaders had been forced to respond as any would --

16  any reasonable physician similarly situated.  They have been

17  compelled to file a legal action against the AAPS to have their

18  board certification and their member rights restored."

19         That's true isn't it?

20     A    I would dispute this statement -- or this by stating

21  to you that it's been my understanding that this action did not

22  affect board certification and that it was done under AAPS, not

23  under the individual Boards.

24     Q    Look at 3.05 in the bylaws -- or I'll tell you what.

25  Just so we don't have to flip back and forth here, Ari,

1    Exhibit 1317 were the bylaws, and in Section 3.06, Effective

2    Termination, where it describes the effect, it says, "They

3    shall no longer hold himself or herself out as a member of the

4    Association or as the holder of any of its honors, including

5    certification," doesn't it?

6         A    Yes, it does say that.

7         Q    Okay.

8         A    However, it's my understanding that it was

9    changed --

10        Q    We're going to get to that.  That change was in the

11   bylaws that are effective June 25, 2012.

12        A    Okay.

13        Q    So we'll get to that.  Now, this goes on and it

14   says -- talks about how expensive this was going to be on both

15   sides.  You see that?

16        A    Please tell me where you are on this document.

17        Q    Page 3 of the preliminary legal opinion.

18        A    Okay.  Which paragraph, please?

19        Q    The second and third paragraphs.  I'm just trying to

20   move this along.

21        A    Okay.

22        Q    They talk about how expensive this was going to be?

23        A    Yes.

24        Q    That was true, wasn't it?

25        A    Correct.

1        Q      That you -- you had a law firm -- AAPS hired a law

2   firm, a large law firm in Tampa to defend it initially; is that

3   right?

4        A      We -- yes.

5        Q      And then after you lost the summary judgment and the

6   appeal, then you added another law firm; you hired a New York

7   law firm; is that right?

8        A      We have a New York law firm as well, correct.

9        Q      That was Mr. Kruzhkov who's no longer in the

10  courtroom for some reason.  You hired his firm; is that right?

11       A      That's correct.

12       Q      And in 2000 -- I think it as 2011 alone you paid

13  them over $600,000, didn't you?

14       A      I can't answer that question accurately from this --

15  today sitting here without having --

16       Q      I'm sorry.  2013.

17       A      I can't answer that question accurately.

18       Q      Okay.  We can come back to that if we need to.

19       A      Okay.

20       Q      But you're the CEO.  Don't you have to approve these

21  things?

22       A      What do you mean by "things"?

23       Q      Spending money on lawyers.

24       A      The Board engages the law firms.  I do not.

25       Q      Does the Board write the checks?

1       A       No.

2       Q       That's done by staff?

3       A       I didn't say that right.

4       Q       And who manages that staff?

5       A       I do.

6       Q       And you're telling me you don't know what you've

7  been paying to lawyers for all this litigation over these

8  suspensions and the expulsion of Dr. Stewart?

9       A       Well, I wasn't intending to make that statement, or

10 your interpretation of that statement isn't what I was

11 intending it to be.

12      Q       So you do?

13      A       Pardon me?

14      Q       You do know?

15      A       I would have to look at our accounts to tell you

16 exactly what we paid --

17      Q       Well, give us an approximation.

18      A       I don't know.

19              MS. ROSSETTI:  Objection, your Honor.  We're not

20 supposed to be discussing financials at this stage of the case.

21              THE COURT:  We're not discussing -- we're not

22 discussing financials of the organization.

23              MS. ROSSETTI:  Well --

24              THE COURT:  We're talking about legal bills, whether

25 or not he's approved $600,000 for this law firm.

1          MS. ROSSETTI:  But it's not supposed to include

2   anything having to do with the current matter, your Honor.

3          THE COURT:  Overruled.

4     Q    (BY MR. CONWELL:)  Okay.  Well, would you agree with

5   me that this preliminary legal opinion was spot on regarding

6   how expensive the course of action chosen by AAPS was going to

7   be?

8     A    That's -- that's an opinion that you are presenting.

9     Q    No.  I'm asking you will you agree with that?

10  You're the one that said you had all these disagreements from

11  the preliminary legal opinion.

12    A    Would you reiterate that question again, please?

13    Q    Reiterate it?

14    A    Repeat.  Would you repeat the question again?

15    Q    This preliminary legal opinion was spot on in its

16  statement how expensive the course of action chosen by AAPS was

17  going to be?

18    A    I would answer that by saying there's no doubt about

19  it that it was expensive.  I can't give you the precise amounts

20  paid to legal counsels at a specific time.

21    Q    And in addition to the money that you've been paying

22  to -- well, you filed a lawsuit against Dr. Stewart in Florida,

23  didn't you?

24    A    I -- I did not.

25    Q    I'm sorry.  That's my mistake.  The AAPS did?

1          A     The Board of Directors did, correct.

2          Q     The organization that you're the CEO of has sued

3     Dr. Stewart in Florida, right?

4          A     Correct.

5          Q     Sued her husband in Florida?

6          A     That's also correct.

7          Q     And sued other members of the AAPS in Florida,

8     right?

9          A     Right.  Correct.

10         Q     And you've been spending a lot of money in suing

11    your own members, haven't you?

12         A     Yes.

13         Q     Plus you've got the risk of paying money damages

14    because you're being -- your organization's being sued,

15    certainly here in this courtroom, right?

16         A     There's always a risk, correct.

17         Q     And in Florida; is that right?

18         A     Yes.

19         Q     And then in the next paragraph down it says,

20    "Several members of our organization have questioned why these

21    physician leaders who have -- who each had a very strong track

22    record of service to AAPS and were board certified through it

23    could have been accused of trying to destroy their

24    board-certifying organization and been suspended without a

25    hearing and without articulation of the specific facts upon

1   which their suspension was based."

2          Do you see that?

3   A      Yes.

4   Q      You agree that that doesn't make any sense

5   whatsoever that these board-certified physicians would be

6   trying to destroy the organization that gives them their board

7   certification?

8   A      I don't know if all these physicians had a strong

9   track record.

10  Q      Maybe you didn't understand my question.  It doesn't

11  make any sense for AAPS to allege that these doctors who are

12  board certified with the AAPS would try to destroy their

13  board-certifying organization, does it?

14  A      Doesn't make sense to me.  It doesn't mean it

15  doesn't make sense to someone else.

16  Q      I'm only asking about you.

17  A      Doesn't make sense to me.

18  Q      So you agree with Dr. Okerblom this doesn't make

19  sense?

20  A      I would not try to destroy the organization that I

21  was depending on for my certification, personally.

