1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE OTIS D. WRIGHT, II

4          UNITED STATES DISTRICT JUDGE PRESIDING

5   PATRICIA STEWART, D.O.,            )
                                       )
6                  Plaintiff,          )
                                       ) ED CV 13-1670-ODW(DTBx)
7        vs.                           )
                                       )
8   AMERICAN ASSOCIATION OF PHYSICIAN  )         VOLUME 5
    SPECIALISTS, INC., WILLIAM         )
9   CARBONE; ROBERT CERRATO; SVETLANA  )      PAGES 1 - 205
    RUBAKOVIC and DOES 1-100,          )
10                                     )
                   Defendants.         )
11  _____   )

12

13

14              REPORTER'S TRANSCRIPT OF
                   TRIAL - DAY 5
15          TUESDAY, FEBRUARY 2, 2016
                    8:14 A.M.
16           LOS ANGELES, CALIFORNIA

17

18

19

20

21

22  _____

        DEBI READ, CSR 3949 CRR RMR RDR
23     FEDERAL OFFICIAL COURT REPORTER
        312 NORTH SPRING STREET 432A
24     LOS ANGELES, CALIFORNIA 90012
           READIT3949@GMAIL.COM
25


              UNITED STATES DISTRICT COURT

1                        A P P E A R A N C E S

2

ON BEHALF OF THE PLAINTIFF:

3

       CONWELL BUSINESS LAW, P.A.
4      BY:  GEORGE DONOVAN CONWELL, JR.
            Attorney at Law
5      12610 Race Track Road, Suite 200
       Tampa, Florida 33626
6      813-282-8000
       dconwell@conwellbusinesslaw.com

7

       HILAIRE MCGRIFF, PC
8      BY:  MIKA HILAIRE
            Attorney at Law
9      601 S. Figueroa Street, Suite 4050
       Los Angeles, California 90017
10     213-330-4260
       mika@hmpclaw.com

11

       WILLIAM A. OKERBLOM LAW OFFICES
12     BY:  WILLIAM ALLEN OKERBLOM
            Attorney at Law
13     1145 E. Clark Avenue, Suite H
       Santa Maria, California 93454
14     805-478-6570
       drlaw07@aol.com

15

16  ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
    PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:
17

       ANDERSON, MCPHARLIN & CONNERS LLP
18     BY:  ERIC A. SCHNEIDER
       BY:  LEILA M. ROSSETTI
19          Attorney at Law
       707 Wilshire Boulevard, Suite 4000
20     Los Angeles, California 90017-3623
       213-688-0080
21     eas@amclaw.com
       lmr@amclaw.com

22

23

24

25

1        A P P E A R A N C E S (continued)

2

ON BEHALF OF DEFENDANT AMERICAN ASSOCIATION OF PHYSICIAN
3   SPECIALISTS, INC.:

4        GUSRAE KAPLAN NUSBAUM PLLC
         BY:  MARLEN KRUZHKOV
5             Attorney at Law
         120 Wall Street
6        New York, New York 10005
         212-269-1400
7        mkruzhkov@gusraekaplan.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I  N  D  E  X

2                    CHRONOLOGICAL INDEX OF WITNESSES

3

4    PLAINTIFF'S WITNESSES                          PAGE    VOL.

5

6    **WILLIAM CARBONE**
       Cross-Examination By Ms. Rossetti            8      5
       Redirect Examination By Mr. Conwell         59      5
7
     **ROBERT CERRATO, M.D.**
8      Direct Examination By Mr. Conwell           66      5

9    **LEONARD M. YOUNG, JR.**
       Direct Examination By Ms. Hilaire          169      5
10
     **ROBERT CERRATO, M.D. RESUMED**
11     Cross-Examination By Mr. Schneider         190      5

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

E X H I B I T S

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|---|---|---|---|---|
| 5 | Stewart Letter to Board of Directors dated May 24, 2012 | 142 | 204 | 5 |
| 12 | Russo Letter from BOD to all members of AAPS, dated 6/24/11 | 197 | 204 | 5 |
| 311 | E-mail letter dated 01/18/11 from Robert Cerrato to William Carbone regarding no authorization to have any conference calls on any matters concerning three suspended physicians | 111 | | 5 |
| 1067 | 06/28/10 Letter from William Carbone to Dr. Stewart re: Donation to the AAPS National Initiative Fund | 46 | 47 | 5 |
| 1071 | 10/19/10 E-mail between William Carbone and Dr. Patricia Stewart | 13 | 47 | 5 |
| 1093 | | | 205 | 5 |
| 1095 | 04/27/11 Minutes of the AAPS Board of Directors Meeting | 113 | 128 | 5 |
| 1098 | 06/10/12 e-mail from Dr. Stephen Montes to the AAPS Board of Directors recommending Dr. Patricia Stewart's membership with AAPS be terminated | 184 | 204 | 5 |
| 1306 | 13th Revision to AAPS's bylaws adopted 08/22/06 | 107 | 128 | 5 |
| 1332 | 05/16/12 Memorandum from the APPS Executive Committee to the AAPS Board of Directors re: AAPS Disciplinary Committee | 165 | 204 | 5 |
| 1442 | AAPS Board of Directors minutes, June 23, 2011 | 112 | 128 | 5 |

E X H I B I T S (continued)

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|-----|-------------|------------------------|------------------|------|
| 1477 | AAPS Board of Directors conference call minutes, February 28, 2012 | 134 | 204 | 5 |
| 1530 | Certified letter dated July 27, 2012, from Robert Cerrato to Patricia Stewart | 160 | 204 | 5 |
| 1599.1 | Special Litigation Assessment Notice with supporting documents, May 24, 2013, Exhibit W to MSJ | 163 | 204 | 5 |
| 1730 | Letter from Robert Cerrato to the New Jersey Bar Ethics Committee dated August 26, 2010 | 115 | | 5 |
| 1807 | Complaint in AAPS v. Timothy Bell, filed October 1, 2010 | 102 | 128 | 5 |
| 1811 | Affidavit of Anthony Durante in support of motion for summary judgment in APPS v Bell lawsuit | 120 | | 5 |
| 1867 | Statement by Eric Wilkens-threatening phone call from Carbone, Ritz | 50 | 53 | 5 |

1          LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 2, 2016

2                        8:14 A.M.

3                         -o0o-

4          (Call to Order of the Court.)

5          THE COURTROOM DEPUTY:  Calling Item 1,

6  ED CV 13-1670, Patricia Stewart versus American Association of

7  Physician Specialties, et al.

8          Counsel, may I have your appearances, please.

9          MS. HILAIRE:  Good morning.

10    Mika Hilaire appearing on behalf of plaintiff, as well as

11  Don Conwell appearing on behalf of the plaintiff, Patricia

12  Stewart.

13          MR. SCHNEIDER:  Good morning, your Honor.

14    Eric Schneider and Leila Rossetti for all of the

15  defendants.

16          THE COURT:  Good morning.  And the jurors are

17  present.  We're still in the plaintiff's case-in-chief.

18    Next witness.  You're not sure?

19          MR. CONWELL:  Your Honor, I believe we're doing

20  cross-examination of Mr. Carbone.

21          THE COURT:  Is that where we left off?  That's

22  right.  Okay.

23    **WILLIAM CARBONE, PREVIOUSLY SWORN, RESUMED THE STAND**

24          THE COURTROOM DEPUTY:  You have been previously

25  sworn and you're still under oath.  Please state your name for

1    the record.

2              THE WITNESS:  William Carbone.

3              THE COURTROOM DEPUTY:  Okay.  Be seated.

4                        CROSS-EXAMINATION

5    BY MS. ROSSETTI:

6         Q    Good morning, Mr. Carbone.

7         A    Good morning.

8         Q    Mr. Carbone, how many employees work for AAPS?

9         A    Fourteen or fifteen.

10        Q    And has that number been relatively constant in the

11   period since 2009?

12        A    Yes.

13        Q    As CEO of the company, what role, if any, do you

14   play in selecting who's on the Board of Directors of AAPS?

15        A    I play no role.

16        Q    Who selects the members of the Board of Directors?

17        A    The Board of Directors are elected by the

18   individuals -- individual academies of medicine.  The

19   physicians that are on those academies make that decision.

20        Q    And do you ever participate in the selection of

21   Board members?

22        A    No.

23        Q    Do you ever provide any input as to who might be

24   placed on the Board of Directors?

25        A    I may if asked.

 1        Q     And do people regularly ask you?

 2        A     No.

 3        Q     Has anyone ever asked you?

 4        A     Yes.

 5        Q     And does that happen frequently?

 6        A     Very infrequently.

 7        Q     Are there any members of the AAPS staff that you

 8   report to?

 9        A     I don't report to anybody on the staff.  I report to

10   the president and the Board of Directors.

11        Q     And the current president of AAPS is Dr. Robert

12   Cerrato, correct?

13        A     The current president?

14        Q     Correct.

15        A     No.  The current president is a physician from

16   Texas, Dr. Thornton.

17        Q     And Dr. Cerrato is a past president of AAPS?

18        A     He is one of numerous past presidents, yes.

19        Q     Have you ever played any role in AAPS compensating

20   Dr. Cerrato for legal services provided to AAPS?

21        A     No, I have not.

22        Q     For any services provided to AAPS?

23        A     Not that I can recall.

24        Q     Do you know if something like that were to happen,

25   someone were to make some sort of arrangement with the

1    president or with any officers of the company to provide

2    services for AAPS, who would make a decision like that?

3        A    It would be the Executive Committee and the Board of

4    Directors.

5        Q    To what extent, if any, did you or AAPS ever seek

6    legal advice from Dr. Cerrato on behalf of AAPS?

7        A    I'm not aware of any instance.

8        Q    Have you yourself ever referred to Dr. Cerrato as

9    AAPS's corporate counsel?

10       A    No.

11       Q    Have you ever heard anyone refer to him in such a

12   way?

13       A    No.

14       Q    Have you ever suggested to employees that they run

15   certain things by Dr. Cerrato?

16       A    I may have concerning conceptual issues with an

17   agreement, a contract, a policy, or a procedure.

18       Q    And why would you suggest that such things be ran by

19   him?

20       A    He has a complete understanding of the operations of

21   the organization concept.

22       Q    In the time period between, let's say, 2009 and

23   2011, how often did Dr. Cerrato come to AAPS's offices?

24       A    I would answer that by telling you that he was there

25   when there was an official meeting.  Whether it's the Executive

1   Committee or the Board of Directors, those are the times I

2   remember him there, two or three times a year, at most.

3        Q    And when you say official meeting, there's been a

4   lot of discussion about conference calls and, you know,

5   telephonic meetings.  By official meeting, are you including

6   those telephonic meetings?

7        A    No.  I'm referring to in-person meetings where the

8   Board and Executive Committee had to meet face to face.

9        Q    Gotcha.  Okay.  And you said during the time period

10  between 2009-2011, it was maybe two or three times a year.  Has

11  that frequency been different during any time period during the

12  time you've known Dr. Cerrato?

13       A    No, it isn't.

14       Q    Are you friendly with AAPS's members?

15       A    Yes, I am.

16       Q    Do you ever socialize with any AAPS members outside

17  of AAPS functions?

18       A    I purposely do not do that.

19       Q    And what about members of the Board of Directors?

20  Do you ever socialize with them outside of AAPS functions?

21       A    Other than the functions, I do not.

22       Q    And that would include Dr. Cerrato?

23       A    Yes.

24       Q    And before he passed, Dr. Montes?

25       A    Yes.

```
 1        Q      And what about Dr. Castillo?  Did you ever socialize
 2   with him in any fashion?
 3        A      No.
 4        Q      Are you friendly with Dr. Castillo?
 5        A      I was very friendly with him, yes.
 6        Q      And you said was.  Is -- has that changed?
 7        A      Yes, for me it has.
 8        Q      And what brought about that change?
 9        A      The lawsuit.
10        Q      And you're talking about the lawsuit that was filed
11   in Florida?
12        A      Correct.
13        Q      Is there a particular reason that you don't
14   socialize with any AAPS Board members outside of AAPS
15   functions?
16        A      It's always been my practice that it's better to
17   keep business with business.
18        Q      Has anyone ever suggested to you certain social
19   activities that you wanted to participate in?
20        A      I can remember one instance, it was 2005 or 2006 --
21   I'm not certain of the year -- we had a meeting, annual meeting
22   in Vancouver, British Columbia, and several of the physicians
23   suggested that I take a cruise prior to the meeting, a week
24   prior, and I decided I can't do that because then I would be in
25   a social issue; I couldn't be myself.  In addition, I'm
```

1   preparing for annual meeting, and so for those reasons, I

2   declined.

3       Q    So as a rule, when you're offered invitation to

4   social functions with AAPS members or Board members, do you

5   always decline them if they're outside of AAPS functions?

6       A    I have always declined them, yes.

7           MS. ROSSETTI:  I'm going to show you an exhibit.

8   It's Exhibit 1071.

9           (Exhibit 1071 previously marked for identification.)

10          MS. ROSSETTI:  Thank you, Ms. English.

11      Q    (BY MS. ROSSETTI:)  Have you had a chance to take a

12  look at this exhibit, Mr. Carbone?

13      A    Okay.

14      Q    And do you recognize this e-mail?

15      A    Yes, I do.

16      Q    And when did you send this?

17      A    It looks like it was October 19th of 2010.

18      Q    And did you send it to Dr. Stewart?

19      A    Yes.

20      Q    And could you read for me what that says there?

21      A    Yes.  It says, "Patty, we will never go back to

22  where we were.  That's a promise.  Regards, Bill."

23      Q    And what did you mean by that?

24      A    Just what I said.

25      Q    When you said, "We'll never go back to where we

 1  were," was there something specific you were referring to?

 2      A      The Board of Dermatology had experienced various

 3  governing problems.  It wasn't able to function as it was

 4  expected to.  So the -- I believe it was the Board of Directors

 5  made a decision to transition that Board under the Board of

 6  Internal Medicine until such time as they could correct what

 7  needed to be resolved so they could function independently as a

 8  board of certification in dermatology.

 9      Q      And why did you send this specific e-mail to

10  Dr. Stewart?  What is it you were trying to accomplish by

11  sending this e-mail?

12      A      To help assure her that we are working to do the

13  right thing, to encourage her to remain engaged with the

14  organization, to stay active and participate.

15      Q      Are you a member of the Executive Committee of AAPS?

16      A      No.  It's only physicians.

17      Q      Were you involved in the decision -- in the decision

18  at one point to attempt to amend AAPS's bylaws to allow the

19  Executive Committee to make emergency disciplinary decisions?

20      A      The only involvement I had is I was asked -- I was

21  requested to put some proposals together on what they might

22  consider.

23      Q      What about in the decision to even bring such a

24  proposal?  Were you involved in that decision?

25      A      No.

1     Q     And did you ever provide any opinion or input as to

2   whether the proposal should pass?

3     A     Would you repeat that, please?

4     Q     Absolutely.  Did you ever provide any opinion or

5   input as to whether or not you personally thought that the

6   proposal should pass?

7     A     No, I did not.

8     Q     And we've discussed Tim Bell in this case.  You know

9   who Tim Bell is?  Yes?

10    A     I definitely do.

11    Q     And he's an ex-employee of AAPS?

12    A     That's correct.

13    Q     And what position did Tim Bell hold with AAPS?

14    A     He was a director of governmental affairs.

15    Q     And at a certain point his employment with AAPS was

16  terminated; is that correct?

17    A     It was, correct.

18    Q     Do you have any recollection of when that was?

19    A     I believe it was sometime in February of 2010.

20    Q     And what was your involvement in the decision to

21  terminate Mr. Bell?

22    A     It was ultimately my decision.

23    Q     And why was he terminated?

24    A     In his lack of following policy on a recurring

25  basis, disappearing, I guess, or not showing up at the office

1    for extended periods, not days, but week -- over a week, not

2    performing his duties in terms of providing reports on a timely

3    basis, accuracy in those reports, and in calling in at 3,

4    4 o'clock in the morning that he was ill or he had -- could not

5    come back from a meeting because his brother had to have

6    emergency heart surgery in another state, things of that

7    nature.

8         Q    And why would calling in sick or calling in because

9    he had to attend a family member -- why would that be grounds

10   for termination?

11        A    That wasn't the reason for it.  It was just a

12   cacophony of different issues that led up to it.

13             MS. ROSSETTI:  Your Honor, I would like to request

14   permission to read some of the -- just a short piece of depo

15   testimony that was read on Friday to Mr. Carbone for

16   impeachment purposes.

17             THE COURT:  You want to impeach Mr. Carbone?

18             MS. ROSSETTI:  No.  I want to go over the testimony

19   with him to clarify it.

20             THE COURT:  Whose testimony's that?

21             MS. ROSSETTI:  His own.

22             THE COURT:  I'm at a loss.

23             MS. ROSSETTI:  There was certain testimony that was

24   read to Mr. Carbone on Friday, and I would like to go over with

25   him again just to clarify his testimony.

```
 1              THE COURT:  All right.
 2              MR. CONWELL:  Well, your Honor, I object to her just
 3    reading testimony.  That's not proper rehabilitation.
 4    Obviously I don't object to her attempting to rehabilitate him.
 5    It's not proper rehabilitation to just read something.
 6              THE COURT:  My understanding is she wants to
 7    question him about something he said.
 8              MS. ROSSETTI:  Right.
 9              MR. CONWELL:  I don't object to her questioning him.
10    I thought she asked if she could just start reading things.
11              THE COURT:  In order to put the question into
12    context, I guess we have to know what she's questioning him
13    about and what the prior answer was.  So go ahead.
14              MS. ROSSETTI:  Thank you, your Honor.
15         Q    (BY MS. ROSSETTI:)  Mr. Carbone, I'm going to be
16    reading from your 2012 deposition testimony in the Florida
17    matter from page 183, line 20, for Mr. Conwell's purposes, to
18    page 184, line 12.  And the testimony reads, Mr. Carbone,
19    (Reading:)
20              "And when Tim Bell asked you to forward
21              these e-mails to him, you did so?
22              "Answer:  Yes.
23              "And why did you do so?
24              "It was an interoffice issue.  He was one
25              of our staff and I didn't see an issue
```

1              with it.
2              "Question:  You think it's okay so long as
3              it's to someone in the office?
4              "Answer:  Not necessarily.  But he asked
5              me to do it and I did it.
6              "Question:  You think it's okay for you to
7              forward such e-mails to someone, to an
8              AAPS staff person if they make the
9              request?
10             "Answer:  Would you repeat the question?
11             "Question:  Think it's okay or appropriate
12             for you to forward such e-mails to an AAPS
13             staff member if they make the request?
14             "Answer:  I don't think it's
15             inappropriate."
16             Now, Mr. Carbone, on Friday we went through certain
17   inappropriate e-mails, so in terms of the e-mails being
18   researched in this testimony, are those the e-mails in
19   question?
20        A    I believe they are, yes.
21        Q    And with regard to your response here and
22   specifically where it says, "I don't think it's inappropriate,"
23   why did you -- why did you testify in such a fashion?
24        A    I don't know what I was thinking.  I was confused,
25   maybe, with the -- due to the changing and the tense of the

1    questions, past and present tense, but I don't know what I was

2    thinking at the time.

3         Q    Do you agree with that statement that you don't

4    think it's inappropriate?

5         A    I do not agree with that.

6         Q    At some point did anyone, any member of the AAPS

7    Board, have any discussion with you regarding these

8    inappropriate e-mails?

9         A    Yes.

10        Q    And do you recall who you discussed this with?

11        A    Several physicians and I spoke about it,

12   Dr. McCann, David McCann, Dr. Cerrato, I think Dr. Steve Carin,

13   definitely Dr. Russo, Anthony Russo, and there were probably

14   more that I spoke to individually.

15        Q    And what was discussed?

16             MR. CONWELL:  Your Honor, I object to the extent

17   it's calling for hearsay from people who aren't here in the

18   courtroom to be cross-examined.

19             MS. ROSSETTI:  Your Honor --

20             THE COURT:  Overruled.  Just the subject that was

21   discussed will be permitted.

22             THE WITNESS:  Was the question what was discussed?

23        Q    (BY MS. ROSSETTI:)  Correct, with regard to the

24   inappropriate e-mails.

25        A    That I regretted what I did and was sorry about it

```
 1   and committed that I wouldn't repeat that.
 2        Q    And moving forward, did you ever send or allow
 3   yourself to receive any such inappropriate e-mails moving
 4   forward?
 5        A    No.
 6        Q    And, obviously, you don't have control over what's
 7   sent to you?
 8        A    Right.
 9        Q    So did you take any steps to make sure that such
10   things weren't sent to you in the future?
11        A    I did.  I may have spoken with somebody directly.  I
12   may have filtered their e-mail address, or -- and I may have
13   sent them an e-mail and asked that they refrain from forwarding
14   these types of messages in the future.
15        Q    So when you're saying "may have," did you --
16        A    I'm not sure which one of those communication
17   modalities that I used, but those were the three that I would
18   use.
19        Q    Is it -- is it an issue of which you used as it
20   pertained to which particular sender?
21        A    Yes.  Yes.  Okay.
22        Q    Okay.  And why did you take these steps?
23        A    Well, because I thought it was -- I made a
24   commitment stating that I believed it was inappropriate and I
25   gave my word, and I just needed to let these individuals know
```

 1    that in the office -- interoffice or in the office -- it's not

 2    appropriate, without offending them.

 3          Q     Now, with regard to Ms. Newby, another person we've

 4    discussed in this matter, are you familiar with Ms. Cassandra

 5    Newby?

 6          A     Yes, I am.

 7          Q     And who is she?

 8          A     She's a former employee of AAPS.

 9          Q     Are you the person that made the decision to

10    terminate Ms. Newby's employment?

11          A     I am.

12          Q     And she testified that she started with AAPS around

13    2007.  Does that sound right to you?

14          A     It was in 2007.  I don't know the month, yeah.

15          Q     But 2007 sounds right?

16          A     Yes.  That would be correct, yes.

17          Q     And who hired her?

18          A     I did.

19          Q     And did you have a face-to-face interview with her

20    prior to hiring her?

21          A     I did.

22          Q     Prior to Ms. Newby holding -- actually, let me ask

23    you what was her position with AAPS?

24          A     She was the director of certification.

25          Q     And at the time that she was being hired, the person

 1   that -- who was the person that held the position previously,

 2   before Ms. Newby?

 3       A     That was Mr. Stan Kalisch from Atlanta, Georgia

 4   area.

 5       Q     Gotcha.  And then Ms. Newby directly followed

 6   Mr. Kalisch in that position?

 7       A     She did, yes.

 8       Q     And when you hired Ms. Newby and interviewed her,

 9   could you ascertain her approximate age when you were

10   interviewing her?

11       A     Approximate, I would say she was in her mid to late

12   50s, maybe early 60s, yeah.

13       Q     And when was she terminated?

14       A     I think it was June of 2010.

15       Q     And why was she terminated?

16       A     She was terminated for several reasons, but the

17   particular reason that day was that she assaulted one of our

18   employees.

19       Q     And that was the video that we watched on Friday?

20       A     That's correct.  Right, it was, right.

21           MS. ROSSETTI:  Let's take a quick look at it.  We'll

22   show you Exhibit 1093.

23       (Video played, not reported.)

24       Q     (BY MS. ROSSETTI:)  While this is loading, let me

25   ask you, Mr. Carbone, since we've already seen this video and

```
 1    it depicts, let's just say, two people running into each other,
 2    if nothing else -- correct?  -- how did you learn of this video
 3    or this incident?  I apologize.
 4         A    Mr. Durante came into my office.  I believe I was in
 5    a meeting.
 6              MR. CONWELL:  Your Honor, I object to the extent
 7    this is calling for hearsay.  Sounds like he's starting to give
 8    that.
 9              THE COURT:  Another employee brought it to your
10    attention, right?
11              THE WITNESS:  That's correct.
12              THE COURT:  Okay.
13         Q    (BY MS. ROSSETTI:)  And once you learned about it,
14    what did you do?
15         A    Well, I had to speak with the individual and met
16    with that individual.
17         Q    And which individual are you referring to?
18         A    Mr. Durante.
19         Q    Okay.
20         A    And he explained to me what happened and then I
21    reviewed the videotape.
22         Q    Did you speak to Ms. -- the two individuals on the
23    video?  One is Ms. Newby, correct?
24         A    Would you repeat that?
25         Q    There's two individuals in the video, once we get to
```

1   show it?

2       A    Yes.

3       Q    One is Ms. Newby, correct?

4       A    That's correct.

5       Q    And the other one is who?

6       A    Debi Colmorgen.

7       Q    And what position did Ms. Colmorgen have with the

8   company at the time?

9       A    She was the communications coordinator which you

10  could say was a receptionist.

11      Q    And what was the relationship between Ms. Newby and

12  Ms. Colmorgen like prior to the incident on the video?

13      A    Very tenuous.

14      Q    And why is that?

15      A    They had a lot of, uhm -- what would I say? -- I'm

16  not going to say interesting -- a lot of discussions that were

17  critical, criticizing her.  Debi felt intimidated by her.

18           MR. CONWELL:  Your Honor, I object to the hearsay.

19           THE COURT:  Sustained.

20      Q    (BY MS. ROSSETTI:)  After viewing this -- this video

21  and learning of the incident between Ms. Newby and

22  Ms. Colmorgen that's shown on the video, did you speak to

23  Ms. Colmorgen about the incident?

24      A    Yes.

25      Q    And without telling me the words that she told you,

1    what did she convey to you?

2              MR. CONWELL:  Your Honor, that's calling for

3    hearsay.

4              THE COURT:  Overruled.

5              THE WITNESS:  She denied it.

6         Q    (BY MS. ROSSETTI:)  Ms. Colmorgen denied it?

7         A    Oh, I'm sorry.  I apologize.  What did

8    Ms. Colmorgen?

9         Q    Ms. Colmorgen, yes.  You discussed this incident

10   with her?

11        A    Yes, I did.  Yes, I did.

12        Q    And --

13        A    She explained that she was pushed into the file

14   cabinets.

15        Q    And then did you discuss it with Ms. Newby as well?

16        A    I did within the presence of another employee.

17        Q    And did she confirm or deny that the incident had

18   occurred?

19        A    She denied it.

20        Q    At the time that she denied it, did she know that

21   there was a video depicting the incident?

22        A    I did not divulge that, no.

23        Q    And so was the -- ultimately the day of her

24   termination, when was she terminated?

25        A    She wasn't terminated the same day.  I directed her

1   to leave the office and go home I think it was a Thursday --

2   could be wrong on that -- and to return Monday and we'll

3   discuss it further.

4          Q     And ultimately why was this incident -- the video,

5   the discussions after the whole thing, why was this incident

6   important to you?

7          A     In of itself, you mean?

8          Q     Correct.

9          A     You don't do that to people, whether you're at work

10  or not.  I mean, it's not appropriate, it's not acceptable.

11         Q     And so were there reasons beyond just the physical

12  altercation that led to the termination?

13         A     Yes.

14         Q     And what were those?

15         A     Her demeanor, communications with staff that she

16  supervised and how they were treated by her, and her

17  interactions with me, not meeting deadlines, reports,

18  argumentative.

19         Q     And prior to her termination, had you ever

20  counselled Ms. Newby about her treatment of fellow employees?

21         A     I -- yes, I did.

22         Q     And do you recall what her response was?

23         A     She didn't think that she was being demeaning or

24  intimidating or belligerent with the staff.

25         Q     Did she ever agree to change her behavior?

```
 1        A     I don't recall that.

 2        Q     Fair enough.

 3              Who's in charge of human resources at AAPS?

 4        A     That would be Tony Durante.

 5        Q     And how long has he held that role?

 6        A     Since 2007.

 7        Q     At any time during her employ with AAPS, were you

 8   aware that Ms. Newby suffered from diabetes?

 9        A     I was not aware of that, no.

10        Q     Did you ever learn that information at any point up

11   till today?

12        A     I learned it.  I can't tell you -- I can't recall

13   exactly when I learned it, but I did.  Not -- not through her,

14   though.

15        Q     But it was subsequent to her termination?

16        A     Oh, yes.

17        Q     Did you ever learn that whether, during her

18   employment with AAPS, Ms. Newby had undergone a lumpectomy in

19   her breast?

20        A     I was unaware of that as well.

21        Q     Were you aware of the fact that -- of whether at a

22   certain point she had fractured her arm?

23        A     Yes.  You could see it and I knew that she fell

24   somewhere -- not in the office -- but she had taken a fall

25   somewhere.
```

1      Q    Did you ever give her a hard time about any health

2 condition she may have been dealing with?

3      A    No, I did not.

4      Q    Did you ever discuss any of her health issues with

5 her at any time during her employment?

6      A    I may have discussed with her the difficulty she was

7 having with her arm being fractured.

8      Q    Did you ever tell her to reduce the amount of her

9 physical therapy?

10      A    Absolutely not.

11      Q    Did you ever give her a hard time if she missed any

12 work for any sort of medical reason?

13      A    No.

14      Q    During her employment, did Ms. Newby ever complain

15 to you that she felt her employment with AAPS created a hostile

16 work environment?

17      A    Not with me she did not.

18      Q    Are you aware of whether she made any such complaint

19 to Mr. Durante?

20      A    I'm not -- I don't recall that.

21      Q    During Ms. Newby's employment, were there ever

22 instances where employees would have to burn the midnight oil,

23 work late into the night?

24      A    Yes.

25      Q    And was Ms. Newby ever one of the employees that was

1    kept late?

2        A      Yes.

3        Q      And when these late nights occurred, was there any

4    sort of policy or understanding that people could come in late

5    to work the next day?

6        A      Yes, there was.

7        Q      And was Ms. Newby ever prohibited from doing so?

8        A      Not to my knowledge.

9        Q      Was there ever any sort of distinction made as to

10   who was and was not permitted to come in late the day after a

11   late night of work?

12       A      If they worked late, they were just asked to notify

13   Mr. Durante that they would be coming in late because of the

14   extended period.

15       Q      Did you ever express any preference for male

16   physicians over female positions -- physicians holding

17   leadership roles at AAPS?

18       A      No, never.

19       Q      Do you have any personal belief as to whether males

20   or females are better suited for such roles?

21       A      We have -- repeat the question, please.

22       Q      Do you personally have any sort of belief as to

23   whether males or females as physicians are better suited to

24   hold leadership positions at AAPS?

25       A      In some respects the females are more effective than

1    the males.

2         Q     And why is that?

3         A     I would just say in follow-up and getting things

4    completed.

5         Q     Going back to Ms. Newby, did you ever refer to

6    Ms. Newby as -- excuse me, my language -- an old bitch?

7         A     I never did, no.

8         Q     Did you ever call her an old cow?

9         A     Absolutely not.

10        Q     And this word I won't use, but did you ever refer to

11   her using the C word?

12        A     Never.  Never.

13        Q     Did you ever refer to anyone using those words in

14   Ms. Newby's presence?

15        A     I did not.

16        Q     Did you ever make a statement to anyone that you

17   would have preferred to have a male in Ms. Newby's position as

18   director of certification?

19        A     Absolutely not.

20        Q     Is that something that you believe that a male would

21   be better suited for that role?

22        A     Absolutely not.

23        Q     Who replaced Ms. Newby as director of certification

24   after she was terminated?

25        A     Uhm, the person was Arrie Potter.

1      Q      And is that a male or a female?

2      A      That was a female.

3      Q      And who made the decision to have Ms. Potter take

4   over that role for Ms. Newby?

5      A      I did.

6      Q      And was Ms. Potter already employed with AAPS at the

7   time?

8      A      She was promoted from a managerial position.

9      Q      And you made the decision to promote her?

10      A      Yes.

11      Q      And what was Ms. Potter's race?

12      A      What was her race?

13      Q      Correct.

14      A      She was black.

15      Q      And do you have any idea what her approximate age

16   was?

17      A      I'm going to say early 50s, late -- probably early

18   50s is my guess.

19      Q      And did Ms. Potter have any sort of observable

20   disability at the time that you chose to promote her?

21      A      Yes, she did.

22      Q      And what was that?

23      A      She had elephantiasis.

24      Q      And how could you tell that that was something she

25   suffered from?

1          A     It was very conspicuous.

2          Q     Is Ms. Potter currently the director of

3    certification for AAPS?

4          A     She -- no, she is not.

5          Q     And why not?

6          A     She resigned.

7          Q     Do you have any idea of the reason for her

8    resignation?

9          A     There were a couple reasons, yes.

10         Q     And what were those?

11               MR. CONWELL:  Object to the -- excuse me.  Object to

12   this.  Calling for hearsay.

13               THE COURT:  Sustained.

14         Q     (BY MS. ROSSETTI:)  Ms. Potter resigned of her own

15   volition, correct?

16         A     Yes.

17         Q     How long did Ms. Potter serve as director of

18   certification?

19         A     I'm not certain, as I think about it today.  I'm

20   going to guess and say a year-and-a-half maybe.

21         Q     And then after Ms. Potter, who took over the

22   position of director of certification?

23         A     I believe it was Andrea.

24         Q     And do you remember her last name by any chance?

25         A     Yeah.  Uhm, Balboa.  Balboa.

```
 1          Q      And was Ms. Balboa already employed at AAPS at the
 2    time that she was made director of certification?
 3          A      Yes, she was.
 4          Q      And what was her role?
 5          A      I think she was the assistant or manager for
 6    certification.  I'm not sure what her exact title was.
 7          Q      So moving to director of certification would have
 8    been a promotion for her?
 9          A      Oh, definitely.
10          Q      And who made the decision to promote her?
11          A      I did.
12          Q      Is Ms. Balboa still the director of certification?
13          A      No, she's not.
14          Q      And who replaced her as the director of
15    certification?
16          A      Susan LoBianco.
17          Q      And do you know why Ms. Balboa is no longer the
18    director of certification?
19          A      Yes.
20          Q      And why is that?
21          A      She resigned to go back to work for the state.  She
22    was an employee of the state of Florida.
23          Q      And you said she was replaced by someone named Susan
24    LoBianco; was that correct?
25          A      Yes, correct.
```

1          Q       And was she a current AAPS employee at the time that

2     she was made director of certification?

3          A       I believe she was.  I'm not absolutely certain.  I

4     think she was, yes.

5          Q       Okay.  So at the time that she was brought in --

6          A       Yes, she was, yes.

7          Q       -- she was a current employee?

8          A       Yes.

9          Q       And had she been consecutively working at AAPS over

10    a period of time?

11         A       No.  She actually resigned -- I can't tell you the

12    date.  I can't even tell you the year.  She resigned to go into

13    private industry, 'cause we're a nonprofit, and she didn't like

14    it, and when we had an opening for director of certification,

15    she saw the notice and applied for the position.

16         Q       So at the time that she applied for the position,

17    she was a former employee of AAPS; is that correct?

18         A       Correct.

19         Q       And who made the decision to hire her back?

20         A       I did.

21         Q       And do you have any idea what her approximate age

22    was when you hired her as director of certification?

23         A       In her 50s, I'm guessing.

24         Q       And Ms. LoBianco -- is Ms. LoBianco currently the

25    director of certification for AAPS?

1        A      Yes, she is.

2        Q      Going back to those inappropriate e-mails that we've

3  discussed several times, did you ever show any of these e-mails

4  to Ms. Newby?

5        A      I never showed her any.

6        Q      Do you have any idea as to whether she may have

7  gotten a glance at any of them at any point?

8        A      She saw one.

9        Q      And how do you know that?

10        A      She came up behind me and I was opening an

11  attachment, and she was behind me, saw that one.

12        Q      Did she indicate to you that she had seen anything?

13        A      It was -- yes.

14        Q      And did anything happen thereafter?  Did you address

15  it in any fashion?

16        A      I addressed it immediately.

17        Q      And what'd you do?

18        A      I apologized to her and I reported it to

19  Mr. Durante, and those were the actions I took.

20        Q      And did Ms. Newby accept your apology?

21        A      Yeah.  She said don't worry about it, she's seen it

22  before.

23        Q      After the incident where Ms. Newby caught a glance

24  at one of these e-mails, did you after that point forward any

25  e-mails to Mr. Bell, any of these inappropriate e-mails?

1    A    No.

2    Q    You didn't forward any more after that point?

3    A    To her?

4    Q    To Mr. Bell?

5    A    I don't recall.  I believe I did not.  Okay?

6    Q    Do you know what the share drive is at AAPS?

7    A    That's a server.

8    Q    And can people upload documents to the server?

9    A    Most staff can, yes.

10   Q    And do you know how to do that?

11   A    Yes.

12   Q    Did you ever upload any of these inappropriate

13   e-mails to the share drive at AAPS?

14   A    No.

15   Q    Have you ever used Ms. Newby's computer or did you

16   ever during the time that she was employed by AAPS?

17   A    No.  I never touched it.

18   Q    At any time have you ever rejected a candidate for

19   employment at AAPS on the basis that the candidate was, quote,

20   "too light in his loafers"?

21   A    No.

22   Q    Have you ever used that phrase before?

23   A    No.

24   Q    Do you know who Mike Destefano is?

25   A    Yes, I do.

```
 1        Q      And who's that?

 2        A      He was a applicant for a position at the

 3   organization.

 4        Q      And what position was that, if you recall?

 5        A      I believe it was manager or assistant manager for

 6   certification.

 7        Q      And how did you find this person, this applicant?

 8        A      I -- I didn't find him.  He had seen a position

 9   announcement we placed and applied for the position.

10        Q      And did he come in for an interview?

11        A      Yes, he did.

12        Q      Prior to his interview, had you ever met this man

13   before?

14        A      No.

15        Q      How long did your interview last?

16        A      I'd say an hour.

17        Q      Did you interview him more than once?

18        A      I may have the same day after he met with other

19   people.  He may have come back for 15, 20 minutes and talked to

20   me.

21        Q      Other than that --

22        A      Not sure of that, but, yeah.

23        Q      Fair enough.  Other than that, were there any other

24   interviews?

25        A      With him?
```

1       Q       Uh-huh.

2       A       No, not that I recall.

3       Q       How -- what was discussed in his interview, just

4   like the topics that were covered?

5       A       His experience in working with certification

6   organizations, his experience in working with physicians, his

7   communication skills, the fact that the position wasn't

8   necessarily a 40-hour-a week position, travel was involved,

9   general questions to try to assess his effectiveness of his

10  candidacy, whether he could actually perform the position.

11      Q       At any time during his interview or otherwise, did

12  you tell Mr. Destefano that you preferred to have a man in

13  Ms. Newby's position?

14      A       No, I did not do that.

15      Q       Did you tell him that you wanted to hire him so that

16  you could promote him to the position of director of

17  certification?

18      A       No.

19      Q       Did you end up hiring Mr. Destefano?

20      A       Did I hire him is the question?

21      Q       Correct.  Did you hire him?

22      A       No, I decided not to.

23      Q       And why not?

24      A       After our interexchange of information and dialog

25  and discussions, I didn't feel that he was qualified for the

1    position.

2         Q    So he wasn't hired to work for AAPS in any capacity,

3    correct?

4         A    No, he was not.

5              MS. ROSSETTI:  Mr. Carbone, I'd like to show you

6    Exhibit 1591.2.

7          I will represent to the Court that that is the exhibit

8    with the inappropriate e-mails, so we won't display it for the

9    jury.  I think they've seen it.  But if Mr. Carbone could take

10   a quick look at it, if that's okay?

11             THE COURTROOM DEPUTY:  1591.2?

12             MS. ROSSETTI:  1591.2.

13        Q    (BY MS. ROSSETTI:)  Do you have the document with

14   you, Mr. Carbone?

15        A    Yes.  Yes, I do.

16        Q    And have you had a chance -- probably not sitting

17   here today -- but have you recently had a chance to go through

18   the entirety of this document?

19        A    Since we've been here, yes.

20        Q    And any of these e-mails that are included in here

21   which you've admitted are inappropriate, do any of these

22   e-mails reference people of Hispanic or Latino origin?

23        A    I don't think so.

24        Q    To your recollection, did any of the inappropriate

25   e-mails that you received or forwarded at any time reference

1    any individuals of Hispanic or Latino origin in any capacity?

2        A    Not that I recall.

3        Q    We've discussed in this case the discipline of three

4    AAPS member physicians, Drs. Castillo, Klein, and Geller.

5    You're familiar with these three doctors, correct?

6        A    I am.

7        Q    What role, if any, did you play in the decision to

8    discipline these three doctors?

9        A    I wouldn't play any role.  It's a Board decision.

10        Q    Did you provide any input or opinion as to whether

11    or not these doctors should have been disciplined in any

12    fashion?

13        A    No, I didn't.

14        Q    Do you have any -- do you recall the 2011 annual

15    conference in Tysons Corner, Virginia?

16        A    I do.

17        Q    And at any time during this conference, did you have

18    a conversation with Dr. David McCann concerning his health?

19        A    I did, yes.

20        Q    And at the time Dr. McCann was the president-elect

21    of the organization, correct?

22        A    That's correct, yes.

23        Q    And in terms of his health, what was discussed?

24        A    We were just finishing dinner, it was a meeting of

25    the Executive Committee, and he asked me if I could step out --

```
 1    step outside the restaurant in the hallway and talk with him.

 2         Q    And what occurred?

 3         A    We sat down --

 4              MR. CONWELL:  Excuse me, your Honor.  I'm sorry.  I

 5    object to the extent this is calling for hearsay testimony.

 6              THE COURT:  Question -- overruled.  The question was

 7    what occurred.

 8              THE WITNESS:  We sat down on a bench and he informed

 9    me that --

10              MR. CONWELL:  Objection.  Hearsay.

11              THE COURT:  What's the purpose of this statement

12    that's about to come out?

13              MS. ROSSETTI:  Your Honor, it's to establish

14    Mr. Carbone's motivations in informing or not informing certain

15    people about the status of Mr. McCann's health.

16              THE COURT:  Why is that important to this case?

17              MS. ROSSETTI:  Because that is one of the

18    allegations that Dr. Okerblom had alleged was that there was

19    some sort of fraud in hiding the ailing health of Mr. McCann.

20              THE COURT:  Okay.  Objection's overruled.  Go ahead.

21              THE WITNESS:  Dr. McCann informed me that he was

22    ill, seriously ill.  He had that night heard from a

23    physician -- one of his physicians or a physician, and that he

24    would be willing to continue to serve over the weekend.

25         And I asked him why.
```

1          He said, "Because I was committed to do it."

2          And I said, "Don't you think you should be committed to

3    your health and your family?"

4          And he said, "Well, yes, but it's going to be pretty

5    expensive to get a plane to leave the next day."

6          And I said, "You need" -- I said, "I personally think you

7    need to do it."

8          Q     (BY MS. ROSSETTI:)  And did Mr. McCann inform you of

9    the actual nature of whatever his health issue was?

10         A     All I knew at that time it was abdominal issues.

11         Q     And why didn't you inform -- or did you inform

12    AAPS's membership of what you did know about Mr. McCann's

13    health at that time?

14         A     Dr. McCann asked me to keep it confidential so he

15    could be the one to communicate it, and I think he suggested

16    that the term to be used was a "family emergency."

17         Q     And at this conference, the 2011 annual conference

18    in Tysons Corner, did you encounter Dr. Patricia Stewart at

19    this conference at any point?

20         A     Yes, I did.

21         Q     And what happened when you encountered her?

22         A     I think I talked to her twice.  The first time I was

23    walking from one meeting room to another by an elevator, and I

24    made a comment to Dr. Okerblom that I was offended by the

25    documents that he circulated.

1      Q      And the document you're referring to, is that the

2   preliminary legal opinion?

3      A      Yes, it was, right.

4      Q      And did you approach Ms. Stewart at any point?

5      A      No, I didn't.

6      Q      Did you speak to her at all?

7      A      No.

8      Q      When you were speaking with -- she was present when

9   you were speaking with Dr. Okerblom, correct?

10     A      She was sitting right next to him.

11     Q      Did you raise your voice at all?

12     A      No.

13     Q      Did Ms. Stewart address you in any fashion?

14     A      Yes.

15     Q      And what happened?

16     A      She stood up and she was very unhappy with me.

17     Q      And did you respond?

18     A      I don't think I did.  I may have.  She mentioned

19   something about I took some action or actions to preclude her

20   from becoming certified, something to that effect.  I can't

21   tell you exactly.  And I denied it.  And I was with several

22   other physicians and we left.  We entered the elevator and went

23   to the next meeting.

24     Q      And did you encounter her again at all during that

25   conference?

1        A      Yes, I did.

2        Q      And did you interact with her?  Did you speak to

3    her?

4        A      Yes, I did.

5        Q      And at that point did you raise your voice?

6        A      No.  I -- she was -- just entered the House of

7    Delegates room and I apologized to her.  I didn't know why she

8    was so upset.  I apologized to her and she said she would only

9    talk to me in the presence of an attorney from that point.

10       Q      And did you speak to her in the presence of an

11   attorney?

12       A      I don't recall that I ever did, no.

13       Q      Last week a physician came in to testify, Dr. Atwood

14   Rice.  Are you familiar with Dr. Rice?

15       A      Yes, I am.  Yeah.

16       Q      Did you play any role in the decision to remove

17   Dr. Rice from the Board of Directors?

18       A      I did not.

19       Q      Did you provide any input or opinion as to whether

20   or not he should be removed from the Board of Directors?

21       A      I did not.

22       Q      And there was testimony to the effect that at a

23   certain point Dr. Stewart was removed as the governor of the

24   Dermatology Academy.  Are you familiar with that testimony?

25       A      Uhm, vaguely.

1      Q      Did you play any role in the decision to remove

2  Dr. Stewart as a governor in the Dermatology Academy?

3      A      No.

4      Q      Did you provide any input or opinion as to whether

5  she should have been removed from her role as governor?

6      A      I did not, no.

7      Q      With regard to the decision to discipline

8  Dr. Stewart, which ultimately led to the termination of her

9  membership, were you in any way involved in the selection of

10  the individuals who served on the disciplinary committee?

11      A      I was not.

12      Q      Did you provide any opinion or input as to who

13  should serve on the disciplinary committee?

14      A      I did not.

15      Q      Did you provide any input or opinion as to whether

16  or not a disciplinary committee should even be appointed?

17      A      No, I did not.

18      Q      Prior to 2011, prior to this conference at Tysons

19  Corner, how did you feel about Dr. Stewart?

20      A      How did I feel about her.  Uhm, I had spoken with

21  her on probably numerous occasions at meetings -- I don't

22  remember exact meetings -- and spoken with her on the

23  telephone, and had no issue whatsoever with her.

24           MS. ROSSETTI:  I'm going to show you an exhibit,

25  Exhibit 1067.

```
 1                  (Exhibit 1067 previously marked for identification.)

 2        Q      (BY MS. ROSSETTI:)  Are you familiar with this

 3   document, Mr. Carbone?

 4        A      Yes.  It's a letter to her from the National

 5   Initiative Fund.

 6        Q      Her being Dr. Carbone -- or Dr. Stewart?

 7        A      To Dr. Stewart, yes.

 8        Q      And you'll notice that up at the top and down at the

 9   bottom there's some handwritten language there; is that

10   correct?

11        A      Right.  That's my handwriting.

12        Q      Up at the top you handwrote her name in there where

13   it says "Patty"?

14        A      That's right, I did.

15        Q      And at the bottom there's a little message there.

16   Could you read that for us?

17        A      "Patty," at the top.  And the bottom says, "PS, nice

18   seeing you and congratulations on your marriage."

19        Q      Is it typical for you to write personal notes on

20   form letters such as this one?

21        A      Infrequently I do, yes.

22        Q      And why did you do so on this occasion?

23        A      I had had maybe one or two conversations with her at

24   this meeting and she was talking to me about her recent

25   marriage and how happy she was and about her spouse's legal
```

```
 1   acumen and the cases he's won and so on and so forth, so I just
 2   thought it was just a nice personal touch to do that.
 3       Q    Now, the June 2012 annual meeting in Marina Del Rey,
 4   did you attend that meeting?
 5       A    I did.
 6            MS. ROSSETTI:  I'm going to show you another
 7   exhibit, Exhibit 1525.  I will represent to you that this
 8   exhibit has been shown before.
 9        Your Honor, while Ms. English is looking for those
10   exhibits, can I ask that the exhibits that we've gone through
11   so far be admitted, if counsel has no objection?
12            THE COURT:  Any objection?
13            MR. CONWELL:  No, your Honor.
14            THE COURT:  All right.  Admitted.  I will have to go
15   through these later, one by one.
16            (Exhibits received into evidence.)
17            MS. ROSSETTI:  Will do.  Thank you, your Honor.
18   Would you like to do it before Mr. Carbone is finished?  No?
19   Okay.
20       Q    (BY MS. ROSSETTI:)  And do you recognize
21   Exhibit 1525, Mr. Carbone?
22       A    Yes.
23       Q    And is this a printout of a presentation that was
24   presented at the 2012 annual meeting in Marina Del Rey?
25       A    Yes, it is.
```

1      Q      Did you have any involvement in the decision to make

2  this presentation at the meeting?

3      A      No.

4      Q      Did you have any involvement in the preparation of

5  the presentation?

6      A      No, I did not.

7      Q      Did you provide any opinion or input as to whether

8  or not this presentation should be presented to the AAPS

9  membership?

10     A      I don't recall I did, no.

11     Q      Did you provide any opinion or input as to the

12  contents of the presentation?

13     A      I don't recall that either.

14     Q      Did you participate in the actual presentation in

15  any fashion?

16     A      No.

17     Q      Were you standing up at the front of the room when

18  it was being presented?

19     A      I don't think I was.  I was in the room, but I don't

20  remember being in the front of the room.

21     Q      But you were physically present in the room when the

22  presentation was happening, correct?

23     A      Yes, but I can't tell you where my location was.

24     Q      Okay.  To your recollection, did Dr. Cerrato after

25  the presentation was complete invite Dr. Stewart and

1    Dr. Radentz to come up and present their defense, if any?

2         A     Not to my knowledge.

3         Q     Are you familiar with Dr. Eric Wilkens?

4         A     I am.

5         Q     Prior to around December 2010, what was your opinion

6    of Dr. Wilkens?

7         A     I didn't -- I wouldn't have had an opinion, per se.

8         Q     Did you know him?

9         A     I knew of him.

10        Q     Had you ever spoken to him on the phone prior to

11   that December 2010 conference call?

12        A     I don't think so, but I'm not absolutely certain.  I

13   would say I don't think I did.

14        Q     And in December 2010 did you participate in the

15   House of Delegates conference call where the issue of the

16   proposal to amend the bylaws came up?

17        A     I was participating, yes.

18        Q     And in this 2010 -- December 2010 conference call,

19   was the proposal to amend the bylaws to give extra authority to

20   the Executive Committee?

21        A     Yes.

22        Q     And that measure was not passed ultimately, was it?

23        A     I think it was with -- it was either defeated or

24   withdrawn.  I'm not sure.

25        Q     Did anything about that conference call or the fact

1    that the measure did not pass change your opinion of

2    Dr. Wilkens in any way?

3        A    No.

4        Q    Did you call him after this December 2012[*sic*] House

5    of Delegates conference call?

6        A    Absolutely not.

7             MS. ROSSETTI:  We're going to put up another

8    exhibit.  It's Exhibit 1867.

9             (Exhibit 1867 previously marked for identification.)

10            THE WITNESS:  Thank you.

11            THE COURTROOM DEPUTY:  Uh-huh.

12        Q    (BY MS. ROSSETTI:)  Do you recognize this document,

13   Mr. Carbone?

14        A    I do.

15        Q    And what is it?

16        A    It's a copy of a letter from him that was slipped

17   under the door of every physician and guest at the hotel.

18        Q    And would that be at the 2011 meeting at Tysons

19   Corner?

20        A    It was Tysons Corner, yes.

21        Q    But the letter itself is dated April 28, 2011,

22   correct?

23        A    Yeah.  Mine is, yes.

24        Q    And it says, "Re:  Statement of events of

25   December 15th and 16th, 2010"?

    1       A      Yes.

    2       Q      And so do you have any understanding of what this

    3   letter is about?

    4       A      I've read it many times, yes.

    5       Q      Okay.  And what is your understanding of who wrote

    6   it and why?

    7       A      Based on what I see here, it was written by

    8   Dr. Wilkens, and he thinks that I spoke with him, called him,

    9   which I did not.

   10       Q      Okay.  I'd like to direct your attention

   11   specifically to the second page of this letter, kind of towards

   12   the middle where it says, "Eric, I just wanted to know what the

   13   f' you were thinking last night."

   14              And then he says, "Excuse me?"

   15              And then it says, "The response was you heard me,

   16   f'er.  What the f' were you thinking last night?  I'm dealing

   17   with an f'ing disaster here and you play Boy Scout.  You'd

   18   better explain what this is about and right now and tell me

   19   what this is about and talk like a sane person" --

   20              THE COURT:  Slow down.

   21       Q      (BY MS. ROSSETTI:)  So it says here, "You better

   22   explain what this is about right now and tell me what this is

   23   about and talk like a sane person or this is going to be a

   24   really short phone call, Bill."

   25              And then it says, "You know damn well what this is

1   about.  You screwed with the wrong f'ing guy.  This group needs

2   that change and by hell or high water it'll happen."

3           Did you say any of these things to Dr. Wilkens?

4       A    Absolutely, unequivocally I said none of this.

5       Q    Then going down a little further, where it says,

6   "You better listen closely, Eric.  We will end you.  I get one

7   hint that you f' with this again, and we will end you."

8           And then a little further down it says, "It's not a

9   threat, it's a promise, a-hole.  You'll be lucky if we only

10  decide to sue your ass off so bad you'll be living under a

11  bridge."

12          Did you say any of those things to Dr. Wilkens?

13      A    Absolutely not.

14      Q    Did you ever threaten Dr. Wilkens in any capacity?

15      A    Absolutely not.

16      Q    Did you ever discuss the failure of the passage of

17  the amendment in December 2012 with Dr. Wilkens in any

18  capacity?

19      A    I did not do that, no.

20          MS. ROSSETTI:  I'd like to show you one more

21  exhibit, Exhibit 12 -- actually, before we do that, your Honor,

22  could we have Exhibit 1867 admitted?

23          MR. CONWELL:  That's the one you just showed him?

24  No objection.

25          THE COURT:  Admitted.

```
 1                 (Exhibit 1867 received into evidence.)

 2                 THE COURTROOM DEPUTY:  Counsel, did you want 12?

 3    You said wait.

 4                 MS. ROSSETTI:  Oh, yes, Exhibit 12, please.  Thank

 5    you.

 6                 THE WITNESS:  Okay.  Thank you.

 7                 THE COURTROOM DEPUTY:  Uh-huh.

 8         Q     (BY MS. ROSSETTI:)  Are you familiar with this

 9    document, Mr. Carbone?

10         A     Yes.

11         Q     And what is it?

12         A     It's a newsletter or a letter to the members of

13    AAPS.

14         Q     And do you have any idea when it was sent?

15         A     I'm going to guess and say June.

16         Q     Of which year?

17         A     Uhm, 2012 would be my guess.

18         Q     And I believe there's a date up at the top of the

19    first page, okay.  Is that correct?

20         A     Oh, okay.  Then I can tell you exactly.  June 24th,

21    2011.  Sorry.  Okay.

22         Q     Not a problem.

23         A     Okay.

24         Q     Did you participate in drafting this document in any

25    way?
```

1        A       I don't think I did.

2        Q       And this is the letter that I believe has already

3    been admitted into evidence that goes through and addresses 14

4    points of concern; is that correct?

5        A       Yes, it is.

6        Q       And I'd like to direct you specifically to .8.  Are

7    you with me?

8        A       Yeah.  Yes.

9        Q       And do you see that it says there that, "The CEO of

10   the organization called this delegate the next day and verbally

11   cursed and threatened the member, who promptly resigned over

12   his ill treatment"?

13              Is it your understanding that this refers to

14   Dr. Wilkens?

15       A       Yes, it would be.

16       Q       And prior to this date of June 24th, 2011, did you

17   ever discuss the issue of Dr. Wilkens's letter with Dr. Russo?

18       A       Would you repeat that, please?

19       Q       Prior to the date of this letter, which is

20   June 24th, 2011, do you recall having any discussion with

21   Dr. Russo regarding Dr. Wilkens's representation that you had

22   called him?

23       A       Yes.

24       Q       And what was discussed?

25       A       My -- my discussion was -- with him was my

 1    unhappiness that the letter was written and that the

 2    information in it about me and my statements was absolutely

 3    untrue.

 4         Q      There's been testimony in this trial to date with

 5    regard to an issue that AAPS had with the Federal Election

 6    Commission.  Are you familiar with that issue?

 7         A      Yes, I am.

 8         Q      As of 2011, were you concerned that the issue with

 9    the Federal Election Commission had caused or would cause harm

10    to AAPS's reputation moving forward?

11         A      Personally and as the CEO in both capacities, no, I

12    wasn't concerned that it would harm the organization.

13         Q      And why not?

14         A      My opinion, the reason I said that is because it was

15    an administrative issue that was handled and resolved.

16         Q      Was there a monetary settlement with the Federal

17    Election Commission?

18         A      AAPS had to pay a fine, yes.

19         Q      You have any recollection as to approximately what

20    that fine was?

21         A      5200, $5300, somewhere around there.  Around $5,000.

22         Q      Gotcha.  Did the Federal Election Committee mandate

23    that AAPS make any changes to its operations as a part of the

24    settlement?

25         A      I would have to look at that document to tell you

1    for sure, but if they did, we made the changes.

2         Q     Do you recall if there was any change, for example,

3    with AAPS's political action committee?

4         A     I don't -- I don't recall any change being made.

5         Q     Or was there any change that was required to be

6    made?

7         A     Excuse me?

8         Q     Well, you said you don't recall if any were made.

9    Do you recall if any were required to be made that maybe just

10   weren't made but you were supposed to make them?

11        A     If the FEC had instructed us to make any changes, I

12   can tell you we would have made the changes, definitely.

13        Q     Gotcha.

14        A     I can't tell you if they did and what they were.

15        Q     Understood.  Now, do you know what ACCME stands for?

16        A     I do.

17        Q     And I won't ask you to memorize the acronym, but

18   generally do you know what the ACCME is?

19        A     Yes.  It's a body that oversees organizations that

20   are accredited to approve continuing medical education programs

21   or program symposiums.

22        Q     And was AAPS placed on probation by ACCME at any

23   point?

24        A     They were, yes.

25        Q     And how, if at all, did the probation affect AAPS's

1    ability to provide continuing medical education?

2         A     It had no effect.

3         Q     Has AAPS at any point during your tenure as CEO been

4    prohibited from putting on any manner of continuing medical

5    education?

6         A     No.

7         Q     At the time that AAPS was placed on probation, were

8    you concerned that the probation had or would cause harm to

9    AAPS's reputation?

10        A     I was not concerned about that.

11        Q     And why not?

12        A     Because of the insignificance of the

13   administrative -- it was an administrative issue that wouldn't

14   affect our continuing to provide the services and the programs.

15        Q     Have either of these issues, the issue with the

16   Federal Election Commission or the issue with the ACCME -- have

17   either of these issues affected AAPS's ability to gain greater

18   recognition in the United States?

19        A      I would say no, they have not, and I would back that

20   up or substantiate that by telling you that in that period or

21   after -- in that period or after that period, the organization

22   has achieved successes that it has never achieved since 1950.

23   The HHS through CMS recognized the organization.  That was

24   published in Federal Register -- I can't tell you when -- and

25   that was a national recognition for Medicare or Medicaid.  And

1    in my tenure at the organization, if somebody asked me -- and I

2    realize you didn't ask me -- "What would have been one of the

3    highest moments that would have been the pinnacle?" that would

4    have been the most fantastic development we ever had.

5           We've also developed new boards of certification,

6    Board of Urgent Care Medicine.  We have gained recognition with

7    the Department of Veterans Affairs, meeting with the secretary,

8    Robert McDonald.  We have created the American Board of

9    Administrative Medicine with the University of Tennessee

10   Physician MBA Executive Program, a first in the country.

11          We've had a lot of successes despite the challenges.

12       Q    And all of these things that you just described for

13   me, all of these things have happened since 2011?

14       A    Yes.  We also had the American Board of Integrative

15   Medicine with Dr. Andrew Weil out of Arizona, and it set a

16   historical record with the organization, more applicants and

17   more new diplomates than we have ever experienced, at least in

18   my time.  So it's been great.

19          MS. ROSSETTI:  Thank you, Mr. Carbone.

20       That's all I have for now, your Honor.

21          THE COURT:  Redirect.

22          MR. CONWELL:  Sorry, your Honor.

23          THE COURT:  Just so we're clear, this is more than

24   just redirect.  I allowed Ms. Rossetti to take him on direct as

25   her witness, so you may also cross.

```
 1                MR. CONWELL:  All right.  Thank you, your Honor.

 2                           REDIRECT EXAMINATION

 3    BY MR. CONWELL:

 4        Q     I just wanted to clear up a couple of things.  You

 5    said that -- that you don't approve the payments to

 6    Mr. Cerrato.  Who actually approves the checks to Mr. Cerrato

 7    from AAPS?

 8                MS. ROSSETTI:  Objection.  Mischaracterizes his

 9    testimony.

10                THE COURT:  Who approves the checks?  Overruled.

11                THE WITNESS:  Mr. Durante.

12        Q     (BY MR. CONWELL:)  Okay.  And as the CEO, can you

13    tell us how much money AAPS has paid to Bob Cerrato?

14        A     Offhand I can't.

15        Q     Okay.  And you said in connection with whether or

16    not you have nonbusiness relationships with any of the doctors

17    in the AAPS, you said, "Business is business."  What does that

18    mean?

19        A     I do not mix business with pleasure or social

20    events.

21        Q     Well, but we've seen that you exchange pornography

22    with doctors who are, in fact, on the Board.  Do you consider

23    that business or pleasure?

24        A     Neither.

25        Q     So when you said, "Business is business," and you
```

 1    don't socialize with the doctors, you were excluding from that

 2    testimony the pornography that you exchanged with members of

 3    the Board, is that fair?

 4         A    I was responding that I do not socialize with the

 5    physicians other than during a business meeting or annual

 6    meeting.

 7         Q    Okay.  And the pornography is not pleasure?

 8         A    I didn't say that.

 9         Q    The pornography is pleasure?

10         A    I didn't say that either.

11         Q    Well, is it pleasure?

12         A    I have no opinion on that.

13         Q    Okay.  So when -- you said that you talked to

14    Dr. McCann, and Dr. Cerrato, Dr. Russo, and another doctor

15    about the pornography; is that correct?

16         A    Yes.

17         Q    I think you said, I quote, "I regretted what I did

18    and was sorry that I did it."

19              Now, was that when Dr. Castillo called for an

20    investigation?  Is that when you told Dr. Cerrato and the

21    others that you regretted what you did and you were sorry that

22    you did it?

23         A    I was referring to forwarding the e-mails to Tim

24    Bell.

25         Q    Right.  I'm asking when you had that conversation

1    where you told Dr. Cerrato and the others -- the other doctors

2    on the Board, "I regretted what I did.  I'm sorry that I did

3    it," was that at the time -- the conversation, was that at the

4    time that Dr. Castillo had gone to Dr. McCann and said that he

5    thought that the Board should conduct an investigation into

6    your conduct?

7         A     I'm not clear on your question.  Can you rephrase

8    it?  Or shorten it?

9         Q     Sure.

10        A     Please.

11        Q     I'm dealing with the issue of time, and what I want

12   to know is the date of a conversation.  You with me so far?

13        A     I don't recall the dates of the conversations.

14        Q     Was it more than one conversation when you told

15   Dr. Cerrato and the others that you were -- you regretted what

16   you did, you were sorry that you did it?

17        A     I spoke to numerous physicians, some of which I

18   mentioned at different times.

19        Q     Okay.  Well, you said when I questioned you on

20   Friday that you had got in front of the Board and come clean,

21   so to speak, on this pornography and forwarding the pornography

22   prior to the suspensions of Castillo, Geller, and Klein, which

23   we agreed was October of 2010.  You recall that?

24        A     I think I do, yes.

25        Q     Okay.  So the conversation where you said to

```
 1   Dr. Cerrato you regretted what you did, in other words, you

 2   regretted forwarding this pornography and you were sorry that

 3   you did it, was that -- does this help you out on the timing

 4   that was prior to October of 2010?

 5        A    So your question is that did I speak with

 6   Dr. Cerrato prior to --

 7        Q    October of 2010 --

 8        A    -- or after?

 9        Q    -- and say you regretted -- you regretted forwarding

10   the pornography and you were sorry for doing it?

11        A    I don't recall the exact month that I spoke with him

12   as I'm sitting here talking to you.  All I do recall is I spoke

13   with numerous physicians.

14        Q    I just want to know was it prior to October of 2010,

15   prior to the suspensions?

16        A    I don't recall.

17        Q    So when you said on Friday that you'd gone to the

18   Board and confessed to forwarding the e-mails, these

19   pornographic and racist e-mails, are you now making a

20   distinction between confessing to them versus apologizing to

21   them?

22        A    In my opinion or judgment, it's one and the same

23   thing and I'm sorry or I'm confessing.  I'm admitting it and

24   I'm saying I regretted what I did, which I've said myriad times

25   during this testimony.
```

```
 1        Q     And you --

 2        A     And I still do.

 3        Q     Okay.  So --

 4        A     Right?

 5        Q     -- I think I'm following you.

 6        A     Okay.

 7        Q     So they're one and the same.  This conversation and

 8   you confessing the forwarding of e-mails to the Board, that all

 9   happened prior to the suspensions of Drs. Castillo, Geller, and

10   Klein as you testified under oath to this jury on Friday; is

11   that right?

12        A     Yes.

13        Q     Okay.  Thank you.

14        A     You're welcome.

15        Q     And now after -- after you were exposed, so to

16   speak -- after you were exposed and what you had been doing was

17   exposed, then you said you then promised the Board that you

18   would stop forwarding e-mails?

19        A     At some point in time I committed to the members of

20   the Board that I would not continue to do that.

21        Q     Okay.  And you think that you made that promise

22   prior to the -- prior to the suspensions of Drs. Castillo,

23   Geller, and Klein on October 2010?

24        A     I said I don't recall.  I'm not sure.

25        Q     Okay.  And you also said that you had not forwarded
```

 1   any e-mails to Mr. Bell that made fun of Hispanics; is that

 2   correct?

 3        A    I said I'm not aware of forwarding any to him, yes.

 4        Q    Okay.  Do you recall in your deposition me asking --

 5   this is at page 383, line 22 through 384, line 16 --

 6             THE COURT:  No, no, no.  Just ask him a question.

 7   If he has given prior inconsistent testimony, we will simply

 8   read that inconsistent testimony.

 9             MR. CONWELL:  Okay.

10        Q    (BY MR. CONWELL:)  (Reading:)

11             "Question:  Let me show you what I'm going

12             to mark as Exhibit 57.  This is an e-mail

13             dated February of 2009" --

14             THE COURT:  (Knocks on microphone.)  Is this

15   impeachment?

16             MR. CONWELL:  Yes.

17             THE COURT:  Okay.  Page numbers?  Volume, page

18   numbers, line.

19             MR. CONWELL:  Page 383, line 22 through 384, line

20   16.  Okay.

21             THE COURT:  Any objection?

22             MR. SCHNEIDER:  383/22 through 384/16?

23             THE COURT:  Uh-huh.

24             MR. SCHNEIDER:  No objection.

25             MS. ROSSETTI:  No objection, your Honor.

```
1              THE COURT:  Go ahead.  Read it.

2              MR. CONWELL:  (Reading:)

3              "Okay.  So this is an e-mail dated

4              February of 2009 from Mr. Madigan to you

5              basically making fun of Hispanics which,

6              according to this, you then forwarded on

7              to Mr. Bell in February 18th of 2009; is

8              that correct?"

9              Your answer:  "Let me look at it here."

10             Then, it -- you said, "Would you repeat

11             the question for me, please?"

12             "Question:  Is this an e-mail that you

13             received from Mr. Madigan February of 2009

14             that you then forwarded on to Mr. Bell?"

15             Your answer was:  "Yes."

16             Is that -- do you recall that question and that

17  answer?

18             THE COURT:  Move on.  Just move on.

19             THE WITNESS:  Uhm, do I recall --

20             THE COURT:  There's no question.

21             THE WITNESS:  Excuse me?

22             THE COURT:  There's no question.

23             THE WITNESS:  Thank you.

24             MR. CONWELL:  I have no further questions.

25             THE COURT:  Any further redirect or recross?
```

```
 1              MS. ROSSETTI:  No, your Honor.

 2              THE COURT:  You may step down, sir.  Thank you.

 3              THE WITNESS:  Thank you.

 4              MR. CONWELL:  Call Bob Cerrato.

 5       ROBERT CERRATO, M.D., PLAINTIFF'S WITNESS, WAS SWORN

 6              THE COURTROOM DEPUTY:  Please be seated.

 7         Please state your name and spell your last name for the

 8   record.

 9              THE WITNESS:  Robert Cerrato, C-e-r-r-a-t-o.

10              THE COURTROOM DEPUTY:  Thank you.

11              THE COURT:  Mr. Conwell.

12              MR. CONWELL:  Sorry, your Honor.

13                      DIRECT EXAMINATION

14   BY MR. CONWELL:

15       Q    Mr. Cerrato -- or Dr. Cerrato, you are a lawyer?

16       A    Yes.

17       Q    And you live in New Jersey?

18       A    Yes.

19       Q    You're a member of the New Jersey Bar?

20       A    Yes.

21       Q    You're also a doctor and a member of the AAPS?

22       A    Yes.

23       Q    And you were on the Executive Committee and the

24   Board of Directors the entire time of the events that we've

25   been discussing in this lawsuit from 2010 through at least
```

```
 1   2013?
 2        A     I believe so, yes.
 3        Q     You were the president of the entire AAPS
 4   organization from the end of August 2011 through June of 2013?
 5        A     Yes.
 6        Q     And as president, you ran the Board meetings from
 7   August of '11 through June of '13?
 8        A     Yes.
 9        Q     And you voted as a member of the Executive Committee
10   on September 10, 2010, to suspended Drs. Castillo, Geller, and
11   Klein without a hearing?
12        A     I don't believe I voted in that meeting.
13        Q     You were present?
14        A     In 2010?
15        Q     Yes.
16        A     I have to check the minutes, but I guess I was.
17        Q     Okay.  Am I correct they were suspended without a
18   hearing?
19        A     Yes.
20        Q     Okay.  And you were the one who created and
21   appointed the legal task force that recommended suing
22   Dr. Stewart and other members; is that right?
23        A     Yes.
24        Q     You appointed yourself to the legal task force?
25        A     Yes.
```

```
 1        Q      You were the one who created and appointed the

 2   members of the disciplinary committee also; is that correct?

 3        A      Yes.

 4        Q      And that included Dr. Montes, right?

 5        A      Yes.

 6        Q      He's from Michigan?

 7        A      Uhm, I'm not sure exactly what his place of

 8   residence was.

 9        Q      He has a place in Michigan and in New York; is that

10   right?

11        A      That's correct.

12        Q      And you appointed Bart Maggio; is that right?

13        A      Yes.

14        Q      He's from New Jersey like you?

15        A      Was, yes.

16        Q      Was, I understand.  And you appointed Dr. Wallace.

17   He's from Tallahassee, Florida?

18        A      I'm -- he's from Florida.

19        Q      Right.  Tallahassee?

20        A      I don't know that.

21        Q      You know he's not from Tampa?

22        A      I don't know where he lives.  All I know is he lives

23   in the state of Florida last time I knew.

24        Q      Okay.  You also have held positions with the ABPS,

25   the American Board of Physician Specialties; is that right?
```

1      A      Yes.

2      Q      And that is not a separate legal entity from AAPS,

3   is it?

4      A      I'm not exactly sure whether that's a separate

5   corporation or not.

6      Q      And can you briefly tell us what positions you held

7   in ABPS in 2010 and 2011?

8      A      I'd have to check my notes on that.  I was at

9   various times the chair and vice chair of ABPS.

10     Q      And that's of the Board of Directors?

11     A      Yes.  They have a seat on the Board of Directors.

12     Q      Okay.  And when you were the president of AAPS, did

13   you thereby obtain a position on the Board of ABPS?

14     A      Say that again.

15     Q      When you were president of AAPS, did you also hold a

16   position on the Board of ABPS?

17     A      No.  You can't, uhm -- if you're the president of

18   AAPS, you can't be the chair of ABPS.

19     Q      Okay.  So the positions, the chair and vice chair,

20   were before you took over as chair of the -- or as president of

21   the AAPS?

22     A      Yes.

23            MR. CONWELL:  Okay.  Your Honor?

24            THE COURT:  Good timing.  All right.  Ladies and

25   gentlemen, we're going to take our first morning break.  Please

 1    remember the admonition.  Let's come back at 10 o'clock.

 2              THE COURTROOM DEPUTY:  All rise.

 3              (Open court out of the presence of the jury.)

 4              THE COURT:  Anything?

 5              THE COURTROOM DEPUTY:  You can be seated.

 6              (A recess was taken.)

 7              (Open court in the presence of the jury.)

 8              THE COURT:  All right.  Mr. Conwell, you may

 9    continue your examination of Dr. Cerrato.

10              MR. CONWELL:  All right.  Thank you.

11         Q    (BY MR. CONWELL:)  Okay.  So Dr. Cerrato, you've

12    been attending the trial and hearing the testimony that's

13    coming in, right?

14         A    Yes.

15         Q    And you've heard the testimony from Mr. Carbone that

16    he disclosed to the Board of Directors that he had received and

17    forwarded racist and pornographic e-mails while at work using

18    AAPS computers?

19         A    Yes.

20         Q    And that he disclosed this to the AAPS Board of

21    Directors and specifically to you before the suspensions of

22    Drs. Castillo, Geller, and Klein that occurred in October of

23    2010?

24         A    Yes.

25         Q    Heard that?  And you were on the Executive Committee

1    and the Board of Directors at that time?

2         A     Yes.

3         Q     But that's completely false --

4         A     What is --

5         Q     -- according to you?

6         A     What is completely false?

7         Q     According to you, it's completely false that Bill

8    Carbone disclosed to you or the Board of Directors prior to

9    October of 2010 that he was receiving and forwarding racist and

10   pornographic e-mails while at work using AAPS computers; is

11   that right?

12        A     No.

13        Q     To help us, I've got a little -- little diagram that

14   I've created here, just a little timeline.  It's pretty crude.

15   But, so over here I've got October of 2010.  Here I've got

16   June 2011 annual meeting; that's the one in Tysons Corner.

17   Here I've got June 13th, 2012, Dr. Stewart is expelled, and

18   then June of 2012, two weeks later, the annual meeting in

19   Marina Del Rey.  And then way over here I took your deposition

20   on May the 8th of 2013.

21             So I just wanted you to have that timeline in your

22   mind, okay?

23             And over here, this October 2010, we've just heard

24   from Mr. Carbone that prior to that time is when he confessed

25   that he was forwarding these e-mails -- receiving and

1   forwarding these pornographic and racist e-mails to Mr. Bell,

2   okay?  You with me?

3       A   Yes.

4       Q   Okay.  Now, when I took your deposition in May of

5   2013, you said that you did not know even then whether or not

6   Mr. Bell had sent e-mails of naked women, correct?

7       A   I don't understand the question.

8       Q   Let's go one by one.  Your lawyer -- you're a

9   lawyer; you know what a deposition is?

10      A   Yes.

11      Q   And although there's not a jury there, you're sworn

12  to tell the truth in response to my questions?

13      A   Yes.

14      Q   And when I took your deposition, you swore to tell

15  the truth, just like you have sworn to tell the truth to the

16  jury here today; is that right?

17      A   Yes.

18      Q   Okay.  So when I took your deposition in May of

19  2013, I asked you whether or not Mr. Bell had sent these

20  pornographic photographs -- excuse me -- whether or not

21  Mr. Carbone had sent these pornographic e-mails to Mr. Bell,

22  and you told me under oath --

23              MR. SCHNEIDER:  I object, your Honor.

24              MR. CONWELL:  -- "I don't know."

25              MR. SCHNEIDER:  I object.

1          THE COURT:  Not the way it's done.

2          MR. CONWELL:  I'll re-ask the question.

3          THE COURT:  Okay.

4     Q    (BY MR. CONWELL:)  Did -- is it your contention that

5     these pornographic e-mails were not sent by Mr. Carbone to

6     Mr. Bell?

7     A    The way I understand it was -- and the way -- the

8     first time that I had seen the materials were black and white

9     images that were included in Mr. Bell's, uhm, lack of a better

10    term, charging document that he sent to the Board of Directors,

11    and that was in 2010.

12    Q    Okay.  I'm talking about whether it's your

13    contention that Mr. Carbone sent them to Mr. Bell.  That's what

14    I'm focussing on, Mr. Carbone sending those to Mr. Bell.

15         THE COURT:  What's the question?

16         THE WITNESS:  Yeah, I don't know what --

17         MR. SCHNEIDER:  Objection.  There's no question.

18         MR. CONWELL:  The question that I have asked that

19    was not answered was whether it was the witness's contention

20    that these pornographic e-mails were not sent by Mr. Carbone to

21    Mr. Bell.

22         THE WITNESS:  I do not understand the question.  I

23    seriously do not answer -- can't answer that question.

24    Q    (BY MR. CONWELL:)  Okay.  I'll try it again.

25         Is it your contention that these pornographic

1    e-mails were not sent by Mr. Carbone to Mr. Bell?

2         A    No.

3         Q    Now, in your deposition, page 171, line 7 through

4    9 -- and I've just shown you the pornographic e-mails -- I

5    asked you -- and this is on May 8th --

6              MR. SCHNEIDER:  May --

7              THE COURT:  Hey, hey, hey.  Let's get a question out

8    first.

9              MR. SCHNEIDER:  That's fair.

10        Q    (BY MR. CONWELL:) -- May 8, 2013, I asked you this

11   question and so --

12             THE COURT:  Wait a minute.  No, no, no.

13        Q    (BY MR. CONWELL:) -- is your --

14             THE COURT:  Whoa, whoa, whoa, whoa, whoa.  Hang on.

15   Page 171?

16             MR. CONWELL:  Yes.

17             THE COURT:  What line were you going to read?

18             MR. CONWELL:  7 through 9.

19             THE COURT:  This isn't impeaching.

20             MR. CONWELL:  He just --

21             THE COURT:  "I don't know"?

22             MR. CONWELL:  That's right.  That's not what he just

23   said.

24             THE COURT:  Your question:  "Is it your contention

25   that they were not sent?"

 1          And he said, "No," which means that's not his contention.

 2               MR. CONWELL:  Right.  And that's not what he said in

 3    his deposition.

 4               THE COURT:  And previously he said, "I don't know

 5    that they were or were not."

 6               MR. CONWELL:  Right.

 7               THE COURT:  I don't think this is impeaching.

 8       Q    (BY MR. CONWELL:)  Do you recall testifying that as

 9    of May 2013, you did not know whether Mr. Carbone had sent the

10    e-mails or not?

11               MR. SCHNEIDER:  I object.  It doesn't matter whether

12    he was -- he remembers that testimony.  It's irrelevant.

13               THE COURT:  No, no.  He's finally gotten to a

14    germane question.  Overruled.

15               MR. SCHNEIDER:  Okay.  May I have an opportunity to

16    read the testimony first, your Honor?

17       171?

18               MR. CONWELL:  Right.  171, 7 through 9.

19               THE COURT:  We've moved on from that.  We've moved

20    on from that.

21               MR. CONWELL:  Yes.

22               THE COURT:  The question now is whether or not

23    Dr. Cerrato knew about these e-mails as of May of 2013.

24       In any event, the objection's overruled.

25       You may answer the question.

1          THE WITNESS:  Can you repeat the question?

2     Q     (BY MR. CONWELL:)  Yes.  As of May of 2013, when you

3  were giving testimony under oath, did you know about these

4  pornographic e-mails that were sent by Mr. Carbone to Mr. Bell?

5     A     I knew about pornographic e-mails from -- the only

6  ones I knew about were the ones that were included in Bell's

7  document that was sent by the Board of Directors.

8     Q     And was it your contention at that time that

9  Mr. Carbone had sent those on to Mr. Bell?

10    A     Uhm, I believe so.

11    Q     Okay.  In your deposition, you said," I don't know

12 that they were or were not."

13    A     You started out this questioning by telling me that

14 I was sitting here listening to testimony.  That testimony, you

15 know, refreshed my recollection.  You know, you're talking

16 about things that are now five years old at a deposition and

17 that was now three years old.

18    Q     When you appeared for your deposition, you appeared

19 as what's called a corporate representative for AAPS.  Do you

20 recall that?

21    A     No.

22    Q     What is a corporate representative?

23    A     A representative of a corporation to testify for

24 whatever the corporation did or didn't do.

25    Q     Did AAPS know in May of 2013 whether Mr. Carbone had

```
 1    sent the e-mails to Mr. Bell, the pornographic e-mails?

 2        A     Are you asking me whether AAPS knew?

 3        Q     Yes.

 4        A     I wasn't the corporate representative.

 5        Q     Well, my question is, if you can answer the

 6    question, did AAPS know in 2013 whether or not Mr. Bell had

 7    sent pornographic e-mails -- excuse me -- whether or not

 8    Mr. Carbone had sent the pornographic e-mails to Mr. Bell?

 9        A     I don't know.

10        Q     And did you know in May of 2013 whether or not

11    Mr. Carbone had sent the pornographic e-mails to Mr. Bell?

12        A     Yes.

13        Q     In your deposition in May of 2013, you said, "I

14    don't know."

15              Do you recall that?

16        A     No.

17        Q     Let me refresh your memory.  May of 2013 I asked

18    you, "Did Mr. Carbone accept the e-mails attached to this

19    letter?"

20              MR. SCHNEIDER:  Objection.  Objection.

21              THE COURT:  Overruled.  Have to wait till it's done.

22              MR. CONWELL:  I'm not impeaching; I'm refreshing his

23    memory.  He said he didn't remember what he said.

24              THE COURT:  All right.  Take a look at that, sir.

25    You see anything up there that refreshes your recollection?
```

 1          MR. SCHNEIDER:  Your Honor, I object to this

 2   question because this question refers to a specific e-mail.

 3   It's not about e-mails in general.

 4          THE COURT:  Are you talking about what we are

 5   looking at here?

 6          MR. SCHNEIDER:  Yes, your Honor.

 7          THE COURT:  That could be his lunch menu.  It

 8   doesn't really matter what he's using to refresh his

 9   recollection.

10      The question is does this --

11          MR. SCHNEIDER:  Except that the jury is seeing it.

12          THE COURT:  Does this refresh your recollection?

13      Q    (BY MR. CONWELL:)  Of what you testified to on

14   May 8th, 2013, about whether or not Mr. Carbone sent the

15   e-mails -- these are the pornographic e-mails -- to Mr. Bell.

16   Does that refresh your memory?

17      A    No, it really doesn't.

18          THE COURT:  Okay.  Let's move on.

19      By the way, did you just say that you did not appear at

20   that deposition as the corporate representative?

21          THE WITNESS:  Not to my knowledge, sir.  I just

22   don't remember what my status was.  I was called for a

23   deposition and I appeared.

24      Q    (BY MR. CONWELL:)  Let me show you the cover page of

25   the transcript.  Does that refresh your recollection?

```
 1        A      If that's what it says, that's what it is, I guess.

 2               THE COURT:   Show him page 108.

 3        Q      (BY MR. CONWELL:)  Would you please take a look at

 4   the question, lines 10 through 14, and see if this refreshes

 5   your memory whether you were appearing as the AAPS corporate

 6   representative.  (Reading:)

 7               "Is it your understanding that you are

 8               here appearing today as the AAPS corporate

 9               representative to testify about the topics

10               listed in this deposition notice?"

11               And your answer was, "Yes."

12        A      First of all, you have to make it smaller because I

13   can't see all the document side to side.

14               Okay.

15        Q      Does that refresh your memory?

16        A      Yes.

17        Q      You also testified that you prepared to give the

18   testimony on the topics in the notice.  You recall that?

19        A      That I was prepared to do what?

20        Q      Testify.  You prepared yourself for the deposition

21   on these topics?

22        A      Yes.

23        Q      Okay.  Including the pornographic e-mails?

24        A      Uhm, I prepared myself --

25               MR. SCHNEIDER:  Your Honor, I object.  He's talking
```

 1   about pornographic e-mails as a whole.  It's unclear what he's

 2   talking about.

 3              MR. CONWELL:  The pornographic e-mails --

 4              THE COURT:  And the objection is vague.  But the

 5   rest of it you can leave out.

 6       It would help, I suppose, if we saw the deposition notice,

 7   and if pornographic e-mails are included in the notice, that

 8   would help us.

 9              MR. CONWELL:  Okay.  I --

10       Q    (BY MR. CONWELL:)  Do you remember?

11       A    I prepared for the deposition as a whole.

12       Q    Okay.  Now, as of your May 8, 2013, deposition, Bill

13   Carbone had never said in your presence that he sent e-mails of

14   naked women to anybody at AAPS; is that correct?

15       A    Uhm, as of what date?

16       Q    As of May 8, 2013, some 13 months -- or -- after

17   Dr. Stewart had been expelled from the AAPS, Bill Carbone had

18   never said in your presence that he sent any of these e-mails

19   with pictures of naked women to anybody at AAPS -- anybody else

20   other than Bell at AAPS?

21       A    I just have trouble remembering the exact time

22   sequence.

23       Q    Okay.  Let me see if this refreshes your memory.

24              Page 199, "Did Bill Carbone ever say in your

25   presence that he had sent" --

```
 1              MR. SCHNEIDER:  Your Honor --

 2              MR. CONWELL:  -- "any of these" --

 3              MR. SCHNEIDER:  -- may we see the testimony before?

 4              THE COURT:  Yeah.

 5              MR. CONWELL:  -- "any of these" --

 6              THE COURT:  Hang on.  Stop.

 7              MR. SCHNEIDER:  All I have is page 199.  I don't

 8  know what he's reading.

 9              THE COURT:  It appears to be lines 21 through 24.

10              MR. CONWELL:  Yes.

11              MR. SCHNEIDER:  Objection.  Vague as to "these

12  e-mails."

13              MR. CONWELL:  Okay.  I'll start at line 17.

14              THE COURT:  Overruled.

15        Q    (BY MR. CONWELL)  (Reading:)

16              "Are you aware of any Board members

17              sending photographs of naked women to

18              anybody at AAPS other than Bill Carbone?"

19              And your answer:  "I can't testify to

20              that, no."

21              "Did Bill Carbone ever say in your

22              presence that he had sent any of these

23              e-mails with pictures of naked women to

24              anybody else at AAPS?"

25              And your answer was, "No."
```

1              Does that refresh your memory?

2        A      Yes, it refreshes my memory.

3        Q      And did he send these to anybody on the Board that

4   you're aware of -- I'm sorry.  Did he say this to anybody on

5   the Board that you're aware of?

6        A      Well, we had a discussion with Mr. Carbone at some

7   point.  Uhm, I know that Dr. Montes and Dr. Russo and I had

8   talked to him about this.

9        Q      Okay.  Do you recall -- take a look at your

10  testimony on page 199 to 200. (Reading:)

11              "Did he ever say it" -- referring to

12              these -- "that he had sent pornographic

13              e-mails or of naked women pictures to

14              anybody at AAPS?  Did he ever say it to

15              anybody else on the Board that you're

16              aware of?"

17              "Answer" -- your answer was, "No."

18              "Do you recall anybody on the Board ever

19              saying anything about Bill Carbone sending

20              such e-mails to others at AAPS?"

21              Your answer was, "No."

22              You see that?

23       A      That's correct.  And I remember that after that

24  testimony, I did -- the problem is the conversations took place

25  separately, so I was not aware that anyone else had talked to

 1   Mr. Carbone about it.  And I remember that very clearly.  After

 2   that testimony I asked Dr. Montes and Dr. Russo if they had

 3   addressed it, and they said they did.  That I remember that.

 4        Q     Now, at the time you gave your deposition on May 8th

 5   of 2013, you were the president and -- on the Executive

 6   Committee and on the Board; is that right?

 7        A     Yes.

 8        Q     And in the spring of 2012 and the March through May

 9   time frame, you created the legal task force and the

10   disciplinary committee, right?

11        A     I have to check the dates.  I'm not sure about the

12   exact dates.  It was --

13        Q     This all happened before you expelled Dr. Stewart on

14   June the 13th, 2012; is that right?

15        A     Yes.

16        Q     All right.  And notwithstanding all that involvement

17   with all this involving Dr. Stewart, when you testified on

18   May 8, 2013, you said that Bill Carbone had never told you that

19   he had sent pictures of naked women to anybody else at AAPS as

20   we've just seen; isn't that correct?

21        A     Well, my deposition testimony said that the time

22   sequence of that is very hazy.  I just don't remember the time

23   sequence when conversations took place and where this took

24   place.

25        Q     Well, in any event, let's -- I want to follow up on

 1    Mr. Carbone's version of all this where he says he did in fact

 2    tell you about this before the suspensions of Drs. Castillo,

 3    Geller, and Klein.

 4              Now --

 5              MR. SCHNEIDER:  I object to the statement being

 6    made.  He's here to ask questions.

 7              THE COURT:  Overruled.

 8         Q    (BY MR. CONWELL:)  You've seen the pornography that

 9    Mr. Carbone was forwarding on to Mr. Bell; is that right?

10         A    Yes.

11         Q    And you saw some of it here in the courtroom?

12         A    Yes.

13         Q    And you've seen that some of the pornography -- a

14    lot of the pornography that he was sending on to Mr. Carbone he

15    received from members of the AAPS Board?

16         A    It appears so.

17         Q    Herb Pardell, he was on the Board, wasn't he?

18         A    I'm not sure when he was on the Board.

19         Q    He was on the Board in 2011, wasn't he?

20         A    I don't remember when he was on the Board.

21         Q    Doc Feaver was on the Board, wasn't he?

22         A    Again, I'm not aware of who was on the Board and who

23    wasn't on the Board in that time period.

24         Q    Doc Feaver was on the Board when there was a vote to

25    expel Dr. Stewart from the organization; is that right?

```
 1        A     I'd have to check that.

 2        Q     Joseph Gallagher was on the Board; is that right?

 3        A     Again, I'd have to check that.

 4        Q     And Joseph Gallagher was on the Board that voted to

 5   expel Dr. Stewart; is that right?

 6        A     On what Board?

 7        Q     The AAPS Board.

 8        A     Again, I would have to check that detail.

 9        Q     Did you ever go to Herb Pardell and ask him why he

10   was sending pornography to Mr. Bell?

11        A     No.

12        Q     Did you just accept it as fact that he was?

13        A     My concern was not with Herb Pardell.  My concern

14   was with, uhm, the servers at AAPS being used to transmit that

15   information.

16        Q     Okay.  Did you go to Doc Feaver or Joseph Gallagher

17   about the hardcore pornography that they were sending to

18   Mr. Carbone?

19        A     No.

20        Q     Did you have any investigation done asking for an

21   investigation of the Board for -- the Board of Directors of a

22   medical doctor Association sending such material to your CEO

23   using the AAPS computer e-mail system and computer server?

24        A     When -- when this was brought to light, I, uhm --

25   the first thing I did was talk to Mr. Carbone about it.
```

1              The second thing is I urged a review of internet use

2    policy.

3              And the third thing is we made it clear to all the

4    members, particularly to Board members, that AAPS servers were

5    not to be used to transmit such information, and that was it.

6         Q    So you did not investigate Pardell, Feaver,

7    Gallagher, and other Board members to see what part they played

8    in it; is that correct?

9         A    No.

10        Q    You're agreeing with me?

11        A    I'm agreeing that we didn't launch an investigation

12   into those members.

13        Q    Okay.  The ones that you investigated were the ones

14   that were calling for an investigation of this pornography,

15   Castillo, Geller, and Klein; is that right?

16        A    No.

17        Q    But you did not investigate them?

18        A    Is your question did we investigate those three for

19   pornography?

20        Q    No.  Did you investigate those three, Castillo,

21   Geller, and Klein?

22        A    Yes.

23        Q    Okay.  And that investigation started after

24   Dr. Castillo went to Dr. McCann and called for an

25   investigation?

```
 1         A      No.

 2         Q      When did it begin?

 3         A      It began after we received e-mails -- Timothy Bell's

 4   e-mail trail that named Castillo, Geller, and Klein, and

 5   others.

 6         Q      When -- I want to go back to October of 2010.

 7   Mr. Carbone, as we've seen, has testified that he came clean

 8   prior to October of 2010 about these pornographic e-mails.

 9                Was he disciplined by the AAPS for sending photos of

10   nude women to co-workers?

11         A      What we did was we, as president and past

12   presidents -- we talked to Mr. Carbone.  We talked to members

13   of the Board of Directors, and we came to a decision to

14   basically counsel Mr. Carbone and allow him to continue.

15         Q      Okay.  Here's my question:  Was he ever

16   disciplined -- you understand we're here at a trial about

17   discipline of Dr. Stewart, don't you?

18         A      Yes.

19         Q      Was Bill Carbone ever disciplined?

20         A      No.

21         Q      Why?

22         A      Well, we felt that the situation was grossly out of

23   character for this individual, that he had served faithfully

24   for many years, and that the good that he did for the

25   organization outweighed any negative aspects, and that it was
```

1   within the purview of the Board of Directors, Executive

2   Committee to, I guess for lack of a better word, admonish him

3   and keep him employed.

4        Q     Well, that's not what you told me under oath on

5   May 8, 2013, is it?

6        A     I have no idea what I told you then.

7        Q     Page 175, line 5 through line 15.  (Reading:)

8              "Was Mr. Carbone" --

9              THE COURT:  Hang on.

10             MR. SCHNEIDER:  Objection.

11             THE COURT:  Hang on.

12             THE WITNESS:  I see that testimony.

13       Q     (BY MR. CONWELL:)  Right.  You testified under

14   oath --

15             THE COURT:  You want to read 5 through 12, right?

16             MR. CONWELL:  5 through 15 -- 5 through 12 and then

17   I'm going to ask about AAPS, so, yes.

18             THE COURT:  All right.  Any objection, 5 through 12?

19             MR. SCHNEIDER:  No, your Honor.

20             THE COURT:  All right.  You may read that.

21             MR. CONWELL:  (Reading:)

22             "Question:  Was Mr. Carbone ever

23             disciplined in any way for sending --

24             using company computers and e-mail, the

25             e-mail system, to send photographs of nude

```
 1                    women to co-workers?

 2                    "No.

 3                    "Do you know why not?

 4                    "Answer:  Well, I mean, I don't have any

 5                    knowledge that he did send them."

 6              That was your testimony May of 2013, nearly a year

 7      after you had expelled Dr. Stewart from AAPS; is that right?

 8         A     Uhm, yes.

 9         Q     And to your knowledge, AAPS the company didn't have

10      any knowledge that Mr. Carbone had sent them, did they?

11         A     At what time?

12         Q     When you gave your deposition on May the 8th, 2013,

13      at that very late date your position was that AAPS had no

14      knowledge that Mr. Carbone had sent the pornography; is that

15      right?

16         A     I think I know the pressure of a deposition.  You

17      can forget your own name, particularly as one as contentious as

18      this.

19              Now, there are many, many aspects to this case,

20      many, many moving parts.  This is just one piece that after I

21      sat down and thought about everything in total and put pieces

22      together, I could remember.  I don't know why I testified like

23      that.

24         Q     Okay.  Was it against AAPS policy in 2010 to send

25      out sexist e-mails that make fun of women?
```

 1        A        I believe there was some type of internet use policy

 2    that granted that.

 3        Q        In your deposition you told me you didn't know; is

 4    that right?

 5        A        I did not at that time.

 6        Q        You, the president and chairman of the Board, head

 7    of the Executive Committee of AAPS, did not know as of May 8,

 8    2013, whether or not AAPS had a policy in 2010 against sending

 9    out sexist e-mails that made fun of women?  That's your

10    testimony?

11        A        The policies and procedures of AAPS are not within

12    the -- of the administrative office is not within the purview

13    of the Board, per se.

14        Q        In other words, it was in the purview of

15    Mr. Carbone?

16        A        That's correct.

17        Q        Not of you and the Board?

18        A        No.

19        Q        You're agreeing with me?

20        A        Yes.  Administrative rules apply to the office.  The

21    Board, you know, for the most part, did not get involved in

22    that.

23        Q        So you're saying that the Board of Directors and you

24    as the president and chair of the Board didn't even know if you

25    had a policy against sending out sexist e-mails using your

1    company server?  Am I hearing that right?

2        A    We did not get involved in the administrative

3    policies, per se.  And at the time --

4            THE COURT:  Wait, wait.  That's not the question.

5            THE WITNESS:  Repeat the question.

6        Q    (BY MR. CONWELL:)  Are you telling us that you as

7    the president, chairman of the Board of AAPS did not know in

8    2013 whether or not AAPS had a policy against sending out

9    sexist e-mails that made fun of women?

10       A    At the time I gave the deposition testimony, I did

11   not know.  I had to go back and review it.

12       Q    And so when you were appointing prosecutors, so to

13   speak, to prosecute Dr. Stewart and appointed a disciplinary

14   committee to discipline Dr. Stewart over speaking up on behalf

15   of the doctors who wanted this porno and racism investigated,

16   you never found out whether your company had a policy against

17   this?

18           MR. SCHNEIDER:  Objection.  There's no foundation

19   that that's what they were considering.

20           THE COURT:  I don't understand the objection.

21           MR. SCHNEIDER:  That the question assumes certain

22   facts that the witness has not yet testified to as to why they

23   were conducting an investigation.  He just put it in the

24   question as if it were fact.

25           THE COURT:  All right.  I'm lost.  The letter

1  written by Dr. Okerblom identified a number of things that

2  concerned a group of doctors, and the inappropriate e-mails

3  were one of those things.

4          MR. SCHNEIDER:  Yes.

5          THE COURT:  Granted, this witness didn't testify to

6  it, but we do have testimony on that.

7      So the question is whether or not the Board had actually

8  educated itself on the various policies of the organization

9  before they began their --

10         MR. SCHNEIDER:  Your Honor, let me try again.  There

11 isn't evidence that those complaints are the reason for the

12 investigation, but that is built into the question.

13         THE COURT:  Oh, okay.  All right.

14     Clarify that then.  What was the reason for the

15 investigation?

16     Q     (BY MR. CONWELL:)  Well, the charges against Stewart

17 are in your May 8, 2012[sic], letter to her which attaches the

18 complaint; is that right?

19     A     I guess so.

20     Q     And the complaint that you filed against Dr. Stewart

21 makes allegations regarding the e-mails -- the e-mails that

22 were being sent by Mr. Carbone; is that right?

23     A     I'd have to review it.

24     Q     Okay.  Well, I'll come to that later.  Let me

25 simplify the question for you.

1            Is it your testimony that before you suspended

2    Dr. Stewart from the AAPS, you never educated yourself to see

3    whether or not the AAPS had a policy against sending out sexist

4    e-mails that made fun of women?

5            MR. SCHNEIDER:  Asked and answered.

6            THE COURT:  Overruled.

7            THE WITNESS:  I think I just stated that when way

8    back in 2010, October, September, whenever the Bell packet went

9    out to the Board of Directors, the first thing I did was to

10   check the internet policy -- and that was back in 2010 --

11   whether it existed and what the extent of it was.

12        Q    (BY MR. CONWELL:)  So you did have a policy in 2010

13   against sending out sexist e-mails; is that right?

14        A    Yes, there was a policy.

15        Q    Okay.  And was there a policy in 2010 against

16   sending out racist e-mails?

17        A    I don't know that it named every type of offensive

18   e-mail that could possibly be invented, okay?  The wording was

19   broad enough to capture those types of things, from what I

20   understand.

21        Q    Well, that's not what you said in your deposition.

22   In that sworn testimony you said you didn't even know as of

23   your depo in 2013 whether or not you had a policy against

24   sending out racist e-mails.

25            MR. SCHNEIDER:  Objection.  Your Honor, we object to

UNITED STATES DISTRICT COURT

```
 1   him reading testimony --
 2              THE COURT:  Sustained.
 3              MR. CONWELL:  I'm -- I'm just asking a question.
 4              THE COURT:  Okay.  Just ask the question.
 5              MR. CONWELL:  Yes.
 6       Q    (BY MR. CONWELL:)  In 2013, when I took your
 7   deposition, you didn't know whether or not AAPS had a policy
 8   against sending out racist e-mails in 2010; is that right?
 9       A    I'd have to look at the testimony.
10       Q    Okay.  Let me show it to you.  Page 178, line 12,
11   (Reading:)
12              "Was there a policy against sending out
13              racist e-mails in 2010?"
14              Your answer was, "I don't know."
15              See that?
16       A    Yes, I do.
17       Q    How is it that you, the president, the chairman of
18   the Board, the chairman of the Executive Committee, the one
19   that appointed all the people to prosecute Dr. Stewart, didn't
20   know that in 2013?
21       A    Didn't know what?
22       Q    That your company had a policy against sending out
23   racist e-mails?  How is it you didn't know that?
24       A    I'm saying we did know that and I did know that and
25   I remember checking the policy back in 2010.
```

1     Q     So you did know there was a policy, but you told me

2    that you didn't know; is that correct?

3     A     That's -- that was the testimony in the deposition,

4    yes.

5     Q     Okay.  Mr. Carbone is a friend of yours; is that

6    right?

7     A     I have a friendly relationship with Mr. Carbone.

8     Q     As of May 8, 2013, you had not seen any direct

9    evidence that Mr. Carbone was disseminating or forwarding

10   e-mails of a pornographic nature; is that right?

11    A     Well, there was -- there was evidence in 2010.

12    Q     In your deposition you testified that as of the time

13   of your deposition, you had not seen any direct evidence that

14   he had disseminated pornographic e-mail; is that right?

15    A     Again, I have to look at the deposition.

16    Q     Okay.  Let me refresh your memory.  This is from

17   your May 8, 2013, deposition.

18          MR. SCHNEIDER:  Your Honor, we object to the

19   publication of deposition testimony before it's proper.  It's

20   not -- the jury is seeing it now and it shouldn't.

21          MR. CONWELL:  He just asked to have his testimony --

22   his memory refreshed.  He said he needed to see the testimony,

23   so I'm showing it to him to refresh his memory.

24          MR. SCHNEIDER:  Which testimony are you asking about

25   now?

1              MR. CONWELL:  192, 15 through 20.

2              THE WITNESS:  I see it.

3              MR. CONWELL:  Okay.  I don't see it for some reason.

4    It just disappeared.

5              THE COURT:  On your screen?

6              MR. CONWELL:  No, it's not --

7              THE COURT:  On your screen?

8              MR. CONWELL:  Right.  It just stopped.

9              THE COURTROOM DEPUTY:  Did you push a button dot

10   cam?

11             THE COURT:  Don't worry about it.  You don't see it?

12             MR. CONWELL:  I see it, but it's not up there where

13   the jury can see it.

14             THE COURT:  Don't worry about it.  I got that.  You

15   just deal with your questioning of the witness, all right?

16             MR. CONWELL:  All right.  Thank you.  I've got more

17   use I'm going to be making of this document cam on other

18   exhibits, so at some point we need to figure out --

19             THE COURT:  Oh, I've got that figured out.  Don't

20   worry about that.

21             MR. CONWELL:  Okay.

22        Q    (BY MR. CONWELL:)  All right.  So I'll just read it

23   to you, then.  "To this day" --

24             THE COURT:  Wait, wait, wait, wait, wait.  He asked

25   to see it to refresh his recollection.  Now he's seen it.

1          Now ask him has his recollection been refreshed.

2      Q      (BY MR. CONWELL:)  Oh, were you able to see it?

3      A      I saw it.

4      Q      Okay.  Does that refresh your memory?

5      A      Uhm, yes.

6      Q      Okay.  And you did testify that as of May 8, 2013,

7  you had not seen any direct evidence that Mr. Carbone had

8  disseminated pornography --

9      A      That's the way --

10      Q      -- using AAPS computers?

11      A      That's the way I testified at that time.

12      Q      But you're now saying that testimony is incorrect?

13      A      I think 2010 was when I first saw it.

14      Q      Okay.  And you said that you did an investigation as

15  to whether or not Mr. Carbone had disseminated pornography and

16  racist e-mails; is that right?

17      A      I don't recall that.

18      Q      You don't recall doing an investigation as to

19  whether or not he was disseminating pornography and racist

20  e-mails?

21      A      Well, the investigation was -- was limited to

22  reviewing what we had and questioning Mr. Carbone.

23      Q      Who did the investigation?

24      A      Uhm, I believe the Board of Directors looked at the

25  materials and the past presidents questioned Mr. Carbone.

1        Q      So is it now your testimony that you knew and the

2    Board knew prior to your suspensions of Drs. Castillo, Geller,

3    and Klein that Mr. Carbone was disseminating pornography and

4    racist e-mails using AAPS computers and resources?

5        A      I think the information was out there, yeah.  Yes.

6        Q      Well, I'm more specific.  You knew it and the Board

7    knew it before you suspended Castillo, Geller, and Klein,

8    correct?

9        A      I just can't remember the exact time sequence in

10   that period of time.

11       Q      It was inappropriate for Mr. Carbone to be

12   disseminating pornography using AAPS computers to AAPS

13   employees; is that right?

14       A      Yes.

15       Q      It also was not consistent with the AAPS code of

16   conduct; is that right?

17       A      Well, as far as I know, the code of conduct applies

18   to the physicians, not the administrative staff.

19       Q      So he's not bound by a code of ethics?

20       A      I didn't say that.

21       Q      Is he bound by the code of ethics?

22       A      I don't know that AAPS has a code of ethics for its

23   employees, per se.

24       Q      You're familiar with the AAPS code of ethics?

25       A      I believe that the code of ethics applies to

1   physicians.

2          Q      Are you familiar with the code of ethics?

3          A      I may have read it once or seen it once in this

4   courtroom.

5          Q      How long have you been a member of the AAPS?

6          A      Twenty years.

7          Q      Every year don't you have to pledge to abide by the

8   code of ethics?

9          A      Uhm, yes.

10         Q      And so can you tell us whether or not using AAPS

11  computers to disseminate pornography to AAPS employees violates

12  the code of ethics?

13         A      Yes, it would.

14         Q      Okay.  You believe that sending out e-mails with

15  photos of naked women at AAPS offices using AAPS computers to

16  AAPS staff creates a hostile work environment; is that right?

17         A      I think that's a legal conclusion and I'm not

18  qualified to make that decision.

19         Q      I just want to know, you -- whether you as the

20  chairman of the Board and president and head of the Executive

21  Committee think that that creates a hostile work environment?

22         A      Again, I think that's a legal conclusion and I'm not

23  prepared to make a legal conclusion about that.

24         Q      So you've never to this day formed any conclusion in

25  your mind as to whether or not that -- that creates a hostile

1    work environment, have you?

2        A    My opinion is it shouldn't be done.  What exact

3    legal definition you add to it, that's up to whoever wants to,

4    you know, describe it, if you want to describe it as a hostile

5    workplace.  Okay?  It's just inappropriate.

6        Q    Your own personal opinion is that it's a -- it

7    creates a hostile work environment; is that right?

8        A    Again, I'm -- that's a legal conclusion, as far as

9    I'm concerned.  I don't know the elements that -- that

10   constitute a hostile work environment.  It's inappropriate,

11   doesn't belong in the workplace.

12       Q    Well, you know what a work environment is, don't

13   you?

14       A    Yes.

15       Q    Okay.  And you know what a hostile work environment

16   is.  And I'm not asking in a legal sense, just in every day use

17   of the English language.  You know what a hostile work

18   environment is, don't you?

19       A    The hostile work environment is a EOC definition.

20       Q    I'm not asking about that.

21       A    Well, that's what it means to me.

22       Q    You know the EEOC definition?

23       A    I just stated that it's a legal conclusion that I'm

24   not able to make 'cause I don't know the elements.  It doesn't

25   mean it's not inappropriate.

1     Q     Okay.  You agree it's inappropriate, but you've

2  never in all these years in the various positions you've held

3  in the AAPS never concluded that showing porno in the workplace

4  using workplace computers creates a hostile work environment;

5  is that right?

6     A     Again, that type of activity is inappropriate in the

7  workplace.  How you describe it --

8     Q     Is showing -- forwarding a video to AAPS staff

9  showing people having group sex pornographic?

10    A     I would believe so.

11    Q     And does forwarding that create a hostile work

12  environment?

13    A     I don't think that pornography belongs anywhere in

14  the workplace period.

15    Q     Okay.  I think we're in agreement on that.  My

16  question is whether or not you think disseminating the video

17  showing group sex creates a hostile work environment?

18    A     Again, it's inappropriate in the workplace.

19    Q     Okay.  You agree that the photographs of the young

20  women playing Twister completely naked are pornographic; is

21  that right?

22    A     Yes.

23    Q     Okay.  Now, on September 30, 2010, the Board of

24  Directors of AAPS voted to sue Timothy Bell --

25    A     Yes.

```
 1        Q       -- correct?  And the next day, October 1, 2010, AAPS

 2   sued Mr. Bell; is that right?

 3        A       Sued who?

 4        Q       Timothy Bell.

 5        A       I believe so.

 6                MR. CONWELL:  Can you take a look at Exhibit 1807,

 7   please.

 8                (Exhibit 1807 previously marked for identification.)

 9        Q       (BY MR. CONWELL:)  Is that the complaint against

10   Mr. Bell?

11                THE COURT:  Page 1 ought to answer that question.

12                THE WITNESS:  It appears to be.

13        Q       (BY MR. CONWELL:)  All right.  And -- and on

14   October 1, 2010, were you on the Executive Committee and the

15   Board?

16        A       Yes.

17        Q       Okay.  And you ended up doing some work on this

18   lawsuit against Mr. Bell; is that right?

19                MR. SCHNEIDER:  Objection.  Vague.

20                THE COURT:  Sustained.

21        Q       (BY MR. CONWELL:)  Well, let me direct you to

22   paragraph 46 of the complaint.

23        A       Okay.

24        Q       It says, "Bell, together with Klein, Geller, and

25   Castillo have conspired to portray the CEO" -- that's
```

1    Mr. Carbone, right?

2        A    Yes.

3        Q    -- "in a false light by contacting public members of

4    the organization and distributing pornographic e-mails to

5    them."

6             You see that?

7        A    Yes.

8        Q    AAPS put that in this complaint and filed it in the

9    public record; is that right?

10       A    Yes.

11       Q    Okay.  Now, at the time you filed the complaint, you

12   knew, as you've just now clarified, that it was Mr. Carbone

13   that was distributing pornography, right?

14       A    Again, the time -- the time sequence of all this,

15   uhm, is hard to put together, the timing of the filing, the

16   timing of talking to him about it, the timing of when it was

17   distributed, the timing of when this was filed.

18       Q    Okay.  The Executive Committee then met on

19   September 10, 2010, and recommended investigating

20   Drs. Castillo, Geller, and Klein and suspending them; is that

21   right?

22       A    I believe so.

23       Q    And then the Board, however, never did vote to

24   suspend them; is that right?

25       A    Uhm, no, that's not true.  I believe that the Board

```
 1   did vote.

 2        Q    Take a look -- you contend that the Board voted at

 3   the September 30, 2010, meeting; is that right?

 4        A    Yes.

 5        Q    And -- and you're governed by Robert's Rules of

 6   Order; is that right?

 7        A    Yes.

 8        Q    And Robert's Rules of Order requires you to keep

 9   minutes of your meetings; is that right?

10        A    I'm not expert on Robert's Rules --

11        Q    But you know that much?

12        A    That's usual method of recording.

13        Q    So let's take a look at the minutes of the

14   September 30, 2010, meeting, Exhibit 1405.

15             Are you looking at Exhibit 1405?

16        A    Yes.

17        Q    Those are the minutes of the AAPS Board of Directors

18   from September 30, 2010?

19        A    Yes.

20        Q    Okay.  Take a look down here in the body of this, of

21   the minutes, which are just these two paragraphs and then

22   there's this paragraph at the top.

23             There's no motion made anywhere to suspend

24   Drs. Castillo, Geller, and Klein in the minutes.  Do you agree

25   with me?
```

1       A     Yes.

2       Q     There's no record of any such vote taking place; is

3  that correct?

4       A     Uhm, yes.

5       Q     And the -- take a look at Exhibit 1413.

6             Do you have that?

7       A     Yes.

8       Q     Those are the minutes from the AAPS Board of

9  Directors meeting on November 6, 2010?

10      A     Yes.

11      Q     And at those -- at that meeting, the -- there was an

12 approval of the minutes that we just looked at from

13 September 30, 2010; is that right?

14      A     Say it again.

15      Q     At that meeting on November 6, 2010, the minutes of

16 the September 30, 2010, meeting were approved by the Board; is

17 that right?

18      A     Yes.

19      Q     So the September 30, 2010, minutes that we looked at

20 are the official record of the AAPS on what occurred at that

21 meeting; is that right?

22      A     Yes.

23      Q     Okay.  Mr. Carbone was instructed after the Board

24 had -- excuse me -- after the Executive Committee itself had

25 suspended Drs. Castillo, Geller, and Klein, AAPS asked

 1   Mr. Carbone to draft a proposed bylaw that would give the

 2   Executive Committee the authority and the power to do what it

 3   just had done to Drs. Castillo, Geller, and Klein, which is

 4   suspend them; is that right?

 5           MR. SCHNEIDER:  Objection.  Lacks foundation.

 6           THE COURT:  It's overruled.

 7           MR. SCHNEIDER:  Your Honor, may I be heard?

 8           THE COURT:  No.

 9       Q   (BY MR. CONWELL:)  All right.  Can you take a look

10   at Exhibit 304?

11           Now, is that an e-mail from Mr. Carbone to Tony

12   Russo that -- and a copy of that was sent to you on

13   September 24, 2010?

14       A   Appears so.

15       Q   So September 24, 2010, this is -- this is just after

16   your September 10, 2010, suspension of Castillo, Geller, and

17   Klein by the Executive Committee; is that right?

18       A   Well, that's incorrect.  The Board of Directors

19   voted on the suspension.

20       Q   My question is on September 10th -- I'm just getting

21   the chronology -- September 10, 2010, is when the Executive

22   Committee suspended Drs. Castillo, Geller, and Klein; is that

23   right?

24       A   I believe so.

25       Q   And then on the 24th, now Mr. Carbone is drafting a

```
 1   revision to the bylaws that would give the Executive Committee

 2   the authority to do that, correct?

 3        A    I don't see anything in this document says anything

 4   about suspension.

 5        Q    In the draft -- this was the first draft of this

 6   amendment -- it gives the Executive Committee power and

 7   authority to act for the Board in certain matters; is that

 8   right?

 9        A    Yes.

10        Q    And the -- let's take a look at the bylaws as they

11   exist -- as they existed at that time.  Do you know what the

12   bylaws say regarding what authority the Executive Committee had

13   in September of 2010?

14        A    I'd have to review them.

15             MR. CONWELL:  Can you take a look at Exhibit 1306.

16             (Exhibit 1306 previously marked for identification.)

17        Q    (BY MR. CONWELL:)  You have it?

18        A    Yes.

19        Q    Now, where in the bylaws does it say what authority

20   the Executive Committee had?

21        A    I have to go through the whole document.

22        Q    Well, there's a table of contents; I think that'll

23   speed it up for you.  If you look at the table of contents,

24   there's specifically a reference to the Executive Committee.

25   So let's go to page 21.
```

1           On 21, this is -- at the time you suspended

2   Castillo, Geller, and Klein, this is what the bylaws said you

3   could do as an Executive Committee.  (Reading:)

4               "The Executive Committee of the Board of

5               Directors shall be composed of the six

6               officers of the Association, namely, the

7               president, the president-elect, the

8               immediate past president, the vice

9               president, the secretary/treasurer, and

10              the membership officer.  The president

11              shall serve as chairman of the Executive

12              Committee.  The Executive Committee shall

13              meet at least four times each year,

14              preceding the regular meetings of the

15              Board of Directors.  The Executive

16              Committee shall make policy

17              recommendations to the Board of

18              Directors."

19          That's all that 6.08 said as of September 10, 2010,

20   when you suspended Castillo, Geller, and Klein, right?

21      A    Yes.

22      Q    So what you had Mr. Carbone doing was a draft -- all

23   this from 1 all the way down here now talks about the Executive

24   Committee and the power it's going to have, right?

25      A    Yes.

1    Q      And the timing of this was such that you were trying

2 to plug a hole to give yourself the authority to do what you

3 already did; isn't that right?

4    A      No.

5    Q      There was quite a bit of opposition to giving

6 expanded power to the Executive Committee, wasn't there?

7            MR. SCHNEIDER:  Objection.  Vague as to time.

8            THE COURT:  Overruled.

9            THE WITNESS:  There was disagreement.

10   Q      (BY MR. CONWELL:)  And in fact, when you brought it

11 up for vote at the 2011 annual meeting, there was so much

12 opposition that you ended up having to withdraw it from the

13 floor for vote; is that right?

14   A      I believe so.

15   Q      Now, there was an effort within the Surgery Academy

16 that Dr. Castillo was the representative of to let him give his

17 side of the story; is that right?

18   A      I have no such knowledge of that.

19   Q      Okay.  And who was the head of the Surgery Academy

20 in January of 2011?

21   A      I don't recall.

22   Q      Do you know a Ms. Koegel?

23   A      Yes.

24   Q      And who was that?

25   A      She's one of our members.

1        Q      Dr. -- do you recall that Dr. Castillo was a member

2   of the Surgery Academy?

3        A      Yes.  He had to be.

4        Q      And he was the elected representative of the Surgery

5   Academy to the Board of Directors when the Executive Committee

6   removed him from that position; is that right?

7        A      I'd have to check that fact.

8        Q      And in January of 2011, Ms. Koegel sent an e-mail to

9   Mr. Russo saying that the surgery diplomates wanted to have a

10  conference call and to hear Dr. Castillo's side of the story

11  'cause he'd been suspended and removed from the Board; is that

12  right?

13       A      I know that there was a communication that

14  Dr. Koegel had submitted to, I believe, Dr. Russo.

15       Q      And -- and -- but you as a member of the Executive

16  Committee had told Dr. Castillo he was not to have any contact

17  with any member of the AAPS while he was being, quote,

18  "investigated," is that right?

19       A      That was a condition, yes.

20       Q      And so when Ms. Koegel contacted the AAPS and said,

21  "We want to talk to him.  We want to hear his side of the

22  story.  We want to find out why he's being suspended like

23  this," you put a stop to it.  You, Bob Cerrato, put a stop to

24  it, didn't you?

25       A      No.

 1          Q      You weren't even the president of the organization.

 2     You were on the Executive Committee.  You were a member of the

 3     Board and you put a stop to it?

 4          A      No, I didn't.

 5                 MR. CONWELL:  Let's look at Exhibit 311.

 6                 (Exhibit 311 previously marked for identification.)

 7          Q      (BY MR. CONWELL:)  On page 2, I want to direct your

 8     attention to this e-mail from Ms. Koegel, who calls -- calls

 9     herself Cat Herder.  She says, "The opinion of the surgery

10     diplomates is they would like to have this conference call and

11     they would like to have Mr. Tom Castillo to be part of the call

12     so that both sides can be heard.  Please give some potential

13     times that we can have the call so we can make arrangements.

14     Thanks."

15                 She sends that to Tony Russo and he sends it to

16     Mr. Carbone; is that right?  You see that?  He forwards it on

17     to Mr. Carbone?

18          A      Are you on --

19          Q      See this?  Mr. Russo forwards it on to Mr. Carbone?

20          A      Yes.

21          Q      And then -- then Mr. Carbone sends it on to you?

22          A      Yes, I see that.

23          Q      Right?  And now here's your e-mail.  Let's read what

24     you said.  (Reading:)

25                 "January 18, 2011, to all.  No one is

```
 1              authorized to have any conference call on

 2              any matters concerning the three suspended

 3              physicians.  Nor are any of the three

 4              physicians to be involved in any way in

 5              any official AAPS/ABPS business.  There

 6              are multiple reasons for this that we need

 7              not explain at this junction."

 8         You wrote that to the president of the AAPS and to

 9    the Chief Executive Officer William Carbone; is that right?

10         A    Yes.

11         Q    Okay.  You did put a stop to it.  You now admit

12    that, don't you?

13         A    That e-mail was reiterating what the Board had --

14    Board of Directors had decided how to deal with those members,

15    and that there was a process in place and that the whole

16    situation needed to be kept to a minimum, and this was just

17    going to essentially blow out the procedure.

18              MR. CONWELL:  Let's take a look at Exhibit 1442.

19              (Exhibit 1442 previously marked for identification.)

20         Q    (BY MR. CONWELL:)  Now, these are the minutes of the

21    Board of Directors of AAPS at your June 23, 2011, meeting at

22    Tysons Corner, Virginia; is that right?

23         A    Yes.

24         Q    Okay.  And the first order of business was Approval

25    of the Minutes.  You see that?
```

1       A     Yes.

2       Q     And you, Dr. Cerrato, were the one that made the

3  motion to approve the April 27, 2011, minutes; is that right?

4       A     Yes.

5             MR. CONWELL:  Now I want to take a look at the

6  April 27, 2011, minutes that the Board approved on June 23rd.

7  Let's look at Exhibit 1095.

8             (Exhibit 1095 previously marked for identification.)

9       Q     (BY MR. CONWELL:)  Okay.  Do you have that in front

10  of you?

11      A     Yes.

12      Q     Let's put it up where everybody can see it.  Those

13  are the minutes that you moved to approve at the next meeting

14  in June; is that right?

15      A     Yes.

16      Q     And there was a conference call meeting of the Board

17  of Directors on April 27, 2011; is that right?

18      A     Yes.

19      Q     Now, one of the things that was discussed under New

20  Business was Board of Certification Orthopedic Surgery Conflict

21  of Interest Inquiry; is that right?

22      A     Yes.

23      Q     And this conflict of interest was all about you; is

24  that right?

25      A     Yes.

1        Q        And according to these minutes, "Dr. Russo reviewed

2   the concern from the Board of Certification of Orthopedic

3   Surgery regarding any AAPS/ABPS member receiving compensation

4   from AAPS/ABPS.  Thus, Dr. Russo reported Dr. Cerrato is

5   engaged by AAPS on an attorney/consultant basis."

6                Do you see that?

7        A        Yes.

8        Q        "Plus some of the services Dr. Cerrato provides are

9   pro bono."

10                So that was the issue was a conflict of interest

11   regarding this, right?

12        A        Yes.

13        Q        And then it says, "Following a discussion,

14   Dr. McCann motioned to have Dr. Cerrato continue his

15   consultant/attorney services to AAPS as well as a member of the

16   AAPS Board of Directors," right?

17        A        That's what it states.

18        Q        That's what the minutes say that were approved in

19   June.

20                Now, that -- and that motion passed, right?

21        A        Yes.

22        Q        Now, that is not what you told the New Jersey Bar,

23   is it?

24        A        In terms of what?

25                MR. CONWELL:  Let's look at Exhibit 1730.

1          (Exhibit 1730 previously marked for identification.)

2     Q    (BY MR. CONWELL:)  You wrote to the New Jersey Bar;

3    is that right?

4     A    Yes.

5     Q    Do you have exhibit -- and this is your letter of

6    August 26, 2010; is that right?

7     A    Yes.

8     Q    And Mr. Bell, just to give some context here --

9    Mr. Bell, when he left, he had reported that you were getting

10   paid for receiving -- excuse me -- getting paid for providing

11   legal services and he made a report to the New Jersey Bar and

12   you were responding to it; is that right?

13    A    Yes.

14    Q    Okay.  And in your letter to the New Jersey Bar on

15   August 26th, you said, "There is no written, oral, or other

16   contract between myself and AAPS to provide legal services,"

17   right?

18    A    That's correct.

19    Q    And in fact, we just saw where the Board said that

20   in fact you had been, quote, "engaged to provide attorney

21   services to the AAPS," is that right?  That's what the minutes

22   say?

23    A    The minutes say that, yes.

24    Q    Okay.  Now, did you -- after the vote at the

25   April 2011 meeting to continue your attorney services and your

```
 1    "legal services," as Mr. McCann phrased that, did you go back

 2    to the New Jersey Bar and say, "There is in fact an agreement

 3    for me to provide legal services to the AAPS"?

 4         A    On the circumstances, I didn't.

 5         Q    Okay.

 6         A    'Cause the legal services that I would provide or

 7    could possibly provide were only going to be in the states of

 8    New Jersey and Pennsylvania.

 9         Q    All right.  But you didn't say that in your letter

10    to the Bar.  You weren't saying, "I'm doing it, but I'm doing

11    it in New Jersey."  You said, "I'm not doing it," right?  We

12    just saw it in your own words?

13         A    In fact, I had represented AAPS one time in the two

14    years that that arrangement was in place.

15         Q    You're not aware of any member of the AAPS being

16    paid for services by the AAPS other than yourself; is that

17    correct?

18         A    I'm not aware of that.

19         Q    You have told me that you had a consulting contract

20    with AAPS; is that right?

21         A    I think we had a -- an oral agreement.

22         Q    For what?  For consulting services?

23         A    Yes.

24         Q    And so these consulting services, these are legal

25    services?
```

```
1        A       When it concerned the states of New Jersey and

2    Pennsylvania.

3        Q       And when they're not legal services, what are they?

4        A       Generic business consulting.

5        Q       Generic business consulting.  What is generic

6    business consulting?  Is that like making decisions that are

7    brought before the Board and speaking up as a Board member and

8    talking about the issues facing AAPS?

9        A       No.  It was much more mundane than that.

10        Q       But your rate of pay was $225 per hour; is that

11    right --

12        A       I believe so.

13        Q       -- for these -- for these consulting services?

14                And you say the consulting services are for general

15    business consulting?

16        A       Yes.

17        Q       You don't have any education in business consulting,

18    do you?

19        A       I've run -- started and run multiple companies.

20        Q       My question is you don't have any education in

21    business consulting, do you?

22        A       I have a street education.

23        Q       You recall testifying in your deposition that you

24    have no education in business consulting?

25        A       I have no formal business education.
```

```
 1        Q     You don't have any specialized training in business

 2   consulting; is that right?

 3        A     No.

 4        Q     You don't have any, do you?

 5        A     No.

 6        Q     Now, there are a lot of physicians out there who are

 7   part of the AAPS who have started businesses.  In fact,

 8   Dr. Castillo had an MBA.  He had a master's in business

 9   administration.  You recall that?

10        A     Yes.

11        Q     He didn't get paid for providing business advice to

12   the AAPS, did he?

13        A     He never asked.

14        Q     So all you got do is ask and you get it?

15        A     I don't know what the process is.

16        Q     But you asked?

17        A     I asked.

18        Q     And who signed the checks to you?

19        A     Uhm, Mr. Carbone.

20        Q     Mr. Carbone did?

21        A     Yes.

22        Q     How many checks did Mr. Carbone sign to pay you for

23   these consulting services?

24        A     I don't recall the number.

25        Q     How much money per year?
```

1        A        Uhm, with the space of about a year-and-a-half,

2   about $27,000 in 2010 and I think it was about 9,000 in 2011.

3        Q        Have you gone back and refreshed your memory since

4   your deposition?

5        A        Yes.

6        Q        Okay.  And now have you seen -- I think I covered

7   this with you in your deposition.  I showed you the 2010 return

8   for AAPS showing that you were paid $40,000.  Do you recall

9   that?

10       A        Yes.  That's incorrect.

11       Q        Tax return is wrong?

12       A        I think that that tax return was the combined

13   number, but that wasn't in a single year.

14       Q        Okay.  Is it your position that you have never been

15   paid by AAPS for providing legal services?

16       A        No, that's not true.  I was -- I was paid to provide

17   legal services in the state of New Jersey within the one

18   situation I just spoke about.

19       Q        Well, now, you -- you were -- you were paid for

20   providing legal services in the *Bell* lawsuit, weren't you?

21       A        No.

22       Q        Nothing at all in connection with the *Bell* lawsuit?

23       A        I performed no legal services in the *Bell* case.

24       Q        Okay.  Did you charge AAPS money for work you did on

25   the *Bell* case?

```
 1        A     If I did, it was in a supportive role.

 2              MR. CONWELL:  Let's take a look at Exhibit 1811.

 3              (Exhibit 1811 previously marked for identification.)

 4        Q     (BY MR. CONWELL:)  Now, this is -- this is a court

 5   filing in the AAPS v. Bell case; is that right?

 6        A     Yes.

 7        Q     And Anthony Durante, who's seated over here,

 8   submitted an affidavit to get money from Mr. Bell because you'd

 9   obtained a summary judgment against Mr. Bell; is that right?

10   Or you were seeking one?

11        A     Yes.

12        Q     And there was -- just to clear this up, there never

13   was any trial involving Mr. Bell?  He filed, you filed the

14   Motion For Summary Judgment, he never answered it, and you got

15   a judgment without a trial; isn't that right?

16        A     From what I understand, yes, there was a summary

17   judgment, but Bell was represented by counsel throughout this

18   proceeding.  I think he decided not to pay his lawyers and they

19   withdrew.

20        Q     And when they withdrew and he didn't have a lawyer,

21   then you got a judgment without a trial, right?

22        A     Well, Mr. Bell was --

23        Q     You got --

24        A     -- very well --

25        Q     Excuse me.  Can you answer my question?  You got a
```

 1    judgment without a trial?

 2         A      AAPS got a judgment.

 3         Q      I stand corrected.

 4                And he was never found guilty, was he?  There was no

 5    guilt or innocence here.  There wasn't something where he's

 6    found guilty.  There's no such document finding him guilty?

 7         A      This is a civil action.  It's not a criminal action.

 8         Q      So I'm correct?

 9         A      Yes.

10         Q      Okay.  Now, I want you to look where you list all

11    these fees, I want you to look at paragraph 33.  On

12    September 10, 2010, that happens to be the same day the

13    Executive Committee was meeting, right?  And you were at that

14    meeting?

15         A      Yes.

16         Q      *Robert Cerrato, New Jersey vs. Timothy Bell* --

17    excuse me -- *Timothy Bell vs. Robert Cerrato* legal fees $2,520.

18    Legal fees, right?  That's what you submitted to the court?

19         A      I didn't submit legal fees.  How they were

20    characterized is not under my control.

21         Q      Let's look at the next page.  "July 22nd, AAPS

22    incurred the costs of Robert Cerrato regarding advisory costs

23    *Bell* case, 592."  In fact, every one of these says the same

24    thing; there are all these advisory costs.  You didn't want to

25    call it legal services 'cause you thought you might get in

```
 1    trouble; is that right?

 2         A     No.

 3         Q     You're a lawyer.  You're working on the Bell case

 4    and now you're calling it, quote, "business consulting" now,

 5    right?

 6         A     Advisory costs were exactly that.  I interfaced with

 7    all the players that were involved with the case, lawyers,

 8    computer people, the list went on and on and on.  There were

 9    many people that we had to call in to deal with this situation.

10         Q     Well, that's because you were on the Executive

11    Committee and you were leading the charge.  As a member of the

12    Executive Committee and the Board of Directors, you charged

13    AAPS for providing money for volunteer services.  That's what

14    you did, isn't it?

15         A     I wasn't leading any charge.  That relationship was

16    approved twice by the Board of Directors.  They had the

17    opportunity to deny it.  They were very well -- they had much

18    knowledge as to what I was adding to the Association in terms

19    of knowledge and experience and they were very grateful for

20    what I did.

21         Q     And that knowledge and experience is you're a

22    lawyer?

23         A     I think you can't deny your education, okay?  You're

24    going to use whatever facility you have to do what you need to

25    do.  But to --
```

```
 1        Q     I'm sorry.

 2        A     I wasn't acting as an attorney.  There's a big

 3   difference there.

 4        Q     I understand.  You were being a business --

 5        A     I don't think you do understand.

 6        Q     You were being a business consultant, right?

 7        A     That was one aspect, yes.

 8        Q     Because you had started a business before and that

 9   qualified you as a business consultant to provide advice in a

10   law case, in a lawsuit, right?

11        A     I wasn't -- I wasn't providing advice on a law case.

12   And, yes, I had started and run multiple businesses and run

13   multiple departments, employees, everything you can imagine in

14   running a company.

15        Q     Those companies were your own medical practice?

16        A     No.  It was -- I've been the Chief of Anesthesia in

17   every place I've ever been, starting with the Navy, okay?  I

18   know how to run budgets.  I know how to hire people.  I know

19   how to fire people.  That experience is probably a lot more

20   than you get in any MBA school -- at least that's what the MBA

21   graduates tell me.

22        Q     Now, the third -- it just goes on and on and on.

23   You getting money for advisory costs in the *Bell* case?

24        A     Mr. Bell started a war.  We had to defend ourselves.

25   It's expensive.
```

1        Q        In fact, from the years 2010 through 2013, AAPS paid

2    $1.6 million for attorney's fees to sue its own members; isn't

3    that true?

4        A        I have no knowledge of that.

5        Q        Who approves the attorney's fees?

6        A        Not I.

7        Q        Is it Mr. Carbone?

8        A        Well, uhm, indirectly I suppose the Board of

9    Directors does, but --

10       Q        Aren't -- weren't you the chairman of the Board

11   2011, 2012, 2013?

12       A        You're talking about a total expenditure, okay?  It

13   wasn't one total -- it wasn't $1.6 million bill, okay?  The

14   bills come in as they come in.  And as they come in, the Board

15   of Directors approve the paying the legal fees.  Mr. Carbone

16   signs the checks.  That's how it goes.

17       Q        Okay.  I mean, I can pull out these tax returns

18   where you spell out the payments for legal fees.  They -- you

19   don't deny that they add up to 1.6 million just for the years

20   2010 to 2013, do you?

21       A        I don't have access to the tax return, so I don't --

22   and I've never seen them, so you're trying to make me testify

23   to a number that I can't verify.  Sorry, can't do that.

24       Q        How much -- 2014, 2015, how much more was it?

25       A        I don't know.

1      Q      You've paid over $2 million in suing your own

2   members, haven't you?

3      A      The expenditure was to defend the Association.

4      Q      Well, you just showed us -- we've seen this e-mail

5   from Tony Russo dated June 23 or June 24, 2011.  You know what

6   I'm talking about, right?  Said at the annual meeting in 2011

7   to respond to this letter with 14 points, and one of the points

8   is the AAPS is going to spend a fortune in litigation with its

9   own members.  You remember that?  Does this ring any bells?

10     A      I remember the 14-point letter.

11     Q      And in that letter Tony Russo responds and says, "No

12  problem.  This is not going to cost us any money 'cause we got

13  insurance.  It's all paid for.  We got insurance."

14            You remember Tony Russo saying that in his letter?

15     A      What I remember was that Dr. Russo talked about when

16  the question was asked how we were going to pay for it, we did

17  have insurance in place, and it was our understanding that the

18  insurance was going to cover our expenses in that matter.

19            But no one -- and I mean no one -- could have

20  anticipated six years of litigation in multiple courts with

21  multiple judges with one side doing everything they could to

22  run up the costs.

23     Q      The one point -- the $2 million comes -- the

24  insurance company doesn't pay you or doesn't pay the lawyers to

25  sue people; it only pays to defend, right?

1           A       That's correct.

2           Q       So the insurance company covers the lawsuit against

3    AAPS, but the $2 million is to go after your members, right?

4           A       Again, I'd have to review those numbers.  I'm not

5    going to agree with something I don't even know.

6           Q       Now --

7                   THE COURT:  Would this be a good time?

8                   MR. CONWELL:  Sure.

9                   THE COURT:  All right.  All right.  Ladies and

10   gentlemen, let's take another 15 minutes.  Remember the

11   admonition, please.

12                  THE COURTROOM DEPUTY:  All rise.

13                  You may be seated.  Court's in recess.

14                  (A recess was taken.)

15                  (Open court in the presence of the jury.)

16                  THE COURT:  All right.  Mr. Conwell, you may

17   continue your examination of Dr. Cerrato.

18          Q       (BY MR. CONWELL:)  Dr. Cerrato, we just talked about

19   how you've been paid as a consultant providing business

20   consulting services; is that right?

21          A       Among other things, yeah.

22          Q       You would agree with me, though, that in your

23   capacity as a Board member as opposed to a consultant, you

24   weren't supposed to be paid; is that right?

25          A       No, that's not true.

1       Q    So you think you're supposed to be paid for serving

2  on the Board of Directors providing your advice and counsel to

3  the organization?

4       A    I think the AAPS Board of Directors decided that

5  my -- my contribution was of such value that it was worth

6  compensating me for my time.

7       Q    Okay.  But my question is you believe that you're

8  entitled to be paid and supposed to be paid for providing

9  advice and counsel to the Board as a member of the Board,

10 right?

11      A    I believe in certain situations, as the situation I

12 had with AAPS, that I brought continued value and they decided

13 that it was worth paying for.

14      Q    And no other member of the Board gets that money for

15 being a member of the Board; is that right?

16      A    I don't have any idea.

17      Q    Okay.  Now, there's some members had a problem with

18 this arrangement; is that right?

19      A    There was criticism.

20      Q    And that ended up making its way into the lawsuit

21 you filed against Dr. Stewart; is that right?

22      A    I believe -- I don't know.

23           MR. CONWELL:  I'm going to help you out.  Let's take

24 a look at Exhibit 1333, and I'd like you to turn to page 24.

25      While you're doing that, your Honor, I want to move into

```
 1   evidence Exhibits 1807, 1306, 1442, and 1095.

 2              THE COURT:  Any objection?

 3              MR. SCHNEIDER:  No, your Honor.

 4              THE COURT:  All right.  Received.

 5              (Exhibits received into evidence.)

 6              THE WITNESS:  What page?

 7        Q     (BY MR. CONWELL:)  24 and 25.  I'm just going to ask

 8   this is the lawsuit that the AAPS filed against Dr. Stewart; is

 9   that right?

10        A     Yes.

11        Q     Okay.  So now, let's turn to pages 24 and 25.

12        A     Okay.

13        Q     And in your lawsuit against Dr. Stewart, on page 24

14   you've got a section called "Plaintiffs/Counter-Defendants

15   conspire with additional Counter-Defendant Cressey to file

16   multiple frivolous ethic complaints against Counter-Plaintiff

17   Cerrato."

18              You see that?

19        A     Yes.

20        Q     And then, (Reading:)

21              "AAPS alleged in or about December 2011

22              Cressey filed frivolous ethics

23              complaints" --

24              Cressey, he's a doctor, right?

25        A     Yes.
```

```
 1      Q    He's a member of the AAPS?

 2      A    Yes.

 3      Q    He practices up in Boston?

 4      A    I don't know where he practices.

 5      Q    (Reading:)

 6           -- "filed frivolous ethics complaints

 7           against Cerrato in the jurisdictions where

 8           Cerrato is admitted to practice law:  New

 9           Jersey and Pennsylvania.  Cressey is a

10           member of AAPS and its Academy of

11           Emergency Medicine."

12           And then it goes on.  (Reading:)

13           "All of Cressey's ethics complaints

14           contain identical claims that Cerrato had

15           engaged in unauthorized practice of law

16           by, among other things, purportedly

17           performing unauthorized legal work for

18           AAPS and then supposedly seeking

19           reimbursement for this work.  All of the

20           aforementioned charges are false and

21           unfounded."

22           Right?

23      A    Yes.

24      Q    And so -- and then you go on and make additional

25 allegations regarding yourself in here, right?  This all is
```

UNITED STATES DISTRICT COURT

```
 1   about you?
 2       A    Allegations about myself?
 3       Q    Your name's all over here; it's all about you.  This
 4   whole thing about the ethics --
 5       A    Yes.
 6       Q    -- and getting paid for doing legal work, and all
 7   that's about you, right?
 8       A    Allegedly, yes.
 9       Q    And then -- and you were the head of the legal task
10   force that recommended filing this lawsuit, right?  You
11   appointed yourself to the legal task force?
12       A    I wasn't the head of the legal task force.  I was on
13   the --
14       Q    You appointed yourself to the legal task force?
15       A    That's correct.
16       Q    And Dr. Montes, right?
17       A    Yes.
18       Q    Dr. Montes is on the legal task force that
19   recommended filing this complaint?
20       A    Yes.
21       Q    And Dr. Gallagher?
22       A    Yes.
23       Q    Dr. Maggio?
24       A    Yes.
25       Q    Dr. Wallace?
```

```
 1        A    I believe so.

 2        Q    Okay.  So this complaint also makes allegations

 3   regarding Dr. Montes, right?  Look at page 18.  It's an

 4   allegation here about providing -- conspiring to provide false

 5   information to a news reporter, including what you called

 6   "false information regarding AAPS's violation of federal

 7   election laws."

 8             That was all -- that's part of your complaint,

 9   right?

10        A    Yes.

11        Q    Now, we can -- we can go on here.  You allege that

12   Dr. Stewart -- this is in your count for defamation -- that

13   Dr. Stewart and these others are publishing false --

14             THE COURT:  Where are you?

15             MR. CONWELL:  I'm sorry.  Page 29, paragraph 96.

16             THE WITNESS:  Okay.

17        Q    (BY MR. CONWELL:)  -- false, offensive, threatening

18   statements, letters, and e-mails regarding AAPS and its

19   leadership, including Mr. Carbone, Mr. Durante and you, right?

20   That's what this says?

21        A    Yes, yes.

22        Q    That's what this says, okay.  And then -- and you

23   say that these letters and e-mails were sent and/or made by

24   these -- by these defendants, including Dr. Stewart, "with

25   malicious intent to damage the good name, reputation, trade and
```

1    or business of AAPS."

2              That's what you wrote.  That's what your company

3    wrote, right?  Right?

4         A    Yes, I see it.

5         Q    And then in 101, you said that (Reading:)

6              "These counter-defendants Cressey,

7              Radentz, and Stewart, acted ultra

8              vires" -- meaning outside the bounds of

9              their duties and responsibilities -- "as

10             members of AAPS and as members of the

11             Board of Directors of AAPS."

12             Right?  That's what you said?

13        A    Yes.

14        Q    You also said in paragraph 104, that (Reading:)

15             "Counter-defendants" -- that would include

16             Dr. Stewart -- "Counter-defendants have

17             conspired with each other and with Bell

18             and Newby, as well as other

19             co-conspirators whose identities are

20             currently unknown, to defame, damage, and

21             destroy AAPS's good name, reputation,"

22             etc., and to oust the leadership including

23             Carbone, Durante and yourself."

24             Right?

25             "And they're trying to take over AAPS" --

```
 1        A     Yes.

 2        Q     -- "by wrongful and illicit means."

 3              That's what you said about Dr. Stewart, isn't it?

 4        A     Yes.

 5        Q     And the complaint -- you got to admit, the complaint

 6    is largely about you, isn't it?

 7        A     I haven't reviewed this complaint.

 8        Q     It's largely about Dr. Montes, isn't it?

 9        A     Again, I would need to review the complaint.

10        Q     Now, you let Dr. Montes chair the disciplinary

11    committee that was supposed to investigate whether or not

12    Dr. Stewart was doing all these horrible things, right?

13        A     Yes.

14        Q     You also put Dr. Maggio on the disciplinary

15    committee?

16        A     Yes.

17        Q     He was on the legal task force that authorized the

18    filing of this lawsuit --

19        A     Yes.

20        Q     -- the complaint we just read, wasn't he?

21        A     Yes.

22        Q     And the disciplinary committee, ultimately you've

23    given us a record from Dr. Montes saying that they recommend

24    permanent expulsion of Dr. Stewart.  Do you remember that?

25        A     Uhm, yes, I believe so.
```

1      Q     Okay.  Now -- and -- but you disciplined

2  Dr. Stewart -- AAPS disciplined Dr. Stewart, right?

3      A     Yes.

4      Q     But AAPS is not a disciplinary organization, is it?

5  It doesn't discipline members?

6      A     It provides for discipline.  Uhm, it's a Board

7  certification organization.

8            MR. CONWELL:  Let's take a look at Exhibit 1477.

9            (Exhibit 1477 previously marked for identification.)

10     Q     (BY MR. CONWELL:)  Now, 1477, these are the minutes

11 of the Board of Directors of AAPS from February 28th, 2012; is

12 that right?

13     A     Yes.

14     Q     And you were there?

15     A     Yes.

16     Q     Okay.  And February of 2012 you were the president

17 and chairman of the Board; is that right?

18     A     Yes.

19     Q     And at that meeting, Dr. Gallagher -- I'm on

20 page 4 -- Dr. Gallagher explained the situation -- see

21 (Reading:)

22            "Dr. Gallagher explained a situation at a

23            Pennsylvania hospital concerning an AA --

24            an ABPS diplomate" -- that's a

25            board-certified AAPS member, right?

```
 1              Right?

 2    A      Yes.

 3    Q      Okay.  (Reading:)

 4              "And inquired whether this particular ABPS

 5              physician's board certification

 6              circumstances would be in purview of the

 7              State of Pennsylvania Medical Board or the

 8              American Board of Physician Specialties."

 9              There's a doctor in Pennsylvania that'd been found

10    liable for malpractice, and Dr. Gallagher was asking should we

11    do any discipline, meaning if one of our doctors is found

12    liable for malpractice, shouldn't we be doing some kind of

13    discipline?

14         And then Dr. Cerrato stated, "The AAPS is not a

15    disciplinary organization," right?

16    A      Yes.

17              MR. SCHNEIDER:  I object to this question.  Lacks

18    foundation regarding malpractice.

19    Q      (BY MR. CONWELL:)  Isn't that what happened?

20              THE COURT:  Overruled.

21              THE WITNESS:  I have no idea.

22    Q      (BY MR. CONWELL:)  You said this, didn't you?

23    A      If you're commenting on what this situation was,

24    whether it was malpractice or not, I have no idea what this

25    situation was.
```

 1              And as far as the statement that AAPS is not a

 2   disciplinary organization, that's correct.  You're confusing

 3   two things.  Dr. Gallagher was on the State of Pennsylvania

 4   Osteopathic Medical Board and he deals with licensure

 5   discipline, okay.  AAPS is not a licensure discipline

 6   organization.  Discipline applies to membership, okay?  That's

 7   what was meant by that.

 8              So, you know -- if he had, you know, subsequently

 9   been disciplined by the State of Pennsylvania, then it would

10   become an ABPS matter, but the way this is presented here, it's

11   just an irrelevant concept.

12       Q    Okay.  I'll move on.  Let's look at Exhibit 1498.

13              You recognize this as your May 8, 2012, letter to

14   Dr. Stewart informing her that she was being disciplined?  She

15   was -- she had -- was the subject of inquiry by a disciplinary

16   committee; is that right?

17       A    This was the -- the appearance letter before the

18   disciplinary committee.

19       Q    Okay.  So even though you're not a disciplinary

20   organization, you did create a disciplinary committee; is that

21   right?

22       A    The bylaws provide for disciplining members under

23   certain conditions and I think those conditions are actually

24   elucidated in this letter.

25       Q    Okay.  And this is -- this is the charging document,

```
 1    spells out the claims that Dr. Stewart had to -- or was given

 2    supposedly an opportunity to defend against, right, some 160

 3    pages of charges?

 4         A    Well, I disagree with the statement there's 160

 5    pages of charges.

 6         Q    How many pages do you think?

 7         A    I think there's a lot of background material here

 8    that is just that, background material.

 9         Q    Well, that's not what you said in your letter.

10    Let's look at what you said.

11              You said (Reading:)

12              "At this meeting" -- after advising her

13              there's going to be a meeting in Tampa on

14              June 9th -- "this meeting, the committee

15              will consider charges against you for

16              conduct injurious to the best interest of

17              AAPS and/or incompatible with its

18              purposes, as more specifically described

19              in the materials annexed here as

20              Exhibit 1."

21              That's what you wrote, isn't it?

22         A    As relevant to her.  That should have been added --

23         Q    And 160 pages of that, right?

24         A    -- as relevant to her.

25         Q    Okay.  And then you said you're going to give her --
```

 1   oh, you told her that you might terminate her, right?

 2       A     That -- that is a -- one level of discipline, yes.

 3       Q     Pretty scary thing, isn't it?

 4       A     Uhm, I mean, it would be -- it would be of special

 5   interest, yes.

 6       Q     Of special interest.  Hmm.  Is that the way you

 7   viewed this?  That this was just something that might be of

 8   special interest to Dr. Stewart as --

 9       A     No.

10       Q     -- opposed to frightening?

11       A     I can't testify as to what people would think of --

12   of this.

13       Q     That's what you thought?

14       A     Some people --

15       Q     You thought it was no big deal, just something of

16   special interest?

17       A     That's not what I said, okay?  I can't predict how

18   people would take this.  Okay?  It is a serious situation, no

19   question about it.

20       Q     Okay.  So then you said, (Reading:)

21             "Under Section 3.05 you may appear in

22             person, with or without counsel, before

23             the disciplinary committee at the

24             appointed time, to present evidence that

25             you're qualified to continue as a member

```
 1                 in good standing with AAPS.  If you choose

 2                 to appear in person, you'll be given up to

 3                 15 minutes for oral presentation to the

 4                 disciplinary committee."

 5                 Now, is that your idea to give her a whopping 15

 6      minutes to respond to this?

 7           A     No.

 8           Q     It's not in the Board -- in the bylaws is it?  It

 9      doesn't say 15 minutes anywhere?

10           A     No, it does not.

11           Q     So who came up with this 15 minutes to respond as to

12      whether or not you should be terminated from the AAPS?

13           A     Disciplinary processes were only done in this

14      organization -- this is probably the third time since 1952.

15      And the process had to essentially be invented for this

16      process, and we --

17           Q     The process had to be invented for the process?

18           A     Exactly.  I know how it sounds, but, you know, we

19      had -- we had never run into this situation ever in the past,

20      not the ones that were dealing with the current situation.

21      So --

22           Q     Who invented -- who invented the process?

23                 MR. SCHNEIDER:  Your Honor, can we ask the witness

24      be permitted to complete his answers?

25                 THE COURT:  Yeah.  Actually, wait a minute.  I want
```

```
 1   you to go back and provide a direct answer to the first

 2   question, Who came up with the 15 minutes?

 3              THE WITNESS:  I was getting to that.

 4              THE COURT:  No, no, no.  Just -- it's a name.

 5              THE WITNESS:  Well, it --

 6              THE COURT:  Or names.

 7              THE WITNESS:  I don't remember one particular person

 8   coming up with the 15 minutes.  This whole process was

 9   discussed among the Board of Directors and legal counsel at the

10   time.  Uhm --

11        Q    (BY MR. CONWELL:)  So you, AAPS, carefully

12   considered this, and after careful consideration and

13   deliberation, you thought it would be a good idea to give her a

14   total of 15 minutes to respond?  This wasn't an off-the-cuff

15   thing.  You really thought hard about it; is that right?

16        A    There was nothing off the cuff in this entire

17   process.

18        Q    You deliberated and you thought hard and you

19   concluded 15 minutes was fair.

20        A    That was the conclusion under the circumstances.

21        Q    It's not fair, is it, Dr. Cerrato?  It's not?

22        A    I think you're taking this -- this whole situation

23   in isolation.  That -- I can tell you with great certainty that

24   her situation as well as any other situation would have lasted

25   a lot longer than 15 minutes.
```

1            Her 15 minutes was her presentation piece, but this

2    process would have taken a lot longer than 15 minutes.

3        Q    That's not what your letter says.  Says, "You're

4    given up to 15 minutes for oral presentation to the committee."

5    That's what your letter says, right?

6        A    Yeah, her piece of testimony.

7        Q    She's not allowed to bring witnesses, is she?  Just

8    herself and one person?

9        A    That wasn't -- that wasn't allowed.

10       Q    "Witnesses are not allowed."  Is that -- you said

11   that.  You're saying witnesses are not allowed?

12       A    Witnesses weren't permitted under the system.

13       Q    And you say she "may submit written evidence of your

14   qualification at any time before this meeting.  We strongly

15   encourage you to do so at least five days before the date of

16   the meeting," right?

17       A    Yes.

18       Q    Now, were you in that group of people that came up

19   with the process for this process?

20       A    The entire Board of Directors had input into this

21   procedure.

22       Q    I'm asking about you.

23       A    Well, I was on the Board of Directors.

24       Q    You were in charge of the Board.  You were the chair

25   of the Board, right?

```
 1        A     I may have been the chair of the Board, but my

 2    single opinion was one of 16.

 3        Q     Now, you said in here she could come to Tampa,

 4    Florida.  You knew in the lawsuit you had just filed against

 5    her that you attached to this charging document to your letter

 6    of May 8, 2012, that she was challenging the jurisdiction of

 7    the Florida court.  You knew that?

 8        A     No, I did not know that.

 9        Q     So you -- the Board never made any inquiry, knew

10    nothing about that?

11        A     I can't testify as to the -- what the Board knew.  I

12    wasn't aware of a jurisdictional challenge.

13        Q     Okay.  So I take it then you didn't see her May 24th

14    e-mail that said she was challenging jurisdiction, right?

15    Let's take a look at that.

16              MR. CONWELL:  Excuse me one moment, your Honor.

17              THE COURT:  Uh-huh.

18              MR. CONWELL:  Can you take a look at Exhibit 1024?

19         How about Exhibit 5?  Take a look at Exhibit 5.

20              (Exhibit 5 previously marked for identification.)

21              THE WITNESS:  Nope.

22        Q     (BY MR. CONWELL:)  Do you have Exhibit 5?

23        A     Yes.

24        Q     Okay.  This is the May 24, 2012, e-mail that

25    Dr. Stewart sent to the Board of Directors.
```

1        A       Yes.

2        Q       And I can show, if we need to, the header showing

3    that it went to you.

4        A       Yes.

5        Q       You've seen this?

6        A       I've seen this before.

7        Q       And your letter of May 8th told her she could send a

8    written defense, right?

9        A       Not a written defense, a --

10       Q       A defense --

11       A       -- writing in support of -- can't remember --

12       Q       Writing in support of her defense?

13       A       Yes.

14       Q       Writing in support of her defense.  So this is a

15   writing in support of her defense, right?

16       A       Uhm, yes.

17       Q       She -- for example, on page 2, she says, "I've done

18   nothing to harm AAPS.  I've not conspired with Tim Bell or

19   anyone else to harm AAPS.  I don't even know Tim Bell, never

20   spoken to him at any time."

21               She goes on and on denying these things, right?

22       A       Yes.

23       Q       This is -- and then if you turn over to page 5 --

24       A       Yes.

25       Q       -- in this e-mail that she sent to you, she says

```
 1   (Reading:)

 2              "Although I will fully cooperate with any

 3              reasonable investigation of my actions,

 4              please remember that AAPS is suing me

 5              right now and I have to operate under the

 6              legal advice of counsel.  By suing me,

 7              AAPS has created a situation that makes it

 8              legally inadvisable for me to travel to

 9              Florida in early June.  In requiring me to

10              do so, you are demanding that I take

11              actions that would force me to surrender

12              some of my legal rights in a lawsuit that

13              has been filed against me.  Right now I

14              have a contest whether the state of

15              Florida has the legal authority to compel

16              me to litigate there, since I am not a

17              resident of Florida, and it has not been

18              established that I've done anything to

19              hurt anyone over there.  If you force me

20              to come there before the court has ruled

21              on the issue of whether it has

22              jurisdiction over me, I could be served

23              while I'm in Florida and would then be

24              under the jurisdiction of the Florida

25              court.  Is it your intention to compel me
```

1                    to forfeit my legal rights by threatening

2                    to discipline me if I do not do so?  If it

3                    is not, please let me know your answer to

4                    this question immediately."

5                    So you did know?

6        A    I -- I recall this now, yeah, and --

7        Q    You did know?

8        A    The question you asked me was whether AAPS, the

9   Board of Directors, the way I understand the question --

10  whether the AAPS had a concern with the jurisdictional issues.

11  So I don't know what -- and the answer would be no, okay?

12       Q    You told her in your letter she could come to Tampa

13  and she said, "I can't go to Tampa 'cause I'm fighting

14  jurisdiction," right?

15       A    Yes.

16       Q    And she said, "Can I do it by phone?"

17            And you said no?

18       A    That's correct.

19       Q    And she said, "Can we do it in Marina Del Rey just

20  two weeks later?"

21            And you said no?

22       A    That's correct.

23       Q    She also asked in her e-mails who was on the

24  Board -- I'm sorry -- who was on the disciplinary committee.

25  Do you recall that?

1        A     In this letter?

2        Q     In this and other letters she wanted to know who's

3   on the disciplinary committee.  You all never told her, did

4   you?

5        A     I -- I -- I just don't recall.

6        Q     Okay.  Take a look again on page 5, (Reading:)

7              "Who is it accusing me?  I deserve to know

8              that in advance of my disciplinary

9              hearing.  Who is it that's going to judge

10             me?  If it's any of the people named in

11             the lawsuit that's been filed against me,

12             those people have a conflict of interest.

13             I'm going to have to ask that they abstain

14             from attending the disciplinary action.

15             That includes Dr. Cerrato, Russo,

16             Marciniak, Schenck, Barnes, as well as

17             Carbone."

18             Then she says,.

19             "The same goes for the legal task force,

20             Montes, Maggio."

21             But those were the members of the disciplinary

22   committee, right?

23       A     Uhm, Montes, Maggio, and Gallagher were on the --

24       Q     She objected --

25       A     -- Montes, Maggio, and Wallace I think were on the

1   litigation, right -- litigation committee.

2        Q    She objected -- yeah, and the disciplinary

3   committee, and she objected to that, right?

4        A    Yes.

5        Q    And also Herb Pardell and Brian Feaver, the guys

6   that are sending the porno to your CEO, she objects to them,

7   right?

8        A    Yes.

9        Q    AAPS did not respond to this letter, did it?

10        A    Uhm, I don't recall if there was a response.

11        Q    The only one who responded was Betsy Schenck, and

12   she did that to let Patty Stewart know that, "After I read your

13   letter, I resigned from the Board because of what we were doing

14   to you."

15             You've seen that letter, haven't you?

16        A    No.

17        Q    You heard Betsy Schenck's testimony that's exactly

18   what she did, she resigned from the Board over this?

19        A    She resigned from the Board because she had some

20   issues with how the process was going.  I don't know exactly --

21        Q    Wasn't fair?

22        A    I don't know exactly what her problem was.

23        Q    It wasn't fair, was it?

24        A    Yes, I think it was fair.

25        Q    Oh, you think this was a fair proceeding?

```
 1       A      It's a proceeding that never happened.

 2       Q      You never disciplined her?

 3       A      In the sense that the proceeding was, you know --

 4  it -- how can I put this?  The proceeding went through the

 5  process, but it was the hope that she would participate in the

 6  process and we wouldn't have to do what we did.

 7       Q      You hoped that she would participate as in come to

 8  Florida and get served with the lawsuit and lose her

 9  jurisdictional argument?

10       A      No.  There was never any plan to serve her in the

11  Florida issue.  That was never -- that was never planned or

12  even discussed.

13       Q      She wanted to participate in the process.  She sent

14  this letter, but the letter was never shown to the disciplinary

15  committee, was it?

16       A      You talking about Exhibit 5?

17       Q      Right, May 24th letter.  Her May 24th letter, you

18  never furnished it to the disciplinary committee, did you?

19       A      No, I think the disciplinary committee did see this

20  letter.

21       Q      Dr. Wallace is on the disciplinary committee, right?

22       A      Yes.

23       Q      He is the only surviving member of the disciplinary

24  committee; the other two have passed away?

25       A      Correct.
```

```
 1        Q     Dr. Wallace gave a deposition in this case, didn't

 2   he?

 3        A     Yes.

 4        Q     We'll just check with Dr. Wallace to see if this

 5   letter was given to the disciplinary committee, okay?

 6        A     Uhm --

 7        Q     Would that be okay?

 8        A     Whether Dr. Wallace remembers receiving this letter

 9   or not is one person's testimony.  But I am almost absolutely

10   sure that this was given to them.

11        Q     Did you give it to them?

12        A     No.

13        Q     Did you put it in his hands?

14        A     No.

15        Q     Okay.  In any event, you do know that the Florida

16   court ruled in her favor and said it had no jurisdiction,

17   right?  You know that?

18        A     I -- I don't recall that.

19        Q     Well, you got to recall it because you appealed it

20   to the Court of Appeals and you litigated it in the Court of

21   Appeals for over a year.  You telling us you don't know that?

22              MR. SCHNEIDER:  Objection.  Lacks foundation.

23              THE COURT:  It's slightly argumentative.

24        Q     (BY MR. CONWELL:)  Do you know that your company

25   lost on jurisdiction because she refused to go to Florida and
```

 1    subject herself to jurisdiction, and then you appealed it and

 2    you lost the appeal?

 3        A    I don't recall that piece of the litigation.  This

 4    litigation's been going on for six years.  There have been

 5    multiple -- probably hundreds of motions and hundreds of

 6    rulings.  I don't remember that particular one.

 7        Q    Let's look at Exhibit 1347.  Now, these are the

 8    minutes of the AAPS Board of Directors conference call of

 9    June 13, 2012; is that right?

10        A    Yes.

11        Q    And says (Reading:)

12             "AAPS Disciplinary Committee:  Dr. Montes

13             presented the recommendation of the

14             disciplinary committee following the

15             committee's June 9, 2012, meeting to the

16             Board of Directors whereby a motion was

17             made to approve the disciplinary

18             committee's recommendation to expel Leslie

19             Radentz, M.D. and Patricia Stewart D.O.,

20             FAAIM.  The motion was seconded and motion

21             passed.  Being no further business, the

22             meeting was adjourned at 9 o'clock P.M."

23             Now, your name is on there, right?

24        A    Yes.

25        Q    Now, you know that you all sent a letter out saying

1    that the meeting actually didn't occur on the 13th; it occurred

2    on a different day, right?

3         A    I, uhm --

4              MR. SCHNEIDER:  Your Honor, this question is

5    inconsistent with the Court's ruling in the motion in limine.

6              THE COURT:  Sorry.  Which one?  Relative to what?

7              MR. SCHNEIDER:  Relative --

8              MR. CONWELL:  Let me just speed this along, ask a

9    different question.

10             THE COURT:  Okay.

11        Q    (BY MR. CONWELL:)  People that supposedly were at

12   this meeting don't remember it.  Did it happen on the 13th?

13        A    I -- I don't recall the exact date.  This is almost

14   four years ago and hundreds of calls have occurred after that.

15   So I -- a conference call occurred, okay?  Whether it occurred

16   on that particular date, I'm not sure.

17        Q    You are not willing to testify under oath that it

18   did, are you?

19        A    I know that it occurred.  I -- if you're saying

20   there was a question about the date, I'd have to go back and

21   research it.

22        Q    Now, you let -- we saw where she objected to the

23   people judging her.  She objected to Feaver, didn't she?  And

24   yet here he is at this meeting voting; is that right?

25        A    According to this record, yes.

 1      Q    And -- by the way, this says draft.  Why is it --

 2  you know, you've had many Board meetings after that.  There's

 3  no minutes of any meeting of the Board ratifying these minutes,

 4  is there?

 5      A    Again, I'd have to do research.  You're asking me

 6  questions -- documents I have no control over, I don't have in

 7  my possession.

 8      Q    Okay.  There should be a final somewhere if it was

 9  ratified; is that right?

10      A    Should be.

11      Q    I'm sure if you have them, you'll show them to us,

12  won't you?

13      A    Yes.

14      Q    Okay.  Now, did you vote?

15      A    Uhm, I don't recall voting.

16      Q    You think you did not vote?

17      A    I don't recall whether I voted or not.

18      Q    That's because no record is made of who actually

19  voted; is that right?

20      A    Uhm, I think there's -- there's no record of, well,

21  certainly how they voted.  I think it's assumed that everyone

22  but the president votes.

23      Q    You were the president?

24      A    Uhm, 12 -- yes.

25      Q    Okay.  She objected to Feaver, but you let him vote?

```
 1        A      Uhm, I don't recall, uhm, not letting him vote.

 2        Q      Now, we've -- there was some dispute between your

 3   testimony and Carbone's at the beginning of your examination

 4   regarding what you knew and when.  But ultimately you agreed

 5   that it was in 2010 that you learned from Carbone that he was

 6   getting this porno from the Board of Directors and these racist

 7   e-mails and forwarding them on; is that right?

 8        A      I believe so.

 9        Q      So you knew on June 13, 2012, that Feaver was

10   personally involved in this as one of the doctors sending porn

11   that was a part of this controversy that Dr. Stewart found

12   herself in, right?  You knew that?

13        A      Uhm, I believe his name did appear.

14        Q      Yeah.  You knew that 'cause her June 24 -- her

15   May 24 letter to you, to the Board, said, "I object to him,"

16   for that very reason, right?

17        A      Yes, her letter did contain his name.

18        Q      And you let him vote anyway?

19        A      Appears so.

20        Q      And you let Joseph Gallagher vote anyway even though

21   he was sending porn to CEO -- to Bill Carbone and he was

22   sending disgusting racist e-mails, right?

23        A      I know he was sending e-mails.  I don't recall the

24   nature of it.

25        Q      You forgot those?
```

 1      A      Yes, believe it or not.

 2      Q      I don't.

 3      A      Well --

 4             MR. SCHNEIDER:  Objection.

 5             MR. CONWELL:  Well, he asked.

 6             THE COURT:  Overruled.

 7      Q      (BY MR. CONWELL:)  Stephen Montes, you let Stephen

 8   Montes vote?

 9      A      I believe so.

10      Q      And he voted, right?

11      A      I'm assuming.

12      Q      You know under Robert's Rules that if they got a

13   conflict of interest, they're not supposed to vote, don't you?

14   You know that?

15      A      I don't know that that's covered under Robert's

16   Rules.

17      Q      Conflicts of interest are not covered under Robert's

18   Rules or you don't know?

19      A      I don't know.

20      Q      Well, you say here in these minutes they were

21   convened and conducted in accordance with Robert's Rules of

22   Order.  You mean you chaired a meeting under Robert's Rules of

23   Order and you don't know whether or not Robert's says anything

24   about conflicts of interest?

25      A      I'm not an expert on Robert's Rules.

1    Q    Well, who at the meeting was?

2    A    Uhm, usually the staff members deal with those types

3    of issues.

4    Q    Bill Carbone, right?

5    A    Well, he -- that varies on each different meeting.

6    Q    Well, he was at this one, right?

7    A    Yes.

8    Q    He's a staff member.  So you heard his testimony.

9    He said he didn't think that the people with conflicts of

10   interest were supposed to be able to vote.  He told us that on

11   Friday.  You heard that, didn't you?

12   A    I don't recall that.

13   Q    You were relying on Bill Carbone to tell you whether

14   or not people with a conflict of interest could vote?

15   A    Well, there's another staff member there, too,

16   Nadine Simone.

17   Q    Okay.  Who's Nadine?

18   A    She's a staff member.

19   Q    Is she his secretary?

20   A    I don't think so.

21   Q    Who is she?

22   A    She works at the office.

23   Q    You don't know what she does?

24   A    No.

25   Q    So did either -- did you ask either one of them is

```
 1    it okay to have people with conflicts of interest vote on

 2    whether or not to terminate -- terminate the membership of

 3    Dr. Stewart?

 4         A    No, I did not ask.

 5         Q    Well, given the fact that she'd objected in her

 6    May 24 e-mail, why didn't you?

 7         A    Because I felt -- well, in retrospect, I think I

 8    felt that the issues concerning Dr. Stewart were -- how can I

 9    say this?  -- I think the voting members could separate those

10    issues and separate themselves from -- from their past behavior

11    and their past knowledge to render a decision that was fair.

12         Q    So, from May 24, 2012, to June 13, 2012, which is

13    more than two weeks from the time you knew she objected to

14    people with conflicts of interest judging her, you did nothing

15    to check Robert's Rules of Order on this issue; is that

16    correct?

17         A    No, I did not.

18         Q    And you still think it's fair?  You're going to say

19    it's fair no matter what, aren't you?

20         A    The issues with Dr. Stewart didn't have to do with

21    pornographic e-mails, okay?  The issues were very different.

22    Uhm, whether these people were sending these e-mails or

23    whatever, it -- that -- that whole situation was dealt with two

24    years prior.

25         Q    Well, what is it -- I'm dying to know.  I'd asked
```

1    Mr. Carbone about it -- what is it Dr. Stewart did that was so

2    bad that she had to be expelled from the organization?  What

3    did she do?  What did she, Dr. Patricia Stewart, do?

4         A     Through her attorney, Dr. Okerblom, set upon the

5    organization to, uhm, demean and disrupt the power structure, I

6    mean, through relentless attacks demeaning individuals,

7    creating half truths, half lies, putting spins on things that

8    were clearly incorrect and known to be incorrect to disrupt the

9    entire organization and to put us in a false light.

10        Q     This was an e-mail from Dr. Stewart?  Is there --

11        A     A series of communications --

12        Q     Isn't --

13        A     -- that were submitted to the entire organization

14   essentially.

15        Q     There is an e-mail that you have in mind from

16   Dr. Stewart that does all these horrible things you just

17   mentioned?

18        A     There's a series of e-mails.

19        Q     Okay.  When are the e-mails from Dr. Stewart?  I'd

20   like to see it.

21        A     It starts with the preliminary legal opinion.

22        Q     Wait a sec.  I said an e-mail from Dr. Stewart.

23        A     Okay.

24        Q     Preliminary legal opinion is neither an e-mail nor

25   is it from Dr. Stewart.

```
 1        A      If I remember correctly, I said a series of

 2   communications.

 3        Q      I asked you about e-mails, one at a time.

 4        A      Okay.  There's two other e-mails that occurred after

 5   the preliminary legal opinion.

 6        Q      From Dr. Stewart?

 7        A      From Dr. Okerblom --

 8        Q      No, no.  I'm asking you about Dr. Stewart.  I'm

 9   asking you a specific question.  Tell me the e-mails that

10   Dr. Stewart authored and sent that have all these horrible

11   things in them.

12        A      From Dr. Okerblom --

13        Q      No --

14        A      -- representing Dr. Stewart.

15        Q      -- I'm talking about Dr. Stewart.

16               MR. CONWELL:  Your Honor, I'd like an answer to my

17   question, Dr. Stewart.

18               THE COURT:  Wait.  It is Dr. Stewart who was ousted

19   from your organization.  It is Dr. Stewart who is suing for

20   that ouster.  The question is directed solely to her, not to

21   anyone else that you think may have been acting on her behalf.

22   Solely with respect to actions taken by Dr. Stewart.  Do you

23   understand that?

24               THE WITNESS:  Yes, sir.

25               THE COURT:  Okay.  Answer that question directly.
```

```
 1              THE WITNESS:  Okay.  Uhm, right at this particular
 2   moment I'm drawing a blank.
 3        Q    (BY MR. CONWELL:)  That's because there is no
 4   evidence whatsoever that Dr. Stewart did any of what you
 5   described, right?
 6        A    Well, if you cause another or you concert with
 7   another --
 8        Q    I'm talking about Dr. Stewart.  You with me?
 9        A    So am I.
10        Q    I'm going to get to Dr. Okerblom.  I'm talking about
11   Dr. Stewart.  There is no evidence of Dr. Stewart doing any of
12   these things, is there?
13        A    Again, if you cause another to create a situation --
14              THE COURT:  Hold on, hold on, hold on.  Earlier
15   today you were unqualified to offer legal opinions.  Don't
16   start now.  All right?
17              THE WITNESS:  Okay.
18              THE COURT:  The question is with respect to actions
19   by Dr. Stewart which caused you to believe that she should be
20   terminated from the organization, okay?  I want you to confine
21   your answers to Dr. Patricia Stewart, okay?
22              THE WITNESS:  Okay.
23        Q    (BY MR. CONWELL:)  You have no such evidence, do
24   you?
25        A    Uhm, I can't recall it right now.
```

```
 1        Q      That's why in her May 24 letter when she asked you

 2   to provide her such evidence, you didn't provide her anything,

 3   did you?  Nobody did?

 4        A      No.

 5        Q      Nobody did; is that correct?

 6        A      Not to my knowledge.

 7        Q      You didn't do it then, and here we are years later

 8   in this lawsuit and you still can't do it, can you?

 9        A      Uhm, no.

10        Q      Okay.  Now, in any event, you let these people with

11   conflicts of interest vote and that's all recorded right here;

12   is that right?

13        A      Uhm, these individuals had something to do with the

14   conference call, yes.

15        Q      I didn't ask if they had something to do with the

16   conference call.  You let these people vote --

17        A      Yes.

18        Q      -- right?

19               And you -- do these minutes state everything you

20   remember about that meeting?

21        A      Yes.

22               MR. CONWELL:  Okay.  Look at Exhibit 1530.

23               (Exhibit 1530 previously marked for identification.)

24        Q      (BY MR. CONWELL:)  You have it?

25        A      Yes.
```

1      Q      What is Exhibit 1530?

2      A      It's a letter notifying Dr. Stewart of appeal

3   process.

4      Q      Okay.  Can you -- did you author that?

5      A      Uhm, I don't know that I authored that.

6      Q      Is that your signature?

7      A      That's a -- what do you call that? -- e-sign

8   signature.

9      Q      That's your e-sign signature?

10     A      It's -- it's a signature that's put on the document

11  by the office.

12     Q      Okay.  So this was sent to Dr. Stewart on what date?

13     A      Well, the date of the letter's 27 July.

14     Q      Okay.  Now, let's go back -- can you just tell us --

15  here you're saying that she appealed late but you're willing to

16  waive the technical deficiencies, and you've granted her

17  request for an appeal; is that right?

18     A      Correct.

19     Q      And you say, (Reading:)

20            "Pursuant to Section 3.5(b)" --

21            That should be 3.05(b); is that right?

22     A      Yes.

23     Q      (Reading).

24            -- "of the AAPS bylaws, AAPS is in the

25            process of forming the appeal Board which

```
 1                  will consider your appeal.  After the

 2                  appeal Board is formed, we will notify you

 3                  of the time and place of your appeal

 4                  hearing."

 5                  Okay.  That never happened, did it?

 6        A     No.

 7        Q     You never even formed the appeal Board, did you?

 8        A     I couldn't.

 9        Q     You never even notified -- or contacted the first

10   person that they were going to be on the appeal Board, did you?

11        A     I -- I had basically, you know, used up any

12   individuals in the prior processes, uhm, that I could use for

13   such an appeal Board.  And after all this litigation, no one

14   wanted to touch this.  No one wanted to be involved with this.

15        Q     You say you used them up.

16        A     Well, there was only so many people who would be

17   willing to put themselves into this type of situation.

18        Q     Now, the appeal Board would be made up of former

19   presidents of the AAPS, that is right?

20        A     That's correct.

21        Q     Dr. Castillo is a former president, right?

22        A     Yes.

23        Q     Now, by July of 2012, you'd received the order in

24   Florida to reinstate him, right?

25        A     Uhm, we had an order to reinstate him.
```

```
 1        Q      And you reinstated him, right?

 2        A      Yes.

 3        Q      He was a member in good standing in July of 2012,

 4   right?

 5        A      Yes.

 6        Q      So why not put him on the appeal Board?

 7        A      Uhm, given the circumstances, I didn't think it

 8   would be a --

 9        Q      You think he would have a conflict of interest,

10   right?

11        A      Uhm, I think there's direct involvement in a lot of

12   this and I don't think that that was a wise choice to do.

13        Q      Yet you let Gallagher and Feaver and Montes vote

14   against her to expel her.  They're directly involved, too.  Why

15   can't it work both ways?

16        A      Again, the two situations are very different.  The

17   issues were much different.

18        Q      Okay.  You said you would inform her of the time and

19   place of her appeal and you never did that; is that right?

20        A      That's correct.

21               MR. CONWELL:  Well, take a look at Exhibit 1599.1.

22               (Exhibit 1599.1 previously marked for identification.)

23        Q      (BY MR. CONWELL:)  Is that an e-mail that was sent

24   out to the members of AAPS by the Board of Directors?

25        A      I believe so.
```

1      Q      And one of them was you?

2      A      Yes.

3      Q      And in this e-mail of May 24, 2013, you threatened

4   that if these members did not pay $895 as a special litigation

5   assessment fee, that they would no longer be in, quote, "good

6   standing," close quote; is that right?

7      A      What we stated was that in order to maintain your

8   Board certification, the fee had to be submitted.

9      Q      Right.  That's a pretty heavy hammer, isn't it?  If

10  you want to keep your Board certification, you got to pay this

11  $895 assessment, right?

12     A      Yes.

13     Q      And now you've heard Mr. Carbone testify there's

14  over -- there were over 3,000 members; is that right?

15     A      That's correct.

16     Q      And this morning he said it's even grown; you have

17  even more members, right?

18     A      I don't have the exact numbers.

19     Q      Things have been going great, got lots of members.

20  So each of those members had to pay $895 to you for your war

21  chest; is that right?

22     A      Well, we didn't get a hundred percent compliance.

23     Q      You generated over $2 million, didn't you?

24     A      I -- I don't know the exact number.

25     Q      And you sent one of these to Dr. Stewart, didn't

1    you?

2         A    Uhm, yes.

3         Q    And you told Dr. Stewart she had to pay $895 for

4    this legal fund or you were going to remove her Board

5    certification as well; is that right?

6         A    Well, everybody got the same letter who was Board

7    certified through us.

8         Q    Okay.  So you're agreeing with me?

9         A    Yes.

10             MR. CONWELL:  Okay.  Now, take a look at

11   Exhibit 1332.

12             (Exhibit 1332 previously marked for identification.)

13        Q    (BY MR. CONWELL:)  What is this?

14        A    It looks like it's a -- it looks like it's a summary

15   of activity from the Executive Committee to the rest of the

16   Board of Directors.

17        Q    Okay.  And this is dated May 16th of 2012?

18        A    Yes.

19        Q    So this is eight days after you sent the

20   disciplinary letter to Dr. Stewart, right?

21        A    Uhm, calling for a hearing -- yeah, calling for a

22   hearing, yeah.  Yes.

23        Q    And about three weeks before the June 9 disciplinary

24   hearing; is that right?

25        A    Uhm, yes.

```
 1        Q    Who authored this document, Dr. Cerrato?

 2        A    I don't recall.

 3        Q    It wasn't created on May 16, 2012, was it?

 4        A    Again, I don't know when this correspondence was

 5   formed.

 6        Q    The statements in here are not true, are they?

 7        A    Well, let me read it.

 8        Q    And I want to direct your attention particularly to

 9   paragraph 3, starts with, "As a result."

10        A    Yes.  Yeah, the date was -- had to be incorrect.

11        Q    That's right.  That's because somebody made up this

12   document for purposes of litigation; is that right?

13        A    I -- I don't even recall this document.

14        Q    It says that (Reading:)

15             "There was a meeting of the AAPS Executive

16             Committee convened whereby the

17             disciplinary committee presented its

18             findings to the Executive Committee and a

19             motion was approved and carried

20             unanimously to accept the disciplinary

21             committee's findings."

22             That meeting never took place, did it?

23        A    Repeat that again.

24        Q    This meeting, referred to here, of the Executive

25   Committee, and this vote, it never happened, did it?
```

1      A      Well, probably what happened here -- obviously, the

2    date is wrong -- is the disciplinary committee presented its

3    findings to the Executive Committee and then that was

4    transferred to the Board of Directors, and that's how -- that's

5    how it would -- it would have happened.

6      Q      Sir, you were in the courtroom when Betsy Schenck

7    testified by videotape, weren't you?

8      A      Uhm, yes.

9      Q      And you heard her testify that she was on the

10   Executive Committee and there was never a meeting of the

11   Executive Committee whereby they voted to discipline or to go

12   forward with any disciplinary proceedings as to Dr. Stewart?

13   You heard that, didn't you?

14     A      No, I did not hear that.

15     Q      But that's the truth?  There never was a meeting of

16   the Executive Committee, there never was a vote?  That's the

17   truth, isn't it?

18     A      Uhm, I -- I don't think that, uhm -- I think there

19   was a, uhm -- I'd have to review the notes of that whole period

20   to piece it back together again.  Uhm --

21     Q      There are no minutes of the Executive Committee

22   having such a meeting or making such a motion or of a vote,

23   correct?

24     A      Again, I'd have to check the records.  Uhm,

25   actually, when I think about it, the disciplinary committee

1   probably just presented their findings to the Board.

2       Q      That was Dr. Montes, what he did on June 13?

3       A      Yeah, because that's -- that's probably -- that's

4   what the procedure was, uhm -- I think -- I believe that's how

5   the disciplinary -- bylaw disciplinary procedure was supposed

6   to be that the committee was supposed to present to the Board

7   of Directors.

8       Q      Just one more thing.  You know that it's against the

9   law in Florida to record a phone conversation without the

10  permission of everyone on the phone call, don't you?

11          MR. SCHNEIDER:  Objection.  Calls for legal

12  conclusion.

13          MR. CONWELL:  He's a lawyer.

14          THE COURT:  Yes or no?  Do you know or not?

15          THE WITNESS:  I don't know that.

16          MR. CONWELL:  One moment.

17       No further questions, your Honor.

18          MS. HILAIRE:  Your Honor, we have asked the defense

19  and there's no objection if we can put on our expert prior --

20          THE COURT:  He's been sitting here for three days.

21          MS. HILAIRE:  Yes.

22          THE COURT:  No problem?

23          MR. SCHNEIDER:  No problem, your Honor.

24          THE COURT:  All right.  You may step down, sir.

25          MS. HILAIRE:  The plaintiff is calling Dr. Leonard

1    Young, your Honor.

2         **LEONARD M. YOUNG, JR., PLAINTIFF'S WITNESS, WAS SWORN**

3              THE COURTROOM DEPUTY:  Please be seated.

4         Please state your name for the record.

5              THE WITNESS:  My name is Leonard M. Young, Jr.

6                       DIRECT EXAMINATION

7    BY MS. HILAIRE:

8         Q     Good afternoon, Dr. Young.

9         A     Good afternoon.

10        Q     Have you been retained as an expert in the use and

11   understanding of the Robert's Rules of Order?

12        A     I have.

13        Q     And what are the Robert's Rules of Order?

14        A     Robert's Rules of Order is a book of parliamentary

15   procedure -- I have a copy of it here with me -- and what it

16   says about itself, if I might quote from the index, are the --

17   or excuse me -- the introduction pages -- page 29 -- says, "The

18   book is designed as a manual to be adopted by organizations or

19   assemblies as their parliamentary authority.  When the manual

20   has been thus adopted, the rules within it, together with any

21   special rules of procedures that may have been adopted, are

22   binding upon the body and constitute the body's rules of

23   order."

24        Q     Okay.  And in laymen's terms, why would

25   organizations or corporations want to incorporate Robert's

     1    Rules of Order into their bylaws or incorporating documents?

     2        A    Well, Robert's Rules of Order covers lots and lots

     3    of topics, including the topic of discipline, which typically

     4    are not written in detail in a governing document.  Therefore,

     5    an organization adopts Robert's in their bylaws as their

     6    parliamentary authority to fill in all the places where their

     7    bylaws are silent.

     8        Q    And does it also help with consistency in terms of

     9    how actions are being taken by a particular organizations?

    10        A    Yes.  If Robert's is followed, it provides a

    11    consistent pattern for whatever issue or process is being

    12    considered.

    13        Q    Okay.  Let's back up a little bit before we begin.

    14             Dr. Young, would you describe your credentials as an

    15    expert in the use and understanding of the use of Robert's

    16    Rules of Order?

    17        A    All right.  I'm a professional registered

    18    parliamentarian -- tell you what that means in a minute.  I'm a

    19    past president of the National Association of Parliamentarians.

    20    I am a past executive director of the National Association of

    21    Parliamentarians.  And for the last two years I served as the

    22    National Official Parliamentarian for the National Association

    23    of Parliamentarians, thus, the parliamentarian for the

    24    parliamentarians.

    25             In addition to that, I served as chairman of almost

1    every committee -- if you don't mind, I'll call it NAP rather

2    than keep saying the National Association of

3    Parliamentarians -- including the Professional Development

4    Committee in which I was the primary author of the materials

5    that are used to certify professional registered

6    parliamentarians and to recertify them.

7           And I was also the president of NAP when we adopted

8    our first code of ethics, and I was the primary author of that

9    code of ethics and served for a number of years on the NAP

10   ethics committee.

11      Q    Okay.  And can you just give us an example of some

12   of your clients?

13      A    Okay.  Some of my clients have been the National

14   Governors Association, the National Counsel of State Boards of

15   nursing, the National Congress of Parents and Teachers, the

16   Missouri School Boards Association, Missouri PTA, the Michigan

17   Elementary and Secondary Principals Association, and numerous

18   city councils and boards of education, religious bodies from

19   the international, national, and local levels, as well as other

20   professional societies that have retained my services as a

21   parliamentarian.

22      Q    Thank you.  And have you previously provided any

23   testimony in court on the use and understanding of the Robert's

24   Rules of Order?

25      A    Yes.  You mean recently or --

1          Q      Correct.

2          A      Yes.  In the last few years I have done two such

3     appearances in the state courts of Missouri.

4          Q      Okay.  And I know you mentioned that you were a

5     professional registered parliamentarian.  Can you explain what

6     that is and how you became one?

7          A      Certainly.  First one begins by joining the National

8     Association of Parliamentarians.  This requires the passage of

9     a basic parliamentary procedure examination.  Then if a person

10    wishes to continue on in certification, they, after time and

11    study, can sit for the national registration exam.  If the

12    registration exam is passed, which is a comprehensive exam over

13    the particulars of what Robert's Rules of Order provides -- if

14    you pass all five sections of that with an 80 percent score,

15    you become a registered parliamentarian.

16             Then, if you want to go on for the ultimate

17    certification, you must take and successfully complete the

18    professional qualifying course, and then every six years you

19    must continue to qualify by taking a requalification course and

20    taking certain continuing education requirements.  That course

21    is the one that I mentioned I was the original author of.

22         Q      Okay.  And just very briefly, what is the National

23    Association of Parliamentarians?

24         A      The National Association of Parliamentarians is the

25    oldest and largest parliamentary Association in the world.  It

1   has more than 4,000 members.  It was established in 1930.  And

2   of those 4,000 members, approximately 600 are registered

3   parliamentarians, and of those, approximately 300 are

4   professional registered parliamentarians.

5        Q    Okay.  And given this expertise, what were you asked

6   to do in this particular case as an expert?

7        A    I was asked to research the issues in Robert's Rules

8   of Order Newly Revised, which is the current edition of

9   Robert's.  It's the 11th edition, the one I have here with me

10  that I quoted from before.  And in addition, to review numerous

11  documents, including the minutes of the AAPS boards between

12  September of 2010 and June of 2012, and a number of memos,

13  e-mails, and letters concerning all of those meetings and

14  matters during that same period of time.

15            Then I was asked to write a number of opinions about

16  that matter, and then I was asked later additional questions

17  and have responded to those, and then for this testimony today.

18  Altogether I have spent about 30 days, working days,

19  researching and preparing for this presentation today.

20       Q    Okay.  And have you received any compensation for

21  those 30 days of work?

22       A    Oh, yes.

23       Q    Okay.  Can you tell the jury how much compensation

24  you received?

25       A    My standard rate is $2,000 a day.  For those 30 days

 1    of work, however, I did not charge that much.  I charged

 2    $13,000.

 3         Q    Thank you.

 4              And I'd like you now to look at Exhibit 1317.

 5         A    Okay.  I have it.

 6         Q    Thank you, Dr.  And if you could, just identify the

 7    document for me, please.

 8         A    This appears to be the -- I'm looking for the date

 9    on it --

10         Q    I believe it's on the second page.

11         A    On the second page, okay.  Yes, this is the 15th

12    revision of the AAPS bylaws adopted June 25th, 2011.

13         Q    Thank you.  And if you could, please turn to the

14    back of this document to page 35.

15         A    Uh-huh.

16         Q    And in particular, I'd like to direct your attention

17    to a particular subsection.  So let me know when you get to

18    that page.

19         A    I'm there.

20         Q    Okay.  If you could look at Section 15.09.

21         A    Yes, ma'am.

22         Q    Okay.  Okay.  And what does this section state,

23    Dr. Young?

24         A    That -- this is kind of a standard statement of

25    bylaws that Robert's has been adopted as the parliamentary

1    authority unless there were other rules that supersede it.

2         Q    Okay.  And so that means that the Robert's Rules of

3    Order should be applied to this particular organization with

4    respect to how it does its governance, correct?

5         A    That's correct.

6         Q    Now, we've been hearing lots of days of testimony

7    about minutes.  I'd like you to tell me, Dr. Young, does

8    Robert's Rules of Order discuss minutes?

9         A    Yes.

10        Q    Okay.  And what does the Robert's Rules of Order

11   discuss about the purpose and contents of minutes?

12        A    Primary information on minutes begins on page 468,

13   and I'll quote a couple parts of that.  (Reading:)

14             "The official record of the proceedings of

15             a deliberative assembly is usually called

16             the minutes.  The minutes should contain

17             mainly a record of what was done at the

18             meeting.  And in the body of the

19             minutes" -- over on 469 says that, "it

20             should contain all main motions that were

21             presented or taken up and the disposition

22             of those motions."

23        Q    And can you explain what Robert's Rules of Order

24   mean by the disposition of motions?

25        A    Sure.  Let's suppose that a motion was made to do a

 1    certain thing and seconded and discussed, and finally let's say

 2    it was adopted or defeated -- doesn't make any difference.  How

 3    it was finally disposed of, either by it being adopted, or by

 4    being defeated should appear in the minutes.

 5         Q    Okay.  And do minutes become the official record of

 6    a body?

 7         A    They do once that body has adopted those minutes --

 8    approved them would be the common way to say it.

 9              MS. HILAIRE:  Okay.  I'd like Dr. Young to look at

10    Exhibit 1405.

11         Q    (BY MS. HILAIRE:)  And Dr. Young, you see the top

12    portion of this document on page 1 indicates that these are the

13    minutes from the AAPS Board of Directors meeting that was

14    conducted on September 30th, 2010?

15         A    I see it on the screen here.  I don't have the

16    document -- yes.  Thank you.

17              THE COURTROOM DEPUTY:  It's hiding.

18              MS. HILAIRE:  I'll give you a minute to find it on

19    your document.

20              THE WITNESS:  Yes.  These are the minutes of the

21    AAPS Board meeting conference call of September 30, 2010.

22         Q    (BY MS. HILAIRE:)  Okay.  And in these minutes, do

23    you see any reference to a vote to suspend the Drs. Castillo,

24    Geller, and Klein?

25         A    I am familiar with these minutes; I've seen them

 1    before.  And no, it does not contain -- they do not contain any

 2    reference to the suspension of the doctors you just mentioned.

 3         Q    And according to Robert's Rules of Order, if such a

 4    vote took place, should it be reflected in these minutes?

 5         A    Yes.  As I quoted a moment ago, any motion should be

 6    recorded in the minutes and how it was disposed of, that being

 7    adopted or defeated.

 8         Q    Okay.  Let's take a look at another set of minutes.

 9    Let me direct your attention to Exhibit 1413.

10         A    All right.

11         Q    Okay.  Dr. Young -- and if you could look at the

12    bottom of the page -- there is a title or at least a section,

13    Section 2, that states Approval of Minutes.  Do you see that

14    section?

15         A    Yes, on the first page.

16         Q    Yes.  Thank you.  Can you read that for me, please?

17         A    Sure.  This is the bottom of the page.  It says

18    (Reading:)

19              "Approval of minutes:  Dr. Majers" -- I

20              believe -- "Dr. Majers motioned to approve

21              the September 30, 2010, September 3, 2010,

22              and June 10, 2010, minutes.  The motion

23              was seconded by Dr. Amin.  The motion was

24              approved and carried unanimously."

25         Q    Okay.  And can you just explain what this means

1    according to Robert's Rules of Order?

2        A    Well, right there's a very standard way that you

3    would say that in a set of minutes, and usually they are

4    approved unanimously because if no one has a correction, then

5    you approve them.

6            So what that means is they reviewed those three sets

7    of minutes, did not have any corrections to them, approved

8    them, thereby making them the official record of those

9    meetings.

10       Q    Thank you.

11           And just to be clear, when it says that something is

12   carried unanimously, what does that mean pursuant to Robert's

13   Rules of Order as well?

14       A    It means that no one in the room objected to its

15   passage, that everyone there, when they asked, "Will this be

16   approved?" they all agreed --

17       Q    Okay.

18       A    -- or at least they didn't object.

19       Q    All right.  Didn't mean to cut you off.

20           Now, switching gears a little bit, I know that you

21   were present in the courtroom and there's been some testimony

22   about conflict of interest.

23           Does Robert's Rules of Order discuss anything

24   pertaining to conflicts of interest or having individuals who

25   may have bias refrain from voting?

1    A     Sorry.  Just putting a lozenge in my mouth.

2          Yes, in fact it does.  On page 407 of Robert's,

3    under Abstaining from Voting on a Question of Direct Personal

4    Interest, it says the following (Reading:)

5              "No member should vote on a question in

6              which he has a direct personal or

7              pecuniary interest not common to other

8              members of the organization."

9    Q     Okay.  And can you explain that in laymen's terms?

10   A     In laymen's terms what that means is if you have --

11   for example, let's say that you were a school board and I'm a

12   school board member and my wife is going to be given a contract

13   as a teacher.  Obviously, I have a conflict of interest and I

14   should refrain from speaking about it or voting on the matter.

15   That would be an example of a pecuniary one.

16         One of personal interest might be one that I'm

17   deeply involved in some issue and that issue then comes before

18   the body that I sit as a member of.  I should not vote or

19   participate in that decision.

20   Q     Okay.  And since we were -- we were previously

21   discussing making sure that certain notations were made on

22   minutes, if there are individuals that are present at meetings,

23   should the fact -- and they have a pecuniary or a personal

24   conflict of interest, should that be indicated on minutes?

25   A     If an individual is present who has one of these

conflicts of interest, they should excuse themselves from the meeting, first of all.  If they don't do that, the minutes should indicate whether they were present or absent, and certainly whether or not they voted on the matter.

Q    Okay.  And I think that you were present in the courtroom when my co-counsel was questioning Dr. Cerrato.  Do you recall that?

A    Yes.

Q    And there was a portion where we were looking at a minute and it showed that Dr. Cerrato exited a telephone call because of a conflict of interest.  Do you recall that?

A    I don't recall that, that he exited the room.

Q    I'm sorry.  He got off the telephone call because there was a conflict of interest and it was noted in the minutes?

A    Well, it may have been.  I don't remember that.

Q    Okay.

A    I'm sorry.

Q    If, in fact, there is a conflict of interest, even by way of telephone, that should be noted on the minutes, correct?

A    It should be, yes.

Q    Now, what does Robert's Rules of Order discuss with respect to committees, such as disciplinary committees?

A    Well, let's begin first with committees in general,

1  okay?  Starting on page 489, it's a whole section on

2  committees.  Basically it says that a committee is appointed to

3  investigate, consider, and make recommendations.  In

4  particular -- I'll read from page 490 -- (Reading).

5           "Generally the term committee implies that

6           within the area of its assigned

7           responsibilities, the committee has less

8           authority to act independently for the

9           society or their constituting power than a

10          board is usually understood to have.

11          Thus, if the committee is to do more than

12          report its findings or recommendations, it

13          may be empowered to act for the society

14          only on specific instructions."

15          Now, you asked also particularly about disciplinary

16  committees --

17      Q    That's correct.

18      A    If I go a little further down into Robert's, there's

19  a section that discusses fair disciplinary process.  And within

20  that, it discusses the appointment of a committee to

21  investigate whether there's enough information to charge an

22  individual before whatever body would try them.

23          And then it goes on to talk about the trial

24  procedure.  And in that it says in particular about a trial

25  committee -- there's two different committees here, the

```
 1    investigating and the trial -- it says on page 661 (Reading:)

 2              "A special committee appointed to hear a

 3              trial must be composed of persons

 4              different from those on the preliminary

 5              investigating committee."

 6         So the committee to make its report -- and I'll just

 7    quote you what that says, too -- in writing -- let's get that

 8    page.  Here it is.  Sorry, that's the wrong page.  Trial

 9    committee's findings -- yeah, here it is (Reading:)

10              "If the trial committee has been held

11              before -- if the trial has been held

12              before a committee instead of the assembly

13              of the society, the report is prepared in

14              writing and includes, to the extent

15              possible without discussing confidential

16              information that should be kept within the

17              committee, a summary of the basis for the

18              committee's findings, after which" --

19              unless -- sorry -- skipped a line here.

20              So it says, "It should provide a summary

21              of the committee's findings, unless the

22              report exonerates the accused.  He is then

23              permitted personally or through counsel,

24              or both, if he prefers, to make a

25              statement of the case."
```

 1          And then it says -- after that it goes on the

 2   process of finally deciding guilt or innocence.

 3          Q    Okay.  And with respect to committee reports, does

 4   Robert's Rules of Order discuss what information is supposed to

 5   be contained in investigative reports?

 6          A    Yes.  It says (Reading:)

 7               "If the committee" -- this is on page 658

 8               and 659 -- "If the committee from its

 9               investigation finds substance to the

10               allegations and cannot resolve the matter

11               satisfactorily in any other way, it makes

12               a report in writing, which is signed by

13               every member who agrees, outlining the

14               course of the investigation and

15               recommending in the report the adoption of

16               resolutions, preferring charges, and then

17               arranging for a trial, and if desired,

18               suspending the rights of the accused."

19          And it gives examples, a page or so, of what those

20   might look like.

21          Q    Okay.  And in terms of giving recommendations for

22   certain action after you've completed an investigation, on

23   page 505 does Robert's also give some guidance with respect to

24   this issue as well?

25          A    I believe it does.  Now, on 505, this is referring

```
 1   to any kind of report, including a report of a disciplinary

 2   committee.  It says (Reading:)

 3              "It should include a full account of the

 4              details involved in the case.  The body of

 5              the report is best organized according to

 6              the following topics:  A description of

 7              the way in which the reporting body

 8              undertook its charge; the facts uncovered;

 9              the information obtained; the findings or

10              conclusions derived from the facts or

11              information; and then finally resolutions

12              or recommendations on what should be done

13              about it."

14        Q    Okay.  And let's look at Exhibit 1098, please,

15   Dr. Young.

16        A    Okay.

17              (Exhibit 1098 previously marked for identification.)

18              THE WITNESS:  Thank you.  I have it.

19        Q    (BY MS. HILAIRE:)  Okay.  Thank you.  And do you --

20   have you identified what this document is?  I want to make sure

21   you've had enough time to acquaint yourself with what it is.

22        A    Well, I have seen this document before.  It's an

23   e-mail from S. Montes, who I assume is Dr. Montes, to a number

24   of people.  The only name that's not just an e-mail address is

25   William Carbone.  But says, "Subject is the disciplinary
```

```
 1  committee hearing of Saturday, June the 9th, 2012," and it says

 2  "Drs. Stewart and Radentz."

 3           So this is the communication -- it appears to be a

 4  communication between the chairman of the disciplinary

 5  committee and the Board regarding what the recommendations of

 6  the committee were after it had done its investigation, I

 7  suppose.

 8      Q    Okay.  And as an expert on Robert's Rules of Order,

 9  does this e-mail have the necessary detail?

10      A    Does this e-mail have the necessary detail a

11  disciplinary committee should convey to the Board?  Is that

12  what you're asking?

13      Q    Correct.

14      A    No, it certainly doesn't.  The only thing that it

15  says is that it recommends that the defendants did not disprove

16  that their conduct was not in the best interest and they

17  recommend that they be expelled, but no information is given

18  about information found out or details at all.

19      Q    Okay.  And have you ever seen any evidence that AAPS

20  complied with the requirements in Robert's Rules of Order

21  regarding the investigation and disciplinary committee as it

22  relates to this case?

23      A    I've never seen any evidence of that.

24      Q    Okay.  I'd like to now direct your attention to

25  Exhibit 1098.
```

1       A     That's the one --

2       Q     I'm sorry.  I apologize.  I misspoke.  Exhibit 1347.

3             And Dr. Young, let me ask you a preliminary question

4       before we get to this document.

5       A     All right.

6       Q     What does Robert's Rules of Order state about how a

7       deliberative body should determine if a two-thirds vote has

8       been received when taking a vote?

9       A     Okay.  On page 401, it says -- this is on line 29 --

10      (Reading:)

11            "In determining whether a question has

12            obtained two-thirds of the votes cast, the

13            chair should take a rising vote, or in a

14            very small assembly, if he prefers and no

15            one objects, a show of hands.  And he

16            should obtain a count on the vote whenever

17            he is in doubt concerning the results."

18      Q     Okay.  Now, if you could, let's turn to

19      Exhibit 1347.

20      A     All right.

21      Q     Okay.  And can you determine by these minutes,

22      Dr. Young, whether or not this meeting took place in person or

23      by telephone?

24      A     At the top of the minutes it says, "Conference

25      Call."

1        Q      Okay.  And is it -- is it possible to take a rising

2   vote or a show of hands on a telephone conference call?

3        A      No, it's not possible at all.

4        Q      Okay.  So in that case, how should a two-thirds vote

5   be taken during a telephone conference call?

6        A      The only way to take a vote in that case is to take

7   a roll call vote, that is, the secretary will call the name of

8   each member, they would respond either yes or no, are they in

9   favor or opposed, and then that information would be put in the

10  minutes.

11       Q      Okay.  And then how does Robert's indicate that the

12  results should be recorded in the minutes?

13       A      On page 422 regarding a roll call vote, it says

14  (Reading:)

15              "In a roll call, a record of how each

16              member voted, as well as the result of the

17              vote, should be entered in full in the

18              minutes."

19       Q      Okay.  And if you look at the minutes that are here

20  before you, does it contain any record that a count or a roll

21  call actually took place?

22       A      No.

23       Q      And where should that have been reflected in the

24  minutes?

25       A      At the end of the paragraph that talks about AAPS

 1   disciplinary committee, if such a count took place, it should

 2   have said, "The motion was then put to vote and the following

 3   individuals voted in favor" with their names, "and the

 4   following voted against" or if there were any on either side,

 5   and indicate then it passed by whatever number.

 6        Q    Okay.  Thank you.

 7             And if we look at this exhibit, based on what you

 8   can read here, how many members of the AAPS Board would have

 9   had to vote to approve the expulsion of Dr. Stewart for this

10   action to have been approved?

11        A    The minutes reflect that 14 persons were present and

12   that 4 were absent.  That means there were 18 members of the

13   Board.  Two-thirds of the members of the Board would be 12.  12

14   must have voted, then, in favor for the motion to carry.

15        Q    Okay.  And so according to Robert's, if more than

16   two individuals were shown to have a conflict of interest, were

17   enough Board members present to properly expel Dr. Stewart?

18        A    Repeat your question one more time.

19        Q    Sure.  Now that we've broken down the math, if --

20   based on the 14 members that were present, if more than two of

21   them were determined to have a conflict of interest and should

22   have refrained from giving a vote, would there have been enough

23   members to be there to give a proper vote to cast Dr. Stewart

24   from her membership from AAPS?

25        A    So if there were 14 present and more than 2 had a

```
 1  conflict of interest that should have disqualified them from

 2  voting, it would have been impossible to receive 12 votes.  2

 3  minus from 12, again -- or 14 is 12.  If more than two had had

 4  to refrain from voting, there could not possibly have been 12

 5  votes.

 6            MS. HILAIRE:  Thank you, Dr. Young.  I have no more

 7  questions.

 8            THE COURT:  All right.  Great.  This is a great time

 9  for --

10            THE WITNESS:  Are they going to cross me?

11            THE COURT:  Yes, they are.  They're going to grill

12  you.

13       Take our last afternoon break, ladies and gentlemen,

14  15 minutes.  Remember the admonition.

15            THE COURTROOM DEPUTY:  All rise.

16            (A recess was taken.)

17            (Open court in the presence of the jury.)

18            THE COURT:  All right.  The record will reflect that

19  we're now joined by the jury, parties, all counsel.

20       Dr. Cerrato has resumed his place on the witness stand.  I

21  should also note that the defense has elected not to

22  cross-examine Dr. Young.

23       Dr. Cerrato, you are still under oath, sir.

24       Mr. Schneider, you may cross-examine him.

25            MR. SCHNEIDER:  Thank you, your Honor.
```

1        **ROBERT CERRATO, M.D., PREVIOUSLY SWORN, RESUMED THE STAND**

2                          CROSS-EXAMINATION

3     BY MR. SCHNEIDER:

4        Q     Dr. Cerrato, you recall giving testimony this

5     afternoon -- or this morning about your having observed

6     inappropriate e-mails?

7        A     Yes.

8        Q     When did you first come to learn that Mr. Carbone

9     was sending inappropriate e-mails on his work computer to

10    anyone?

11       A     Uhm, I believe it was July-August 2010.

12       Q     And how did it come to be that you learned of any of

13    these e-mails?

14       A     Timothy Bell had put together a packet of black and

15    white photographs and had sent them to the Board of Directors,

16    I believe.

17       Q     And what did the black and white photographs or

18    copies that you saw show?

19       A     Mainly, uhm, women, you know, scantily-clad-type

20    pictures, in various poses.

21       Q     One of the exhibits that the plaintiff has shown in

22    this litigation involves a woman walking down what appears to

23    be a hallway in a high school.  You recall that?  And a comment

24    about what adult male teachers are thinking?

25       A     Yes.

1       Q       Is that the sort of thing you're talking about?

2       A       No.  These were black and white Xerox copies of

3   e-mails where the material was -- how can I say? -- I guess

4   lack of a better term -- attached to it.

5       Q       Could you see what were attached?  Were they

6   attachments or part of the body of the e-mails themselves?

7       A       They were in the body of the e-mails.

8       Q       So you could see the pictures of the ladies?

9       A       Yes.

10       Q       I take it if they're paper e-mails that you're

11   getting, that did not include actual video?

12       A       That's correct.  There was no video.

13       Q       In looking at them for the first time in the summer

14   of 2010, did you form a conclusion as to whether it was

15   appropriate for Mr. Carbone to be sending them to anybody from

16   his office computer?

17       A       I think it was inappropriate, yes.

18       Q       You've -- you were in the courtroom when we saw the

19   *Cheers* episode and we saw the rather crude joke from the woman

20   who was not wearing any clothing?

21       A       Yes.

22       Q       At some point before this week, you had seen that

23   material before?

24       A       Yes.

25       Q       How did it come to be that you first saw those

1   materials?

2       A       They were shown to me in my deposition in 2013.

3       Q       So were you unaware of the existence of those

4   materials before you gave your deposition that day?

5       A       Yes.

6       Q       In seeing those materials, did that seem to you to

7   be materially worse than what you had seen before?

8       A       Uhm, well, certainly it was -- it was more graphic.

9       Q       Okay.  I don't think anybody would dispute that the

10  *Cheers* video was pornographic in nature.

11      A       I agree with that.

12      Q       So when you gave testimony at your deposition in

13  2013, you were being exposed to those materials for the first

14  time?

15      A       That's correct.

16      Q       Let's talk for a moment about the nature of the work

17  that you got compensated for by AAPS.  Some of that was legal

18  services.  And when I say legal services, I mean you're

19  actually being a lawyer and performing the work as a lawyer?

20      A       Uhm, yes, limited to where I was admitted.

21      Q       And what work did you perform as a lawyer for AAPS?

22      A       Quite a few years ago now there was a proposed

23  regulation by a New Jersey administrative department that would

24  have, I guess, restricted AAPS members in some manner, and it's

25  been a long time and the regulation was quite technical, but at

1    the end of the day would have been derogatory to AAPS.  So

2    essentially I wrote a letter on behalf of AAPS to oppose the

3    passage of that regulation.

4         Q     Dr. Cerrato, you saw the complaint that was filed

5    when AAPS sued Mr. Bell in -- that was one of the exhibits

6    today?

7         A     Yes.

8         Q     Did you represent any party as a lawyer in the

9    actual litigation of that case?

10        A     No.

11        Q     You indicated or you were shown exhibits indicating

12   that you received some compensation for your efforts in

13   connection with the prosecution of that case against Mr. Bell?

14        A     Yes.

15        Q     What work did you actually perform in order to earn

16   that compensation relative to the *Bell* litigation?

17        A     Uhm, most of the work done was interfacing with the

18   attorneys dealing with that litigation.  Uhm, I mean, it's -- I

19   did so much that I can't remember all the details, but that was

20   the bulk of it.

21        Q     And you yourself, of course, are a lawyer?

22        A     That's correct.

23        Q     And you understand in litigation lawyers do what

24   Ms. Hilaire and Mr. Conwell and I'm doing right now?

25        A     That's correct.

1      Q      And you've also seen references to depositions.  Is

2  it your understanding that lawyers represent parties in

3  depositions?

4      A      Yes.

5      Q      And I believe one of the exhibits in this case is

6  something called a request for admission.  And do you

7  understand that to be part of the discovery process?

8      A      Yes.

9      Q      Did you do any work of that nature, that is, send

10 interrogatories, or take depositions, or appear in court, or

11 file motions in the *Bell* litigation?

12     A      No, I did not.

13     Q      So you said you spent the bulk of the time for which

14 you were compensated in connection with that case in

15 interfacing with the lawyers?

16     A      That's correct.

17     Q      But would you say you were acting as the client?

18     A      Yes.

19     Q      Corporations are imaginary things, aren't they?  You

20 can't see or touch corporations?

21     A      That's correct.

22     Q      So corporations have to act through human beings?

23     A      That's correct.

24     Q      And was that the role that you were filling in

25 connection with the *Bell* case?

1      A      Yes.

2             THE COURT:  And I kind of prefer the testimony to

3   come through the witness.

4             MR. SCHNEIDER:  I think that's a reasonable comment

5   and I will guide myself accordingly, your Honor.  Thank you.

6      Q      (BY MR. SCHNEIDER:)  There are a number of different

7   positions that people can hold as officers of AAPS; is that

8   correct?

9      A      Yes.

10     Q      What positions are those?

11     A      Officers on the Board of Directors.  That what

12  you're speaking of?

13     Q      Yes.

14     A      Starting from the bottom, membership officer,

15  secretary/treasurer, vice president, president-elect, and

16  president.

17     Q      And what exactly is president-elect?

18     A      The president-elect steps into the shoes of the

19  president and he's -- if he's unable to serve, and he's also

20  more or less automatically elevated at the end of the

21  president's term to assume the president's role.

22     Q      And are each of the officers members of the Board of

23  Directors?

24     A      Yes.

25     Q      And how are the other directors -- how do they

1    become directors?

2        A    They are voted upon by the House of Delegates at the

3    House of Delegates meeting at the annual meeting -- meetings.

4        Q    So the Board of Directors will -- would consist of

5    people from the academies?

6        A    Yes.

7        Q    And the officers?

8        A    Yes.

9        Q    And are there any other members of the Board of

10   Directors that don't come from either of those two sources?

11       A    Yes.  The Board of Directors, there's some

12   additional people.  The chair of the American Board of

13   Physician Specialties, the chair of the CME committee, uhm, I

14   believe the immediate past president and the president of the

15   academies -- I don't have that term right -- but there's a

16   president of all the academies and he sits on the Board, too.

17       Q    He or she?

18       A    He or she.

19       Q    And how many -- which people are appointed by the

20   president?

21       A    Uhm, the American Board of Physician Specialties

22   chair, I believe the chair of the CME committee.  Oh, and I

23   missed one, chair of strategic planning, I believe.  I think

24   that's an appointed position also.

25       Q    With regard to the academies, what are they?

 1       A      The academies consist of physicians that have a like

 2  specialty.  In other words, I don't -- I can't remember how

 3  many different specialties we have under our wings now, but

 4  there's a group of anesthesiologists that's an academy.

 5  There's a group of surgeons that's an academy.  There's a group

 6  of dermatologists that's an academy.

 7       Q      Which academy are you in?

 8       A      Anesthesiology.

 9       Q      And when are the members of the -- are the officers

10  elected?

11       A      They're elected at the annual meetings.

12       Q      Is there a particular time of year that the annual

13  meetings take place?

14       A      Typically in June.

15       Q      And who conducts the -- who votes for the officers?

16       A      Each academy sends a representative to the House of

17  Delegates and those representatives vote for the slate.

18             MR. SCHNEIDER:  Okay.  Could you take a look,

19  please, at Exhibit 0012.

20       Ms. English, I think this is the only exhibit we're going

21  to get to today.

22             THE COURTROOM DEPUTY:  Okay.  Would that be 12?

23             MR. CONWELL:  Yes, it's 12.

24             THE COURTROOM DEPUTY:  It is 12?

25             (Exhibit 12 previously marked for identification.)

1       Q       (BY MR. SCHNEIDER:)   What is this item?

2       A       This was a -- this was a response that was

3  formulated to address concerns at the Tysons Corner meeting in

4  June of 2011 from the Board of Directors.

5       Q       And what is the genesis of this document?   Why did

6  it come into existence?

7       A       Sometime just before, I believe, the House of

8  Delegates meeting or a day or two before this letter came out,

9  uhm, someone had anonymously put under the AAPS room members'

10  doors a document that made quite a few negative allegations

11  toward various -- uhm, well, against the Association, and this

12  was a response to that.

13      Q       Does this letter list the complaints that were set

14  forth in the anonymous communication?

15      A       Yes, it does.

16      Q       And is there a response as to each of them from

17  whoever prepared this document?

18      A       Yes.

19      Q       Who is it that decided that this document would be

20  prepared?

21      A       Uhm, I think it started with Dr. Russo in the sense

22  that, you know, we felt that we had to -- we couldn't let these

23  allegations just float out there.  We had to inform, uhm -- we

24  had to give the individuals the other side of the story.

25              So Dr. Russo talked individually to the Board of

 1    Directors and we decided a response was necessary.  So we

 2    formulated a team to work on the responses and got it out.

 3         Q    What was Dr. Russo's position at the time?

 4         A    He was the president.

 5         Q    So you mention a team.  Who were the members of that

 6    team?

 7         A    Uhm, it was himself --

 8         Q    Himself being Dr. --

 9         A    I'm sorry.  Dr. Russo, Tony Durante, Monique Tapie,

10    myself, and the person who was the head of the governmental

11    affairs section whose name is escaping me right now.

12         Q    You mentioned someone named Monique Tapie?

13         A    Yes.

14         Q    Who is that?

15         A    She is an outside contractor that handles

16    communications and recognition efforts for us.

17         Q    Do you know how your team, for lack of a better

18    term, went about developing the information to include in this

19    correspondence?

20         A    I think -- well, I know how we handled it was that

21    Monique did the basic structure, and then we e-mailed drafts

22    back and forth between the members of the team until we came up

23    with a final version.

24         Q    Do you have a recollection of when it was that you

25    saw the first draft of this document?

1      A      It was probably 11 o'clock at night on I guess it

2  was the 23rd.

3      Q      This was at the annual conference in Tysons Corner?

4      A      That's correct.

5      Q      At the annual conference, what -- are there any

6  group meetings that are held among the entire organization?

7      A      Oh, yes.  There's the House of Delegates meeting and

8  Board of Directors meeting.

9      Q      And would the Board of Directors meeting -- are all

10  the members permitted to attend?

11      A      In the open sessions, yes.

12      Q      And what about in the House of Delegates meeting?

13      A      Members can.  It's an open meeting.

14      Q      In addition to the preparation of this document, did

15  Dr. Russo orally address either of those bodies that you spoke

16  of, the House of Delegates or the Board of Directors?

17      A      I believe -- I believe he did.

18      Q      Dr. Cerrato, was there a doctor named David McCann

19  on the Board of Directors at the time frame of June 2012?

20      A      Yes.

21      Q      Was he an officer?

22      A      Yes.

23      Q      Do you know what his position was on the Board?

24      A      President-elect, I believe.

25      Q      Has it been your experience that the president-elect

```
 1    becomes the president the following year?

 2         A     Yes.

 3         Q     So if he were president-elect at the beginning of

 4    this meeting, would it be your expectation that he would be the

 5    president at the end of that meeting?

 6         A     Yes.

 7         Q     Was he elected president?

 8         A     Yes.

 9         Q     Was he able to serve his term?

10         A     Uhm, partially.

11         Q     Was he able to serve the entirety of his term?

12         A     No.

13         Q     And why is that?

14         A     Uhm, he died of pancreatic cancer.

15         Q     How did you come to learn that he suffered from

16    pancreatic cancer?

17         A     Uhm, about two weeks after that meeting we found

18    out.

19         Q     When you say we, whom are you speaking of?

20         A     The general membership.

21         Q     As of the time that that meeting, the annual meeting

22    was completed, did you know what Dr. McCann's condition was?

23         A     No.

24         Q     Had -- to your knowledge, had Dr. McCann left the

25    conference before the conference had ended?
```

1        A       Yes.

2        Q       And was there a message delivered to the members as

3    a whole as to why that took place?

4        A       From what I recall, I think it was that he had a

5    family issue that he had to take care of.  He lived in Canada,

6    so it was a significant distance, so --

7        Q       And did you have any notion of what the family issue

8    referred to was as of the time of this meeting?

9        A       No.

10               MR. SCHNEIDER:  Your Honor, this is a good stopping

11   place for me.

12               THE COURT:  Okay.  Me, too.

13        Okay.  We're going to adjourn for the day.  Ladies and

14   gentlemen, I'll see you 8 o'clock in the morning.  Remember the

15   admonition, please.

16               THE COURTROOM DEPUTY:  All rise.

17               (Open court out of the presence of the jury.)

18               MR. CONWELL:  Your Honor, there's one thing I wanted

19   to raise with the Court before we adjourn.

20               THE COURT:  Sure.  Sit.

21               MR. CONWELL:  And that was after --

22               THE COURTROOM DEPUTY:  Be seated.

23               THE COURT:  Nobody does anything I say, right?

24               MR. CONWELL:  When we took the break, I was

25   concerned because Dr. Cerrato went out into the meeting room

1    and met with New York counsel, and we went in and told them

2    that it's not proper to meet with a witness after he's been

3    passed and he's been testifying on the stand.  Mr. Schneider

4    acknowledged that.

5        I just wanted the Court to instruct the witness

6    accordingly so that during the break this evening they're not

7    going to be discussing his testimony with him, because that's

8    not allowed.

9        THE COURT:  Show of hands of everyone who believes

10   that the witnesses won't be thoroughly prepared by tomorrow,

11   just like Mr. Carbone was thoroughly prepared today.  He's like

12   a new man.

13       MR. CONWELL:  I'd like to think an admonishment from

14   the Court would be helpful.

15       THE COURT:  Well, there's certainly nothing wrong

16   with them speaking with their attorneys.  And to the extent

17   that we've got a couple of witnesses here who are named

18   defendants, there's nothing really inappropriate about them

19   speaking with their own counsel.  Matter of fact, it may be

20   foolish if they didn't.

21       But I hear what you're saying.  Okay.  Off the record.

22       (Discussion off the record.)

23       MR. CONWELL:  Your Honor, I also wanted to offer

24   into evidence Exhibits 1477, 5, 1530, 1599.1, 1332, 1098, and

25   1413.  Is that --

```
 1              THE COURTROOM DEPUTY:  No.  Yeah.  That was another
 2   day, but --
 3              MR. CONWELL:  Okay.
 4              THE COURT:  And just FYI, if before once the trial
 5   itself is over, the presentation of evidence is over and after
 6   the arguments and the instruction and they retire to
 7   deliberate, you will -- one lawyer from each side will sit down
 8   with Ms. English and compare notes with respect to the
 9   exhibits, because we have to be pretty exact because we're
10   going to send the exhibits back there.  So we want to make sure
11   no extraneous material goes back, but we also want to assure
12   that everything that has been admitted into evidence is there
13   for them to review, if they wish.
14       Now, that doesn't apply to the video.  If they want to see
15   that Cheers episode again, which I missed, they'll have to come
16   back out and do it in open court.
17       Okay.  Anything else we need to talk about?
18              MS. ROSSETTI:  Yes, your Honor.
19              THE COURT:  What?  Wait, wait, wait, wait.  One
20   second.
21              Oh, yeah, whatever you say.  I'm not keeping track.
22              MR. CONWELL:  Were those admitted?
23              THE COURTROOM DEPUTY:  Yes.
24              (Exhibits received into evidence.)
25              THE COURT:  Okay.  Ms. Rossetti?
```

```
 1              MS. ROSSETTI:  In the same vein, your Honor, I would
 2    like to request that Exhibits 1071, 1093, 1067, 1867, and 12 be
 3    admitted to the extent that they already haven't been admitted.
 4              MR. CONWELL:  Those were the ones that were
 5    discussed with witnesses?
 6              MS. ROSSETTI:  Absolutely.
 7              MR. CONWELL:  No objection.
 8              MR. SCHNEIDER:  We have no objection to any of the
 9    exhibits they presented today.
10              (Exhibits received into evidence.)
11              THE COURT:  Okay.  You know, I didn't think that
12    there was any objection to begin with --
13              THE COURTROOM DEPUTY:  There was.
14              THE COURT:  There was?
15              THE COURTROOM DEPUTY:  Yes.
16              THE COURT:  'Cause we could really dispense with all
17    this.  Seriously, that was the offer I made, right?
18              THE COURTROOM DEPUTY:  But there was some objection.
19              THE COURT:  Okay.
20              THE COURTROOM DEPUTY:  Trust me.
21              THE COURT:  All right.  Tomorrow.
22              MS. ROSSETTI:  Thank you, your Honor.
23              THE COURTROOM DEPUTY:  This Court is in recess.
24              (Proceedings adjourned at 2:08 P.M., until
25              Wednesday, February 3, 2016, at 8:00 A.M.)
```

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5    I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6    FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7    OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8    TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14        DATED THIS 2ND DAY OF FEBRUARY, 2016.

15

16

17             /S/ DEBRA READ

18        DEBRA READ, CSR NO. 3949 CRR RMR RDR
          FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT