1                   UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3                   HONORABLE OTIS D. WRIGHT, II

4              UNITED STATES DISTRICT JUDGE PRESIDING

5   PATRICIA STEWART, D.O.,            )
                                       )
6                   Plaintiff,         )
                                       )  ED CV 13-1670-ODW(DTBx)
7            vs.                       )
                                       )
8   AMERICAN ASSOCIATION OF PHYSICIAN  )          VOLUME 6
    SPECIALISTS, INC., WILLIAM         )
9   CARBONE; ROBERT CERRATO; SVETLANA  )       PAGES 1 – 206
    RUBAKOVIC and DOES 1-100,          )
10                                     )
                    Defendants.        )
11  _____  )

12

13

14                  REPORTER'S TRANSCRIPT OF
                        TRIAL – DAY 6
15               WEDNESDAY, FEBRUARY 3, 2016
                         8:02 A.M.
16               LOS ANGELES, CALIFORNIA

17

18

19

20

21

22  _____

23             DEBI READ, CSR 3949 CRR RMR RDR
            FEDERAL OFFICIAL COURT REPORTER
               312 NORTH SPRING STREET 432A
24            LOS ANGELES, CALIFORNIA 90012
                 READIT3949@GMAIL.COM
25

```
 1                    A P P E A R A N C E S

 2

    ON BEHALF OF THE PLAINTIFF:
 3
        CONWELL BUSINESS LAW, P.A.
 4      BY:  GEORGE DONOVAN CONWELL, JR.
             Attorney at Law
 5      12610 Race Track Road, Suite 200
        Tampa, Florida 33626
 6      813-282-8000
        dconwell@conwellbusinesslaw.com
 7
        HILAIRE MCGRIFF, PC
 8      BY:  MIKA HILAIRE
             Attorney at Law
 9      601 S. Figueroa Street, Suite 4050
        Los Angeles, California 90017
10      213-330-4260
        mika@hmpclaw.com
11
        WILLIAM A. OKERBLOM LAW OFFICES
12      BY:  WILLIAM ALLEN OKERBLOM
             Attorney at Law
13      1145 E. Clark Avenue, Suite H
        Santa Maria, California 93454
14      805-478-6570
        drlaw07@aol.com
15

16   ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
     PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:
17
        ANDERSON, MCPHARLIN & CONNERS LLP
18      BY:  ERIC A. SCHNEIDER
        BY:  LEILA M. ROSSETTI
19           Attorney at Law
        707 Wilshire Boulevard, Suite 4000
20      Los Angeles, California 90017-3623
        213-688-0080
21      eas@amclaw.com
        lmr@amclaw.com
22

23

24

25
```

1            A P P E A R A N C E S (continued)

2

ON BEHALF OF DEFENDANT AMERICAN Association OF PHYSICIAN
3 SPECIALISTS, INC.:

4      GUSRAE KAPLAN NUSBAUM PLLC
     BY: MARLEN KRUZHKOV
5          Attorney at Law
     120 Wall Street
6      New York, New York 10005
     212-269-1400
7      mkruzhkov@gusraekaplan.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                CHRONOLOGICAL INDEX OF WITNESSES

3

4    PLAINTIFF'S WITNESSES                          PAGE   VOL.

5

6    **RICHARD CERRATO, M.D. RESUMED**
      Cross-Examination Resumed By Mr. Schneider      8     6
      Redirect Examination By Mr. Conwell          141     6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

E X H I B I T S

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|---|---|---|---|---|
| 1 | Minutes of April 28, 2012, Board of Directors Meeting | 79 | 94 | 6 |
| 0011 | Agenda of House of Delegates Meeting scheduled in Tysons Corner on 6/25/11 | 42 | | 6 |
| 218 | E-mail letter dated November 30, 2010, from Lewis Marshall to William Carbone, Esther Berg, and Stephen Montes regarding ACCME explanation | 161 | 190 | 6 |
| 228 | Stewart letter to AAPS Board June 6, 2012, request to appear telephonically and Montes response | 114 | | 6 |
| 306 | 03/28/12 e-mail from AAPS's Legal Task Force to its members re:  Filing counterclaims in the pending Florida lawsuit | 175 | 190 | 6 |
| 1039 | AAPS Memorandum dated 06/22/12 to Dr. Patricia Stewart from AAPS Board of Directors | 120 | 122 | 6 |
| 1202 | 12/18/11 Letter from Dr. William Okerblom to the AAPS House of Delegates, its Board of Directors, and others | 63 | 73 | 6 |
| 1316 | Minutes from 06/25/11 House of Delegates meeting | 48 | | 6 |
| 1327 | Letter from Dr. Robert Cerrato to Dr. Richard Cressey re: Disciplinary hearing | 99 | 103 | 6 |
| 1328 | Letter from Dr. Robert Cerrato to Dr. Leslie Radentz re: Disciplinary hearing | 99 | 103 | 6 |
| 1329 | Letter from Dr. Robert Cerrato to Dr. Gary Klein re: Disciplinary hearing | 99 | 103 | 6 |

E X H I B I T S (continued)

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|-----|-----|-----|-----|-----|
| 1330 | Letter from Dr. Robert Cerrato to Dr. Thomas Castillo re: Disciplinary hearing | 99 | 103 | 6 |
| 1331 | Letter from Dr. Robert Cerrato to Dr. Robert Geller re: Disciplinary hearing | 99 | 103 | 6 |
| 1340 | 06/25/12 Minutes from the AAPS House of Delegates Meeting | 49 | 50 | 6 |
| 1356 | Letter from Robert Johnson to Dr. Castillo dated October 7, 2010 | 27 | | 6 |
| 1357 | Letter from Robert Johnson to Dr. Geller dated October 7, 2010 | 27 | | 6 |
| 1358 | Letter from Robert Johnson to Dr. Klein dated October 7, 2010 | 27 | | 6 |
| 1436 | Minutes of AAPS Board of Directors Conference Call dated April 27, 2011 | 47 | | 6 |
| 1466 | E-mail letter dated December 21, 2011, from Tony Russo to Robert Cerrato regarding reply to Dr. Ilowite | 74 | 92 | 6 |
| 1467 | Certified copy of transcript of 6-7-12 hearing before Judge Foster | 103 | 107 | 6 |
| 1479 | E-mail letter from Douglas Marciniak to Anthony Russo dated March 1, 2012 | 187 | | 6 |
| 1494 | E-mail Letter dated April 30, 2012, from Robert Cerrato to Stephen Montes, Ken Wallace, and Bart Maggio regarding new Disciplinary Committee information | 93 | 95 | 6 |

E X H I B I T S (continued)

| NO. | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. | VOL. |
|-----|-------------|------------------------|------------------|------|
| 1497 | Letter from Dr. Stewart dated May 6, 2012, to the AAPS Board of Directors showing insufficient postage on letter informing her of deadline | 84 | 92 | 6 |
| 1629 | Castillo Suspension Letter | 185 | | 6 |
| 1720 | AAPS Board of Directors conference call meeting minutes, January 28, 2010 | 125 | 128 | 6 |
| 1731 | Excerpts from the report of Luke McOmie dated May 17, 2010 | 12 | | 6 |
| 1740 | June 8, 2012, fax to Esther Berg with e-mail confirmation | 112 | 114 | 6 |
| 1759 | | 154 | | 6 |
| 1765 | Transcript of July 27, 2015, hearing before Judge Baumann | 107 | | 6 |
| 1875 | Letter from Andrea Koegel to the members of the Board of Directors re: Tom Castillo and due process in his suspension | 128 | 131 | 6 |
| 1885 | Letter from Dr. Cressey to Cynthia S. Earl, Esq. Re: Cerrato | 189 | | 6 |
| 1892 | Letter between counsel for Drs. Castillo, Geller, and Klein and AAPS lawyer, Robert Johnson | 157 | 190 | 6 |

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, FEBRUARY 3, 2016

 2                            8:02 A.M.

 3                            -oOo-

 4              (Call to Order of the Court.)

 5              THE COURTROOM DEPUTY:  Calling Item 1,

 6    ED CV 13-1670, Patricia Stewart, D.O. versus American

 7    Association of Physician Specialists, Inc., et al.

 8         Counsel, may I have your appearances, please.

 9              MS. HILAIRE:  Good morning.

10         Mika Hilaire and Don Conwell for the plaintiff, Patricia

11    Stewart.

12              THE COURT:  Good morning to you all.

13              MR. SCHNEIDER:  Eric Schneider and Leila Rossetti

14    for the defendants.

15              THE COURT:  All right.  Good morning, counsel.

16              MS. ROSSETTI:  Good morning.

17              THE COURT:  All right.  And Dr. Cerrato has resumed

18    his place on the witness stand.

19         You may continue your cross-examination, Mr. Schneider.

20              MR. SCHNEIDER:  Thank you, your Honor.

21    **RICHARD CERRATO, M.D., PREVIOUSLY SWORN, RESUMED THE STAND**

22                       CROSS-EXAMINATION RESUMED

23    BY MR. SCHNEIDER:

24         Q    Dr. Cerrato, would you please take a look at

25    Exhibit 12.  And if you can open up to the second page, please.
```

```
 1        A      Okay.

 2        Q      Dr., could you read Item 1, please?

 3        A      (Reading:)

 4               "That Cassandra Newby, our former director

 5               of certification, who many thought

 6               excellent, was fired and that she was

 7               replaced in two weeks by Arrie Potter, who

 8               is now gone, leaving us no director at

 9               present."

10               (Brief pause in the proceedings.)

11        Q      (BY MR. SCHNEIDER:)  Dr., could you remind us what

12    Exhibit 12 is?

13        A      Exhibit 12 is the 14-point response by the Board of

14    Directors to the anonymous letter that was -- excuse me --

15    placed under the room doors in -- at the Ritz Carlton Tysons

16    Corner AAPS meeting on -- in June of 2011.

17        Q      And is what you just read to us, the first point

18    that was set forth in that anonymous letter?

19        A      Yes.

20        Q      And what was AAPS's response?

21        A      AAPS responded that, "The details surrounding

22    Newby's separation from AAPS employment are barred from being

23    discussed by either Newby or AAPS, according to the terms of

24    the confidential settlement agreement."

25        Q      And the next paragraph?
```

```
1        A      (Reading:)

2               "Arrie Potter has, indeed, resigned, but is

3    considering supporting our efforts part-time as a consultant.

4    Andrea Balboa is our assistant director of certification, as

5    was Arrie, and she continues in her duties.  JT Stewart, a

6    well-known and respected psychometrician, whom has worked with

7    AAPS for years, has made himself available to AAPS as needed."

8        Q      Do you agree with that response?

9        A      Yes.

10       Q      And what is Item 2?

11       A      Item 2 states that, "Cassandra sued AAPS with some

12   very startling accusations concerning the CEO, including sexual

13   harassment."

14       Q      And a lawsuit in fact had been filed?

15       A      Yes.

16       Q      Is -- before the lawsuit was filed, did AAPS have

17   any knowledge that Ms. Newby was presenting a claim?

18       A      Yes.  Her attorney submitted a demand letter.

19       Q      And had you seen the demand letter?

20       A      I did.

21       Q      And how did that reach you?

22       A      I believe it was distributed via the Board of

23   Directors.

24       Q      And what was the time frame of the demand letter?

25       A      In terms of?
```

1       Q    When -- when you received it.

2          Well, let me ask a different question.  Did you

3  receive it before the decision was made to suspend Drs. Klein,

4  Geller, and Castillo?

5       A    I believe so, yes.

6       Q    And how did -- before the settlement was reached,

7  how did AAPS go about addressing the demand letter?

8       A    Uhm, I think that we talked to Bill about the

9  allegations.

10       Q    Is Bill Mr. Carbone?

11       A    I'm sorry.  We talked to Mr. Carbone about the

12  allegations, and then, you know, we consulted our attorneys to

13  mount a defense.

14       Q    And who was the interface with those attorneys?

15       A    I was one.

16       Q    And who provided the facts to the lawyer?

17       A    I believe that was Mr. Carbone.

18       Q    And you indicated the case was resolved?

19       A    Yes.

20       Q    What does a confidential settlement mean?

21       A    A confidential settlement states that items

22  surrounding the settlement cannot be discussed by either party

23  in public.

24       Q    Was it your belief that had the matter gone to

25  trial, Ms. Newby would have won?

1      A      No.

2      Q      Then why did you folks settle the case?

3      A      At the time we were facing litigation from Bell --

4  uhm, we had the Bell e-mail issue and the Castillo, Geller,

5  Klein issue that we were dealing with.

6          Now we had this additional potential litigation we

7  were facing, and probably the most pressuring factor was the

8  insurance company.  The insurance company was pressuring us to

9  settle the case.

10     Q      AAPS suspended the memberships of Drs. Klein,

11 Geller, and Castillo?

12     A      Yes.

13     Q      When did you first have a concern that those doctors

14 may have been acting improperly?

15     A      Shortly after Mr. Bell was fired, a routine scan of

16 his corporate e-mail accounts revealed these communications,

17 e-mail communications between Castillo, Geller, and Klein,

18 naming them, naming a Wolters Kluwer, which is a big medical

19 publisher, a reporter, and those e-mails were quite disturbing.

20         MR. SCHNEIDER:  Okay.  Would you please take a look

21 at Exhibit 1731, please.

22         (Exhibit 1731 previously marked for identification.)

23     Q      (BY MR. SCHNEIDER:)  And can you identify what that

24 document is?

25     A      This document's called the Activities and Findings

1    Report from the r00t Cellar Security Team.

2            MR. CONWELL:  Your Honor, I object to this document

3    on the basis of hearsay.  Entire document is hearsay.

4            THE COURT:  It is.  Sustained.

5        Q    (BY MR. SCHNEIDER:)  Did AAPS engage someone to look

6    into Mr. Bell's e-mail?

7        A    Yes.

8        Q    And do you know what they did?

9        A    I don't know the exact mechanics, but they examined

10   the hard drive, from what I understand.

11       Q    Would you take a look at Exhibit 1525, please.  And

12   first could you tell us what that exhibit is?

13       A    This is slides from a PowerPoint presentation I gave

14   at Marina Del Rey at a AAPS annual meeting in Marina Del Rey, I

15   believe.

16       Q    And when was that meeting?

17       A    Think it was 2012.

18       Q    When you -- is that something that you presented to

19   someone?

20       A    Yes.

21       Q    And was that at the Board of Directors meeting?

22       A    I believe that was the House of Delegates meeting.

23       Q    Okay.  What was your role in the preparation of the

24   presentation?

25       A    The AAPS staff prepared it for me.

1    Q    So did you write any of it?

2    A    No.

3    Q    Would you take a look at page 13, please.

4    A    Page 13.

5    Q    This is an e-mail?

6    A    Yes.

7    Q    And what is significant to you about this e-mail?

8    A    Well, what this e-mail's about is it's a -- we later

9    learned that the sender was Mr. Bell's close friend who had

10   previously set up a fake interview with Mr. Carbone.  And what

11   this was talking about was that -- this was essentially a

12   formation of a conspiracy naming Ms. Newby and Mr. Bell and

13   this individual.

14   Q    Could you go to the next page, 14, please.

15        Do you see a reference to Dr. Klein?

16   A    Yes.

17   Q    And what is the significance of that to you?

18   A    Well, it appeared that these three individuals were

19   communicating with two potential -- or not potential -- two

20   active litigants against AAPS.

21   Q    And do you see a reference to Dr. Geller?

22   A    Yes.

23   Q    And same thing with him?

24   A    Yes.

25   Q    Why was it a concern to you that Mr. Bell was in

```
 1    contact with Dr. Klein, Dr. Geller, and Dr. Castillo?

 2         A     Well, all these four individuals --

 3               MR. CONWELL:  Your Honor, I have a objection.

 4               THE COURT:  Yes.

 5               MR. CONWELL:  There's no foundation that Bell was in

 6    contact with these individuals.  It's a hearsay document.

 7         I don't object to him saying what he thought of things,

 8    but to say that there is evidence that Bell was in contact with

 9    these individuals, there is no such evidence.

10               THE COURT:  Okay.  Could we back up?  I'm not

11    certain I understand who this e-mail is from and to.

12         Q     (BY MR. SCHNEIDER:)  Who --

13               THE COURT:  Is that important?

14         Q     (BY MR. SCHNEIDER:)  Who do you understand this

15    e-mail was from?

16               THE COURT:  I don't care who he understands it's

17    from.  What does it say?  There's got to be a header on it,

18    right?

19         Q     (BY MR. SCHNEIDER:)  Could you go back to the prior

20    page, please?

21               Who is the person to whom this e-mail is sent?

22         A     Mr. Bell.

23         Q     Okay.

24               THE COURT:  And from?

25               THE WITNESS:  This was later identified as -- I've
```

1   forgotten his name -- we did identify this -- this e-mail

2   address -- sorry.

3           THE COURT:  All right.  The objection's sustained.

4       Q    (BY MR. SCHNEIDER:)  What conclusion did you draw

5   from reading this e-mail?

6       A    Well, my conclusion was these three members were

7   somehow involved together with Bell, Castillo, Klein, Geller,

8   and probably Newby, to create damage to the organization by,

9   you know, filing lawsuits and attempting to disrupt the power

10  structure.

11      Q    Did you have understanding in your own mind about

12  how Mr. Bell felt about AAPS?

13      A    Mr. Bell had made previous statements toward the

14  end, in particular last couple months when his work ethic

15  deteriorated quite rapidly, and I think he felt that he knew

16  that --

17          MR. CONWELL:  Your Honor, I object to the

18  speculation.  And also there's no foundation that this is

19  anything that this witness heard.

20          THE COURT:  Sustained.

21      Q    (BY MR. SCHNEIDER:)  Had AAPS received a package of

22  materials from Mr. Bell?

23      A    Yes.

24      Q    I believe you testified about that yesterday?

25      A    Yes.

1       Q      What else was included in the package?

2       A      Uhm, there was many, many allegations of wrongdoing

3  by certain members.

4       Q      Well, was there anything about the Federal Election

5  Commission in the package?

6       A      I believe so, yes.

7       Q      And were you aware of any issues concerning AAPS and

8  the Federal Election Commission before getting that package?

9       A      I was not.

10      Q      Was there anything in the package concerning your

11 practicing law in Florida without a license?

12      A      Yes.

13      Q      And what was the time frame that this package was

14 received?

15      A      It was shortly after Bell was discharged.

16      Q      Why were you concerned about what Drs. Klein,

17 Geller, and Castillo may have been doing?

18      A      Well, Mr. Bell said any position of great

19 information flow.  The No. 1 major issue with the Association

20 is recognition.  His Rolodex contained high-level contacts at

21 many medical boards and high-level contacts all across the

22 country.  These three individuals were high-level individuals

23 who had extensive knowledge of our policies, procedures, goals,

24 strategies, tactics, etc.

25             At the time, you know, we were making a very active

push in Texas, New York, to the state medical boards for

recognition, and these issues are very politically charged.

And Mr. Bell, for example, had started a misinformation

campaign via seven fake e-mails, and he began to use the names

of public members and submit misinformation to AAPS members.

         And it was -- it was a very -- it could have been a

very destructive situation that would have rolled back -- it

had the potential to destroy all our efforts and possibly

damage the certification -- certifications of the individuals

in the organization that currently had the certification, and

that was the worry.

     Q     Is certification something that's important?

     A     Yes, it is.

     Q     And why is it important?

     A     About 20 years ago the push in credentialing was to

require board certification for hospital credentialing, and

within about five years ago, essentially, without

certification, you just would not be employed as a physician,

period.

     Q     Does AAPS itself provide certification?

     A     Well, the American Board of Physician Specialties is

the board certification arm of that company.

     Q     What is the connection between American Board of

Physician Specialties -- ABPS?

     A     Correct.

1       Q       -- and AAPS?

2       A       AAPS is the administrative umbrella organization

3   that the American Board of Physician Specialties works

4   underneath.

5       Q       Would you take a look at Exhibit 1405, please.

6               Dr., what is that document?

7       A       This is the minutes of the AAPS Board of Directors

8   conference call on September 30th, 2010.

9       Q       And what did the minutes indicate was accomplished

10  at that meeting?

11      A       At this meeting, uhm, Mr. -- a discussion was had

12  about filing a lawsuit against Mr. Bell.

13      Q       Is there any other subject matter in those minutes?

14      A       Uhm, yes, that Mr. Nolan had explained there was a

15  ongoing investigation into co-conspirators who supported Bell's

16  actions.

17      Q       Who is Mr. Nolan?

18      A       Mr. Nolan is an attorney at the Gray Robinson firm

19  in Tampa, Florida.

20      Q       And was he attending this meeting as counsel for

21  AAPS?

22      A       Yes.

23      Q       Was anything else discussed at this meeting?  Was

24  there any other subject matter besides filing the *Bell* suit?

25      A       I believe that the suspension of the members was

1    discussed at this meeting.

2         Q     Is there any mention of that in these minutes?

3         A     No.

4         Q     Do you know why that is?

5         A     We really -- this whole situation, we wanted to keep

6    this situation as quiet, as confidential as possible, okay?  We

7    wanted to protect these members but at the same time protect

8    the Association.  And I believe we kept those -- that

9    information off the minutes because we were also concerned

10   about leaks from the Board of Directors to the general --

11   general members.

12        Q     Is that consistent with Dr. Young's testimony

13   yesterday that all motions should be set forth in the minutes?

14             MR. CONWELL:  Your Honor, I object.  That's not

15   proper for one witness to testify about consistency of another

16   witness.

17             THE COURT:  Sustained.

18        Q     (BY MR. SCHNEIDER:)  Well, do you believe that AAPS

19   complied with Robert's Rules in connection with not putting the

20   suspension activity in these minutes?

21             MR. CONWELL:  Objection, your Honor.  The witness

22   said several times he's not familiar with Robert's Rules.

23             THE COURT:  Overruled.

24         You may answer, if you can.

25             THE WITNESS:  No.

1      Q     (BY MR. SCHNEIDER:)  In your experience, did AAPS

2   make it a practice of making sure that it always complied with

3   Robert's Rules?

4      A     We made a good faith attempt to comply with Robert's

5   Rules, but I think you have to put this into context.  The vast

6   majority of meetings are held telephonically, between 9 and

7   10 P.M., after most of the physicians who worked a 12-hour day,

8   and the agenda was, you know, commonly a 20-item list.

9           THE COURT:  Hang on.  Hang on.  The question was

10   whether or not you complied with Robert's Rules.  That was all.

11          THE WITNESS:  Okay.  I didn't understand the

12   question like that.  Sorry.

13          THE COURT:  All right.  And I've got a question.

14          THE WITNESS:  Yes.

15          THE COURT:  Since you said you made a good faith

16   effort to comply with Robert's Rules of order, is that with

17   respect to your understanding of Robert's Rules of Order after

18   Dr. Young testified yesterday?  Because you had indicated

19   earlier that you didn't know anything about Robert's Rules of

20   Order.

21          THE WITNESS:  I -- I would not say that I don't know

22   anything about Robert's Rules of Order.  Okay?  And my

23   testimony yesterday stated that there was always a staff member

24   there who was essentially in charge of keeping us on track with

25   Robert's Rules.

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  Okay.  So I have, you know, basic

 3   knowledge, but I don't have all the nuances, so --

 4        Q    (BY MR. SCHNEIDER:)  Why was it that AAPS did not

 5   make a greater effort to be fully compliant with Robert's

 6   Rules?

 7        A    I -- I can't answer that question.  I don't know

 8   why.

 9        Q    During this meeting on September 30th, did the Board

10   seek advice from Mr. Nolan?

11        A    Yes.

12        Q    And did it seek advice with regard to filing the

13   Bell suit?

14        A    Yes.

15        Q    And did it seek advice regarding the suspension?

16        A    Yes.

17        Q    And did the Board consider that advice before making

18   the decision to suspend the doctors?

19        A    Yes.

20        Q    At the time of this meeting when the Board decided

21   to suspend the three doctors, were you familiar with the bylaws

22   with regard to discipline?

23        A    Yes.

24        Q    And did the bylaws provide for suspension without

25   notice?
```

1      A      No, they did not.

2      Q      If the bylaws didn't provide for that, why did the

3  Board suspend the doctors?

4      A      The problem is is that we were stuck with this

5  procedure -- okay? -- a procedure that had only been used two

6  times previously in 50-some years, and we felt that the

7  procedure was too harsh at this point under the circumstances.

8  We needed to find some type of a lesser solution, again,

9  balancing the needs of the individuals that were accused with

10  the 3,000 members that we were attempting to protect, and there

11  was a statute that talked about the availability of emergency

12  powers that could be implemented in the situation.  So that's

13  what we based our suspension apparatus, for lack of a better

14  term, on.

15      Q      Why did the Board suspend these doctors rather than

16  terminating their memberships?

17      A      The Board wanted to get information as to what was

18  going on.  We did not want to discipline anybody, but at the

19  same time, like I said before, there was very strong evidence

20  that there was a conspiracy between all these individuals at

21  the time when, like I had mentioned before, we were at a

22  critical political stage.

23          For example, you know, a big part of the conspiracy

24  was to get rid of Mr. Carbone.  Well, so sites like ours that

25  are voluntary organizations can't function without an

1    administrative organization, particularly one that doesn't have

2    a CEO.  That would have, obviously, crippled us severely.

3              There were -- if Mr. Carbone had to be removed,

4    there was mechanisms for that, okay, but this was not the

5    correct mechanism.  To collude with present litigants against

6    the Association, that was very problematic.

7         Q    Well, at the time of this meeting, September of

8    2010, what would the consequences of termination have been to

9    Drs. Klein, Geller, and Castillo?

10        A    Termination.  If they had been terminated, they

11   could no longer hold themselves out as a member.  They couldn't

12   come to our meetings.  They just couldn't be a part of the

13   academy structure.  Their board certification would have

14   remained intact, and that's about it.

15        Q    Would their board certification have remained intact

16   in that time frame, 2010?

17        A    Yes, it would have.

18        Q    Would you take a look at Exhibit 1317, please.  And

19   what is that?

20        A    This is the AAPS bylaws, 15th revision.

21        Q    And would you take a look at Section 306, please.

22        A    306, Effective Termination of Membership.

23        Q    And what does it indicate is the effect of a member

24   being terminated?

25        A    (Reading:)

1            "A member of the Association who is no

2            longer a member in good standing or whose

3            membership" -- sorry -- "has been

4            terminated, shall forthwith return to the

5            Association his or her membership

6            certificate as well as any certificate of

7            degree of fellow issued to him or her by

8            the Association or by any organization

9            affiliated by the Association; shall no

10           longer qualify to hold any office or

11           position whatsoever in the Association or

12           in any organization affiliated with the

13           Association; shall be stricken from the

14           roles of membership in the Association and

15           in any and all organizations affiliated

16           with the Association; and shall no longer

17           hold him or herself out as a member of the

18           Association or as the holder of any

19           honors, including certification."

20      Q    Does that refresh your recollection as to what would

21  happen to these doctors' certification had they been

22  terminated?

23      A    Yes.  I -- I understand what 306 said, but there

24  was -- there was a couple things -- a couple factors with 306.

25  That back in 2006, actually --

1          MR. CONWELL:  Your Honor, this is not responsive to

2     the question.  Objection.

3          THE COURT:  Sustained.

4       Counsel, I need to see all the lawyers, sort of unrelated

5     matter.

6          (Sidebar conference:)

7          THE COURT:  Okay.  I think it's Juror No. 7, a

8     Mr. Kirby Kotler, is a contractor.  He has been sitting there

9     looking at this beam running across the courtroom right above

10    the lectern.  He says it's loose and he was concerned that it

11    may come down and, obviously, if it did come down, it's going

12    to kill whoever's standing at the lectern.  I don't want to be

13    an alarmist, but I would want to know if I were in your

14    position.

15         The offer I'm making to all of you, if you wish to conduct

16    your examination at counsel table, feel free.  We're going to

17    get GSA down here as soon as possible to look at this.  I don't

18    know if it's an issue or not, but I'm just telling you what I

19    know.  Okay?

20         MS. ROSSETTI:  Okay.  Thank you.

21         THE COURT:  Go right ahead, continue your

22    examination, and talk as long as you want.

23         MR. SCHNEIDER:  What is your point?

24         MR. CONWELL:  I'll be looking at it myself.

25         THE COURT:  Do whatever you wish to do.

```
1              MS. HILAIRE:  When are you moving to the new federal

2    building?

3              THE COURT:  July.  You want to continue the trial?

4              (Open court in the presence of the jury.)

5         Q    (BY MR. SCHNEIDER:)  Dr., did you believe that had

6    AAPS terminated those members at that time, that they would

7    have lost their certification?

8         A    Absolutely not.

9         Q    Okay.  Why didn't you give them a hearing?

10        A    We were precluded to do so by a court in Florida.

11        Q    No, I'm talking about in 2010.  Why didn't you give

12   them a hearing before you suspended them?

13        A    Again, I think that the thinking was to reach out to

14   these individuals and bring them in to talk to us about what

15   was going on.  The suspension wasn't -- we didn't want to

16   trigger this disciplinary -- I think it's 3.05 -- the

17   disciplinary mechanism.

18             MR. SCHNEIDER:  Would you take a look at

19   Exhibit 1356, please.  I'm going to show him 1357 and 1358 as

20   well.

21             (Exhibits 1356, 1357, 1358 previously

22             marked for identification.)

23             MR. SCHNEIDER:  I'm sorry?  Did the Court say

24   something?  I didn't hear.

25             THE COURT:  No.
```

```
 1                MR. SCHNEIDER:  Oh.

 2                THE COURT:  I was asleep.

 3                MR. SCHNEIDER:  Ms. English, these are the exhibits

 4    I gave you yesterday.

 5                THE COURTROOM DEPUTY:  Oh, okay.

 6                MR. CONWELL:  All right.  This is not on our list.

 7                THE COURT:  What are we at?

 8                THE COURTROOM DEPUTY:  No, no.  These are the extra

 9    ones --

10                MR. SCHNEIDER:  This is what we discussed yesterday,

11    Mr. Conwell.

12                MR. CONWELL:  Oh.  Can I see what it is?  I still

13    don't have a --

14                THE COURT:  Here you go.  This is newly added?

15    Wasn't previously disclosed?  Not previously on the list?

16                THE COURTROOM DEPUTY:  Right.

17                THE COURT:  It can only come in for impeachment.

18                MR. CONWELL:  No, I agreed with Mr. Schneider he

19    could use this.  I didn't know the number.

20                THE COURT:  Okay.  Fine.

21         Q    (BY MR. SCHNEIDER:)  Well, what are --

22                MR. CONWELL:  Let me just say for the record there

23    was a quid pro quo, so we'll see what happens.

24                THE COURT:  Okay.

25                MR. SCHNEIDER:  Concur.
```

```
 1        Q      (BY MR. SCHNEIDER:)  Dr., what are these letters?

 2        A      These are letters from Robert Johnson, an attorney

 3   at Gray Robinson, to Drs. Castillo, Geller, and Klein.  They

 4   were dated October 7, 2010.

 5        Q      So that was after the suspension decision?

 6        A      Yes.

 7        Q      And Mr. Johnson indicated he was representing AAPS

 8   in connection with this -- with these letters?

 9        A      Yes.

10        Q      And who are the addressees of the letters?

11        A      It was Dr. Castillo, Dr. Thomas Castillo, Dr. Robert

12   Geller, Dr. Gary Klein.

13        Q      Could you read the second paragraph, please?

14        A      (Reading:)

15               "It is our understanding that you may have

16               information about the allegations

17               contained in the complaint, as well as

18               information regarding Mr. Bell's

19               activities subsequent to the termination

20               of his employment at AAPS."

21        Q      And the third paragraph.

22        A      (Reading:)

23               "If you were represented by counsel in

24               this matter, please advise us and we will

25               deal directly with your lawyer.  If you
```

```
 1                are not represented by counsel, we would

 2                like to have our investigator meet with

 3                you on an informal basis to discuss the

 4                allegations contained in the complaint and

 5                the activities of Mr. Bell."

 6       Q    And the fourth paragraph.

 7       A    (Reading:)

 8                "If you would prefer not to speak with our

 9                investigator on an informal basis, please

10                advise us and we will seek the issuance of

11                a subpoena for the taking of your

12                deposition.  We look forward to hearing

13                from you."

14       Q    Did you ever come to hear from them?

15       A    No.

16       Q    Dr. Castillo testified that he and Drs. Geller and

17  Klein requested that they be deposed in the litigation.  You

18  recall that?

19       A    Yes.

20       Q    Were you ever aware of such a request?

21       A    No.

22       Q    Would you take a look again at Exhibit 12, and in

23  particular Item 4.

24       A    Okay.

25       Q    And what is the nature of the complaint relative to
```

```
 1    Item 4?

 2         A     Item 4 states that, "Our organization has been on

 3    probation for offering CME at least since last year and that

 4    this information was even hidden from many Board members and

 5    CME committee members."

 6         Q     Was it hidden?

 7         A     No.

 8         Q     Was it announced?

 9         A     Uhm, I don't know whether it was announced, but it

10    wasn't hidden.

11         Q     And what was the cause for the probation?

12         A     The way I understand it, there were --

13               MR. CONWELL:  Objection.  No foundation.

14               THE COURT:  Sustained.

15         Q     (BY MR. SCHNEIDER:)  What did you understand the

16    basis for the suspension to be?

17               MR. CONWELL:  Well, that's not relevant.  There's no

18    foundation.

19               THE COURT:  Sustained.

20         Q     (BY MR. SCHNEIDER:)  What was the nature of the

21    response from AAPS?

22         A     The response stated that there were the -- the

23    ACCME, which is the, I guess, reporting -- when you're doing

24    continuing medical education, the ACCME is the umbrella agency

25    that records and runs the CME, approves CME -- that there were
```

1    changes in documentation requirements by the ACCME that led to

2    certain deficiencies in our paperwork being submitted to ACCME.

3         Q    When you used the abbreviation CMEs, that continuing

4    medical education?

5         A    Yes.

6         Q    And what does that relate to?

7         A    AAPS at the annual meeting gives CME credit via a

8    CME meeting.

9         Q    And do doctors need to get CME for any purpose?

10        A    Yes.  CME is required by I believe all 50 states to

11   maintain your physician license.

12        Q    And in the response, was there an indication that

13   75 percent of CME providers have been disciplined?

14        A    Yes, that statement was made.

15        Q    Where did that come from?

16        A    Dr. Montes, who was on the CME committee.

17   Unfortunately, that was misstated.  His original statement was

18   that 75 percent of the CME programs at one time or another had

19   been placed on probation.

20        Q    Well, before responding to the membership as a

21   whole, why didn't you folks fact check that to find out if it

22   were true?

23        A    Like I previously stated, we were working on this at

24   around 10, 11 P.M. up until 1 A.M.  There wasn't enough time to

25   fact check this situation.

```
 1        Q      Well, why were you in such a hurry to get a response

 2    out?

 3        A      We wanted to get the response out by the next

 4    morning.

 5        Q      Was something happening the next morning?

 6        A      I believe the House of Delegates meeting was

 7    happening.

 8        Q      Would you take a look at Item 5, please.

 9        A      Oh, I'm sorry.

10        Q      That's in the same exhibit.

11        A      Yeah, I'm sorry.  I got mixed up.

12        Q      And that begins, "Drs. Castillo, Keller, and Klein

13    were forced to file suit against the organization to protect

14    their professional reputations because there was no internal

15    address of the matters of concern."

16               Did you think that was an accurate statement?

17        A      No.

18        Q      And what was inaccurate about it?

19        A      Well, clearly we had started an internal process to

20    address the problems with these individuals.

21        Q      And do you see a reference to the expense that would

22    result from the litigation?

23        A      Uhm, yes.

24        Q      And how did AAPS respond to that?

25        A      Uhm, AAPS responded that the costs of the lawsuit
```

1    defense would be covered by insurance.

2         Q    And is the insurance company paying for the defense

3    of that?

4         A    Yes.

5         Q    Okay.  In the Florida case, AAPS has a counterclaim,

6    does it not?

7         A    Yes.

8         Q    And is the insurance company paying for that?

9         A    No.

10        Q    Would you go to Item 6, please.  And what does that

11   say by way of the complaint to you folks?

12        A    That the CEO of our organization was accused of

13   distributing pornography via company e-mail.

14        Q    And what was your understanding of the scope of

15   materials that Mr. Carbone was sending out as of that time?

16        A    The materials that I had in my possession was

17   contained in the Bell packet that was sent shortly after his

18   discharge to the members of the Board of Directors.

19        Q    Are you referring to the black and white pictures of

20   the scantily clad and naked women?

21        A    Yes.

22        Q    And at that time when you're doing this response,

23   were you aware of the *Cheers* video?

24        A    No.

25        Q    Were you aware of the video with a naked woman

1    telling a joke?

2         A     No.

3         Q     Were you -- well, what was the scope of what you

4    were aware of?

5         A     The only thing I was aware of were the fuzzy black

6    and white e-mail copies that were on paper.

7         Q     Now, are you saying that it was appropriate for

8    Dr. -- for Mr. Carbone to be sending that out via the company

9    server?

10        A     No.

11        Q     At the -- did you discuss the pornography and other

12   materials that Mr. Carbone was sending out with Mr. Carbone?

13        A     Yes.

14        Q     And what did you say to him?

15        A     I asked him whether -- you know, whether these

16   allegations were true and whether the internal policies -- what

17   were the internal policies that dealt with these types of

18   issues, internet use policy.

19        Q     And his response?

20        A     He admitted to doing this, and it triggered a review

21   of the internet policy.

22        Q     Did you ask him not to do that any more?

23        A     Yes.

24        Q     And did he agree?

25        A     Yes.

1    Q    Have you become aware of his sending out materials

2    of that nature since then?

3    A    No.

4    Q    Please take a look at Item 7.  And what is Item 7?

5    A    Item 7, that (Reading:)

6         "The same six-member Executive Committee

7         who suspended the above three members

8         tried to pass an enhancement of their

9         powers by a Bylaws Amendment with a phone

10        call House of Delegates meeting in

11        December which failed because a delegate

12        who did not originally get his invitation

13        got on the phone call, started asking hard

14        questions for which the CEO and Executive

15        Committee did not have good answers.

16        After the sputter response, the delegate

17        called for a vote under Robert's Rules of

18        Order and the amendment failed."

19    Q    Did the Executive Committee itself try to enhance

20    its powers?

21    A    I believe that they tried to change procedures --

22    yes.  I would say yes.

23    Q    And was it the Executive Committee or the Board that

24    passed an amendment to the bylaws to grant more power to the

25    Executive Committee?

```
 1        A     Well, the amendment to the bylaws was approved by

 2   the Board of Directors, but it had to go to the House of

 3   Delegates to be passed before it would be inserted into the

 4   bylaws.

 5        Q     Now, in that time frame, were you a member of the

 6   Executive Committee?

 7        A     Yes.

 8        Q     What was the purpose of seeking to amend the bylaws

 9   in that regard?

10        A     The issue is is the amount of material, the amount

11   of time, and the amount of actions that we were -- had to deal

12   with were just overwhelming, and we felt that, you know, it

13   would be much easier to get six people together on a phone than

14   16 people together on a phone, and that the members of the

15   Executive Committee were the most senior members who had been

16   in the organization the longest and probably the most

17   accessible of the group.

18            We needed decisions made fast and we needed to be

19   decisive, and we found it logistically difficult to get the

20   Board of Directors together on a phone call on short notice.

21        Q     Well, was it your intention to try to place all of

22   the power for the organization in a very small group of -- in

23   the hands of a very small group of people?

24        A     No.  Decisions could be made by the Executive

25   Committee in a rapid manner, but they'd still have to be
```

```
 1   ratified by the Board of Directors in a period of time.

 2        Q    Would you take a look at Exhibit 1413, please.  You

 3   have that?

 4        A    Yes.

 5        Q    And what is that?

 6        A    These are the minutes from the Board of Directors

 7   meeting in November 6th, 2010, in Tampa, Florida.

 8        Q    And do those minutes address expanding the power of

 9   the Executive Committee?

10        A    Yes.  Sorry.  It's a lot of pages.  Yes.

11        Q    And what was the disposition of that motion?

12        A    It was approved.  The motion was carried.

13        Q    So if the motion carried, did that serve to amend

14   the bylaws to expand the power of the Executive Committee?

15        A    No.

16        Q    And why not?

17        A    That wasn't the procedure.

18        Q    Well, what else was required?

19        A    This had to go to the House of Delegates for

20   approval before it was inserted into the bylaws.

21        Q    And that was not approved?

22        A    No, it wasn't approved.

23        Q    Would you take a look at Exhibit 1867, please.  And

24   would you go to the second page.

25             This is the letter from Dr. Wilkens?
```

1      A      Yes.

2      Q      And that's Eric Wilkens?

3      A      Yes.

4      Q      And in this letter he references a phone call?

5      A      Yes.

6      Q      And he states, "The caller was William, Bill, J.

7   Carbone, CEO of the AAPS.  He identified himself and he asked

8   me if I could speak with him for a minute, and was this a bad

9   time."

10             I asked Bill what was up.

11             And he says, "Eric, I just wanted to know what the

12   f' you were thinking last night."

13             And then Dr. Wilkens says, "I was very taken aback

14   and thought I incorrectly heard him and asked, 'Excuse me?'"

15             The response was, "You heard me, f'er.  What the f'

16   were you thinking last night?  I'm dealing with a f'ing

17   disaster and you played Boy Scout."

18             Do you see that?

19      A      Yes.

20      Q      Did anything come to mind when you saw the phrase

21   "Boy Scout"?

22      A      Boy Scout was a term that Bell used quite a bit.

23      Q      And in what kind of context?

24      A      Bell had previous experience as a Florida lobbyist,

25   and he would always, you know -- with a lot of our dealings he

```
 1    would always put forth certain activities that really probably
 2    shouldn't be done, and he used that term, "Don't" -- you know,
 3    "Don't be a Boy Scout about it."
 4              That term rang a massive bell, that was a huge
 5    bell -- bell for the Bell, I guess.
 6         Q    Would you take a look again at Exhibit 12?  The
 7    response with regard to this letter is that the conversation
 8    never took place, correct?
 9         A    Yes.
10         Q    And how was that conclusion reached?
11         A    Mr. Carbone was asked about it.
12         Q    And what'd he say?
13         A    It never happened.
14         Q    Would you take a look at No. 9, please.  Could you
15    read that?
16         A    (Reading:)
17              "That the CEO and Executive Committee
18              ignored the request of a number of members
19              to hold off on a vote of the bylaws
20              change, and scheduled another House of
21              Delegates phone meetings to make sure the
22              bylaws amendment could pass before the
23              June meeting without the general
24              discussion of the academies.  Questions
25              surrounding the makeup of the House of
```

UNITED STATES DISTRICT COURT

```
 1              Delegates, the inability of certain
 2              delegates to get in on the phone meeting,
 3              and the outcome of the amendment passing
 4              all call into question what happened to
 5              the opposition between December and May,
 6              and whether the process itself was
 7              manipulated."
 8     Q        And what was the response from your group?
 9     A        (Reading:)
10              "The CEO or the the Executive Committee
11              had no knowledge of any such request.  An
12              academy meeting was not necessary.
13              Delegates should be talking to and
14              representing the academy members.  The
15              amendment passed as revised with a final
16              vote of 10 to 4.  As this vote
17              demonstrates, there was opposition."
18     Q        Now, did you agree with that response?
19     A        Yes.
20     Q        And what was the basis for that -- for -- for the
21  response?
22     A        Well, the basis of the response is that there's --
23  there was no manipulation of any votes or individuals to get a
24  result.  I mean, it was almost -- it would be almost impossible
25  to do anyway.
```

1       Q      Would you take a look at Item 10, please.  That

2  refers to a star chamber disciplinary amendment.  What do you

3  understand the meaning of star chamber to be?

4       A      A star chamber is a closed group of judges who make

5  decisions essentially in the blind.

6       Q      Do you think it's fair to call that an unfair

7  procedure?

8       A      Yes.

9       Q      Do you agree with that conclusion that it was a star

10  chamber procedure?

11      A      No.

12      Q      And what was the basis for your conclusion?

13      A      I think the process that was proposed was fair.  I

14  think the intent was misconstrued, and that our intent was to

15  slow the process down and make it a little bit less onerous.

16      Q      Were you -- was the Board of Directors acting on its

17  own or with advice of a lawyer?

18      A      We always consulted counsel for -- particularly when

19  it came to disciplinary issues.  But anything on the -- you

20  know, for bylaws had always went through the attorneys.

21             MR. SCHNEIDER:  Would you take a look at Exhibit 11,

22  please, 0011.

23             (Exhibit 0011 previously marked for identification.)

24      Q      (BY MR. SCHNEIDER:)  And what is that document?

25      A      This is the -- this is the agenda for a House of

```
 1   Delegates meeting for Saturday, June 25th, 2011, at Tysons

 2   Corner, Virginia, at the Ritz Carlton.

 3        Q     Would you take a look at the second page?  Do you

 4   see in the paragraph that says A, that the last sentence is,

 5   "The member suspension must be approved within 90 days by a

 6   majority vote of the Board of Directors after a quorum is

 7   reached"?

 8        A     That's correct.

 9        Q     Would you go back to Exhibit 12, please.  And

10   does -- if you could go back to Section 10?

11        A     Okay.

12        Q     Does that indicate that the Board would be acting

13   within 30 days?

14        A     Yes.  That was -- that was an error.

15        Q     Someone just made a mistake?

16        A     Correct.

17        Q     Based on your experience, would you expect the Board

18   of Directors in the situation involving a suspension to take

19   90 days to address the issue?

20        A     No.

21        Q     Then why does it say 90 days?

22        A     Given our current circumstance and now experience

23   with trying to get, you know, people to meet telephonically,

24   trying to get records, trying to get attorneys involved,

25   logistically it just takes time and we needed a cushion to try
```

```
 1    to get things together to render a fair decision.

 2         Q     Okay.  Would you take a look at Item 11, please.

 3    That relates to the accusation that you were acting as an

 4    attorney for AAPS in George and Florida, correct?

 5         A     I'm sorry.  Where are you?

 6         Q     Section 11.

 7         A     Oh.

 8         Q     I'm sorry --

 9         A     I'm sorry.  Wrong exhibit.

10               Okay.  Yes.

11         Q     Did Mr. Bell bring a complaint in the state of New

12    Jersey, their State Bar, to that effect?

13         A     Yes.

14         Q     What was the result?

15         A     I was cleared.

16         Q     And when were you cleared?

17         A     I believe it was February 2011.

18         Q     Okay.  Did anyone else ever bring a complaint of

19    that nature against you?

20         A     Dr. Cressey.

21         Q     And what was the result of his complaints in the New

22    Jersey Bar?

23         A     New Jersey Bar refused to take up the matter.

24         Q     Okay.  This section also indicates that you were

25    paid by AAPS for your services.
```

1      A      That's correct.

2      Q      Was that simply a deal that you had with Mr. Carbone

3 to get you paid?

4      A      No.  That was -- that was approved by the Board of

5 Directors.

6      Q      Was Dr. Castillo on the Board of Directors at the

7 time that that was approved?

8      A      Yes, he was.

9      Q      And is Item 12 a request for a forensic audit?

10     A      Yes.

11     Q      And what do you understand that to mean?

12     A      I understand it to mean that forensic audit is done

13 when there's an accusation of criminal activity.

14     Q      And what was the response?

15     A      The response was that (Reading:)

16            "A forensic audit, for the most part, is

17            only undertaken in situations where there

18            is alleged violation of some law.  There

19            have been" -- and I think this was cut off

20            here but -- "there have been any

21            allegations of illegal financial

22            activities by AAPS or AAPS personnel or

23            AAPS as a whole.  Therefore, this item is

24            irrelevant.  Numerous extensive audits

25            have been done and no significant material

```
1                 items have been found.  Of note, in 2008,

2                 a former president had an unauthorized

3                 back channel communication with a

4                 temporary accountant employee which

5                 precipitated a special audit only six

6                 weeks after our routine annual audit at a

7                 direct cost of an additional $45,000.

8                 Subsequently, this person tried to extort

9                 money from us."

10        Q      And did you agree with the response?

11        A      Yes.

12        Q      Didn't Mr. Bell make an accusation that Mr. Carbone

13  was engaged in improper financial manipulations?

14        A      I believe so.

15        Q      And why wouldn't that be considered a basis for a

16  forensic audit?

17        A      We had just been through these multiple audits.  We

18  get audited every year.  The financial reports are open to the

19  Board of Directors for review.  The Board of Directors decided

20  it just wasn't necessary under the circumstances.

21        Q      Is Item 13 on Exhibit 12 a demand for a membership

22  list and claiming that it's required under Florida law?

23        A      That was the claim, yes.

24        Q      And is that legitimate claim?

25        A      It's my understanding after consultation with the
```

1    Florida attorney that it -- there is no such requirement.

2         Q    Well, why wouldn't AAPS want to make its entire

3    membership list available to all the members?

4         A    It's a question of privacy.  I don't believe that --

5    you know, our members give their personal information to AAPS

6    and it shouldn't be shared without their direct permission and

7    for good purpose.

8              MR. SCHNEIDER:  Would you take a look, please, at

9    Exhibit 1436.

10             (Exhibit 1436 previously marked for identification.)

11        Q    (BY MR. SCHNEIDER:)  And what is this document?

12        A    This is the minutes of the Board of Directors

13   conference call on April 27, 2011.

14        Q    Would you take a look at page 2, please?  Was there

15   a proposal to amend the bylaws with regard to the impact of

16   termination?

17        A    Yes.  Under "New Business, A, Amendment to AAPS

18   Bylaws Article 3.06 Effective Termination of Membership."

19        Q    And what was the proposed amendment?

20        A    (Reading:)

21             "Dr. Russo reviewed the summary regarding

22             Article 3.06 recommending the deletion of

23             the words, quote, 'including

24             certification' unquote, at the end of the

25             paragraph.  Following a brief discussion,

```
 1              Dr. McCann motioned to delete the, quote,
 2              'including certification' end quote.  Dr.
 3              Barnes seconded the motion.  The motion
 4              was approved and carried unanimously."
 5      Q     And what does that mean?  How would that have
 6  changed the consequences of a member's termination?
 7      A     Essentially it protected the member's certification
 8  status from being rescinded.
 9              MR. SCHNEIDER:  Would you take a look, please, at
10  Exhibit 1316.
11              (Exhibit 1316 previously marked for identification.)
12      Q     (BY MR. SCHNEIDER:)  Would you look at 13 -- well,
13  first, can you tell us what it is?
14      A     It's the minutes of the House of Delegates meeting
15  June 25th, 2011, at the Ritz Carlton at Tysons Corner, McLean,
16  Virginia.
17      Q     And would you take a look at page 4?  Do you see an
18  amendment to Section 3.06 of the bylaws, a proposal to amend
19  it?
20      A     Yes.
21      Q     Does that proposal include deleting the language
22  that would impose loss of certification on a terminated member?
23      A     Yes.
24      Q     It does?
25      A     Repeat the question.  I'm sorry.  I was reading.
```

1      Q      Does that paragraph include proposed language that

2  would result in a terminated member not losing certification?

3      A      No, it doesn't.

4           MR. SCHNEIDER:  Would you take a look at

5  Exhibit 1340, please.

6           (Exhibit 1340 previously marked for identification.)

7           THE WITNESS:  These are the minutes of the House of

8  Delegates meeting in June 25th, 2012, Ritz Carlton, Marina Del

9  Rey, California.

10      Q      (BY MR. SCHNEIDER:)  Would you take a look at page 3

11  of that.  And is there a motion to –– for the House of

12  Delegates to approve an amendment to the bylaws?

13      A      Yes.

14      Q      And what is the amendment that was approved?

15      A      The amendment –– the amendment was AAPS Bylaws

16  Amendment Article 3.06 Effect of Termination of Membership.

17      Q      Yes.

18      A      (Reading:)

19           "A member of the Association who is no

20           longer a member in good standing or whose

21           membership has been terminated shall

22           forthwith return to the Association his or

23           her membership" –– this is bold printed ––

24           "membership certificate shall no longer

25           qualify to hold any office or position

```
 1              whatsoever in the Association or in any

 2              organization affiliated with the

 3              Association; shall be stricken from the

 4              rolls of the Association and in any and

 5              all organizations affiliated with the

 6              Association; and shall no longer hold

 7              himself or herself out as a member of the

 8              Association."

 9         Q    So does that delete the language that would entail

10  loss of certification if a member is terminated?

11         A    No.

12         Q    So at that point terminated members no longer lose

13  their certification?

14         A    That's correct.

15              MR. SCHNEIDER:  Okay.  Would you take a look at

16  exhibit -- I'd like to move that into evidence, your Honor.

17              THE COURT:  Any objection?

18              MR. CONWELL:  No objection.

19              THE COURT:  Received.

20              (Exhibit 1340 received into evidence.)

21              THE COURTROOM DEPUTY:  1340, right?  The one you

22  just talked about?

23         Q    (BY MR. SCHNEIDER:)  Well, what's the exhibit number

24  you just looked at?

25         A    1340.
```

```
 1              MR. SCHNEIDER:  Thank you.

 2              THE COURTROOM DEPUTY:  Next.

 3      Q     (BY MR. SCHNEIDER:)  Would you take a look at

 4   Exhibit 1031, please.

 5              Now, what is this?

 6      A     This is the document that was distributed at the

 7   House of Delegates meeting at I believe it was 2011.

 8      Q     Who is identified as the author of this document?

 9      A     William A. Okerblom.

10      Q     And does it indicate for whom he is presenting this

11   document on the front page?

12      A     It says, "Attorney for AAPS Physician Member

13   Patricia Stewart, D.O."

14      Q     Would you take a look at the second page, please.

15   And that's the preface?

16      A     Yes.

17      Q     Would you take a look at the second paragraph.

18      A     It starts with, "I should add"?

19      Q     Yes.  And what's the next thing that follows?

20      A     (Reading:)

21              "I should add that my client has recently

22              become aware."

23      Q     And did you understand that to refer to Dr. Stewart?

24      A     Yes.

25      Q     Do you see any other references in the preface to
```

 1    the phrase, "My client"?

 2         A     I see it in the next paragraph.  I see it mentioned

 3    again.

 4         Q     Did you have any idea who Dr. Okerblom was at the

 5    time that you first saw this document?

 6         A     No.

 7         Q     What was your reaction to seeing the document as a

 8    whole?

 9         A     I was concerned.  I was -- it is unprecedented-type

10    situation for someone to hand out a document such as this in

11    that setting.

12         Q     Well, what was unprecedented about it?  I'm sorry.

13    What was unprecedented about it?

14         A     Well, the House of Delegates meeting is about two

15    things:  Approving/disapproving bylaws and electing members.

16    This clearly was not included in one of those two topics.

17         Q     Did you think that the letter was accurate in all

18    respects?

19         A     No.

20         Q     Would you take a look at page 3 of that document

21    which is page -- well, page 3 of the letter, but page 6 of the

22    exhibit.

23               Do you see at the end of the third paragraph where

24    it says, "These physicians who have questioned the Executive

25    Committee have also been accused of trying to harm the

```
 1    organization by questioning the conduct of the leaders and have

 2    been threatened with suspension"?

 3         A    Yes.

 4         Q    Did you think it was true that they were threatened

 5    with suspension merely for raising questions?

 6         A    No.

 7         Q    Okay.  And you've already testified as to why they

 8    were suspended?

 9         A    That's correct.

10         Q    In the fourth paragraph, it says (Reading:)

11              "The Executive Committee is currently

12              asking our House of Delegates to approve a

13              new bylaw amendment that would provide the

14              Executive Committee president with the

15              power to suspend members of the AAPS for

16              any reason, even political reasons, at

17              will and without a hearing."

18              First of all, was it the Executive Committee that

19    was asking that this motion be passed?

20         A    No.  It was the Board of Directors.

21         Q    And is it true that they were asking for members to

22    be suspended for any reason, including political ones?

23         A    No.  That's incorrect.

24         Q    What would be correct?

25         A    It stated -- the reasons were not changed as far as
```

1    discipline.  They're contained in the disciplinary section in

2    the bylaws.

3         Q    Okay.  Would you go to the next page which would be

4    1031-7.  At the end of the previous paragraph, there's a

5    reference to "radical members," an accusation that these are

6    "radical members trying to destroy the organization," and that

7    those doctors are accused of that.

8              And the next paragraph says (Reading:)

9              "Quite to the contrary, it is the

10             Executive Committee actions whose actions

11             are threatening to destroy the

12             organization.  The manner of governance

13             that is currently being practiced by the

14             Executive Committee is extremely radical

15             and undemocratic, resulting in suspension

16             of due process, suppression of free

17             thinking, and the members' rights to

18             exercise their constitutionally guaranteed

19             freedom of speech."

20             Do you think that the characterization that the

21   Executive Committee was acting in "extremely radical and

22   undemocratic manner" was accurate?

23        A    No.

24        Q    And why not?

25        A    First of all, the Executive Committee actions have

```
 1   to be ratified by the Board of Directors.  So Executive

 2   Committee alone doesn't have the power to do much.  That's the

 3   first thing.

 4         The second thing is that the whole paragraph is

 5   actually 180 degrees opposite, that any actions we took were

 6   anything but radical.  They were carefully thought out.  They

 7   were carefully consulted with attorneys.  They were discussed

 8   at length by probably the most conservative people in the

 9   organization.  There was no suppression of free thinking or

10   exercising freedom of speech.  It was just a -- anything could

11   be further from the truth.

12         Q    And the last sentence of that paragraph says

13   (Reading:)

14               "It is without precedent in any other

15               fellowship of physicians, and is so

16               extreme that, if continued, it will

17               certainly result in the loss of AAPS's

18               status as a board-certifying

19               organization."

20         Dr. Cerrato, has AAPS ceased to be -- or ABPS ceased

21   to be a board-certifying organization?

22         A    No.

23         Q    Since that time, has ABPS achieved anything?

24         A    We've had great strides with our recognition

25   efforts.  We're recognized now in I believe 62 -- either we're
```

```
 1   recognized directly or we're not mentioned at all, so,

 2   therefore, recognized by default in 62 medical boards across

 3   this country.

 4           We're recognized in various federal agencies.  Uhm,

 5   we have made great strides.  Our financial situation's better

 6   now than it ever was.  Our membership numbers have increased.

 7   We've increased with new boards such as integrative medicine.

 8   We've been at the forefront of certification.  We're doing

 9   quite well.

10       Q    Okay.  Would you take a look at the next page,

11   1031-8.

12           What does heading A say?

13       A    "Timothy Bell, a former employee of AAPS, became a

14   whistle-blower."

15       Q    Do you think that's accurate?

16       A    No.

17       Q    What's inaccurate about it?

18       A    Mr. Bell was a disgruntled terminated employee.

19   That's what he was.

20       Q    Would you take a look at section D, please.

21       A    "Additional evidence surfaced which appeared to

22   substantial[sic] this allegation."

23       Q    It begins with (Reading:)

24           "At or about the same time, in mid

25           September of 2010, Cassandra Newby, also a
```

1           former high-ranking employee of the AAPS,

2           filed claims of discrimination harassment

3           against the AAPS and Mr. Carbone, alleging

4           among other things that Mr. Carbone

5           frequently addressed with extremely crude

6           and graphic profane speech and sent her

7           e-mails containing explicit pornographic

8           imagines using AAPS computers."

9           Did you do anything to find out if that were true?

10    A     Well, we -- we had the previous computer e-mail

11    audit as was discussed previously.  And we interviewed Dr. --

12    Mr. Carbone as to these allegations.

13    Q     Okay.  Would you go to E, please.

14    A     (Reading:)

15          "Drs. Castillo and Geller requested the

16          president, president-elect to initiate an

17          investigation into the allegations that

18          Mr. Carbone had engaged in inappropriate

19          conduct and misused member funds."

20    Q     Was there any basis for an allegation that

21    Mr. Carbone was misusing member funds?

22    A     No.

23    Q     Okay.  Would you go to 1031-11, please.  And let's

24    begin with section H, "There was no evidence that any of the

25    three doctors had done anything improper."

```
 1              Do you think that's true?

 2      A     No.

 3      Q     At that point, at this point in time, had any

 4 ultimate conclusion been reached as to whether those doctors

 5 had done something improper?

 6      A     By that time the Bell e-mails were the evidence

 7 against them and people knew it.

 8      Q     Okay.  Those e-mails were from Mr. Bell, not from

 9 Drs. Klein, Geller, and Castillo, correct?

10              MR. CONWELL:  Your Honor, I object.  There's no

11 foundation.  It's got no -- he's not testified to any personal

12 knowledge about any of this.

13              THE COURT:  Is your question limited to the e-mails

14 that we just looked at -- I don't know -- an hour ago, or are

15 there additional e-mails?

16              MR. SCHNEIDER:  I'm just asking if there were any

17 from those doctors.

18              THE COURT:  Again, my question is, are you referring

19 to e-mails that he has not yet testified to which then gives

20 rise to the objection no foundation?

21              MR. SCHNEIDER:  Let me rephrase the question then.

22              THE COURT:  Okay.

23      Q     (BY MR. SCHNEIDER:)  Have you seen any e-mails

24 actually from Drs. Klein, Geller, or Castillo that indicate

25 that they are working with Mr. Bell?
```

```
 1         A      I don't believe so.

 2         Q      So at this point no ultimate conclusion had been

 3   reached?

 4         A      No.

 5         Q      Okay.  Would you take a look at section I then?

 6                THE COURT:  Before we launch into something new, why

 7   don't we take this opportunity to take our first morning break.

 8          15 minutes, ladies and gentlemen.  Remember the

 9   admonition, please.

10                THE COURTROOM DEPUTY:  All rise.

11                (A recess was taken.)

12                (Open court in the presence of the jury.)

13                THE COURT:  I'm sorry.  Go.

14                MR. SCHNEIDER:  Thank you.  Your Honor, before we go

15   further, I'd like to move into evidence 1356, 1357, 1358, 1405,

16   and 1317.

17                THE COURT:  Okay.  Any objection?

18                MR. CONWELL:  Your Honor, I don't know which

19   exhibits those were, so if I could just address that later?

20   There were some exhibits that I objected to and you sustained

21   the objection, so --

22                THE COURT:  Oh.

23                MR. SCHNEIDER:  That's not one of them.

24                THE COURTROOM DEPUTY:  It's okay.  Except 1317 you

25   didn't talk about.  You said 1316.
```

```
 1                    MR. SCHNEIDER:  Okay.

 2                    THE COURT:  All right.

 3                    THE COURTROOM DEPUTY:  1317's already in.

 4                    THE COURT:  All right.  If there's some confusion,

 5      then we're going to hold off on that.  We'll take care of it at

 6      the end of the day.  How's that?

 7                    MR. SCHNEIDER:  Yes.

 8                    MR. CONWELL:  Yes.  Thank you.

 9                    THE COURT:  Okay.

10         Q    (BY MR. SCHNEIDER:)  Dr. Cerrato, you testified a

11      few minutes ago about the Board of Directors and the House of

12      Delegates approving the amendment to delete the loss of

13      certification from the consequences of termination of

14      membership.  Do you recall that?

15         A    Yes.

16         Q    Why did the -- why was that proposed?

17         A    We felt that it was unfair to interfere with a

18      physician's, you know, right to employment vis-à-vis the board

19      certification for something that would amount to a disagreement

20      with some political issue that they may have created.

21               Board certification is tied to employment, as I

22      testified before.  And the only time something like that would

23      be appropriate is if the accusation had something to do with

24      their medical practice, and at that point that would be outside

25      of our purview.
```

1            So board certification was tied to some type of

2     issue with their medical practice where the membership or loss

3     of membership will be tied to the -- just about anything else.

4          Q    Well, when you say out of your purview, you talking

5     about the Board of Directors?

6          A    Yes.

7          Q    Is board certification controlled by ABPS rather

8     than AAPS?

9          A    Yes.

10         Q    Would you take a look again at Exhibit 1031 on

11     page 11, section I.

12         A    (Reading:)

13              "There was no evidence that any of the

14              suspended physicians had conspired to harm

15              the AAPS."

16         Q    Did you regard that as true?

17         A    No.

18         Q    Would you take a look at the next page and section

19     J?

20         A    (Reading:)

21              "The conduct of Castillo, Geller, and

22              Klein was both appropriate and proper."

23         Q    And do you agree with that?

24         A    No, I don't.

25         Q    Okay.  Would you go to K, please?

```
 1        A       (Reading:)

 2                "The Executive Committee knew that it had

 3                exceeded its authority and had sought to

 4                change the bylaws in order to make

 5                themselves look less culpable."

 6        Q       And is there anything inaccurate about that?

 7        A       That's absolutely incorrect.

 8        Q       What about it is incorrect?

 9        A       Well, the change in bylaws was -- was sought to

10   improve the process, and once again, the Executive Committee

11   had very limited power, and any decision that the Executive

12   Committee would have made would still have to be approved by

13   the Board of Directors.

14        Q       Okay.  Were you troubled at all by the tone of this

15   correspondence?

16        A       Yes, I was.  It was -- it was quite onerous.  And if

17   you look at the document in total, my impression was that it

18   would serve to give a false impression and to frighten those in

19   the House of Delegates.

20        Q       Well, was it the tone and content of this

21   correspondence rather than just someone voicing opposition that

22   troubled you?

23                MR. CONWELL:  Objection.  Leading.

24                THE COURT:  Sustained.

25        Q       (BY MR. SCHNEIDER:)  Did anyone express -- besides
```

1    Dr. Okerblom -- express opposition to this motion?  Talking

2    about the motion to the House of Delegates to amend the bylaws

3    to enhance the authority of the Executive Committee.

4          A    Yes, they did.

5          Q    And were you troubled by the fact that anybody

6    opposed it?

7          A    No.  This was a proposal that was submitted to the

8    Board of Directors for approval by the House of Delegates.  The

9    process was needed to invoke thought processes.  Was this, in

10   their estimation, a correct thing to do.  Clearly they didn't

11   at that point.  It wasn't approved, end of the -- it was

12   totally the end of the situation.

13              MR. SCHNEIDER:  Okay.  I'd like you to take a look

14   now at Exhibit 1202.

15              (Exhibit 1202 previously marked for identification.)

16         Q    (BY MR. SCHNEIDER:)  Have you ever seen this

17   document before?

18         A    Yes.

19         Q    And how did you come to receive it?

20         A    Via e-mail.

21         Q    From?

22         A    Dr. Okerblom.

23         Q    And was the e-mail directed to anyone besides you?

24         A    It was directed to Board members, any officers, all

25   the House of Delegates -- House of Delegate members.

```
 1      Q      Indeed, that's what the beginning of it says?

 2      A      "To all officers, Board members, and members of the

 3   House of Delegates, collectively and individually."

 4      Q      This document begins (Reading:)

 5             "You are hereby notified that several

 6             concerned physician members and leaders of

 7             your organization have authorized me to

 8             formally demand," etc.

 9      A      That's correct.

10      Q      Did you see anywhere in this e-mail who those

11   concerned members and leaders were?

12      A      No.

13      Q      Did you draw any conclusion as to who was included

14   in the concerned members?

15      A      Well, Dr. Okerblom had previously mentioned, had

16   previously notified us that he represented Dr. Stewart.  Here

17   he is, once again, sending e-mails on behalf of concerned

18   physician members and leaders.  I think to a reasonable person

19   one would assume that Dr. Stewart was one of those concerned

20   physician members.

21      Q      Okay.  Do you see midway down the page where it

22   begins, "You are also hereby notified?"

23      A      Yes.

24      Q      Could you read that paragraph, please.

25      A      (Reading:)
```

```
 1              "You are also hereby notified that the new

 2              proposed bylaws amendments contain

 3              provisions that will authorize the

 4              executive leadership of the AAPS to

 5              violate Florida corporation laws by

 6              suspending the rights of physician members

 7              without providing them the due process

 8              requirements of notice and the opportunity

 9              to be heard."

10      Q       And would you please take a look at the next

11 paragraph.

12      A       (Reading:)

13              "Prior to voting for such bylaw

14              amendments, you are hereby advised to seek

15              legal advice with regard to your potential

16              liability for aiding and abetting the

17              executive officers and executive staff

18              members of the AAPS in breaches of

19              fiduciary duties that they owe to the

20              members of the AAPS."

21      Q       Did you find that language troubling in any manner?

22      A       Yes.  When somebody tells you get a lawyer, then

23 that's a serious issue.

24      Q       What message do you think was being conveyed?

25      A       You're about to be sued.
```

```
 1        Q     You're about to be sued if what?

 2        A     If you vote for this amendment.

 3        Q     Okay.  And would you take a look at the next

 4   paragraph, please.

 5        A     "Any persons" --

 6        Q     Yes.

 7        A     (Reading:)

 8              -- "who knowingly assist the executive

 9              leadership to violate their fiduciary

10              duties may be named as co-defendants in a

11              number of legal actions that are currently

12              being drafted and that are expected to be

13              filed within 90 days of the time that the

14              proposed amendments are ratified."

15        Q     And what did you think was meant by that?

16        A     If you don't vote my way, expect a lawsuit on your

17   front step.

18        Q     A lawsuit against you?

19        A     Personally, yes.

20        Q     When you said, "If you don't vote this way, expect a

21   lawsuit," were you saying the person who voted that way should

22   get -- expect a lawsuit?

23        A     No.  The person who -- if you -- if you voted for

24   this amendment, expect a lawsuit.

25        Q     Okay.  Would you take a look at page 3 of this
```

```
 1   exhibit.

 2           Would you read the first paragraph there, begins

 3   with "Furthermore"?

 4       A    (Reading:)

 5            "Furthermore and more importantly, the

 6            apparent purpose and net effect of these

 7            new bylaws appears to be to assist the

 8            current leadership of AAPS to escape being

 9            held accountable for their misconduct by

10            suspending and excluding any members who

11            speak out or question them."

12       Q    Did you regard that as a fair criticism?

13       A    No, I did not.

14       Q    Would you take a look at page 6 of this exhibit.  Do

15   you see a section that is in very large type, underscored, and

16   in bold type?

17       A    (Reading:)

18            "You are now on notice that lawsuits will

19            be filed if the amendments are adopted."

20       Q    And from that, did you draw any assumption as to

21   whom the lawsuits would be filed against?

22       A    It would be filed against the members of the House

23   of Delegates who voted for the amendment passage.

24       Q    Okay.  Would you go to the next page, please,

25   1202-7.
```

```
 1              And would you take a look at the last full paragraph
 2   there, the language beginning with, "Instead of disclosing."
 3       A     We're on page 7?
 4       Q     Yes.
 5       A     I'm sorry.  Where?
 6       Q     Last full paragraph, the language toward -- that's
 7   three-quarters of the way into that paragraph beginning with,
 8   "Instead of disclosing."
 9       A     Oh, yes.  (Reading:)
10              "Instead of disclosing that Dr. McCann was
11              not present at the meeting because he had
12              discovered the -- he was terminally ill,
13              they stated simply that Dr. McCann was
14              unable to attend the meeting because he
15              had a family emergency thereby depriving
16              delegates of critical information that
17              they needed to knowingly and intelligently
18              exercise their right to elect the
19              president of AAPS."
20       Q     And would you go to the next page, please.
21              We'll, let's go back to the prior page.  And if you
22   can look in the middle of the page -- middle of the last
23   paragraph, it begins with (Reading:)
24              "The lawsuit will also allege that the
25              current president of the AAPS had been --
```

1          has been, quote, 'elected' close quote, by

2          means of fraudulent and deceptive conduct

3          in connection with the annual election of

4          the officers of the AAPS at the House of

5          Delegates meeting that took place in June

6          of 2011.  In particular, it will be

7          alleged that the executive leaders

8          misrepresented to the delegates at the

9          annual meeting material facts concerning

10         the status and significance of the ACCME

11         actions and FEC actions which were

12         described above.  It will also be alleged

13         that the executive leadership knowingly

14         and intentionally committed election fraud

15         by concealing from the voting members at

16         the House of Delegates meeting their

17         knowledge of the fact that nominated

18         candidate for president, David McCann, had

19         been known by them prior to the election

20         to have metastatic tumors in his pancreas

21         and liver."

22         Did you think that that was accurate?

23    A    No.  It was quite the outrageous statement.

24    Q    And what was outrageous about it?

25    A    I'm not sure where to begin here.  But first of all,

1    there's no -- there was no election fraud in the election of

2    Dr. McCann.  The processes to elect Dr. McCann were both normal

3    and usual.  The fact that somehow we concealed his medical

4    condition -- Dr. McCann, from my knowledge, didn't even know he

5    had anything wrong with him.  That didn't come out till -- till

6    later.

7        Q    Did you believe you were under any sort of duty to

8    notify the voters of the candidate's medical condition in any

9    event?

10       A    I don't know that we had a positive -- we didn't

11   have a positive obligation to release someone's medical

12   information.  I mean, that's -- I've never heard of such a

13   thing.  But we can't release knowledge we didn't have anyway.

14       Q    And also in that paragraph, that last paragraph, it

15   begins, "The lawsuit will also allege that the current

16   president of the AAPS" -- I'm sorry.  I just read that.

17            Would you take a look at Exhibit 1762, please.  Can

18   you tell us what this document is?

19       A    Yes.  This is a notification transmitted from Nadine

20   Simone, who was an individual who dealt with communications, to

21   the House of Delegates --

22       Q    Are you talking about the e-mail communication on

23   the bottom of this document?

24       A    Yes.

25       Q    And what does it say?

```
 1      A      It says that (Reading:)

 2             "Per Dr. Cerrato's request, Dr. Cerrato

 3             believes it's in the best interest of the

 4             HOD members that the HOD conference call

 5             scheduled for tonight be cancelled.  After

 6             much consideration" --

 7             THE COURT:  Slow down.

 8             THE WITNESS:  Sorry.  (Reading:)

 9             "After much consideration, in lieu of the

10             legal uncertainty surrounding this

11             meeting, HOD members will" -- should say

12             "will be notified, in accordance with the

13             bylaws, if and when another meeting will

14             be scheduled."

15      Q      And had you in fact authorized Ms. Simone to send

16  this out?

17      A      Yes.

18      Q      And why did do you that?

19      A      Well, this was exactly what I was afraid of.  I saw

20  this pattern of increasing threatening behavior toward the

21  delegates which finally resulted in an e-mail that said, you

22  know -- essentially, you know, "Vote the way I want you to vote

23  or else you're going to get sued."

24             And there was no way -- there's absolutely no way I

25  was going to expose these House of Delegates individuals to a
```

```
 1   legal action if I could prevent it.  The situation was

 2   extremely hot.  It wasn't a subject that had to be dealt with

 3   right then and there, and to protect everybody, I just stopped

 4   the meeting.

 5        Q     Now, the delegates themselves, I think you indicated

 6   before, are elected from the membership of AAPS?

 7        A     They're elected from the academies, yeah.

 8        Q     And the members of the academies are members of the

 9   Association?

10        A     That's correct.

11        Q     And did they serve as volunteers?

12        A     Yes.

13        Q     So there are a number of members -- well, let me ask

14   you.  Would you say the majority of members are not actively

15   engaged in AAPS activities?

16        A     I would say 95 percent are not actively engaged.

17        Q     And when you say actively engaged, would that

18   include being a member of the House of Delegates?

19        A     Yes.

20        Q     And being a member of the Board of Directors?

21        A     Yes.

22        Q     And what other people would you consider to be

23   active?

24        A     Well, there are many people who --

25        Q     Just in the general sense.
```

1     A     Yeah.  There are many people who don't

2  necessarily -- I wouldn't say many -- there are a few people

3  who are involved but don't actually have a position as an

4  officer or delegate or whatever.  They don't have an official

5  position.  But they're few and far between.

6     Q     So was it difficult to get people to be actively

7  involved to do things for the organization?

8     A     Absolutely.  It -- you know, it's a volunteer

9  organization.  People have jobs, they have families.  A lot of

10 these issues are highly technical issues that they have no

11 background dealing with.  You know, doctors work very long

12 hours these days, more hours than they ever worked before, and

13 there's just no extra time to get on conference calls at 9 or

14 10 o'clock at night after a 12-hour day to discuss issues until

15 midnight.  People just don't want to do that.  And it's very

16 difficult to find people to do anything.

17          MR. SCHNEIDER:  Your Honor, I'd like to move 1762

18 and 1202 into evidence.

19          THE COURT:  Any objection?

20          MR. CONWELL:  No objection.

21          THE COURT:  Received.

22          (Exhibit 1202 received into evidence.)

23          THE COURTROOM DEPUTY:  1762 is already in.

24          MR. SCHNEIDER:  Oh.  Thank you.

25       Okay.  Would you take a look at Exhibit 1466, please.

```
 1                   (Exhibit 1466 previously marked for identification.)

 2        Q     (BY MR. SCHNEIDER:)  So to begin with, can you tell

 3   me what the e-mail at the bottom is of this page?

 4        A     This is an e-mail from William Okerblom to Board

 5   directors -- just about every -- many, many people in the power

 6   structure in AAPS.

 7        Q     Can you go to the next page, please.  Is there

 8   reference to the accusation that you were practicing law in

 9   Florida without a license?

10        A     Yes.

11        Q     And by that time had a resolution of that complaint

12   been delivered?

13        A     Twice.

14        Q     Twice?

15        A     I believe it was twice.

16        Q     Why was --

17        A     I'm sorry.  Once by December 2011, I think.

18        Q     After -- well, as of that time, was that the Bell

19   complaint that had been resolved by then?

20        A     Yes.

21        Q     And did someone else make a complaint that you were

22   practicing law in Florida without a license?

23        A     Dr. Cressey.

24        Q     And was Dr. Cressey's complaint any different than

25   Dr. -- Mr. Bell's?
```

```
 1        A     No.

 2              MR. CONWELL:  Objection.  No foundation.

 3        Q     (BY MR. SCHNEIDER:)  Well, did you see Dr. --

 4              THE COURT:  Hang on.  I'm going to overrule that.

 5         Go ahead.

 6              THE WITNESS:  I'm sorry.  Repeat the question.

 7        Q     (BY MR. SCHNEIDER:)  Well, did you see Dr. Cressey's

 8   complaint?

 9        A     Yes.  It was a complete carbon copy of the original

10   complaint.

11        Q     And ultimately, how was that resolved?

12        A     New Jersey -- the New Jersey Bar refused to reopen

13   it.

14        Q     Would you take a look at next page, please.  Well,

15   actually, stay on this page for a moment.  Do you see where

16   middle of the page it says, "Obviously, Dr. Cerrato did not

17   believe that the bylaws of the organization applied to him"?

18   Under -- yeah, there it is.

19        A     Yeah.  It starts, "Under Voluntary Service of

20   Diplomates, obviously Dr. Cerrato did not believe that the

21   bylaws of the organization applied to him."

22        Q     Dr. Cerrato?  Did Dr. Cerrato believe that the

23   bylaws of the organization applied to Dr. Cerrato?

24        A     Yes.  I always operated within those bylaws.

25        Q     And again, was your being paid for services
```

1    something that was approved?

2         A     Twice by the Board of Directors.

3         Q     And on at least one of those occasions, was

4    Dr. Castillo part of the Board that approved that?

5         A     Not only that he was on the Board, I had discussed

6    it with him at length.

7         Q     Okay.  Now, would you go to the next page, please.

8               The beginning of the first full paragraph says

9    (Reading:)

10               "Most doctors are prudent and careful and

11               responsible.  Dr. Cerrato seems to be a

12               significant exception.  He has proceeded

13               with reckless indifference to societal

14               norms."

15               Do you think that that's a fair criticism of you?

16         A     I'm not sure where to begin with this one.

17    Absolutely not.  It's a hateful language by an individual who

18    never met me, never talked with me, never knew anything I did.

19         Q     Did you regard this as a personal attack?

20         A     Yes, a hateful, personal attack.

21         Q     Did you see any need for that level of personal

22    attack simply to express displeasure with your being paid?

23         A     Absolutely not.  It was ridiculous.

24         Q     Did you discuss this correspondence with Board

25    members?

1        A        Yes, I did.

2        Q        And what was the nature of that dialog?

3        A        I discussed it -- I displayed my extreme displeasure

4   with this and was very concerned about the level of hatefulness

5   in these individuals, something I had never seen before.

6        Q        You say "these individuals."  About whom are you

7   speaking?

8        A        Well, it seemed to me that Castillo, Geller, Klein,

9   Stewart, Radentz, Bell, all these individuals, you know,

10  colluded to basically go on a personal assassination attempt --

11  I mean, that's what I see -- totally, completely unwarranted.

12  Behavior I had never, ever, ever seen in professionals.  In

13  25 years of dealing with all kinds of situations and all kinds

14  of people, I'd never seen this -- this kind of behavior.  Okay?

15  Over what?  To do what?  I mean, what was the end game with

16  this?  Okay?  Because we didn't vote properly on a House of

17  Delegates meeting?  Okay.  Because, you know, we wanted to

18  protect 3,000 members' ability to make a living and, you know,

19  we saw that three people, three of our close members who we

20  knew basically stabbed us in the back, and dealt with two other

21  people who were suing us under false pretenses, who had the

22  ability to bring everything down, down, zero.  Okay?

23              I mean, it -- it was just overwhelming, okay?  And

24  this type of behavior is despicable as far as I'm concerned,

25  particularly coming from people who didn't know me at all.  I

1    didn't know them.  I -- the first time I saw Dr. Stewart,

2    Dr. Okerblom was at the House of Delegates meeting.  I didn't

3    know who they were.  I barely knew Klein.  I barely knew

4    Geller.  Castillo I knew very briefly.  They keep talking about

5    what I did, what I did, and what I did.  They know -- they had

6    no idea what I did.  And I kept doing what I did for them

7    because so many members came to me and thanked me from the

8    bottom of their heart to support their certification 19 years

9    for free.

10            So I continued to do what I did.  But to have this

11   written about you and distributed all over the place, I still

12   remember the day that I got this piece of paper.  I remember

13   where I was, what I was doing, and I've never, never been

14   attacked like this.  It was upsetting.  Still is.

15        Q    Did Dr. Okerblom identify anywhere in this

16   correspondence for -- on whose behalf he was sending this?

17        A    I -- I -- I don't recall.  I'd have to read the

18   document.

19        Q    Did you draw any conclusions about at least one of

20   the people for whom he was writing it?

21        A    Well, clearly Dr. Okerblom was not a member of the

22   Association.  The only information he possibly could have got

23   about the internal processes was from Dr. Stewart.  Dr. Stewart

24   had assigned him as her legal counsel, okay?  Where else would

25   this be coming from?  Okay?  Whose ends would be furthered with

1  this?

2      Q      Well, is there any reason Dr. Okerblom couldn't have

3  been speaking with Dr. Geller, and Dr. Klein, and Dr. Castillo,

4  and Dr. Russo, etc.?

5      A      They absolutely had to, okay?  The information that

6  he had had to come from all these sources, internal sources.

7      Q      Okay.  As opposed to the source of the information,

8  did you in your own mind form a conclusion about on whose

9  behalf he was sending this?

10     A      My conclusion was is that he was sending it on

11  behalf of Dr. Stewart.

12     Q      And why did you draw that conclusion?

13     A      Because he had represented her in the past on

14  multiple occasions and put it in writing.

15     Q      Did you come to learn what his relationship to

16  Dr. Stewart was?

17     A      I believe they're husband and wife.

18            MR. CONWELL:  Okay.  I'd like you to take a look at

19  Exhibit 1, please.

20            (Exhibit 1 previously marked for identification.)

21     Q      (BY MR. SCHNEIDER:)  And can you tell us what this

22  document is?

23            THE WITNESS:  I need to take a break.

24            THE COURT:  Okay.  All right.  Let's take five,

25  ladies and gentlemen.

```
1                THE COURTROOM DEPUTY:  All rise.

2                (A recess was taken.)

3                (Open court in the presence of the jury.)

4                THE COURT:  All right.  We're back on the record.

5    Dr. Cerrato has resumed his place on the witness stand.

6      Mr. Schneider, you may continue.

7                MR. SCHNEIDER:  Thank you, your Honor.

8         Q    (BY MR. SCHNEIDER:)  Would you take a look at page 2

9    of this document, please.

10        A    These are the minutes of the Board of Directors

11   April 28th, 2012?  Is that what we're talking about?

12   Exhibit 1?  I'm sorry.  Wrong exhibit?

13               THE COURTROOM DEPUTY:  You're still on 1.

14               MR. SCHNEIDER:  Yes.  This is Exhibit 1 you're

15   looking at.

16               THE WITNESS:  Okay.  So this is the minutes of the

17   AAPS Board of Directors, April 28th, 2012.

18        Q    (BY MR. SCHNEIDER:)  April 28th?

19        A    April 28th, 2012, Tampa, Florida.

20        Q    On the second page it begins with, "At this point of

21   the meeting, Dr. Cerrato introduced Mikhail Ratner, Esquire, of

22   the law firm Gusrae, Kaplan, Bruno & Nusbaum."

23               And who was Mr. Ratner?

24        A    Mr. Ratner worked for the named law firm.  We had

25   decided to add additional counsel to our -- to handle our legal
```

1    issues.

2         Q     Okay.  If you go down the page to where it begins

3    with, "Also during his presentation"?

4         A     Yes.

5         Q     And it says (Reading:)

6               "Also during his presentation, Mr. Ratner

7                discussed the ethics complaints filed by

8                Dr. Richard Cressey on or about

9                December 11, 2011, against Dr. A. Robert

10               Cerrato in the jurisdictions where

11               Dr. Cerrato is admitted to practice law,

12               New Jersey and Pennsylvania.

13               Dr. Cressey's ethics complaints contained

14               identical claims which Mr. Bell had filed

15               previously whereby Dr. Cerrato had engaged

16               in unauthorized practice of law, among

17               other things, purportedly performing

18               unauthorized legal work for AAPS and

19               supposedly seeking reimbursement for this

20               work."

21               You already testified that you were paid for some of

22    your work on behalf of AAPS.

23         A     Yes.

24         Q     And was the only legal matter the one you described

25    regarding the rule change in New Jersey?

1    A    Yes.

2    Q    Okay.  And you've talked about what other things you

3 got paid for?

4    A    That's correct.

5    Q    How did it come to be that you got paid?

6    A    Well, basically, it got to a point where I was doing

7 so much extra outside work for AAPS, was employed full time,

8 was trying to do this part time, and it just got to a point

9 where I just couldn't do it free any more.  It was just eating

10 up way too much of my time.  And I discussed it with some of

11 the Board of Directors and I said, "You know, this is getting

12 to be a big burden.  I want to do it, but, you know, I just --

13 I just -- it's starting to eat away at my day job."

14        And they suggested to, you know, maybe ask for

15 compensation for the kinds of work I was doing, and that's what

16 I did, and they approved it.

17    Q    You had testified earlier that one of the types of

18 work that you were doing for AAPS was looking at contracts.

19    A    That's correct.

20    Q    When you were looking at the contracts, from what

21 perspective were you doing that?  Were you doing that as a

22 lawyer with regard to the enforceability of the contract?

23    A    No.  I was -- what I was doing was looking at the

24 terms of the contracts, you know.  For example, one of the

25 biggest expenditure of the Association was hotel contracts and

```
 1   they were quite complicated and expensive.  And clearly the

 2   object was to get the best deal.

 3            So there was a -- there's a programs and meetings

 4   individual at AAPS and we would work close together in changing

 5   terms in a contract such as room prices, attrition rates, food

 6   and beverage allowances.  I mean, it's not real exciting stuff,

 7   but, you know, we worked together to get the best deal.

 8       Q    Would you take a look at page 6 of this document,

 9   please.  In the second paragraph, it reads (Reading:)

10            "At this point of the discussion,

11            Dr. Cerrato responded the Board of

12            Directors decision regarding the removal

13            of AOMBOC noncompliant members/diplomate

14            officers is for the protection and privacy

15            of all AAPS/ABPS members."

16            What were you talking about?

17       A    The context here was, as I had stated before, we

18   were ramping up our recognition efforts, and many discussions

19   were had about the strategy and tactics of doing so.  And we

20   were concerned that our plans would get communicated to our

21   competition.  So we instituted a policy which was a standard

22   business policy of a nondisclosure agreement which simply

23   stated that whatever you hear at a meeting, whatever you see

24   written about in a meeting is confidential and essentially

25   owned by the company and it's not to be shared.  And we went at
```

84

```
 1   a promise that you weren't going to do it.

 2       Q    So did you ask people to sign this nondisclosure

 3   agreement?

 4       A    We required them -- we required them to do it 'cause

 5   we felt it necessary to get compliance in this manner.

 6       Q    And did you inform people what the consequence would

 7   be if they chose not to sign it?

 8       A    Yes.  If you didn't sign the nondisclosure, you

 9   couldn't serve on whatever capacity you were at.

10       Q    And was there a deadline for compliance?

11       A    Yes.

12            MR. SCHNEIDER:  Would you take a look at

13   Exhibit 1497, please.

14            (Exhibit 1497 previously marked for identification.)

15            THE WITNESS:  This is a letter from Patricia Stewart

16   dated May 6, 2012.

17       Q    (BY MR. SCHNEIDER:)  And to whom is it addressed?

18       A    To Dr. Douglas Marciniak.

19       Q    Who is Douglas Marciniak?

20       A    I believe he was the president at the time.

21       Q    Of AAPS?

22       A    Of AAPS.  Sorry.

23       Q    The letter begins (Reading:)

24            "I have received your letter dated

25            March 26, 2012, informing me that I have
```

1          been removed from my position as governor

2          of the American Academy of Specialists in

3          Dermatology."

4          And the next paragraph (Reading:)

5          "As you know from the date of delivery

6          recorded on the return receipt, I did not

7          receive the certified letter from

8          Mr. Carbone which stated that there was a

9          February 10, 2012, deadline for returning

10         the signed confidentiality agreement until

11         March 15, 2012, more than a month after

12         the deadline had already passed."

13         Did the Board remove Dr. Stewart as a governor of

14    the Dermatology Academy?

15         A    Yes.

16         Q    And if you look at the -- would you take a look at

17    the last page of this exhibit, please.  And what is that?

18         A    I'm sorry.  Last page.  I'm sorry.  It's -- looks

19    like a copy of the envelope, cancelled envelope.

20         Q    Okay.  And it indicates postage due?

21         A    Yes.

22         Q    And then there's a handwritten note, "I signed this

23    3/15/12"?

24         A    Yes.

25         Q    Do you believe that this verifies what Dr. Stewart

1   was saying, that she did not receive the nondisclosure

2   agreement in sufficient time for her to sign it and return it

3   timely?

4       A    Yes.

5       Q    Did you think it was fair that the Board removed her

6   as a governor from the Dermatology Academy given that she

7   couldn't possibly have complied with the request?

8       A    Uhm, my personal opinion is -- and just my personal

9   opinion -- is discretion probably should have been applied

10  here, but I wasn't the one making that decision.

11      Q    Who was?

12      A    Dr. Marciniak.

13      Q    Was he making that decision alone?

14      A    No.  The Board of Directors, from what I

15  understand -- well, from what I understand, the Board of

16  Directors said that the date was the date and the logistics of

17  it was that there were over a hundred of these things sent out

18  by the office, and they all had to be collated and organized to

19  make sure to see who returned it and who didn't, so the date

20  was the date.

21      Q    Okay.  I'd like to turn to another topic.  There was

22  a disciplinary committee that was formed?

23      A    Yes.

24      Q    And who made the decision to form a disciplinary

25  committee?

```
 1        A      I did.

 2        Q      And were you doing that in your capacity as

 3   president?

 4        A      Yes.

 5        Q      And why was it that you were able to unilaterally

 6   decide to form a disciplinary committee?

 7        A      The bylaws allows the president to form committees,

 8   any committee at his discretion to fulfill whatever purpose the

 9   president wants them to.

10        Q      And did you personally select the members of the

11   disciplinary committee?

12        A      Yes.

13        Q      And whom did you select?

14        A      It was Dr. Montes, Dr. Maggio, and Dr. Wallace.

15        Q      And how did you choose the three of them?

16        A      Well, Dr. Montes and Dr. Maggio were past

17   presidents.  Both of those individuals had had previous

18   experience with disciplinary procedures in AAPS.

19               I selected Dr. Wallace as essentially an outsider,

20   newer to the organization with no experience in the

21   disciplinary process just to be the odd man out, to get a

22   different slant on whatever evidence that they saw, would see.

23        Q      Had Dr. Montes been the chair of the PAC that ended

24   up getting fined by the Federal Elections Commission?

25        A      Yes.
```

1          Q      And was -- at the time that AAPS was placed on

2     probation by the ACCME, was he the chair of the CME program for

3     AAPS?

4          A      Yes.

5          Q      Did you think that that posed a conflict of interest

6     for him to be involved in the disciplinary committee of

7     Dr. Stewart when one of the issues Dr. Stewart complained about

8     was the FEC fine and sanction and the other was the ACCME

9     probation?

10         A      No.  I didn't think -- the issues were totally

11    different.  Bell was the one who started the drum roll with the

12    FEC and the CME allegations.  The Dr. Stewart issues were

13    totally separate from that.  That's not why the disciplinary

14    committee was formed to -- these weren't the issues.

15         Q      But what led you to believe that Dr. Montes would

16    not consider the fact that she had criticized him in particular

17    with regard to the FEC and ACCME matters?

18         A      I'd known Dr. Montes for many years, and he was a --

19    he was a very fair and just individual, and he understood what

20    the issues were, and he also understood, you know, how -- how

21    this case had to be looked at.  He fully understood what the

22    repercussions were, and I sincerely felt that he could be

23    objective in reaching a conclusion.

24               And the second thing is, there again, there's not

25    that many people who would put theirselves forward in this

```
 1    situation.  There's not a lot of people to choose from with

 2    that kind of profile.

 3         Q    The profile meaning his level of experience in AAPS

 4    matters?

 5         A    His level of experience and integrity.

 6         Q    Okay.

 7         A    And I might add, his willingness to serve, which was

 8    a big thing.

 9         Q    By the way, with regard to the ACCME probation, did

10    you consider that to be something serious?

11         A    No.  It was -- it is -- to me it was an

12    administrative issue that was easily solved that harmed no one.

13    That was totally blown out of proportion.

14         Q    Did the probation serve to -- at any time to

15    preclude AAPS from putting on CME programs?

16         A    Well, not only didn't it preclude AAPS from putting

17    on programs, the individuals who received CME credits before

18    the probation and after the probation still received credit.

19    There was no change in that.

20         Q    Okay.  Let's talk about Dr. Wallace for a moment.

21    Was Dr. Wallace a dermatologist by trade?

22         A    Yes.

23         Q    Did you come to learn that he now occupied this time

24    frame the seat as governor that Dr. Stewart held until she was

25    removed?
```

1     A     I found that much later.

2     Q     Well, did that at all concern you that he was

3  sitting in that governor's seat?

4     A     No, because the seat was vacant.  I mean, you know,

5  the NDA -- the nondisclosure agreement issue had precluded

6  Dr. Stewart from sitting in that seat.  Somebody had to fill

7  it.  Okay?  So that issue was over.  It was basically by

8  default.

9     Q     Well, what was your understanding of who would

10  occupy that seat in the event that Dr. Stewart was absolved in

11  this disciplinary process?

12     A     Well, I don't know that I had an understanding who

13  is going to sit in that spot.

14     Q     Why didn't you look to other members of the Board of

15  Directors in selecting who would occupy spots on that

16  disciplinary committee besides the three doctors?

17     A     I think that, No. 1, people did not want to get

18  involved.  I think they understood that the time commitment,

19  No. 1.

20          No. 2, they weren't very educated to the issues.

21          And No. 3, I had no power to force anybody to do

22  anything.  I couldn't force them to sit on that committee.  I

23  needed volunteers.

24     Q     Well, did you consider looking outside of the Board

25  of Directors for people to serve on that committee?

1        A      Somewhat.

2        Q      Well, was Dr. Wallace at that time a director?

3        A      I -- I don't remember.  I think -- he may have been.

4    I don't remember.

5        Q      Okay.  Dr. Cerrato, do you remember the timeline

6    that Mr. Conwell presented to you?

7        A      Yes.

8        Q      Okay.  And the timeline reflected that the

9    disciplinary -- that the meeting of the Board of Directors

10   regarding the discipline was on June 13, 2012?

11       A      Yes.

12       Q      And the annual meeting was a couple weeks later in

13   Marina Del Rey?

14       A      Yes.

15       Q      And you knew by this time that Dr. Stewart resided

16   in California, didn't you?

17       A      Yes.

18       Q      Why is it that you couldn't honor her request that

19   the hearing take place in California rather than in Florida?

20       A      At the time we had five outstanding individuals for

21   discipline, and the annual meetings are very tightly

22   choreographed, and just the timing just wouldn't allow us to

23   carry that meeting off at that point.

24       Q      Were there five people who were the subject of

25   discipline at that time?

```
 1        A      Yes, yes, there were.

 2        Q      Who were they?

 3        A      Castillo, Klein, Geller, Cressey, Stewart, and

 4   Radentz.

 5        Q      I count six.

 6        A      Sorry.

 7        Q      Okay.  Would you agree there's six?

 8        A      There's six.  I'm sorry.

 9        Q      And each person had been notified that they would

10   get 15 minutes to defend themselves?

11        A      That's correct, each and every one.

12        Q      Okay.  And was it your understanding that would be

13   the length of the disciplinary meeting, 15 minutes?

14        A      No, that wasn't -- that was the length of the limit

15   of their testimony.  I expected each one of those to go for

16   quite a while.

17             MR. SCHNEIDER:  Okay.  Would you take a look -- oh,

18   before I move on, I would like to move 1497 into evidence.

19             MR. CONWELL:  No objection.

20             THE COURT:  Received.

21             (Exhibit 1497 received into evidence.)

22             MR. SCHNEIDER:  And 1466.

23             MR. CONWELL:  No objection.

24             THE COURT:  Received.

25             (Exhibit 1466 received into evidence.)
```

```
 1               MR. SCHNEIDER:  Would you take a look at
 2    Exhibit 1494, please.
 3               (Exhibit 1494 previously marked for identification.)
 4               MR. SCHNEIDER:  While he is doing that, I would like
 5    to move Exhibit 1 into evidence.
 6               MR. CONWELL:  Your Honor, his Exhibit 1 is not the
 7    same as our Exhibit 1, so we have to address that.  They're two
 8    different documents.
 9               THE COURT:  All right.  The joint exhibit list shows
10    Exhibit 1 as the minutes of the April 28, 2012, Board of
11    Directors meeting.  Is it not?
12               MR. CONWELL:  Correct.  And our Exhibit 1 --
13               THE COURT:  I don't understand what you mean by "our
14    Exhibit 1."  I have a joint exhibit list.
15               MR. CONWELL:  Right.  It's -- that's what I think it
16    should be.  And the document he showed is not matching up with
17    what we have.
18               THE COURT:  When you say "what we have," you mean
19    the joint exhibit list?
20               MR. CONWELL:  Yes.
21               THE COURT:  What I just read?
22               MR. CONWELL:  Yes.  We've got it as the minutes, but
23    what he showed is not matching up with what I have.  So I just
24    need to check it to see if the --
25               THE COURTROOM DEPUTY:  Put it back on.
```

1          MR. CONWELL:  I'm looking at electronic copy.  I

2     just need to see if this differs from the paper copy.

3          THE COURT:  Mr. Schneider, refresh my recollection.

4     What was Exhibit 1?

5          MR. SCHNEIDER:  That was the minutes of the

6     April 28, 2012, meeting.

7          THE COURT:  Okay.

8          MR. CONWELL:  And I used those minutes and I thought

9     the exhibit number --

10          THE COURT:  You thought?

11          MR. CONWELL:  I used those minutes in the

12     examination of Dr. Cerrato, but under a different exhibit

13     number.

14          THE COURT:  Yeah, okay.  Well, 1 comes in.

15          MR. CONWELL:  I just need to see the paper copy.

16          THE COURT:  Wait, wait, wait.  Show it to him.

17          MR. CONWELL:  Thank you.

18          No objection.

19          THE COURT:  All right.  Received.

20          MR. SCHNEIDER:  Thank you.

21          (Exhibit 1 received into evidence.)

22     Q     (BY MR. SCHNEIDER:)  Dr. Cerrato, you're now looking

23     at Exhibit 1494?

24     A     Correct.

25     Q     And what is that?

```
 1        A      This is an e-mail from myself to the members of the

 2   disciplinary committee with Dr. Montes, Dr. Wallace,

 3   Dr. Maggio.

 4        Q      And why did you send this?

 5        A      I sent it to thank them for volunteering to serve on

 6   the committee and to give them some preliminary instructions as

 7   to what they were supposed to do, and that they were to contact

 8   Mr. Ratner for details to carry out any particular steps to

 9   their duties, that the firm would be their sole point of

10   contact for guidance on all these issues.

11             MR. SCHNEIDER:  I'd like to move 1494 into evidence.

12             MR. CONWELL:  No objection.

13             THE COURT:  Received.

14             (Exhibit 1494 received into evidence.)

15        Q     (BY MR. SCHNEIDER:)  Would you please look at

16   Exhibit 1498.

17             What is the first page?

18        A      The first page is a letter to Dr. Stewart from

19   myself, uhm, essentially notifying her of a disciplinary

20   committee charge.

21        Q      And the disciplinary meeting was to take place in

22   Tampa on June 9, 2012?

23        A      That's correct.

24        Q      The second paragraph reads (Reading:)

25             "At this meeting, the committee will
```

1          consider charges against you for conduct

2          injurious to the best interest of AAPS

3          and/or incompatible with its purposes as

4          more specifically described in the

5          materials annexed here as Exhibit 1."

6          Do you see that?

7     A    Yes.

8     Q    And then it says (Reading:)

9          "The committee will present its

10         recommendations on the appropriate level

11         of discipline, which may include

12         termination of your membership privileges

13         in AAPS for action by the full Board of

14         Directors at the Board's next meeting."

15         What was Exhibit 1?

16    A    Exhibit 1, I believe, was the counterclaim.

17    Q    And Dr. Stewart was a counter-defendant?

18    A    Yes.

19    Q    And AAPS was one of the counterclaimants?

20    A    That's correct.

21    Q    The next paragraph says --

22         THE COURT:  Hang on a sec.  Are you talking to them,

23    those six?  Do you care that they know what a counterclaimant

24    or counter-defendant is?

25         Q    (BY MR. SCHNEIDER:)  Dr., what's a counterclaim?

1    A      When someone files a legal claim against you, the

2    defendant files an action, uhm, that, uhm -- I could say this:

3    Basically, if A sues B, B sues A back.  That's about the

4    easiest I could put it.

5    Q      In your hypothetical, B would be filing a

6    counterclaim against A?

7    A      Correct.  B is the counterclaim.

8           MR. SCHNEIDER:  Thank you.

9      And thank you, your Honor.

10   Q      (BY MR. SCHNEIDER:)  The next paragraph reads

11   (Reading:)

12          "Under Section 3.05 of the bylaws, you may

13          appear in person with or without counsel

14          before the disciplinary committee at the

15          appointed time to present evidence that

16          you are qualified to continue as a member

17          in good standing with AAPS.  If you choose

18          to appear in person, you will be given up

19          to 15 minutes for oral presentation to the

20          disciplinary committee."

21          How did it come to be that Dr. Stewart was granted

22   15 minutes?

23   A      The process, the disciplinary process, was discussed

24   with legal counsel and among the Board of Directors, and it was

25   decided that this is the procedure they were going to follow.

1       Q      Did you think that 15 minutes was fair to

2  Dr. Stewart?

3       A      I think it was.

4       Q      And what makes you think that was fair?

5       A      I think that the charges against her, uhm, could be

6  explained, or why what happened happened could be explained in

7  15 minutes.

8       Q      And again, were you working with counsel in coming

9  up with that --

10      A      Yeah.  Absolutely.  I mean, again, this is a process

11 we weren't used to doing.

12      Q      The next sentence says (Reading:)

13             "If you choose to appear in person" -- I'm

14             sorry.  The next sentence says (Reading:)

15             "Please be advised that only you and your

16             counsel will be allowed in the room during

17             the meeting of the disciplinary

18             committee."

19             Would you agree that if it were only Dr. Stewart and

20 counsel appearing, that that meant she could not present

21 witnesses?

22      A      Yes.  That's -- yes, that's correct.

23      Q      Did you think that was fair?

24      A      Well, whether it was fair or not, it was in the

25 bylaws.

1          THE COURT:  Could you answer the question, please?

2          THE WITNESS:  Yes, I think it was fair.

3     Q    (BY MR. SCHNEIDER:)  And what leads you to believe

4 that it was fair?

5     A    I think that the scope of what she was being charged

6 with didn't need witnesses.

7          MR. SCHNEIDER:  Would you take a look at

8 Exhibits 1327, 1328, 1329, 1330, and 1331.

9          (Exhibits 1327, 1328, 1329, 1330, 1331

10          previously marked for identification.)

11     Q    (BY MR. SCHNEIDER:)  Okay.  On the screen right now

12 is 1327.

13     A    Yes.

14     Q    And this letter is dated to Richard Cressey, M.D.?

15     A    That is correct.

16     Q    And is the content of this letter the same as the

17 content of the letter to Dr. Stewart?

18     A    Yes.  It's exactly the same.

19     Q    Okay.  What is 1328?

20     A    1328 is a letter to Dr. Radentz which is a exact

21 copy of the letter to Dr. Cressey.

22     Q    And what about 1329 through 1331?

23     A    1329, 1330, and 1331 are identical documents with

24 the exception of who they were sent to.

25     Q    And who were the addressees of those three?

```
 1        A      1329 is Dr. Klein; 3730 is Dr. Castillo; 3731 is

 2   Dr. Geller.

 3        Q      We have met Dr. Castillo.  He is, obviously, a man.

 4   What gender is Dr. Klein?

 5        A      Dr. Klein is a man.

 6        Q      And what about Dr. Cressey?

 7        A      Dr. Cressey's a man.

 8        Q      And what about Dr. Geller?

 9        A      Dr. Geller's a man.

10        Q      And how about Dr. Radentz?

11        A      Dr. Radentz is a woman.

12        Q      Would you take a look at Exhibit 1334, please.

13        A      These are the minutes of the AAPS Board of Directors

14   conference call, May 30, 2012.

15        Q      And would you take a look at the second page,

16   please, and would you read Section B.

17        A      (Reading:)

18               "B. Disciplinary Committee.  The Board

19               heard an update on the creation of the

20               disciplinary committee, which included a

21               presentation from AAPS's counsel.  The

22               Board considered, discussed, and voted to

23               adopt the attached resolution, ratifying

24               the disciplinary committee and delegating

25               to it certain powers enumerated in the
```

1               resolution."

2     Q    And would you take a look at Section E.

3     A    The removal of Dr. Atwood Rice?

4     Q    Yes.  And what does that say?

5     A    (Reading:)

6             "The Board considered and discussed

7             whether Dr. Rice's past and present

8             conduct was not in the best interests of

9             AAPS and otherwise violated his fiduciary

10           obligations as a member of the Board.  A

11           motion was made and seconded to remove

12           Dr. Atwood from the Board of Directors for

13           conduct not in the best interests of AAPS,

14           pursuant to sections 6.09 and 7.09 of AAPS

15           bylaws.  Following an executive session of

16           the Board to further consider and discuss

17           the pending motion, the Board unanimously

18           voted to remove Dr. Rice as a member of

19           the Board, effective immediately."

20     Q    First, could you tell us what executive session

21 means?

22    A    Uhm, an executive session of the Board basically

23 just includes the officers.

24     Q    So that would be the Executive Committee?

25     A    Yes, that would be the Executive Committee.

1      Q      Was this a telephone conference?

2      A      Yes.

3      Q      So were Dr. Rice and the other people who were not

4  in the Executive Committee asked to hang up?

5      A      Yes.

6      Q      And what was discussed when you folks were in

7  executive session?

8      A      Uhm, I think it was the behavior of Dr. Rice in

9  passing documents to our litigants.

10     Q      And what led you to believe that he was doing that?

11     A      I -- you know, I don't recall right now.

12     Q      Okay.

13     A      I'm sorry.

14     Q      Did the disciplinary meetings go forward as to

15  Dr. Stewart and Dr. Radentz?

16     A      Yes, they did.

17     Q      Did the disciplinary meetings go forward as to

18  Drs. Cressey, Klein, Geller, and Castillo?

19     A      No, they did not.

20     Q      Why not?

21     A      Those defendants filed a motion in Florida court to

22  obtain a temporary restraining order to prevent us from moving

23  ahead with the disciplinary action against them.

24          MR. SCHNEIDER:  I'd like to move into evidence 1327

25  through 1331.

```
 1              MR. CONWELL:  No objection.

 2              THE COURT:  Received.

 3              (Exhibits received into evidence.)

 4              MR. SCHNEIDER:  And 1334.

 5              MR. CONWELL:  No objection.  I thought that was in

 6    already.

 7              THE COURTROOM DEPUTY:  It is.  It's in.

 8              MR. SCHNEIDER:  Okay.  Would you take a look at

 9    Exhibit 1467, please.

10              (Exhibit 1467 previously marked for identification.)

11              THE WITNESS:  Okay.

12        Q    (BY MR. SCHNEIDER:)  Can you tell us what this is?

13        A    1467 is a transcript of proceedings before

14    Judge Robert Foster, what transpired on June 7, 2012, with the

15    plaintiffs Castillo, Klein, and Geller vs. AAPS.

16        Q    And there's reference in that caption to the

17    counterclaim?

18        A    Correct.  Excuse me.  And AAPS, counter-plaintiffs

19    vs. Castillo, Klein and Geller.

20        Q    Would you go to page 81, please.  Would you go to

21    line 21, please.

22        A    Line 21?

23        Q    Yes.

24        A    (Reading:)

25              "The Court:  I'm going to grant temporary
```

```
 1              injunction" --
 2       Q      Wait a minute.
 3       A      Oh, I'm sorry.
 4       Q      When you say, "The Court," are you indicating that
 5   is the Court speaking?
 6       A      Well, it's the judge speaking.
 7       Q      Okay.  And what did the judge say?
 8       A      The judge said that, (Reading:)
 9              "I'm going to grant temporary injunction
10              until the 12th July -- 12th July.  I'm
11              going to find that they have a right to
12              have some discovery, they have a right to
13              take depositions, if they want, in this
14              matter.  And Judge Baumann will decide on
15              the 27th of July if the temporary
16              injunction is going to be continued.
17              I'm going to find that this is a
18              organization that is not a social
19              organization, that it could be injurious
20              to the individuals that are before the
21              Court.  I don't find any prejudice on the
22              part of AAPS as to how and why they would
23              be prejudiced by not continuing the
24              disciplinary committee hearing."
25       Q      You used --
```

```
 1              MR. CONWELL:  Your Honor, I'm sorry.  For
 2    completeness, I'd like him to finish.  It's only just another
 3    20 lines.  He's only read part of it.  So for completeness --
 4              THE COURT:  How much more did you want him to read?
 5              MR. CONWELL:  Just to the end of where the court is
 6    speaking which is only about another 20 lines.
 7              THE COURT:  20 lines?  Tell you what, I'll let you
 8    do it during your cross which I imagine is going to be
 9    extensive.
10              MR. CONWELL:  Okay.
11         Q    (BY MR. SCHNEIDER:)  You've used the word
12    discovery -- well, actually, the court used the word discovery.
13    What does that mean?
14         A    A gathering of evidence.
15         Q    That the litigants can do with one another?
16         A    Yes.
17         Q    So is that why the disciplinary hearing did not go
18    forward with regard to Drs. Klein, Cressey, Castillo, and
19    Geller?
20              MR. CONWELL:  Your Honor, I object to the witness
21    interpreting what the court's saying.
22              THE COURT:  No, that's not my --
23              MR. CONWELL:  This ruling is the court's ruling.
24              THE COURT:  Overruled.
25              THE WITNESS:  Can you just repeat the question?
```

```
1        Q      (BY MR. SCHNEIDER:)  Is what the court ruled, what

2   you just read --

3        A      Right.

4        Q      -- the reason that the disciplinary hearing did not

5   proceed as to Dr. Klein, Dr. Geller, Dr. Cressey, and

6   Dr. Castillo?

7        A      No.

8        Q      That's not the reason?

9        A      Well, this -- this matter never came up again.

10       Q      I don't understand.

11       A      Well, I think I don't understand the question.  I'm

12  not going to --

13       Q      There had been six disciplinary hearings set for

14  June 9th, correct?

15       A      Correct.

16       Q      Okay.  And was the date of this hearing June 7th?

17       A      Yes.

18       Q      And did the court issue an order that those

19  disciplinary meetings could not go forward?

20       A      Yes.

21       Q      Thank you.

22              Was there a similar motion brought on behalf of

23  Dr. Radentz, a motion for an injunction?

24       A      Uhm, I don't think so.

25       Q      And what about for Dr. Stewart?
```

1      A      I don't believe so.

2      Q      And what is an injunction?

3      A      An injunction issued by a court stops some action.

4      Q      So would you have been able to go forward with the

5  disciplinary meetings as to Dr. Klein, Geller, Castillo, and

6  Geller without violating a court order?

7      A      No.

8      Q      Did the -- who was Judge Baumann?

9      A      He was one of the Florida judges that was assigned

10  to our -- assigned to the *Geller, Klein, and Castillo vs. AAPS*

11  case.

12      Q      And was he the judge assigned to this matter at the

13  time of this hearing to this case?

14      A      Yes, he was.

15      Q      And was this hearing in front of Judge Baumann?

16      A      No.  It was in front of Judge Foster.

17              MR. SCHNEIDER:  Would you take a look at

18  Exhibit 1765, please.

19              (Exhibit 1765 previously marked for identification.)

20              MR. SCHNEIDER:  I would like to move 1467 into

21  evidence.

22              MR. CONWELL:  No objection.

23              THE COURT:  Received.

24              (Exhibit 1467 received into evidence.)

25              THE WITNESS:  This is a -- this is a transcript of

1    proceedings before Judge Herbert Baumann on July 27th, 2012.

2    Again, the same plaintiffs, defendants, counter-plaintiffs and

3    counter-defendants.

4         Q    (BY MR. SCHNEIDER:)  Dr., could you tell us what a

5    transcript is?

6              THE COURT:  Hang on a sec.  Why are we spending this

7    much time on the Florida matter?  How is that relevant now?

8    Some of the disciplinary hearings were enjoined by a state

9    court in Florida.  Fine.  Okay.  What's this have to do with

10   Dr. Stewart?

11             MR. SCHNEIDER:  It has to do with the discrimination

12   claim.

13             THE COURT:  Okay.  So there were males and females

14   alike; obviously, males involved, right?  Disciplined?

15             MR. SCHNEIDER:  I'm sorry.  I can't hear you.

16             THE COURT:  Okay.  There were two females, including

17   Dr. Stewart.

18             MR. SCHNEIDER:  Yes.

19             THE COURT:  And the rest of the people that were

20   subject to discipline were males.

21             MR. SCHNEIDER:  Yes.

22             THE COURT:  That's been established.  Now, why do we

23   care about this Florida hearing?

24             MR. SCHNEIDER:  We care about this Florida hearing

25   because AAPS was not permitted to go forward with the

```
 1    disciplinary meetings as to the four men.

 2              THE COURT:  Okay.  Stipulate.  Let's move on.

 3              MR. CONWELL:  That's -- it's not stipulated.

 4              THE COURT:  Oh, there wasn't an injunction?

 5              MR. CONWELL:  It was a temporary injunction which --

 6              THE COURT:  Fine.

 7              MR. CONWELL:  -- which -- which did not prohibit

 8    them from going forward with the men --

 9              THE COURT:  At a later date.

10              MR. CONWELL:  -- at a later date and they had to be

11    fair proceedings.

12              THE COURT:  Okay.  So why don't we move to there?

13              MR. CONWELL:  Yeah.  That's fine.

14              THE COURT:  All right.  So the temporary injunction

15    expired, let's assume, on -- I don't know -- pick a date.  And

16    let's pick up after that.  What happened after that?

17              MR. SCHNEIDER:  Well, your Honor, where I was going

18    is it was through July 27th.

19              THE COURT:  Got it.  July 27th.  What happened after

20    July 27th?

21              MR. SCHNEIDER:  Judge Baumann extended it.

22              THE COURT:  Okay.  What happened after that, after

23    they reached the extended date?

24              MR. SCHNEIDER:  Nothing has happened after that.  It

25    still hasn't been lifted.
```

```
 1                THE COURT:  Oh, it's a permanent injunction?

 2                MR. SCHNEIDER:  No.

 3                MR. CONWELL:  No, it's not.

 4                MR. SCHNEIDER:  It's not a permanent injunction.  It

 5     just hasn't been lifted yet.

 6                THE COURT:  So you still -- you cannot proceed with

 7     disciplinary hearings as to those other doctors right now

 8     because they've been enjoined by a judge in Florida?

 9                MR. SCHNEIDER:  Yes.

10                MR. CONWELL:  Judge, that's not correct.

11                THE COURT:  Excuse me?  Meaning he just made --

12                MR. CONWELL:  That's not --

13                THE COURT:  -- a misrepresentation to the Court?

14                MR. CONWELL:  I think so.  It's not correct.  I'll

15     tell you what happened, if you'd like.

16                THE COURT:  What happened?

17                MR. CONWELL:  Mr. Kruzhkov, their New York counsel,

18     at the hearing before Judge Baumann said, "We would like to

19     voluntarily extend the TRO."  That's what he did.

20          And then the judge said, "Do you have any objection to

21     them voluntarily extending the TRO?"  This is in the

22     transcript.

23          I said, "If they want to extend the TRO, that's up to

24     them.  We don't object to it."

25          So they, the AAPS, asked if they could extend the TRO, and
```

```
1    then he set a date for an evidentiary hearing, and that
2    evidentiary hearing never went forward.
3              THE COURT:  Okay.
4              MR. CONWELL:  So it was completely within the
5    control of AAPS to --
6              THE COURT:  Wait a minute.  Okay.  Wait.
7         Is what he said so far accurate?
8              MR. SCHNEIDER:  I don't think so.
9              THE COURT:  What's wrong?  You're saying that AAPS
10   didn't ask -- voluntarily ask for an extension?
11             MR. SCHNEIDER:  Well, based on what he just said,
12   we're going to be calling Mr. Kruzhkov as a witness to explain
13   what occurred.
14             THE COURT:  Why?
15             MR. CONWELL:  We've got the transcript.
16             THE COURT:  This is why I don't want to get too far
17   down this rabbit hole.  This is tangential.
18             MR. SCHNEIDER:  It's not tangential at all, your
19   Honor.
20             THE COURT:  It's going to be.  I don't want us
21   fooling around with a TRO in Florida dealing with a
22   disciplinary hearing with respect to other people.  This is
23   about Dr. Stewart.
24             MR. SCHNEIDER:  It is, and Dr. Stewart is claiming
25   that she was discriminated against on the basis of her gender,
```

```
 1   and we are arguing that we couldn't proceed as to the male

 2   doctors not because they're male, but because there's a court

 3   order.

 4              THE COURT:  Okay.  Fine.  Great.  Let's move on.

 5              MR. SCHNEIDER:  We need to introduce the evidence of

 6   it.

 7              THE COURT:  It's -- you know what?  You've

 8   introduced all that's going to be introduced on this.  Move on.

 9              MR. SCHNEIDER:  Okay.

10              THE COURT:  Or sit down.

11              MR. SCHNEIDER:  Pardon me?

12              THE COURT:  Ask another question in another area or

13   sit down.

14              MR. SCHNEIDER:  All right.

15              THE COURT:  Okay.

16              MR. SCHNEIDER:  Would you take a look at

17   Exhibit 1740, please.

18              (Exhibit 1740 previously marked for identification.)

19              THE WITNESS:  This is a letter from William Okerblom

20   dated June 8th, 2012, to Ms. Esther Berg.

21        Q    (BY MR. SCHNEIDER:)  And what does the letter say?

22        A    (Reading:)

23              "As you know when I spoke with you this

24              morning and informed you that I am

25              representing Dr. Stewart at her
```

```
  1                    disciplinary hearing tomorrow and asked

  2                    you to provide me with a telephone number

  3                    for attending the hearing telephonically,

  4                    you told me that you would find the

  5                    information that I needed and get back to

  6                    me within two hours.  More than that

  7                    amount of time has passed and I have not

  8                    heard back from you.  I had tried to call

  9                    Mr. Carbone directly, but there must have

 10                    been a problem with the phones because he

 11                    never picked up the phone line when Nicole

 12                    transferred the call to him, and then her

 13                    phone stopped answering my calls with no

 14                    explanation.  Please respond before you

 15                    leave work today as without a phone

 16                    number, my client will not be able to

 17                    attend her hearing.  Sincerely, William

 18                    Okerblom."

 19        Q     Who is Ms. Berg?

 20        A     She's an employee at AAPS.

 21        Q     And were you shown this letter?

 22        A     Uhm, no -- oh, actually, yes, I was.

 23        Q     And did you draw any conclusion from the first

 24   sentence in this letter?

 25        A     Well, the first sentence says that, "I'm
```

representing Dr. Stewart at her hearing tomorrow."

Q    Had there already been an exchange of communications between Dr. Stewart and Dr. Montes regarding whether she could appear by phone?

A    Yes.

Q    And what was the conclusion from that?

A    The conclusion was she had to appear in person.

MR. SCHNEIDER:  Would you take a look -- I'd like to move 1740 into evidence.

THE COURT:  Any objection?

MR. CONWELL:  No objection.

THE COURT:  Received.

(Exhibit 1740 received into evidence.)

Q    (BY MR. SCHNEIDER:)  Are you looking at 228?

THE COURTROOM DEPUTY:  You didn't give the number yet.

(Exhibit 228 previously marked for identification.)

THE WITNESS:  This is a letter dated Wednesday, June 6, 2012, from Patricia Stewart to the members of the AAPS Board.

Q    (BY MR. SCHNEIDER:)  And in this e-mail, did Dr. Stewart request that she be permitted to participate in the meeting by phone?

A    I can't find it.

Q    Okay.  Would you go to the last page of this

1    exhibit.  And what is that?

2        A    Oh, turn the page.  This is a e-mail from Patricia

3    Stewart on June 8th to Dr. Montes, states, "Dr. Montes, I'm

4    physically unable to attend the hearing in person at 10:00 AM.

5    If you're acting in good faith, please call me on June 9, 2012,

6    at 10 A.M. and permit me to attend telephonically.  I'll be

7    awaiting your call" --

8        Q    I'm sorry.  Dr. Cerrato, what I wanted you to look

9    at was an e-mail that's the only thing on the last page.

10       A    Sorry.  E-mail from Dr. Montes to Dr. Radentz and

11   Dr. Stewart, "Patricia and Leslie" -- dated Friday, June 8th,

12   2012 -- "Patricia and Leslie, on advice of our counsel, your

13   appearance is to be in person.  Conference call is not allowed.

14   The hearing is scheduled for 10 A.M. Saturday, June 9th."

15       Q    Did you participate in the decision that Dr. Stewart

16   not be permitted to participate telephonically?

17       A    No, I did not.

18       Q    Had you ever discussed that with Dr. Montes?

19       A    Uhm, no.

20       Q    Would you take a look at Exhibit 1098, please.

21       A    This is an e-mail from Dr. Montes dated Sunday,

22   June 10th, 2012, to myself and Bill Carbone and the attorneys,

23   Dr. Marciniak.  Subject was a disciplinary committee hearing

24   Saturday, June 9th, 2012, Dr. Stewart and Dr. Radentz.

25       Q    What did Dr. Montes say in this e-mail?

```
 1        A      Uhm, it said essentially that the disciplinary

 2   committee had met on Saturday, June 9th.  They convened a

 3   hearing at 10 A.M. and then 11:30; that Dr. Stewart and Radentz

 4   did not appear on their behalf, nor was there any counsel

 5   present on their behalf.  (Reading:)

 6                "There wasn't any defense documentation

 7                presented either before or during the

 8                hearing, and, therefore, the decision and

 9                recommendation of the committee that the

10                defendants Patricia Stewart and

11                Dr. Radentz did not disprove their actions

12                of conduct -- quote, 'conduct not in the

13                best interest of or beneficial to AAPS and

14                the -- to the remaining members of the

15                Association,' end quote.

16                The disciplinary committee recommends that

17                the two individuals, Dr. Stewart and

18                Dr. Leslie Radentz, be permanently

19                expelled from AAPS with no remaining

20                rights or claims."

21                And signed by Dr. Montes, Dr. Maggio, and

22   Dr. Wallace.

23        Q      Dr. Cerrato, in the first paragraph it indicates

24   that there was no defense documentation presented either before

25   or during the hearing.  Do you recall testifying yesterday
```

1     about a letter dated May 24, 2012, from Dr. Stewart?

2         A     Yes.

3         Q     And Dr. Stewart denied the allegations against her?

4         A     Yes.

5         Q     So was it accurate for Dr. Montes to say that no

6     documentation was presented before or during the hearing?

7               MR. CONWELL:  Objection, your Honor.  No foundation

8     that this witness was present at the hearing.

9               THE COURT:  Sustained.

10        Q     (BY MR. SCHNEIDER:)  Well, had -- had you received

11    correspondence from Dr. Stewart that was dated May 24th?

12        A     Yes.

13        Q     And did that correspondence go to the entire Board

14    of Directors?

15        A     Yes.

16        Q     Was Dr. Montes a member of the Board of Directors

17    then?

18        A     Yes.

19        Q     Was Dr. Maggio a member of the Board of Directors

20    then?

21        A     I believe so.

22        Q     Okay.  Would you take a look now at Exhibit 1347.

23    And what is this?

24        A     These are Draft Minutes AAPS Board of Directors

25    Conference Call June 13, 2012.

```
 1        Q     Do you know why they say draft on them?

 2        A     Uhm, draft was a term that we used on many of the

 3   minutes until they were officially approved.  Many times,

 4   unfortunately, the draft terminology just got passed -- passed

 5   on.

 6        Q     What do you mean by that?

 7        A     Well, they -- it should have said final minutes.

 8   Many times those minutes got recorded as draft instead of final

 9   minutes.

10        Q     These particular minutes, were they ever superseded

11   by one that said minutes or final minutes?

12        A     Not to my knowledge.

13        Q     Based on your limited knowledge of Robert's Rules,

14   do you think these comply?

15              MR. CONWELL:  Objection, your Honor.  He's not

16   qualified.

17              THE COURT:  Sustained.

18        Q     (BY MR. SCHNEIDER:)  What happened at the meeting on

19   June 13, 2012?

20        A     Dr. Montes presented the recommendation of the

21   disciplinary committee following that committee's meeting on

22   June 9th to the Board of Directors.  Uhm --

23        Q     And was there discussion concerning Dr. Stewart?

24        A     Yes.

25        Q     You recall what it was?
```

```
 1        A     Uhm, we discussed the findings.  We discussed the

 2   recommendation.

 3        Q     And what was discussed in connection with the

 4   findings and the recommendation?

 5        A     What the elements of this decision -- what

 6   exactly -- how was the decision arrived at and whether -- you

 7   know, what should be the fair conclusion to this.

 8        Q     And what was said as to whether -- the bases for

 9   whatever decision you were going to make?

10        A     Well, the basis was for Dr. -- well, we discussed --

11   there was two people here, two individuals, Radentz and

12   Stewart, so they had different issues.  So we discussed the

13   issues that brought them to this point.

14        Q     And what were they?

15        A     Well --

16              THE COURT:  With respect to Stewart.

17              THE WITNESS:  With respect to Stewart were the

18   e-mails and documents that Dr. Okerblom had been --

19        Q     (BY MR. SCHNEIDER:)  Dr. Okerblom had been what?

20        A     Her attorney.

21        Q     Are you saying that the ones that Dr. Okerblom sent?

22        A     Yes.

23        Q     And what about with respect to Dr. Radentz?

24        A     Dr. Radentz was distributing a lot of negative

25   information first with -- AAPS had a dermatology -- for lack of
```

1    a better term -- a dermatology blog that was supposed to be for

2    the exchange of educational -- it was for educational purposes.

3    And Dr. Radentz had essentially hijacked that and turned it

4    into a soapbox for her issues with Board of Directors,

5    Executive Committee, and AAPS in general.  And when the AAPS

6    invoked its internet use policies, she formulated her own

7    independent blog where she continued with the spread of

8    misinformation and derogatory comments or remarks directed to

9    individuals at AAPS.

10        Q    And how was that injurious to the best interest of

11   AAPS?

12        A    Well, it portrayed AAPS -- I mean, some of the

13   statements in there were quite -- quite remarkable.  They --

14   she described us as a medical Mafia, in derogatory terms like

15   that.

16             MR. SCHNEIDER:  Okay.  Would you take a look at

17   Exhibit 1039.

18             (Exhibit 1039 previously marked for identification.)

19             THE WITNESS:  This is a letter -- a memorandum

20   from -- or to Patricia Stewart from the AAPS Board of

21   Directors.

22        Q    (BY MR. SCHNEIDER:)  I'm sorry.  Would you go to the

23   next page, please.  And what is this?

24        A    It says 1039-2?

25        Q    Yes.

1      A      This is a memorandum from Dr. Stewart to the AAPS

2  Board of Directors dated June 18th, 2012, re:  AAPS Membership.

3      Q      Okay.  Would you -- and this notifies her that her

4  membership's been terminated?

5      A      Correct.

6      Q      Would you read the third paragraph beginning with,

7  "Please note"?

8      A      (Reading:)

9              "Please note, however, that termination of

10             your membership in AAPS will not in any

11             way affect your board certification status

12             with American Board of Physician

13             Specialties.  As long as you comply -- as

14             long as you continue to comply with any

15             current and/or future board certification

16             and recertification rules and

17             requirements, you will still be identified

18             and/or verified as, quote, 'ABPS board

19             certified,' end quote, in accordance with

20             any diplomate identification policy in

21             effect now or in the future."

22     Q      Can you tell me what the word diplomate means in

23  this context?  It doesn't mean ambassador, does it?

24     A      No.  A diplomate is shorthand for board-certified

25  physician.  We call them diplomates.

```
 1        Q      So would it be fair to say that net of this letter

 2   is her membership has been terminated but not her

 3   certification?

 4        A      That's correct.

 5               MR. SCHNEIDER:  I'd like to move 1039 into evidence.

 6               MR. CONWELL:  No objection.

 7               THE COURT:  Received.

 8               (Exhibit 1039 received into evidence.)

 9        Q      (BY MR. SCHNEIDER:)  Why is it this letter indicates

10   that Dr. Stewart did not lose her board certification?

11        A      Well, I think by this time the bylaws had -- had

12   been changed concerning that issue.

13        Q      A change such as terminated members did not lose

14   their certification?

15        A      Correct.  That -- right.  If they were subjected to

16   discipline and they were found guilty of that infraction, that

17   their board certification was not -- not affected.

18        Q      Okay.

19               MR. SCHNEIDER:  I'm not going to be finished in two

20   minutes, if that's what you're asking.

21               THE COURT:  Well, we're going to stop and take a

22   break in two minutes.

23               MR. SCHNEIDER:  Oh, okay.  Thank you.

24               THE COURT:  Go ahead.

25               MR. SCHNEIDER:  All right.
```

1          Q      (BY MR. SCHNEIDER:)  Dr. Cerrato, did you regard the

2     disciplinary process as applied to Dr. Stewart as a whole as

3     being fair?

4          A      Yes, I did.

5          Q      And what -- what leads you to that conclusion?

6          A      We followed the bylaws.  We obtained legal counsel

7     to guide us through the process.  We offered her a chance to

8     come and speak on her behalf.  I selected a team of people that

9     I trusted to give me a decision that would be fair and just.  I

10    mean, overall I think it was a fair process.

11         Q      Was it the intention of the Board to use the same

12    process for all six of the doctors?

13         A      Exactly the same.

14         Q      Did you think that the termination of Dr. Stewart's

15    membership was the right conclusion?

16         A      Yes, I do.

17         Q      And why do you think that?

18         A      I think an individual doesn't belong in an

19    organization where they continuously and destructively launch

20    activities toward it.  I don't -- I don't see the value there.

21                You know, this -- you know, the activities

22    jeopardize the whole, and it's just -- it's just not right.  I

23    mean, it doesn't add anything to the organization and it

24    detracts much.

25         Q      Well, what risk did you perceive that Dr. Stewart's

```
 1   conduct posed?

 2        A     I think to outsiders, our competition, you know,

 3   specifically -- we're one of three national boards, certifying

 4   boards; we're the smallest -- and our competition has -- always

 5   looks for negative evidence to exploit when we go to medical

 6   boards for recognition efforts.  The last thing we needed was

 7   some type of a civil war that could be used against us.

 8             The core of the business was certification, okay?

 9   And anything that affected that had grave consequences.

10             MR. SCHNEIDER:  Your Honor, I'm about to go to

11   another document.  Might this be the time?

12             THE COURT:  Okay.  All right.  Let's take a break.

13        Ladies and gentlemen, 15 minutes.  Remember the

14   admonition, please.

15             THE COURTROOM DEPUTY:  All rise.

16             THE COURT:  Five of the hour.

17             (Open court out of the presence of the jury.)

18             THE COURTROOM DEPUTY:  This Court is in recess.

19             THE COURT:  Tell you what.  Let's make it about 20

20   so you all can have a minute to go try to grab something to

21   eat.

22             MR. SCHNEIDER:  Thank you.

23             MS. HILAIRE:  Thank you.

24             (A recess was taken.)

25             (Open court in the presence of the jury.)
```

```
1              THE COURT:  All are present who should be present.
2   Dr. Cerrato has returned to the witness stand.
3       You may continue your examination, Mr. Schneider.
4       Q     (BY MR. SCHNEIDER:)  Dr. Cerrato, you recall your
5   testimony concerning Dr. Stewart being removed as a governor as
6   a consequence of not sending in the signed no disclosure
7   agreement?
8       A     Yes.
9       Q     Were any other physicians removed from their
10  positions?
11      A     Yes, they were.
12      Q     And were any of them men?
13      A     Yes.
14      Q     Who?
15      A     Dr. Friedlander.  He's a man.
16            MR. SCHNEIDER:  Okay.  I'd like you to take a look
17  at Exhibit 1720, please.
18            (Exhibit 1720 previously marked for identification.)
19      Q     (BY MR. SCHNEIDER:)  What is this document?
20      A     This is the minutes from the Board of Directors
21  conference call dated January 28, 2010.
22      Q     And would you read the last paragraph, please.
23      A     (Reading:)
24            "It is reported that the American Board of
25            Medical Specialties has engaged
```

1           consultants and has budgeted and amassed a

2           significant amount of funding for the

3           purpose of impeding ABPS's progress with

4           state medical boards, state and county

5           medical associations, national and state

6           societies, hospital systems, and possible

7           managed care organizations.  Currently, we

8           have no information that would have --

9           that would -- that would indicated that

10          the American Osteopathic Association is

11          involved in this effort.  In addition, at

12          the 2009 October Oklahoma and North

13          Carolina Board of Medicine meetings, the

14          general counsel to the ABMS was present

15          and spoke against ABPS obtaining approval

16          for each of these boards.  This is the

17          first time in history that this has

18          occurred."

19      Q    Is ABMS one of the two other national organizations?

20      A    It is the largest.

21      Q    And AOA is the other?

22      A    That's the second largest.

23      Q    Okay.  What was significant about what appears in

24   that paragraph?

25      A    ABMS in the past regarded -- has always regarded

1    AAPS as a nuisance.  They didn't really regard them as very

2    serious competition.  And as time went on and our recognition

3    efforts started to gain steam and we became more successful,

4    they changed their strategy dramatically and in public.

5        Q    And did you perceive that they are competition for

6    AAPS?

7        A    Absolutely.

8        Q    What is the nature of the competition?

9        A    The American public doesn't understand, to my

10   knowledge, that, you know, board certification is a

11   money-making operation.  Boards charge fees and these

12   associations or these boards collect fees.

13           ABMS, the American Board of Medical Specialties is a

14   billion, with a B, organization and to control certification is

15   a very encompassing thing.  Board certification controls the

16   employment of almost all physicians today.

17       Q    Well, why are you talking about certification as a

18   profit center if you're a nonprofit Association?

19       A    You know, whether you're profit or nonprofit,

20   obviously there are expenses in maintaining board

21   certification.  The fees that our members pay go to support the

22   infrastructure such as expenditures toward recognition.

23           MR. SCHNEIDER:  Okay.  Would you take a look at --

24   I'd like to move that exhibit into evidence.

25           MR. CONWELL:  No objection.

```
 1              THE COURT:  Received.

 2              (Exhibit 1720 received into evidence.)

 3              MR. SCHNEIDER:  Would you take a look at

 4   Exhibit 1875, please.

 5              (Exhibit 1875 previously marked for identification.)

 6              THE WITNESS:  This is a letter dated January 18th,

 7   2010, to the members of the Board of Directors from Dr. Andrea

 8   K. Koegel, K-o-e-g-e-l.

 9         Q    (BY MR. SCHNEIDER:)  And she is writing in her

10   capacity as the president of the Academy of Surgery?

11         A    That's correct.

12         Q    And she states in the second paragraph (Reading:)

13              "We believe that our member and immediate

14              past president, Dr. Tom Castillo, as well

15              as other members have been denied due

16              process under the bylaws of AAPS."

17         A    That's correct.

18         Q    Before we go further, the letter is -- bears a date

19   of January 18, 2010?

20         A    That's correct.

21         Q    And there's a received stamp of January 20, 2011?

22         A    Yes.

23         Q    And you have testified that the suspensions were in

24   September of 2010?

25         A    Yes.
```

1      Q      Does that lead you to believe that the January 18,

2  2010, date is erroneous?

3      A      Uhm, yes.

4      Q      Would you regard this letter as indicative of

5  Dr. Koegel and her academy being highly critical of the manner

6  in which the Board of Directors handled the suspension of

7  Dr. Castillo?

8      A      Yes, it was critical.

9      Q      Did the Board initiate any discipline to Dr. Koegel?

10     A      No.

11     Q      And what gender is Dr. Koegel?

12     A      She's a female.

13     Q      And she indicates in this letter that she is writing

14 on behalf of other members?

15     A      Yes.

16     Q      In addition to Dr. Castillo, she indicates she's --

17 well, she says Dan Avery, Jr., M.D., William Castillo, M.D.,

18 and that's a different Dr. Castillo, is it not?

19     A      Yes.  That's no relation.

20     Q      Franklin De La Cruz, M.D., Louis Friedlander, Jack

21 Greiner.  I don't know how to pronounce this person's name.

22     A      Kosoko.

23     Q      Well, the first name?

24     A      Oh, Sade.

25     Q      What gender is Sade?

```
 1        A     I believe she's female.

 2        Q     And Edna Mahmood is female?

 3        A     That's female.

 4        Q     And Celeste Miller-Parish?

 5        A     Female.

 6        Q     And John Westwood.  And Madeline Zak is female?

 7        A     Well, John Westwood's male and Madeline Zak is

 8   female.

 9        Q     Well, has AAPS initiated discipline as to any of

10   those doctors?

11        A     No.

12              MR. SCHNEIDER:  Would you take a look at

13   Exhibit 1525, please.

14         If 1875 has not been admitted, I would like to move to

15   admit it.

16              THE COURTROOM DEPUTY:  Wait, wait.  Are you saying

17   1525 or 1575?

18              MR. SCHNEIDER:  No.  I was referring to the prior

19   exhibit of 1875.

20              THE COURTROOM DEPUTY:  Oh, okay.

21              MR. CONWELL:  No objection.

22              THE COURT:  1875?

23              THE COURTROOM DEPUTY:  Yes.

24              MR. SCHNEIDER:  Yes, your Honor.

25              THE COURT:  And the objection is?
```

```
 1                   THE COURTROOM DEPUTY:  He said no.

 2                   MR. CONWELL:  I said no objection.

 3                   THE COURT:  Oh, I'm sorry.  Received.

 4                   (Exhibit 1875 received into evidence.)

 5         Q    (BY MR. SCHNEIDER:)  Okay.  Would you take a look at

 6    page 22 --

 7         A    Excuse me a second.  I have 1525.

 8                   THE COURTROOM DEPUTY:  Yeah.

 9                   MR. SCHNEIDER:  Right.  The right one?

10                   THE WITNESS:  Okay.  Okay.

11                   MR. SCHNEIDER:  Yeah.

12                   THE WITNESS:  Okay.  Page?

13                   MR. SCHNEIDER:  1525.  I'm sorry, page 21.  We now

14    have page 21.

15         Q    (BY MR. SCHNEIDER:)  Well, page 21, it's the bottom

16    part.  Does this indicate that it was part of your PowerPoint

17    presentation?

18         A    Yes.

19                   MR. SCHNEIDER:  Okay.  Would you go to the next one?

20    Not sure what's happening here.

21         Q    (BY MR. SCHNEIDER:)  Is this an e-mail from

22    Dr. Lemonick?

23         A    Yes.

24         Q    And that's June 20, 2012?

25         A    That's correct.
```

1             MR. SCHNEIDER:  Okay.  And could you go to the next

2     page?  I'd like to see the text of the e-mail.

3        Q    (BY MR. SCHNEIDER:)  Would you agree that this

4     e-mail is indicative of Dr. Lemonick being critical of AAPS

5     leadership?

6        A    Yes.

7        Q    Was Dr. Lemonick disciplined in any fashion?

8        A    No.

9        Q    Okay.  I would like you to look now at Exhibit 1718,

10    please.

11       A    This is the American Association of Physician

12    Specialists Employee Handbook revised on 10-29 of 2009.

13       Q    Would you go to page 23, please.

14       A    23?

15       Q    Yep.  Do you see below the first paragraph one line

16    that says, "The following actions, among other things, could

17    constitute grounds for immediate dismissal"?

18       A    Yes.

19       Q    And one of those is "displaying, disseminating, or

20    discussing pornographic or sexually explicit materials or

21    information."

22       A    Yes.  I see that.

23       Q    Mr. Carbone did that, didn't he?

24       A    Yes.

25       Q    Did the Board take steps to fire Dr. Carbone for

1  doing that?

2      A    No, they did not.

3      Q    Does this document indicate that it was -- that the

4  Board was required to fire Mr. Carbone for that?

5      A    No.  A strict reading basically would be that the

6  Board could constitute grounds, so there was discretion.

7      Q    Okay.  We saw some evidence that after Dr. --

8  Mr. Carbone's dissemination of pornography came to light, he

9  was given pay raises.  You recall that?

10     A    Yes.

11     Q    Did you play any role in his obtaining pay raises?

12     A    Uhm, I was part of a committee that evaluated his

13 salary and benefits.

14     Q    Okay.  Well, why would you increase his pay after

15 learning that he is sending pornography out on company

16 computers?

17     A    We felt to look -- we felt it was appropriate to

18 look at his conduct before that period and to evaluate his

19 circumstances in total.  In other words, what has he done for

20 the organization and how far had he brought our organization.

21          We felt that we did not live in a perfect world and

22 that people make mistakes and sometimes they're big mistakes,

23 but you have to look at the entire person.

24          Mr. Carbone was well-liked by the vast majority of

25 members.  He worked very hard for us, unlike anybody else ever

1    did, uhm, and we felt that, you know, we needed to be

2    competitive and -- as far as salary and benefits.  Good CEO's,

3    particularly small medical organizations, are tough to find.

4    So those were the reasons.

5       Q    Okay.  Would you take a look at Exhibit 1530,

6    please.

7       A    Okay.  This is -- 1530, correct?  Okay.  So this is

8    a letter dated July 27, 2012, to Dr. Stewart -- oh, that the

9    AAPS was in receipt of your request to appeal the Board's

10   decision to terminate her membership.

11      Q    Okay.  And the second paragraph says, "Pursuant to

12   Section 3.5(b)" -- and I think you testified that that should

13   have been 3.05(b)?

14      A    That's correct.

15      Q    -- "AAPS is in the process of forming the appeal

16   Board which will consider your appeal."

17           Now, when you say AAPS was in the process of forming

18   the appeal board, did you mean that you were in the process of

19   forming the appeal board?

20      A    Well, the Board of Directors assigns duties such as

21   this to the president, and I -- I was attempting to actively

22   find people who wanted to deal with this issue.  And I was

23   not -- was not successful.

24      Q    Well, did you just give up?

25      A    Well, uhm, I couldn't force anybody to be on this

```
 1   panel.

 2        Q     Who was qualified to be on this panel?

 3        A     The appeals board, according to bylaws, had to be

 4   made up of past presidents.

 5        Q     And past presidents in good standing?

 6        A     Yes.

 7        Q     Okay.  Whom did you ask?

 8        A     I asked Dr. Allen Genteman.  He had called me over a

 9   period of time and asked me if he could be of assistance during

10   this whole process, but by the time this unfolded he had his

11   own issues that he had to deal with and he just didn't have the

12   time to do this.

13        Q     Did you ask anyone else?

14        A     I can't recall.  I did make some inquiries, but the

15   pool of people that I could choose was extremely small.

16        Q     In this time frame, did you have anything going on

17   in your own life of -- that was impacting your ability to

18   perform this aspect of your duties?

19        A     Uhm, yeah.  Well, my mother was severely ill, and

20   she was in and out of the hospital for the last year-and-a-half

21   of her life, and I was also on call at the VA, director of the

22   operating room on call every other night, every other weekend,

23   every other holiday.  So there were some issues I had to deal

24   with.

25        Q     Well, when you sent this letter to Dr. Stewart
```

1   indicating that you were taking steps to form an appeal board

2   or AAPS was, what was your intention?

3        A     My intention was to give her that appeal.

4        Q     And did that ever happen?

5        A     It never happened.

6        Q     And why hasn't it happened?

7        A     I think in the storm of all this over the period of

8   six years, I hate to admit it, but it just got lost.  It just

9   got lost.

10       Q     Did Dr. Stewart ever inquire of you what the status

11   of that was?

12       A     No.  I didn't receive any information -- or requests

13   or other requests for appeal.

14       Q     Well, did you think it was incumbent upon her to

15   follow up with you?

16       A     No, I think we should have followed up with her.

17       Q     You heard testimony from Dr. Castillo and some

18   others about the dangers of physicians looking at pornography?

19       A     Yes.

20       Q     How do you feel about physicians looking at

21   pornography?

22       A     Well, my personal opinion is is that when I

23   graduated law school, I don't remember taking a vow for the

24   priesthood.

25       Q     When you graduated medical school?

1      A    Or medical school, I'm sorry.  I don't remember

2  that.  Okay.  I think everyone has their views on pornography.

3  The Supreme Court has said that pornography under certain

4  circumstances is legal.  And people have a -- have to make

5  their own judgment as to how they live their lives and what

6  they do.

7          But the idea that somehow doctors are asexual is

8  ridiculous.  You know, this idea that somehow physicians look

9  at their female patients as sex objects can't be any further

10  from the truth.  It's ridiculous.  I mean, I can tell you my

11  own experience is, you know --

12          MR. CONWELL:  Your Honor, this is nonresponsive to

13  the question which --

14          THE COURT:  Sustained.

15          MR. CONWELL:  Beginning a lecture.

16          THE COURT:  Sustained.

17      Q    (BY MR. SCHNEIDER:)  Well, do you feel there's a

18  problem that's created by physicians looking at pornography

19  vis-à-vis they're treating female patients who are not wearing

20  clothing?

21      A    No.  I -- I don't connect the two.

22      Q    Okay.  Could you take a look at Exhibit 1525,

23  paragraph -- page 13.

24      A    I'm sorry.  I already have it?

25          THE COURTROOM DEPUTY:  Yeah.

1           THE WITNESS:  15- what?

2      Q      (BY MR. SCHNEIDER:)  1525.  Actually, you can

3 disregard that one.  But if you could look at 1525, page 27.

4 This says "Dr. Patricia Stewart blog."

5      A      Yes.

6      Q      Did you ever have any facts to indicate that she

7 herself had a blog?

8      A      No.

9      Q      Were you responsible for including this item?

10      A      No.

11      Q      Would you go to 1525, page 30.

12           Okay.  This is another page that references

13 Dr. Patricia Stewart blog?

14      A      Yes, it does.

15      Q      And then directly underneath that is an indication

16 of a article written by Dr. Radentz?

17      A      That's correct.

18      Q      Somebody goof here?

19      A      Clearly.

20      Q      You were the president during the Marina Del Rey

21 conference in June of 2012?

22      A      Yes.

23      Q      Is that why you were doing the PowerPoint

24 presentation?

25      A      Yes.

1      Q      Did you have any understanding that guards were

2   posted at the entrance of the room where the Board of Directors

3   was being held?

4      A      Yes.

5      Q      Do you know why?

6      A      We were about to display this information, uhm, to

7   our members at essentially the members' request for

8   transparency.  And the information is quite internally damaging

9   and we did not want nonmembers inside that room.

10      Q      Do you believe that Dr. Stewart was in that room

11   where you were giving this presentation at the time that you

12   were doing so?

13      A      No, she wasn't in the room.

14      Q      And why wouldn't she be in the room?

15      A      She wasn't a member at that point.

16      Q      Did you ask Dr. Stewart and Dr. Radentz after doing

17   this presentation to come to the podium to explain themselves

18   knowing that they were not there?

19      A      No.

20      Q      What role did Dr. Stewart's gender play in her

21   termination?

22      A      None.

23      Q      Do you recall Dr. Castillo testifying and making an

24   allusion to people tampering with computers with regard to the

25   Bell e-mails?

 1        A      Yes, I remember that allegation.

 2        Q      Do you know anything about people doing that?

 3        A      No, absolutely not.

 4        Q      How frequently were you in the AAPS Tampa offices?

 5        A      I was there for whatever meetings were called,

 6   official meetings, such as strategic planning or if there was

 7   any academy meetings or any other official meetings.  It was

 8   not very often.

 9        Q      How long have you been living in New Jersey?

10        A      Uhm, since 1999.

11        Q      Okay.  Do you ever just drop by the offices of AAPS

12   in Tampa?

13        A      No.

14        Q      Have you ever heard anything negative about

15   Dr. Stewart's care of patients?

16        A      No.

17        Q      Do you have any reason to believe that Dr. Stewart

18   is anything other than an outstanding physician?

19        A      Absolutely not.

20        Q      What value do you get out of your membership -- I'm

21   talking about your membership -- as opposed to your

22   certification?

23        A      Personally?

24        Q      Yeah.

25        A      Not much.

1    Q    Well, you've been testifying about all the efforts

2   that you have been putting into AAPS as a Board member and

3   various other capacities.  Why do you do all of that if you

4   personally aren't getting much out of AAPS?

5    A    Well, I am getting the biggest thing and that's the

6   ability to make a living via my board certification.  That's

7   why I do what I do.

8    Q    Why do your efforts on behalf of AAPS serve to

9   protect your certification from ABPS?

10    A    Well, the stronger I work for the organization, the

11   more I give to the organization.  That to me bears a direct

12   relationship to the strength of my board certification which

13   translates to my employability which is quite important to me.

14        MR. SCHNEIDER:  Thank you.  I have no further

15   questions.

16        THE COURT:  Cross.

17        MR. CONWELL:  I need to show a document to counsel.

18   Thank you.

19                    REDIRECT EXAMINATION

20   BY MR. CONWELL:

21    Q    Good afternoon, Dr. Cerrato.  I want to start with

22   something that was covered with you yesterday.  In your

23   discussion with your counsel yesterday, you said that the only

24   photos -- the only pornography that you saw were the black and

25   white photos sent by Mr. Bell to each member of the Board of

1    Directors.  Do you recall that?

2         A     Yes.

3         Q     And that these other photographs and the triple X

4    videos and so forth, you'd not seen that until your deposition

5    in 2013?

6         A     That's correct.

7         Q     Right?

8         A     Yes.

9         Q     So you testified, you told the jury that you had had

10   some forensic examination done of the computers of AAPS; is

11   that right, the e-mail system?

12        A     Uhm, yes.

13        Q     Right.  So certainly it must have concerned you,

14   given your testimony, about how inappropriate it would be for

15   Mr. Bell to be disseminating these photographs to -- excuse

16   me -- Mr. Carbone to be disseminating this pornography in the

17   office?  Surely as a Board member, you asked for an

18   investigation of Mr. Carbone's e-mails, right?

19        A     Well, that was a part of the investigation, yes.

20        Q     Right.  And so you investigated Mr. Carbone's

21   e-mails and you saw that there were all these e-mails that have

22   been shown in this trial.  That was all discovered because they

23   were in your e-mail system; isn't that right?

24        A     I never personally saw the results of that report.

25   In other words, I didn't see the, I guess, raw data.

1    Q    Okay.  So you -- you, the Board, hired somebody to

2  do that, and they found all those e-mails?

3    A    I'm not exactly sure, you know, what they found

4  other than they -- the only conclusion that I know of was that

5  they validated that the e-mails did exist on the server.

6    Q    Okay.  And this was in 2010?

7    A    Yes.

8    Q    Right?  So they found all those that the jury's

9  seen, and you heard Mr. Carbone's testimony, he'd been doing

10  this for three years, right?

11    A    Well, I -- I'm not sure that I was here when he said

12  that, but --

13    Q    So -- so we've just really barely touched the

14  surface in terms of the volume of pornography in the AAPS

15  e-mail servers, isn't that right?

16    A    I'm not sure what you're asking me.

17    Q    But we've just seen some of the e-mails from 2009.

18  We haven't seen all the porno for all the other years.  When

19  you had the server inspected, the e-mail server inspected, all

20  those other e-mails were uncovered, weren't they?

21    A    Again, I -- I'm not certain as to what was uncovered

22  and what wasn't uncovered.

23    Q    So is it your testimony that no one came to the

24  Board and told the Board about all the e-mails on Mr. Carbone's

25  e-mail system that they uncovered?  That was never told to you?

1      A      The only conclusion that -- that I could remember

2  was that the e-mails were -- the e-mail trails were verified.

3  That's all I remember about that.

4      Q      Okay.  But don't you think that the Board should

5  have been looking into that given the fact that it was

6  inappropriate, that it was not consistent with the code of

7  ethics of the AAPS?  Don't you think the Board should have been

8  trying to find out the extent of Mr. Carbone's dissemination of

9  pornography using company servers and sending them to company

10 employees?

11     A      Uhm, the extent of it, I think that -- well, I can't

12 testify as to what the Board would think --

13     Q      That's not what I asked.  I said don't you -- well,

14 you as the Board member, don't you think that you as a Board

15 member, given the evidence of Mr. Carbone disseminating

16 pornography as has been discussed, should have been followed up

17 to find out how extensive it was regarding whether or not you

18 needed to do anything regarding Mr. Carbone?

19     A      Well, there was an investigation.  There was a

20 report filed.  That's all I can say about that.

21     Q      I asked what you thought as the Board member.  I

22 understand there was an investigation.  I understand there was

23 a report.  You as a Board member, didn't you think -- didn't

24 you want to know -- trying to protect all these members and the

25 reputation of the AAPS as you've described it, didn't you want

1  to know how extensive this was?

2      A     Well, I thought I did know, and through the

3  conversations with Mr. Carbone and from what I saw, that's what

4  I thought the extent of it was.

5      Q     In your conversation with Mr. Carbone you testified

6  that all he told you about were the e-mails that Mr. Bell had

7  sent to the Board, the black and whites which were just a small

8  portion of these, right?

9      A     No, we never had the discussion as to what the

10  content or amount was.  Whether he was doing this was the gist

11  of the conversation.

12      Q     So he didn't --

13      A     Was he involved in this.

14      Q     So when you had your discussion with Mr. Carbone, he

15  did not tell you about the triple X videos and the other

16  pornography?

17      A     We didn't get into -- no, I didn't get into the

18  details.

19      Q     Okay.  But you later learned that all this existed,

20  that he was perceiving and sending triple X videos and the

21  other hardcore pornography, right?

22      A     In 2013, yes.

23      Q     So when you found out at that time, did the Board do

24  anything to reprimand Mr. Carbone for not making a full

25  disclosure?

1      A     No.

2      Q     Did you continue to give him pay raises even then

3  when you'd learned that having gone to him and asked for him to

4  disclose what had happened, he in fact had not disclosed these

5  other things to you?

6      A     Well, he disclosed that he was involved in this --

7  this pornography e-mail issue.  Like I had stated before, the

8  pay raise issue was for the reasons I explained.

9      Q     Let's take a look at Exhibit 1405.

10      A     You think I have it?

11             THE COURTROOM DEPUTY:  I think so.

12             MR. CONWELL:  That is the September 30, 2010,

13  minutes of the Board of Directors.

14             THE WITNESS:  1405, September 30, 2010, Board of

15  Directors conference call.

16      Q     (BY MR. CONWELL:)  Right.  So now what I want to ask

17  about concerning these minutes is your testimony that these

18  Board minutes do not contain any record of a vote of the Board

19  of Directors to suspend Castillo, Geller, and Klein?

20      A     That's correct.

21      Q     And the thing that I thought was interesting --

22  fascinating, really -- was that you said the reason that the --

23  that this alleged vote is not recorded in here is you wanted to

24  keep it a secret.

25             MR. SCHNEIDER:  Objection.  That's not a question.

```
 1        Q     (BY MR. CONWELL:)  Is that correct?  That's a

 2   question.

 3              MR. SCHNEIDER:  I object to counsel testifying.

 4              THE COURT:  Your objection's sustained.

 5         Go ahead.

 6        Q     (BY MR. CONWELL:)  Your testimony, Dr. Cerrato, is

 7   the reason that that's not in the minutes is because you wanted

 8   to keep it a secret; is that right?

 9        A     No.  We wanted to keep it confidential.

10        Q     Okay.  Is there a difference?

11        A     Yes, there is a difference.

12        Q     What's the difference between confidential and

13   secret?

14        A     Confidential has a limited circulation.

15        Q     Okay.  So you wanted to keep it confidential.

16              And the people that were -- that allegedly voted on

17   this were all Board members; is that right?

18        A     That's correct.

19        Q     There's nothing to keep those Board members from

20   saying that they had voted to suspend Drs. Castillo, Geller,

21   and Klein is there?

22        A     Well, there's a statement in the minutes that

23   Dr. Russo informed all the Board members that this discussion

24   is extremely confidential and should not be discussed.

25        Q     With?
```

```
 1      A      Any other Board members.

 2      Q      Any other Board members.  Doesn't say with anyone;

 3  it says with any other Board members.

 4      A      Uh-huh.

 5      Q      Right?

 6      A      Yes.

 7      Q      And in fact, on October 10th, I believe it was, you

 8  sent suspension letters to Drs. Castillo, Geller, and Klein

 9  telling them that they were suspended?

10      A      What was the date again?

11      Q      Approximately October 10th.

12      A      Okay.

13      Q      October 7th.  I'm sorry.  October 7, 2010, you sent

14  out notices to them telling them they were suspended, right?

15      A      The suspension letters were sent out.

16      Q      Right.  And there is nothing to prohibit them from

17  telling other people that they were suspended, right?

18      A      They were the ones affected.  How could you keep a

19  secret from the people that it affected?

20      Q      Exactly.

21      A      Okay.

22      Q      Exactly.  I mean, this whole notion of keeping this

23  confidential that you're suspending three members of the AAPS,

24  two of whom are on the Board of Directors, is just silly, isn't

25  it?
```

1     A     No, it's not silly.

2     Q     That's just something you came up with overnight

3  after hearing Dr. Young's testimony that if it's not in the

4  Board minutes, which are your official record, it didn't happen

5  as far as the company's concerned, isn't it?  You just came up

6  with that last night?

7              MR. SCHNEIDER:  Objection.  Argumentative.

8              THE COURT:  Overruled.

9              THE WITNESS:  Uhm, first of all, I was barely in

10  here when Dr. Young was testifying.  So I don't recall what

11  Dr. Young testified to unless you said it, No. 1.

12       No. 2, confidentiality in keeping this as low profile as

13  possible and as careful as possible was always the goal.  It's

14  not something I just came up with yesterday.

15     Q     (BY MR. CONWELL:)  Now, this story that the reason

16  that your Board minutes don't even reflect a vote of the Board

17  of Directors which the bylaws, as you know, say two-thirds of

18  the Board have to vote saying that they found that those

19  members engaged in conduct injurious to the best interest of

20  the AAPS, that's -- you just came up with a reason they're not

21  in the Board minutes last night?  You just made it up?

22              MR. SCHNEIDER:  Objection.  There's two questions.

23  He's making statements, not asking questions.

24              MR. CONWELL:  That's a question.

25              THE COURT:  Overruled.

1           THE WITNESS:  What's the question?

2      Q    (BY MR. CONWELL:)  You just made that up, never

3  happened, the whole notion of this trying to keep the

4  suspension of three members, two of whom are Board of Directors

5  members, confidential is just silly?

6      A    It's not silly.

7      Q    Isn't it?

8      A    It's not silly to me.

9      Q    There's nothing in these minutes that say, We broke

10  into executive session and had some confidential thing that's

11  not going to be reflected in the minutes, is there?

12     A    I can tell you I was there.  I can tell you --

13     Q    Would you answer my question -- would you answer my

14  question, please?

15     A    I'm trying to.

16          MR. CONWELL:  Your Honor, I'd like him to answer my

17  question.

18          THE COURT:  All right.  The question before you now

19  is did you -- did the Board break into executive session?

20          THE WITNESS:  I don't believe so.

21     Q    (BY MR. CONWELL:)  Okay.  Now, we saw there was some

22  minutes shown to you by your counsel on the May 30, 2012,

23  meeting of the Board of Directors when you wanted to have a

24  private session as it regards to Dr. Rice -- excuse me --

25  Dr. Rice that you broke into executive session and we don't

1    know what happened in that executive session, but -- is that

2    right?

3         A    Uhm, I didn't testify as to we don't know what

4    happened in an executive session.

5         Q    The minutes don't reflect what happened in the

6    executive session.  That just says you broke into executive

7    session, then you came back, right?

8         A    I think -- I think so, yes.

9         Q    Right.  And after you came back, you told -- you

10   voted Dr. Rice out of the Board of Directors, right?

11        A    That's correct.

12        Q    There's nothing in the September 30, 2010, minutes

13   that do anything like that?  There's nothing about an executive

14   session, is there?

15        A    Going into an executive session is at the discretion

16   of the Board.

17        Q    So the reason there's nothing in the minutes of the

18   Board of Directors for September 30, 2010, showing that there

19   was a vote of two-thirds of the members of the Board to

20   expel -- to -- excuse me -- suspend Drs. Castillo, Geller, and

21   Klein is because it did not happen?

22             MR. SCHNEIDER:  Objection --

23        Q    (BY MR. CONWELL:)  Isn't that correct?

24             THE COURT:  Overruled.

25         Answer the question.

1          THE WITNESS:  First of all, you're misstating the

2     process.  The suspension process does not require a two-thirds

3     vote of the Board.  You're confusing the 3.05 disciplinary

4     activity with the suspension.  The suspension activity did not

5     exist.

6          MR. CONWELL:  Let's look at 3.05.

7     Q     (BY MR. CONWELL:)  Now, let's look at first

8     Exhibit 1306.  That's the 13th -- the 13th revision of the

9     bylaws which are the bylaws that were in effect on

10     September 30, 2010.

11          Can you turn to page 9, please.  This is the

12     revision as of August 22, 2006.  The 15th and the 14th were

13     enacted and adopted in 2011; is that right?

14     A     I'm not -- I'm not seeing where you see 2011.  This

15     is the "13th Revision Adopted August 22nd, 2006, Table of

16     Contents Updated February 18, 2015."

17     Q     Are you looking at the 13th revision?

18     A     13th revision.

19     Q     Okay.  Adopted August 22, 2006.  Now look at the

20     15th revision which is Exhibit 1317.

21     A     Okay.  This is -- this is the 15th revision adopted

22     June 25, 2011.

23     Q     Right.  The -- I think there's an interim 14th

24     revision, but it's also dated in June 2011.  We can pull it, if

25     you want to see it.

```
1              But the 13th revision was the one in effect on

2    September 30, 2010; is that right?

3         A    I believe so.

4         Q    Okay.  And look at 3.05.

5         A    Okay.

6         Q    This says (Reading:)

7              "The Board of Directors may expel, call

8              for the resignation of, or otherwise

9              discipline any member if two-thirds of the

10             members of the Board find the conduct of

11             the member has been injurious to the best

12             interest of the Association or

13             inconsistent with its purposes."

14             And then it goes on and requires notice and so

15   forth; is that right?

16        A    Yes.

17        Q    The notices that you sent to Drs. Castillo, Geller,

18   and Klein dated October 7, 2010, quote this verbatim, don't

19   they?  They quote 3.05 verbatim, don't they?

20        A    I'd have to see the letter.

21        Q    Okay.  We'll get that letter for you.  While they

22   locate that, I'm going to move on.

23             In any event, the Board of Director minutes of

24   September 30, 2010, do not identify any vote of the Board of

25   Directors to suspend Castillo, Geller, and Klein; is that
```

1    right?

2         A     Yes.

3              MR. CONWELL:  Now, I'd like you to take a look at

4    Exhibit 1759.

5              (Exhibit 1759 previously marked for identification.)

6              MR. CONWELL:  I'd also like to show him 1758.

7         Q    (BY MR. CONWELL:)  You told us in response to

8    questions from your counsel that the Executive Committee was

9    acting pursuant to its emergency powers --

10        A     The Board --

11        Q    -- in suspending -- excuse me.  The Executive

12   Committee was acting in accordance with its emergency powers

13   when it suspended Drs. Castillo, Geller, and Klein; is that

14   right?

15        A     No.

16        Q    What's incorrect about that?

17        A     The Board of Directors were acting.

18        Q    Okay.  And that's a matter that was argued in the

19   litigation brought by Drs. Castillo, Geller, and Klein to be

20   reinstated; is that right?

21        A     Ask the question again.

22        Q    That's a matter that was litigated on the lawsuit of

23   Drs. Castillo, Geller, and Klein to be reinstated; is that

24   right?

25        A     I'm not aware of that.

1      Q      Well, do you have Exhibit 1758 in front of you?

2      A      Yes.

3      Q      And that is the order granting the plaintiff's

4   motion for partial summary judgment; is that correct?

5      A      Order granting in part and denying in part

6   plaintiff's motion for partial summary judgment on Count 3.

7      Q      And take a look at No. 6 on page 2 of that order.

8   It says (Reading:)

9               "AAPS contends it placed carefully

10              constructed restrictions on certain

11              activities that normally would not affect

12              the plaintiff's behavior in conjunction

13              with the AAPS, and that in taking those

14              actions, the AAPS Board relied, in part,

15              on Florida statute 617.0207 that allows an

16              organization, when confronted by disaster,

17              to take extraordinary steps to protect the

18              organization, its assets, and its members'

19              ability to make a living.  Declaration of

20              Robert Cerrato."

21              See that?

22      A      Yes.

23      Q      So you were the one making that statement to the

24   court that you were acting pursuant to emergency powers because

25   you were confronted with a disaster, right?

```
 1        A     Yes.

 2        Q     And then under 1617.0207[sic], correct?

 3        A     Uh, yes.

 4        Q     And then you argued that to the court, and the court

 5   said (Reading:)

 6              "The AAPS did not comply with 617.0207

 7              with respect to the suspension of

 8              plaintiffs' membership rights in the

 9              AAPS."

10              Is that correct?

11        A     That was the analysis.

12        Q     That's in fact what the court found, right?

13        A     Where are you?  What page?

14        Q     Three.

15        A     Okay.  Go ahead.

16        Q     So that's what the court found, that you did not

17   comply with this statute regarding acting in an emergency, did

18   you?

19        A     That's what the court found, yeah.

20        Q     Okay.  Now, you were shown a letter, Exhibit 1756.

21   Could you take a look at that exhibit again, please?  What's

22   that?

23              THE COURTROOM DEPUTY:  No 1756.

24              MR. CONWELL:  This is a new one that he added.  Is

25   that the correct number, Mr. Schneider?
```

1          MR. SCHNEIDER:  No.

2          THE COURTROOM DEPUTY:  1356.

3          MR. CONWELL:  1356, sorry.  I wrote it down wrong.

4     Q    (BY MR. CONWELL:)  And 1356 was a letter that -- and

5 I don't have a copy of that.  It's a new exhibit.  That's a

6 letter from your counsel at Gray Robinson in Tampa, Mr. Robert

7 Johnson; is that right?

8     A    Yes.

9     Q    And the purpose of -- you testified after seeing

10 that that AAPS did not hear anything further in response to

11 that letter regarding setting the depositions of Drs. Castillo,

12 Geller, and Klein; is that right?

13    A    That's correct.

14         MR. CONWELL:  Okay.  Let me show you -- excuse me.

15    Judge, I told you we had a quid pro quo?

16         THE COURT:  Yes.

17         MR. CONWELL:  So I need to give this a new exhibit

18 number.  This is in response to the letter -- new letter that

19 they just introduced.  So I'd like to ask if I could be given

20 an exhibit number for this?

21         THE COURTROOM DEPUTY:  1892.

22         MR. CONWELL:  1892.

23         (Exhibit 1892 marked for identification.)

24         MR. CONWELL:  I'm going to mark them both as 1892.

25    Q    (BY MR. CONWELL:)  While that's being marked, 1356,

```
 1   the letter from Gray Robinson, that's dated October 7, 2010,

 2   right?

 3       A     Uhm, yes.

 4             MR. CONWELL:  Okay.  And now -- sorry.  What was the

 5   number?  I wrote it down on that one.

 6             THE COURTROOM DEPUTY:  Gray Robinson is 1892.

 7             MR. CONWELL:  1892.

 8             THE COURTROOM DEPUTY:  You said both of them.

 9             MR. CONWELL:  Yes.  Together, yes.

10       Q     (BY MR. CONWELL:)  So now, Exhibit 1892 is a letter

11   between counsel for Drs. Castillo, Geller, and Klein and your

12   lawyer, Robert Johnson.  Do you see that?

13       A     Yeah.  This is a letter from looks like a Mr. Taylor

14   to Mr. Johnson.

15       Q     Right.  Cary Taylor.  She's a woman.

16             So -- and in here, she says (Reading:)

17             "I will be representing Dr. Castillo and

18             Dr. Klein in depositions you plan to take

19             relative to the Tim Bell litigation.  I

20             have spoken with Drs. Castillo and Klein,

21             coordinated their available dates with me.

22             At this time Dr. Klein and I are available

23             May 23rd, Dr. Castillo and I are available

24             May 17th."

25             Do you see that?
```

UNITED STATES DISTRICT COURT

```
 1      A      Yes.

 2             THE COURT:  What's the date of that letter?

 3             MR. CONWELL:  That's dated May 11, 2011.

 4             THE COURT:  Thank you.

 5      Q      (BY MR. CONWELL:)  And then on May 23rd --

 6             THE COURT:  Sorry.

 7      Q      (BY MR. CONWELL:)  May 23rd there's a letter from

 8  your lawyer, Robert Johnson, talking about taking -- scheduling

 9  a deposition of Dr. Geller.  He's the third doctor; is that

10  right?

11      A      Yes.

12      Q      In fact, Mr. Johnson did hear back regarding trying

13  to get information from Drs. Castillo, Geller, and Klein in a

14  deposition; is that correct?

15      A      Well, according to these documents.

16      Q      Right.  So -- but -- but their depositions were

17  never taken because Gray Robinson never scheduled their

18  depositions, did they?

19      A      First of all, I wasn't aware of this -- this

20  communication at all.  And second of all, I don't know whether

21  Mr. Johnson never scheduled depositions.

22      Q      Okay.  But you heard -- were you here and heard

23  Dr. Castillo testify that he wanted to give a deposition as did

24  Dr. Klein and Dr. Geller?

25      A      I -- I didn't recall that.
```

         Q      And you can see from the correspondence that they
were trying to give a deposition, right?  They gave available
dates?
         A      It appears so.
         Q      But your counsel never took their depos, did he?
         A      Not to my knowledge.
         Q      To your knowledge, after -- what's it been? --
four -- four years at least now, has AAPS ever deposed
Drs. Castillo, Geller, and Klein?
         A      No.
         Q      Now I'd like to take a look at Exhibit 12 which is
this response of the AAPS to the 14-point letter that you
talked about earlier.  This is the one from the Board of
Directors.  I think it's actually signed at the end by Tony
Russo.  And a lot of your testimony on examination by your
counsel was going through these 14 points.
              Okay.  And you were talking about item number -- oh,
I have got to switch you back up -- you were going through this
and we get to No. 4.  So can you turn to page 3, No. 4,
regarding the ACCME accreditation?
         A      Yes.
         Q      And if you look in here, it says (Reading:)
              "Special note, when ACCME recently changed
              the document requirements, 75 percent of
              those organizations accredited were put on

1          probation."

2              Now, you know that that statement is incorrect,

3    right?

4         A    Yes.

5         Q    And your explanation of that is that Steve Montes

6    had told you that at one time 75 percent were put on probation

7    and there was just a mistake made; is that right?

8         A    No.   His -- his statement was -- oh, let me go back

9    one.  Now I know it's incorrect.  I didn't understand that it

10   was incorrect at the time.

11             No. 2, his statement was that 75 percent of the

12   programs at one time or another were on probation.

13             MR. CONWELL:  Okay.  I'd like you to take a look at

14   Exhibit 218.

15             (Exhibit 218 previously marked for identification.)

16        Q    (BY MR. CONWELL:)  Now, this is the source of the

17   information regarding the 75 percent, isn't it --

18        A    I've never seen this e-mail so --

19        Q    -- this e-mail from Dr. Montes?  This is an e-mail

20   from Dr. Montes to Bill Carbone; is that right?

21        A    Yes.

22        Q    Bill Carbone was at that June 2011 annual meeting?

23        A    I believe so.

24        Q    And he was working on preparing this response to the

25   14 points; is that right?

1      A      Mr. Carbone?

2      Q      Yes.

3      A      No, he didn't assist in this.

4      Q      Dr. Montes was present, wasn't he?

5      A      I -- I think he was.

6      Q      Okay.  And he's the one that said 75 percent?

7      A      Uhm, I'm not sure exactly where we got that

8  information.

9      Q      In his e-mail to Mr. Carbone, he said, "ACCME has

10  one-half to three-quarters of its members on probation" didn't

11  he?

12      A      That's what's in this e-mail, yes.

13      Q      He didn't say at one time.  He said that's the way

14  it is, right?

15      A      In this e-mail that's what it says.

16      Q      But you learned -- you certainly learned by now, and

17  if you listened to the deposition of Dr. Russo you know that it

18  was less than -- less than two percent, wasn't it?

19      A      It was considerably smaller, yes.

20      Q      Okay.  The AAPS has never had an independent audit

21  done; isn't that correct?

22      A      We have had -- we've had many audits -- audits.  I'm

23  not sure how you categorize the different types of audits other

24  than forensic audit.

25      Q      Well, by an independent audit I mean someone

1    auditing the books other than the one that was keeping the

2    books?

3         A    We've had various audit accounting companies go

4    through our books over the period of years.

5         Q    You can't identify one independent audit that's been

6    done, can you?

7         A    I personally cannot.

8         Q    You familiar with Mr. Durante's testimony that not

9    one independent audit has been done?

10              MR. SCHNEIDER:  Objection.  Lacks foundation.

11              THE COURT:  Overruled.

12              THE WITNESS:  Say it again.

13        Q    (BY MR. CONWELL:)  You familiar with Mr. Durante's

14   testimony that not one independent audit has been done?

15        A    No, I'm not familiar with that testimony.

16        Q    And you're saying you don't have any personal

17   knowledge one way or another whether there's been an

18   independent audit?

19        A    That's correct.

20        Q    Okay.  And Dr. Castillo was asking for an

21   independent audit, wasn't he?

22        A    I believe so.

23        Q    And -- but an independent audit was never given in

24   response to his request, was it?

25        A    There was an audit.  There was an extra audit at

```
 1    some point.  I'm not sure how you characterize that audit or

 2    who did that audit, but something was done.

 3         Q    And the audit you're referring to is the audit done

 4    by the accounting firm who keeps your books and does your tax

 5    work, right?

 6         A    Again, I -- I'd have to look up that information.  I

 7    don't have that at my disposal.

 8         Q    They audited themselves, right?  They didn't have --

 9    you didn't get some other third party auditor to come in and do

10    the audit; you had the company that keeps the books audit

11    themselves?

12         A    Again, who did the auditing, when it audited, I

13    don't have information in that regard.

14         Q    Okay.  Let's go back to the bylaws for a second.  We

15    were looking at the 13th revision.  The 15th revision, as we

16    pointed out -- as you pointed out was adopted June 25, 2011; is

17    that right?  That's Exhibit 1317?

18         A    Okay.  1317 was the 15th revision adopted June 25th,

19    2011.

20         Q    Okay.  And June 25, 2011, that's the annual meeting

21    that occurred at Tysons Corner, Virginia, in June of 2011?

22         A    Yes.

23         Q    Okay.  And so these -- these were the bylaws until

24    the 16th revision; is that right?

25         A    I suppose so.
```

1     Q     Okay.  The 16th revision was adopted at the meeting

2     in Marina Del Rey approximately June 25th of 2012; is that

3     right?

4     A     Again, I'd have to check the records.

5     Q     Okay.  Take a look at Exhibit 1202.  Now, this is

6     the e-mail that you identified that was from Dr. William

7     Okerblom; is that right?

8     A     Yes.

9     Q     And this was sent on December 17, 2012?

10     A     I believe so, yes.

11     Q     And what was going to happen the next day?  What was

12     scheduled to happen?

13     A     I believe it was the House of Delegates meeting.

14     Q     Okay.  And they were going to vote on this amendment

15     that a number of doctors were objecting to, saying it gave too

16     much power to the Executive Committee?

17     A     That was one of their concerns, yes.

18     Q     Right.  And you pointed out how this document says

19     that Dr. Okerblom says that he's acting on behalf of certain

20     physician members?

21     A     Several concerned physicians, yes.

22     Q     Right.  And I noted, I wrote it down when you

23     testified to that, you said you assumed Dr. Stewart was one of

24     them.

25     A     Yes.

 1       Q       Did you ever call her and ask her?

 2       A       No.

 3       Q       You weren't in litigation with her, right?

 4       A       No.

 5       Q       You'd not undertaken any attempts to discipline her

 6   at this point, right?

 7       A       No, not at that point.

 8       Q       She was a governor of her academy; is that right?

 9       A       Yes.

10       Q       And so there was nothing to prevent you from just

11   getting on the phone and asking her, "Are you behind this

12   letter, this e-mail?"  Right?

13       A       That's correct.

14       Q       Did you ask somebody else to do that?

15       A       No.

16       Q       Did you ask Dr. Okerblom if he was representing

17   Dr. Stewart in sending this e-mail?

18       A       No.

19       Q       Have you ever done anything to see whether or not

20   Dr. Stewart has ever even seen this e-mail?

21       A       No.

22       Q       So when you used the word assumed, you said, "I

23   assumed Dr. Stewart was one of them," that was -- that was

24   completely an assumption because you did nothing to check; is

25   that right?

1       A       It was -- it was a good faith assumption, yes.

2       Q       Well, it would not have been difficult for you to

3    call her or even e-mail her, right?

4       A       Yes.

5       Q       But you didn't do that?

6       A       No.

7       Q       Now, is it your testimony that this e-mail from

8    Dr. Okerblom was one of the reasons you sued Dr. Stewart?

9       A       Yes.

10      Q       And is it one of the reasons you subjected her to

11   discipline?

12      A       Yes.

13      Q       And in all those months that passed -- you filed

14   that lawsuit in what?  March of 2012?

15      A       I'd have to look at the date.

16      Q       You remember the disciplinary action, though?  You

17   sent her that charging document on May 8, 2012, right?

18      A       Again, I'd have to check the dates.

19      Q       Well, we just -- you just covered that in your

20   examination by your counsel.

21      A       About two hours ago.

22      Q       Okay.  I don't want to take the time to show it to

23   you, but it's May 8, 2012?

24      A       Okay.

25      Q       It's a letter that you sent to her charging her,

```
 1    saying that she's going to -- she's going to appear at a

 2    disciplinary hearing.  That's almost half a year later.  You

 3    filed a lawsuit and you brought disciplinary charges against

 4    her without even calling her or e-mailing her to see if she had

 5    anything at all to do with this -- with this e-mail from

 6    Dr. Okerblom that you had problems with; is that right?

 7         A    She had the opportunity to avail herself at the

 8    disciplinary committee meeting to do all that.  She decided not

 9    to avail herself of that opportunity.

10         Q    Maybe you don't --

11         A    I don't know that I had --

12         Q    Maybe you didn't hear my question.  I'm asking what

13    you did.

14         A    No, I did not do that.

15         Q    And did you direct anybody on staff to do that?

16         A    No.

17         Q    Did you direct -- did you ask anybody on the

18    disciplinary committee who were supposed to be undertaking a

19    good faith investigation into her conduct?  Did you ask any of

20    them to make that inquiry?

21         A    The disciplinary committee was -- their task was to

22    obtain that type of information.  That's why she was called to

23    a committee meeting for a face-to-face with these individuals

24    so they could ask those questions and she could supply those

25    answers.
```

1          I don't know that I had some affirmative duty to

2     call Dr. Stewart.  I had other things to do, okay?  At that

3     point it just wasn't a relevant thing to do.

4          I think that in my mind when an attorney represents

5     an individual and then continues to write on the same topic in

6     the same way to the same people, that it's a fairly good

7     assumption to a reasonable person that this individual is being

8     represented, that that person still has a interest in this

9     subject.  This is the second writing on essentially the same

10    topic.

11         And by the way, Dr. Okerblom didn't deny -- okay? --

12    or didn't exclude Dr. Stewart.  Uhm, to me, this was just a

13    veiled effort to hide her identity.  That's just my opinion,

14    okay?

15    Q     Okay.  Can I --

16    A     I'm not sure that opinion was worth much because I

17    wasn't in a disciplinary situation.

18    Q     Now, if I could get an answer to the question that I

19    asked.  I asked did you ask anybody in the disciplinary

20    committee that were supposed to be doing this good faith

21    investigation to find out from Dr. Stewart whether or not she

22    had anything to do with this December 17th e-mail from

23    Dr. Okerblom that you had these problems with?  Did you or not?

24    That's yes, I did, or no, I didn't.

25    A     No.

1     Q    It doesn't take a long time.

2     A    No, I did not.

3     Q    Okay.  Did you ask anybody on the disciplinary

4  committee -- did you even alert them to the issue, you know,

5  "What's really got me upset, it's this December 17th e-mail

6  from Dr. Okerblom.  I don't like it.  I want you to investigate

7  and see if Dr. Stewart has anything to do with it."  Anything

8  like that ever happen?

9     A    I did not contact the disciplinary committee and

10  tell them to ask questions or tell them how to conduct their

11  investigation or tell them how to come to a conclusion or what

12  questions or exhibits or documents they were supposed to do.

13        I wanted them to do the work independently of what I

14  wanted.  What I wanted wasn't important, okay?  What was

15  important is that they gathered the information the way they

16  sought fit and then render a decision that they saw fit, and

17  then have a Board of Directors review that situation where they

18  saw fit.

19        My opinion, pretty meaningless okay?  So, no, I did

20  not ask those questions.  I did not tell them what to do.

21     Q    You created the disciplinary committee, right?

22     A    That's correct.

23     Q    You didn't have a disciplinary committee until you,

24  Bob Cerrato, created one?

25     A    That's correct.

1      Q      And after you created one, you -- you showed

2  exhibit -- I have the exhibit number here -- you showed an

3  e-mail that you sent to Dr. Montes, Dr. Maggio, and Dr. Geller,

4  telling them that they were to report to counsel and telling

5  them what they were being called upon to do as the disciplinary

6  committee; is that right?

7      A      I recall that.

8      Q      And when you formed that committee, you had in mind

9  that what Patty Stewart had done was somehow she was

10  responsible for this December 17th e-mail that was sent by

11  Dr. Okerblom and that she was responsible for another e-mail

12  that he sent on December 21st of 2011, that you got quite

13  emotional about on the stand; is that right?

14      A      That question took two minutes.  What -- what is --

15  can you shorten that for me because I don't know how to answer

16  that question.

17      Q      Sure.  When you formed the disciplinary committee,

18  you had in your mind, as to Dr. Stewart, the December 17th and

19  the December 21st e-mails from Dr. Okerblom, right?  That's why

20  you formed the committee as to Dr. Stewart?

21      A      I -- I formed the committee to look into her conduct

22  to see if it was negative enough to have her removed.

23      Q      What conduct?

24      A      The conduct we just described.

25      Q      The December 17th and the December 21st e-mails?

```
 1        A     The preliminary legal opinion, December 17th, and
 2   December 21st.  But that was -- I did not know the extent,
 3   okay?  That's what they were supposed to -- there may have been
 4   more -- I don't know.  They were supposed to investigate that
 5   and they were going to work with counsel because, frankly, they
 6   weren't professional disciplinary committee people.
 7        Q     Did you ask anybody, whether they were on the
 8   disciplinary committee or the legal task force or just staff --
 9   anybody to simply pick up the phone and ask Dr. Stewart if she
10   had anything to do with those two e-mails?
11        A     No.
12        Q     Or ask her by e-mail if she had anything to do with
13   it?
14        A     No.
15        Q     Did you ask anybody to make that inquiry of
16   Dr. Okerblom?
17        A     No.
18        Q     So all this went forward -- the discipline, the
19   lawsuit and everything was based on your assumption that she
20   had something to do with those?
21        A     All the members -- many members received all those
22   e-mails.  The conclusions they could draw was their conclusion.
23   It was out there, okay?  It was out there.  It was out there
24   just like a punch in the face.
25             Okay.  So as to what their conclusions were or how
```

```
 1    they arrived at it, what information she had, who knew what,

 2    that's what the disciplinary committee was for, to determine

 3    all that evidence.

 4           MR. CONWELL:  Now, talk -- I want to take a look at

 5    Exhibit 1466.  No, this is the wrong one.  I'm sorry.

 6        What is the exhibit number for the December 21st e-mail

 7    from Dr. Okerblom that he talked about?  If I can ask the

 8    clerk, what was the exhibit number for the December 21, 2011,

 9    e-mail that was introduced and discussed with the witness

10    during examination by counsel?

11           THE COURTROOM DEPUTY:  The new ones?

12           MR. CONWELL:  That's not one of the new ones.

13           THE COURT:  Was it December 18th?

14           THE COURTROOM DEPUTY:  December 21st.

15           MR. CONWELL:  Can we look at Exhibit 1204?

16           THE COURTROOM DEPUTY:  There's no 1204.  There's no

17    1204.  Did you say December 21st from Tony Russo?

18           MR. CONWELL:  No.  This is from Dr. Okerblom to a

19    number of people, including Dr. Cerrato.  And Dr. Cerrato

20    testified that he -- it was a personal attack against him, one

21    of the worst things he's ever experienced.

22           MS. HILAIRE:  You had it right.  It's 1466.  You

23    just have to scroll down.

24           THE COURT:  1466 is the right date but the wrong

25    people.
```

```
 1              MR. CONWELL:  Okay.  It's 1466.

 2       Q     (BY MR. CONWELL:)  Do you have that?

 3       A     I have it.

 4       Q     Okay.  Now, this is an e-mail from Dr. Okerblom to

 5  Dr. Ilowite; is that right?

 6       A     Yes.

 7       Q     And in the e-mail at the bottom of page 2, he says,

 8  "Dr. Cerrato does not seem to know how to stay out of trouble."

 9       A     Yes.

10       Q     "He seems to think that the rules don't apply to

11  him."

12              You see that?

13       A     Yes, I see it.

14       Q     And he goes on to says the things that you read

15  before.

16              And this -- you said that this upset you so much

17  that you still remember where you were when you received it; is

18  that right?

19       A     Yes.

20       Q     And he goes on on top of page 3 and says (Reading:)

21              "Most doctors are prudent and careful and

22              responsible.  Dr. Cerrato seems to be a

23              significant exception.  He has proceeded

24              with reckless indifference to societal

25              norms.  His conduct does not comport with
```

```
 1                    the type of character that typically

 2                    belongs to a board-certifying body."

 3               This bothered you so much that you even had an

 4    emotional response to it on the witness stand; is that right?

 5        A     Yes.

 6        Q     We had to take a break, right?

 7        A     Yes.

 8        Q     This -- these few lines caused you a great deal of

 9    emotional distress; is that right?

10        A     I would say yes.

11        Q     Even to the point where here we are,

12    four-and-a-half -- four years later and it causes you to

13    experience a lot of pain; is that right?

14        A     Yes.

15               MR. CONWELL:  So take a look at Exhibit 306, because

16    I want to talk about the emotional pain that Dr. Stewart has

17    experienced.

18               (Exhibit 306 previously marked for identification.)

19        Q     (BY MR. CONWELL:)  Have you found it?

20        A     Yes.

21        Q     Now, this is an e-mail that was sent to all the

22    members of AAPS; is that right?

23        A     Uhm, yes.

24        Q     In contrast to the e-mail from Dr. Okerblom that was

25    just to a limited number of people, all of whom were in
```

```
 1   leadership; is that correct?
 2        A    I'd have to go over the e-mail list to see who it
 3   exactly went to, but, yes --
 4        Q    Sure.
 5        A    -- there were many leaders on that list.
 6        Q    Okay.  So this -- this e-mail now, 306, went to all
 7   3,000 members, right?
 8        A    Uhm, I believe it did.
 9        Q    Okay.  And if you look at the second page, it says
10   who this is from.  Can you go to the second page --
11        A    Right.  It's from the --
12        Q    -- the bottom and I'd like to -- who's that from?
13        A    It's from legal task force:  myself, Dr. Maggio,
14   Dr. Geller, and Dr. Montes.
15        Q    Okay.  So now in here at the bottom of page 1, you
16   said (Reading:)
17             "Make no mistake" --
18             Let him catch up.  The bottom paragraph, if you can
19   enlarge that.  (Reading:)
20             "Make no mistake, the charges against
21             Drs. Castillo, Geller, and Klein are
22             serious.  In the counterclaims we allege
23             that these doctors have joined forces with
24             a handful of other rogue members of our
25             organization as well as nonmembers, and a
```

1          disgruntled former employee of AAPS, to

2          engage in a systematic campaign of

3          harassment, defamation, and intimidation

4          against AAPS and its leadership.  In

5          addition to these three doctors, we have

6          named as additional defendants Dr. Richard

7          Cressey, Dr. William Okerblom, Dr. Leslie

8          Radentz, and Dr. Patricia" -- let's go to

9          the top of the next page --

10    A     "Stewart."

11    Q     -- "Dr. Patricia Stewart.  And all of whom are

12   alleged" -- if you can enlarge that -- "all of whom are alleged

13   to have played an active role in this campaign to destroy

14   AAPS."

15          You see that?

16    A     Yes.

17    Q     So you certainly, of all people, can understand the

18   kind of pain and emotional distress Dr. Stewart experienced

19   having been publicly accused in an e-mail that went out to the

20   entire organization of engaging in a campaign to destroy her

21   board-certifying organization and to have played a, quote,

22   "active role" in that campaign, can't you?

23    A     I don't know what Dr. Stewart's emotional response

24   would be to this, okay?  But I can tell you that in this

25   document we had a good faith belief to do and say what we did,

```
 1   and this is a far cry what I was accused of in the Okerblom

 2   e-mail, far cry.

 3        Q    The --

 4        A    That's open to interpretation, I understand that,

 5   but --

 6        Q    I'm just saying given your reaction to what

 7   Dr. Okerblom said in just a few lines in a letter to just

 8   elected leadership on an issue that was a matter of -- that was

 9   going to be submitted to a vote, given your emotional response,

10   you can at least understand her emotional pain, can't you?

11        A    First of all --

12        Q    Yes or no?  I'd like on an answer to my question and

13   not another speech.

14        A    Repeat the question.

15        Q    You can understand her emotional pain in being

16   subjected to the ridicule and the false accusations in this

17   e-mail, can't you?

18        A    No.

19        Q    On May 8, 2012, you sent her a charging document.

20             Can we pull up Exhibit 1498?  This is the charging

21   document, right, May 8, 2012?

22        A    Yes.

23        Q    And in this document, you said that -- to

24   Dr. Stewart that the committee, the disciplinary committee that

25   you had formed, was going to consider charges against her for
```

1   "conduct injurious to the best interest of AAPS and or

2   incompatible with its purposes," right?

3       A    Yes.

4       Q    And you elaborated on the charges by attaching the

5   counterclaim that you had filed, the lawsuit you had filed

6   against her; is that right?

7       A    Yes.

8       Q    In which quite a few accusation are made, right?

9       A    Yes.

10      Q    And then you said (Reading:)

11              "The committee is going to present its

12              recommendations on the appropriate level

13              of discipline, which may include

14              termination of your membership privileges

15              in AAPS."

16              Is that right?

17      A    That's correct.

18      Q    So given the experience you had that you've just

19  shown us here in the courtroom in experiencing pain and being

20  charged with something that you didn't think was true, you can

21  certainly understand Dr. Stewart's pain when she received this

22  document from you, can't you?

23              MR. SCHNEIDER:  Objection.  Asked and answered.

24              MR. CONWELL:  I haven't asked about this question.

25              THE COURT:  That's a question.  Overruled.

```
 1              THE WITNESS:  If you're asking me to testify on

 2    Dr. Stewart's mental status or how she's going to --

 3         Q    (BY MR. CONWELL:)  No.  I'm asking can you

 4    understand her pain, her emotional distress in being falsely

 5    accused and having her membership threatened?

 6              MR. SCHNEIDER:  Objection.  Lacks foundation.

 7              THE COURT:  Probably.  But you answered the other

 8    question.  Answer this one.

 9              THE WITNESS:  Ask it again.

10         Q    (BY MR. CONWELL:)  Can you understand her pain, yes

11    or no?  Yes, I can; no, I can't?

12         A    If she had pain, I would understand it.

13         Q    Okay.  And then on June 13th or some date, according

14    to your testimony yesterday -- you could not tell us a date

15    when the vote occurred to expel her -- but sometime the Board

16    voted to expel her from the AAPS; is that right?

17         A    Yes.

18         Q    For conduct injurious to the best interests of AAPS?

19         A    Yes.

20         Q    And then that was publicly discussed at the AAPS

21    meeting in Marina Del Rey at an open Board meeting; is that

22    right?

23         A    What was -- what was discussed?

24         Q    Publicly discussed that Dr. Radentz and Dr. Stewart

25    had been expelled from the AAPS?  It was publicly discussed at
```

1   your open Board meeting?

2        A     I believe it was.

3        Q     So you could certainly understand her pain, can't

4   you, in having this spoken to her colleagues, her friends for

5   some 20 years, that she was expelled from the organization for

6   conduct injurious to the organization?  You can understand

7   that, can't you?

8              MR. SCHNEIDER:  Objection.  Lacks foundation.

9              THE COURT:  Overruled.

10             THE WITNESS:  If she had pain concerning this issue,

11  yes, I could understand it.

12       Q     (BY MR. CONWELL:)  Because, as you yourself had told

13  us, it hurts to be falsely accused, doesn't it?

14       A     Yes.

15             THE COURT:  Hang on.  Let's take ten minutes.

16        All right.  Ladies and gentlemen, ten minutes.  Remember

17  the admonition, please.

18             THE COURTROOM DEPUTY:  All rise.  This Court's in

19  recess.

20             (Open court out of the presence of the jury.)

21             MR. SCHNEIDER:  Your Honor, how late are we going

22  today?

23             THE COURT:  I don't know.  We'll see.

24             (A recess was taken.)

25             (Open court in the presence of the jury.)

1          THE COURT:  All right.  Everyone has returned, and

2     Dr. Cerrato has returned to the witness stand.

3          Mr. Conwell, you may continue.

4          Q     (BY MR. CONWELL:)  So Dr. Cerrato, take a look at

5     Exhibit 5 which is Dr. Stewart's May 24, 2012, letter to the

6     AAPS Board of Directors.  You previously identified this as a

7     document that you received from her and read; is that right?

8          A     Uhm, yes.

9          Q     Okay.  And turn to page 2, please.  And about

10    halfway down is a single line that I want you to focus on.  See

11    that?  It says, "I have not sent out -- I've not sent letters

12    out attacking the leadership of our organization either."

13              You see that?

14         A     I see that.

15         Q     So before you said that you assumed that she was the

16    one behind Dr. Okerblom sending his December 17th and

17    December 21st e-mails to the AAPS?

18              MR. SCHNEIDER:  Objection.  Mischaracterizes the

19    testimony.

20              THE COURT:  If so, not in significant detail.

21    Overruled.

22         Q     (BY MR. CONWELL:)  Right?  We had a long discussion

23    about you making that assumption.  You remember that, just

24    before the break?

25         A     Yes.

```
1        Q    And you remember me asking had you done anything to
2   check with anybody?  Remember that?
3        A    Yes.
4        Q    And you finally said, "No, I didn't check -- I
5   didn't check nor did I ask anybody to check with Dr. Stewart."
6   You remember that?
7        A    That's correct.
8        Q    And then you told me, you said, "Dr. Stewart should
9   have come to us and told her -- told us that she -- she didn't
10  do this."  Right?
11       A    Yes.
12       Q    But in fact, she did write to you.  She did respond
13  to the allegation that she was behind it and told you, "I've
14  not sent letters out attacking the leadership of our
15  organization, either."  Isn't that right?
16       A    That's in this writing.
17       Q    And you just ignored that?
18       A    Again, she -- she was free to write whatever she
19  wanted, but this needed to be presented to the disciplinary
20  committee in person at a time and date that it was designated.
21       Q    No, that's not true at all.  You sent her a letter
22  on May 8th that said she could respond in writing and she did.
23  You told us that yesterday, right?
24       A    The letter stated that she could present written --
25  if I remember correctly, she could present written evidence.
```

```
 1    This is a letter.  It doesn't allow a committee member to

 2    question her about this.

 3         Q    Why?

 4         A    That's not what it said.

 5         Q    Why can't Dr. Montes, or Dr. Maggio, or Dr. Wallace,

 6    who was in the Derm Academy, just get on the phone and ask her?

 7    Why not?

 8         A    There's a -- there's a procedure to follow, okay?

 9    The procedure was set up carefully so that all parties

10    concerned would have a fair shot of a correct result.

11         Q    Because she would not waive jurisdiction and come to

12    Florida for this hearing, you just ignored this and went ahead

13    and expelled her, right?

14         A    I can't say that this was ignored, okay?  I -- I'm

15    sure that the disciplinary committee who received this took it

16    into account, but they reached their decision.

17         Q    This is very interesting.  You have a letter from

18    her saying, "I didn't do it," nothing in the letter from

19    Dr. Okerblom says he's acting on her behalf.  Yet you take --

20    you then just expel her on the basis that she was the one that

21    asked him to send out those two letters that you have a problem

22    with, right?

23         A    We have a preliminary legal opinion that says that

24    Dr. Okerblom is representing Dr. Stewart, okay?  We have two

25    other communications that are progressively highly critical of
```

1    AAPS.  Okerblom does not say that he does not represent

2    Stewart.  Up until this point, we hadn't heard any denials.  We

3    gave her a process by which she could come in and deal with

4    this issue.

5         Q    I want to clean up something that we talked about

6    earlier regarding whether or not 3.05 applied to the suspension

7    of Drs. Castillo, Geller, and Klein.  And you took issue with

8    me and you said 3.05 doesn't apply.

9         A    It did not apply in the suspension.

10             MR. CONWELL:  Okay.  All right.  So take a look at

11   1629.

12             (Exhibit 1629 previously marked for identification.)

13        Q    (BY MR. CONWELL:)  Now, this is the suspension

14   letter that was sent to Dr. Castillo on October 6, 2010.  I was

15   mistaken when I said the 7th.  Is that right?

16        A    This is October 6th, correct.

17        Q    Okay.  And the letter to Dr. Castillo said (Reading:)

18             "Reliable information's been brought to

19             the attention of the AAPS Board of

20             Directors that you're in violation of AAPS

21             bylaw 3.05."

22             And then it cited that; is that correct?

23        A    That's correct.

24        Q    Thank you.

25             Take a look at Exhibit 1497.  Now, this is going

UNITED STATES DISTRICT COURT

1  back to the issue about removing Dr. Stewart from the Board of

2  Governors, and this is her letter of May 6, 2012.  You

3  discussed this with counsel.  Do you recall that?

4       A    Yes.

5       Q    And in here she said that you all didn't put

6  sufficient postage on it; I got it late; by the time I returned

7  it, it was past the deadline; it was only a day late; you

8  shouldn't remove me.  You remember that?

9       A    Yes.

10       Q    And then you said, "Hey, this is on Marciniak's

11  back, not mine," or words to that effect, right?

12       A    Yes.

13       Q    Now -- 'cause you said it was Marciniak who wanted

14  to enforce this and to remove her as a governor?

15       A    It was the Board of Directors' decision to, from

16  what I remember -- to firmly adhere to the deadlines.

17       Q    Now, what you told us was it was Doug Marciniak?

18       A    Well, Marciniak I think was the point man on this,

19  but it was the Board of Directors who essentially enforced that

20  deadline.

21       Q    And on March 1, 2012, who was the chairman of the

22  Board of Directors?

23       A    I believe I was.  It's not chairman of the Board of

24  Directors.  It's president.

25       Q    President of the Board of Directors, okay.

```
 1            MR. CONWELL:  And so now let's take a look at

 2    Exhibit 1479.

 3            (Exhibit 1479 previously marked for identification.)

 4       Q    (BY MR. CONWELL:)  Do you have that?

 5       A    Yeah, yes.

 6       Q    Okay.  And you see there's an e-mail from Doug

 7    Marciniak dated February 29, 2012.  Do you see that?

 8       A    Yes.  This appears to be looks like an e-mail from

 9    Tony Russo to Doug Marciniak.

10       Q    Right.  And then below that is Marciniak's e-mail to

11    the Board dated February 29, 2010?

12       A    Yes.

13       Q    And in here he says (Reading:)

14            "I've been doing a lot of thinking since

15            the meeting last night.  At the risk" --

16            this is the bottom of the page -- "at the

17            risk of a couple of hands coming through

18            my computer towards my throat, I would

19            like to throw a few thoughts out for --

20            out of consideration.  We essentially

21            accomplished our goal of getting the NDA's

22            and CA's signed without exclusions, even

23            though they were late.  Whether we like it

24            or not, I think we share some

25            responsibility of perpetuating the mess by
```

1       letting it drag on so long.  I understand

2       why we did, in hopes of avoiding

3       confrontation, but in doing so we may have

4       the wrong message.  Nevertheless, the end

5       result is what ultimately counts and we

6       achieved that.  This is something that has

7       not been traditionally enforced that hard.

8       Our mistake was not setting a deadline

9       sooner.  It sends a veiled message that

10      this just wasn't important to us.  Then

11      suddenly, we drop the hammer.  Past

12      history is not on our side.  I think this

13      is going to create a political firestorm

14      that we just do not need at this point in

15      time.  Secondly, by the time the letter

16      went out, there really was not much time

17      to respond and if people were out of town,

18      or, as with one doctor whose name I

19      forget, was out of the country.  We need

20      to choose our battles.  We need a number

21      of bylaw changes and policies and

22      procedures regarding behavior and

23      discipline, and if we hope to get any of

24      them, the animosity needs to subside.

25      It basically goes through here and makes an argument

1    to not enforce removing Dr. Stewart as a governor.  And at the

2    end, on the page 3, he says, "I urge you to please reconsider

3    and respond quickly.  Time is critical."

4        You see that?

5        A    Where is that?

6        Q    Page 3, "I urge you to please reconsider and respond

7    quickly.  Time is critical."

8        A    Yes, I see that.

9        Q    And so you were mistaken when you said that it was

10   Dr. Marciniak who was pushing to lay this hammer down and to

11   get Dr. Stewart removed as a governor because she did not

12   timely sign the nondisclosure agreement.  You were mistaken,

13   weren't you?

14       A    Yes.  Uhm, I don't know that -- again, what I would

15   default is -- and I remember this -- is that it was the Board

16   of Directors' ultimate responsibility to set these deadlines.

17   I mean, he even described in here that we really -- I think

18   from the time we announced it to the time we actually set a

19   date, we let people -- we gave them a lot of time, from what I

20   remember.  But that's my recollection.  That's the best of my

21   recollection.

22            MR. CONWELL:  Now I want us to take a look at couple

23   more exhibits.  1885.

24            (Exhibit 1885 previously marked for identification.)

25            THE COURTROOM DEPUTY:  Did you say 13 or 15?  18?

UNITED STATES DISTRICT COURT

```
 1                    MR. CONWELL:  1885 and 1333.

 2                    THE COURTROOM DEPUTY:  1885.  And what was the other

 3      one?

 4                    MR. CONWELL:  1333.

 5                    THE COURTROOM DEPUTY:  Okay.

 6                    MR. CONWELL:  So let's start with 1333 and turn to

 7      page 59.

 8           While the witness is doing that, your Honor, I'm moving

 9      into evidence 1892, 218, and 306.

10                    MR. SCHNEIDER:  We don't object to 1892.  What were

11      the other two?

12                    MR. CONWELL:  The other two were 218 and 306.  Okay.

13                    MR. SCHNEIDER:  Is 306 the May 24th letter?

14                    MR. CONWELL:  No, that's Exhibit 5.  That's the

15      March 28, 2012 --

16                    MR. SCHNEIDER:  We have no objection to 306.

17           And the other one was?

18                    MR. CONWELL:  218.

19                    MR. SCHNEIDER:  No, we don't object to that either.

20                    THE COURT:  They'll be received in evidence.

21                    (Exhibits received into evidence.)

22           Q    (BY MR. CONWELL:)  Okay.  So we're on Exhibit 1333.

23      Now, that is the complaint/counterclaim that you filed against

24      Dr. Stewart and others; is that right?

25           A    Appears to be, yes.
```

1       Q     And one of the attachments to that is the complaint

2   that Mr. Bell filed with the Florida Bar which he then copied

3   to the New Jersey Bar concerning you.  You see that on page 59

4   and 60?

5       A     Yes.

6       Q     And this is what you talked about on examination

7   from your counsel as a bar complaint that had been filed by

8   Mr. Bell against you, is that it?

9       A     Yes.

10      Q     And then if we can go to page 60, there's a July 19,

11  2010, letter from Mr. Bell where he identifies you, and then he

12  says, "He's a New Jersey lawyer, and he's -- he's acting as the

13  unofficial general counsel for AAPS."

14            You see that?

15      A     Yes, I see it.

16      Q     (Reading:)

17            "Whenever a legal issue arose, Bill

18            Carbone, William Carbone, would instruct

19            staff to pass it on to Cerrato."

20            And then he goes on (Reading:)

21            "You've been giving legal advice and

22            performing legal tasks for the Association

23            for several years.  Mr. Cerrato's billed

24            AAPS for legal advice, sends monthly bills

25            to the organization."

1          He goes on and says how much you're billing them.

2          And then on the next page he identifies some of the legal

3      work that you've been doing:  reviewing accounts, etc.

4          Do you see that?

5          A     I've already spoken to what I was doing with those

6      contracts.

7          Q     I'm just asking do you see what --

8          A     Yes, I see it.

9          Q     Okay.  Now, you said that Dr. Cressey filed an

10     identical complaint with the New Jersey Bar?

11         A     From what I remembered.

12         Q     Okay.  Well, I'm going to help you out.  Take a look

13     at Exhibit 1885.  You find it?  1885?

14         A     Yes.

15         Q     Okay.  Now, this is what you're calling

16     Dr. Cressey's complaint to the New Jersey Bar; is that right?

17         A     No.  The way I remember it, Dr. Cressey had

18     submitted the same Bell data.

19         Q     Okay.  Well, I'm sure you'll show that to us.  So

20     you don't agree that this is what you're calling the Cressey

21     complaint?

22         A     No, I don't agree with this.

23         Q     You would agree with me that this is not a

24     complaint; he's just asking a question; is that right?  He says

25     (Reading:)

1        "As well, I am inquiring as to whether it

2        is proper and appropriate for one of our

3        member attorneys to be compensated for

4        independent consulting service (legal

5        services) that he regularly provides for

6        the corporation.  For your perusal I've

7        enclosed copies of two e-mail

8        communications that I received from the

9        AAPS dated June 24, 2011, and July 28,

10       2011.  Each of these letters state that

11       this independent consultant arrangement

12       was reviewed and approved by the New

13       Jersey, Pennsylvania, and Florida Bar

14       Associations."

15       You see that?

16    A    I see it.

17    Q    So he's asking a question, right?

18    A    That is a very-well crafted, unauthorized practice

19 of law complaint.

20    Q    So this is the complaint?

21    A    You asked me about this page right here, the first

22 page.  That first page is essentially another accusation about

23 unauthorized practice of law, just this page.

24    Q    Okay.  And so this is the one that you say is

25 identical to Mr. Bell's?

1        A      What I said was, was the material that was submitted

2    was identical to Bell's.  That's what I remember.

3        Q      All right.  That's not true, is it?

4        A      I have to go back and check my records, but that's

5    what I remember.

6        Q      Let's look at the attachment.  He has this e-mail of

7    June 24, 2011, which is Exhibit 12 in this trial.  That's the

8    response to the 14 points.  And you'll see under item No. 11,

9    referring to someone on the Executive Committee who may have

10   been employed as an attorney, he underlines (Reading:)

11                "This refers to Cerrato.  He has been paid

12                as an independent consultant.  This was

13                another concern which was instigated by

14                some.  This was presented to the Board of

15                Directors who approved it unanimously.

16                And in addition, this arrangement was

17                reviewed by the Pennsylvania, New Jersey,

18                and Florida Bars and was approved."

19                So he's asking, Have you guys approved this, right?

20       A      This response was written by lay people.  They

21   wouldn't understand that Bars don't approve such a arrangement.

22   Okay?  So that's -- that's why this was written this way.

23       Q      This statement in this document that went out to the

24   membership on June 24, 2011, Exhibit 12 at this trial, this

25   statement is false, isn't it?  The Pennsylvania, New Jersey,

1    and Florida Bars never approved your arrangement, did they?

2        A     No, it's incorrect.  It's incorrect.  That's not --

3    that's not -- that's not what Bar -- that's not what Bars do.

4        Q     And when Mr. Bell had written his -- sent in his

5    letter to the New Jersey Bar regarding whether or not you were

6    involved in the unauthorized practice of law, you wrote back --

7    and I covered with you yesterday -- and you said, "I have no

8    written, oral, or other arrangement with the AAPS to provide

9    legal services," right?

10       A     Yes.

11       Q     But then we saw Mr. McCann made a motion --

12   Dr. McCann made a motion at the April 23, 2011, Board meeting

13   that your contract, your engagement for, quote, "legal

14   services" be renewed, and that was passed, right?  He uses the

15   word "legal services"?

16       A     Yes.  And the issue that I kept speaking about was

17   that if it was going to be legal services, it was only going to

18   be limited to the states of New Jersey and Pennsylvania.  They

19   just didn't understand the concept and it was clear, you know,

20   what my responsibilities were going to be outside of those

21   states.

22       Q     Now, Dr. Cerrato, when you were president of the

23   AAPS, president of the Board of Directors, head of the

24   Executive Committee, you authorized AAPS to file a lawsuit

25   against Dr. Cressey for sending this letter asking that

1    question, didn't you?

2        A    Yes.

3        Q    You're not even allowed to ask a question about you

4    without getting sued, are you?

5        A    You could ask all the questions you want, okay?  But

6    this was clearly an attempt to just reopen that whole

7    investigation and it was just a veiled attempt at again

8    accusing me of unauthorized practice of law.

9            Cressey knew, okay?  Everybody knew what the New

10   Jersey Bar said.  Why?  Because even though the document that

11   was sent to Mr. Bell saying that this was a confidential matter

12   and not to be shared, Bell sent it everywhere.  So everybody

13   knew, and Cressey knew, and that was even in the

14   documentation -- a legal document that Castillo submitted.

15       Q    Now, you kept saying in response to questions by

16   counsel that everything you did regarding Dr. Stewart, you ran

17   it by legal counsel, right?

18       A    In terms of discipline, in terms of, you know,

19   filing lawsuits or any -- any matter, any of those matters of

20   that type, yes.

21       Q    So when you sent the letter to Montes, and Maggio,

22   and Gallagher -- or Wallace -- excuse me -- Wallace on the

23   disciplinary committee, you told them to work with outside

24   counsel, right?  That --

25       A    I wouldn't turn to outside counsel.  They were

1    counsel, period.

2         Q    Okay.  And you said on the May 8th charging

3    document, all this you ran it by -- your lawyer was very

4    careful to always say, "Yeah, I coordinated it with outside

5    counsel.  I sought their advice," right?

6         A    Activities that had to do with discipline, we -- we

7    sought legal advice and counsel.

8         Q    Right.  And the counsel is Mr. Kruzhkov's firm,

9    right?

10        A    Not them alone.

11        Q    And Mr. Johnson's firm?

12        A    That's correct.

13        Q    Mr. Johnson and Mr. Kruzhkov are your trial lawyers?

14   They're the ones that you hired to sue your members, right?

15        A    Yes.

16        Q    So the ones giving you advice on what's going to be

17   fair for Dr. Stewart are the same ones that are leading the

18   charge in suing her, right?

19        A    I -- leading the charge is a mischaracterization.

20        Q    Well, I'll restate it.  They're the ones who are

21   representing you in your lawsuit against her?

22        A    Yes, they are representing us.

23        Q    And so those are the lawyers -- the ones that are

24   trying to win a case for you against her are the ones now

25   advising you on what's fair in the disciplinary proceedings?

```
 1          A      I think that was one of just many options.  Suing
 2    her wasn't the only option.  Legal counsel was instituted to
 3    give us options and risk and probability.
 4          Q      They're the same ones, right?
 5          A      What do you mean?
 6          Q      The ones who are suing her are the same ones giving
 7    you counsel --
 8          A      Yes.
 9          Q      -- on this -- on conducting a fair and impartial
10    investigation, right?
11          A      Yes.  They're assisting us with the disciplinary
12    process.
13          Q      Now, on the appeal, you said that you ran out of
14    doctors, you ran out of people who could be on the appeal; is
15    that right?
16          A      Yes.
17          Q      And you also said that you'd used up the doctors on
18    the disciplinary committee.  You had two prior presidents,
19    Dr. Maggio and Dr., Montes on the disciplinary committee,
20    right?
21          A      Yes.
22          Q      And you explained how hard it is to find volunteers
23    to do these things, right?
24          A      Yes.
25          Q      Well, you've explained to the jury how much money
```

 1    AAPS has.  So why not just do what other corporations do and

 2    hire and get an outside -- people outside the organization to

 3    conduct your investigation?

 4         A    I wasn't advised to do that.

 5         Q    You certainly could afford to hire some respected

 6    people in the medical community or just in the business

 7    community to conduct this investigation, couldn't you?

 8         A    I don't -- it's not a question of money.  That

 9    option was never entertained.  It was never -- never presented

10    to me.

11         Q    Instead of getting outside independent people with

12    good business judgment to come in and conduct this

13    investigation, you got Dr. Montes, who was the subject of these

14    e-mails that you found so distasteful in the preliminary legal

15    opinion, right?

16         A    Dr. Montes was mentioned in the ACCME thing and the

17    preliminary legal opinion, but --

18         Q    And the FEC, Federal Election Commission?

19         A    And the FEC.  But it was felt that those matters

20    were relatively minor and that I could depend on them to give

21    me a judgment that was fair.

22         Q    I just want to make sure I'm clear on this.  There

23    was no reason why you cannot go out and create an independent

24    committee from people outside the organization; is that right?

25         A    Well, the bylaws did not call for that.  The bylaws

 1    had an internal disciplinary procedure.

 2         Q    Bylaws don't say anything about a disciplinary

 3    committee.

 4         A    Disciplinary committee, that's true, but we're not

 5    talking about a disciplinary committee.  We're talking about --

 6         Q    I am.

 7              THE COURT:  Appeals.

 8              THE WITNESS:  You're talking about an appeals

 9    committee, very different.

10         Q    (BY MR. CONWELL:)  No, I'm talking about the

11    disciplinary committee.

12         A    Okay.  If you're talking about the disciplinary

13    committee --

14         Q    If I said appeals, I misspoke.

15         A    -- if I discussed it with counsel and if they gave

16    that to me as a viable option, I would have considered it.

17         Q    Take a look at Exhibit 1467.  Also, do you still

18    have 1498 up there?  That's the May 8 letter.

19         A    Yes.

20         Q    So let's look at 1498 first, then I'll go to 1467.

21         A    1498?

22         Q    Yes.  That's the May 8 letter?

23         A    Got it.

24         Q    So in the May 8 letter, you gave her notice about

25    this hearing and so forth, and then you said that she could

```
1    appear with legal counsel; is that right?

2        A    Yes.

3        Q    But when your lawyer asked you about this, about

4    whether or not you could bring witnesses, you said they could

5    not bring witnesses; is that right?

6        A    Yes.

7        Q    So you viewed this hearing to be important enough

8    that you needed to tell her that she could bring a lawyer, but

9    it wasn't so important that she needed to bring witnesses?

10       A    It's not a question of whether it was important to

11   bring witnesses.  3.05 was written such that witnesses weren't

12   allowed.  That was the process we had.  They weren't

13   specifically named.

14       Q    But you understand what we're here about?  One of

15   the issues we're here about is whether or not your bylaws are

16   fair and reasonable and were carried out in good faith.

17            So I want to know -- you're telling us that bylaws

18   say no witnesses, right?

19       A    That's correct.

20       Q    And so it's important enough to bring a lawyer but

21   not to bring witnesses, right?

22       A    I don't know that it was a question of importance.

23   The bylaws -- this is the procedure that we had.  This is the

24   procedure that we were stuck with, for a better term.  This is

25   what we did.
```

1        Q     Okay.  Now, let's go to 1467.  Let's turn to

2   page 81.  This is the transcript of the temporary injunction

3   hearing on June 7, 2012.  You recall that?

4        A     Yes, I saw it -- I saw the document previously.

5        Q     All right.  So you were reading from page 81 and the

6   top of 82 where the court was speaking and said, "I'm going to

7   grant the temporary injunction until the 27th of July."

8              Do you recall that?

9        A     Yes.

10       Q     And then he went on.  I'm going to pick up from

11  where you left off.  (Reading:)

12             "I don't find any prejudice on the part of

13             AAPS" -- this is on page 82 -- "as to how

14             and why they would be prejudiced by not

15             continuing the disciplinary committee

16             hearing.  I don't know that the

17             disciplinary committee really is even --

18             and this is kind of my dicta -- is

19             something to which they're entitled.

20             15 minutes to me seems a little short as

21             far as due process.  If it was a simple

22             traffic ticket, you could certainly have

23             a" --

24             MR. SCHNEIDER:  Objection.  This is not relevant.

25             MR. CONWELL:  (Reading:)

```
 1                 – "hearing of more than 15 minutes.  So

 2                 I'm taking" --

 3                 THE COURT:  Hang on.  This came up during your

 4      examination and he wanted all of it read for completeness.

 5                 MR. SCHNEIDER:  Oh.

 6                 THE COURT:  All right.

 7                 MR. CONWELL:  (Reading:)

 8                 "This has to do with the men's livelihood,

 9                 the doctors' livelihood.  There is

10                 allegations of conspiracy.  This is a

11                 160-some odd pages that have been

12                 presented to me.  I have not been able to

13                 wade through it, but I want to commend the

14                 attorneys for the professionalism that

15                 they've shown in breaking this down to the

16                 parts that I can understand.  This has

17                 taken over an hour just trying to get to

18                 the heart of it."

19                 Then, I made some comments and he continued,

20      (Reading:)

21                 "I got it.  I don't know.  There seems to

22                 be some conflict that the attorneys are

23                 having.  The discipline says the Board may

24                 expel, call for the resignation of, or

25                 otherwise discipline if two-thirds of the
```

1                  members of the Board find that the conduct

2                  has been injurious to the best interests

3                  of the Association or inconsistent with

4                  its purposes.  And it says before such

5                  action, which is expel, they've got to

6                  give notice to the member" --

7                  MR. SCHNEIDER:  I'm going to object to the rest of

8      this, your Honor.  It's inconsistent with the Court's motion in

9      limine ruling.

10                 THE COURT:  All right.  As entertaining as this

11     might be, the ruling of some state court in Florida's got no

12     bearing on what we're doing here.  Okay?  So --

13                 MR. CONWELL:  Okay.

14                 THE COURT:  -- let's wrap it up for the day.

15          I'm sorry.  Wait a minute.  Was there going to be a

16     question in there?

17                 MR. CONWELL:  Yes.

18                 THE COURT:  Why don't you ask the question.

19                 MR. CONWELL:  Yes.

20                 THE COURT:  Go ahead.

21          Q     (BY MR. CONWELL:)  So you were aware of this ruling

22     at the time that you proceeded with the disciplinary committee

23     hearing on June 9th; is that right?  AAPS was aware of this

24     court ruling?

25          A     In this case, yes.

```
 1         Q     Okay.  Finding that this was -- this process that

 2    you want to go forward with, the disciplinary process, was not

 3    fair and did not --

 4              MR. SCHNEIDER:  Objection.

 5              THE COURT:  At least in this judge's opinion was not

 6    fair.

 7              MR. CONWELL:  Right.

 8         Q     (BY MR. CONWELL:)  You were aware of that, right?

 9         A     Yes.

10         Q     And notwithstanding that, you proceeded against

11    Dr. Stewart, didn't you?

12         A     Uhm, again, we relied on --

13              THE COURT:  That's yes or no.

14              THE WITNESS:  Say it again.

15         Q     (BY MR. CONWELL:)  Notwithstanding that you knew

16    that, you proceeded with those proceedings against Dr. Stewart,

17    right?

18         A     Yes.

19         Q     And based on those proceedings, you expelled her?

20         A     Yes.

21              THE COURT:  All right.  Let's shut it down for the

22    day.

23         All right.  Ladies and gentlemen, we're going to adjourn.

24    I know, much to your disappointment.

25         Please remember the admonition.  We will reconvene in the
```

1    morning.  Thank you.

2              THE COURTROOM DEPUTY:  All rise.

3              (Proceedings adjourned at 2:33 P.M., until

4              Thursday, February 4, 2016, at 8:00 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5    I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6    FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7    OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8    TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14        DATED THIS 3RD DAY OF FEBRUARY, 2016.

15

16

17        /S/ DEBRA READ

18   DEBRA READ, CSR NO. 3949 CRR RMR RDR
     FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT