```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

 3             HONORABLE OTIS D. WRIGHT, II

 4         UNITED STATES DISTRICT JUDGE PRESIDING

 5   PATRICIA STEWART, D.O.,            )
                                        )
 6                  Plaintiff,          )
                                        ) ED CV 13-1670-ODW(DTBx)
 7        vs.                           )
                                        )
 8   AMERICAN ASSOCIATION OF PHYSICIAN  )        VOLUME 11
     SPECIALISTS, INC., WILLIAM         )
 9   CARBONE; ROBERT CERRATO; SVETLANA  )      PAGES 1 – 36
     RUBAKOVIC and DOES 1-100,          )
10                                      )
                    Defendants.         )
11   _____)

12

13

14             REPORTER'S TRANSCRIPT OF
                   TRIAL – DAY 11
15          THURSDAY, FEBRUARY 11, 2016
                    3:37 P.M.
16             LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

          DEBI READ, CSR 3949 CRR RMR RDR
23        FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET 432A
24        LOS ANGELES, CALIFORNIA 90012
              READIT3949@GMAIL.COM
25
```

```
 1                       A P P E A R A N C E S

 2

    ON BEHALF OF THE PLAINTIFF:
 3
         CONWELL BUSINESS LAW, P.A.
 4       BY:  GEORGE DONOVAN CONWELL, JR.
              Attorney at Law
 5       12610 Race Track Road, Suite 200
         Tampa, Florida 33626
 6       813-282-8000
         dconwell@conwellbusinesslaw.com
 7
         HILAIRE MCGRIFF, PC
 8       BY:  MIKA HILAIRE
              Attorney at Law
 9       601 S. Figueroa Street, Suite 4050
         Los Angeles, California 90017
10       213-330-4260
         mika@hmpclaw.com
11
         WILLIAM A. OKERBLOM LAW OFFICES
12       BY:  WILLIAM ALLEN OKERBLOM
              Attorney at Law
13       1145 E. Clark Avenue, Suite H
         Santa Maria, California 93454
14       805-478-6570
         drlaw07@aol.com
15

16  ON BEHALF OF THE DEFENDANTS AMERICAN ASSOCIATION OF
    PHYSICIAN SPECIALISTS, INC.; WILLIAM CARBONE; ROBERT CERRATO:
17
         ANDERSON, MCPHARLIN & CONNERS LLP
18       BY:  ERIC A. SCHNEIDER
         BY:  LEILA M. ROSSETTI
19            Attorney at Law
         707 Wilshire Boulevard, Suite 4000
20       Los Angeles, California 90017-3623
         213-688-0080
21       eas@amclaw.com
         lmr@amclaw.com
22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1              A P P E A R A N C E S  (continued)

2

   ON BEHALF OF DEFENDANT AMERICAN ASSOCIATION OF PHYSICIAN
3  SPECIALISTS, INC.:

4        GUSRAE KAPLAN NUSBAUM PLLC
         BY:  MARLEN KRUZHKOV
5             Attorney at Law
         120 Wall Street
6        New York, New York 10005
         212-269-1400
7        mkruzhkov@gusraekaplan.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

E X H I B I T S

2

3                                                    FOR                  FOR
                                              IDENTIFICATION          EVIDENCE
4    NO.      DESCRIPTION                          PG.             PG.    VOL.

5    ─────────────────────────────────────────────────────────────────────────

     1767   AAPS 2013 tax returns –              18              19      11
6           unredacted

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

5

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 11, 2016
 2                          3:37 p.m.
 3                          -o0o-
 4           (Call to Order of the Court.)
 5           (Open court out of the presence of the jury.)
 6           THE COURTROOM DEPUTY:  Calling Item 1, ED CV
 7  13-1670, Patricia Stewart, D.O. versus American Association of
 8  Physician Specialists, Inc., et al.
 9       Counsel, may I have your appearances, please.
10           MS. HILAIRE:  Mika Hilaire appearing on behalf of
11  the plaintiff Patricia Stewart.
12           MR. SCHNEIDER:  Eric Schneider for the defendants.
13           THE COURT:  All right.  The jury is still outside
14  the courtroom deliberating, but the Court has been advised that
15  the parties have reached a resolution of this matter.  And for
16  the benefit of some level of comfort to both sides, the terms
17  of the settlement are being placed on the record.
18       Where'd Mr. Schneider go?
19           MS. HILAIRE:  He's right here.
20           MR. SCHNEIDER:  He is finding the settlement.
21           MS. HILAIRE:  Do you want me to say it?  I know it
22  off the top of my head.
23           MR. SCHNEIDER:  I'd like to read along when you do.
24           MS. HILAIRE:  Okay.  Go ahead.
25       (Mr. Conwell entered the courtroom.)
```

```
 1              MR. CONWELL:  Hey, what are we doing?

 2              THE COURT:  You're keeping your mouth shut.

 3              MR. SCHNEIDER:  Okay.

 4              MS. HILAIRE:  Okay.  Go ahead.

 5              MR. SCHNEIDER:  Where's the judge?

 6              THE COURTROOM DEPUTY:  Right there.

 7              MR. SCHNEIDER:  Oh, okay.

 8              THE COURT:  I'm not taking it down.  She is.

 9              MR. SCHNEIDER:  I understand, but I feel more

10    comfortable if you're in the room.

11              THE COURT:  Okay.

12              MR. SCHNEIDER:  Okay.  The terms of the settlement

13    are as follows:

14         1.  One lump sum payment of $5,500,00 to be paid within

15    ten days of verdict;

16         2.  All parties to bear their own costs and fees;

17         3.  A letter of apology to be sent no later than ten days

18    after the verdict.  Letter must apologize for wrongfully filing

19    a lawsuit against Dr. Stewart, bringing unfounded discipline

20    against her, expelling her, and defaming her name and

21    reputation;

22         Dismissal of Dr. Okerblom from Florida litigation with

23    prejudice, each party to bear their own attorneys' fees and

24    costs; and

25         5.  The jury goes to verdict on all claims.
```

1       So I will represent that all three of my clients have

2   signed off.  I have given the signed document to Ms. Hilaire.

3   The plaintiff also signed off on that document, which I do not

4   yet have, but I'm assured I will get soon.

5              MS. HILAIRE:  Yes.

6              THE COURT:  All right.  So it's my understanding

7   that should the jury return as part of their verdict a finding

8   of malice, fraud, or oppression, then we will move into the

9   phase two part of the trial on punitive damages and that the

10  total judgment in this case will not be enforced; is that

11  correct?

12             MR. SCHNEIDER:  I don't see any reason for it to be

13  entered.

14             MR. CONWELL:  The only reason -- the only reason a

15  judgment would be entered is if they breach the agreement and

16  don't pay.  They're obligated to pay within ten days, so we

17  want a jury verdict.  In the event anything goes wrong, we can

18  move forward with the judgment.

19             THE COURT:  Understood.

20             MS. HILAIRE:  Yes.

21             THE COURT:  That your understanding, Mr. Schneider?

22             MR. SCHNEIDER:  Yes.

23             THE COURT:  All right.  Excellent.  Thank you.

24  Okay.  We're off.

25             (Brief pause in the proceedings.)

```
 1                  (Open court in the presence of the jury.)

 2                  THE COURT:  All right.  Ladies and gentlemen --

 3      well, go ahead.  Call the case.

 4                  THE COURTROOM DEPUTY:  Calling Item 1, ED CV

 5      13-1670, Patricia Stewart D.O. versus American Association of

 6      Physician Specialists, Inc., et al.

 7            Counsel, may I have your appearances, again.

 8                  MS. HILAIRE:  Mika Hilaire on behalf of Patricia

 9      Stewart.

10                  MR. CONWELL:  And Don Conwell on behalf of Patricia

11      Stewart.

12                  THE COURT:  Good afternoon.

13                  MR. SCHNEIDER:  Eric Schneider for the defendants.

14                  THE COURT:  Good afternoon.

15            Ladies and gentlemen, I understand that you have a

16      verdict; is that true?

17                  THE FOREPERSON:  That is true.

18                  THE COURT:  Who's the foreperson?  Mr. Kotler?

19                  THE FOREPERSON:  Yes.

20                  THE COURT:  Listen.  I apologize to you all for

21      keeping you waiting.  I'm sorry.

22            Mr. Kotler, if you will hand the verdict folder to

23      Ms. English.

24            Thank you.

25            All right.  Ms. English, would you publish the verdict,
```

1    please.

2            THE COURTROOM DEPUTY:  (Reading:)

3        "United States District Court, Central District of

4    California, Patricia Stewart D.O. versus American Association

5    of Physician Specialists, Inc., et al., case No. ED CV

6    13-01670.

7        Jury Verdict:

8        Breach of Contract:

9        1.  Did Stewart do all, or substantially all, of the

10   significant things that the contract required her to do or was

11   she excused from having to do so?

12       Yes.

13       2.  Did AAPS fail to do something that the contract

14   required it to do?

15       Yes.

16       3.  Was Stewart harmed by that failure?

17       Yes.

18       What are Stewart's damages?

19       Past economic loss:  $1,081,927.

20       Future economic loss:  $5,819,808.

21       TOTAL:  6,901,735.

22       Fraudulent Promise:

23       1.  Did AAPS make a false promise to Stewart that AAPS

24   would provide her an appeal before a panel of past presidents?

25       Yes.

1      2.  Did AAPS know that the promise was false at the time

2  that it was made or did it make the representation recklessly

3  and without regard for its truth at the time that it was made?

4      Yes.

5      3.  Did AAPS intend that Stewart rely on the promise?

6      Yes.

7      4.  Did Stewart reasonably rely on the promise?

8      Yes.

9      5.  Was Stewart's reliance on AAPS's promise a substantial

10  factor in causing harm to Stewart?

11      Yes.

12      What are Stewart's damages?

13      Past economic loss, lost earnings:  191,791.

14      Other past economic loss:  $890,136.

15      Total Past Economic Damages:  $1,081,927.

16      Future economic loss, lost earnings:  $2,254,670.

17      Other future economic loss:  $3,565,138.

18      Total future economic damages:  5,819,808.

19      Past noneconomic loss, including mental suffering:

20      1,500,000.

21      Future noneconomic loss, including mental suffering:

22      1,000,000.

23      TOTAL:  $9,401,735.

24      Unruh Discrimination:

25      1.  Did AAPS deny full and equal privileges to Patricia

1   Stewart?

2       Yes.

3       2.  Was Patty Stewart's sex a substantial motivating

4   reason for AAPS's conduct?

5       No.

6       No. 3:  Was AAPS's conduct a substantial factor in causing

7   harm to Patricia Stewart?

8       Yes.

9       What are Patty Stewart's damages?

10      Past economic loss, lost earnings/lost profits:  $191,791.

11      Other past economic loss:  $890,136.

12      Total Past Economic Damages:  $1,081,927.

13      Future economic loss, lost earnings/lost profits:

14      $2,254,670.

15      Other future economic loss:  3,565,138.

16      Total Future Economic Damages:  $5,819,808.

17      Past noneconomic loss, including physical pain/mental

18      suffering:  1,000,000.

19      Future noneconomic loss, including physical pain/mental

20      suffering:  1,500,000.

21      TOTAL:  9,401,735.

22      Defamation AAPS:

23      1.  Did AAPS make the statements set forth in the

24   March 28, 2012, e-mail to all members of AAPS and the

25   statements made and shown during the PowerPoint presentation at

1    the AAPS annual meeting in Marina Del Rey, to persons other

2    than the Stewart?

3         Yes.

4         No. 2:  Did the people to whom the statements were made

5    reasonably understand that the statements were about Stewart?

6         Yes.

7         3.  Did these people reasonably understand the statement

8    to mean that Stewart had committed the acts stated?

9         Yes.

10        Were the statements false?

11        Yes.

12        No. 5:  Did Stewart prove by clear and convincing evidence

13   that AAPS knew the statements were false or had serious doubts

14   about the truth of the statement?

15        Yes.

16        ACTUAL DAMAGES:

17        No. 6:  Was AAPS's conduct a substantial factor in causing

18   Stewart actual harm?

19        Yes.

20        No. 7:  What are Stewart's actual damages for:

21        a.  Harm to Stewart reputation:  2,000,000.

22        b.  Shame, mortification, or hurt feelings:  1,000,000.

23        ASSUMED DAMAGES:

24        No. 8:  What are the damages you award Stewart for the

25   assumed harm to her reputation and for shame, mortification, or

1  hurt feelings?  You must award at least a nominal sum:

2      3,000,000.

3      Defamation Cerrato:

4      1.  Did Cerrato make the statements set forth in the

5  March 28, 2012, e-mail to all members of AAPS and the

6  statements made and shown during the PowerPoint presentation at

7  the AAPS annual meeting in Marina Del Rey, California, to

8  persons other than Stewart?

9      Yes.

10      2.  Did the people to whom the statements were made

11  reasonably understand that the statements were about Stewart?

12      Yes.

13      3.  Did these people reasonably understand the statement

14  to mean that Stewart had committed the acts stated?

15      Yes.

16      4.  Were the statements false?

17      Yes.

18      5.  Did Stewart prove by clear and convincing evidence

19  that Cerrato knew the statements were false or had serious

20  doubts about the truth of the statement?

21      Yes.

22      ACTUAL DAMAGES:

23      6.  Was Cerrato's conduct a substantial factor in causing

24  Stewart actual harm?

25      Yes.

1    7.  What are Stewart's actual damages for:

2    a.  Harm to Stewart's reputation?  3,000,000.

3    b. Shame, mortification, or hurt feelings?  1,000,000.

4    ASSUMED DAMAGES:

5    8.  What are the damages you award Stewart for the assumed

6    harm to her reputation, and for shame, mortification, or hurt

7    feelings?  You must award at least a nominal sum.

8    4,000,000.

9    Intentional Infliction of Emotional Distress – Cerrato:

10   1.  Was Cerrato's conduct outrageous?

11   Yes.

12   2.  Did Cerrato intend to cause Stewart emotional

13   distress?  Or,

14   Did Cerrato act with reckless disregard of the probability

15   that Stewart would suffer emotional distress, knowing that

16   Stewart was present when the conduct occurred?

17   Yes.

18   3.  Did Stewart suffer severe emotional distress?

19   Yes.

20   4.  Was Cerrato's conduct a substantial factor in causing

21   Stewart severe emotional distress?

22   Yes.

23   5.  What are Stewart's damages?

24   a. Past economic loss/lost earnings:  191,791.

25   Lost profits:  None.

1     Medical expenses:  None.

2     Other past economic loss:  890,136.

3     Total Past Economic Damages:  1,081,927.

4     Future economic loss, lost earnings:  $2,254,670.

5     Lost profits:  None.

6     Excuse me.

7     Other future economic loss:  3,565,138.

8     Total Future Economic Damages:  5,819,808.

9     c.  Past noneconomic loss, including physical pain/mental

10    suffering:  2,000,000.

11    d. Future noneconomic loss, including physical

12    pain/mental suffering:  1,600,000.

13    TOTAL:  10,501, 735.

14    Intentional Infliction of Emotional Distress – AAPS:

15    1.  Was AAPS's conduct outrageous?

16    Yes.

17    2.  Did AAPS intend to cause Stewart emotional distress?

18    Or,

19    Did AAPS act with reckless disregard of the probability

20 that Stewart would suffer emotional distress knowing that

21 Stewart was present when the conduct occurred?

22    Yes.

23    3.  Did Stewart suffer severe emotional distress?

24    Yes.

25    4.  Was AAPS's conduct a substantial factor in causing

1    Stewart's severe emotional distress?

2         Yes.

3         5.  What are Stewart's damages?

4         a. Past economic loss/lost earnings:  191,791.

5         Lost profits:  Zero.

6         Medical expenses:  Zero.

7         Other past economic loss:  890,136.

8         Total Past Economic Damages:  1,081,927.

9         Future economic loss/lost earnings:  2,254,670.

10        Lost profits:  Zero.

11        Other future economic loss:  3,565,138.

12        Total Future Economic Damages:  5,819,808.

13        c.  Past economic loss, including physical pain/mental

14        suffering:  1,000,000.

15        d. Future noneconomic loss, including physical pain/

16        mental suffering:  1,500,000.

17        TOTAL:  9,401, 735.

18        Special Verdict – Common Law Right to Fair Procedure:

19        1.  Did AAPS violate Stewart's Common Law Right to Fair

20   Procedure by means of the manner in which they terminated her

21   membership in AAPS?

22        Yes.

23        2.  Was Stewart harmed by that failure?

24        Yes.

25        3.  What are Stewart's damages?

1          a. Past economic loss:  1,081,927.

2          b.  Future economic loss:  5,819,808.

3          TOTAL:  $6,901,735.

4          Punitive Damages:

5          No. 1:  Did Cerrato engage in the conduct with malice,

6     oppression, or fraud?

7          Yes.

8          2.  Did AAPS engage in the conduct with malice,

9     oppression, or fraud?

10         Yes."

11         Signed by the Presiding Juror, dated February 11, 2016.

12              THE COURT:  Mr. Running, is that your verdict, sir?

13              THE JUROR NO. 2:  I'm sorry?

14              THE COURT:  Is that your verdict?

15              THE JUROR NO. 2:  Yes.

16              THE COURT:  Ms. Johns, is that your verdict, ma'am?

17              THE JUROR NO. 3:  Yes.

18              THE COURT:  Ms. Ramos, is that your verdict?

19              THE JUROR NO. 5:  Yes.

20              THE COURT:  Ms. Vargas, is that your verdict?

21              THE JUROR NO. 9:  Yes.

22              THE COURT:  Mr. Kotler, is that your verdict, sir?

23              THE JUROR NO. 12:  Yes.

24              THE COURT:  And Mr. Destefano, is that your verdict?

25              THE JUROR NO. 14:  Yes.

1          THE COURT:  All right.  Because you have all

2   indicated that the plaintiff is entitled to punitive damages,

3   that then will necessitate a very brief presentation of

4   basically the financial worth of the defendants, the

5   Association, and Mr. Cerrato.

6       I have been informed by the attorneys that they can make

7   this presentation in about 15 minutes.

8       You all have been here since 8 this morning.  I will leave

9   it up to you.

10          THE JURORS:  We're in.

11          THE COURT:  You're in.  Okay.  Let's get started.

12          MR. CONWELL:  Your Honor, I don't have any

13   witnesses, just exhibits.

14          THE COURT:  Understood.

15          MR. CONWELL:  And I perhaps can do this by

16   stipulation now with defense counsel.

17       1767 was previously admitted with redactions of financial

18   information, and that's the 2013 tax return which is the most

19   recent return we have for AAPS.  And so we would offer 2013

20   without the redactions.

21          (Exhibit 1767 previously marked for identification.)

22          THE COURT:  Any objection?

23          MR. SCHNEIDER:  Yes, we object.  It's -- it is not

24   indicative of the defendant's financial condition what their

25   taxes were in 2013.  It's irrelevant.

1          MR. CONWELL:  And also, your Honor, there's already

2   been testimony from Mr. Carbone and from Bob Cerrato that it's

3   just gotten better since then; that the finances are even

4   better, the membership has grown.  So it seems to me he's

5   objecting to his own harm.  If necessary, we can subpoena the

6   current records.

7          THE COURT:  No.  The objection's overruled.  The

8   point's well taken.  He did indicate that the organization has

9   continued to grow and prosper; therefore, I would imagine the

10  returns for 2013 would probably understate their current net

11  worth, so I'll permit it.

12         MR. SCHNEIDER:  Excuse me, your Honor.  The returns

13  don't state the net worth at all.  They're income tax returns.

14         MR. CONWELL:  They actually do.

15         THE COURT:  They'll be permitted.

16         (Exhibit 1767 received into evidence.)

17         MR. CONWELL:  Thank you.

18     And the other evidence we have is already in evidence and

19  that's 1599.  So I'm ready to go directly to closing.

20         THE COURT:  Go.

21         MR. SCHNEIDER:  We have no evidence to present.

22         THE COURT:  Okay.  And you have no burden there.  I

23  understand.

24         MR. CONWELL:  May I proceed, your Honor?

25         THE COURT:  Yes, please.

1          MR. CONWELL:  First, I want to say thank you for

2    your verdict.

3          So I told you those verdict forms are not easy to fill

4    out.

5          THE JURORS:  Took us all day.

6          MR. CONWELL:  Now you have a story to tell.  They're

7    not easy to fill out.  But you, obviously, gave it a lot of

8    thought.  And so we -- I just want to say thank you on behalf

9    of Dr. Stewart.

10         So what you have done, what we've all tried to do, is to

11   make Dr. Stewart whole to the extent money can do that.  But

12   her life is not going to be the same after what she's endured

13   for the last four years.  There are injuries emotional and

14   otherwise that really probably can't be repaired with a

15   monetary award, and she'll just have to work that out during

16   the remainder of her life.  I'm sure she will.

17         But she never should have been put into this place to

18   start with.  This was something forced upon her by the men in

19   power over her at AAPS who decided her fate and never even gave

20   her a voice in the matter.  What they did was wrong, and as

21   you've indicated, it's certainly worthy of punishment.

22         One of the factors for you to consider is the defendants'

23   reprehensible conduct.  And expelling Dr. Stewart with

24   absolutely no evidence at all, to do so I think is cruel and

25   reprehensible.  They knew that what they were doing was going

1    to ruin her career, and you really had to be heartless to do

2    that, and that is something that should be punished.

3         They could have come up with other forms of discipline.

4    In fact, in their history they've never come up with this

5    discipline.  And instead, they decided to expel her.  There's

6    no explanation for that other than malice, other than an intent

7    to hurt someone.

8         They brought a baseless lawsuit against her in March of

9    2012.  As they have now admitted, they had absolutely no facts

10   to support that, and a lawsuit that made very, very serious

11   allegations against her.

12        And then after doing that, they sent an e-mail to the

13   entire membership on March 28th and said that this rogue

14   physician was sued and that we invite you, all 3,000-plus

15   members of the AAPS, to go to a public Web site and look at

16   what we have charged her with, you know, things that are

17   essentially crimes laid out there against her.  I think that's

18   heartless and that's something that needs to be punished.

19        They then used that lawsuit and the disciplinary

20   proceedings in tandem to try to trap her.  She had no -- she

21   had no contacts with Florida, and under the law they can't sue

22   you in a place where you have no contacts.  That's

23   unconstitutional.  And as you've heard, she asserted her

24   defense of lack of jurisdiction, but -- and they knew she was

25   right, I think.

1       But they tried to trap her into coming and made that

2   disciplinary hearing so that it could only be in person and

3   only in Florida with absolutely no reason to do so.

4           THE COURT:  Permit me to interrupt you, but the

5   jury's been up an awfully long time.  You're arguing for

6   punitive damages.  They agree with you.  They indicate that

7   punitive damages are warranted.  They need some guidance on the

8   amount.

9           MR. CONWELL:  Yes, your Honor.

10      Under the case law there are three factors:  One is the

11  nature of the conduct; then one is the defendant's ability to

12  pay; and the third is the harm caused to the plaintiff.

13      So I can take a hint.  I'm going to go on to the other

14  factors.

15      But in terms of what they've done to her, which is one of

16  the three factors that you would look at, I think, without

17  going through this evidence again, it's clearly just cruel and

18  reprehensible conduct.  In terms of the harm this caused to

19  her, I think you've stated that by your verdict.

20      The other issue is it's called the defendant's ability to

21  pay.  So now there's two documents in evidence and some

22  testimony in evidence that guide you in what is this

23  defendant's ability to pay.  And one of them is the tax return

24  from 2013.  And so we can look at that quickly because this is

25  part of the equation.

1        So what the tax return shows is a net assets -- or net

2   worth for nonprofit -- excuse me -- net assets for nonprofit on

3   line 22 of 2,682,000.  Now that was back in 2013.  The

4   testimony has been that they have only grown since then and

5   they've increased their membership.

6        So the other document I want to look at is 1599.  And this

7   is the most important of the two because 1599 is the special

8   litigation assessment fee letter that was sent out in 2013.

9   And what they did was they sent this to all 3,000-plus members

10  at that time and they told them on page 2 of this that if you

11  don't pay the special litigation assessment fee of $895, then

12  your board certification would be in jeopardy, that this was

13  part of the requirement of being a member and being board

14  certified was to support the AAPS when the AAPS needed that

15  support.

16       And so in less than a month, they were able to build

17  through that single letter a war chest of over $2 million,

18  which they used to pay the New York attorneys for pursuing the

19  litigation against Dr. Stewart and the other doctors that you

20  heard about.

21       So that is the real source of their ability to pay.  I

22  don't know how many doctors they have now.  All I know is from

23  what they told us that there's a lot more than the 3,000 that

24  they had in 2012.

25       So when they want money to sue her, they go to those

1    doctors.  Well, now when it comes time to pay a punitive damage

2    award, they can go to those doctors.  And these doctors I don't

3    think are innocent in this matter.  And the reason I say that

4    is because they're the ones who elected their leadership.

5    They're the ones who, when all this was happening, did not do

6    anything to step in for Dr. Stewart or anyone else.  Their

7    income has been unaffected by all this.  They're going on

8    making pretty nice incomes, I believe.

9        They're well able to pay money to the AAPS and it's about

10   time that they did something.  It's about time they stepped up

11   to the plate instead of keeping just this matter of really

12   corruption in their leadership under the rug.  They really have

13   got to come up now and come up with some money for this.  And

14   it's, we've seen, very easy for them to send out a special

15   assessment to people who are members of this organization, and

16   they certainly will pay it because, as we've seen, if they

17   don't, then the AAPS will say that you're not meeting the

18   requirements of the bylaws by paying the money that's required

19   to support the organization.  So they've got 3,000-plus members

20   now that they can go to with a special assessment.  So they've

21   got the ability to pay a large -- a large amount of money.

22       What will it take to punish them?  What will it take to

23   deter future conduct like this?  And what will it take to make

24   a difference for the doctors out there who have just decided to

25   be quiet and in the background and not to get involved?

1    You know, this is another category that I can't give you a
2 number, really.  I can only, you know, make some suggestions.
3 These -- these doctors could easily pay $10,000 a doctor.  When
4 they go to these conferences, when they go to these annual
5 meetings, I'm sure they're paying 2,000, maybe $2500 for the
6 weekend.  These meetings are at the Ritz Carltons, they're very
7 upscale events, so it's not a lot for them to pay money for
8 AAPS activities.  In addition to that, they've got other fees
9 that they pay to the AAPS.  $10,000 is not a lot of money for
10 each of those doctors to pay.
11    That might be what it takes to make these members finally
12 do something and clean up their organization, 'cause this has
13 got to stop.  It's got to stop.  And there's really not another
14 way to do it.  There's not another place to go to do something
15 about this.  So long as the members tolerate it, it goes on.
16 Something's got to happen to make the members not tolerate it.
17    Punitive damages punish and they deter.  Here's the way it
18 works.  Imagine someone goes into another person's house and
19 they steal something very valuable from them.  And later
20 they're caught and they have to return what they stole.  But
21 they're not punished, there's no consequence to them; they just
22 give back what they took.  They're no worse off than they were
23 before.
24    Then they go and they do it again -- somebody else's house
25 this time.  They steal something very valuable and then they're

1    caught and they're not punished.  This goes on.

2          Now, imagine that they -- this person goes into someone's

3    house, steals something very valuable, they're caught, they

4    return what they took, which is essentially what you've done so

5    far.  Let's make them pay for the damage they caused, but

6    they're no worse off.

7          Now, that person is punished, faces trial, is found

8    guilty, goes to prison.  The likelihood of that occurring again

9    is, I think, a lot less.  That's how it deters.  There's got to

10   be some punishment to deter.  And so now that's where you step

11   in.  What will it take to deter them?  What will it take to get

12   the other -- I don't know how much -- 3,000-plus, maybe 4,000

13   doctors now to do something to clean up their organization?

14   They need someone to tell them that.  And that someone is you.

15   'Cause what's happened here cannot be tolerated any longer.

16   Someone has got to put a stop to it.

17          And so that's what we're asking you to do is to punish

18   them and to do something to deter them.

19          If -- if you assume the number 3,000 doctors and they pay

20   10,000 a doctor, that would be $30 million.  That doesn't even

21   affect the $2.6 million in net worth that they have.  That's

22   just a special assessment.

23          I don't know if $10,000 is the number.  I mean, I think

24   some doctors won't even notice that.  Some doctors will.  Maybe

25   the amount is less than that.  That's what you have to decide:

1    What will it take to deter and to punish them?

2        We've seen they can raise that kind of money literally

3    overnight.  They can have it within the next 30 days.

4        So I hope that you speak on this and you express your

5    feelings about what's happened, and that you speak with a loud

6    voice, not a soft voice.  And speak in a way that lets them

7    know that you're not going to tolerate this, that the community

8    is not going to tolerate this sort of conduct, and that when

9    someone is cruel like this to one of their own, they're going

10   to have to pay a penalty for that.

11       Let your voice be heard in the amount of your award.  And

12   make the award substantial enough that it'll wake these people

13   up and motivate them to do the right thing.  Thank you.

14           THE COURT:  Okay.  Thank you, Mr. Conwell.

15       All right.  Mr. Schneider.

16           MR. SCHNEIDER:  Good afternoon, ladies and

17   gentlemen.  Notwithstanding the result of the initial phase of

18   this trial, we continue to thank you for your service.  You,

19   obviously, spent a lot of time.  You brought some questions to

20   make sure that you understood what it was that you were doing.

21   And you have spoken and we understand.

22       I told you yesterday that the AAPS leadership acted in a

23   wrong-headed way, although they were trying to achieve the

24   correct purpose.  I've listened to what the verdict is to date,

25   and it would appear that you did not agree with me.

1    To some extent, AAPS has already recognized its errors in

2  conducting the meeting, whether it was valid or not.  Part of

3  it, to be sure, was to protect itself.  I'm not going to deny

4  that.  Part of it was also to protect Dr. Stewart, to allow her

5  to return to business as usual and to get back the insurance

6  companies that she had.  And to the extent that the resolution

7  that was reached on Sunday is not valid, they're going to do it

8  right.  They do want to do the right thing for Dr. Stewart.

9  They do recognize the error.

10    But the error was not to hurt her.  And I think the best

11  evidence of that is that they worked hard to make sure that she

12  would not lose her certification.  And they believed -- you

13  heard evidence of it -- that the big ticket item is

14  certification.  They really did not recognize the harm that

15  would befall Dr. Stewart merely from being ousted from the

16  organization.  And I hope you keep that in mind.

17    Mr. Conwell accurately set forth the factors that you

18  should consider, the reprehensibleness, if that's a word.  I

19  don't quite share his view that it was as reprehensible as he

20  makes it to be, but I am cognizant that you did find that my

21  client acted with fraud, malice, or oppression, and hence,

22  we're talking about punitive damages now.

23    Now, please bear in mind that the defendant that engaged

24  in this behavior was AAPS, and, yes, corporations are inanimate

25  objects.  You can't even see them and they have to act through

1    people.  But they didn't act through 3,000 doctors.  They acted

2    through leadership.  And it's AAPS that should be punished, not

3    the 10,000 -- or 3,000 members of it.

4        You've heard evidence that very few of them were active.

5    This is a volunteer organization, and most of the people are

6    there simply to preserve their certifications.  And the fact

7    that doctors who are not defendants in this case should each

8    pony up $10,000 simply does not make sense and it's not

9    necessary to punish them.

10       And when we look at the electorate, the electorate

11   actually included Dr. Stewart.  She was part of the group of

12   people who was voting for leaders.  She voted for

13   representatives of her Dermatological Academy just like the

14   other doctors did, and it simply doesn't make sense to be

15   leaning on the doctors simply because they -- the AAPS can do

16   that, that AAPS has a hold over them by virtue of the

17   certification.  That's -- that's not the way to punish people

18   by getting innocent people to have to contribute.

19       Certainly your verdict to date has sent a message that's

20   been received.  I do agree with Mr. Conwell that punishment is

21   in order -- well, for one thing, I have to.  You've already

22   decided that.  But, you know, when someone steals something,

23   merely asking him to give it back is really not punishment.  I

24   do understand that, and I'm not going to tell you otherwise.

25       But the idea of $30 million?  And you know, this money is

1   exclusively to punish and deter.  You've already issued an

2   award that's designed to make Dr. Stewart whole.  And she may

3   not be whole emotionally, but we have a system where the only

4   thing that you can provide is dollars.  And I'm not going to

5   pretend that dollars necessarily represent a cure to whatever

6   distress Dr. Stewart has suffered, but with that verdict, she

7   has been made whole.  So that's not what we're talking about

8   here.

9        What we're talking about here is what is necessary to

10  deter.  And I really, you know, talked yesterday about reserve

11  second basemen making $3 million.  You all know what you make.

12  I know what I make.  And we're not -- well, I can't speak for

13  all of you -- I assume you're not making the $3 million the

14  second basemen are.  But let's keep track of what real dollars

15  are, and $1 million is certainly enough to send a message and a

16  deterrent.

17       Now, you also rendered a punitive damages decision as to

18  Dr. Cerrato.  And there's no evidence whatsoever of

19  Dr. Cerrato's net worth.  There's no evidence of his income.

20  And you're not permitted to simply assume that he must be

21  making money because he's a doctor.  So you cannot award

22  punitive damages against Dr. Cerrato.

23       Again, I ask you to use your best judgment, and again I

24  thank you for your attentiveness.

25            THE COURT:  All right.  Thank you, counsel.

1        One short instruction, ladies and gentlemen.

2        If you find that punitive damages are appropriate, you

3    must use reason in setting the amount.  Punitive damages, if

4    any, should be in an amount sufficient to fulfill their

5    purposes, but should not reflect bias, prejudice, or sympathy

6    toward any party.

7        In considering the amount of any punitive damages,

8    consider the degree of reprehensibility of the defendants'

9    conduct, including whether the conduct that harmed the

10   plaintiff was particularly reprehensible because it also caused

11   actual harm.

12       In addition, you may consider the relationship of any

13   award of punitive damages to any actual harm inflicted on the

14   plaintiff.

15       All right.  Ladies and gentlemen, once again, a special

16   verdict form has been provided to you.  In this particular

17   case, there will be two distinct forms because you have

18   indicated by your initial verdict in phase one of the trial

19   that punitive or exemplary damages are warranted against both

20   the organization and Dr. Cerrato.  Therefore, there are two

21   forms, one for each of those defendants.

22       All right.  You may now retire and deliberate on the issue

23   of punitive damages alone.  Thank you.

24            THE COURTROOM DEPUTY:  All rise.

25            (Jury retires to commence deliberations.)

```
 1              (Open court out of the presence of the jury.)

 2              MR. CONWELL:  Your Honor, I had a question.  I

 3    thought that on the verdict form at the very bottom there was a

 4    place for a total number where they were supposed to compute

 5    and I didn't hear that.

 6              THE COURT:  It's there.  It's on there.  It's a huge

 7    number.  It's $10 million or something.

 8              THE COURTROOM DEPUTY:  On which part?

 9              MR. CONWELL:  On the last page there should be a

10    place for a total.

11              THE COURTROOM DEPUTY:  Yeah.  I read it on each

12    page.

13              THE COURT:  No.  The very -- sugar, look at the very

14    last page, 10 million something.

15              THE COURTROOM DEPUTY:  I'm at the last page.

16              THE COURT:  No, no, no, not that one.  That's for

17    the punitives.

18              THE COURTROOM DEPUTY:  Which one you talking about?

19    I read the 10,000,000.  Yeah, 10.5.

20              (Discussion off the record.)

21              THE COURT:  I'm going to make -- well, I shouldn't

22    assume.  Back on the record.

23         Earlier before the jury returned its verdict, we had

24    placed on the record the fact that there had been a settlement

25    reached.  And Mr. Schneider had indicated that he had
```

1    signatures on behalf of the other defendants approving the term

2    of the settlement.  But we have not heard from the plaintiff.

3        Now, you were here when the settlement was read into the

4    record, correct?

5                 MS. STEWART:  Yes, sir.

6                 THE COURT:  $5 million settlement?  Do you approve

7    of the settlement?

8                 MS. STEWART:  5.5.

9                 THE COURT:  $5.5 million.  Do you approve of the

10   terms of the settlement as recited by Mr. Schneider?

11                MS. STEWART:  Yes, sir.

12                THE COURT:  Okay.  Excellent.  Anything else in

13   terms of --

14                MR. SCHNEIDER:  Your Honor, I don't think the jury

15   is permitted to award punitive damages against Dr. Cerrato with

16   no evidence of his net worth or his income.

17                THE COURT:  They can award a dollar.

18                MR. SCHNEIDER:  Not under California law.

19                THE COURT:  All right.  You can appeal it, if it's

20   worth it.

21                MR. SCHNEIDER:  Okay.

22                (Discussion off the record and brief pause.)

23                (Open court in the presence of the jury.)

24                THE COURT:  All right.  Mr. Kotler, I understand

25   you've finally reached a verdict --

1          THE FOREPERSON:  Yes, we have.

2          THE COURT:  -- on the punitive damages of the case?

3          THE FOREPERSON:  Yes, we have, sir.

4          THE COURT:  I'm sure you did hear the test will be

5   going on for half an hour?

6          THE FOREPERSON:  We didn't hear that.

7          THE COURT:  You didn't hear that?

8          THE FOREPERSON:  We saw the blinking light.

9          THE COURT:  Okay.  All right.  I'm glad you didn't

10  leave.

11      If you'll hand the verdict to Ms. English, please.

12      Would you please publish the verdict, please.

13          THE COURTROOM DEPUTY:  (Reading:)

14      "Punitive Damages:

15      1.  Did AAPS engage in the conduct with malice,

16  oppression, or fraud?

17      Yes.

18      2.  What amount of punitive damages, if any, do you award

19  Stewart?

20      14,000,000."

21      Signed by the Presiding Juror Foreperson, dated

22  February 11, 2016.

23      "Punitive Damages:

24      1.  Did Cerrato engage in conduct with malice, oppression,

25  or fraud?

1       Yes.

2       2.  What amount of punitive damages, if any, do you award

3  Stewart?

4       6 million."

5       Signed by the Jury Foreperson, dated February 11, 2016.

6            THE COURT:  All right.  Is this your verdict,

7  Ms. Vargas?

8            THE JUROR NO. 9:  Yes.

9            THE COURT:  Mr. Kotler?

10            THE JUROR NO. 12:  Yes, sir.

11            THE COURT:  Mr. Destefano?

12            THE JUROR NO. 14:  Yes.

13            THE COURT:  Ms. Ramos?

14            THE JUROR NO. 5:  Yes.

15            THE COURT:  Ms. Johns?

16            THE JUROR NO. 3:  Yes.

17            THE COURT:  Ms. Johns, yes?

18            THE JUROR NO. 3:  Yes.

19            THE COURT:  All right.  And Mr. Running?

20            THE JUROR NO. 2:  Yes, sir.

21            THE COURT:  All right.  Ladies and gentlemen, thank

22  you so much.  You guys have been above and beyond and more than

23  we ever could have hoped for.  But I have a small favor to ask

24  of you:  30 seconds.  I want to speak to you.  So if you'll go

25  back into the jury deliberation room, I've got precisely

```
1    one-half of one thing I need to deal with the lawyers on and

2    then I want to come talk to you.  Would you do that?

3          All right.  Thank you.

4                THE COURTROOM DEPUTY:  All rise.

5                (Open court out of the presence of the jury.)

6                THE COURT:  All right.  Earlier, Mr. Schneider

7    raised an issue with respect to any award of punitive damages

8    against Cerrato.  I did a little brief research and your point

9    is well taken.  Any award of punitive damages in the absence of

10   any evidence whatsoever of that gentleman's worth is based upon

11   pure speculation.

12         If you make a motion to strike that award -- well, do you?

13               MR. SCHNEIDER:  I move to strike that award.

14               THE COURT:  It's stricken.

15         I'm going to -- is there anything else that we need to

16   take care of on the record?

17               MR. CONWELL:  Just one thing.  Just one thing, your

18   Honor.  What we'd said before on the total amount of the --

19               THE COURT:  Good-bye.

20               MR. CONWELL:  -- compensatory award?

21               THE COURT:  Okay.

22               (Proceedings concluded at 7:03 p.m.)

23

24

25
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5     I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6     FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7     OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8     TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9     CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10    HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11    FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12    CONFERENCE OF THE UNITED STATES.

13

14         DATED THIS 11TH DAY OF FEBRUARY, 2016._____

15

16

17         /S/ DEBRA READ
      _____    _____
18    DEBRA READ, CSR NO. 3949 CRR RMR RDR
      FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**