22  Q      Okay.  I think we're in agreement on this.

23          Now, the next paragraph he says, "The Executive

24  Committee is currently asking our House of Delegates to approve

25  a new Bylaws Amendment that will provide the Executive

```
1    Committee with the power to suspend members of the AAPS for any

2    reason, even political reasons, at will and without a hearing."

3              Now, you saw the testimony by Dr. Rice and there's

4    been other references to it by Dr. Lemonick and others about

5    this amendment that would give all these powers to the

6    Executive Committee.  You recall that?

7         A    Yes, I do.

8         Q    And you're very well aware of that amendment, aren't

9    you?

10        A    I wouldn't say very well.  I'm aware of it.

11        Q    Okay.  And so in this document -- by the way, that

12   was up for vote at the House of Delegates' meeting in June of

13   2011 in Tysons Corner, Virginia, right?

14        A    Yes, that's correct.

15        Q    So this preliminary legal opinion is writing about

16   the proposed amendment that was going to be voting on, right?

17        A    Correct.

18        Q    That's called political speech, isn't it?

19        A    If that's what you call it, that's --

20        Q    Advocating for or against a measure that's to be

21   voted on by a legislative body, right?

22        A    Yeah.  If you call it political speech, I'll accept

23   that.

24        Q    And this document, this preliminary legal opinion,

25   is advocating that this amendment not be passed by the House of
```

```
 1   Delegates; isn't that right?

 2        A     I haven't read it all here to see if that's the

 3   actual opinion or --

 4        Q     Well, take a look at the last page --

 5        A     I'm still on page 3.  Okay.

 6        Q     I'm going to help you out here.

 7        A     Well --

 8        Q     Go to page 14, if you would, please.

 9        A     I'm there.

10        Q     Okay.  And do you see the last paragraph -- last

11   paragraph, page 14 --

12        A     Yes, I do.

13        Q     Can you see that?

14        A     Yeah, I see it.

15             MR. CONWELL:  No, you're not on the right page.  Let

16   me see.  It's page 1031-17.  Got it?  Dash 17.  I'm just going

17   to switch over here.

18        Q     (BY MR. CONWELL:)  The preliminary legal opinion

19   ends with this paragraph, "The House of Delegates should vote

20   down the proposed new bylaws.  They should restore the powers

21   of the Board of Directors and once again limit the powers of

22   the Executive Committee.  They should terminate the contract

23   with Attorney Nolan and seek to settle its lawsuit with

24   Dr. Castillo, Geller, and Klein" -- this says Stein; should be

25   Klein.  "They should apologize to Dr. Wilkens and Dr. Radentz.
```

```
 1   They should initiate an investigation into the allegations that

 2   Mr. Carbone has misused members' funds.  They should attempt to

 3   restore the kind of good character that this organization needs

 4   to possess in order to serve its members and the community at

 5   large.  This may mean investigating the conduct of the current

 6   Executive Committee, and could mean replacing some or all with

 7   new officers who are committed to following the bylaws and

 8   upholding the principles upon which the organization must be

 9   based if it is to survive and prosper."

10           You see that?

11   A     Yes.

12   Q     You -- you did not want the Bylaw Amendment voted

13   down.  You wanted it approved; is that right?

14   A     That's incorrect.

15   Q     But you wanted it voted down?

16   A     That's incorrect.

17   Q     Why is it incorrect?

18   A     It's the Board's purview for bylaws.  It's not the

19   CEO's purview.

20   Q     So you don't have any disagreement with the advocacy

21   in this document for voting down this amendment?

22   A     I don't understand the question.

23   Q     This -- this document advocates voting down the

24   amendment that gives this super power to the Executive

25   Committee.
```

1          A      I understand that.

2          Q      And you -- you don't have any issue with a letter

3    being furnished to the people voting -- telling them why they

4    should vote it down, do you?

5          A      I think it'd be appropriate if it came from a voting

6    member or member of the organization.

7          Q      Okay.  But this came from Dr. Okerblom and he was

8    not a voting member?

9          A      Not that I knew about.

10         Q      Okay.  So that's your problem with this is that it

11   did not come from a voting member?

12         A      No.  That's one issue.  I didn't say that was my

13   problem.  That's one issue.  But my point is everybody's

14   entitled to their opinion, every member is entitled --

15   appropriately entitled and they can position with the

16   organization.  I don't know do that.  That's not my purview.

17         Q      Let me ask you.  Is this document -- maybe I

18   misunderstood the defendant's case.  Is this document something

19   that you're using to support your expulsion of Dr. Stewart from

20   the AAPS because Dr. Okerblom, her husband, prepared it?

21                MS. ROSSETTI:  Objection.  Calls for an expert legal

22   opinion.

23                THE COURT:  Overruled.

24                THE WITNESS:  I don't believe I said that.

25         Q      (BY MR. CONWELL:)  Well, I'm asking you that.

```
 1        A      No.  I don't believe that's the case.

 2        Q      Okay.  Is it because Dr. Stewart handed out I think

 3   four copies of it to people she knew at the House of Delegates'

 4   meeting in June of 2011?  Is that why she was expelled?  For

 5   handing out four copies of this and talking to people about it?

 6              MS. ROSSETTI:  Objection.  Lacks foundation.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  I don't believe that to be the case,

 9   but I haven't been involved in those discussions.

10        Q      (BY MR. CONWELL:)  Okay.  Well, what -- can you turn

11   to page 4 of this document?

12        A      Of the same document we're in?

13        Q      Yes, sir.

14        A      Okay.

15        Q      This is Exhibit 1031 --

16        A      Seven?

17        Q      -- dash 7.

18        A      Okay.

19        Q      1031-7.

20        A      Okay.

21        Q      It says, "It is the Executive Committee whose

22   actions are threatening to destroy the organization.  The

23   manner of governance that is currently being practiced by the

24   Executive Committee is extremely radical and undemocratic

25   resulting in suspension of due process, suppression of free
```

```
 1    thinking, and of the members' rights to exercise their
 2    constitutionally guaranteed freedom of speech.  It is without
 3    precedent in any other fellowship of physicians and is so
 4    extreme that if continued, it will most certainly result in the
 5    loss of the AAPS's status as a board-certifying organization.
 6              If the members to the AAPS wish to prevent
 7    irreparable harm from occurring to their organization, they'll
 8    have to persuade the members of the House of Delegates to
 9    disapprove of the new Bylaws Amendment and demand that their
10    governing bodies operate in accordance with the bylaws as they
11    were currently written."
12              Would you agree that's appropriate advocacy against
13    passing that amendment that gives that super power to the
14    Executive Committee?
15        A     The last -- these two paragraphs you're referring
16    to?
17        Q     Right.
18        A     Not to the last one?  This -- this individual has an
19    opinion and put it in writing.  I think it's inappropriate that
20    the opinion was being disseminated or circulated by a nonmember
21    of the organization.
22              I don't have any issue with anyone that's a member
23    advocating a position on any issue within the organization.
24              Does that answer what --
25        Q     Well, I think -- I think we're in agreement.  You're
```

```
 1    saying that it's perfectly fine for Dr. Stewart to disseminate

 2    this document at the 2011 meeting, right?

 3         A    Do I -- the question is do I think it's appropriate

 4    for her to disseminate this document in its entirety --

 5         Q    Yes.

 6         A    -- to members at the annual meeting?

 7         Q    To the people who are going to be voting on that

 8    bylaw.

 9              You seem to be struggling.  What's the problem?

10         A    Well, I think it's appropriate for people to express

11    their views in writing and otherwise unencumbered by anything

12    else.

13              But my -- my concern in answering this question to

14    you is what I'm thinking about, I think the way in which this

15    was proceeded, process, was not appropriate.

16         Q    Her handing it to people?  Is that what you mean by

17    the procedure?  She put it in people's hands?

18         A    I think it would have been appropriate to present it

19    to the Board of Directors ahead of time and sit down with

20    people and discuss your concerns rather than distribute it at a

21    meeting and to limit the number of people you distribute it to,

22    yes.

23         Q    Let me ask you this.  At the 2011 annual meeting,

24    were you present during her meetings with Dr. Russo and

25    Dr. Montes on this issue?
```

```
 1        A     I don't recall if I was.

 2        Q     You know she had conversations with Dr. Russo and

 3   Dr. Montes at the 2011 meeting on this very topic?

 4        A     I don't recall.  Okay.

 5        Q     That's the proper channel, right?

 6        A     Okay.

 7        Q     Who was Russo?

 8        A     Yeah.  If in fact that's correct, and irrespective

 9   of me recalling, I think that's okay.

10        Q     Okay.  Who is Russo?

11        A     Who is Russo?

12        Q     Yeah.  In 2011 --

13        A     Russo was --

14        Q     -- wasn't he president?

15        A     -- past president, right.

16        Q     Past -- he was a past president?

17        A     Well, he is now.

18        Q     2011?

19        A     He was president.

20        Q     And Montes was on the Board?

21        A     I believe that's right.

22        Q     Okay.  So you think that -- I'm still -- I'm trying

23   to find out what it is that you were objecting to.

24        A     I'm not objecting to anything.

25        Q     Okay.  The AAPS, the company that you're the CEO of.
```

1  What is it the AAPS is objecting to as to what she did with

2  this preliminary legal opinion?

3      A    I think there are two issues, but I can't speak for

4  the Board of Directors.  Personally, I think there are two

5  issues:  One, that this document was not presented to the Board

6  of Directors in advance of the meeting, even though discussions

7  may have been held with several Board members; and two, I think

8  there's concern about the statements or misstatements,

9  allegations, etc., that are listed in this document.

10     Q    Well, I haven't -- we haven't seen any misstatements

11 so far.  So maybe this'll speed it up.

12          Tell me what is it in this document that is a

13 misstatement.

14     A    I would have to go through the entire document.

15     Q    Well, surely by now -- this happened in 2011.  We're

16 four years later, we're two years into a lawsuit.  Surely by

17 now you've figured that out, haven't you?

18     A    A lot comes across my desk.  There's been a lot of

19 issues, there's been a lot of developments with these lawsuits,

20 and without having the opportunity to look at the details here,

21 that wouldn't be appropriate for me to answer you one way or

22 the other.  I don't know without looking at it.

23     Q    Well, I was --

24     A    Okay?

25     Q    We can do it that way.  Turn to page 5 of the

```
 1    document which is Bates number 1031-8.

 2         A    I'm on page 5.

 3         Q    Okay.  So Details, Analysis Supporting Documents,

 4    "The situation appears to have arisen as follows:  No. 1,

 5    Timothy Bell, a former employee of the AAPS, becomes a

 6    whistleblower, "and it says in here, "He became a whistleblower

 7    reporting the AAPS to various government agencies and

 8    credentialing bodies.  He also sent e-mails to some of the

 9    members of the Board alleging various forms of misconduct that

10    Mr. Carbone had been supposedly engaged in which most of the

11    Board members had not previously heard about."

12              Now, that's all true, isn't it?  Mr. Bell did report

13    things to various government agencies, right?

14         A    Yeah.  From my understanding he did, yes.

15         Q    And he sent various e-mails of misconduct that you,

16    Carbone, had supposedly engaged in, right?

17         A    Yes, he did.

18         Q    So this is -- this is true, this is correct, isn't

19    it?

20         A    That paragraph would be, yes.

21         Q    Now, Mr. Okerblom is still saying "supposedly" and

22    "allegedly."  He's not saying you in fact did it, is he?

23         A    Where is that he's saying "allegedly"?

24         Q    I just read it, "alleging various forms of

25    misconduct that Mr." --
```

1          A      Okay.

2          Q      -- "that Mr. Carbone has been supposedly engaged

3   in."

4          A      Okay.  Thank you.

5          Q      And then the next big sentence uses the word

6   "allegations"?

7          A      No problem.  I see it.  Thank you.

8          Q      Okay.  So you see that.  You agree with that?

9          A      Yes, I do, yeah.

10         Q      And now -- but in fact, it was true, right?  You've

11  now told us this morning that was all inappropriate and

12  improper and unprofessional, I think?

13         A      I said I inappropriately did that, yes, I did.

14         Q      Okay.

15         A      Yep.

16         Q      So let's go on to the next part B, "Mr. Bell

17  informed the Board that AAPS was on CME credentialing

18  probation."

19                Well, that was true, wasn't it?  You were on

20  probation?

21         A      Correct.

22         Q      Okay.  C, "Mr. Bell informed the Board that

23  Mr. Carbone had engaged in inappropriate conduct in dealing

24  with his subordinates."

25                And it says that, "Mr. Bell sent to members copies

     1    of very explicit pornographic images together with tracing

     2    records which showed that the images had originated from

     3    Mr. Carbone's computer.  He accused Mr. Carbone of circulating

     4    this kind of pornography among the office staff."

     5              Mr. Bell in fact made those allegations, didn't he?

     6    A    Right.  I will dispute this one.  He was the only

     7    one that I sent it to -- sent them to.

     8    Q    Well --

     9    A    This references "office staff."

    10    Q    Okay.

    11    A    Okay?

    12    Q    Mr. -- the question is Mr. Bell alleged that you had

    13    sent it to --

    14    A    Okay.

    15    Q    -- office staff; is that right?

    16    A    He can allege anything he wants to, right.

    17    Q    Okay.

    18    A    Right.

    19    Q    So it's true that he alleged it.  You're just saying

    20    that it wasn't true?

    21    A    Correct.

    22    Q    You're saying you sent it only to Bell?

    23    A    Correct.

    24    Q    All right.  And then D, "Additional evidence which

    25    surfaced which appeared to substantiate this allegation."

1            Then he talks about Cassandra Newby files a lawsuit

2     for sexual harassment in which he says you, in fact, sent it to

3     her, right?

4            A     Right what?  That he alleges that?

5            Q     Yes.

6            A     Yes.

7            Q     And Ms. Newby alleged that, didn't she?

8            A     She did.

9            Q     Okay.  I know you disagree with it, but all this

10    says is it's been alleged in her lawsuit which appears to

11    confirm this, right?

12           A     Yes.

13           Q     So this statement by Dr. Okerblom is also correct,

14    right?  That this -- these allegations were made and they

15    appear to substantiate the allegation?

16           A     Yes.

17           Q     Okay.  So now E, "Dr. Castillo and Geller requested

18    the president and president-elect to initiate an

19    investigation," as to whether you'd engaged in inappropriate

20    conduct.

21           And then it says in the body of it that,

22    "Dr. Castillo felt strongly that performing an investigation

23    into Carbone's alleged misconduct should be a top priority for

24    the Executive Committee," you know.

25           This is all correct, isn't it?  That's what

1    happened?   There was a call for an investigation?

2         A     Yes.

3         Q     Okay.  F, "Instead of investigating, the Executive

4    Committee suspended Drs. Castillo, Geller, and Klein."

5              We already know that's true, right?

6         A     Yes.

7         Q     G, "The Executive Committee does not have the power

8    to suspend, did not follow the procedures specified in the

9    bylaws to ensure the due process afforded."

10             And then he spells out that 3.05, and he even quotes

11   it here, "provides for a procedure for this and that procedure

12   was not followed."

13             That's all correct, isn't it?

14        A     That's correct.

15        Q     Okay.  "Thus, the Executive Committee had no

16   authority to suspended members since that authority belonged to

17   the Board and not the Executive Committee," correct?

18        A     Correct.

19        Q     Then, H, "There was no evidence that any of the

20   three doctors had done anything wrong."

21             And then he quotes a letter that he attaches to this

22   document from your attorney in Florida, Mr. Nolan, to

23   Ms. Kegel, the president or the head of the Surgery Academy, in

24   which your own attorney says, "Realizing that the evidence was

25   incomplete and also realizing that the current AAPS bylaws do

1    not address such a situation, the AAPS Board at my

2    recommendation decided to take the step of suspending the

3    membership."

4            That's what your attorney's letter said, didn't it?

5    A    Yes.

6    Q    Okay.  Then in the next paragraph, "There was no

7    evidence that any of the suspended members had conspired to

8    harm the AAPS."

9            Right?

10   A    I believe at the time, yes, that's correct.

11   Q    Okay.  And in fact, he says, "All the evidence on

12   that issue points to the fact they were intending to help the

13   organization by requesting an investigation into allegations

14   that were supported by substantial evidence that Mr. Carbone

15   had engaged in acts of unprofessional conduct," etc.

16           Do you see that?

17   A    Yes.

18   Q    That's all true, right?

19   A    Yes.

20   Q    Okay.

21           THE COURT:  How many more of these are there?

22           MR. CONWELL:  Well, your Honor, I -- I tried a

23   faster way to do this --

24           THE COURT:  How many more of these are there?

25   Because I'm going to try a faster way.

```
 1              MR. CONWELL:  Okay.  I'm on page --

 2              THE COURT:  How many items?

 3              MR. CONWELL:  Uhm, 1, 2 --

 4              THE COURT:  What letter of the alphabet?

 5              MR. CONWELL:  -- 4, 5 -- five items.

 6              THE COURT:  You're familiar with this, aren't you?

 7    You're familiar with this document, aren't you?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Because you've expressed an opinion

10    regarding this document whether or not the allegations set

11    forth in the document are true or false.  You've testified to

12    it just now, right?  You disagree with things stated in this

13    document, right?

14              THE WITNESS:  Yes.

15              THE COURT:  Identify them.

16              THE WITNESS:  Well, so far I haven't been able to

17    identify --

18              THE COURT:  No, no, no, no.  Before you gave your

19    answer that you disagreed with some of the things in this

20    document--

21              THE WITNESS:  Right.

22              THE COURT:  -- before you answered that question,

23    you had in your mind items that you disagreed with.  Just

24    simply identify them now.

25              THE WITNESS:  Well, I guess I can't.
```

113

```
 1              THE COURT:  Let's move on.
 2              THE WITNESS:  Okay.
 3              MR. CONWELL:  Okay.  Okay.  Take a look at
 4   Exhibit 1446.
 5              (Exhibit 1446 previously marked for identification.)
 6       Q    (BY MR. CONWELL:)  And can you identify that for us,
 7   please?
 8       A    These are the minutes of the House of Delegates
 9   meeting of June 25th, 2011.
10       Q    Okay.  And that is the meeting where the House of
11   Delegates voted on the amendment; is that right?
12       A    I understand that to be correct, yes.
13       Q    And are you required -- is the AAPS required to send
14   out notice of what's going to be voted on?
15       A    Yes.
16       Q    And so you had to send out notice to -- that
17   identified the specific language of this amendment; is that
18   right?
19       A    Yes.
20       Q    And -- and the purpose of that is so the people
21   could prepare for the meeting and decide what their position
22   was going to be on the issue; is that right?
23       A    Yes.
24       Q    Now, Patricia Stewart, Dr. Stewart, was a governor
25   of the Dermatology Academy; is that right?
```

 1        A      I can't specifically recall at that time.  We've got

 2   over ten different academies, so I -- I don't know specifically

 3   if she was.

 4        Q      Okay.  You don't dispute that she was?

 5        A      No, I do not.

 6        Q      And she certainly had the right to speak up at the

 7   House of Delegates' meeting stating the position of her

 8   constituents regarding this issue; is that right?

 9        A      Yes.

10        Q      Okay.  So is there anything about her speaking up --

11   we've talked about her handing out the preliminary legal

12   opinion.  Now I want to talk -- say is there anything about her

13   speaking up at that meeting that got her expelled?

14        A      That got her what?

15        Q      Expelled.

16        A      Not that I'm aware of.

17        Q      Okay.  In fact, she wasn't the only one opposing

18   that amendment; is that right?

19        A      I believe that's correct.

20        Q      Do you recall Dr. Lemonick gave an impassioned

21   speech at that meeting as to why this was bad for the AAPS and

22   would injure the AAPS?

23        A      Yes.

24        Q      And this -- there was so much opposition to this

25   amendment that was attempting to give power to the Executive

```
 1    Committee to do to every member what they did to Castillo,

 2    Geller, and Klein, that it was withdrawn; is that right?

 3         A    The proposal was withdrawn, correct.

 4         Q    Okay.  And I want to move to January 10, 2012.

 5    There was a meeting of the Dermatology Academy by conference

 6    call.  You've heard that, haven't you?

 7         A    Did I what?  Sorry.

 8         Q    A meeting of Dermatology Committee -- committee --

 9    excuse me -- a conference call of the Dermatology Academy?

10         A    I guess there was.

11         Q    And who's Mr. Cotton?

12         A    He was the governmental affairs liaison of the

13    organization at one time.

14         Q    And Mr. Cotton reported to you, didn't he?

15         A    Yes, he did.

16         Q    And you had Mr. Cotton record the dermatology

17    meeting that occurred on January 10, 2012; is that right?

18         A    I don't recall that I did.

19         Q    He did record it, didn't he?

20         A    I believe that's correct, yes.

21         Q    He gave the tape of that recording to Mr. Durante,

22    and you also obtained the tape; is that right?

23         A    I think that's correct also, yes.

24         Q    And you listened to the tape; isn't that true?

25         A    No, I did not listen to the tape.
```

1        Q      You authorized that tape to be given to people

2   outside the organization, including your attorneys; is that

3   right?

4        A      I don't recall I authorized it, per se.

5        Q      Okay.  Well, who -- you're the CEO.  If not you,

6   who?

7        A      It could have been the Executive Committee.  Could

8   have been the president.

9        Q      You don't deny that you authorized it, do you?

10        A      I don't recall if I did or I did not.

11        Q      So, right, you're not denying it; is that correct?

12        A      Correct.

13               MR. CONWELL:  Okay.  Let's look at the May 8th

14   charging document, Exhibit 1498.

15               (Exhibit 1498 previously marked for identification.)

16        Q      (BY MR. CONWELL:)  Do you recall this?

17        A      I've seen this letter before, yes.

18        Q      Okay.  And in this document, the AAPS is notifying

19   Dr. Stewart that she is going to be subject to disciplinary

20   proceedings; is that right?

21        A      Yes.

22        Q      It says, "Please be advised pursuant to Section 3.05

23   of the bylaws, a special meeting of the disciplinary committee

24   of the Board of Directors has been called for Saturday, June 9,

25   2012, at 10 A.M. at the Intercontinental Hotel," and they give

1   the address in Tampa Florida.  You see that?

2        A    Yes, I do.

3        Q    This was all occurring pursuant to Section 3.05?

4        A    That's my understanding.

5        Q    Okay.  Of the bylaws that existed on May 8, 2012; is

6   that right?

7        A    I believe that's true also, yes.

8        Q    Okay.  And let's turn back to those bylaws.  I

9   believe that's Exhibit 1317.

10            So I just want to go to the first page -- make

11   that -- there you go.  If you can enlarge the top.

12            This is "Bylaws Fifteenth Revision Adopted June 25,

13   2011."  You see that?

14       A    Yes.

15       Q    Now, I want you to look at Exhibit 1341, which is

16   the 16th revision.

17            This 1317, which was adopted June 25, 2011, is the

18   15th.

19            Okay.  Now I want us to look at the 16th which is

20   Exhibit 1341.  Do you have that?

21       A    No -- oh, now I do.  Okay.

22            MR. CONWELL:  Okay.  Stop.  If we can enlarge the

23   top.

24       Q    (BY MR. CONWELL:)  So these are dated June 25th --

25   says, "Sixteenth Revision Adopted June 25, 2012."

1              See that?

2        A      Yes, I see it.

3        Q      Okay.  So -- and there's not a 15-and-a-half or

4   anything like that, is there?

5        A      Not to my knowledge there isn't, no.  I don't think

6   so.

7        Q      Okay.  So since the 16th revision was adopted

8   June 25, 2012, and Dr. Stewart was expelled and her

9   disciplinary proceedings were prior to that date, the operative

10  bylaws for her disciplinary proceedings were the 15th revision,

11  correct?

12       A      I would agree with that, yeah.

13       Q      Okay.  So just want to make sure we're looking at

14  the right ones.  So let's look at the 15th revision that this

15  May 8th letter says she's being disciplined under.

16              It says in paragraph A, as we've seen before, that,

17  "The Board of Directors may expel, call for the resignation

18  of" -- we're still on page 4 -- "or otherwise discipline any

19  member if two-thirds of the members of the Board of Directors

20  find that the conduct of the member has been injurious to the

21  best interests of the Association or inconsistent with its

22  purposes."

23              See that?

24       A      Yes.

25       Q      What had Dr. Stewart done as of May 8, 2012, that

1    was injurious to the best interests of the Association or

2    inconsistent with its purposes?

3         A    I'm not aware of anything specifically.

4         Q    Okay.

5         A    In other words, I don't have knowledge.

6              THE COURT:  Ladies and gentlemen, we're going to

7    take -- well, actually it's going to be the last break that

8    we're going to take.  Let's keep it to ten minutes.

9         Please remember the admonition, please.

10             THE COURTROOM DEPUTY:  All rise.

11             (A recess was taken.)

12             (Open court in the presence of the jury.)

13             THE COURT:  We've been joined by the jury.  All

14   counsel and the parties are present, and Mr. Carbone has

15   resumed his place on the witness stand.

16        You may continue, counsel.

17        Q    (BY MR. CONWELL:)  Okay.  The May 8th charging

18   document, Exhibit 1498.  All right.  Do you have it, sir?

19        A    Yes, I have.

20        Q    And if you go to -- of the second paragraph at this

21   meeting.  You see that?

22        A    Yes, I do.

23        Q    "Committee will consider charges against you for

24   conduct injurious to the best interests of AAPS and/or

25   incompatible with its purposes as more specifically described

1    in the materials annexed here as Exhibit 1.  The committee will

2    present its recommendations on the appropriate level of

3    discipline which may include termination of your membership

4    privileges in AAPS for action by the full Board of Directors at

5    the Board's next meeting."

6               Now, this -- this charging document with the

7    attachment is fairly thick, isn't it?

8         A    Yes.

9         Q    We've counted.  It's over 160 pages of allegations,

10   isn't it?

11        A    It is 160 pages, yep.

12        Q    And in terms of allegations against Dr. Stewart, all

13   it says is all these other people did something and you

14   conspired, right?

15        A    What says that?  What states that?

16        Q    The charging document.

17        A    Okay.

18        Q    Do you recall?

19        A    No, I don't recall.

20        Q    This document alleges -- do you recall that this

21   document alleges that Dr. Stewart conspired with Timothy Bell?

22        A    And how -- what is the question, sir?

23        Q    What information did AAPS have on May 8th -- excuse

24   me -- yeah, May 8, 2012, that Dr. Stewart conspired with

25   Timothy Bell?

1     A     I don't know what they had, the committee had.  I
2  had no information.
3     Q     Just to save time, would that be true on anything in
4  here?  If I asked you what basis did you have for making these
5  charges, you would say, "I don't know.  Talk to somebody else"?
6           MS. ROSSETTI:  Objection.  Lacks foundation.
7           THE COURT:  Overruled.
8           THE WITNESS:  So you're asking me if I would agree
9  to that every page in here --
10    Q     (BY MR. CONWELL:)  Well, I certainly don't want to
11 go through every page.  So I'm trying to find a way to shortcut
12 this.
13    A     I understand that.  So how about rephrasing it--
14    Q     Is there any allegation in this document against
15 Dr. Stewart that you can verify?
16    A     I would say I'm not aware of -- aware of anything in
17 general, but I don't know if I've read 160 pages and I'm
18 familiar with it.  I'm sorry, but that's the truth.
19    Q     Okay.  Well, let's go to the next paragraph in the
20 May 8th letter, the third paragraph.  It ays, "Under
21 Section 3.05 you may -- of the bylaws, you may appear in person
22 with or without counsel before the disciplinary proceedings at
23 the appointed time to present evidence that you are qualified
24 to continue as a member in good standing with AAPS.  If you
25 choose to appear in person, you will be given up to 15 minutes

1    for oral presentation to the disciplinary committee."

2              You see that?

3        A    Yes, I see it.

4        Q    Now, it would take more than 15 minutes just to read

5    this charging document, wouldn't it?

6        A    I would say so, yes.

7        Q    You've got to agree that 15 minutes is not a

8    reasonable amount of time for this hearing, is it?

9        A    I didn't set that time, so --

10       Q    Okay.  Well, thank you for that information.

11             But my question is you would agree with me that

12   15 minutes is not a reasonable amount of time?

13       A    Based on these documents, yes.

14       Q    Based on these documents?

15       A    Based on reviewing these, you said?  That was

16   your --

17       Q    Okay.  So you're agreeing with me 15 minutes is not

18   a reasonable amount of time?

19       A    Yes.

20       Q    Okay.  And if Dr. Stewart had requested up to two

21   hours, only two hours -- and I think your examination this

22   morning has been longer than that -- if she'd requested only

23   two hours for this hearing, that should have been granted,

24   shouldn't it?

25       A    I don't know if it's my purview to make a judgment

1    of -- based on that question because I wasn't part of the

2    committee in any way.

3         Q     Okay.  Well, do you have a view on that as to

4    whether or not she should have been given two hours if she

5    asked for it?

6         A     I don't know about two hours, but I think more time

7    should have been afforded.

8         Q     Okay.  Do you have a number in mind?

9         A     No, sir.

10        Q     It says also, "Please be advised that only you and

11   your counsel will be allowed in the room during the meeting of

12   the disciplinary committee."

13             You see that?

14        A     Yes, I do.

15        Q     So that means that if she has a witness that she

16   wants to bring to give testimony to this investigative

17   committee, she's not allowed to bring any witnesses; is that

18   right?

19        A     Well, she can only be limited to the total number of

20   people, whether -- whoever they are.  So --

21        Q     What?  I don't understand that.

22        A     Well, that only her and her counsel can be there.

23        Q     Okay.

24        A     Right?

25        Q     So you're agreeing with me, that she's --

```
 1        A     So I'm saying that it's limited to those two

 2   representatives, her and her counsellor.

 3        Q     Right.

 4        A     So therefore --

 5        Q     This isn't hard.  This isn't hard, okay?  I'm asking

 6   you simply --

 7        A     I understand it isn't hard.

 8        Q     She want allowed to bring a witness --

 9              THE COURT:  (Knocked three times.)  You know better;

10   I understand he doesn't.  One at a time.

11        Q     (BY MR. CONWELL:)  Are you finished?

12        A     Yes.

13        Q     Okay.  She was not allowed to bring any witnesses,

14   was she?

15        A     Correct.

16        Q     But this is an investigative committee, right?

17        A     Yes, it was.

18        Q     And they're supposed to make a recommendation of

19   potentially expelling her from the organization, right?

20        A     Yes.

21        Q     Okay.  Don't you think that it would be fair if

22   you're potentially going to be expelled from your

23   board-certifying organization that you be allowed to bring a

24   witness in your own defense?

25        A     I have no opinion on that.
```

1       Q       Okay.  You -- do you see anywhere in this document

2   where it identifies the members of the disciplinary committee?

3       A       Referencing the first page or the entire 160 pages?

4       Q       Well, the 160.  That's the complaint.  That's the

5   lawsuit you filed -- or your company filed against her.

6       A       Right.

7       Q       Right?

8       A       Right.

9       Q       So I don't think it's going to say there.  But

10  you're welcome to look if you want, but on the letter --

11      A       I just want to be clear, that's all.  Okay.

12      Q       -- it just says the disciplinary committee, correct?

13      A       Correct.

14      Q       And who created that disciplinary committee?

15      A       I believe it was the president.

16      Q       Who was Bob Cerrato?

17      A       Yes.

18      Q       And Bob Cerrato in this letter did not identify who

19  the members of the disciplinary committee were; is that

20  correct?

21      A       Yes.

22      Q       Don't you think it would be fair to let the accused,

23  Dr. Stewart, know whether or not she was going to be appearing

24  in front of a fair and an impartial tribunal?

25      A       I don't know whether listing the members of the

1   committee is pertinent to the issue of the committee.

2        Q     Let me ask the question again.

3        A     Okay.

4        Q     Do you think it would be fair to let the accused

5   know whether she would be appearing in front of an impartial

6   tribunal?

7        A     I think it would be fair, yes.

8        Q     And so turns out the disciplinary committee was

9   chaired by Dr. Stephen Montes; is that right?

10       A     Yes.

11       Q     And Dr. Montes was certainly a subject of part of

12  the controversy surrounding the suspension of Drs. Castillo,

13  Geller, and Klein as it relates to the ACCME probation and the

14  Federal Election Commission violations; is that right?

15       A     That's correct.

16       Q     You don't consider him to be impartial in this

17  matter, do you?

18       A     That's a difficult question to answer because I am

19  not privy, knowledgeable to his interactions with Dr. Stewart

20  or anybody else directly, so it's hard for me to make a

21  judgment.

22       Q     Isn't the fact that he's at the center of the

23  controversy that are in these pages of allegations against

24  Dr. Stewart enough for you to answer that question?

25       A     I can understand the concern based on what you just

1    stated, but I can't say for certain he would not be impartial.

2         Q    But don't you think there's at least the appearance

3    of partiality and bias on his part given the fact that he's one

4    of the centers of the controversy?

5         A    Someone could certainly come to that conclusion,

6    yes.

7         Q    Certainly reasonable for the accused to be concerned

8    about that, isn't it?

9         A    Yes.

10        Q    And she had a right to an impartial tribunal, didn't

11   she?

12        A    I don't see why not.

13        Q    You're agreeing with me, aren't you?

14        A    Correct.

15        Q    Now, there was also Dr. Maggio.  He was on the

16   disciplinary proceedings; is that right?

17        A    I believe that's correct, yes.

18        Q    He's also was on the legal task force; is that

19   right?

20        A    Yes, that is correct, too.

21        Q    And Bob Cerrato appointed the legal task force,

22   didn't he?

23        A    I don't know if it was the president or the

24   Executive Committee or the Board.  I don't recall.

25        Q    Okay.  Montes, Dr. Montes, was also on the legal

```
 1   task force, wasn't he?

 2        A     That's correct.

 3        Q     And Dr. Gallagher was on the legal task force?

 4        A     He may have been at one time.  My memory isn't

 5   working well at this moment about that.

 6        Q     We can bring documents to show it.  If you remember,

 7   just tell us.  If you don't --

 8        A     He was on it at one point, I remember.

 9        Q     And Dr. Gallagher was one of the doctors that you

10   exchanged porn with, right?

11        A     That's correct.

12        Q     And he was put -- he was put on the legal task force

13   by Bob Cerrato to make a recommendation as to whether or not to

14   proceed with a lawsuit against Dr. Stewart and others; is that

15   right?

16        A     I don't know if Dr. Cerrato was the person that

17   appointed him, but he was on at one time, yes.

18        Q     Okay.  So whoever appointed him, he was also

19   interested in the controversy that's at the center of all this

20   as it relates to the exchange of pornography between AAPS's CEO

21   and members of the Board of Directors; is that right?

22        A     I -- he had an interest, yes.

23        Q     Okay.  Don't you think she had a right to an

24   impartial legal task force also given that what they were doing

25   is giving a recommendation to the Board on whether or not to
```

1    file a lawsuit?

2         A     Yes.

3         Q     Certainly you can understand Dr. Gallagher's concern

4    if these people aren't stopped, that he might be exposed to his

5    friends and family as someone exchanging some pretty explicit

6    pornography with you, right?

7         A     I can't speak to how he would feel.  I would myself.

8         Q     Okay.  So the legal task force was Dr. Montes,

9    Dr. Gallagher, and Dr. Maggio, right?

10        A     I think there may have been an additional person on

11   that task force.

12        Q     Oh, Dr. Cerrato.

13        A     And I think another one, too.

14        Q     Who was the other one?

15        A     Dr. Wallace.

16        Q     Dr. Wallace, okay.  Okay.  So then the disciplinary

17   proceedings is Dr. Montes, who was on the legal task force,

18   Dr. Maggio, who was on the legal task force, and Dr. Wallace,

19   who you just said was on the legal task force, right?

20        A     Yes.

21        Q     So the prosecutor, so to speak, the legal task

22   force, the ones that made the recommendation to sue

23   Dr. Stewart, are now being put on the investigative body to --

24   investigative committee to make -- to hear evidence and to make

25   a decision whether or not to discipline her, including

1   expulsion; is that right?

2        A     I do not believe that the task force that you're

3   referring to made that recommendation or decision about

4   Dr. Stewart.

5        Q     So you don't think that the legal task force made a

6   recommendation to sue?

7        A     I don't remember that precisely.

8        Q     Okay.  But what were they doing?  What was the legal

9   task force doing?

10       A     They were involved primarily in the Florida

11  litigation.

12       Q     Well, but the Florida litigation you sued her and

13  her husband in Florida.

14       A     Let me be a little more specific.  The original

15  lawsuit with the three physicians, Drs. Castillo, Geller, and

16  Klein.

17       Q     Okay.  Well, I think I'll be able to clear this up

18  as to whether or not your own minutes show that the legal task

19  force made the recommendation to bring the suit.

20             I'll move on.  But --

21       A     Okay.

22       Q     -- do you think that's fair for the legal task

23  force, the people charged with making a recommendation of

24  suing, are now put on the disciplinary committee to be this

25  subjective body conducting an independent investigation?

1   That's not right, is it?

2        A     I see the conflict that you're --

3        Q     It's called a conflict of interest, isn't it?

4        A     I just said I see the --

5        Q     Well, when you saw it back then, did you voice your

6   concern?  Did you speak up and say, "This is not right.

7   There's a conflict of interest.  Don't" -- you know, "Don't do

8   that.  It's not fair"?

9        A     No, I did not.

10       Q     So this says in the next sentence at the bottom of

11  page 8 -- I'm sorry -- at the bottom of the May 8th letter,

12  "You may submit written evidence of your qualification at any

13  time before this meeting, and you are strongly encouraged to do

14  so."

15             You see that?

16       A     Yes, I do see it.

17       Q     Now, are you aware of whether Dr. Stewart sent four

18  such documents to AAPS prior to the meeting?

19       A     In reference to the hearing?

20       Q     Yes.

21       A     I don't think there were any, but I'm not certain.

22       Q     You're not aware of the May 24th e-mail from her to

23  the Board of Directors going through in detail and denying the

24  allegations?

25       A     Okay.  Thinking about it, there was one, right, but

1     I can't -- I can't recall what the contents were.

2          Q     Okay.

3          A     Okay.

4          Q     And do you think that the investigative committee

5     should have read that?

6          A     Presuming that it had to do with this hearing, yes.

7          Q     Okay.  Now, did you also know -- and just tell me if

8     you're not the right guy to be asking this question, 'cause I

9     don't want to waste time here -- did you also know that

10    Dr. Stewart in the Florida case after you all sued her was

11    opposing jurisdiction of the Florida court since she neither

12    lives nor works or has any contact with the state of Florida?

13         A     I was aware of that, yes.

14         Q     And were you also aware that she would not come to

15    the state of Florida for this disciplinary hearing because she

16    did not want to subject herself to the jurisdiction of a

17    Florida court?

18         A     That's my understanding, yes.

19         Q     Right.  And you are aware of her request, therefore,

20    to participate by telephone?

21         A     I believe so, yes.

22         Q     But that was denied, wasn't it?

23         A     I understand it was, yes.

24         Q     That's not fair, is it, to try to trap her, making

25    her come to defend herself in a disciplinary proceeding that

1    could result in her termination, come to Florida to do that and

2    therefore subject herself to jurisdiction in Florida?  That's

3    not fair, is it?

4        A    I was not privy to the governance directing

5    discussions of these committees, so I really can't --

6        Q    I'm just asking you.  Those are the facts.  So

7    that's not fair, is it?

8        A    The question is it's not fair that she was not

9    allowed -- would you repeat it for me, please?

10       Q    It's not fair to make the disciplinary proceeding

11   occur in Florida and only in Florida when she was opposing the

12   jurisdiction of a Florida court and therefore could not go into

13   the state?  That's not fair, is it?

14       A    I guess you're right.  It's not.

15       Q    But you, nonetheless, or AAPS, nonetheless, denied

16   her the right to do this by phone, right?

17       A    I understand that to be correct, yes.  It was

18   declined, right.

19       Q    Now, when we go back and look at the minutes of the

20   Board, a lot of your meetings take place by phone, don't they?

21       A    Yes, sir.  Yeah.

22       Q    AAPS regularly conducts its business by telephone,

23   right?

24       A    Frequently, yes.

25       Q    Because your members are living all across the

1    country, right?

2          A      Correct.

3          Q      So why is it fair for the Board to conduct itself

4    and other committees to conduct their meetings by phone, but

5    it's not fair for her to defend herself in the disciplinary

6    hearing by phone?

7          A      My answer would be it would probably be -- the best

8    way to answer that would -- would be based on the issue or the

9    reason for the meeting, whether face-to-face contact or

10   in-person contact was critical.

11         Q      You think face to face would be better?

12         A      Always.

13         Q      And you're aware, aren't you, that she asked, "Could

14   we move this meeting back just two weeks" to the annual meeting

15   that was going to be held in Marina Del Ray, not far from where

16   she lives and works?  You're aware that she asked for that

17   face-to-face meeting only two weeks later, aren't you?

18         A      I don't know if it was two weeks later, but I do

19   recall that she had made that request, yes.

20         Q      Well, the hearing was set for the 9th.  And when was

21   the annual meeting?

22         A      It was definitely after that, 22nd, 23rd, 24th,

23   somewhere in that part, third or fourth week of June.

24         Q      Okay.  So that's about two weeks.

25         A      Okay.

1     Q     What was the problem in waiting two weeks and doing

2  it then when she could appear face to face, which you say is

3  the right way to do it?

4     A     You are asking me.  I wasn't part of this

5  investigative committee, so I can't really comment what -- why

6  they decided what they decided.  I'm sorry.  I'm just not --

7     Q     And all these years no one has shared that with you?

8     A     No.

9     Q     Okay.  Take a look at Exhibit 1347.

10        (Exhibit 1347 previously marked for identification.)

11     Q     (BY MR. CONWELL:)  You recognize this as the minutes

12  of the Board of Directors for the conference call on June 13,

13  2012, whereby Dr. Stewart was expelled?

14     A     Yes.  Yes.

15     Q     Okay.  And you see that it says, "Doctor," at the

16  bottom, "unfinished business."  So did you consider Dr. Stewart

17  to be unfinished business?

18     A     I would need to really see the preceding minutes of

19  the same body to know whether this was new or unfinished

20  business.

21     Q     The preceding.  That's the prior Board of Directors'

22  meeting?

23     A     Whatever -- yes.

24     Q     Okay.  But in any event, this -- there was a

25  presentation by Dr. Montes, right?  See where it says, "AAPS

```
 1    disciplinary committee and Dr. Montes" --

 2         A     Right.

 3         Q     -- "presented the recommendation"?

 4               Now, he was the one we talked about earlier that had

 5    the conflict of interest, right?

 6         A     Correct.

 7         Q     And you were at this meeting, weren't you?

 8         A     I don't remember, but based on the virtue that my

 9    name is on here, I definitely was there.

10         Q     Okay.  It's not memorable to you, a vote to expel

11    Dr. Stewart?  You had no memory of this?

12         A     I have hundreds of meetings.

13         Q     But how many --

14         A     So --

15         Q     -- where you expel a member?

16         A     I'm not denying I wasn't there.  I'm just saying to

17    you that I don't recall the details of it.

18         Q     Did you misspeak?

19         A     Did I misspeak?

20         Q     "I'm not denying I wasn't there."

21         A     No, I'm not denying I wasn't there.  I was there by

22    virtue of seeing my name there.  I just don't recall the

23    details of the meeting and actually being there.

24         Q     You were there.  You believe that Dr. Montes had a

25    conflict of interest, you believe that she had the right to
```

```
 1    more than 15 minutes, you believe that she had the right to do
 2    this by phone, and you did not speak up?
 3         A    No, I don't -- don't recall speaking up at all.
 4         Q    Well, let's look at who was making this decision,
 5    look at the Board -- look at who was present.
 6              Are these the people that voted up here?
 7         A    I would say that's correct.
 8         Q    So Bob Cerrato voted?
 9         A    He generally doesn't vote.
10         Q    He did not vote?
11         A    Unless there's a tie.
12         Q    Did he vote or didn't he?
13         A    I don't remember.
14         Q    Okay.  Brian Feaver, he voted, right?
15         A    I presume so, but I don't see -- yeah, I presume so,
16    yes.
17         Q    Well, you remember earlier I was asking you about
18    the porn that you were getting from the doctors?
19         A    Yes, I do.
20         Q    You said Brian Feaver was on the Board and he voted
21    to expel her.  And you said, "I don't know.  I'd need to look."
22              Well, here we are.
23         A    Okay.
24         Q    Here's the document.
25         A    Okay.
```

1        Q       He voted to expel her, right?

2        A       I'm presuming he did 'cause he was at the meeting

3    and he was a Board of Director, yes.

4        Q       And he's one of the people that was sending you

5    those porn e-mails that created this scandal that is at the

6    center of the whole controversy involving Dr. Stewart, right?

7        A       Correct.

8        Q       He's got a conflict of interest, doesn't he?

9        A       Correct.

10       Q       And if you look also, Dr. Joseph Gallagher is

11   voting, right?  He's another one sending you pornography?

12       A       Yes.

13       Q       And he's the one that sends you racist e-mails

14   including the one about the black man jumping to his death on

15   the sidewalk, right?

16       A       Yes.

17       Q       And this is all part of this controversy involving

18   Dr. Stewart, right?

19       A       Correct.

20       Q       Yes?

21       A       Yes.

22       Q       He's got a conflict of interest, doesn't he?

23       A       Yes.

24       Q       Okay.  Stephen Montes, we've already talked about

25   him.  He's got a conflict of interest.  Did he both make the

```
 1    recommendation then vote?
 2         A     I don't recall.  I'm sorry.
 3         Q     Okay.  So now, you know, when you do the math here,
 4    you take out the people with the conflict of interest, Stephen
 5    Montes -- okay?  -- Joseph Gallagher, Brian Feaver, Bob
 6    Cerrato, it's mathematically impossible to get a two-thirds
 7    vote, isn't it?
 8         A     Yes.
 9         Q     So this was an invalid expulsion of Dr. Stewart,
10    wasn't it?
11         A     I don't know how to answer that --
12         Q     Why?
13         A     -- correctly.
14         Q     Can't you just say yes because that's the truth?
15         A     I could say yes; I could say no.  I don't know if it
16    was valid or invalid.
17         Q     But you don't consider it to be valid, do you,
18    because it takes a two-third vote?
19         A     Well, invalid in view of the fact that those
20    individuals had a conflict of interest?  Is that your point?
21         Q     Right.
22         A     And I agree with that point.
23         Q     These disciplinary proceedings against Dr. Stewart
24    were not fair or reasonable or carried out in good faith, were
25    they?
```

1        A     I would say they could have been a lot better.

2        Q     Well, that's all I asked.  I want you to look at

3   these people in the jury and tell them -- answer this question:

4   These proceedings against Dr. Stewart were neither fair nor

5   reasonable nor carried out in good faith, were they?

6        A     I would say there was a lot of room for

7   improvement --

8        Q     Can you answer my question?

9        A     -- for the process.  My answer is yes.

10       Q     Okay.  Yes, they were not fair?

11       A     Correct.

12       Q     Not reasonable?

13       A     Right.

14       Q     Not carried out in good faith, correct?

15       A     To the best of my understanding, yes.

16       Q     Okay.  Well -- and you're in the middle of it all,

17   right?  You go to these Board meetings; you're the CEO?

18       A     That statement is true, but it doesn't necessarily

19   extend to other issues that are involved with being in the

20   position I'm in.

21       Q     Okay.  Basically what the power group at AAPS was

22   doing was taking Dr. Stewart and making an example out of her

23   to other potential dissenters, people who would not go along

24   with their view; is that right?

25            MS. ROSSETTI:  Objection.  Vague.

```
1                    THE COURT:  Sustained.
2          Q    (BY MR. CONWELL:)  They were -- they didn't -- not
3    identified any evidence to support her expulsion, have you?
4          A    I don't know what evidence they had.
5                    THE COURT:  Listen to the question.
6                    THE WITNESS:  Okay.
7          Q    (BY MR. CONWELL:)  You've not identified any
8    evidence to support this expulsion, have you?
9          A    Repeat that one more time, please.
10         Q    I said you've not identified any evidence to support
11   this expulsion, have you?
12         A    Have I?
13         Q    Right.
14         A    No, I did not, correct.
15         Q    And we didn't get the two-thirds vote, right?
16         A    From what I understand that, yes.
17         Q    It wasn't fair, wasn't reasonable, wasn't done in
18   good faith, right?
19         A    Correct.
20         Q    So I'm -- what I'm trying to find out is why you did
21   it.  And you did it to make an example out of her, right?
22         A    Well, I didn't do anything.
23         Q    I'm sorry.  I meant the AAPS, your organization that
24   you are the CEO of and have been since 1997.
25         A    I can understand how you might come to that
```

1    conclusion.  I was not aware of anybody proceeding for that

2    sole purpose or any purpose.

3         Q    Okay.  And there was one other person expelled on

4    that day, and that was Leslie Radentz, right?

5         A    I think that's correct, right.

6         Q    The two females who spoke up on these issues were

7    the two that you expelled; is that right?

8         A    There were two females that spoke up, among others,

9    and these two were expelled, correct.

10        Q    Okay.  Oh, were any of the men expelled?

11        A    No.

12        Q    Okay.  Take a look at Exhibit 304.

13             (Exhibit 304 previously marked for identification.)

14        Q    (BY MR. CONWELL:)  Before I ask you about that,

15   there was a -- have you seen the e-mail from Dr. Cerrato to

16   Dr. Stewart dated July 27, 2012, in which he says, "Your appeal

17   has been granted"?

18        A    Don't recall that.

19        Q    Okay.  You don't have any memory of that whatsoever?

20        A    No.

21        Q    Would -- can you agree with me that AAPS has never

22   given Dr. Stewart either a time or a place where she can

23   proceed with an appeal?

24        A    Where she can --

25        Q    Proceed with an appeal of the disciplinary -- of the

1    expulsion.

2         A    My only -- my understanding -- again, I wasn't

3    involved with the committee in any way -- is that she was

4    offered an appeal.  I don't know what happened from that point

5    forward.

6         Q    Okay.  Did the AAPS ever create an appeal board?

7         A    Not to my knowledge it did not, no.

8         Q    And now back to 304.

9              Is that an e-mail from you?

10        A    Yes.

11        Q    And did you author the amendment that's attached to

12   it?

13        A    I may have.

14        Q    Well, what did you mean when you said, "To Tony,

15   Dave and Bob" -- that's Bob Cerrato, right?

16        A    Uhm, yes.

17        Q    -- "I have finally found the time to craft a first

18   draft"?  What did you mean?

19        A    Okay.  Well, I guess I did then, right?

20        Q    Okay.  And if you turn over the page at the draft

21   you created -- and by the way, I want you to note the date of

22   this is September 24, 2010.

23        A    Yes, I did create this.  Revisiting this, I did,

24   yes.

25        Q    Okay.  So this is just before the Executive

```
 1    Committee suspended Castillo, Geller, and Klein; is that right?
 2         A    Yes.
 3         Q    Okay.  And so we can look at the bylaws to see what
 4    they used to say, but what you did is you put in provisions to
 5    give the Executive Committee the authority to expel -- or I'm
 6    sorry -- to suspend and discipline members; is that right?
 7         A    Yes.
 8         Q    Okay.  That's because you didn't have any provision
 9    in there that really allowed the Executive Committee to do
10    that, right?
11         A    There was none.
12         Q    So at the time that they were expelled -- or I'm
13    sorry -- at the time that they were suspended by the Executive
14    Committee, the bylaws had no provision that allowed them to do
15    that?
16         A    Correct.
17         Q    And so what you were doing was trying to plug that
18    hole; is that right?
19         A    I was asked to make a -- to draft recommendations
20    for the -- for this, and I did.
21         Q    Okay.  And as a CEO is it part of your
22    responsibility to ensure that the bylaws are complied with?
23         A    That would be the Board.
24         Q    Okay.  You have nothing to do with that at all?
25         A    Generally, no, no.
```

1      Q      Okay.  Let me ask you how hard would it have been

2  for the AAPS to select a committee of responsible people

3  outside of the organization to conduct an independent

4  investigation into alleged misconduct?

5      A      Hard in terms of -- I'm not sure I understand

6  exactly what you mean.  How hard would it be to establish a

7  committee of individuals --

8      Q      How much effort would it have required if the Board

9  delegated that to you?  "Mr. Carbone, we want an independent

10 committee to investigate" -- excuse me -- "investigate

11 misconduct of alleged misconduct of Dr. Stewart"?

12     A      Okay.

13     Q      How much effort would have been required for you to

14 do that?

15     A      Probably a substantial amount of effort.

16     Q      Okay.  And they never asked you to do that, did

17 they?

18     A      Never.

19            MR. CONWELL:  That's all the questions I have -- oh,

20 I'm sorry.  I'm sorry.  I did have one more thing.

21     Q      (BY MR. CONWELL:)  This -- we looked at this e-mail

22 earlier of the -- depicting a number of black people in an

23 operating room with a guy on an operating table wearing a Ku

24 Klux Klan hat.  You recall that?

25     A      Yes, I do recall that.

```
 1          Q      And you recall when I asked why you sent it, you
 2     said it was just, "He also wanted me -- he gave me a standing
 3     order to send racist e-mails"?
 4          A      He occasionally said, "Send me other things you
 5     get."
 6          Q      Okay.
 7          A      Yes.
 8          Q      And so the reason you forwarded that to Mr. Bell was
 9     that he just happened to be in the room and was in your office;
10     is that right?
11          A      I have no recollection of that.
12          Q      Let me show you your testimony on page 222, line 3
13     to 223 line 8 to refresh your memory.
14                 And I asked you, (Reading:)
15                 "Do you understand this is depicting a
16                 number of black people in an operating
17                 room with a guy on the operating table
18                 wearing a Ku Klux Klan hat?"
19                 You said, "Right.  Yes, I do."
20                 And I said, "It could be wrong, but
21                 judging by his hat, this guy ain't going
22                 to make it."
23                 And you said, "Do I understand that?  Yes,
24                 I do understand that."
25                 "Why did you forward this to Mr. Bell?
```

UNITED STATES DISTRICT COURT

1          "Answer:  He asked for this one for

2          certain and he just --

3          "Question:  And he just happened to be in

4          the room?

5          "Answer:  He was in my office.

6          "Question:  You were looking at it?

7          "Answer:  He was in my office frequently,

8          sometime hour by hour, back and forth.

9          And as I mentioned to you earlier, I was

10          facing this way, my computer was this way,

11          and I might have been on the telephone and

12          somebody's standing behind me and I didn't

13          even know they were there until they

14          finally moved over here, came around the

15          table, and that's why that's what happened

16          on many occasions."

17          Does that refresh your memory?

18     A     Yes.

19     Q     And in fact, all these photographs that we were

20   looking at, the racist and pornographic photographs, he was in

21   your offices -- or he was in your office when all those were

22   sent; is that right?

23     A     He wasn't in there when all of them were sent, no.

24     Q     Do you recall me asking -- let me see if this

25   refreshes your memory, on page 223, (Reading:)

UNITED STATES DISTRICT COURT

```
1              "So all these photographs that we've been

2              looking at, was he in your office when all

3              those were sent, or did you send any of

4              these to him on your own pursuant to his

5              request that you keep them coming?

6              "Answer:  It would be my comment that all

7              of these he had to have in some capacity

8              some involvement whereby he said, 'Oh, I

9              know.  You know, I saw something earlier

10             this morning.  If you still have it, can

11             you forward it to me?'  Sometimes I would,

12             sometimes I wouldn't.  If I forgot about

13             it when I got pulled in another direction,

14             I wouldn't do it."

15             Do you recall that testimony?

16      A     Now, that I read it, yes.

17      Q     And is that accurate or is the story you told this

18  morning accurate?

19      A     Well, I --

20             MS. ROSSETTI:  Objection.  Argumentative.

21             THE COURT:  Sustained.

22             MR. CONWELL:  No further questions.

23             THE COURT:  Okay.  All right, ladies and gentlemen,

24  as I indicated earlier, we were going to end a couple of hours

25  early today.  So we're going to adjourn for the weekend.
```

1          On Mondays the Court deals with all of its other matters,

2     so we will reconvene on Tuesday morning at 8.  Have a pleasant

3     weekend and remember the admonition, please.

4               THE COURTROOM DEPUTY:  All rise.

5               (Open court out of the presence of the jury.)

6               MR. SCHNEIDER:  Your Honor, we wanted to alert you

7     to a stipulation that the parties have reached.

8               THE COURT:  Sure.  Oh, and this is something we will

9     read to the jury Tuesday?

10              MR. SCHNEIDER:  No.

11              THE COURT:  Oh.  Okay.

12              MR. SCHNEIDER:  The stipulation is that

13    Dr. Gallagher may testify remotely, and in turn they have asked

14    and we have agreed that Drs. Castillo and --

15              MS. ROSSETTI:  Rice.

16              MR. SCHNEIDER:  -- and Rice, if they need to be

17    called back, they may testify remotely as well.

18              THE COURT:  Okay.  Sounds good.  Okay.  I take it

19    Gallagher's Florida?

20              MR. CONWELL:  Yeah -- uhm, Texas, I believe.

21              MR. SCHNEIDER:  He's in Florida.

22              MR. CONWELL:  He's in Florida?  Oh, wait.  Feaver's

23    Texas, that's right.

24              THE COURT:  All of them then are out of the country.

25              MR. CONWELL:  Yes.

1          THE COURT:  Okay.

2          THE COURTROOM DEPUTY:  This Court is adjourned.

3          (At 12:03 p.m. an adjournment was taken

4          until Tuesday, February 2, 2016, at 8:00 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5    I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6    FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7    OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8    TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14        DATED THIS 29TH DAY OF JANUARY, 2016.

15

16

17        /S/ DEBRA READ
          _____
18        DEBRA READ, CSR NO. 3949 CRR RMR RDR
          FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT